**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>         Plaintiff,<br><br>    —*against*—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN";<br><br>THEIA AVIATION, LLC; and<br><br>THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>         Defendants. | 21 Civ. 6995 |

**PLAINTIFF FCS ADVISORS, LLC'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR**
**APPOINTMENT OF A TEMPORARY RECEIVER**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

    The SNPSA ...................................................................................................................... 3

    Theia's History of Broken Promises and The Third Amendment ..................................... 5

    Theia's Defaults on Its Promises ..................................................................................... 7

    Theia's Highly Suspicious Incorporation of New Corporate Entities ............................. 10

    Time Is of the Essence ................................................................................................... 10

    FCS's Complaint............................................................................................................ 11

ARGUMENT .......................................................................................................................12

    I.     The Court Should Appoint a Temporary Receiver ............................................... 12

          A.    Standard for Appointing a Receiver ........................................................... 12

          B.    Theia Expressly Agreed That a Receiver Would Be Appropriate In These Circumstances ........................................................................................... 13

          C.    Theia's Multiple Defaults Justify Appointment of a Receiver ................. 14

          D.    Theia's Actions Imminently Threaten the Value of FCS's Collateral...... 15

          E.    A Balancing of the Equities Favors Appointing a Receiver .................... 16

    II.    The Court Should Order Expedited Discovery.................................................... 17

CONCLUSION....................................................................................................................18

# TABLE OF AUTHORITIES

**Title**                                                                                          **Page(s)**

**CASES**

*CFTC v. Atwood & James, Ltd.*,
    No. 09 CV 6032, 2009 WL 666970 (W.D.N.Y. Jan. 23, 2009) ...................................... 18

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
    839 F.2d 93 (2d Cir. 1988)............................................................................. 12, 13, 15, 16

*Computerland Corp. v. Batac, Inc.*,
    No. 88 CIV. 862, 1988 WL 140816 (S.D.N.Y. Dec. 16, 1988) ...................................... 18

*D.B. Zwirn Special Opportunities Fund v. Tama Broad., Inc.*,
    No. 0600692/2008, 2008 WL 2958270 (N.Y. Sup. Ct. July 21, 2008) ........................... 16

*Digital Sin, Inc. v. Does 1-176*,
    279 F.R.D. 239 (S.D.N.Y. 2012) .................................................................................... 17

*Fed. Home Loan Mortg. Corp. v. Green*,
    No. 89 CIV. 7717, 1990 WL 58900 (S.D.N.Y. April 27, 1990) ..................................... 13

*JP Morgan Chase Bank, N.A. v. Reijtenbagh*,
    615 F. Supp. 2d 278 (S.D.N.Y. 2009)............................................................................. 18

*Miss Jones LLC v. Stiles*,
    17 Civ. 1450, 2019 WL 3034906 (S.D.N.Y. July 10, 2019) ........................................... 13

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Property LLC*,
    866 F. Supp. 2d 247 (S.D.N.Y. 2012)................................................................. 13, 14, 16

*United States v. Ianniello*,
    824 F.2d 203 (2d Cir. 1987)............................................................................................ 12

*United States v. Trusty Capital, Inc.*,
    No. 06-CV-8170, 2007 WL 44015 (S.D.N.Y. Jan. 5, 2007) ........................................... 14

*Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*,
    550 F. Supp. 2d 481 (S.D.N.Y. 2008)...................................................................... passim

**OTHER AUTHORITIES**

2 Charles Alan Wright, et all., Federal Practice & Procedure (3d ed. 2014)............................... 13

Shai Y. Waisman & John W. Lucas, *The Role and Retention of the Chief Restructuring Officer*,
    AM. RESTRUCTURING & INSOLVENCY GUIDE (2008-09) ...................................................... 8

U.S. Dep't of Justice, U.S. Trustee Program and Practices Manual ............................................... 8

## INTRODUCTION

By this application, Plaintiff FCS Advisors, LLC ("FCS"), seeks the immediate appointment of a temporary receiver and expedited discovery in order to recover over $289 million of secured debt due from Defendants Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, "Theia").

FCS provided Theia with short-term financing to support Theia in developing, under a license granted by the Federal Communications Commission ("FCC") in May 2019, a series of satellites to image the Earth's surface. The license is conditioned on Theia launching 56 satellites by May 2025. As security for the loans, Theia pledged as collateral substantially all its assets, including the equity interests in the single-purpose entity holding the FCC license.

