UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>                                                    Plaintiff,<br><br>—*against*—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN";<br><br>THEIA AVIATION, LLC; and<br><br>THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>                                                    Defendants. | 21 Civ. 6995 |

**DECLARATION OF MANUEL COLON**

      1.     I am Vice President of FCS Advisors, LLC d/b/a Brevet Capital Advisors ("FCS"), an SEC-registered investment advisory firm.

      2.     I submit this declaration in support of FCS's application for appointment of a temporary receiver in the above-captioned matter to oversee the defendants, Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, "Theia").

      3.     Except where indicated otherwise, I have personal knowledge of the facts contained in this declaration, and, if called as a witness, I could and would testify competently to such facts under oath. For statements made upon information and belief, I believe them to be true. The exhibits to this declaration are true copies of the originals.

**Theia**

      4.     FCS makes debt investments, and one of our borrowers is Theia. As I understand it, Theia gathers images of Earth from aircraft and has at times completed such work pursuant to

contracts with government agencies. The company was founded, as I understand it, in 2015 by Erlend Olson and Joseph Fargnoli.

5. In November 2016, Theia applied to the Federal Communications Commission ("FCC") for a license to create a network of satellites to image the entire surface of the Earth. In May 2019, the FCC granted Theia's application and authorized Theia to build a network of 112 low-Earth orbit satellites. (Ex. 1.) The license approval includes the following chart, setting forth the frequencies in which Theia would propose to operate:

| Operations | Frequencies |
|---|---|
| Remote Sensing | 1215-1300 MHz |
| Gateway | 17.8-18.6 GHz (space-to-Earth)<br>18.8-19.4 GHz (space-to-Earth)[15]<br>19.6-20.2 GHz (space-to-Earth)<br>25.5-27.0 GHz (space-to-Earth)<br>27.5-29.1 GHz (Earth-to-space)[16]<br>29.5-30.0 GHz (Earth-to-space)<br>37.5-42.0 GHz (space-to-Earth)[17]<br>47.2-50.2 GHz (Earth-to-space)<br>50.4-51.4 GHz (Earth-to-space) |
| User | 10.7-12.7 GHz (space-to-Earth)<br>12.75-13.25 GHz (Earth-to-space)<br>14.0-14.5 GHz (Earth-to-space) |

(*Id*. at 3.)

6. The FCC's authorization conditions the license upon Theia's successful launch of 56 of the satellites by May 2025. (*Id*. at 3548 (¶ 59(b)).)

7. To date, over two years after the license grant, Theia has not built or launched any satellites, and, particularly without more money, appears in no position to do so.

**The SNPSA**

8. FCS's first transaction with Theia was through loans evidenced by a series of promissory notes issued in October 2018. FCS and Theia have amended their loan relationship over time.

9. On June 29, 2020, FCS and Theia entered into a Secured Note Purchase and Security Agreement ("SNPSA"), pursuant to which FCS lent cash to Theia in exchange for two promissory notes (the "Notes") and other consideration expressed in the SNPSA. (Ex. 2.) The SNPSA is the operative loan agreement today.

10. The purpose of the SNPSA was to provide financing for Theia to begin developing its satellite network and obtain additional outside financing through which it could retire the Notes before maturity. In essence, the SPNSA debt was intended as bridge to one of many contemplated outside investments, or, at a bare minimum, was expected to be paid off from operational revenue.

11. The first Note was a Series A-1 Secured Promissory Note in the amount of $100 million, set to mature six months from the SNPSA, on December 29, 2020. (Ex. 3.)

12. The second Note was a Series A-2 Secured Promissory Note, also in the amount of $100 million, set to mature one year from the SNPSA, on June 29, 2021. (Ex. 4.)

13. The SNPSA obligated Theia to take a number of steps in addition to repaying the Notes. For example, to allow FCS to monitor Theia's financial position and progress toward payments, Theia agreed to provide FCS with:

    (a) an unaudited consolidated balance sheet for each fiscal quarter within 45 days after the end of each fiscal quarter (Ex. 2, SNPSA § 6(e)(i));

    (b) an unaudited consolidated balance sheet for each fiscal year no later than 90 days after the end of each fiscal year (*id.* § 6(e)(ii));

    (c) an unaudited consolidated balance sheet for each calendar month no later than 15 days after the end of each calendar month (*id.*);

  (d) a certificate from a corporate officer certifying that as of the date of each financial statement, the representations and warranties were accurate and complete and that no Event of Default had occurred (*id.* § 6(e)(iii)); and

  (e) a monthly budget identifying expected expenses and case expenditures as well as a comparison to the most recent monthly budget (*id.* § 6(e)(v)).

