# EXHIBIT 2

CONFIDENTIAL AND PROPRIETARY

## THEIA GROUP, INCORPORATED

## AMENDED AND RESTATED

## SECURED NOTE PURCHASE AND SECURITY AGREEMENT

This AMENDED AND RESTATED SECURED NOTE PURCHASE AND SECURITY AGREEMENT (this "Agreement"), dated as of June 29, 2020 (the "Effective Date"), is among Theia Group, Incorporated, a Delaware corporation ("Theia Group"), as issuer (the "Issuer") and a Grantor, and Theia Aviation LLC, a Delaware limited liability company ("Theia Aviation"), as a Grantor, and Theia Holdings A, Inc., a Delaware corporation ("Theia Holdings), as a Grantor, and FCS Advisors, LLC d/b/a Brevet Capital Advisors ("FCS") or its designee, as purchaser and the initial holder of the Notes (in such capacities, and together with any assignees thereof from time to time, the "Purchaser") and as administrative agent on behalf of the Purchaser (in such capacity, including any successor thereto or assignee thereof from time to time, the "Administrative Agent" or the "Agent").

**WHEREAS**, the Issuer, Theia Aviation and Theia Holdings (the "Theia Parties"), FCS and certain other parties are parties to the Existing NPA Documents, and the parties have agreed to certain amendments thereto, including an increase in the obligations thereunder, on the terms and conditions set forth herein and in the other Transaction Documents.

NOW, THEREFORE, in consideration of the respective representations, warranties, covenants and conditions contained in this Agreement, the parties to this Agreement agree that the Existing NPA Documents are hereby amended and restated as follows:

1.  Purchase and Sale; Conditions to Issuance; Closing.

(a)   Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Issuer agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Issuer, at a purchase price of 100% of the principal amount thereof (with respect to each Note, the "Purchase Price"), the following promissory notes substantially in the form attached hereto as Exhibit 1(a) (collectively, the "Notes"):

(i)   a Series A-1 Note in the principal amount of $100,000,000.00 (the "Series A-1 Note"); and

(ii)   a Series A-2 Note in the principal amount of $100,000,000.00 (the "Series A-2 Note" and together with the Series A-1 Note, the "Series A Notes" or the "Notes");

(b)   The obligation of the Purchaser to purchase the Notes is subject to the satisfaction (or waiver by the Purchaser in its sole discretion) on or prior to the Issue Date thereof of each of the conditions described on Annex 1(b).

(c)   Subject to the terms and conditions set forth herein, the purchase and sale of the Notes shall take place at such time(s) and place(s) as the Issuer and the Purchaser mutually agree upon, orally or in writing (each, a "Closing").  At each Closing, the Issuer shall deliver to

**CONFIDENTIAL AND PROPRIETARY**

the Purchaser the Series A Notes, against the Purchaser's payment of the applicable Purchase Price therefor, as set forth on Annex 1(c).

    2.    <u>Terms of the Notes</u>.

    (a)    The terms of the Notes shall be as set forth therein and in this Agreement.

    (b)    <u>Maturity Dates</u>.  The maturity date for each Note (the "<u>Maturity Date</u>") is:

    (i)    for the Series A-1 Note, the six month anniversary of its Issue Date; and

    (ii)    for the Series A-2 Note, the twelve month anniversary of its Issue Date.

    (c)    <u>Interest</u>.

    (i)    *<u>Interest Rate; Accrual and Payment</u>*.  Amounts outstanding hereunder and under the Notes from time to time shall bear interest at the rate of twenty percent (20%) per annum from its Issue Date until such Note is paid in full, whether on the scheduled Maturity Date, upon acceleration, by prepayment or otherwise, but subject to the other terms and conditions of this Agreement, including Section 2(d), which interest shall accrue and be due and payable monthly in arrears on the first day of each month, starting on such date as is specified in the Notes, and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

    (ii)    *<u>Default Interest</u>*. If any amount payable hereunder is not paid when due (without regard to any applicable grace periods), such overdue amount shall bear interest at the rate of twenty-two percent (22%) per annum (the "<u>Default Rate</u>") from the date of such non-payment until such amount is paid in full. Notwithstanding anything herein to the contrary, at any time interest is being calculated at the Default Rate, it shall compound on each calendar day and, to the extent not otherwise paid, automatically increase the principal amount of the respective Note. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

    (iii)    *<u>Computation of Interest</u>*. All computations of interest shall be made on the basis of a year of three hundred and sixty (360) days, and the actual number of days elapsed.

    (iv)    *<u>Post-Bankruptcy Interest</u>*.  The Issuer will pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue principal at the rate then applicable to the Notes, and shall pay interest (including post-petition interest in any proceeding under any Debtor Relief Law) on overdue installments of interest (without regard to any applicable grace periods) at the rate then applicable to the Notes to the extent lawful.

    (v)    *<u>Interest Rate Limitation</u>*. Notwithstanding anything to the contrary contained herein, the interest paid or agreed to be paid hereunder shall not exceed the maximum

CONFIDENTIAL AND PROPRIETARY

rate of non-usurious interest permitted by applicable Requirement of Law. If an interest paid hereunder is in an amount that exceeds such maximum rate, the excess interest shall be deemed to be a prepayment of the Notes.

(d)　　Optional Prepayment.  The Issuer may repurchase the Notes at any time in whole or in part, at a purchase price equal to the following amount (the "Early Discharge Amount"): (i) 100% of the principal amount being prepaid (the "Prepayment Principal") plus (ii) the total amount of interest that would be paid on the Prepayment Principal if it remained outstanding until its final Maturity Date, and, without duplication, accrued and unpaid interest to, but not including, the date on which the prepayment is made.  The Notes may not be redeemed, repurchased or otherwise prepaid prior to their final maturity except in accordance with the foregoing requirements.  Such prepayments, if any, shall be allocated and applied first to interest and then to principal, in each case pro rata among the Series A-1 Note and the Series A-2 Note.

(e)　　Mandatory Prepayment.  Contemporaneously with the funding of that certain Secured Convertible Promissory Note in the principal amount of $2,000,000,000.00, issued by the Issuer pursuant to a Secured Note Purchase Agreement among the Issuer and the purchaser thereof, redacted copies of which were provided to the Purchaser (collectively, the "Undrawn Debt Documents"), the Issuer shall repurchase the Notes, in whole, at a purchase price equal to the Early Discharge Amount determined as of the repurchase date.

(f)　　Payment Dates.  If any payment by the Issuer hereunder is scheduled to be made on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

3.　　Purchaser Representations and Warranties.  In connection with the purchase of the Notes, the Purchaser represents and warrants to the Issuer the following:

(a)　　The Purchaser is aware of the Issuer's business affairs and has acquired sufficient information about the Issuer to reach an informed and knowledgeable decision to acquire the Security.  The Purchaser is purchasing the Notes for investment and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)　　The Purchaser is (i) an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act and (ii) aware that the sale of the Note to it is being made in reliance on a private placement exemption from registration under the Securities Act.

(c)　　The Purchaser acknowledges that it is not purchasing the Notes as a result of any form of general solicitation or general advertising within the meaning of Rule 502 under the Securities Act that would result in the offer and sale of the Note requiring registration or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

(d)　　The Purchaser understands that the Notes have not been registered under the Securities Act, which exemption depends upon, among other things, the accuracy of the Purchaser's representations and warranties herein.

- 3 -

**CONFIDENTIAL AND PROPRIETARY**

(e)     The Purchaser further acknowledges and understands that the Notes must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.  The Purchaser further acknowledges and understands that the Issuer is under no obligation to register the Notes.  The Purchaser understands that the Notes will be imprinted with a legend which prohibits the transfer of the Notes unless they are registered or such registration is not required in the written opinion of counsel satisfactory to the Issuer if so required by the Issuer.

(f)     The Purchaser has reviewed this Agreement in its entirety, has had an opportunity to obtain the advice of its own counsel prior to executing this Agreement and understands all provisions of this Agreement.  The Purchaser acknowledges that it has (i) conducted its own investigation and credit analysis of the Issuer and the terms of the Notes and has relied exclusively on such investigation and analysis in making its decision to invest in the Notes, independently and without reliance on any other purchaser of promissory notes issued by the Issuer, (ii) had access to such financial and other information as it deems necessary to make its decision to purchase the Notes independently and without reliance on any such other purchaser, and (iii) been offered the opportunity to ask questions of the Issuer and received answers thereto, as it deemed necessary in connection with the decision to purchase the Notes.

(g)     By purchasing the Notes, the Purchaser acknowledges that the Issuer and its agents and advisers may each collect, use and disclose its name and other specified personally identifiable information, including the amount of securities that the Purchaser has purchased for purposes of meeting legal, regulatory and audit requirements and as otherwise permitted or required by Requirement of Law.  The Purchaser consents to the disclosure of such information to the extent, and only to the extent, required by legal, regulatory and audit requirements of the Issuer.

(h)     The Purchaser acknowledges that where required by applicable securities laws, regulations or rules, it will execute, deliver and file such reports, undertakings and other documents relating to its purchase of the Notes as may be required by such laws, regulations and rules, or assist the Issuer in obtaining and filing such reports, undertakings and other documents.

(i)     The Purchaser understands that the Issuer and its counsel (in advising the Issuer on the sale and issuance of the Notes hereunder) will rely upon the truth and accuracy of the foregoing representations and acknowledgements.

4.     <u>Representations and Warranties of the Issuer</u>.  In connection with the purchase of the Notes, the Issuer represents and warrants to the Purchaser the following and as set forth on Annex 4, as of the Effective Date and each Issue Date:

(a)     <u>Schedule 4(a)</u> accurately and completely sets forth (i) each of the Issuer's Subsidiaries, its jurisdiction of organization, and the percentages of Equity Interests therein owned by the Issuer and/or any of its other Subsidiaries and whether or not such is represented by certificates, (ii) the exact correct name of the Issuer and each of its Subsidiaries, (iii) the type of organization of each of them and their respective jurisdiction of organization, and (iv) their respective places of business or, if more than one, chief executive office, as well as their respective mailing addresses, if different.  Except for Theia Aviation and Theia Holdings, such

**CONFIDENTIAL AND PROPRIETARY**

Subsidiaries have no material assets or liabilities.  No certificates representing the Equity Interests of Theia Holdings or Theia Aviation have been issued and no Grantor has pledged any such Equity Interests other than under this Agreement and as per Schedule 4(u) or its intellectual property.

(b)     The Issuer's and its Subsidiaries' books and records have been properly maintained according to Requirements of Law and accurately reflect, in accordance with GAAP, all of the transactions entered into by the Issuer or to which it is a party.

(c)     There have been no applications, steps, proceedings or orders for the deregistration, dissolution, winding up, liquidation, judicial management, lien, or administration of the Issuer, whether provisional or final.

(d)     The Issuer has complied with all Requirements of Law which affect or apply to it, including any federal or state securities or blue sky law.

(e)     The Issuer has all such licenses, consents, permits and other authorities prescribed by Requirements of Law for the conduct of its business in the manner in which it is presently conducted and the state in which it presently is composed.  The Issuer does not represent what licenses, consents, permits or other approvals may or may not be required for it to conduct any specific planned or future business activities.

(f)     No special rights or preferences have been granted to any of the Issuer's shareholders.

(g)     None of the Issuer nor any other Theia Party is liable, whether contingently or otherwise and whether as surety, co-principal debtor, guarantor or indemnitor, for the liabilities of any third party that is not a Theia Party.

(h)     No express or implied or tacit warranties have been given by the Issuer to third parties.

(i)     No person is entitled to participate in or to obtain a commission on the profits or dividends of the Issuer, except as a shareholder.

(j)     None of the Issuer or any of its Subsidiaries is in default of any material obligation, including (i) its Organizational Documents or (ii) any Contractual Obligation relating to any Existing Indebtedness or (iii) any Sales Contract or other material Contractual Obligation.

(k)     The Issuer is not engaged in any litigation, arbitration or criminal proceedings.  The Issuer is not aware of any facts, matters or circumstances which may give rise to any litigation, income tax appeals or arbitration or criminal proceedings.

(l)     The Issuer has no tax liabilities other than normal-course taxes which may become due to state or federal authorities upon filing of normal-course reports.

CONFIDENTIAL AND PROPRIETARY

(m)     No queries have been addressed to the Issuer by any tax official nor has the Issuer lodged any tax objections.

(n)     The right of the Issuer to use or exploit any intellectual property which the Issuer requires to conduct its business is not restricted by, nor is dependent upon, any license, other than those normal licenses necessary to be obtained in the normal course of its business.

(o)     All the patents, patent applications, trademark applications, logos, defensive names and designs belonging to or used by the Issuer are valid, of full force and effect and unencumbered.  The Issuer cannot, however, represent whether any particular submission to the US Patent and Trademark Office, or any other similar non-US regulatory authority, which is in process will be granted in whole or in part.  All of the patent applications, trademark applications, logos, defensive names and designs belonging to or used by the Issuer have been applied for registration with the appropriate authority in its name either as the owner or lawful user.

(p)     There is no infringement or suspected infringement of any of the patents, patent applications, trademarks, software or databases belonging to or used by the Issuer.

(q)     This transaction does not constitute and will not result in a breach of, or any payment obligation (or entitle any Person to accelerate any such payment obligation) by the Issuer or any of its Subsidiaries under, any Contractual Obligation of the Issuer or any of its Subsidiaries, including any Contractual Obligation relating to or under any Indebtedness or Sales Contract, nor does or will it entitle any Person to terminate or vary the terms of any contract to which the Issuer or any of its Subsidiaries is a party.

(r)     In respect of all disclosures made to the Purchaser in the conduct of its due diligence investigation of the Issuer and its Subsidiaries conducted prior to the Effective Date and all other disclosures made to the Purchaser pursuant to this Agreement or any other Transaction Document:

(i)     all information (whether orally, in writing, electronic form or otherwise and whether provided by the Issuer) was true, accurate and complete when made; and

(ii)     as of each Issue Date there is no material adverse change in any of the information so provided to the Purchaser prior thereto which is not disclosed to Purchaser.

(s)     None of the Issuer, any of its Affiliates, or any person acting on any of their behalf has, directly or indirectly, solicited offers for or offered or sold the Note by means of any form of general solicitation or general advertising within the meaning of Rule 502 under the Securities Act that would result in the offer and sale of the Note requiring registration or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

(t)     None of the Issuer, any of its Affiliates, or any person acting on its or their behalf has, directly or indirectly, made offers or sales of any security, or solicited offers to buy, any security under circumstances that would require the registration of the Note under the Securities Act.

**CONFIDENTIAL AND PROPRIETARY**

(u)      No Theia Party has any debts or is party to or bound by any Contractual Obligation relating to Indebtedness or which give rise by their nature, whether direct or implied, to Liens on any of its assets, except as set forth on Schedule 4(u) ("Existing Indebtedness").

(v)      Each Theia Party (i) is a corporation or a limited liability company duly formed, validly existing and in good standing under the laws of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign registered organization in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have an adverse material effect.

(w)      The execution, delivery and performance by each of the Issuer and each of its Subsidiaries of the Transaction Documents to be executed by it and the consummation of the transactions contemplated thereby (i) are within the corporate or company power thereof, and (ii) have been duly authorized by all necessary corporate or company actions on the part thereof.

(x)      Each of this Agreement and the other Transaction Documents has been duly executed and delivered by each Theia Loan Party that is a party thereto and constitutes the legal, valid and binding obligations of such Theia Loan Party, enforceable against it in accordance with its terms, except as limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(y)      The execution and delivery by each Theia Loan Party of this Agreement and each other Transaction Document to which it is a party and the performance and consummation of the transactions contemplated hereby and thereby do not and will not (i) violate its Organizational Documents, in the case of the Issuer and its Subsidiaries, (ii) violate in any material respect any Requirement of Law applicable to it, including any federal or state securities or blue sky law; (iii) result in the creation or imposition of any Lien on any property, asset or revenue of the Issuer or any of its Subsidiaries (except Liens in favor of the Purchaser); or (v) result in a default under any material Contractual Obligation.

