# EXHIBIT 7

# FCS ADVISORS, LLC
*441 Ninth Avenue, 20th Floor*
*New York, NY 10001*

March 17, 2021

Theia Group, Incorporated
Theia Aviation LLC
Theia Holdings A, Inc.
Attn: Steve Buscher
Via email only (sbuscher@tgi-hq.com)

Re:  <u>Third Amendment/March 15, 2021 Email</u>

Dear Steve:

I write in response to your March 15 email to Lucas and me last Monday. Unless stated otherwise, this Letter uses the same defined terms as the Third Amendment. Please be advised FCS Advisors, LLC d/b/a Brevet Capital Advisors ("Brevet") does not waive any rights or remedies by what is said or not said in this Letter, and Brevet hereby expressly preserves such rights and remedies.

Your email does not address many of the outstanding issues Lucas identified in his March 1 letter, or even the issues we discussed in an effort to make some progress during our call on Friday, March 12. For now, I will address the issues we discussed on Friday, including those not discussed in your March 15 communication. Numerous other issues—including those in the list Lucas sent by email on March 12—remain and must be addressed.

The Third Amendment extended the Maturity Date for payment to June 29, 2021 (unless declared accelerated due to uncured Event(s) of Default) so that Theia would have sufficient time to pay its obligations under the Transaction Documents. The extension was necessary because Theia's management did not meet its projections and management informed Brevet that Theia would not meet its obligation to pay $101 million by December. The CRO and Independent Director appointments discussed last Friday and below were integral to the Maturity Date extension and were intended to bring independence and special focus to developing and implementing a Liquidity Plan. Brevet expects no more delays in those in those appointments and the other matters set forth below. Meanwhile, Brevet reiterates its expectation of full and complete compliance with the other requirements of the Third Amendment and the Transaction Documents as well.

Now to what we discussed last Friday and your email.

**<u>Uncertificated Securities Resolution</u>**

We still have not seen a copy of a board resolution providing for Theia Holdings A, Inc. to have uncertificated securities. On March 9th, we provided a draft resolution for this purpose. At

the March 12th Theia responded that it had "dealt with" prior counsel to Brevet on this, indicating that a resolution already existed. We have contacted Valarie Hing, the prior counsel, and she has no recollection or record of any such resolution.

This should be a simple administrative matter. Theia and its principals have repeatedly represented—as recently as last Friday—that uncertificated securities have been authorized. If a resolution exists, just please send it to us. If it does not, just pass the one we sent, ratifying your prior action. On this, at least, there should be no dispute. Please send us the relevant completed resolution ASAP and no later than March 19, 2021.

**List Of Indebtedness and Agreements Concerning Indebtedness**

Section 3(e) of the Third Amendment required Grantors to provide "[n]ot later than January 15, 2021" a "true and complete list of all Sales Contracts of any Grantor and all agreements evidencing Indebtedness of any Grantor, whether written or oral, and complete copies of all agreements listed on such list . . . ." Your email does not provide any information about Sales Contracts. The list of notes is also wholly deficient.

The Third Amendment requires copies of the existing contracts themselves so that we can review them ourselves. I note in this connection that the list of notes on Attachment 4(g) to the SNPSA is far more robust than the list from your email, and in fact shows that many of the notes are *pari* (not subordinated) and at least 180 of the notes are beyond the revised maturity dates shown on the Attachment.

Please immediately comply by sending us copies of all of the notes (as amended) and of all Sales Contracts (or confirm in a rep there are none).

**Independent Director and Vice President Appointments**

Section 3(g) of the Third Amendment required Grantors to appoint an independent director to the boards of directors of Theia Group and Theia Holdings by December 16, 2020. Mr. Ridge was listed in the Third Amendment to fulfill that position.

The appointment is now three months overdue. On Friday's call, you assured us that this would be done momentarily and that Mr. Ridge has recently reiterated his commitment to accept. Your email now states that he will "make every effort" to meet with you this week. We therefore assume that you will adopt formal resolutions making the appointments of Mr. Ridge and provide us copies by this Friday, March 19, 2021.

If there is any conceivable problem meeting this deadline for Mr. Ridge, we ask that you *immediately* provide us with the names and CVs of two additional potential candidates, so that the positions will be *filled* (*i.e.,* formal resolutions signed and provided to us) by no later than March 22, 2021.

**Selected Advisor/Liquidity Plan**

Section 3(c) (i) and (ii) required Grantors to solicit three separate proposals from advisors "experienced in valuing and marketing FCC spectrum licenses or comparable assets or businesses (and selected from a list of candidates approved by the Purchaser), to provide financial advisory and support services to them as required to develop the Liquidity Plan, with a view to engaging an advisor for such purpose (the "<u>Selected Advisor</u>") by January 15, 2021." "No later than January 31, 2021, the Grantors shall engage the Selected Advisor to advise them in developing the Liquidity Plan."