Theia has been unable or unwilling to find an investor or new lenders to take out FCS's debt—despite requesting and being granted an additional six months to do so. The situation has become dire. Theia has little to no revenues. Theia's own efforts to obtain a liquidity event have woefully failed to materialize, and, as explained below, the odds of such an event have dropped precipitously. The only real prospect for repayment of FCS's secured loan and Theia's other creditors is an orderly liquidation of Theia's assets by a Court-appointed fiduciary.

Notably, the agreements among the parties as well as the law supports the appointment of a receiver under such circumstances.

A receiver is especially appropriate because, even beyond Theia's failure to repay its debts, the company has breached numerous provisions of the loan agreements, making clear that it cannot be trusted to right the ship. Those breached promises include:

- Failing to provide FCS with basic financial reporting documents;

- Borrowing purportedly secured loans from a third party, in violation of prohibitions on indebtedness and liens;

- Refusing to provide a detailed "Liquidity Plan" and to appoint a "Selected Advisor" with expertise to help pursue liquidity options; and

- Refusing to appoint an independent Chief Restructuring Officer ("CRO") with authority to effectuate the Liquidity Plan.

These defaults are not just blatant breaches of Theia's contractual obligations. They indicate a pattern of incompetence (at best) or fraud (at worst) that jeopardizes the value of the FCC license and FCS's ability to be repaid.

The situation has become so grim that Theia has been unable to meet its payroll obligations for over a month. So far as we can tell, Theia has run out of money. Adding to FCS's concern is that Theia has, without alerting FCS, apparently incorporated at least three new business entities—seemingly so that it could try to keep assets outside of FCS's reach.

Theia's breaches and financial situation make clear that matters are heading in the wrong direction, making it important to appoint a receiver as soon as possible. And there is additional urgency, beyond the ordinary scenario of a foundering borrower, because the primary collateral, the FCC license, is conditioned on the satellite network being launched by the FCC's deadline of May 2025. Theia has wasted more than two of the six years the FCC had allotted for the process, and so transferring the license to a more capable entity must occur promptly, so that a new licensee can meet the deadline and realize that value that Theia has been squandering.

At bottom, there can be no doubt that FCS's collateral is in peril, and there is ample reason to believe that something even more sinister is afoot. It is exactly these circumstances that

warrant a court-appointed receiver, in addition to expedited discovery. Creditors need and deserve this protection, and applicable law provides it.

## FACTUAL BACKGROUND

**The SNPSA**

Theia is a company formed in 2015 by Erlend Olson and Joseph Fargnoli. (Declaration of Manuel Colon, dated August 18, 2021 ("Colon Decl.") ¶ 4.) To date, Theia's business has involved gathering images of Earth from aircraft, including gathering images pursuant to contracts with government agencies. (*Id.*)

In 2016, Theia sought to expand its operations by applying for a license from the FCC to create a network of satellites to image the entire surface of the Earth. (*Id.* ¶ 5.) In May 2019, the FCC granted the application and authorized Theia to build a network of 112 low-Earth orbit satellites. (Ex. 1.)[1] The FCC's authorization conditions the license upon Theia's successful launch of 56 of the satellites by May 2025. (*Id.* at 3548 (¶ 59(b)).) To date, over two years after the license grant, Theia has not built or launched any satellites. (Colon Decl. ¶ 7.) And Theia has no more money to push the effort forward; it is virtually without funds, having failed to meet its payroll on June 25, 2021, and every week since then. (*Id.* ¶ 43.)

FCS, an SEC-registered investment advisory firm, loaned funds to Theia via a series of promissory notes issued in October 2018. (*Id.* ¶¶ 1, 8.) Over time, FCS and Theia have amended their loan relationship, and the operative loan document today is a Secured Note Purchase and Security Agreement, dated June 29, 2020 ("SNPSA"). (*Id.* ¶ 9; Ex. 2.)

Under the SNPSA, FCS lent cash to Theia in exchange for a Series A-1 Secured Promissory Note in the amount of $100 million, set to mature on December 29, 2020, and a

---

[1] Citations in the form "Ex. [number]" refer to the exhibits to the accompanying declaration of Manuel Colon.

Series A-2 Secured Promissory Note in the amount of $100 million, set to mature on June 29, 2021 (together, the "Notes"). (Ex. 2, SNPSA § 1(a); Ex. 3; Ex. 4.) The parties entered the SNPSA to enable Theia to build its satellite network and, once it showed progress, attract replacement outside longer-term financing in order to retire the Notes before maturity. (Colon Decl. ¶ 10.)