14. Additionally, Theia agreed not to incur or assume any debts or liens besides those encompassed by the SNPSA, without FCS's consent. (*Id.* § 6(a).) This anti-indebtedness provision is a standard feature of secured financing arrangements and was critical to FCS's agreement to the SNPSA.

15. As collateral for the SNPSA, Theia pledged substantially all its assets. (*Id.* § 8(a).) The collateral included Theia Group, Inc.'s ownership of Theia Holdings A, Inc. (the entity possessing the FCC license) and Theia Aviation LLC (the entity owning Theia's aircraft).

16. A security interest in the FCC license was absolutely critical to FCS's decision to enter the SNPSA and provide loans thereunder. The FCC license is by far Theia's most valuable asset, is critical to Theia's business plan, and is the only asset worth anything near the amount loaned by FCS.

17. The SNPSA enables FCS to monetize the FCC license in the event Theia failed to repay what it owed to FCS under the SNPSA. Specifically, upon a default and failure to cure, FCS is "empowered to request the appointment of a receiver from any court of competent jurisdiction," and the "receiver shall be instructed to seek from the FCC and every other applicable Governmental Authority an involuntary transfer of control of any such FCC License Assets for the purpose of seeking a bona fide purchaser to whom control would ultimately by transferred." (*Id.* § 8(n).)

**Theia's History of Broken Promises and The Third Amendment**

18. In the months before and following the SNPSA, Theia repeatedly led FCS to believe that Theia would be obtaining significant revenue imminently, so as to retire FCS's debt. Yet in each case the promised transactions never materialized.

19. For example, in September 2019, Theia told FCS that it expected $2 billion in revenue from a sovereign nation that would be contracting to use Theia's technology, and potentially a separate $2 billion investment from an individual. In November 2019, Theia told FCS that it expected a $2 billion payment from one country within 30 days, and that it had expected to sign in the first quarter of 2021 a $5 billion commitment from another country.

20. In March 2020, Theia told FCS that that it had "definitive" commitments for $18.5 billion in revenue, including from several sovereign nations. Theia also represented that there was significant revenue from its aircraft business. Theia claimed there was a 95% probability it would receive billions in expected funds within 120 days.

21. These representations sent the overall message that Theia was on the cusp of vast revenue that would easily retire FCS's debt. FCS entered into the SNPSA based on those representations—which proved to be false.

22. As the December 29, 2020, maturity date on the Series A-1 Note approached, it became clear that Theia would not be able to timely repay its obligations.

23. At the time, Theia made yet further promises about imminent revenue from soon-to-be-executed contracts. Based on those representations, and in order to facilitate Theia's ability to meet its obligations—and despite many prior instances of promises not materializing—FCS reluctantly decided to give Theia one more chance to follow through on its promises. To that

end, FCS and Theia executed the Third Amendment to the SNPSA on December 15, 2020 (the "Third Amendment"). (Ex. 5.)[1]

24. The Third Amendment extended the maturity date on the Series A-1 Note to June 29, 2021 (the same maturity date as the Series A-2 Note). (*Id.* § 2(a)(i).)

25. The Third Amendment provided FCS additional protections to reinforce Theia's representations that Theia would achieve a liquidity event within the six-month repayment timeframe. These protections were necessary to ensure Theia's eventual ability to timely pay and induced FCS to enter into the Third Amendment.

26. First, the Third Amendment required Theia, by December 23, 2020, to appoint "a chief restructuring officer ['CRO'] . . . whose appointment shall be subject to the reasonable consent of [FCS], with full authority to (i) take such actions in the name of, and otherwise on behalf of, the [Theia], as are required to comply with the other provisions of this Amendment, and (ii) implement the Liquidity Plan [discussed below], or to otherwise raise capital for [Theia] in order to enable repayment of the Notes and the other payments." (*Id.* § 3(f).)