(z)      No consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority or other Person (including, without limitation, the members or shareholders of any Person) is required in connection with the execution and delivery of the Transaction Documents by the Theia Loan Parties, or the performance and consummation of the transactions contemplated thereby, other than consents, approvals, orders or authorizations and declarations that have already been obtained, and registrations and filings that have already been made.

(aa)      The Issuer and each of its Subsidiaries own and have good and valid title, or a valid leasehold interest in, all their respective material properties and assets.

(bb)      Schedule 4(bb) contains a complete and accurate list of all bank accounts of each Theia Party.

(cc)      The Issuer and its Subsidiaries maintain insurance on their insurable properties, liability insurance and business interruption and other insurance in such amounts as

CONFIDENTIAL AND PROPRIETARY

shall be customary for similar businesses, to such extent and against such risks, as is customary for companies in the same or similar businesses and as may be required by Requirement of Law or any other Transaction Document, all provided by financially sound and reputable insurers. Schedule 4(cc) sets forth a true, complete and correct description of all material insurance policies maintained by or on behalf of the Issuer and its Subsidiaries, and such insurance is in full force and effect.

(dd)    No Default or Event of Default has occurred, or is likely to occur as a result of the issuance of any Note or the application of the proceeds thereof.

(ee)    [Reserved]

(ff)    Theia Holdings owns, free and clear of all Liens other than those arising under Requirements of Law, all rights, title and interest in and to the "Order and Authorization for NGSO-like satellite operation in the 10.7-12.7 GHz, 14.0-14.5 GHz, 17.8-18.6 GHz, 18.8-19.3 GHz, 27.5-28.35 GHz, 28.35-29.1 GHz, and 29.5-30.0 GHz frequency bands" or any replacement or successor license and any issued patents required to exploit the license granted by such Order and Authorization (collectively, the "FCC License Assets").

5.    Securities Legends.    Each of the Notes shall be endorsed with the following legends:

(a)    THIS SECURED PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS UNDER THE ACT (PROVIDED THE HOLDER OF THIS NOTE DELIVERS TO THE ISSUER AN OPINION OF COUNSEL FOR THE HOLDER HEREOF SATISFACTORY TO ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT.

(b)    any legend required by any applicable state securities laws; and

(c)    any other legend which is required in order for the applicable issuance to comply with the Securities Act.

6.    Certain Covenants.

(a)    No Theia Party shall:

(i)    enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or sell, transfer or otherwise dispose of any material property or business;

**CONFIDENTIAL AND PROPRIETARY**

(ii)     incur, create, assume or suffer to exist any Indebtedness, other than (1) the Obligations under the Transaction Documents, (2) the Existing Indebtedness and (3) Permitted New Indebtedness;

(iii)     grant or permit to exist any Lien with respect to any of its property, except for Permitted Liens;

(iv)     agree to any restriction on its right or ability to grant any Lien;

(v)     acquire any Equity Interests, beneficial ownership of any Equity Interests of, or other securities of, any Person, or make any capital contribution, advance, loan, or extension of credit to, or any other investment in, any Person (other than in the ordinary course of business in accordance with budgets adopted in compliance with this Agreement) (collectively, "Investments"), other than Investments in the Theia Parties;

(vi)     (A) make or pay any dividends or make any distributions on its Equity Interests, whether in cash or of other assets, (B) purchase, redeem, retire, defease or otherwise acquire for value any of its Equity Interests or otherwise return any capital to any holder of its Equity Interests as such, or (C) repay or pay any interest, principal or other amounts in respect of any Indebtedness owing to any Person other than the Purchaser, including any Existing Indebtedness, other than dividends and distributions to, purchases and other acquisitions of Equity Interests from, and payments on Indebtedness (collectively, "Restricted Payments") owing to the Theia Parties; and provided that the Theia Parties may make Restricted Payments if at the time of the Theia Party's determination to make, and at the time of payment of, such Restricted Payment and after giving effect thereto and the application of the proceeds thereof (1) the amount on deposit in the Reserve Account is equal to or exceeds 120% of the Repayment Amount; (2) the Theia Parties' cash and cash equivalent instruments on hand and anticipated cash receipts (but including amounts in the Reserve Account only to the extent they exceed the amount determined under the preceding clause (1)), are sufficient, in the reasonable judgment of the Issuer's board of directors, to satisfy and discharge the cash flow requirements of the Theia Parties until six months after the Maturity Date of the Series A-2 Note; and (3) no Default or Event of Default exists or would exist.

(vii)     agree to any restriction on the right or ability of Theia Aviation or Theia Holdings to pay dividends or otherwise make distributions to, to repurchase Equity Interests from or to make payments on Indebtedness owing to, the Issuer;

(viii)     enter into any transaction with any Affiliate, except for (A) transactions among the Theia Parties, (B) compensation arrangements and benefit plans for officers and other employees of the Theia Parties that are entered into or maintained in the ordinary course of business, and (C) transactions between or among one or more Theia Parties and one or more Excluded Subsidiaries that are required for and entered into in the ordinary course of the Theia Party's business and are on terms no less favorable to the Theia Parties, as a whole, than would have been obtained in a comparable transaction with unrelated Persons on an arm's-length basis; or

**CONFIDENTIAL AND PROPRIETARY**

(ix)     engage in any line of business, directly or indirectly, other than the lines of business existing on the date hereof.

(b)     The Issuer shall make its best efforts to arrange for the Purchaser and its representatives to attend the meetings of the Issuer and its Subsidiaries with the governments of the Republic of Kazakhstan and the Kingdom of Thailand; it being understood by the Purchaser that it shall be bound by any confidentiality obligations applicable to the Issuer and its subsidiaries in connection with such meetings.

(c)     Unless otherwise mutually agreed by the Issuer and the Purchaser, the Issuer and the other Theia Parties shall use the cash proceeds of the issuance of the Notes only to fund costs and expenses of the Theia Parties in accordance with the budgeted numbers set forth on Annex 6(c) and subsequent budgets of the Theia Parties adopted from time to time subject to the other terms of this Agreement.  Prior to the purchase of any New Aircraft by the Theia Parties, the Issuer shall deliver to the Purchaser copies of all purchase documents relating thereto, including the purchase contract, duly executed by all parties thereto, purchase order and invoice therefor.

(d)     None of the Theia  Parties  shall amend or modify in any manner adverse to the Purchaser, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be adverse to the Purchaser), any of its Organizational Documents.

(e)     The Issuer shall deliver to Purchaser:

(i)     as soon as practicable and in any event within forty-five (45) days the end of each fiscal quarter (other than the fourth fiscal quarter), an unaudited consolidated balance sheet of the Issuer and its Subsidiaries as of the close of such fiscal quarter and unaudited consolidated statements of income, retained earnings and cash flows for the fiscal quarter then ended and that portion of the fiscal year then ended, including the notes thereto, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the corresponding period in the preceding fiscal year and prepared by the Issuer in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the period, and certified by the chief financial officer of the Issuer to present fairly in all material respects the financial condition of the Issuer and its Subsidiaries on a consolidated basis as of their respective dates and the results of operations of the Issuer and its Subsidiaries for the respective periods then ended, subject to normal year end adjustments and the absence of footnotes;

(ii)     as soon as practicable and in any event within ninety (90) days after the end of each fiscal year, an audited consolidated balance sheet of the Issuer and its Subsidiaries as of the close of such fiscal year and audited consolidated statements of income, retained earnings and cash flows for the fiscal year then ended, including the notes thereto, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the preceding fiscal year and prepared in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the year. Such annual financial

statements shall be audited by an independent certified public accounting firm of recognized standing acceptable to Purchaser, and accompanied by a report thereon by such certified public accountants that is not qualified with respect to scope limitations imposed by the Issuer or any of its Subsidiaries or with respect to accounting principles followed by the Issuer or any of its Subsidiaries not in accordance with GAAP;

(iii)   together with each of the financial statements in Sections 6(e)(i) and (ii) a certificate of an officer of the Issuer, certifying that as of the date of the such financial statements and as of the date of such certificate, (A) the representations and warranties in Sections 4(cc) and (ee) are accurate and complete, and (B) no Default or Event of Default has occurred, or is likely to occur since the latest of the last Issue Date and the date of the last certificate delivered pursuant to this subsection;

(iv)   as soon as practicable and in any event within fifteen (15) days after the end of each calendar month, an unaudited combined balance sheet of the Issuer and its Subsidiaries as of the close of such calendar month, and unaudited consolidated statements of income, retained earnings and cash flows for such calendar month and that portion of the fiscal year then ended, including the notes thereto, all in reasonable detail setting forth in comparative form the corresponding figures as of the end of and for the corresponding period in the preceding fiscal year and prepared by the Issuer in accordance with GAAP and, if applicable, containing disclosure of the effect on the financial position or results of operations of any change in the application of accounting principles and practices during the period, and certified by the chief financial officer of the Issuer to present fairly in all material respects the financial condition of the Issuer and its Subsidiaries on a consolidated basis as of their respective dates and the results of operations of the Issuer and its Subsidiaries for the respective periods then ended, subject to normal year end adjustments and the absence of footnotes;

(v)   not later than ten (10) days prior to each calendar month of the Issuer, (A) a budget for the Theia Parties for such month (a "Monthly Budget") identifying for each Theia Party all expenses and cash expenditures that in the Issuer's reasonable estimation, are expected to be incurred or paid by such Theia Party during such month, together with (B) a comparison of the monthly expenses and expenditures to the budget for the then most recently completed calendar month; it being understood and agreed that each proposed Monthly Budget shall be subject to the Purchaser's review and reasonable objection before it becomes a Monthly Budget; and

(vi)   together with each of the financial statements in Sections 6(e)(i), (ii) and (iv), stand-alone summary balance sheet and profit and loss and cash flow information for each Theia Party, as of the close of the applicable period for which the balance sheet included in such financial statements are presented and for the applicable period(s) then ended.

(f)   Within thirty (30) days following the Effective Date (or with respect to any insurance policy obtained after the Effective Date, the date it is obtained) the Issuer shall cause the Purchaser to be named as an additional insured and/or loss payee, as applicable, in each case with no right of subordination by the insurance providers, on each of the property, liability and if any, business interruption, insurance policies of the Issuer and its subsidiaries.

**CONFIDENTIAL AND PROPRIETARY**

(g)     The Issuer shall (A) deliver to the Purchaser periodic reports on any material changes in the status of the Theia Parties' negotiations and their progress, and developments, in respect of (i) obtaining payments from participants and proposed participants in the Master Partnership Program relating to the use of the Issuer and its Subsidiaries' satellite network (the "Theia MPP"), (ii) acquiring, outfitting and deploying Theia Aviation's aircraft, including the New Aircraft, and (iii) entering into Sales Contracts for Theia Aviation's aircraft, in each case, promptly upon the occurrence of any such material change, but in no event less frequently than every 30 days; and (B) promptly, but in any event within two (2) Business Days, written notice of the receipt by any Theia Party of any such payments under the Theia MPP. Without limiting the generality of the foregoing, the Issuer shall participate in meetings and conference calls with the Purchaser, at least once every month, to provide updates to the Purchaser about the Theia Parties' business, including the matters specified in the foregoing sentence.

(h)     Promptly upon any Theia Party entering into any contract to provide goods or services to any third party, including any such contract under the Theia MPP and any service contracts with the U.S. government (each such contract a "Sales Contract") or any amendment to any such Sales Contract, the Issuer shall (i) to the extent not bound by confidentiality restrictions mandated by a governmental counterparty, notify the Purchaser in writing of the parties to and general terms and conditions of the Sales Contract or the amendment, as applicable, and provide Purchaser with a copy of the Sales Contract or such amendment, as applicable, (ii) deliver, or cause the relevant Theia Party to deliver, an Irrevocable Payment Instruction to the counterparty to such Sales Contract, directing it to make all payments thereunder to the Reserve Account or such other ACA Account as the Purchaser shall direct or consent to.

(i)     The Issuer shall deliver to the Purchaser financial statements meeting the requirements of Section 6(e)(ii) for the year ended, and as of, December 31, 2019, promptly upon the issuance thereof.

(j)     On or prior to the 30th day following the first Issue Date, the Issuer shall procure one or more legal opinions addressed to the Purchaser, in form and substance reasonably satisfactory to the Purchaser and its counsel, covering the opinion points set forth on Annex 6(j), from New York counsel to the Theia Parties at Akin, Gump, Strauss, Hauer & Feld LLP, Morrison & Foerster LLP or Hogan Lovells International LLC.

7.     Events of Default; Remedies.

1.     Each of the following events will constitute an "Event of Default" under this Agreement and each of the Notes:

(a)     the Issuer shall fail to pay when due (whether on the Maturity Date, by mandatory prepayment or otherwise) any principal of or interest on any Note;

(b)     any representation or warranty made by any Theia Loan Party in this Agreement or any other Transaction Document proves to have been false in any material respect when made;

- 12 -

**CONFIDENTIAL AND PROPRIETARY**

(c)      any Theia Loan Party violates (i) any covenant, agreement or condition contained in the Aircraft Mortgage or in Section 6(a), 6(d), 6(h)(ii) or 8(f) of this Agreement, or (ii) any other covenant, agreement or condition contained in this Agreement or any other Transaction Document other than with respect to a payment obligation or the covenants referred to in the preceding clause (i), and such violation continues for a period of thirty (30) days without cure;

(d)      any Theia Party shall (i) fail to make any payment when due (whether on the scheduled maturity date, upon acceleration, by prepayment or otherwise) on account of any Indebtedness other than the Notes, including on account of the Existing Indebtedness, or (ii) fail to observe or perform any agreement, term or condition contained in any or instrument related to thereto, or any other event occurs or condition exists, if the effect of such failure, event or condition is to cause, or permit the holder or holders thereof to cause, the obligations under any Indebtedness other than the Notes, including the Existing Indebtedness, to become due;

(e)      one or more final and non-appealable judgments or decrees is entered against the Issuer and/or any Subsidiary by a court of competent jurisdiction involving in the aggregate a liability, to the extent not covered by insurance as to which the insurer does not dispute coverage or effective third party indemnification, in an amount of $100,000 or more and remains unpaid after thirty (30) days or enforcement proceedings in respect thereof are commenced against the Issuer or any of its Subsidiaries;

(f)      the Issuer or any of its Subsidiaries (i) shall fail to pay its debts as they come due, (ii) shall file for relief under any Debtor Relief Law, or (iii) shall be the subject of an involuntary petition under any such law and such involuntary petition is not stayed or dismissed within 45 days after the date thereof;

(g)      any security interest granted pursuant to the Transaction Documents ceases for any reason to be valid, binding and in full force and effect or any security interest granted pursuant to the Transaction Documents ceases to be enforceable and of the same effect and priority purported to be created thereby, other than as expressly permitted under the Transaction Documents;

(h)      any Transaction Document or any material term thereof ceases to be, or is asserted by any Theia Loan Party not to be, a legal, valid and binding obligation of such Theia Loan Party, enforceable in accordance with its terms;

(i)      (i) there shall occur any material breach by any Theia Party under any material contract and such material breach continues beyond any period of grace provided therein, or (ii) any material contract shall be terminated as a result of breach thereof by Theia Party;

(j)      (i) the Issuer shall cease to own 100% of the outstanding Equity Interests in each of Theia Holdings and Theia Aviation, free and clear of all Liens other the security interests granted under the Transaction Documents and, if any, Permitted Liens that exist as of the Effective Date and secure Existing Indebtedness, (ii) Theia Aviation shall cease to own the Existing Aircraft and after their respective acquisition, the New Aircraft, free and clear of all

**CONFIDENTIAL AND PROPRIETARY**

Liens other than the security interests granted under the Transaction Documents and other Liens permitted under the Aircraft Mortgages, (iii) Theia Holdings shall cease to own, free and clear of all Liens other than those arising under Requirements of Law, all rights, title and interest in and to the "Order and Authorization for NGSO-like satellite operation in the 10.7-12.7 GHz, 14.0-14.5 GHz, 17.8-18.6 GHz, 18.8-19.3 GHz, 27.5-28.35 GHz, 28.35-29.1 GHz, and 29.5-30.0 GHz frequency bands" or any replacement or successor license and any issued patents required to exploit the license granted by such Order and Authorization (collectively, the "FCC License Assets"), or (iv) any Issuer Change of Control occurs; or

2.      Upon the occurrence of any Event of Default, the Repayment Amount of each of the Notes shall become immediately due and payable in full and the Purchaser shall be entitled to enforce its right to payment and to exercise all right and remedies hereunder and under the other Transaction Documents and at law in furtherance thereof, following (i) the Purchaser's delivery to the Issuer of a notice declaring an Event of Default (an "EOD Declaration") and (ii) the expiration of a period of 30 days after the EOD Declaration (the "Cure Period") if the Event of Default has not been cured during the Cure Period. The foregoing clause (ii) shall not apply if any other creditor of the Issuer or another Theia Party is already taking or starting to take enforcement action with respect to the debts owing to it by the Issuer or the other Theia Party.