Retention of the Selected Advisor is overdue by two months. Your email states a plan to retain PwC or Armand Musey "this week" but we have yet to receive drafts of the requests for proposals (as required by section 3(c)(1) of the Third Amendment) or their proposed engagement terms. Please send them to us immediately, with the goal of negotiating and retaining them by Monday, March 22.

**Spectrum Valuations**

It should be noted that your email states that Theia has provided us with "three independent appraisals of spectrum licenses" in an apparent effort to suggest at least partial compliance or some mitigation for the delay in hiring a Special Advisor. We disagree**.** None of the reports Theia has provided are current appraisals of the Theia-owned spectrum, and all of the reports are of limited value for preparing the detailed Liquidity Plan required by section 3(b) of the Third Amendment or otherwise evaluating Brevet's collateral.

The Summit Ridge report dated 3/4/20 contains comp value ranges. We are not interested in comps; we are interested in a valuation of the spectrum itself. The Summit Ridge report dated 10/14/16 is five years old and therefore essentially meaningless. The GH Valuation Services report dated 8/7/19 is again too old and, more importantly, on page 10 sets forth an NPV summary of projected cash flows that are wholly different than the cash flows you sent us last week. Again, not a true valuation. Similarly, the Pelton report dated 12/10/20 (pages 26-32) does not refer to the spectrum that Theia owns.

A Special Advisor must be hired promptly to render valuation opinions and analyses so that the Grantors' proposed Liquidity Plan is based on current information by an acceptable expert**.**

**CRO Position**

Theia has nominated Tom Reiter as the Chief Restructuring Officer ("CRO") under section 3(f) the Third Amendment. Brevet does not consent to Mr. Reiter's appointment because the terms of his proposed employment are not that of a CRO and because Mr. Reiter does not have the qualifications of a CRO.

In your March 15th email, you express Theia's position that, among other things, the "CRO role be limited to monitoring and reporting;" that the CRO will not "implement the Liquidity

Plan" or "raise capital for the Grantors;" that the CRO's engagement would terminate upon the debt's maturity date or declaration of default;" that the CRO would receive "back-up indemnity from Brevet;" and that the parties should agree on the CRO's title because "under my proposed duties 'CRO' seems a bit of misnomer."

This position directly contradicts section 2(f) the express terms of the Third Amendment, which states in part: the CRO shall have "**full authority** to (i) take such actions in the name of, and otherwise on behalf of, the Grantors as are required to comply with the other provisions of this Amendment, and (ii) **implement the Liquidity Plan**, **or to otherwise raise capital for the Grantors** in order to enable repayment of the Notes and the other payments owing by the Issuer under the Transaction Documents at or prior to the Maturity Date." (Bold added)

Theia's position is also inconsistent with the common understanding of the term "Chief Restructuring Officer" (something your email acknowledges). It is well-established that a CRO is not a mere observer or monitor who simply reports back to creditors. Rather, a CRO plays a critical role in assisting a financially troubled entity undergo a restructuring. The "goal of a CRO is to restructure a distressed company's balance sheet and make the difficult determination of defining the company's business within a compressed timeframe."[1] The CRO is the strategist and head of the turnaround.[2] "The changes the CRO has to implement usually involve cost-cutting measures, re-staffing of some key employment positions and possibly changes to the process flow, business strategy and information, operating systems or organizational structure."[3] Further, a CRO must manage a company's cash flows and take control over the company's cash situation.[4] "A CRO must gain sufficient control to be on top of the numbers and drive change."[5] With that control, the CRO should impart "the need for dynamic change and improvement with respect to the management of the company."[6] The CRO needs to move the company and its management and workforce towards the end goal of the restructuring.[7] Because the CRO is an outsider, he/she focuses on the "company's financial, organizational, and operational needs without the emotional ties of management that can often cloud decision-making for a distressed company."[8] A CRO adds restructuring expertise and experience to a management team unfamiliar with Chapter 11 or out-of-court restructurings.[9] They must identify the problems.[10] And they are tasked with creating a financial turnaround plan for the company that addresses those problems.[11]

---

[1] Kevin M. Baum, *The Basics for Retaining a CRO,* Am. Bankr. Inst. J., October 2011, at 50; Shai Y. Waisman & John W. Lucas, *The Role and Retention of the Chief Restructuring Officer*, Am. Restructuring & Insolvency Guide, 2008/2009, at 201.

[2] Anthony H.N. Schelling & Lynn Yap, *CRO as Change Manager in Distressed Companies*, Am. Bankr. Inst. J., June 2008, at 36.

[3] *Id.*

[4] *Id.*

[5] Daniel F. Dooley, *CROs Can Be Driving Force for Good Corporate Governance*, Am. Bankruptcy Inst., March 31, 2011.

[6] Waisman & Lucas at 200.

[7] Waisman & Lucas at 200.