Theia pledged as collateral substantially all its assets. (Ex. 2, SNPSA § 8(a).) The collateral includes Theia Group's ownership of Theia Holdings A, Inc. (the entity possessing the FCC license) and Theia Aviation LLC (the entity owning Theia's aircraft). (*Id.*; Colon Decl. ¶ 15.) The FCC license is by far Theia's most valuable asset and the only asset with a value approaching the amounts outstanding under the Notes. (*Id.* ¶ 16.)

The SNPSA enables FCS to monetize the FCC license to protect the security interest in the event Theia failed in its venture. Specifically, after a default and failure to cure, FCS is "empowered to request the appointment of a receiver from any court of competent jurisdiction," and the "receiver shall be instructed to seek from the FCC and every other applicable Governmental Authority an involuntary transfer of control of any such FCC License Assets for the purpose of seeking a bona fide purchaser to whom control would ultimately by transferred." (Ex. 2, SNPSA § 8(a).)

Under the SNPSA, Theia had obligations in addition to just repaying the Notes. Theia agreed to provide FCS with financial reporting to allow FCS to keep a watchful eye on Theia's progress. (Colon Decl. ¶ 13.) In particular, Theia agreed to provide to FCS:

- an unaudited consolidated balance sheet for each fiscal quarter within 45 days after the end of each fiscal quarter (Ex. 2, SNPSA § 6(e)(i));

4

- an unaudited consolidated balance sheet for each fiscal year no later than 90 days after the end of each fiscal year (*id.* § 6(e)(ii));

- an unaudited consolidated balance sheet for each calendar month no later than 15 days after the end of each calendar month (*id.*);

- a certificate from a corporate officer certifying, that as of the date of such financial statements, the representations and warranties were accurate and complete and that no Event of Default has occurred (*id.* § 6(e)(iii)); and

- a monthly budget identifying, among other things, expected expenses and cash expenditures and a comparison to the most recent monthly budget (*id.* § 6(e)(v)).

And Theia agreed, as is standard in similar financing agreements (Colon Decl. ¶ 14), not to incur or assume any debts or liens besides those incurred under the SNPSA without FCS's consent. (Ex. 2, SNPSA § 6(a).)

**Theia's History of Broken Promises and The Third Amendment**

In the months before and following the SNPSA, Theia repeatedly led FCS to believe that Theia would be obtaining significant revenue imminently, so as to retire FCS's debt. (Colon Decl. ¶ 18.) Yet in each case the promised transactions never materialized. (*Id.*)

For example, in September 2019, Theia told FCS that it expected $2 billion in revenue from a sovereign nation that would be contracting to use Theia's technology, and potentially a separate $2 billion investment from an individual. (*Id.* ¶ 19) In November 2019, Theia told FCS that it expected a $2 billion payment from one country within 30 days, and that it had expected to sign in the first quarter of 2021 a $5 billion commitment from another country. (*Id.*)

In March 2020, Theia told FCS that that it had "definitive" commitments for $18.5 billion in revenue, including from several sovereign nations. (*Id.* ¶ 20.) Theia also represented that there

was significant revenue from its aircraft business. (*Id.*) Theia claimed there was a 95%

probability it would receive billions in expected funds within 120 days. (*Id.*)

These representations sent the overall message that Theia was on the cusp of vast revenue

that would easily retire FCS's debt. FCS entered into the SNPSA based on those

representations—which proved to be false. (*Id.* ¶ 21.)

By late 2020, it became clear that Theia would not be able to pay off the Series A-1 Note

by its maturity date. (*Id.* ¶ 22.) At the time, Theia made yet further promises about imminent

revenue from soon-to-be-executed contracts. (*Id.* ¶ 23.) Based on those representations, FCS

reluctantly decided to give Theia one more chance to follow through on its promises. (*Id.*)

To that end, FCS and Theia executed the Third Amendment to the SNPSA on December

15, 2020 (the "Third Amendment"), and pushed the maturity date of the Series A-1 Note to June

29, 2021, to coincide with the maturity date of the Series A-2 Note. (Ex. 5, Third Amendment

§ 2(a)(i).) But there were strings attached. The Third Amendment provided FCS additional

protections to reinforce Theia's representations that Theia would achieve a liquidity event within

the six-month repayment timeframe. (*Id.* ¶ 25.) Specifically, Theia was required to:

- prepare by January 15, 2021, "a comprehensive financial proposal" that would
  "outline in detail" how Theia was to "improve [its] liquidity position" in order to
  enable repayment of the Notes and other payment obligations owing by [Theia] (the
  'Liquidity Plan')," in a "form and substance reasonably acceptable" to FCS (Ex. 5,
  Third Amendment § 3(b));

- engage a "Selected Advisor to advise it in developing the Liquidity Plan" and
  "provide financial advisory and support services to them as required to develop the
  Liquidity Plan" (*id.* §§ 3(c)(i)-(ii)); and

- "engage a chief restructuring officer ['CRO'] . . . whose appointment shall be subject to the reasonable consent of [FCS], with full authority to (i) take such actions in the name of, and otherwise on behalf of, the [Theia], as are required to comply with the other provisions of [the Third] Amendment, and (ii) implement the Liquidity Plan, or to otherwise raise capital for [Theia] in order to enable repayment of the Notes and the other payments" (*id.* § 3(f)).

**Theia's Defaults on Its Promises**

Despite these efforts towards a constructive way forward, after FCS granted the extension of the Note A-1 maturity date, Theia simply thumbed its nose at its commitments, and committed multiple Events of Default. (Ex. 2, SNPSA § 7.1 (defining Events of Default).)

Most importantly, Theia did not pay *any* of the balances due on the Notes on their maturity date of June 29, 2021. (Colon Decl. ¶ 31.) As of July 22, 2021, the aggregate amount of outstanding principal, interest, fees, and expenses due and payable under the Notes was $289,574,162.69. (*Id.*) Interest and fees have continued to accrue since then, and will continue to accrue going forward (*Id.*)

Theia's failure to pay was an outgrowth of multiple, other defaults with respect to provisions designed to place Theia on the path to accountability to its secured lender and repayment.

First, Theia failed to prepare a Liquidity Plan—the "comprehensive financial proposal" that would "outline in detail" how Theia was to repay the Notes—in a "form and substance reasonably acceptable" to FCS. (Ex. 5, Third Amendment § 3(b).) Theia failed to meet these obligations by the contractual deadline of January 15, 2021, and still has not met them today. (Colon Decl. ¶ 33.) Theia prepared only a slide deck with a series of vague goals. It was neither comprehensive nor detailed, as the Third Amendment requires. (*Id.*) In March and April 2021,

FCS warned Theia by letter that its vague slide deck was inadequate (Ex. 7, at 6; Ex. 8, at 1), but Theia wrote back stubbornly insisting that what it provided was enough. (Ex. 9, at 1.) ███████

███████████████████████████████████████████████████████████████ (*id.* at 2)—an assertion that has obviously proved to be false. Theia made no further efforts to draft a Liquidity Plan. (Colon Decl. ¶ 33.)

Second, Theia failed to appoint a CRO by December 23, 2020, and still has not appointed a CRO. (*Id.* ¶ 34.) ███████████████████████████████████████

███████████████████████████████████████████████ (Ex. 9, at 1.) Mr. Buscher could not possibly have served as CRO because that position—as is uniformly understood in the financial restructuring community—requires impartiality and objectivity.[2]

Third, Theia failed to engage a Selected Advisor by January 31, 2021, and still has not engaged a Selected Advisor. (Colon Decl. ¶ 35.) Theia repeatedly held out the prospect of Barclays raising funds via a special purpose acquisition company, or "SPAC," but FCS later found out that those efforts went nowhere. (*Id.*)

Fourth, Theia is months behind on its financial reporting obligations under the SNPSA. (*Id.* ¶ 36.) Specifically, Theia has not provided FCS with certified, audited financial records for

---

[2] The Department of Justice U.S. Trustee Program, which oversees bankruptcies nationwide, will generally only approve CROs that wear only "one hat" and are not otherwise affiliated with the debtor. *See* U.S. Dep't of Justice, U.S. Trustee Program and Practices Manual § 3-7.1.1, available at https://www.justice.gov/ust/file/volume_3_chapter_11_case_administration.pdf/download. And industry experts agree that a CRO should be an outsider because the CRO must impart the "need for dynamic change and improvement *with respect to the management of the company.*" Shai Y. Waisman & John W. Lucas, *The Role and Retention of the Chief Restructuring Officer*, Am. Restructuring & Insolvency Guide (2008-09) at 200 (emphasis added). A CRO focuses on the "company's financial, organizational, and operational needs *without the emotional ties of management* that can often cloud decision-making for a distressed company." *Role of the Chief Restructuring Officer in Bankruptcy: Overview*, Practical Law Practice Note Overview w-001-1449 (emphasis added).

the fiscal year 2020; balance sheets for Quarter 4 of 2020, November 2020, or January 2021; or monthly budgets for 2021. (*Id*.)