27. Second, the Third Amendment required Theia to, by January 15, 2021, prepare "a comprehensive financial proposal to improve [its] liquidity position in order to enable repayment of the Notes and other payment obligations owing by [Theia] (the 'Liquidity Plan')," in a "form and substance reasonably acceptable" to FCS. (*Id.* § 3(b).) The Liquidity Plan was required to "outline in detail the [Theia's] plan" to raise enough money to pay off the Notes. (*Id.*)

28. Finally, the Third Amendment also required Theia, by January 15, 2021, to engage a "Selected Advisor to advise it in developing the Liquidity Plan" and "provide financial

---

[1] The first two amendments to the SNPSA were relatively minor and are not relevant to FCS's application for appointment of a temporary receiver.

advisory and support services to them as required to develop the Liquidity Plan." (*Id.* §§ 3(c)(i)-(ii).).

29. Taken together, these elements—the CRO, the Liquidity Plan and the Selected Advisor—reflected the fact that FCS had lost patience with Theia's broken promises, and that it was time to implement serious restructuring steps to generate the liquidity necessary for FCS to be repaid.

**Theia's Defaults**

30. Despite Theia's promises to comply with the obligations of the Third Amendment, and the company's assurance that the six months provided by the Third Amendment would be sufficient for Theia to meet its obligations under the SNPSA, Theia defaulted under the SPNSA in multiple ways.

31. Most importantly, Theia defaulted under the SNPSA when it did not pay any of the balances due on the Notes on their maturity date of June 29, 2021. As noted, this includes the Series A-1 Note, whose maturity had already been extended pursuant to the Third Amendment. As of July 22, 2021, the aggregate amount of outstanding principal, interest, fees, and expenses due and payable under the Notes was $289,574,162.69. Interest and fees have continued to accrue since then, and will continue to accrue going forward.

32. Theia's failure to pay was preceded by multiple other defaults of SNPSA provisions designed to provide transparency, track Theia's progress towards repayment and protect FCS's collateral.

33. First, Theia failed to prepare a Liquidity Plan—that is, a "comprehensive financial proposal" that would "outline in detail" how Theia was to repay the Notes—in a "form and substance reasonably acceptable" to FCS. (Ex. 5, Third Amendment § 3(b).) Theia failed to meet this obligation by the contractual deadline of January 15, 2021. On January 26, 2021, FCS sent

Theia a letter about the fact that the Liquidity Plan was overdue (among other overdue items). (Ex. 6.) Instead of addressing the problem by drafting a legitimate Liquidity Plan, Theia prepared only a slide deck with a series of vague goals. It was neither comprehensive nor detailed, as the Third Amendment requires. In March and April 2021, FCS warned Theia by letter that its vague slide deck was inadequate (Ex. 7, at 6; Ex. 8, at 1), but Theia wrote back stubbornly insisting that what it provided was enough. (Ex. 9, at 1.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ an assertion that has obviously proved to be false. Theia made no further efforts to provide FCS with a Liquidity Plan.

34. Second, Theia failed to appoint a CRO by December 23, 2020, and still has not appointed a CRO with appropriate authority, pursuant to the Third Amendment's conditions. I am informed that Theia repeatedly stated that it had drafted board resolutions to authorize the appointment of a CRO, and to give the CRO the authority necessary to carry out the duties of a CRO. Yet we were never provided with a copy of any board resolutions. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ but FCS did not consent to him serving in that role. And for good reason: it does not make sense for a longtime management insider to serve as CRO.

35. Third, Theia failed to engage a Selected Advisor by January 31, 2021, and still has not engaged a Selected Advisor. As my colleagues have informed me, Theia repeatedly held out the prospect of Barclays raising funds via a special purpose acquisition company, or "SPAC," but we later found out that those efforts went nowhere.

36. Fourth, Theia is months behind on its financial reporting obligations under the SNPSA. Theia has not provided FCS with certified, audited financial records for the fiscal year

2020; balance sheets for Quarter 4 of 2020, November 2020, or January 2021; or monthly budgets for 2021.

37. Fifth, Theia has failed to pay the administrative fee due under the SNPSA every month beginning with January 1, 2021.

38. Finally, Theia defaulted under the SNPSA by secretly negotiating and furtively entering into a Secured Note Purchase Agreement with Aithre Capital Partners LLC ("Aithre"). Theia did not inform FCS in advance that it would enter an agreement with Aithre, nor did Theia obtain FCS consent for the debt and lien, as required under the SNPSA. FCS has no record of where the proceeds of these loans were deposited, and presumably Theia opened new bank accounts to receive the funds. However, Under the SNPSA, whenever Theia "maintains or opens" a new account, the account must "be subject to a 'shifting control' deposit account control agreement," so that FCS's collateral is protected. (Ex. 2, SNPSA § 8(e).) Theia did not do that with respect any new accounts associated with the loan proceeds.