3.      Application of Payments. Following and during the continuance of any Event of Default, all amounts available for payment of the Obligations, including, without limitation, amounts paid, recovered or realized from any NPA Collateral, the Aviation Mortgage Collateral, and other security interest granted or credit support provided under any Transaction Document, including shall be applied as follows until paid in full:

(i)      first, pro rata to the payment of any fees, expenses, charges, indemnity payments or other amounts outstanding hereunder (other than principal and interest) or under any other Transaction Document;

(ii)      second, pro rata to the payment of interest accrued on the Series A-1 Note and the Series A-2 Note; and

(iii)      third, pro rata to the payment of principal outstanding under the Series A-1 Note and the Series A-2 Note.

8.      Security Interest.

(a)      As security for the prompt payment and performance in full of the Issuer's obligations under the Notes and the other Transaction Documents, each of the Issuer, Theia Aviation and Theia Holdings hereby grants to the Purchaser and the Agent, a continuing first priority security interest (the "NPA Security Interest"), subject to only the Permitted Liens, in all of the right, title and interest in the property of the Issuer, Theia Aviation and Theia Holdings described on Annex 8(a), whether now owned or hereafter acquired, but not including any Excluded Assets (the "NPA Collateral"). Notwithstanding anything herein or in the Aircraft Mortgage or any New Aircraft Mortgage to the contrary, in no event shall the NPA Collateral or the Aviation Mortgage Collateral include or the security interest hereunder or thereunder attach to any Excluded Assets, provided, however, that (x) the right to receive any payment of money

- 14 -

CONFIDENTIAL AND PROPRIETARY

in respect of any Excluded Asset, including, without limitation, general intangibles for money due or to become due under any Sales Contract, license or otherwise, (y) any proceeds, rents, profits, income or benefits or products or similar rights of any Excluded Asset, and (z) to the maximum extent provided by law, all rights incident or appurtenant to the Excluded Assets, shall not be excluded, but shall constitute NPA Collateral or Aviation Mortgage Collateral, as applicable.

(b)     All terms defined in the Uniform Commercial Code and used in Section 8(a), including Annex 8(a), shall have the same definitions herein as specified in the Uniform Commercial Code; provided, however, that the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code rather than Article 3.

(c)     Pledged Equity Interests.

(i)     None of Theia Holdings Theia Aviation or any of their Subsidiaries shall issue any certificates to represent their Equity Interests; provided that if any such certificates are issued, to the extent not prohibited by applicable Governmental Authority (A) they shall be clearly marked with the following legend: "The Shares or limited liability company interests represented by this certificate are pledged to secure the obligations under an Amended And Restated Secured Note Purchase And Security Agreement, dated as of June 29, 2020, among Theia Group, Incorporated, as issuer, FCS Advisors, LLC d/b/a Brevet Capital Advisors, as purchaser, and certain of the Issuer's Subsidiaries.", (B) the Issuer will cause such certificates, together with stock powers duly executed in blank or other instruments of transfer reasonably satisfactory to the Purchaser and such other instruments and documents as the Purchaser may reasonably request ( "Pledged Equity Documentation"), to be held in a separate safe (with no other assets of the Issuer or any other Person) in its offices in Washington, D.C., and (C) if an Event of Default occurs and remains uncured after the Cure Period, then no later than the first day following the Cure Period, each Grantor shall deliver all such Pledged Equity Documentation to the Purchaser.

(ii)     [Reserved]

(iii)     Upon the occurrence and during the continuance of an Event of Default, all rights of the Grantors, with respect to the Pledged Equity Interests, to (a) dividends or other distributions and (b) exercise the voting and/or consent rights and powers attached to the Pledged Equity Interests shall cease, and all such rights shall thereupon become vested in the Purchaser, which shall have the sole and exclusive right and authority to receive and retain such dividends and or other distributions and to exercise such voting and consent rights and powers. All dividends and other distributions with respect to the Pledged Equity Interests received by \any of the Grantors contrary to the provisions of this clause shall not be commingled by the Grantors with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Purchaser, and shall be forthwith delivered to the Purchaser in the same form as so received (and endorsed in a manner reasonably satisfactory to the Purchaser, as necessary).

(iv)     Each Grantor agrees that to the extent any transfer restrictions are imposed on any Pledged Equity Interests for which it is the issuer or any related Collateral under

CONFIDENTIAL AND PROPRIETARY

its Organizational Documents, the Grantor hereby waives and will not in any way invoke or enforce or attempt to invoke or enforce such transfer restrictions with respect to the grant and enforcement of the NPA Security Interests, including any transfer of such Pledged Equity Interests in connection with such enforcement.

(d)     Each of the Grantors hereby irrevocably authorizes the Purchaser at any time and from time to time, until the Obligations are indefeasibly paid in full, to file (or authorize the filing of) in any relevant jurisdiction any initial financing statements, continuation statements, or other filings and recordings, with respect to the NPA Collateral or any part thereof that contain the information required by Article 9 of the Uniform Commercial Code for the filing of any financing statement, or such other information as may be required under applicable Requirements of Law. The Issuer has the right to approve the description of the collateral included in all such proposed filings prior to their filing, such approval not be unreasonably withheld, and except that no such approval is required for any filings that contain a description of the collateral that is consistent with a description previously approved by the Issuer since the Issue Date.

(e)     For the Reserve Account, the Operating Account and each other deposit or securities or similar account that a Grantor at any time maintains or opens, the Grantor shall cause such account to be subject to a "shifting control" deposit account control agreement, securities account control agreement or other similar agreement, in each case, in favor of the Purchaser, and in form and substance satisfactory to the Purchaser (each, an "ACA" and each account subject to an ACA, an "ACA Account"). Each ACA shall give the Purchaser electronic access to the relevant account, and authority that allows the Purchaser to see, at any time, account balances, transaction history, account statements and all other account information available to the account holder for the subject account, or to the extent normally provided by the bank or securities holder (except that the Issuer may designate one of the ACA Accounts as an operating account, to be used for payments to be made by them in operating their business (the "Operating Account") and so long as no Event of Default has occurred, the foregoing access requirement will not apply to the Operating Account), and shall contain the provisions set forth on Annex 8(e)(i) if such provisions are agreed to by the bank where the ACA Account is established. The Issuer shall cause each of the deposit accounts listed on Schedule 4(bb) to be subject to an ACA on or prior to the 30th day following the Effective Date, and prior thereto (i) the Issuer and its Subsidiaries shall not permit any amounts to be deposited to such accounts except by transfer from the Reserve Account, and (ii) from time to time at the request of the Purchaser, the Issuer shall provide the Purchaser copies of account statements showing account balances and transactions relating to such deposit accounts. The Issuer shall promptly notify the Purchaser whenever any Grantor opens a deposit, securities or other similar account. All draws, withdrawals and other transfers out of the deposit, securities or other similar accounts of any Theia Party, whether by check, electronic withdrawal, wire transfer or otherwise, must be authorized by John Gallagher.

(f)     Without limiting the generality of Section 8(e), (i) the Issuer shall maintain in existence at all times, the Reserve Account, which shall be subject at all times to an ACA (the "Reserve Account ACA"), to which the Grantors shall promptly deposit or transfer, and hold, all of their cash receipts from any source (unless the Purchaser consents to or directs the deposit or transfer, or holding thereof in another ACA Account), and (ii) the Grantors shall

- 16 -

**CONFIDENTIAL AND PROPRIETARY**

instruct all payors to make all payments of any kind owing to them into the Reserve Account. Unless otherwise mutually agreed by the Issuer and the Purchaser, the Issuer may utilize Funds from the Reserve Account only to fund costs and expenses of the Theia Parties in accordance with the budgeted numbers set forth on Annex 6(c) and subsequent budgets of the Theia Parties adopted from time to time subject to the other terms of this Agreement.  To the extent the Reserve Account ACA does not comply with the requirements of Section 8(e) when initially entered into on or prior to the Issue Date, the Theia Parties will cooperate with the Purchaser to enter into an amendment thereof that complies with such requirements on or prior to the 14th day following the Effective Date, but subject to agreement thereto by J.P. Morgan Chase Bank.  By the 10th business day after each month end, the Issuer shall provide a reconciliation of transfers out of the Reserve Account to the Operating Account with reasonable back-up with the evidence to support the expenditures.

(g)     The Issuer shall, from time to time, when requested in writing by the Purchaser, prepare and deliver to the Purchaser a schedule of the NPA Collateral.  To insure the attachment, perfection and, subject to any Permitted Lien, priority of, and the ability of the Purchaser to enforce the NPA Security Interest, each Grantor agrees to take any action reasonably requested by the Purchaser to insure the attachment, perfection and first priority of, and the ability of the Purchaser to enforce, the NPA Security Interest in any and all of the NPA Collateral, including (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Uniform Commercial Code, to the extent, if any, that such Grantor's signature thereon is required therefor, (ii) at the request of the Purchaser, causing the Purchaser's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Purchaser to enforce, the NPA Security Interest in such NPA Collateral, (iii) complying with any provision of any statute, regulation or treaty as to any NPA Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Purchaser to enforce, the NPA Security Interest in such NPA Collateral, and (iv) obtaining any required consent of any third party, including any Governmental Authority pursuant to the Federal Assignment of Claims Act as in effect from time to time.

(h)     Each Grantor agrees that (i) without the prior written consent of the Purchaser, it will not change its organizational identification number, company number, type of organization, jurisdiction of organization or incorporation, or organizational identity or other legal structure, and (ii) it will not change its name, place of business (or if more than one, chief executive office) or mailing address except after providing at least thirty (30) days' prior written notice to the Purchaser of the proposed changed, and it will notify the Purchaser of such change no later than its effective date.

(i)     The Grantors shall, prior to the time the Existing Aircraft is dispatched outside the United States, (i) if not already registered, cause the lien under the Aircraft Mortgage to be registered pursuant to the Convention and the Protocol (each as defined in the Aircraft Mortgage), and (ii) do, or cause to be done, any and all other acts and things as are necessary, or as may be reasonably requested by the Purchaser to protect, perfect and keep in full force the Lien under the Aircraft Mortgage pursuant to the Convention and the Protocol and pursuant to applicable Requirement of Laws of any jurisdiction outside the United States.  This Issuer

- 17 -

CONFIDENTIAL AND PROPRIETARY

acknowledges that this Section 8(i) constitutes any required written request under the Aircraft Mortgage with respect to the foregoing matters.

(j)        If an Event of Default has occurred and is continuing after the Cure Period (if applicable), the Purchaser may exercise, in addition to all other rights and remedies granted to it in this Agreement and the other Transaction Documents, all rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law.  The enumeration of the rights and remedies of the Purchaser set forth in this Agreement and the other Transaction Documents is not intended to be exhaustive and the exercise by the Purchaser of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative, and shall be in addition to any other right or remedy given hereunder or under any other Transaction Document or that may now or hereafter exist at law or in equity or by suit or otherwise.

(k)        Each Grantor hereby appoints the Purchaser the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, and with full power of substitution, from time to time in the Purchaser's discretion to take any action and to execute any instrument which the Purchaser may deem necessary or advisable to accomplish the purposes of the NPA Security Interest granted in this Agreement (but the Purchaser shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

(l)        The Issuer and the Grantors shall no later than the date any Person becomes a direct or indirect Subsidiary of Theia Aviation or Theia Holdings after the Effective Date (each, a "New Subsidiary"), (i) notify the Purchaser thereof; (ii) deliver to the Purchaser a joinder to this Agreement, in form and substance satisfactory to the Purchaser and duly executed by such New Subsidiary, to evidence such New Subsidiary's grant of a NPA Security Interest under this Section 8 (which shall be a first priority security interest subject only to Permitted Liens (but other than any Permitted Lien disclosed in the "Liens" section of Schedule 4(u)) in all of its assets of the type described on Annex 8(a), to secure the Obligations; and (iii) deliver to the Purchaser the certificates representing the Equity Interests in such New Subsidiary, if any, and an updated Annex 4(a).

(m)        Theia Aviation shall no later than the date it acquires a New Aircraft, (i) notify the Purchaser thereof; (ii) deliver to the Purchaser, as the Purchaser's election, an amendment or supplement to the Aircraft Mortgage or a new aircraft mortgage and security agreement on terms and conditions substantially the same as the Aircraft Mortgage, in each case in form and substance satisfactory to the Purchaser (each, a "New Aircraft Mortgage"), and duly executed by Theia Aviation, to evidence its grant of a first priority security interest in such New Aircraft to secure the Obligations; and (iii) cooperate with the Purchaser in order to facilitate the prompt recording and registration thereof, and such other acts and things as may be necessary or reasonably requested to protect, perfect and keep in full force such Lien, pursuant to the Federal Aviation Act, the Convention and the Protocol and applicable Requirement of Laws of any jurisdiction outside the United States.

- 18 -

**CONFIDENTIAL AND PROPRIETARY**

(n)      If an Event of Default has occurred and is continuing, the Purchaser (i) may withdraw any and all cash or other NPA Collateral from any ACA Account and apply such cash and other NPA Collateral to the payment of any and all Obligations in the manner provided in Section 7.3 hereof, and (ii) will be entitled and is hereby authorized, to the maximum extent permitted by applicably law and subject to any required consent of the FCC or any other Governmental Authority, to direct and control the sale or other monetization of the NPA Collateral, including the FCC License Assets.  The Grantors shall, upon the occurrence and during the continuance of an Event of Default and after the Cure Period, at the Purchaser's request, file or cause to be filed such applications for approval and shall take such other actions reasonably required by the Purchaser to obtain each such FCC approval or consent as is necessary to transfer ownership and control to the Purchaser of the FCC License Assets. To enforce the provisions of this Section 8(n), the Purchaser is empowered to request the appointment of a receiver from any court of competent jurisdiction. Such receiver shall be instructed to seek from the FCC and every other applicable Governmental Authority an involuntary transfer of control of any such FCC License Assets for the purpose of seeking a bona fide purchaser to whom control would ultimately be transferred.  Upon the occurrence and during the continuance of an Event of Default, at the Purchaser's request, the Grantors shall further use their reasonable best efforts to assist in obtaining approval of the FCC and/or any other applicable Governmental Authority, if required, for any action or transactions contemplated hereby, including the preparation, execution and filing with the FCC and/or other applicable Governmental Authorities of the assignor's or transferor's portion of any application for consent to the assignment of any FCC License Assets or transfer of control, or notice of such assignment or transfer, as applicable, necessary or appropriate under the FCC's and/or other applicable Governmental Authority rules and regulations for approval of the transfer or assignment of any portion of the NPA Collateral.