[8] *Role of the Chief Restructuring Officer in Bankruptcy: Overview,* Practical Law Practice Note Overview w-001-1449.

[9] Todd A. Zoha, *A Primer on the Chief Restructuring Officer (CRO)*, Operating a Distressed Business, September 12, 2017, https://www.dailydac.com/a-primer-on-the-chief-restructuring-officer-cro/.

[10] Waisman & Lucas at 200.

[11] *Role of the Chief Restructuring Officer in Bankruptcy: Overview.*

Theia Letter                                    March 17, 2021                                    Page | 5

Theia's incumbent management seems to be resisting any suggestion of outside control. Brevet required appointment of a CRO because one is needed to turn around Theia, a distressed company.[12]  That an outside perspective is needed was illustrated by the remarkable assertion on Friday's call that Theia is not troubled.  Yet Theia is plainly unable to pay its bills, including those to Brevet, as they come due.    It is clearly cash flow insolvent.

Mr. Rieter's proposed retention is inconsistent with the Third Amendment and its CRO requirement.

First, Mr. Reiter's proposed terms of employment are inconsistent with the obligation that Theia's proposed retention of Mr. Reiter provides that the CRO will not 'implement the Liquidity Plan' or 'raise capital for the Grantors.'"  This is completely at odds with the Third Amendment requirement that the CRO have full authority to implement the Liquidity Plan.  And, as noted these terms are at war with the very idea of a CRO as that term is understood.  Indeed, Theia's proposal violates even the term prescribed in the Third Amendment.  The Third Amendment requires that the CRO remain in place "[s]o long as any obligations under the Transaction Documents remain outstanding."  Third Amendment § 3(f).  However, the proposed retention of Mr. Reiter would terminate upon a "declaration of default," which would have to be prior to satisfaction of all obligations.

Second, Mr. Reiter's background shows no experience as a CRO and no experience as the executive leading an overall financial restructuring.  His resume does not feature anything that would provide him with experience addressing the issues that Theia currently faces.  Serving as in-house counsel for companies in the agricultural and telecommunications sector offers little that is relevant to solving Theia's mounting financial problems.  And, in fact, Theia does not pretend he has such ability, as it has proposed him only for what amounts to an observer-reporter role.

Third, Theia's proposal for a Brevet indemnity is a non-starter, and imposes a condition flatly contrary to the Third Amendment.

During Friday's call, you questioned Brevet's earlier support for Robert Cardillo to suggest Brevet was being inconsistent in its CRO requirements.  In Brevet's judgment, Mr. Cardillo, given "full authority" to perform the CRO role could have done so.  (Of course, Brevet had no idea at the time that Theia intended to tie Mr. Cardillo's hands to an observer role.)  Mr. Cardillo's unique industry background would permit him to take a detached re-evaluation and restructuring of Theia.

In short, Theia's recent foot-dragging and assertions that "CRO" simply means any person who will be conduit for delivering information prepared by management contradicts industry usage, contradicts the Third Amendment, defeats the purpose of giving Theia six months so that independent manager and special advisor can develop a liquidity plan, and simply wastes time. John Gallagher clearly understood what was required last December and efforts by management to re-trade will not be tolerated.

---

[12] *Id.*; Waisman & Lucas at 200.

Other than Mr. Cardillo, Theia has not proposed any acceptable candidates to Brevet for consent. There are dozens, if not hundreds, of qualified turnaround professionals who could serve as CRO. If you need a suggestion, we're happy to refer you to multiple candidates. We would like to resolve this longstanding issue.

**Liquidity Plan**

Finally, much was said on Theia's side on the table last Friday about the "Liquidity Plan" required by section 3(b) of the Third Amendment and that it was already "approved" by Brevet. So that there is no doubt, I am reiterating that Brevet does not believe that Theia has complied with its obligation to provide a Liquidity Plan in "form and substance reasonably acceptable to" Brevet. The one-page laundry list provided in the power point presentation does not set forth any real details. The fact that it was prepared without the input of a retained Special Advisor and an independent CRO as contemplated by the Third Amendment itself means that the Liquidity Plan is not complete.

The essential purpose of the Third Amendment in December was to allow for retention of independent experts to develop and then implement a plan for righting the business and putting it in a position to pay off the Transaction Documents by June 2021. Theia has wasted over three months of the six-month timetable and is now trying to re-trade the terms agreed to in the Third Amendment. Brevet urges Grantors to provide what was agreed to in the Third Amendment: independent management (CRO/Independent Director) and a Special Advisors and allow them to do the jobs they are trained to do, including running the business according to an Approved Budget and developing and implementing a "comprehensive" Liquidity Plan.

We look forward to a prompt response.

Very truly yours,

FCS ADVISORS, LLC
d/b/a BREVET CAPITAL ADVISORS

By: _____
      Mark Callahan, Managing Director