Fifth, Theia has failed to pay the administrative fee due under the SNPSA every month beginning with January 1, 2021. (*Id*. ¶ 37.)

Finally, and perhaps most disturbing, Theia defaulted under the SNPSA by furtively entering into a Secured Note Purchase Agreement with Aithre Capital Partners LLC ("Aithre"). (*Id*. ¶ 38.) As noted, the SNPSA unambiguously requires Brevet's prior written consent before it can obtain such financing. (Ex. 2, SNPSA § 6(a).) Yet Theia secretly negotiated with Aithre to obtain this additional loan, intentionally violating a clear loan covenant. (Colon Decl. ¶ 38.)

FCS made every effort to resolve Theia's defaults without recourse to litigation. In addition to numerous emails and informal discussions, FCS sent Theia multiple letters, urging Theia to take steps to address its defaults (Ex. 6; Ex. 7; Ex. 8), including a proposed forbearance agreement that offered Theia a chance to correct its defaults and proceed toward eventual repayment. (*Id*.) Theia ignored the proposal. (Colon Decl. ¶ 39.)

FCS provided Theia with notices of the defaults (Ex. 10; Ex. 11), and, since then, Theia has not disputed that it is in default, nor cured any of the defaults. (Colon Decl. ¶ 42.)[3] Accordingly, the "Repayment Amount" (defined as all principal, interest, fees or other unpaid amounts) is immediately due, and FCS is "entitled to enforce its right to payment and to exercise all right and remedies" under the loan documents. (Ex. 2, SNPSA § 7.2.)

---

[3] The SNPSA initially provided a cure period of 30 days following a Notice declaring an Event of Default. (Ex. 2, SNPSA § 7.2.) The Third Amendment shortened the cure period to 10 days, which would be reduced by any period in which Theia had actual notice of the default. (Ex. 5, Third Amendment § 2(c).) Theia obviously knew about its own non-payment (among other defaults) as soon as they happened.

**Theia's Highly Suspicious Incorporation of New Corporate Entities**

Adding to FCS's concern is certain recent highly suspicious corporate activity by Theia., involving newly-created corporate entities.

These events trace back to a trademark lawsuit that a software company, also known as "Theia," filed against Theia (the entity in this case) in January 2020 in the Eastern District of Pennsylvania. (Ex. A.)[4] In June 2021, Theia filed a Pretrial Memorandum stating that it had "chosen to voluntarily cease all use of the THEIA mark and will never again use it." (Ex. B.)

Consistent with that filing, Theia recently told FCS that, to settle the trademark litigation, Theia would be doing business under the names "Thorian" and "Cypherian" going forward. (Colon Decl. ¶ 46.) But publicly-available Delaware corporate records do not show that any of the Theia entities filed for a name change. (Ex. B.) Instead, the public records show *new* entities with the "Thorian" and "Cypherian" names: Thorian Group, Incorporated, Thorian Holdings Group A Incorporated, and Cypherian LLC. (Ex. C, D, E.) The documents associated with the Cypherian entity are signed by Theia's CFO, Stephen Buscher (*id.*), and the formation documents of the Thorian entities reflect the same corporate services provider (Harvard Business Services, Inc.) as the Theia entities. (*Compare* Ex. B *with* Exs. C and D). What appears to be going on is alarming, to say the least: Theia's management has apparently formed *new* entities from which to conduct the Theia business. One can only wonder about the purpose for these new entities, other than for Theia to attempt to evade its debts to its creditors.

**Time Is of the Essence**

FCS cannot wait years or even months to start the process of monetizing the FCC license, because there is much to do between now and the FCC's deadline of May 2025.

---

[4] Citations in the form "Ex. [letter]" refer to the exhibits to the accompanying declaration of Charles Michael.

First, FCS will need to spend several months marketing the FCC license to get the best price possible. (Colon Decl. ¶ 51.)

Second, once a deal is in place with an agreed price, the FCC's own guidance published on its website states that it can take six months or longer to approve a significant transaction. (Ex. 12, at 2.)

Third, the approved buyer will need time to build and launch half of the network (56 of the 112 satellites) by May 2025, so as to meet the FCC's condition. This is a substantial undertaking, which is why the FCC originally allowed Theia six years to complete it.

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ there is little time to spare in getting the license in the hands of a buyer that, unlike Theia, can advance the project forward to meet the deadline. (*Id*.)