39. FCS made continuous efforts to resolve Theia's defaults. In addition to numerous emails and informal discussions, FCS sent Theia multiple letters, urging Theia to take steps to address its defaults (Ex. 6; Ex. 7; Ex. 8), including a proposed forbearance agreement that offered Theia a chance to correct its defaults and proceed toward eventual repayment. (*Id.*) Theia ignored the proposal.

40. On April 19, 2021, FCS delivered to Theia a Notice declaring an Event of Default for the following five defaults: (1) failure to develop a Liquidity Plan; (2) failure to appoint a CRO; (3) failure to engage a Selected Advisor; (4) failure to provide FCS with required financial documents; and (5) violation of the SNPSA's anti-indebtedness provision for the Aithre loan. (Ex. 10.)

41. On July 22, 2021, FCS delivered to Theia a Notice declaring an Event of Default for the following two defaults: (6) failure to pay balance due under the Notes; and (7) failure to pay required administrative fees under the SNPSA. (Ex. 11.)

42. Theia has not disputed that it is in default, nor cured its defaults.

43. On June 25, 2021, Theia informed FCS that Theia would miss its payroll for that week. So far as I am aware, Theia has continued missing payroll since then. This development has only raised our level of alarm, and heightened the risk to our collateral.

44. Since June, we have been in ongoing discussions to avoid litigation, but those have led nowhere, forcing FCS to file this suit.

**Additional Highly Suspicious Activity by Theia**

45. Adding to FCS's concern is certain recent highly suspicious corporate activity by Theia. I understand that Theia has been sued over its use of the "Theia" trademark. In recent weeks, as FCS has tried to negotiate an amicable resolution of Theia's defaults, Theia informed us that it had decided to abandon the Theia name, to avoid further litigation.

46. Theia sent FCS documents indicating that it would be doing business under the names "Thorian" and "Cypherian" going forward. I was alarmed to learn recently that Theia, rather than changing the names of its constituent entities to reflect the new names, has seemingly incorporated new "Thorian" and "Cypherian" entities, without disclosing this to FCS, despite the many conversations between the parties. One can imagine the concern at FCS over the possibility that Theia is trying to create entities outside the scope of our liens and loan agreements, so that it can avoid its obligations.

**The Need for a Receiver**

47. Through its continued defaults and dishonest behavior, Theia has proved itself untrustworthy and incapable of taking actions to safeguard the value of FCS's collateral.

48. The FCC license requires Theia to launch its first satellites by May 2025. (Ex. 1, at 3548 (¶ 59(b)).) Based on its inability to comply with the SNPSA and Third Amendment and obtain sufficient outside financing, Theia if left to its own devices is almost certain to miss this deadline and render the license worthless. If Theia cannot even meet payroll, it obviously cannot make progress on developing the licensed satellite network.

49. A receiver is necessary to marshal Theia's assets and facilitate a transfer of the FCC license to an entity that can realize its value.

50. There is urgent need to do so promptly, because of the time required between now and the launch deadline, and because of Theia's repeated pattern of dishonest behavior (e.g., the secret loan, and secretly-formed business entities).

51. First, FCS will need to spend several months marketing the FCC license to get the best price possible.

52. Second, once we have a deal in place and an agreed price, the FCC's own guidance published on its website states that it can take six months or longer to approve a significant transaction. (Ex. 12, at 2.)

53. Third, the approved buyer will need time to build and launch half of the network (56 of the 112 satellites) by May 2025, so as to meet the FCC's condition. This is a substantial undertaking, which is why the FCC originally allowed Theia six years to complete it.

[redacted]



55. In other words, assuming Theia's own timeline is accurate, then there is little time to spare in getting the license in the hands of a buyer that, unlike Theia, can advance the project forward to meet the FCC's deadline. Theia has already wasted over two years of the six-year period allowed by the FCC, and has offered no indication that it has made any progress on developing the license.

56. In sum, given the timeframes above, it is critically important to appoint a receiver swiftly, and I would strongly urge the Court to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       August 18, 2021

_____
Manuel Colon