(o)      The parties acknowledge and agree that (i) so long as no Event of Default has occurred, in accordance with Section 8(c)(ii) the Issuer will not have the right, pursuant to the Lien on the Equity Interests thereof granted hereunder, to exercise control over Theia Holdings, Theia Aviation or any other Subsidiary of the Issuer that possesses and/or creates (i) classified data for the U.S. Government, or (ii) intellectual property which is or may be used in the collection or processing of data for the U.S. Government, or (iii) other know-how or other property which is or may be used in the collection or processing of data for the U.S. Government. In addition, notwithstanding anything herein or in any Transaction Document to the contrary, the Purchaser agrees that to the extent prior approval of the FCC or any other Governmental Authority is required pursuant to Communications Act of 1934, as amended, and the rules and regulations promulgated thereunder, or other applicable law, for (i) the operation and effectiveness of any right or remedy hereunder or under any other Transaction Document or (ii) taking any action that may be taken by the Purchaser hereunder or under the other Transaction Documents, such right, remedy or actions will be subject to any such prior approval having been obtained by or in favor of the Purchaser.

9.      <u>Tax Consequences</u>.

(a)      The Purchaser has reviewed with the Purchaser's own tax advisors the federal, state, local and foreign tax consequences of this investment and the transactions contemplated by this Agreement.  The Purchaser is relying solely on such advisors and not on

- 19 -

CONFIDENTIAL AND PROPRIETARY

any statements or representations of the Issuer or any of its agents.  The Purchaser understands that the Purchaser (and not the Issuer) shall be responsible for the Purchaser's own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

(b)     Any and all payments by the Theia Parties hereunder will be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding income or franchise taxes imposed on the Purchaser's net income by the jurisdiction under the laws of which the Purchaser is organized, where its principal office is located or where it is doing business, or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being "Taxes").  If the Theia Party is required by law to deduct any Taxes from or in respect of any sum payable hereunder (i) the sum payable will be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Purchaser will receive an amount equal to the sum it would have received had no such deductions been made, (ii) the Theia Party will make such deductions, and (iii) the Theia Party will pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. The Theia Party will promptly furnish to the Purchaser the original or a certified copy of a receipt evidencing payment thereof.  The Issuer will indemnify the Creditor for the full amount of Taxes or Other Taxes paid by the Purchaser or any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally asserted, within thirty (30) days of the Purchaser's request therefor.  Without prejudice to the survival of any other agreement contained herein, the Theia Parties' agreements and obligations contained in this Section 9(b) will survive the payment in full of the Obligations and any amounts due hereunder and any termination of this Agreement.

10.     Indemnification.    Subject to the provisions of this clause, the Issuer will indemnify and hold each of the Purchaser, the Administrative Agent and the Collateral Agent (collectively, for purposes of this Section 10, the "Purchaser"), and its directors, managers, officers, equityholders, members, partners, employees and agents (and any other persons with a functionally equivalent role of a person holding such titles notwithstanding a lack of such title or any other title), each person who controls Purchaser, and the directors, managers, officers, equityholders, agents, members, partners or employees of such controlling person (each, a "Purchaser Party") harmless from any and all losses, liabilities, obligations, claims, contingencies, damages, costs and expenses, including all judgments, amounts paid in settlements, court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of or relating to any of the Transaction Documents or the transactions contemplated thereunder, including, without limitation, (a) any breach of any of the representations, warranties, covenants or agreements made by the Issuer or any Grantor in any Transaction Document or (b) any action instituted against the Purchaser in any capacity, or its affiliates, by any stockholder of or other investor in the Issuer or any of its Subsidiaries who is not an Affiliate of the Purchaser, with respect to any of the transactions contemplated by the Transaction Documents (unless such action is based upon a breach of the Purchaser's representations, warranties or covenants under this Agreement or any Notes or any violations by the Purchaser of state or federal securities laws or any conduct by the Purchaser which constitutes fraud, gross negligence, willful misconduct or malfeasance).

**CONFIDENTIAL AND PROPRIETARY**

11.    <u>No Waiver</u>.  No failure or delay on the part of any party in exercising any right, power or privilege hereunder and no course of dealing between the Issuer and Purchaser shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

12.    <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the other party, except that the Purchaser and any other Permitted Holder may assign and transfer any Note and this Agreement, without the Issuer's or any other Theia Party's consent, to any entity (such entities, collectively, "<u>Permitted Holders</u>") which controls, is controlled by, or is under common control with, the Purchaser.

(b)    The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at the Administrative Agent's address in Section 21 a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of each owner of the Notes and the principal amounts (and related interest amounts) of the Notes of each owner pursuant to the terms hereof from time to time, including any participations therein sold by any holder thereof (the "<u>Register</u>"). The entries in the Register shall be conclusive, and the Issuer, the Agent and the Purchaser shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as the owner thereof for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Issuer and any Lender. Neither FCS nor any other Purchaser Party shall be liable to the Issuer or any other Person for any action taken or omitted to be taken by any of them under or in connection with such agency.

13.    <u>Time is of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

14.    <u>Entire Agreement; Effect of Amendment</u>.

(a)    Except as otherwise provided herein, this Agreement sets forth the entire agreement and understanding among the parties hereto as to the subject matter hereof, and merges and supersedes all prior discussions, agreements, and understandings of every kind and nature among them.  No party shall be bound by any condition, definition, warranty or representation, other than as expressly set forth in this Agreement.  The parties hereto acknowledge that no other party, nor anyone else acting on his, her, or its behalf, has made any promise or representation regarding this Agreement except as expressly stated herein. Nothing herein shall affect the continued effectiveness of any provisions of the Letter dated May 16, 2020 from FCS to the Issuer, Re: Possible Financing Transaction (the "<u>LOI</u>") that by their terms survive termination of the LOI, including the confidentiality provisions in Section 7 thereof.

(b)    This Agreement amends and restates and supersedes the 2018 NPA and the 2019 NPA in their entirety from the first Issue Date, and the parties hereto acknowledge and

agree that (i) this Agreement and the other Transaction Documents, whether executed and delivered in connection herewith or otherwise, do not constitute a novation, payment or reborrowing, or termination of the obligations under the Existing NPA Documents and (ii) such obligations and the Existing NPA Documents, including the Aircraft Mortgage and the Liens created thereunder, are in all respects continuing (as amended and restated hereby) with only the terms thereof being modified as provided in this Agreement and the other Transaction Documentations.  The Issuer and the other Grantors each hereby confirms and reaffirms its duties and obligations under each Transaction Document to which it is a party and the security interests created or perfected thereunder, including the Liens created under the Aircraft Mortgage (such reaffirmation being solely for the convenience of the parties hereto and not required by the terms of the Existing NPA Documents). Each reference to this Agreement in any Transaction Document shall be deemed to be a reference to this Agreement as amended and restated hereby.

15.    Invalidity.  In the event that any one or more of the provisions of this Agreement shall, for any reason, be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

16.    Governing Law and Venue; Service of Process.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER OR IN RELATION TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.  Each of the parties hereto (a) submits to the non-exclusive jurisdiction of the Supreme Court of the State of New York, sitting in the County of New York, the U.S. District Court for the Southern District of New York and any appellate court from any of the foregoing with respect to actions brought against it as a defendant, over any suit, action or proceeding arising out of or relating to this Agreement and (b) consents that any such suit, action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such suit, action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same.  The Issuer hereby irrevocably consents to the service of any and all legal process, summons, notices and documents in any suit, action or other proceeding arising out of or in connection with this Note by the mailing or delivering of a copy of such process to it in accordance with the provisions of Section 18 hereof. Nothing contained in this Section 16 shall affect the right of any party hereto to serve process in any other manner permitted by law.

**17.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 17.**

**CONFIDENTIAL AND PROPRIETARY**

18.    <u>Amendment</u>.   This Agreement may not be amended, modified, waived or terminated unless such is done in a writing signed by all parties hereto.

19.    <u>Construction of Agreement</u>.  This Agreement shall not be construed in favor of or against any party hereto on the basis that such party did or did not author this Agreement or any attachment related to it.  It is intended that this Agreement shall be comprehensive in nature and shall be construed liberally to effect its purposes.

20.    <u>Headings</u>.  Section headings used in this Agreement are for convenience only and shall not affect the construction.

21.    <u>Notices</u>.  All notices and/or the tender of any other document or item required herein, shall be valid only if sent by hand delivery, recognized overnight courier, or Certified United States Mail Return Receipt Requested to each party hereto, and only if they include notice by email, at the following addresses:

      (a)    Notices to the Purchaser or the Agent:

            NAME:        FCS Advisors, LLC d/b/a Brevet Capital Advisors
            ADDRESS:   441 9th Ave, 20th Floor
            ADDRESS:   New York, NY 10001
            Attention:    Theia Notes
            Email:          legal@brevetcapital.com

      (b)    Notices to the Issuer or any other Theia Party:

            Theia Group, Incorporated
            Theia Holdings A, Inc.
            Theia Aviation, LLC
            1455 Pennsylvania Ave Suite 800
            Washington DC 20004
             Attn: Paul Carroll
            Email: pcarroll@theiagroupinc.com

Any party to this Agreement may change its address for notice purposes by notifying all other parties of its new notice address in writing in the manner specified above.

22.    <u>Definitions</u>.   For purposes of this Agreement, except as otherwise provided herein, capitalized terms used but not otherwise defined herein shall have the meanings given to them in <u>Annex 22</u> hereto.

23.    <u>Further Actions</u>.  Each of party hereto shall execute and deliver such further agreements, documents, deeds, certificates and other instruments and shall take or cause to be taken such other actions as may reasonably be requested by any other party to carry out the provisions of this Agreement and consummate and make effective the transactions this Agreement contemplates.

**CONFIDENTIAL AND PROPRIETARY**

24.     <u>Fees</u>.

(a)     The Issuer shall pay to the Purchaser an up front fee equal to 2% of the initial principal amount of the Notes, upon and as a condition to the issuance thereof (the "<u>Closing Fee</u>").

(b)     The Issuer shall pay to the Agent an annual administrative fee equal to 0.65% of the outstanding principal amount of the Notes.  The fee shall be payable in equal installments on the first Business Day of each calendar month.

25.     <u>Appointment of Agent</u>.  The Theia Parties acknowledge that FCS is acting in the capacity as Administrative Agent, in addition to its capacity as the Purchaser, and that the Purchaser may from time to time appoint a collateral agent and one or more successors or assigns to act in either or both of such capacities, and the Administrative Agent is authorized to take such action on the Purchaser's behalf under the provisions of this Agreement and each other Transaction Document and to exercise such powers and perform such duties as are expressly delegated or reserved to the Purchaser by the terms of this Agreement or any other Transaction Document, together with such powers as are reasonably incidental thereto.  Any appointment of a collateral agent or of a successor or assign to any agent shall be effective for purposes of this Agreement and the other Transaction Documents upon notice to the Theia Parties. The use of the term "agent" herein and in the other Transaction Documents with reference to any such agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first set forth above.

**THEIA GROUP, INCORPORATED**
a Delaware corporation

By:

Name:

Title:

**THEIA HOLDINGS A, INC.**
a Delaware corporation

By:

Name:

Title:

**THEIA AVIATION, LLC**
a Delaware limed liability company

By:

Name:

Title:

*[Signature Page to 2020 A&R Note Purchase Agreement - Theia]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first set forth above.

FCS ADVISORS, LLC d/b/a
BREVET CAPITAL ADVISORS
a Delaware limited liability company

By: _____

Name:    Mark Callahan

Title:    Managing Director

*[Signature Page to 2020 A&R Note Purchase Agreement  - Brevet]*

## Annex 1(b)

## Conditions Precedent

1.      The representations and warranties of the Issuer and each other Theia Loan Party contained in each Transaction Document shall be true and correct in all material respects (or in all respects in the case of any such representation or warranty that is already qualified by materiality) on the Issue Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects (or if applicable, in all respects) as of such earlier date).

2.      [Reserved]

3.      The Purchaser shall have received:

(i)      each of (A) this Agreement, (B) the Notes, (C) the Guaranty, (D) the Reserve Account ACA, and (E) an amendment to the Aircraft Mortgage to acknowledge the amendment and restatement of the Existing NPA Documents in accordance with the Transaction Documents and such other documents as are required to complete a lien registration on the International Registry pursuant to the Convention on International Interests in Mobile Equipment (the "Convention") and the Protocol to the Convention on Matters Specific to Aircraft Equipment, each signed in Cape Town, South Africa on November 16, 2001, in form and substance acceptable to the Purchaser, each of the foregoing to be duly executed and delivered by authorized representatives of each party thereto;

(ii)      a Solvency Certificate from each Theia Party, substantially in the form of Exhibit D, duly executed and delivered by its Chief Financial Officer;

(iii)      a Closing Certificate from the Issuer, substantially in the form of Exhibit E hereto, duly executed and delivered by an authorized officer of the Issuer;

(iv)      a Secretary's Certificate from each of the Issuer and its Subsidiaries, substantially in the form of Exhibit F hereto, duly executed and delivered by its Secretary;

(v)      an Incumbency Certificate from each of the Issuer and its Subsidiaries, substantially in the form of Exhibit G hereto, duly executed and delivered by its Secretary;

(vi)      a certificate of good standing for each of the Issuer and its Subsidiaries from the Secretary of State of the State of Delaware (as of a date reasonably near the Issue Date and acceptable to the Purchaser);

(vii)      the results of a recent search by a Person satisfactory to the Purchaser, of the Uniform Commercial Code, judgment and tax lien filings which may have been filed with respect to property of each of the Theia Parties and the results of such search shall be satisfactory to the Purchaser; and

(viii)      except for any new or amended UCC financing statements and any documents required under item 3(i)(E) above which will be agreed to and filed promptly following the issuance of the Notes, each document required by this Agreement or the other Transaction Documents to be filed, registered or recorded in order to create in favor of the

Purchaser a perfected Lien on the Collateral described herein and therein, prior to any other Liens (subject only to Permitted Liens in accordance with the terms hereof), in proper form for filing, registration or recording**.**

## Annex 1(c)

## Closing Funds Flow

1. The face value of the funds for the Notes being issued under this Agreement, minus the amounts in item 2. below, shall be wired in full to the Reserve Account (which shall be under the control of the Issuer as provided in this Agreement).

2. The amount wired to the Issuer under 1 above shall be net of:

    a. The Repayment Amounts due to the Purchaser under the 2018 Note and the 2019 Note, and the Purchaser will deliver to the Issuer a payoff statement relating to such notes.

**Annex 4**

**Certain Representations and Warranties**

**Anti-Terrorism Law; Money Laundering; Sanctions; Anti-Corruption Law**

(i)      The Theia Loan Parties, each Subsidiary thereof, the officers, directors, employees, brokers and agents of the Theia Loan Parties and each Subsidiary thereof, and all Persons Controlling the Loan Parties and each Subsidiary thereof, are in compliance with any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

(ii)      No Theia Loan Party, Subsidiary thereof, or any director or officer thereof, and no officers, directors, employees, broker, other agent or Affiliate of any Theia Loan Party or Subsidiary thereof acting or benefiting in any capacity in connection with the purchase of the Notes is, or is owned or controlled by one or more Persons that are, any of the following:

(a)      a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(b)      a Person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise a target of, the Executive Order;

(c)      a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(d)      a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC, the Her Majesty's Treasury's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant Sanctions authority; or

(e)      a Person that is (x) currently the subject or target of any Sanctions or (y) located, organized or resident in a Designated Jurisdiction.