FCS has tried to address this urgent situation without litigation, but further discussions with Theia have gone nowhere. (*Id*. ¶ 44.)

**FCS's Complaint**

As detailed above, FCS finds itself with a borrower that owes FCS over $289 million, has violated numerous contractual commitments, has little capacity even to continue operations, and has imperiled FCS's primary collateral—the FCC license.

Thus, on August 19, 2021, FCS filed its complaint in this case, seeking a judgment against Theia to recover in full on the debts under the SNPNA, which today stand at over $289 million, and which continue to accrue interest, fees, and expenses. Given that Theia has indisputably not paid the amounts due on the Notes (among other defaults), it is difficult to imagine what, if any, defense Theia will offer on the merits.

11

## ARGUMENT

### I.   THE COURT SHOULD APPOINT A TEMPORARY RECEIVER

As detailed below, there is ample reason (indeed, urgent need) for a receiver to be appointed in this case, including (i) the parties' express agreement providing for "appointment of a receiver from any court of competent jurisdiction" (Ex. 2, SNPSA § 8(n)); (ii) the multiple, undisputed defaults by Theia, which will ultimately result in a final judgment against Theia; (iii) the imminent risk to FCS's collateral, particularly in light of Theia's now proven inability to monetize its most important asset, the FCC license; and (iv) the balance of equities, which clearly favors FCS.

#### A.   Standard for Appointing a Receiver

Under Second Circuit law, the existence of a receivership provision in a contract—as is the case here—"strongly supports the appointment of a receiver." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988). Moreover, where a contract authorizes a receiver, "the party opposing the appointment bears the burden of demonstrating why a receiver should not be appointed." *Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008).

Even where there is no explicit receivership provision, it is within the Court's discretion to appoint receivers "in order to protect property." *United States v. Ianniello*, 824 F.2d 203, 207 (2d Cir. 1987) (citation omitted). In exercising that discretion, courts consider various factors, including several that are present in this case: "the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered"; "plaintiff's probability of success in the action"; "the possibility of irreparable injury to [the plaintiff's] interests in the property"; and "the probability that harm to plaintiff by denial of the appointment would be greater than the

injury to the parties opposing appointment." *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Property LLC*, 866 F. Supp. 2d 247, 249-50 (S.D.N.Y. 2012).

Under these standards, secured lending is among the "well established contexts" where a receiver is considered appropriate. 2 Charles Alan Wright, et all., Federal Practice & Procedure § 2983 (3d ed. 2014); *see also Miss Jones LLC v. Stiles*, 17 Civ. 1450, 2019 WL 3034906, at *4 (S.D.N.Y. July 10, 2019) (concluding that "appointment of a receiver is appropriate [where] it is clearly necessary to protect Plaintiff's interests in the property").

### B. Theia Expressly Agreed That a Receiver Would Be Appropriate In These Circumstances

The SPNSA explicitly authorizes appointment of a receiver in the event that Theia defaults on its obligations, and Theia has clearly defaulted. Under the SNPSA, FCS is "empowered to request the appointment of a receiver from any court of competent jurisdiction," and that receiver "shall be instructed to seek from the FCC and every other applicable Governmental Authority an involuntary transfer of control of" the FCC License Assets. (Ex. 2, SNPSA § 8(n).) As discussed, such a provision "strongly supports the appointment of a receiver," *Citibank, N.A.*, 839 F.2d at 97, and shifts the burden to the defendant to show why a receiver should not be appointed. *D.B. Zwirn*, 550 F. Supp. 2d at 491.

Theia cannot meet its burden because of its myriad defaults and conspicuous lack of explanation for *any* of them. Particularly given the additional factors detailed below, Theia cannot show a basis to "depart[] from the terms of the agreement providing for the appointment of a receiver." *Fed. Home Loan Mortg. Corp. v. Green*, No. 89 CIV. 7717, 1990 WL 58900, at *1 (S.D.N.Y. April 27, 1990).

13

### C.      Theia's Multiple Defaults Justify Appointment of a Receiver

Where it is "undisputed that several events of default ha[ve] occurred," the case for a receiver becomes even stronger. *D.B. Zwirn*, 550 F. Supp. 2d at 491; *see also U.S. Bank Nat'l Ass'n*, 866 F. Supp. 2d at 250 (receiver appropriate where there is "no dispute that the defendants have defaulted on the loans at issue"). Theia's defaults are plain and numerous: the company has not paid the balance on the Notes, it incurred unauthorized debt and liens, and it refused to take *any* of the required, basic steps under the SNPSA and Third Amendment to show that it was keeping its house in order. Making matters worse, the company has apparently burned through all the funds loaned to it, so that it has failed to meet its payroll obligations. (Colon Decl. ¶ 43.)