(iii)      No Theia Loan Party, Subsidiary thereof, and, to the knowledge of the Issuer, no officers, directors, employees or agents of any Theia Loan Party, when acting on behalf of any Theia Loan Party, or any Affiliate of any Theia Loan Party has directly or indirectly made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services, including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any domestic official or any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, (a) to obtain favorable treatment for business or contracts secured, (b) to pay for favorable treatment for business or contracts secured, or (c) to obtain

- 30 -

special concessions or for special concessions already obtained, in violation of any Laws, including the FCPA.

**<u>Related Definitions</u>**:

"Designated Jurisdiction" means any country, territory or region to the extent that such country, territory or region itself is the subject of any Sanction.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Sanction(s)" means any international economic sanction administered or enforced by the United States Government (including without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

**<u>Annex 6(c)</u>**

**<u>Use of Proceeds</u>**

<u>(Separately attached)</u>

Annex 6(c)
Use of Proceeds

**Theia Budget (6 Month in $)**

| | Total | 6/30/2020 Closing | Jul-20 Month 1 | Aug-20 Month 2 | Sep-20 Month 3 | Oct-20 Month 4 | Nov-20 Month 5 | Dec-20 Month 6 |
|---|---|---|---|---|---|---|---|---|
| Payoff Prior Loan | 59,340,892 | 59,340,892 | | | | | | |
| Holdback - First 6 Months interest | 20,648,889 | 20,648,889 | | | | | | |
| Upfront Fee | 4,040,000 | 4,040,000 | | | | | | |
| Closing Expenses | 375,000 | 375,000 | | | | | | |
| Loan Payoff Expenses | 84,404,781 | 84,404,781 | - | - | - | - | - | - |
| | | | | | | | | |
| To Theia | 117,595,219 | 117,595,219 | | | | | | |
| Total Loan Amount | 202,000,000 | 202,000,000 | | | | | | |
| | | | | | | | | |
| Description | | | Maximum Draw (Subject to Agreement Terms) | | | Max Draw (Subject to Agreement Terms) | | |
| Aircraft (asset acq) | 33,997,000 | | 16,957,000 | - | 8,520,000 | 8,520,000 | - | - |
| Aircraft Other | 48,820,433 | | 7,607,883 | - | 17,746,334 | 23,466,216 | - | - |
| Aircraft Overage | 1,277,786 | | 847,850 | - | 426,000 | 3,935 | - | - |
| **Aircraft: Maximum Draw** | 84,095,219 | | 25,412,733 | - | 26,692,334 | 31,990,151 | - | - |
| | | | | | | | | |
| Monthly Overhead | 10,800,000 | | 7,000,000 | - | 3,800,000 | - | - | - |
| Debt Payments | - | | - | - | - | - | - | - |
| Lockheed Payable | 2,100,000 | | 2,100,000 | - | - | - | - | - |
| Past Due Employee compensation | 10,000,000 | | 10,000,000 | - | - | - | - | - |
| Past Due Board Compensation | 600,000 | | 600,000 | - | - | - | - | - |
| Theia Misc | 10,000,000 | | 5,000,000 | 5,000,000 | - | - | - | - |
| Corporate Expenses | 33,500,000 | | 24,700,000 | 5,000,000 | 3,800,000 | - | - | - |
| | | | | | | | | |
| FCS Combined Max Draw Down | 117,595,219 | | 50,112,733 | 5,000,000 | 30,492,334 | 31,990,151 | - | - |
| | | | | | | | | |
| Pro-Forma | 117,595,219 | | 50,112,733 | 5,000,000 | 30,492,334 | 31,990,151 | - | - |

**Annex 6(j)**

**Form of Legal Opinion**

We are  of the opinion that:

1.      Each of the Transaction Parties is (a) validly existing and in good standing under the laws of the State of Delaware, and (b) qualified as a foreign entity to do business in (i) the jurisdictions indicated opposite its name on Schedule II and (ii) each other jurisdiction where it is necessary to be so qualified in order to carry on its business and operations, in each case of this clause (b), except where its failure to be so qualified would not reasonably be expected to result in an adverse material effect.

2.      Each of the Transaction Parties has the necessary corporate or limited liability company power and authority, as applicable, to execute, enter into and deliver the Transaction Documents to which it is a party and to perform its obligations thereunder.

3.      Each of the Transaction Parties has taken all necessary corporate or limited liability company action, as applicable, to authorize the execution, delivery and performance of the Transaction Documents to which it is a party.

4.      Each of the Transaction Parties has duly executed and delivered the Transaction Documents to which it is a party.

5.      Each of the Transaction Documents constitutes the valid and binding obligation of each Transaction Party which is a party thereto, enforceable against such Transaction Party  in accordance with its terms

6.      The execution, delivery, and performance by each of the Transaction Parties of each of the Transaction Documents to which it is a party do not and will not (a) contravene the terms of the certificate of incorporation, bylaws, certificate of formation or limited liability company agreement of such Transaction Party, as applicable, or (b) result in any breach of the terms of, or constitute a default under, or result in the acceleration of or entitle any other Person to accelerate (whether after the giving of notice or lapse of time or both) the maturity of any payment under, or result in the creation or imposition of any lien, security interest or other encumbrance upon any assets of such Transaction Party pursuant to the terms of any indenture, mortgage, credit agreement, lease or other material agreement to which such Transaction Party is a party or by which it or any of them is bound, other than (i) such liens, security interests or other encumbrances as may secure the obligations of the Transaction Parties under the Transaction Documents and (ii) such violations, breaches, defaults, liens, security interests or other encumbrances which would not reasonably be expected to result in a material adverse effect on the on (a) the business, assets, operations, or financial or other condition of the Issuer and the other Theia Parties, taken as a whole, or (b) the ability of the Issuer and the other Theia Parties to pay or perform the Obligations in accordance with the terms of the Transaction Documents, or (c) violate any provision of the General Corporation Law of the State of Delaware or the Delaware Limited Liability Company Act or any Applicable Law .

- 33 -

7.      No approval, consent, exemption, authorization, or other action by, or notice to or filing with, any Governmental Authority of  the State of New York, the United States of America or pursuant to the Delaware UCC is necessary or required for the validity of the execution, delivery or performance by, or enforcement against, any of the Transaction Parties of each of the Transaction Documents to which it is a party except for the filing of the UCC Financing Statements in the forms attached hereto as Exhibit A (the "Financing Statements") in the office of the Secretary of State of the State of Delaware (the "Filing Office").

8.      All of the issued and outstanding Equity Interests in each Transaction Party have been duly authorized and are fully paid and non-assessable and are owned by the Company.

9.      To our knowledge, there is no outstanding judgment of, and no action, suit or proceeding is pending before, any arbitrator or court or governmental agency, or is overtly threatened, in either case, against the Transaction Parties, which challenges the legality, validity or enforceability of any Transaction Document.

10.     Under the New York UCC, upon the Purchaser obtaining and retaining possession, in the State of New York, of the Pledged Equity Interest owned by Theia Group in Theia Holdings (the "Theia Holdings Shares") represented by a stock certificate accompanied by stock powers endorsed either in blank or to the Purchaser, the security interest of the Purchaser in the Theia Holdings Shares will be perfected.

11.     The provisions of Section 8 of the Note Purchase Agreement create a valid security interest in favor of the Purchaser in that portion of the Collateral (as such term is defined in the Note Purchase Agreement) in which a security interest may be created under Article 9 of the New York UCC (the "Article 9 Collateral").

12.     Under the Delaware UCC, (i) the Financing Statements are in proper form for filing in the Filing Office and (ii) upon the proper filing of the Financing Statements in the Filing Office (together with payment of any required filing fees) the security interest of the Purchaser in the Article 9 Collateral will be perfected, to the extent that a security interest may be perfected by the filing of a UCC financing statement in the Filing Office.

13.     Each Account Control Agreement is effective to perfect the Lender's security interest in the bank account described therein.

14.     Based upon our examination of the Aircraft Mortgage  and of such records of the FAA as we deemed necessary to render this opinion and as were made available to us  by the FAA, it is my opinion that:

(a)     the Aircraft Mortgage was duly filed with the FAA for recordation and has been duly recorded  by the  FAA pursuant to and in accordance with the provisions of Section 44107 of Title 49 of the United States Code;

(b)     legal title to the Aircraft is vested in Theia Aviation  and the Aircraft is duly registered in the name of Theia Aviation  pursuant to and in accordance with the provisions of Sections 44102 and 44103 of Title 49 of the United States Code;

(c)     the Aircraft and  the Engines are free and clear of any liens, security interests and encumbrances of record with the FAA other than such as is created by the Aircraft Mortgage; the

- 34 -

Aircraft Mortgage creates a duly perfected first priority security interest in favor of FCS in the Aircraft and the Engines; the Aircraft Mortgage is not required to be filed or recorded in any other place within the United States in order to perfect or maintain the perfection of the security interest created thereby in the Aircraft and  the Engines  under the applicable laws of any jurisdiction within the United States; and

(d)      no other registration of the Aircraft and no filings or recordings (other than the filings and recordings with the FAA which have been effected) are necessary to perfect in any jurisdiction within the United States Theia Aviation's title to the Aircraft or the security interest created by the Aircraft Mortgage  the Aircraft and the Engines  under the applicable laws of any jurisdiction within the United States.

15.      None of the Transaction Parties  is required to register as an "investment company" as such term is defined in the U.S. Investment Company Act of 1940, as amended.

## Annex 8(a)

## NPA Collateral

All of the right, title and interest of each of the Issuer, Theia Aviation and Theia Holdings in the following property, whether now owned or hereafter acquired, to the extent not prohibited by applicable Governmental Authority or not otherwise an Excluded Asset (as defined in Annex 22):

(i)     all Equity Interests in Theia Holdings and Theia Aviation and of each Subsidiary of Theia Aviation and Theia Holdings, including as to the foregoing, all other Ownership Interests;

(ii)     all general intangibles (including payment intangibles) constituting the Ownership Interests;

(iii)     all Contract Rights;

(iv)     all FCC License Assets and all proceeds, rents, profits, income, benefits and other products of the FCC License Assets, all supporting obligations in respect thereof and all collateral security and guarantees given by any Person with respect thereto;

(v)     all moneys and securities now or hereafter paid to or owned or held by or for the account of the Grantor, and all deposit accounts and securities accounts;

(vi)     all trademarks, trademark applications, trade names, service names, service marks, domain names, and other similar rights that, in each case, include or derive from the name "Theia";

(vii)     all other personal property of every kind and nature including all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, any other contract rights or rights to the payment of money, insurance claims and proceeds, tort claims, and all other general intangibles including all other payment intangibles, rights to payment under a plaintiff agreement, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature pursuant to which the Grantor possesses, uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of the Grantor;

(viii)     to the extent not otherwise included above, all proceeds, rents, profits, income, benefits and other products of, and all supporting obligations in respect of, any and all of the NPA Collateral described in the foregoing clauses, including all proceeds and products of the Equity Interests and Ownership Interests, and all collateral security and guarantees given by any Person with respect to any of the foregoing; and

(ix)     all books and records pertaining to the NPA Collateral described in foregoing clauses.

- 36 -

**Annex 8(e)(i)**

1.  Provide the Purchaser the right to request additional information regarding the blocked account without the need to obtain any Theia Party's consent;

2.  Prohibit the bank from entering into any other agreement regarding the account, including any other account control agreement without the Purchaser's prior consent;

3.  Provide that the Theia Parties (and not the Purchaser or the Agent) shall be solely responsible for all indemnification obligations to the bank; and

4.  Provide the Purchaser the right to assign its rights and obligations under the ACA without any other party's consent, so long and the assignee is permitted under this Agreement and subject to the bank's KYC and compliance requirements.

**Annex 8(e)(ii)**
**Bank Accounts Without Account Control Agreements**

| | |
|---|---|
| ACCOUNT HOLDER: | Theia Group, Incorporated |
| NAME OF BANK: | WELLS FARGO |
| | 1700 Market Street |
| | Philadelphia, PA 19103 |
| ACCOUNT #: | 635 250 0224 |
| WIRE ROUTING#: | 121000248 |
| PURPOSE OF ACCOUNT: | Payroll |
| | |
| ACCOUNT HOLDER: | Theia Group, Incorporated |
| NAME OF BANK: | CITIZENS BANK |
| | 20th and Market Street, |
| | Philadelphia, PA 19103 |
| ACCOUNT #: | 630 394 94 80 |
| ABA ROUTING#: | 036076150 |
| SWIFT CODE: | CTZIUS33 |
| PURPOSE OF ACCOUNT: | Employee credit card reimbursements |

## Annex 22

### Definitions

"ACA" has the meaning specified in Section 8(e).

"ACA Accounts" has the meaning specified in Section 8(e).

"Administrative Agent" has the meaning specified in the Preamble.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person. A Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agent" has the meaning specified in the Preamble.

"Aircraft Mortgage" shall mean the Aircraft Mortgage and Security Agreement, dated as of the 7th day of August, 2019, between Theia Aviation, as mortgagor and the Purchaser, as mortgagee.

"Aviation Mortgage Collateral" shall mean the collateral on which the mortgages and security interests under the Aircraft Mortgage and the New Aircraft Mortgage, if any, are granted.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks are authorized or required by law to remain closed in New York, New York or Philadelphia, Pennsylvania.

"Closing" has the meaning specified in Section 1(c).

"Closing Fee" has the meaning specified in Section 24(a).

"Collateral" shall mean the property of the Grantors on which the Liens to secure the Obligations are granted under the Transaction Documents.

"Collateral Agent" has the meaning specified in the Preamble.

"Contract Rights" shall mean all accounts (as defined in the Uniform Commercial Code) arising under any and all Sales Contracts of the Issuer and each of its Subsidiaries, including Theia Holdings and Theia Aviation, all general intangibles (including payment intangibles) constituting such accounts, all books and records pertaining to the foregoing, and to the extent not otherwise included, all proceeds and products of any and all of the foregoing, all supporting obligations in respect of the foregoing, and all collateral security and guarantees given by any Person with respect to any of the foregoing.

"Contractual Obligation" of any Person shall mean, any indenture, note, security, deed of trust, mortgage, security agreement, lease, guaranty, instrument, contract, agreement or other form of obligation or undertaking to which such Person is a party or by which such Person or any of its property is bound.

"Cure Period" has the meaning specified in Section 7.2.

"Debtor Relief Law" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" shall mean any event or occurrence that with notice or the passage of time would become an Event of Default.

"Default Rate" has the meaning specified in Section 2(c)(ii).

"Equity Interests" of any Person shall mean (a) all common stock, preferred stock, participations, shares, partnership interests, membership interests or other equity interests in and of such Person (regardless of how designated and whether or not voting or non-voting) and (b) all warrants, options and other rights exercisable for, convertible into or otherwise to acquire any of the foregoing.

"Event of Default" has the meaning specified in Section 7.1.

"Excluded Assets" shall mean assets, including (i) FCC License Assets and (ii) intellectual property, know-how, trade-secrets, software programs, data, and any electronic representation of information, or any other thing which is considered "Classified" by the United States Government, including but not limited to data or software or information in electronic form, that, but only to the extent that, any law, regulation, permit, order, policy, decision or decree of the United States Government or any other competent Governmental Authority prohibits the creation of a security interest therein; but for avoidance of doubt, (i) the rights to receive any payment of money in respect of any of the foregoing (including, without limitation, general intangibles for money due or to become due), (ii) any proceeds, rents, profits, income or benefits or other products thereof, (iii) all other economic rights therein and relating thereto, and (iv) to the maximum extent provided by law, the rights incident or appurtenant thereto, shall not be Excluded Assets, but shall constitute NPA Collateral hereunder.