These defaults evidence the urgent need for a receiver because they reveal a company in disarray that is endangering the very existence of the lender's collateral. Where a defendant "has defaulted, and continues to be in default, on a large obligation," a receiver is necessary to fix the "fail[ure] to demonstrate any concrete plan for recovering its debts." *United States v. Trusty Capital, Inc.*, No. 06-CV-8170, 2007 WL 44015, at *8 (S.D.N.Y. Jan. 5, 2007). Here, Theia's willful, repeated, and brazen defaults demonstrate an unethical and unreliable pattern of behavior.

Consider as just one example Theia's covert loan arrangement with Aithre. The SNPSA could not be clearer in prohibiting indebtedness or liens without FCS consent—a standard provision in secured lending. (Ex. 2, SNPSA §6(a).) Theia was plainly well aware of this restriction, but went ahead and chose to secretly take on additional debt, anyway. Combined with the refusal to provide basic financial documents and the gall of trying to pass off a company insider as CRO, it is evident that Theia's management cannot be trusted and a receiver is needed urgently. Theia's recent mischief involving the newly created "Thorian" and "Cypherian" entities only raises the level of alarm higher.

14

### D. Theia's Actions Imminently Threaten the Value of FCS's Collateral

Theia has proved itself untrustworthy to complete the work necessary to meet the FCC's condition of launching 56 satellites by May 2025. FCS is thus at risk of incurring significant, irreversible losses until a receiver is appointed to manage Theia's affairs, and ensure the license's value is preserved.

Theia's actions make plain its inability to monetize its assets. At the risk of belaboring the point, Theia has failed to pay the balance on the Notes, incurred debt in defiance of a clear anti-indebtedness contractual provision, refused to engage a CRO or Selected Advisor, refused to develop a Liquidity Plan to straighten out its finances, and refused to provide FCS with basic financial reporting documents. Theia's failures to comply with the comparatively straightforward requirements in the SNPSA and Third Amendment prove it has no business with a responsibility the magnitude of managing the FCC license. *Cf. Citibank, N.A.*, 839 F.2d at 97 (receiver appropriate where defendant's "continuing role in managing the [property] would be harmful to the premises' marketability").

The license belongs instead in the hands of a company that can seize on the opportunities that Theia has squandered—and it is urgent that the transfer process occur as soon as possible. As detailed above, the time it will take to market the license and gain approval for its transfer is lengthy, and needs to occur soon enough for a new licensee to build the satellite network by the FCC's deadline. The FCC had allotted six years to build the network, but, thanks to Theia, over two of those years are lost. There is no more time to waste.

Courts have concluded that a receiver should be appointed in similar circumstances, where a license was at risk.

In *D.B. Zwirn*, the owner of several radio stations defaulted on its debts, and could not afford to maintain those stations up to the standards required to maintain their FCC licenses. 550

F. Supp. 2d at 492. Judge Scheindlin found that "[i]rrespective of which party bears the bulk of the blame" for the radio stations' troubles, a receiver should be appointed because there was an "an imminent danger of the property being diminished in value." *Id*.[5]

As a further example, in *U.S. Bank*, the defaulting borrower operated eight hotels via franchise agreements, and, absent funds to make improvements, risked losing licenses to the "Embassy Suits" franchise name. 866 F. Supp. 2d at 253. Judge Koeltl appointed a receiver because, if the licenses were lost, "the substantial diminution of the Hotels' value" would be "inexorable." *Id*. at 253-54.

### E.    A Balancing of the Equities Favors Appointing a Receiver

Finally, FCS's harms in the absence of a temporary receiver outweigh those harms that appointment may cause Theia. FCS is at risk of the FCC license becoming completely worthless if Theia's gross mismanagement is allowed to continue. Theia's suggestion that its own CFO could serve as CRO, for example, shows that the company's management is not serious about taking an honest look at its financial situation. Appointment of a temporary receiver will not cause any harm to Theia that it has not already inflicted upon itself. Transferring the FCC license may seem a significant loss, but Theia only has itself to blame for squandering the opportunity to capitalize on the license in the first place.