"Excluded Subsidiary" shall mean a direct or indirect Subsidiary of the Issuer, or any other Person whose Equity Interests are owned, directly or indirectly, in part by the Issuer, that is a not a Grantor.

"Existing Aircraft" shall mean the aircraft on which the Lien under the Aircraft Mortgage is granted as of the first Issue Date.

"Existing Indebtedness" has the meaning specified in Section 4(u).

"Existing NPA Documents" shall mean (i) the Secured Note Purchase Agreement, dated as of October 4, 2018 between the Issuer, as issuer, and FCS, as purchaser (as amended, modified or supplemented prior to, and in effect on the date hereof, the "2018 NPA"), (ii) the Secured Convertible Promissory Note dated October 4, 2018 issued by the Issuer to FCS pursuant to the 2018 NPA (as amended, modified or supplemented prior to, and in effect on the date hereof, the "2018 Note"), (iii) the Secured Note Purchase and Security Agreement, dated as of August 7, 2019 among the Issuer, as issuer and a grantor, and Theia Holdings and Theia Aviation, as grantors (as amended, modified or supplemented prior to, and in effect on the date hereof, the "2019 NPA"), (iv) the Secured Promissory Note dated August 7, 2019 issued by the Issuer to

- 39 -

FCS pursuant to the 2019 NPA (as amended, modified or supplemented prior to, and in effect on the date hereof, the "2019 Note"), (v) the Aircraft Mortgage and Security Agreement, dated as of August 7, 2019 between Theia Aviation, as mortgagor, and FCS, as lender, which secures the obligations of the Issuer under the 2018 NPA, the 2018 Note, the 2019 NPA and the 2019 Note (as amended, modified or supplemented prior to, and in effect on the date hereof), and (vi) the Guaranty dated as of August 7, 2019, from Erlend Olson, John Gallagher and others for the benefit of FCS to guarantee certain of the Issuer's obligations under the 2018 NPA, the 2018 Note, the 2019 NPA and the 2019 Note (as amended, modified or supplemented prior to, and in effect on the date hereof).

"FCS" has the meaning assigned to it in the Preamble.

"FCC" shall mean the United States Federal Communications Commission.

"FCC License Assets" has the meaning assigned in Section 7.1.(j).

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" shall mean any domestic or foreign national, state or local government, any political subdivision thereof, any department, agency, authority or bureau of any of the foregoing, or any other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Grantor" means each of the Issuer and each of its Subsidiaries that grants a Lien to secure the Obligations under Section 8 or any other Lien or security interest under any other Transaction Document.

"Guarantor" shall mean each Person who is a Guarantor under the Guaranty.

"Guaranty" shall mean the Amended and Restated Limited Purpose Guaranty in the form of Exhibit C hereto to be delivered by Erlend Olson and John Gallagher, the shareholders of the Issuer, for the benefit of the Purchaser.

"Indebtedness" of any Person shall mean and include the aggregate amount of, without duplication (a) all obligations of such Person for borrowed money, (b) all guaranties by such Person of the Indebtedness of another Person of the type described in clause (a), and (c) all Liens granted by such Person to secure the Indebtedness of another Person of the type described in clause (a) or clause (b).

"Investments" has the meaning assigned in Section 6(a)(v).

"Irrevocable Payment Instruction" means a payment instruction substantially in the form of Exhibit H.

"Issue Date" means, with respect to any of the Notes, the date of its issuance hereunder.

"Issuer" has the meaning specified in the Preamble.

"Issuer Change of Control" means (i) if any Person who is a Guarantor under the Guaranty ceases to be actively involved in the management and control of the Issuer and its Subsidiaries business, or (ii) John Gallagher ceases to own or control at least a majority of the Equity Interests

- 40 -

of the Issuer giving him the right to designate or appoint a majority of the board of directors of the Issuer.

"Lien" shall mean, with respect to any property, any security interest, mortgage, pledge, lien, claim, charge or other encumbrance in, of, or on such property or the income therefrom, including, without limitation, the interest of a vendor or lessor under a conditional sale agreement, capital lease or other title retention agreement.

"Maturity Date" has the meaning specified in Section 2(b).

"Monthly Budget" has the meaning specified in Section 6(e)(v).

"New Aircraft" shall mean any aircraft purchased by a Theia Party after the Effective Date, which may include one or more of the following four (4) aircraft: one (1) British Aerospace Jetstream J41 aircraft and three (3) Basler BT-67 aircraft.

"New Aircraft Mortgage" has the meaning assigned in Section 8(m).

"New Subsidiary" has the meaning specified in Section 8(l).

"Notes" has the meaning specified in Section 1(a).

"NPA Collateral" has the meaning specified in Section 8(a).

"Obligations" shall mean and include all loans, advances, debts, liabilities, and obligations owed by the Issuer, of every kind and description, now existing or hereafter arising under or pursuant to the terms of the Transaction Documents, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of any proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 et seq.), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"Operating Account" has the meaning specified in Section 8(e).

"Organizational Documents" means, with respect to each Person that is a corporation, limited liability company, partnership or other legal entity, its certificate or articles of incorporation or formation and its bylaws or limited liability company, operating or partnership agreement, and/or other formation and constitutional documents, as applicable.

"Ownership Interests" means collectively, the Equity Interests issued by a given Person, including as to such Equity Interests, without limitation, the right to receive all proceeds, dividends or distributions of income, profits, surplus or other payment or compensation by way of income or liquidating distributions (in cash, in kind or other property) from such Person.

"Permitted Holders" has the meaning specified in Section 12.

"Permitted Liens" shall mean and include: (a) Liens granted to Purchaser under the Transaction Documents; (b) Liens listed on Schedule 4(u) solely with respect to Existing Indebtedness; (c) Liens of carriers, warehousemen, mechanics, materialmen, vendors, and landlords incurred in the ordinary course of business for sums not overdue or being contested in good faith, provided provision is made by the Issuer and its Subsidiaries for the eventual payment thereof if

subsequently found payable; (d) leases or subleases and non-exclusive licenses or sublicenses granted in the ordinary course of the Issuer and its Subsidiaries' business; (e) Liens for taxes not at the time delinquent or thereafter payable without penalty or being contested in good faith, provided reasonable provision is made by the Issuer and its Subsidiaries for the eventual payment thereof if subsequently found payable; (f) Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums; and (g) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business.

"Permitted New Indebtedness" means new Indebtedness for money borrowed after the Effective Date which: (a) has a maturity or repayment date (in whole or in part) that is no earlier than six months after the last Maturity Date then provided for in any of the Notes; (b) is expressly agreed to be subordinated in all respects to the obligations of the Issuer, Theia Holdings and Theia Aviation under the Transaction Documents on terms and conditions acceptable to the Purchaser (which acceptance shall not be unreasonably withheld or delayed); and (c) otherwise does not contain any covenants, terms, rights, remedies, or conditions that are more favorable to the holder or lender thereof than the covenants, terms, rights, remedies, and conditions under the Transaction Documents.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), estate, a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a Governmental Authority.

"Pledged Equity Interests" means the Equity Interests pledged as collateral under Section 8 hereof.

"Purchase Price" has the meaning specified in Section 1(a).

"Purchaser" has the meaning specified in the Preamble.

"Purchaser Party" has the meaning specified in Section 10.

"Repayment Amount" means, as of any date of determination, the sum of (i) 100% of the principal of the Notes outstanding, plus (ii) the aggregate amount of interest scheduled to be paid thereon through the respective Maturity Dates, plus (iii) without duplication, accrued and unpaid interest to, but not including, the end of the calendar month in which the determination is being made, plus (iv) the aggregate amount of fees scheduled to be paid to the Purchaser or the Agent under any Transaction Document after such date of determination, plus (v) all other known amounts payable or reimburseable to the Purchaser or the Agent under any Transaction Document after such date of determination.

"Requirement of Law" applicable to any Person shall mean (a) any law, rule, regulation, ordinance, order, code interpretation, judgment, decree, directive, guidelines, policy or similar form of decision of any Governmental Authority applicable to such Person, (b) any license, permit, approval or other authorization granted by any Governmental Authority to or for the benefit of such Person and (c) any judgment, decision or determination of any Governmental Authority or arbitrator, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserve Accounts" shall mean Bank Account No. 3826797251, established by the Issuer with J.P. Morgan Chase Bank.

"Reserve Account ACA" has the meaning specified in Section 8(f).

"Sales Contract" has the meaning specified in Section 6(h).

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Series A-1 Note" has the meaning specified in Section 1(a)(i).

"Series A-2 Note" has the meaning specified in Section 1(a)(ii).

"Series A Notes" has the meaning specified in Section 1(a)(ii).

"Series B Note" has the meaning specified in Section 1(a)(iii).

"Subsidiary" of any Person shall mean any corporation, partnership, limited liability company or other business entity of which (i) more than fifty percent (50%) of the issued and outstanding Equity Interests having ordinary voting power to elect a majority of the members of the Board of Directors (or other body serving in a comparable role) thereof is at the time directly or indirectly owned or controlled by such Person and/or one or more of such Person's other Subsidiaries, or (ii) such Person and/or one or more of its other Subsidiaries otherwise has the right to elect or designate a majority of the members of the Board of Directors (or other body serving in a comparable role).

"Theia Aviation" has the meaning assigned in the Preamble.

"Theia Group" has the meaning assigned in the Preamble.

"Theia Holdings" has the meaning assigned in the Preamble.

"Theia Loan Party" means any one or more Grantor and Guarantor.

"Theia Party" has the meaning assigned in the Preamble.

"Theia MPP" has the meaning specified in Section 6(g).

"Transaction Documents" mean (i) this Agreement, (ii) the Notes, (iii) the Aircraft Mortgage, (iv) the Guaranty, (v) the ACAs, and (vi) each other document or agreement executed and delivered by a Theia Loan Party in connection with the foregoing Transaction Documents.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York, or to the extent provided thereby, any other applicable jurisdiction.

## Schedule 4(a)

## Subsidiaries and Grantor Information

Subsidiaries

| Name | Jurisdiction of Organization | Equity Ownership by | Equity Interests Owned |
|---|---|---|---|
| Theia Holdings A, Inc. | Delaware | Theia Group, Incorporated | 100 Shares of Common Stock, par value $0.001 per share, representing 100% of the Equity Interests, which are represented by one or more certificates to be delivered to the Purchaser |
| Theia Aviation LLC | Delaware | Theia Group, Incorporated | 100% of the Percentage Interests in Theia Aviation, LLC, representing 100% of the Equity Interests, which are not represented by certificates |
| Theia Risk Management Systems Inc | Delaware | Theia Group, Incorporated | 100% owned, but subject to existing agreements in principle to sell up to 51% of the common stock of the entity to other companies which provide insurance and credit |
| Theia Resources Group Inc. | Delaware | Theia Group, Incorporated | 100% owned |
| Hyperion Rocket Systems, Inc. | Delaware | Theia Group, Incorporated | 100% owned |
| Hyperion Launch Systems Incorporated | Delaware | Theia Group, Incorporated | 55% owned |

Grantors

| Name | Jurisdiction of Organization | Type of Organization | Chief Executive Office | Mailing Address |
|---|---|---|---|---|
| Theia Group, Incorporated | Delaware | Corporation | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 |
| Theia Holdings A, Inc. | Delaware | Corporation | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 |
| Theia Aviation, LLC | Delaware | Limited liability company | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 | 1455 Pennsylvania Avenue, Suite 600 & 800, Washington DC, 20004 |

**Schedule 4(u)**

**Existing Indebtedness and Liens**

Indebtedness

(Separately Attached)

Liens

1.  A first priority pledge of the Equity Interest of Theia Holdings has been granted to secure the obligations under the Undrawn Debt Documents.  Under the Undrawn Debt Documents the secured party has agreed not to file a UCC financing statement to perfect its security interest.

- 46 -

Schedule 4(u)
Existing Indebtedness and Liens

| Note No. | Lien Position | Issuance Date | Principal Amount | Original Maturity Date | Revised Maturity Date | Conversion Multiple | Pre-Conversion Amount due at Maturity | Agreed To Convert | Amount Owed At maturity | Matures Prior to 9/30/2020 | Matures within 6 Months | Matures within 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note 68 | Pari | 7/5/2018 | $ 50,000 | 7/5/2020 | 7/5/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 147 | Subordinated | 1/10/2020 | $ 500,000 | 7/10/2020 | 7/10/2020 | 2 | $ 1,000,000 | | $ 1,000,000 | yes | | |
| Note 148 | Subordinated | 1/10/2020 | $ 225,000 | 7/10/2020 | 7/10/2020 | 2 | $ 450,000 | | $ 450,000 | yes | | |
| Note 149 | Subordinated | 1/10/2020 | $ 200,000 | 7/10/2020 | 7/10/2020 | 2 | $ 400,000 | | $ 400,000 | yes | | |
| Note 150 | Subordinated | 1/10/2020 | $ 550,000 | 7/10/2020 | 7/10/2020 | 2 | $ 1,100,000 | | $ 1,100,000 | yes | | |
| Note 151 | Subordinated | 1/10/2020 | $ 200,000 | 7/10/2020 | 7/10/2020 | 2 | $ 400,000 | | $ 400,000 | yes | | |
| Note 152 | Subordinated | 1/14/2020 | $ 50,000 | 7/14/2020 | 7/14/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 69 | Pari | 7/16/2018 | $ 100,000 | 7/16/2020 | 7/16/2020 | 2 | $ 200,000 | | $ 200,000 | yes | | |
| Note 70 | Pari | 7/20/2018 | $ 75,000 | 7/20/2020 | 7/20/2020 | 2 | $ 150,000 | | $ 150,000 | yes | | |
| Note 71 | Pari | 7/20/2018 | $ 25,000 | 7/20/2020 | 7/20/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 72 | Pari | 7/20/2018 | $ 10,000 | 7/20/2020 | 7/20/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 73 | Pari | 7/20/2018 | $ 15,000 | 7/20/2020 | 7/20/2020 | 2 | $ 30,000 | | $ 30,000 | yes | | |
| Note 74 | Pari | 7/20/2018 | $ 25,000 | 7/20/2020 | 7/20/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 75 | Pari | 7/30/2018 | $ 10,000 | 7/30/2020 | 7/30/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 76 | Pari | 7/30/2018 | $ 25,000 | 7/30/2020 | 7/30/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 77 | Pari | 7/30/2018 | $ 25,000 | 7/30/2020 | 7/30/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 78 | Pari | 7/30/2018 | $ 10,000 | 7/30/2020 | 7/30/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 79 | Pari | 7/30/2018 | $ 15,000 | 7/30/2020 | 7/30/2020 | 2 | $ 30,000 | | $ 30,000 | yes | | |
| Note 80 | Pari | 7/30/2018 | $ 380,000 | 7/30/2020 | 7/30/2020 | 2 | $ 760,000 | | $ 760,000 | yes | | |
| Note 81 | Pari | 7/31/2018 | $ 200,000 | 7/31/2020 | 7/31/2020 | 2 | $ 400,000 | | $ 400,000 | yes | | |
| Note 82 | Pari | 8/1/2018 | $ 5,000 | 8/1/2020 | 8/1/2020 | 2 | $ 10,000 | | $ 10,000 | yes | | |
| Note 88 | Pari | 8/2/2018 | $ 20,000 | 8/2/2020 | 8/2/2020 | 2 | $ 40,000 | | $ 40,000 | yes | | |
| Note 87 | Pari | 8/3/2018 | $ 50,000 | 8/3/2020 | 8/3/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 95 | Pari | 8/6/2018 | $ 10,000 | 8/6/2020 | 8/6/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 83 | Pari | 8/9/2018 | $ 200,000 | 8/9/2020 | 8/9/2020 | 2 | $ 400,000 | | $ 400,000 | yes | | |
| Note 84 | Pari | 8/9/2018 | $ 25,000 | 8/9/2020 | 8/9/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 86 | Pari | 8/9/2018 | $ 25,000 | 8/9/2020 | 8/9/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 89 | Pari | 8/9/2018 | $ 190,000 | 8/9/2020 | 8/9/2020 | 2 | $ 380,000 | | $ 380,000 | yes | | |
| Note 85 | Pari | 8/10/2018 | $ 25,000 | 8/10/2020 | 8/10/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 90 | Pari | 8/10/2018 | $ 15,000 | 8/10/2020 | 8/10/2020 | 2 | $ 30,000 | | $ 30,000 | yes | | |
| Note 96 | Pari | 8/10/2018 | $ 50,000 | 8/10/2020 | 8/10/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 91 | Pari | 8/14/2018 | $ 500,000 | 8/14/2020 | 8/14/2020 | 2 | $ 1,000,000 | | $ 1,000,000 | yes | | |
| Note 94 | Pari | 8/16/2018 | $ 50,000 | 8/16/2020 | 8/16/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 92 | Pari | 8/17/2018 | $ 150,000 | 8/17/2020 | 8/17/2020 | 2 | $ 300,000 | | $ 300,000 | yes | | |
| Note 93 | Pari | 8/18/2018 | $ 10,000 | 8/18/2020 | 8/18/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 129 | Subordinated | 8/19/2019 | $ 1,000,000 | 8/19/2020 | 8/19/2020 | 2 | $ 2,000,000 | | $ 2,000,000 | yes | | |
| Note 97 | Pari | 8/22/2018 | $ 15,000 | 8/22/2020 | 8/22/2020 | 2 | $ 30,000 | | $ 30,000 | yes | | |
| Note 98 | Pari | 8/23/2018 | $ 10,000 | 8/23/2020 | 8/23/2020 | 2 | $ 20,000 | | $ 20,000 | yes | | |
| Note 130 | Subordinated | 9/6/2019 | $ 6,000,000 | 9/6/2020 | 9/6/2020 | 2 | $ 12,000,000 | | $ 12,000,000 | yes | | |
| Note 178 | Subordinated | 3/9/2020 | $ 20,000 | 9/9/2020 | 9/9/2020 | 2 | $ 40,000 | | $ 40,000 | yes | | |
| Note 131 | Subordinated | 9/16/2019 | $ 85,000 | 9/16/2020 | 9/16/2020 | 2 | $ 170,000 | | $ 170,000 | yes | | |
| Note 132 | Subordinated | 9/16/2019 | $ 30,000 | 9/16/2020 | 9/16/2020 | 2 | $ 60,000 | | $ 60,000 | yes | | |