Further, the appointment of a temporary receiver will protect any interests Theia may still have. A temporary receiver is "an officer of the court and has the duty to preserve and protect the property pending the outcome of the litigation." *Citibank, N.A.*, 839 F.2d at 98. The receiver will not be an employee or agent of FCS but will rather operate "without deference to either party and

---

[5] Judge Scheindlin ultimately concluded that the court lacked subject matter jurisdiction over the case, 550 F. Supp. 2d at 488-49, but on remand the state court agreed, for essentially the same reasons as Judge Scheindlin, to appoint a receiver. *See D.B. Zwirn Special Opportunities Fund v. Tama Broad., Inc.,* No. 0600692/2008, 2008 WL 2958270 (N.Y. Sup. Ct. July 21, 2008).

with preservation of the property as its sole objective." *D.B. Zwirn*, 550 F. Supp. 2d at 492. Theia can hardly claim harm or prejudice by the appointment of an impartial officer, duty-bound to preserving and protecting the property interests at stake.

\* \* \*

In sum, considering "all of the relevant factors including the contractual language agreed to between the parties regarding receivership and the imminent danger of [the] property continuing to diminish in value," *id.* at 493, the Court should appoint a temporary receiver.

## II.    THE COURT SHOULD ORDER EXPEDITED DISCOVERY

In addition to the appointment of a temporary receiver, FCS requests the Court authorize FCS to immediately issue targeted discovery requests relating to (i) where Theia's funds have gone; (ii) any improper related-party transactions; (iii) the contracts it has signed with revenue sources (investors, customers, etc.) and (iii) the nature and purpose of the newly-formed entities. FCS asks the Court to require responses within 10 days of service. (Ex. G (proposed discovery).)

Courts in this district apply a "'flexible standard of reasonableness and good cause' in determining whether to grant a party's expedited discovery request." *Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 239, 241 (S.D.N.Y. 2012) (citation omitted). Among the factors courts consider are (1) whether a "legally cognizable urgency exists," (2) "the purpose for requesting the expedited discovery"; (3) "the breadth of the discovery requests"; and (4) "the burden on the defendants to comply with the requests." 6 James Wm. Moore, Moore's Federal Practice § 26.121[2]. All of these factors favor expedited discovery here.

As detailed above, there is a "legally cognizable urgency" because FCS's collateral is being impaired by Theia's defaults. The information is sought for the legitimate purposes of identifying evidence that is highly relevant to the relief sought in the case, and that is needed promptly so that FCS (and potentially the receiver) can ensure that FCS's rights are protected.

17

Courts have allowed expedited discovery in similar circumstances. For example, in *CFTC v. Atwood & James, Ltd.*, No. 09 CV 6032, 2009 WL 666970 (W.D.N.Y. Jan. 23, 2009), the court authorized the appointment of a temporary receiver, and at the same time allowed expedited discovery as to the "nature, location, status and extent of Defendants' alleged wrongdoing (including but not limited to the possible involvement of others)." *Id.* at \*5. And in *JP Morgan Chase Bank, N.A. v. Reijtenbagh*, 615 F. Supp. 2d 278 (S.D.N.Y. 2009), a bank sued to enforce a $50 million promissory note that was secured by certain art, and Judge Marrero authorized the bank to conduct expedited discovery so that it could "determine the location of any missing Art Collateral." *Id.* at 282-83; *see also Computerland Corp. v. Batac, Inc.*, No. 88 CIV. 862, 1988 WL 140816, at \*5 (S.D.N.Y. Dec. 16, 1988) (where franchisor sought to recover defaulted secured loan debt from franchisee, authorizing discovery "related to the location and status of the collateral").

As for the remaining factors, the discovery is narrowly tailored and minimally burdensome. Theia should have little trouble assembling its bank statements, its material contracts, corporate records explaining any related-party transaction, as well as records bearing on its affiliation and the purpose of the highly suspicious "Thorian" and "Cypherian" entities.

## **CONCLUSION**

For the stated reasons, the Court should grant FCS's application for appointment of a temporary receiver, and should authorize FCS to immediately serve the expedited discovery requests accompanying this motion.

Dated:  Washington, D.C.
        August 19, 2021

Respectfully Submitted,

STEPTOE & JOHNSON LLP

/s/ Filiberto Agusti
Filiberto Agusti
Joshua Taylor*
Mark Murphy*

Charles Michael
1114 Avenue of the Americas
New York, NY
(212) 506-3900
cmichael@steptoe.com

1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000
fagusti@steptoe.com
jtaylor@steptoe.com
mmurphy@steptoe.com

*pro hac vice application forthcoming

*Counsel for Plaintiff FCS Advisors, LLC*