Schedule 4(u)
Existing Indebtedness and Liens

| Note No. | Lien Position | Issuance Date | Principal Amount | Original Maturity Date | Revised Maturity Date | Conversion Multiple | Pre-Conversion Amount due at Maturity | Agreed To Convert | Amount Owed At maturity | Matures Prior to 9/30/2020 | Matures within 6 Months | Matures within 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note 181 | Subordinated | 3/18/2020 | $ 500,000 | 9/18/2020 | 9/18/2020 | 2 | $ 1,000,000 | | $ 1,000,000 | yes | | |
| Note 99 | Pari | 9/21/2018 | $ 25,000 | 9/21/2020 | 9/21/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 100 | Pari | 9/24/2018 | $ 25,000 | 9/24/2020 | 9/24/2020 | 2 | $ 50,000 | | $ 50,000 | yes | | |
| Note 134 | Subordinated | 9/30/2019 | $ 100,000 | 9/30/2020 | 9/30/2020 | 2 | $ 200,000 | | $ 200,000 | yes | | |
| Note 135 | Subordinated | 9/30/2019 | $ 50,000 | 9/30/2020 | 9/30/2020 | 2 | $ 100,000 | | $ 100,000 | yes | | |
| Note 101 | Pari | 10/2/2018 | $ 40,000 | 10/2/2020 | 10/2/2020 | 2 | $ 80,000 | | $ 80,000 | | yes | |
| Note 102 | Subordinated | 10/4/2018 | $ 100,000 | 10/4/2020 | 10/4/2020 | 2 | $ 200,000 | | $ 200,000 | | yes | |
| Note 104 | Subordinated | 10/5/2018 | $ 100,000 | 10/5/2020 | 10/5/2020 | 2 | $ 200,000 | | $ 200,000 | | yes | |
| Note 105 | Subordinated | 10/5/2018 | $ 566,044 | 10/5/2020 | 10/5/2020 | 2 | $ 1,132,088 | | $ 1,132,088 | | yes | |
| Note 106 | Subordinated | 10/10/2018 | $ 150,000 | 10/10/2020 | 10/10/2020 | 2 | $ 300,000 | | $ 300,000 | | yes | |
| Note 107 | Subordinated | 10/11/2018 | $ 50,000 | 10/11/2020 | 10/11/2020 | 2 | $ 100,000 | | $ 100,000 | | yes | |
| Note 136 | Subordinated | 10/11/2019 | $ 200,000 | 10/11/2020 | 10/11/2020 | 2 | $ 400,000 | | $ 400,000 | | yes | |
| Note 137 | Subordinated | 10/13/2019 | $ 600,000 | 10/13/2020 | 10/13/2020 | 2 | $ 1,200,000 | | $ 1,200,000 | | yes | |
| Note 138 | Subordinated | 10/22/2019 | $ 200,000 | 10/22/2020 | 10/22/2020 | 2 | $ 400,000 | | $ 400,000 | | yes | |
| Note 139 | Subordinated | 11/2/2019 | $ 200,000 | 11/2/2020 | 11/2/2020 | 2 | $ 400,000 | | $ 400,000 | | yes | |
| Note 140 | Subordinated | 11/4/2019 | $ 12,000,000 | 11/4/2020 | 11/4/2020 | 2 | $ 24,000,000 | | $ 24,000,000 | | yes | |
| Note 141 | Subordinated | 11/7/2019 | $ 250,000 | 11/7/2020 | 11/7/2020 | 2 | $ 500,000 | | $ 500,000 | | yes | |
| Note 108 | Subordinated | 11/13/2018 | $ 100,000 | 11/13/2020 | 11/13/2020 | 2 | $ 200,000 | | $ 200,000 | | yes | |
| Note 142 | Subordinated | 11/22/2019 | $ 50,000 | 11/22/2020 | 11/22/2020 | 2 | $ 100,000 | | $ 100,000 | | yes | |
| Note 143 | Subordinated | 11/26/2019 | $ 300,000 | 11/26/2020 | 11/26/2020 | 2 | $ 600,000 | | $ 600,000 | | yes | |
| Note 144 | Subordinated | 12/20/2019 | $ 25,000 | 12/20/2020 | 12/20/2020 | 2 | $ 50,000 | | $ 50,000 | | yes | |
| Note 145 | Subordinated | 12/20/2019 | $ 25,000 | 12/20/2020 | 12/20/2020 | 2 | $ 50,000 | | $ 50,000 | | yes | |
| Note 146 | Subordinated | 12/23/2019 | $ 200,000 | 12/23/2020 | 12/23/2020 | 2 | $ 400,000 | | $ 400,000 | | yes | |
| Note 153 | Subordinated | 1/24/2020 | $ 200,000 | 1/24/2021 | 1/24/2021 | 2 | $ 400,000 | | $ 400,000 | | | yes |
| Note 154 | Subordinated | 1/27/2020 | $ 30,000 | 1/27/2021 | 1/27/2021 | 2 | $ 60,000 | | $ 60,000 | | | yes |
| Note 155 | Subordinated | 1/27/2020 | $ 60,000 | 1/27/2021 | 1/27/2021 | 2 | $ 120,000 | | $ 120,000 | | | yes |
| Note 156 | Subordinated | 1/27/2020 | $ 30,000 | 1/27/2021 | 1/27/2021 | 2 | $ 60,000 | | $ 60,000 | | | yes |
| Note 157 | Subordinated | 1/30/2020 | $ 100,000 | 1/30/2021 | 1/30/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 158 | Subordinated | 1/30/2020 | $ 200,000 | 1/30/2021 | 1/30/2021 | 2 | $ 400,000 | | $ 400,000 | | | yes |
| Note 159 | Subordinated | 2/3/2020 | $ 5,000 | 2/3/2021 | 2/3/2021 | 2 | $ 10,000 | | $ 10,000 | | | yes |
| Note 160 | Subordinated | 2/5/2020 | $ 50,000 | 2/5/2021 | 2/5/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 161 | Subordinated | 2/6/2020 | $ 400,000 | 2/6/2021 | 2/6/2021 | 2 | $ 800,000 | | $ 800,000 | | | yes |
| Note 162 | Subordinated | 2/6/2020 | $ 175,000 | 2/6/2021 | 2/6/2021 | 2 | $ 350,000 | | $ 350,000 | | | yes |
| Note 163 | Subordinated | 2/10/2020 | $ 100,000 | 2/10/2021 | 2/10/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 164 | Subordinated | 2/13/2020 | $ 1,111,110 | 2/13/2021 | 2/13/2021 | 2 | $ 2,222,220 | | $ 2,222,220 | | | yes |
| Note 165 | Subordinated | 2/14/2020 | $ 100,000 | 2/14/2021 | 2/14/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 166 | Subordinated | 2/14/2020 | $ 100,000 | 2/14/2021 | 2/14/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 167 | Subordinated | 2/18/2020 | $ 100,000 | 2/18/2021 | 2/18/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |

Schedule 4(u)
Existing Indebtedness and Liens

| Note No. | Lien Position | Issuance Date | Principal Amount | Original Maturity Date | Revised Maturity Date | Conversion Multiple | Pre-Conversion Amount due at Maturity | Agreed To Convert | Amount Owed At maturity | Matures Prior to 9/30/2020 | Matures within 6 Months | Matures within 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note 168 | Subordinated | 2/21/2020 | $ 150,000 | 2/21/2021 | 2/21/2021 | 2 | $ 300,000 | | $ 300,000 | | | yes |
| Note 169 | Subordinated | 2/24/2020 | $ 30,000 | 2/24/2021 | 2/24/2021 | 2 | $ 60,000 | | $ 60,000 | | | yes |
| Note 170 | Subordinated | 2/25/2020 | $ 100,000 | 2/25/2021 | 2/25/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 171 | Subordinated | 2/26/2020 | $ 75,000 | 2/26/2021 | 2/26/2021 | 2 | $ 150,000 | | $ 150,000 | | | yes |
| Note 172 | Subordinated | 2/27/2020 | $ 50,000 | 2/27/2021 | 2/27/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 173 | Subordinated | 2/27/2020 | $ 50,000 | 2/27/2021 | 2/27/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 174 | Subordinated | 2/28/2020 | $ 25,000 | 2/28/2021 | 2/28/2021 | 2 | $ 50,000 | | $ 50,000 | | | yes |
| Note 175 | Subordinated | 3/6/2020 | $ 100,000 | 3/6/2021 | 3/6/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 176 | Subordinated | 3/6/2020 | $ 100,000 | 3/6/2021 | 3/6/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 177 | Subordinated | 3/9/2020 | $ 400,000 | 3/6/2021 | 3/6/2021 | 2 | $ 800,000 | | $ 800,000 | | | yes |
| Note 179 | Subordinated | 3/9/2020 | $ 50,000 | 3/9/2021 | 3/9/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 180 | Subordinated | 3/9/2020 | $ 20,000 | 3/9/2021 | 3/9/2021 | 2 | $ 40,000 | | $ 40,000 | | | yes |
| Note 182 | Subordinated | 3/30/2020 | $ 1,000,000 | 3/30/2021 | 3/30/2021 | 2 | $ 2,000,000 | | $ 2,000,000 | | | yes |
| Note 183 | Subordinated | 3/30/2020 | $ 500,000 | 3/30/2021 | 3/30/2021 | 2 | $ 1,000,000 | | $ 1,000,000 | | | yes |
| Note 184 | Subordinated | 4/1/2020 | $ 300,000 | 4/1/2021 | 4/1/2021 | 2 | $ 600,000 | | $ 600,000 | | | yes |
| Note 185 | Subordinated | 4/2/2020 | $ 3,000,000 | 4/2/2021 | 4/2/2021 | 2 | $ 6,000,000 | | $ 6,000,000 | | | yes |
| Note 186 | Subordinated | 4/7/2020 | $ 300,000 | 4/7/2021 | 4/7/2021 | 2 | $ 600,000 | | $ 600,000 | | | yes |
| Note 187 | Subordinated | 4/8/2020 | $ 50,000 | 4/8/2021 | 4/8/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 188 | Subordinated | 4/14/2020 | $ 100,000 | 4/14/2021 | 4/14/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 189 | Subordinated | 4/15/2020 | $ 25,750 | 4/15/2021 | 4/15/2021 | 2 | $ 51,500 | | $ 51,500 | | | yes |
| Note 190 | Subordinated | 4/15/2020 | $ 200,000 | 4/15/2021 | 4/15/2021 | 2 | $ 400,000 | | $ 400,000 | | | yes |
| Note 191 | Subordinated | 4/16/2020 | $ 75,000 | 4/16/2021 | 4/16/2021 | 2 | $ 150,000 | | $ 150,000 | | | yes |
| Note 192 | Subordinated | 4/17/2020 | $ 100,000 | 4/17/2021 | 4/17/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 193 | Subordinated | 4/17/2020 | $ 25,000 | 4/17/2021 | 4/17/2021 | 2 | $ 50,000 | | $ 50,000 | | | yes |
| Note 194 | Subordinated | 4/19/2020 | $ 5,000 | 4/19/2021 | 4/19/2021 | 2 | $ 10,000 | | $ 10,000 | | | yes |
| Note 195 | Subordinated | 4/19/2020 | $ 20,000 | 4/19/2021 | 4/19/2021 | 2 | $ 40,000 | | $ 40,000 | | | yes |
| Note 196 | Subordinated | 4/19/2020 | $ 50,000 | 4/19/2021 | 4/19/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 197 | Subordinated | 4/19/2020 | $ 100,000 | 4/19/2021 | 4/19/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |
| Note 198 | Subordinated | 4/19/2020 | $ 2,000,000 | 4/19/2021 | 4/19/2021 | 2 | $ 4,000,000 | | $ 4,000,000 | | | yes |
| Note 199 | Subordinated | 4/21/2020 | $ 150,000 | 4/21/2021 | 4/21/2021 | 2 | $ 300,000 | | $ 300,000 | | | yes |
| Note 1 | Pari | 11/4/2016 | $ 100,000 | 11/4/2018 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 2 | Pari | 11/7/2016 | $ 50,000 | 11/7/2018 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 3 | Pari | 11/7/2016 | $ 100,000 | 11/7/2018 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 4 | Pari | 11/10/2016 | $ 150,000 | 11/10/2018 | 5/31/2021 | 5 | $ 750,000 | yes | | | | |
| Note 5 | Pari | 11/11/2016 | $ 100,000 | 11/11/2018 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 6 | Pari | 11/11/2016 | $ 100,000 | 11/11/2018 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 7 | Pari | 1/19/2017 | $ 50,000 | 1/19/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 8 | Pari | 1/31/2017 | $ 200,000 | 1/31/2019 | 5/31/2021 | 5 | $ 1,000,000 | yes | | | | |
| Note 9 | Pari | 1/31/2017 | $ 100,000 | 1/31/2019 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 10 | Pari | 2/27/2017 | $ 20,000 | 2/27/2019 | 5/31/2021 | 5 | $ 100,000 | yes | | | | |

Schedule 4(u)

Existing Indebtedness and Liens

| Note No. | Lien Position | Issuance Date | Principal Amount | Original Maturity Date | Revised Maturity Date | Conversion Multiple | Pre-Conversion Amount due at Maturity | Agreed To Convert | Amount Owed At maturity | Matures Prior to 9/30/2020 | Matures within 6 Months | Matures within 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note 11 | Pari | 3/8/2017 | $ 100,000 | 3/8/2019 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 12 | Pari | 3/30/2017 | $ 200,000 | 3/30/2019 | 5/31/2021 | 5 | $ 1,000,000 | yes | | | | |
| Note 13 | Pari | 3/30/2017 | $ 100,000 | 3/30/2019 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 14 | Pari | 4/15/2017 | $ 50,000 | 4/15/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 15 | Pari | 4/17/2017 | $ 350,000 | 4/17/2019 | 5/31/2021 | 5 | $ 1,750,000 | yes | | | | |
| Note 16 | Pari | 5/30/2017 | $ 50,000 | 5/30/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 17 | Pari | 6/19/2017 | $ 50,000 | 6/19/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 18 | Pari | 6/21/2017 | $ 20,000 | 6/21/2019 | 5/31/2021 | 5 | $ 100,000 | yes | | | | |
| Note 19 | Pari | 6/29/2017 | $ 25,000 | 6/29/2019 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 20 | Pari | 7/31/2017 | $ 50,000 | 7/31/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 21 | Pari | 7/31/2017 | $ 25,000 | 7/31/2019 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 22 | Pari | 7/31/2017 | $ 125,000 | 7/31/2019 | 5/31/2021 | 5 | $ 625,000 | yes | | | | |
| Note 23 | Pari | 7/31/2017 | $ 50,000 | 7/31/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 24 | Pari | 7/31/2017 | $ 25,000 | 7/31/2019 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 25 | Pari | 7/31/2017 | $ 50,000 | 7/31/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 26 | Pari | 7/31/2017 | $ 50,000 | 7/31/2019 | 5/31/2021 | 5 | $ 250,000 | yes | | | | |
| Note 27 | Pari | 7/31/2017 | $ 25,000 | 7/31/2019 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 28 | Pari | 7/31/2017 | $ 150,000 | 7/31/2019 | 5/31/2021 | 5 | $ 750,000 | yes | | | | |
| Note 29 | Pari | 7/31/2017 | $ 1,200,000 | 7/31/2019 | 5/31/2021 | 5 | $ 6,000,000 | yes | | | | |
| Note 30 | Pari | 9/18/2017 | $ 100,000 | 9/18/2019 | 5/31/2021 | 5 | $ 500,000 | yes | | | | |
| Note 31 | Pari | 10/16/2017 | $ 50,000 | 10/16/2019 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 32 | Pari | 10/16/2017 | $ 10,000 | 10/16/2019 | 5/31/2021 | 2 | $ 20,000 | yes | | | | |
| Note 33 | Pari | 10/16/2017 | $ 25,000 | 10/16/2019 | 5/31/2021 | 2 | $ 50,000 | yes | | | | |
| Note 34 | Pari | 12/12/2017 | $ 50,000 | 12/12/2019 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 35 | Pari | 12/14/2017 | $ 5,000 | 12/14/2019 | 5/31/2021 | 2 | $ 10,000 | yes | | | | |
| Note 36 | Pari | 12/14/2017 | $ 15,000 | 12/14/2019 | 5/31/2021 | 2 | $ 30,000 | yes | | | | |
| Note 37 | Pari | 12/15/2017 | $ 30,000 | 12/15/2019 | 5/31/2021 | 2 | $ 60,000 | yes | | | | |
| Note 38 | Pari | 1/23/2018 | $ 50,000 | 1/23/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 39 | Pari | 1/23/2018 | $ 80,000 | 1/23/2020 | 5/31/2021 | 2 | $ 160,000 | yes | | | | |
| Note 40 | Pari | 1/23/2018 | $ 50,000 | 1/23/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 41 | Pari | 1/23/2018 | $ 50,000 | 1/23/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 42 | Pari | 1/25/2018 | $ 20,000 | 1/25/2020 | 5/31/2021 | 5 | $ 100,000 | yes | | | | |
| Note 43 | Pari | 1/31/2018 | $ 25,000 | 1/31/2020 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 44 | Pari | 1/31/2018 | $ 25,000 | 1/31/2020 | 5/31/2021 | 5 | $ 125,000 | yes | | | | |
| Note 45 | Pari | 2/1/2018 | $ 4,000 | 2/1/2020 | 5/31/2021 | 5 | $ 20,000 | yes | | | | |
| Note 46 | Pari | 3/2/2018 | $ 200,000 | 3/2/2020 | 5/31/2021 | 2 | $ 400,000 | yes | | | | |
| Note 47 | Pari | 3/6/2018 | $ 300,000 | 3/6/2020 | 5/31/2021 | 2 | $ 600,000 | yes | | | | |
| Note 48 | Pari | 3/6/2018 | $ 300,000 | 3/6/2020 | 5/31/2021 | 2 | $ 600,000 | yes | | | | |
| Note 49 | Pari | 3/7/2018 | $ 350,000 | 3/7/2020 | 5/31/2021 | 2 | $ 700,000 | yes | | | | |
| Note 50 | Pari | 3/9/2018 | $ 50,000 | 3/9/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 51 | Pari | 3/21/2018 | $ 300,000 | 3/21/2020 | 5/31/2021 | 2 | $ 600,000 | yes | | | | |
| Note 52 | Pari | 4/2/2018 | $ 25,000 | 4/2/2020 | 5/31/2021 | 2 | $ 50,000 | yes | | | | |

Schedule 4(u)
Existing Indebtedness and Liens

| Note No. | Lien Position | Issuance Date | Principal Amount | Original Maturity Date | Revised Maturity Date | Conversion Multiple | Pre-Conversion Amount due at Maturity | Agreed To Convert | Amount Owed At maturity | Matures Prior to 9/30/2020 | Matures within 6 Months | Matures within 12 Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Note 53 | Pari | 4/18/2018 | $ 25,000 | 4/18/2020 | 5/31/2021 | 2 | $ 50,000 | yes | | | | |
| Note 54 | Pari | 5/8/2018 | $ 25,000 | 5/8/2020 | 5/31/2021 | 2 | $ 50,000 | yes | | | | |
| Note 55 | Pari | 5/10/2018 | $ 650,000 | 5/10/2020 | 5/31/2021 | 2 | $ 1,300,000 | yes | | | | |
| Note 56 | Pari | 5/14/2018 | $ 350,000 | 5/14/2020 | 5/31/2021 | 2 | $ 700,000 | yes | | | | |
| Note 57 | Pari | 5/18/2018 | $ 200,000 | 5/18/2020 | 5/31/2021 | 2 | $ 400,000 | yes | | | | |
| Note 58 | Pari | 5/22/2018 | $ 50,000 | 5/22/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 59 | Pari | 5/23/2018 | $ 50,000 | 5/23/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 60 | Pari | 5/23/2018 | $ 50,000 | 5/23/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 61 | Pari | 5/25/2018 | $ 50,000 | 5/25/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 62 | Pari | 6/1/2018 | $ 45,000 | 6/1/2020 | 5/31/2021 | 2 | $ 90,000 | yes | | | | |
| Note 63 | Pari | 6/4/2018 | $ 25,000 | 6/4/2020 | 5/31/2021 | 2 | $ 50,000 | yes | | | | |
| Note 64 | Pari | 6/11/2018 | $ 50,000 | 6/11/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 65 | Pari | 6/12/2018 | $ 50,000 | 6/12/2020 | 5/31/2021 | 2 | $ 100,000 | yes | | | | |
| Note 66* | Pari | 6/19/2018 | $ 3,775,000 | 6/19/2020 | 5/31/2021 | 2 | $ 7,550,000 | yes | | | | |
| Note 67 | Pari | 6/21/2018 | $ 200,000 | 6/21/2020 | 5/31/2021 | 2 | $ 400,000 | yes | | | | |
| Note 110 | Subordinated | 5/21/2019 | $ 650,000 | 11/21/2019 | 5/31/2021 | 2 | $ 1,300,000 | yes | | | | |
| Note 111 | Subordinated | 5/28/2019 | $ 100,000 | 5/28/2020 | 5/31/2021 | 2 | $ 160,000 | yes | | | | |
| Note 112 | Subordinated | 6/3/2019 | $ 25,000 | 6/3/2020 | 5/31/2021 | 2 | $ 41,500 | yes | | | | |
| Note 113 | Subordinated | 6/22/2019 | $ 25,000 | 6/22/2020 | 5/31/2021 | 1 | $ 41,500 | yes | | | | |
| Note 114 | Subordinated | 7/15/2019 | $ 2,000 | 1/1/2020 | 5/31/2021 | 1 | $ 10,000 | yes | | | | |
| Note 115 | Subordinated | 7/16/2019 | $ 50,000 | 1/16/2020 | 5/31/2021 | 1 | $ 66,500 | yes | | | | |
| Note 116 | Subordinated | 7/31/2019 | $ 25,000 | 1/31/2020 | 5/31/2021 | 1 | $ 33,250 | yes | | | | |
| Note 117 | Subordinated | 7/31/2019 | $ 50,000 | 1/31/2020 | 5/31/2021 | 1 | $ 66,500 | yes | | | | |
| Note 118 | Subordinated | 7/31/2019 | $ 25,000 | 1/31/2020 | 5/31/2021 | 1 | $ 33,250 | yes | | | | |
| Note 119 | Subordinated | 8/1/2019 | $ 5,000 | 2/1/2020 | 5/31/2021 | 1 | $ 6,650 | yes | | | | |
| Note 120 | Subordinated | 8/1/2019 | $ 5,000 | 2/1/2020 | 5/31/2021 | 1 | $ 6,650 | yes | | | | |
| Note 121 | Subordinated | 8/1/2019 | $ 5,000 | 2/1/2020 | 5/31/2021 | 1 | $ 6,650 | yes | | | | |
| Note 122 | Subordinated | 8/1/2019 | $ 150,000 | 2/1/2020 | 5/31/2021 | 1 | $ 199,500 | yes | | | | |
| Note 123 | Subordinated | 8/1/2019 | $ 100,000 | 2/1/2020 | 5/31/2021 | 1 | $ 133,000 | yes | | | | |
| Note 124 | Subordinated | 8/2/2019 | $ 100,000 | 2/2/2020 | 5/31/2021 | 1 | $ 133,000 | yes | | | | |
| Note 125 | Subordinated | 8/5/2019 | $ 100,000 | 2/5/2020 | 5/31/2021 | 1 | $ 133,000 | yes | | | | |
| Note 126 | Subordinated | 8/5/2019 | $ 200,000 | 2/5/2020 | 5/31/2021 | 1 | $ 266,000 | yes | | | | |
| Note 128 | Subordinated | 8/19/2019 | $ 20,000 | 2/19/2020 | 5/31/2021 | 1 | $ 26,600 | yes | | | | |
| Note 133 | Subordinated | 9/19/2019 | $ 50,000 | 3/19/2020 | 5/31/2021 | 1 | $ 66,500 | yes | | | | |
| Note 200 | Subordinated | 6/15/2020 | $ 350,000 | 6/15/2021 | 6/15/2021 | 2 | $ 700,000 | | $ 700,000 | | | yes |
| Note 201 | Subordinated | 6/15/2020 | $ 25,000 | 6/15/2021 | 6/15/2021 | 2 | $ 50,000 | | $ 50,000 | | | yes |
| Note 202 | Subordinated | 6/15/2020 | $ 50,000 | 6/15/2021 | 6/15/2021 | 2 | $ 100,000 | | $ 100,000 | | | yes |
| Note 203 | Subordinated | 6/15/2020 | $ 100,000 | 6/15/2021 | 6/15/2021 | 2 | $ 200,000 | | $ 200,000 | | | yes |

## Schedule 4(bb)

## Bank Accounts

### *Theia Aviation, LLC*



### *Theia Group, Incorporated*





37722609v16

## Schedule 4(cc)

## [Insurance Policies][1]

| Broker | Carrier | Insured Party | Policy Number | Description | Coverage Amount | Effective Dates |
|---|---|---|---|---|---|---|
| JLT Aerospace (North America) Inc. | North American Elite Insurance Company | Theia Group, Inc | FGZ800014500 | Aircraft Hull & Liability Insurance | $101,350,000 | December 12, 2018 – December 12, 2019 |
| JLT Specialty Insurance Services, Inc. | Federal Insurance Company | Theia Group, Inc | 8251-4391 | Directors and Officers Insurance | $3,000,000 | June 2, 2019-June 2, 2020 |
| JLT Specialty Insurance Services, Inc. | Everest National Insurance Company | Theia Group, Inc | SC8EX00034-181 | Directors and Officers Insurance | $2,000,000 in excess of underlying Federal Insurance Company D&O Insurance Policy. | June 2, 2019-June 2, 2020 |

---

[1] NTD: THEIA TO UPDATE.

- 49 -

## **EXHIBITS**

Exhibit 1(a) – Note (Separately Attached)

Exhibit B – Reserved

Exhibit C – Guaranty (Separately Attached)

Exhibit D –Solvency Certificate (Separately Attached)

Exhibit E – Closing Certificate (Separately Attached)

Exhibit F – Form of Secretary's Certificate (Separately Attached)

Exhibit G – Form of Incumbency Certificate (Separately Attached)

Exhibit H –Form of Payment Instructions

**Exhibit H**

**Form of Payment Instruction**

**(See following page)**

**Form of Irrevocable Payment Instruction**

[_____], [2019]

[Government Agency]
Attention: Legal Department

    Re: Irrevocable Payment Instruction and Acknowledgement

Ladies and Gentlemen:

    Please be advised that [_____][2] (the "Company") has assigned and pledged to FCS Advisors, LLC, a Delaware limited liability company D/B/A Brevet Capital Advisors ("FCS"), in its capacity as collateral agent under a Secured Note Purchase and Security Agreement, dated [June [ ], 2020], [all of the Company's right, title and interest in and to] the proceeds, cash, money, or other such distributions under its services agreement with you ("Proceeds").

    Accordingly, in furtherance thereof, the Company hereby authorizes and directs you, irrevocably (except as provided below) and unconditionally, to pay all amounts in respect of the Proceeds as and when due to be paid, without any set-off or counterclaim and without any deduction or withholding by electronic transfer of immediately available funds to FCS at the following account:

| | | |
|---|---|---|
| Bank: | [ | ] |
| Account No: | [ | ] |
| ABA No: | [ | ] |
| Reference: | [ | ] |
| Account Name: | [ | ] |

    and otherwise to act in accordance with the payment instructions of the Company at the direction of FCS in connection therewith, in each case.

    By your signature below, you hereby agree to make the payments described above in accordance with these instructions. These instructions may not be revoked or changed except pursuant to an express written instruction executed by FCS and the Company. This notice supersedes all prior payment instructions from the Company to you with respect to the Proceeds.

---

[2] Name of relevant Theia entity (Group, Holdings or Aviation) to be completed.

This notice and your acknowledgment shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to conflict of laws principles that would lead to the application of the laws of another jurisdiction.

Please acknowledge your receipt of this notice and your agreement to comply with the payment terms specified above by executing a copy of this notice where indicated below and returning it in pdf format by electronic mail to [_____]. Thank you for your cooperation in this matter.

*[Remainder of Page Left Intentionally Blank]*

Very truly yours,

**[Theia Entity]**

By: _____
Name:
Title:

**Confirmed by:**
**FCS Advisors, LLC D/B/A Brevet**
**Capital Advisors**

By: _____
Name:
Title:

**Acknowledged and agreed to by:**
**[Name of Government Agency]**

By: _____
Name:
Title: