*EXHIBIT 1-2*

*Execution Version*

THEIA GROUP INCORPORATED

**SECURED NOTE PURCHASE AGREEMENT**

This SECURED NOTE PURCHASE AGREEMENT (this "Agreement"), dated as of **January 5, 2021** (the "Effective Date"), is among **Theia Group Incorporated**, a Delaware corporation (the "Issuer" or "TGI"), **Theia Holdings A, Inc.**, a Delaware corporation (as "Guarantor" under the Collateral Agreement (defined below) and **Aithre Capital Partners LLC**, as purchaser (the "Purchaser").

WHEREAS, subject to the terms and conditions set forth herein, the Issuer wishes to issue and sell to the Purchaser, and the Purchaser wishes to purchase from the Issuer at a purchase price of 100% of the principal amount thereof (the "Consideration"), one or more secured convertible promissory notes.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows

1.      Definitions. Capitalized terms not otherwise defined in this Agreement will have the meanings set forth in this Section 1.

"Administrator" means Bulltick Financial Advisory Services, LLC, as administrator of the issuer under the Purchaser Operating Agreement.

"Aggregate Outstanding Note Balance" shall mean the aggregate of amounts due under any outstanding notes sold or otherwise issued by the Issuer, which have liens or other security interests of any kind on the Collateral.  Such amounts shall include, if applicable, and in addition to the outstanding principal amounts, (i) interest due on any such notes, and (ii) the full amounts due at maturities of such notes, such as the Repayment Amount or any similar amounts, to the extent such amounts are greater than the outstanding principal amount of such note.

"Bankruptcy Event" means, with respect to any Person, (i) such Person becomes insolvent or has been placed into liquidation or receivership (whether voluntary or involuntary), or (ii) there have been instituted against such Person proceedings for the appointment of a receiver, liquidator, rehabilitator, conservator, trustee in bankruptcy, or other agent known by whatever name, to take possession of its assets or control of such Person's operations, and such proceedings continue for a period of more than forty-five (45) days thereafter.

"Bylaws" means the Amended & Restated Bylaws of TGI, effective July 23, 2018.

"Collateral" means (i) one hundred percent (100%) of the common stock of the Guarantor and (ii) all of the Issuer's right, title and interest in the Secured Spectrum as defined on Schedule I hereto.

"Collateral Agreement" means the Guarantee and Collateral Agreement dated January 5, 2021, by and among the Issuer, the Guarantor, as guarantors thereunder and the Purchaser, as the secured party thereunder.

*Execution Version*

"Common Stock" means the Issuer's common stock, par value US$0.0001.

"Conversion Price" means the product of (x) the price per share of Common Stock set forth in the Qualified Valuation and (y) 0.10. (rounded to the nearest 1/100th of one cent).

"Conversion Shares" means shares of Common Stock issued to the Purchaser upon a Qualified Conversion, the holders of which shall have the option to sell all or any portion of such shares to the Issuer on the fourth anniversary of the Effective Date at the applicable price specified in the Qualified Valuation in accordance with Section 5 hereof.

"Definitive Agreements" means this Agreement, the Note, and the Collateral Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"GAAP" means generally accepted accounting principles and practices as in effect from time to time in the United States of America.

"Governmental Authority" means any federal, state or local court or governmental agency, authority, commission, board, bureau, instrumentality or regulatory or legislative body or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or court.

"Material Adverse Effect" means a material adverse change in or a material adverse effect on (a) the business, operations, properties, assets or condition (financial or otherwise) of the Issuer, (b) the ability of the Issuer to fully and timely perform its obligations hereunder, (c) the legality, validity, binding effect or enforceability against the Issuer of this Agreement, or (d) the rights and remedies available to, or conferred upon, the Purchaser under this Agreement.

"Maturity Date" means the date that is twenty-four (24) months following the date of issuance of the Note.

"Member" means each Person holding Membership Interests in the Purchaser in accordance with the terms of the Purchaser Operating Agreement.

"MPP" means the Issuer's Master Partner Program, consisting of a series of definitive agreements entered into by the Issuer with certain countries to serve as anchor customers, providing initial funding in support of establishing the Issuer's global satellite network in exchange for various services and rights, including a perpetual license to access select data generated by the Issuer, and a preferred return.

"MPP Escrow Account" means the account at JP Morgan Chase in which each MPP participant must deposit its financial commitment under its MPP agreement.

"MPP Threshold" means US$12,800,000,000 or more in the account balance of the MPP Escrow Account, satisfying the condition under the MPP escrow agreement for release of monies to the Issuer to fund the construction and launch of the Issuer's satellite network.

"Note" means the secured convertible promissory notes issued to the Purchaser pursuant to Section 2, the form of which is attached hereto as Exhibit A.

2

*Execution Version*

"Permitted Obligations" means those liabilities reflected on the Financial Statements attached hereto as Schedule IV.

"Person" means any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Purchaser Operating Agreement" means that certain Amended & Restated Operating Agreement of Aithre Capital Partners LLC dated January 5, 2021.

"Qualified Conversion" means the conversion of the Note pursuant to Section 5 hereof.

"Repayment Amount" means 150% of the principal amount of the Note.

"Securities Act" means the Securities Act of 1933, as amended.

"Solvent" means, with respect to any Person as of any date of determination, (i) the fair value of the assets of such Person will exceed its debts and liabilities, including contingent liabilities; (ii) the present fair saleable value of the property of such Person will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities as such debts and other liabilities become absolute and matured; (iii) such Person does not intend to, and do not believe it will, incur debts or liabilities beyond its ability to pay such debts and liabilities as they mature; and (iv) such Person will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is presently conducted and is proposed to be conducted after such date of determination, and no Bankruptcy Event has occurred with respect to such Person; *provided* that for purposes of calculation of solvency under this definition, MPP contributions shall not be considered to be a liability.

"Spectrum Value" means the value of all frequencies granted to the Issuer by the Federal Communications Commission ("FCC"), the National Oceanic and Atmospheric Administration and any other governmental agency to construct, launch and operate a satellite constellation comprised of 112 saleable satellites for the purpose of providing earth-imaging data and analytics in the United States and globally.  The Issuer's spectrum value is estimated to be in excess of US$2.4 billion, pursuant to (i) the 2018 Summit Ridge Group valuation report, (ii) the agreed upon valuation by the parties hereto of additional frequencies not considered in such report, (iii) precedent market transactions, and (iv) a subsequent spectrum valuation report dated October 22, 2020, prepared by Dr. Joseph N. Pelton, Dean Emeritus International Space University and Former Executive Director, Space & Advancement Communications Research Institute (SACRI), George Washington University (attached hereto as Schedule III). The valuation of the Issuer's licensed spectrum may be updated or amended by any other third party from time to time. The parties agree that, for purposes of this Agreement, the Spectrum Value shall be set at $2.67 billion.

2.    Purchase and Sale.  Subject to the terms and conditions and in reliance upon the representations and warranties set forth herein**,** the Issuer shall sell and issue to the Purchaser at a purchase price of 100% of the principal amount thereof, the Note.

3.    Security. The Note is a senior secured obligation of the Issuer and will be secured by the Collateral pledged as security therefor pursuant to the Collateral Agreement.

*Execution Version*

4. <u>Closings</u>.

    a. <u>Initial Closing</u>. The initial closing of the sale of the Note in return for the Consideration paid by the Purchaser shall take place either (i) remotely via the exchange of documents and signatures on the date of this Agreement or (ii) at such time and place mutually agreed upon by the Issuer and the Purchaser, orally or in writing (the "<u>Initial Closing</u>"). At the Initial Closing, the Purchaser shall deliver the Consideration by wire transfer of immediately available funds to the bank and account designated by the Issuer and the Issuer shall deliver the executed Note to the Purchaser in return therefor.

    b. <u>Subsequent Closings</u>. In any subsequent closing (a "<u>Subsequent Closing</u>"), the Issuer may sell additional Notes subject to the terms of this Agreement to any purchaser as it will select; provided, that the Aggregate Outstanding Note Balance does not exceed seventy-five percent (75%) of the Spectrum Value. Any subsequent purchasers of Notes will become parties to, and will be entitled to receive Notes in accordance with, this Agreement. Each Subsequent Closing will take place remotely via the exchange of documents and signatures or at such locations and at such times as will be mutually agreed upon orally or in writing by the Issuer and the Purchasers of additional Notes. Schedule I hereto will be updated to reflect the additional Notes purchased at each Subsequent Closing and the parties purchasing such additional Notes.

5. <u>Conversion of the Note</u>.

    a. Upon realization of the MPP Threshold by the Issuer, the Board of Directors of the Issuer shall promptly commence its determination of the valuation of the Issuer, which shall be subject to a fairness opinion by an independent top 10 financial institution selected by the Issuer and previously approved by the Purchaser (the "<u>Qualified Valuation</u>").

    b. Promptly upon completion of the Qualified Valuation and prior to the date of conversion specified therein (the "<u>Conversion Date</u>"), the Purchaser shall duly notify the Issuer of the conversion in accordance with the Purchaser's governing documents.

    c. The number of Conversion Shares the Issuer issues upon such conversion will equal the quotient (rounded down to the nearest whole share) obtained by dividing (x) the Repayment Amount as of the Conversion Date by (y) the applicable Conversion Price. The issuance of Conversion Shares pursuant to this Section 5 will be on, and subject to, the same terms and conditions applicable to other purchasers of Securities issued by the Issuer.

6. <u>Mechanics of Conversion</u>.

    a. <u>Financing Agreements</u>. The Purchaser acknowledges that the conversion of this Note into Conversion Shares pursuant to Section 5 may require the Purchaser's execution of certain agreements relating to the purchase and sale of the Conversion Shares, as well as registration rights, rights of first refusal and co-sale, rights of first offer and voting rights, if any, relating to such securities (collectively, the "<u>Financing Agreements</u>").

*Execution Version*

The Purchaser agrees to execute Financing Agreements reasonably requested by the Issuer in connection with a Qualified Conversion.

b. <u>Certificates</u>. As promptly as practicable after the conversion of this Note and the issuance of the Conversion Shares, the Issuer (at its expense) will issue and deliver a certificate or certificates evidencing the Conversion Shares (if certificated) to the Purchaser, or if the Conversion Shares are not certificated, will deliver a true and correct copy of the Issuer's share register reflecting the Conversion Shares held by the Purchaser. The Issuer will not be required to issue or deliver the Conversion Shares until the Purchaser has surrendered this Note to the Issuer (or provided an instrument of cancellation or affidavit of loss).

7.    <u>Put Option</u>. On the fourth anniversary of the issuance of the Note (the "<u>Put Option Date</u>"), the Purchaser shall have the right to sell all or any portion of the Conversion Shares at the applicable price specified in the Qualified Valuation (the "<u>Put Option</u>"). Promptly after the Qualified Valuation, the Administrator will issue a request for instruction from the Purchaser, in which the Purchaser shall specify whether it will elect to exercise the Put Option in respect of its Conversion Shares. If the Purchaser elects to exercise the Put Option, the Issuer shall pay to the Purchaser an amount equal to the value of such Conversion Shares as of such date in accordance with the request for instruction.

8.    <u>Purchaser Representations and Warranties</u>. In connection with the transactions contemplated by this Agreement, the Purchaser represents and warrants to the Issuer the following:

a. <u>Authorization</u>. The Purchaser has full power and authority (and, if the Purchaser is an individual, the capacity) to enter into this Agreement and to perform all obligations required to be performed by it hereunder. This Agreement, when executed and delivered by the Purchaser, will constitute the Purchaser's valid and legally binding obligation, enforceable in accordance with its terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

b. <u>Disclosure of Information; Non-reliance</u>.

i. The Purchaser further acknowledges that it has (i) conducted its own investigation and credit analysis of the Issuer and the terms of the Securities and has relied exclusively on such investigation and analysis in making its decision to invest in the Securities, independently and without reliance on any other purchaser of promissory notes issued by the Issuer (each, an "<u>Other Purchaser</u>") and (ii) had access to such financial and other information as it deems necessary to make its decision to purchase the Securities independently and without reliance on any Other Purchaser.

ii. The Purchaser and its Members understand that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of this investment.

*Execution Version*

c. <u>Accredited Investor</u>.  The Purchaser is (i) an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act.  The Purchaser agrees to furnish any additional information requested by the Issuer or any of its affiliates to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Securities.

d. <u>No General Solicitation</u>. The Purchaser, and its officers, directors, employees, agents, stockholders or partners have not either directly or indirectly, including through a broker or finder solicited offers for or offered or sold the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502 of Regulation D under the Securities Act.  The Purchaser acknowledges that neither the Issuer nor any other person offered to sell the Securities to it by means of any form of general solicitation or advertising within the meaning of Rule 502 of Regulation D under the Securities Act.

e. <u>Restricted Securities</u>. The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act or any state securities laws, by reason of specific exemptions under the provisions thereof which depend upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under U.S. federal and applicable state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and registered or qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Issuer has no obligation to register or qualify the Securities for resale and further acknowledges that, if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Issuer which are outside of the Purchaser's control, and which the Issuer is under no obligation, and may not be able, to satisfy.

<u>Residence</u>. The Purchaser is an LLC. With its principal place of business located at:

> c/o Bulltick Financial Advisory Services, LLC
> 333 SE 2nd Avenue, Ste. 3950
> Miami, FL 33131

f. <u>No Public Market</u>. The Purchaser understands that no public market now exists for the Securities and that the Issuer has made no assurances that a public market will ever exist for the Securities.

g. <u>Information</u>.

   i. By purchasing the Securities, the Purchaser acknowledges that the Issuer and its agents and advisers may each collect, use and disclose its name and other specified personally identifiable information ("<u>Information</u>"), including the amount of securities that the Purchaser has purchased for purposes of meeting legal, regulatory and audit requirements and as otherwise permitted or required by law or regulation.

*Execution Version*

The Purchaser consents to the disclosure of such Information to the extent, and only to the extent, required by legal, regulatory and audit requirements of the Issuer.

ii.   The Purchaser acknowledges that where required by applicable securities laws, regulations or rules, it will execute, deliver and file such reports, undertakings and other documents relating to its purchase of the Securities as may be required by such laws, regulations and rules, or assist the Issuer in obtaining and filing such reports, undertakings and other documents.

9.    <u>Representations and Warranties of the Issuer</u>.   In connection with the transactions contemplated by this Agreement, the Issuer represents and warrants to the Purchaser the following:

a.   <u>Due Organization; Qualification and Good Standing</u>. The Issuer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Issuer is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify or to be in good standing would have a Material Adverse Effect on the Issuer.

b.   <u>Authorization and Enforceability</u>. Except for the authorization and issuance of the Conversion Shares, all corporate action has been taken on the part of the Issuer and its officers, directors and stockholders necessary for the authorization, execution and delivery of the Note. Except as may be limited by applicable bankruptcy, insolvency, reorganization or similar laws relating to or affecting the enforcement of creditors' rights, the Issuer has taken all corporate action required to make all of the obligations of the Issuer reflected in the provisions of the Note valid and enforceable in accordance with its terms.

c.   <u>Licenses and Permits</u>.   The Issuer has obtained all licenses, consents, permits, approvals, orders and other necessary authorizations, approvals, orders, certificates and permits of and from the applicable authorities presently required or necessary to conduct its business in the manner in which it is conducted as described in its Bylaws.

d.   <u>Valid Issuance of Stock</u>. The Conversion Shares to be issued, sold and delivered upon conversion of the Note will be duly authorized and validly issued, fully paid and nonassessable and, based in part upon the representations and warranties of the Purchaser in this Agreement, will be issued in compliance with all applicable U.S. federal and state securities laws.

e.   <u>Litigation</u>.   There is no private or governmental action, suit, proceeding, claim, arbitration or investigation pending before any agency, court or tribunal, foreign or domestic, or, to the knowledge of the Issuer, threatened against the Issuer or any of its properties or any of its directors, officers or managers (in their capacities as such). There is no judgment, decree or order against the Issuer or, to the knowledge of the Issuer, any of its directors, officers or managers (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the transactions contemplated by this Agreement, or that could reasonably be expected to have a Material Adverse Effect on the Issuer.

*Execution Version*

f.   <u>No Conflict</u>. The execution, delivery, and performance by the Issuer and the Guarantor of the Agreements to which they are party do and will not (i) violate any provision of federal, state, or local law or regulation applicable to the Issuer or the Guarantor or their governing documents, (ii) violate any written agreements, contracts, indentures, licenses or other documents to which each of the Issuer or the Guarantor is party or by which each of the Issuer and the Guarantor is bound or to which its properties or assets are subject, or (iii) require any approval of a third party or the shareholders of the Issuer and the Guarantor, other than consents or approvals that have been or, by the Closing Date will be, obtained and that are still in force and effect.

g.   <u>Books and Records</u>.  The Issuer maintains proper books of record and account in accordance with Delaware Law and any other applicable Governmental Authority.  The Issuer keeps books, records and accounts which, in reasonable detail, accurately reflect all transactions and dispositions of assets.  The Issuer has devised a system of internal accounting controls sufficient to provide reasonable assurances that their respective books, records, and accounts accurately reflect all transactions and dispositions of assets and the Issuer will continue to maintain such system.

h.   <u>Financial Statements</u>. The Issuer has provided unaudited consolidated financial statements of the Issuer and the Guarantor for the years ended December 31, 2018 and 2019 and the nine months ended September 30, 2020, attached hereto in Schedule IV. Such financial statements are a complete set of the Issuer's and the Guarantor's consolidated financial statements and footnotes, have been prepared in accordance with GAAP and reflect the financial conditions of the Issuer and the Guarantor in all material respects.

i.   <u>No Default</u>. On the date hereof, there exists no default that, with the giving of notice or the passage of time, or both, would constitute an event of default under any material indebtedness of the Issuer.  In addition, the Issuer is not in violation of, or in default in the performance, observance or fulfillment of, any obligation, agreement, covenant or condition contained in any treaty, contract, or agreement to which it is a party, except for such violations or defaults that would not, individually or in the aggregate, result in a Material Adverse Effect, and the Issuer has not received any written notice from any of the other parties to such treaties, contracts or agreements that such other party intends not to perform its obligations thereunder or is aware that any of the other parties to such treaties, contracts or agreements intends not to perform its obligations thereunder, except to the extent that such non-performance would not, individually or in the aggregate, result in a Material Adverse Effect.

j.   <u>Tax Matters</u>.  All tax returns required to be filed by the Issuer have been filed and all such returns are true, complete and correct in all material respects. All material taxes that are due from the Issuer have been paid other than those (i) currently payable without penalty or interest or (ii) being contested in good faith and by appropriate proceedings and for which adequate accruals have been established in accordance with GAAP, applied on a consistent basis throughout the periods involved. To the knowledge of the Issuer, after due inquiry, there are no actual or proposed tax assessments against the Issuer that would, individually or in the aggregate, have a Material Adverse Effect. The accruals on the books and records of the Issuer.

k.  <u>Intellectual Property</u>. To its knowledge, the Issuer has sufficient title and ownership of, or licenses to, all patents, trademarks, service marks, trade names, domain names, copyrights, trade secrets, information, proprietary rights and processes necessary for its business as now conducted without any violation or infringement of the rights of others. The right of the Issuer to use or exploit any intellectual property which the Issuer requires to conduct its business is not restricted by, nor is dependent upon any license, other than those normal licenses necessary to be obtained in the normal course of its business.

l.  <u>Collateral</u>. The liens granted to the Purchaser, as secured party, pursuant to the Collateral Agreement (i) constitute valid liens and perfected security interests in the Issuer's right, title and interest therein in the Collateral and (ii) are subject to no liens except liens permitted hereunder or under another Definitive Agreement.  All such action as is necessary has been taken to establish and perfect the Purchaser's right in and to the Collateral, including any recording, filing, registration, giving of notice or other similar action (assuming proper recordation of any such documents).  As of the Effective Date, no filing, recordation, re-filing or re-recording is necessary to perfect and maintain the perfection of the interest, title or liens of the Collateral Agreement that can be perfected by filing.  To the extent required by the Collateral Agreement, the Purchaser has properly delivered or caused to be delivered (or shall deliver on the Effective Date) to the Purchaser all Collateral that requires perfection of the liens and security interests described above by possession.

m.  <u>Accuracy of Diligence Information</u>. To the Issuer's knowledge, the factual information furnished by the Issuer to the Purchaser (whether orally, in writing, electronic form or otherwise and whether provided by the Issuer) in course of the diligence conducted by the Purchaser prior to the date hereof, (i) was, as of the date of such furnishing and (ii) is, as of the date hereof, accurate in all material respects, and did not contain any untrue statement of any material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading.

n.  <u>Solvency</u>. As of the date hereof, no Bankruptcy Event has occurred or is continuing with respect to the Issuer. Before and after giving effect to the transactions contemplated by this Agreement and the other Definitive Agreements, the Issuer shall be Solvent.

o.  <u>Shareholder Rights</u>. No special rights or preferences have been granted to any of the Issuer's shareholders. No person is entitled to participate in or to obtain a commission on the profits or dividends of the Issuer except as a shareholder.

p.  <u>Other Creditors and Liabilities</u>.  Other than Permitted Obligations, and obligations in respect of the Note or otherwise under this Agreement or the other Definitive Agreements, the Issuer is not subject to any material obligations or liabilities of any kind or nature in favor of any third party, including any direct or indirect liability, contingent or otherwise with respect to any indebtedness, lease, declared but unpaid dividends, letter of credit, or any direct or indirect guarantees, endorsements or other obligations. In addition, the Collateral is not subject to the claims of any other creditors

of the Issuer or the Guarantor other than creditors under Permitted Obligations and those specifically described in this Agreement**.**

q. <u>Post-Closing Obligations</u>. Upon the Purchaser's subscription of more than US$150,000,000 (one hundred fifty million U.S. dollars) of Notes:

      i. the Issuer and the Guarantor agree to enter into a guarantee, collateral and intercreditor agreement to be negotiated with all secured creditors, including but not limited to FCS Advisors, LLC d/b/a Brevet Capital Advisors, and will assist with best efforts to obtain such other creditors' participation and agreement with respect to management of the Collateral and *pari passu* treatment of all secured creditors; and

      ii. Following a Qualified Conversion, the Issuer will enter into with its shareholders a typical shareholders' agreement contemplating typical reciprocal shareholders' rights including but not limited to so called 'tag-along' rights.

10. <u>Closing Conditions</u>.

a. <u>Conditions to the Purchaser's Obligations</u>. The obligations of the Purchaser to purchase and pay for the Securities on the Effective Date are subject to the following conditions:

   i. The representations and warranties of the Issuer contained in this Agreement shall be true and correct in all material respects (except to the extent already qualified by materiality) on and as of the date made and on and as of the Effective Date as if made on and as of the Effective Date; the statements of the Issuer's officers made pursuant to any certificate delivered in accordance with the provisions hereof shall be true and correct in all material respects (except to the extent already qualified by materiality) on and as of the date made and on and as of the Effective Date; the Issuer shall have performed all covenants and agreements in all material respects and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Effective Date.

   ii. The Purchaser shall have received on the Effective Date a certificate, dated the Effective Date and signed by an executive officer of the Issuer, certifying that the conditions set forth in Section 10(a)(i) have been satisfied.  The officer signing and delivering such certificate may rely upon the best of his or her knowledge as to matters certified.

   iii. The Issuer shall have executed and delivered each of the other Definitive Agreements and the Purchaser shall have received an electronic copy of the executed versions thereof.

   iv. The Issuer shall have delivered to such Purchaser a certificate of its Secretary or Assistant Secretary, dated the date hereof, certifying as to (i) the resolutions attached thereto and other corporate, partnership or limited liability company proceedings, as applicable, relating to the authorization, execution and delivery of the Note and this Agreement, (ii) the Issuer's organizational documents as then in effect (each certified

as of a recent date by the Secretary of State of the applicable state of organization), and a certificate of good standing as of a recent date from such Secretary of State, and (iii) the incumbency and specimen signature of each officer executing this Agreement or other document delivered in connection herewith, together with a certification of another officer of the Issuer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate.

v.   The Issuer shall have delivered a legal opinion of the General Counsel of the Issuer and the Guarantor, satisfactory to the Purchaser and substantially in the form Schedule III attached hereto.

vi.  The Purchaser shall have been granted on the Effective Date a perfected lien on the Collateral and shall have received:

1.  UCC financing statements (Form UCC l), naming the Issuer as debtor and the Purchaser as secured party, in form appropriate for filing as may be necessary to perfect the security interests purported to be created by the Collateral Agreement, covering the applicable Collateral which constitutes personal property;

2.  results of a recent lien search in each of the jurisdictions as the Purchaser may reasonably require, and such searches shall reveal no lien on any of the assets of the Issuer except for any lien permitted hereunder or liens discharged on or prior to the Effective Date;

3.  copies of all other recordings and filings of, or with respect to, the Collateral Agreement as may be reasonably necessary to perfect the security interests purported to be created by the Collateral Agreement; and

4.  reasonably satisfactory evidence that all other actions necessary to perfect the security interests purported to be created by the Collateral Agreement have been taken or will be taken on the Effective Date.

b.  <u>Conditions to the Issuer's Obligations</u>.  The obligations of the Issuer to issue and sell the Securities on the Effective Date are subject to the following conditions:

i.   The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects (except to the extent already qualified by materiality) on and as of the date made and on and as of the Effective Date as if made on and as of the Effective Date; the statements of the Purchaser's officers made pursuant to any certificate delivered in accordance with the provisions hereof shall be true and correct in all material respects (except to the extent already qualified by materiality) on and as of the date made and on and as of the Effective Date; the Purchaser shall have performed all covenants and agreements in all material respects and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Effective Date.

11.   <u>Covenants of the Issuer</u>. The Issuer covenants and agrees that, until payment in full of the obligations under this Agreement and the Note:

a. <u>LTV Ratio and MPP Threshold Reporting</u>.  The Issuer shall ensure at all times that the Aggregate Outstanding Note Balance does not exceed seventy-five percent (75%) of the Spectrum Value. Upon the passing of the MPP Threshold the Issuer shall promptly cause one of its officers to deliver a written executed certificate confirming that the MPP Threshold has been surpassed, such certificate shall be accompanied with a letter of the escrow agent confirming that the deposited amounts exceed the MPP Threshold and are sufficient to release the deposited amounts to the Issuer under the terms of the escrow.

b. <u>Perfection or Validity and Maintenance of Security Interests</u>.  The Issuer shall at its expense, prepare, give, execute, deliver, file and/or record any notice, financing statement, continuation statement, public deed, instrument or agreement necessary to maintain, preserve, continue, perfect or validate a first priority security interest granted under the Collateral Agreement or pursuant to the Collateral Agreement for the benefit of the Purchaser with respect to such security interest.

c. <u>Priority of Obligations</u>.  The Issuer shall ensure that its payment obligations with respect to the Note will constitute its direct, unconditional and general senior secured obligations and will rank pari passu with all of its other secured debt and senior in priority of payment, in right of security and in all other respects over all of its other indebtedness, which shall rank pari passu or subordinate in priority of payment and in right of security to such payment obligations; provided, however, if Issuer is unable to get its creditors to enter into an intercreditor agreement after using best efforts to do so in accordance with Section 9(q)(i) , Issuer shall not be deemed to be in default under this covenant.

d. <u>Books and Records</u>.  The Issuer will maintain its books of record and account in accordance with Section 9(g) hereof. Notwithstanding the foregoing, Issuer shall provide Purchaser with access to Issuer's and the Guarantor's books and records as if Purchaser were a 'shareholder' under section 2020 of Title 8 of the Delaware Code.

e. <u>Reports</u>.

    i. Stephen Buscher, or such other person as the Board of Directors of the Issuer may appoint, shall be designated as key-man CFO with reporting obligations and certain undertakings agreed upon by the Parties.  The CFO shall report to the CEO, have chief oversight of all accounting and financial control functions via a double key payment system, and shall be a member of the audit committee of the Board of Directors of the Issuer (the "<u>Audit Committee</u>").  The CFO shall have the responsibility to deliver all materials to satisfy the Issuer's reporting obligations, including to the Purchaser, and to keep the Purchaser informed of the Issuer and Guarantor's progress, milestones and any key developments in a timely manner. Accordingly, the CFO shall have access to all company records, including, among others, the company's commercial contracts plus share subscription, shareholder, loan, note, pledge, lien, collateral, escrow and assignment agreements plus shareholder ledger.  The CFO shall be able to review all un-redacted contracts, including as applicable any and all escrow agreements pertaining thereto, and the CFO, the Issuer and the Guarantor undertake to obtain sufficient security clearances as soon as possible for the CFO as necessary to be read-in to all of the Issuer and Guarantor's programs, or will otherwise designate two individuals possessing such

clearances and approved of by the CFO to provide details necessary for the CFO to have financial insight sufficient to verify their existence and rely upon them in accordance with GAAP/IFRS standards. The CFO, the Issuer and Guarantor further undertake to update as soon as possible the Company's MIS/ERP system, to dedicate personnel as deemed appropriate and to enhance processes to enable better financial and accounting management of the Issuer and Guarantor's vertically integrated businesses, according to GAAP/IFRS standards, on stand-alone or consolidated bases and to manage the procurement processes, including of satellite equipment and components according to industry standards.

ii. The Issuer shall furnish or otherwise make available to the Purchaser true and complete copies of:

1. unaudited quarterly consolidated financial statements of the Issuer and the Guarantor prepared in accordance with GAAP consistently applied (other than the requirements under GAAP to make normal year-end adjustments or to provide footnote disclosure relating to the financial statements) within 45 days following the end of each fiscal quarter beginning with the fiscal quarter ending March 31, 2021;

2. audited annual consolidated financial statements of the Issuer and the Guarantor prepared in accordance with GAAP, consistently applied within 150 days following the end of each fiscal year beginning with the fiscal year ending December 31, 2020 (a balance sheet only report will be acceptable for the December 31, 2020 audit, to be delivered the Purchaser no later than June 1, 2021); provided that such audit shall be conducted by an independent top 10 global accounting firm; and

3. such other information about the Issuer as the Purchaser may reasonably request from time to time; *provided* such other financial information in the case of this clause (3) is (A) regularly prepared by the Issuer in the ordinary course of business or can be prepared through administrative and ministerial efforts without undue burden and (B) available to the Issuer in a form that could reasonably be disclosed to the Purchaser. Notwithstanding the foregoing, the Issuer shall not be obligated to provide such information or materials to, including that it may redact, any such information or materials (i) if doing so would violate applicable law or an obligation of confidentiality owing to a third-party or jeopardize the protection of an attorney-client privilege, or (ii) would constitute sensitive business information or personally identifiable information of any individual, as reasonably determined by the Issuer. Each party shall bear their own costs and expenses in connection with any such inspection; and

4. all other information about events or occurrences that, in the Issuer and/or the Guarantor's opinion, would reasonably be expected to have a Material Adverse Effect on the Issuer and/or the Guarantor, such information to be promptly provided by the Issuer or Guarantor to the Purchaser on an on-going basis.

iii.  In addition, the Issuer shall furnish or otherwise make available to the Purchaser, upon request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to the extent such Notes constitute "restricted securities" within the meaning of the Securities Act.

12.    <u>Events of Default</u>. An "Event of Default" shall exist if any of the following conditions or events shall occur and be continuing:

a.  <u>Payment Default</u>. The Issuer defaults in the payment of all or any portion of the Repayment Amount when the same becomes due and payable on the Maturity Date.

b.  <u>Covenant Defaults</u>.

i.  With respect to Sections 11(a), (b) and (c), the Issuer defaults in the performance of or compliance with any term contained therein and such failure continues uncured for a period of three (3) days from the date on which the Issuer obtains knowledge thereof.

ii.  With respect to any other covenant of the Issuer set forth in this Agreement, the Issuer fails to perform or observe such covenant, and does not cure such failure within 30 days from the date on which it obtains knowledge thereof; provided that such grace period shall be extended to 90 days if such default cannot be cured within such thirty day time period but is susceptible to cure within 90 days and the Issuer is diligently taking action reasonably likely to cure such failure to perform.

c.  <u>Change of Control</u>. The Issuer ceases to own one hundred percent (100%) of outstanding Equity Interests of the Guarantor

d.  <u>Misrepresentation</u>.  Any representation or warranty made by the Issuer herein, or in any certificate or notice furnished to the Purchaser in accordance herewith, proves to have been false or misleading in any material respect as of the time made, and the fact, event or circumstance that gave rise to the misrepresentation has resulted in or is reasonably expected to result in a Material Adverse Effect and such misrepresentation or such Material Adverse Effect continues uncured for 30 or more days from the date on which the Issuer obtains knowledge thereof.

e.  <u>Bankruptcy Events</u>.  A Bankruptcy Event occurs with respect to the Issuer.

13.    <u>Remedies on Default</u>.

a.  <u>Acceleration; Conversion</u>.

i.  If, prior to the Maturity Date, an Event of Default under Section 12 has occurred and is continuing, the Purchaser may, at its option, by notice to the Issuer within ten (10) days of notice and cure period of such Event of Default, (A) elect to convert the Note to Conversion Shares upon the happening of a Qualified Valuation in accordance with Section 5, or (B) declare the Note immediately due and payable.

ii.   Upon the Note becoming due and payable pursuant to clause (a)(i) above, (x) the Note will forthwith mature and the entire Repayment Amount, shall all be

immediately due and payable, without presentment, demand, protest or further notice, all of which are hereby waived, and (y) interest shall accrue at a rate per annum equal to 25% of the Repayment Amount, calculated on a daily basis on a quarterly basis from the Maturity Date until the date on which payment is made.

b. <u>Other Remedies</u>.   If any Event of Default has occurred and is continuing, and irrespective of whether the Note have become or have been declared immediately due and payable under Section 13(a), the Purchaser may proceed to protect and enforce its rights by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in the Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise.

c. <u>Rescission</u>.   If at any time after the Note has been declared due and payable pursuant to Section 13(a), the Purchaser, by written notice to the Issuer, may rescind and annul any such declaration and its consequences if (i) the Issuer has paid the Repayment Amount and any other amounts due and owing, (ii) neither the Issuer nor any other Person shall have paid any amounts which have become due solely by reason of such declaration, (iii) all Events of Default, other than non-payment of amounts that have become due solely by reason of such declaration, have been cured or have been waived pursuant to Section 14(h), and (iv) no judgment or decree has been entered for the payment of any monies due pursuant hereto or to the Note.   No rescission and annulment under this Section 13(c) will extend to or affect any subsequent Event of Default or impair any right consequent thereon.

14.   <u>Miscellaneous.</u>

a. <u>Successors and Assigns</u>. Except as otherwise provided herein, the terms and conditions of this Agreement will inure to the benefit of, and be binding upon, the respective successors and assigns of the parties; provided, however, that the Issuer may not assign its obligations under this Agreement without the written consent of the Purchaser. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or will confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

b. <u>Choice of Law</u>. This Agreement and the Note, and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York

c. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, email (including PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other transmission method, and any counterpart so delivered

*Execution Version*

will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

d.  <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are included for convenience only and are not to be considered in construing or interpreting this Agreement.

e.  <u>Notices</u>. All notices and other communications given or made pursuant hereto will be in writing to the addresses set forth below and will be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by email or confirmed facsimile; (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the respective parties at the addresses shown on the signature pages hereto (or to such email address, facsimile number or other address as subsequently modified by written notice given in accordance with this Section 14(e)).

If to the Purchaser:

Aithre Capital Partners LLC
c/o Bulltick Financial Advisory Services, LLC
333 SE 2nd Avenue, Ste. 3950
Miami, FL 33131
Attn: William A Herrera
Email: legal@bulltick.com

With a copy (with shall not constitute notice) to:

DLA Piper (US) LLP
1251 Avenue of the Americas
New York, NY 10020
Attn: William Candelaria
Email: william.candelaria@us.dlapiper.com

If to the Issuer:

Theia Group, Incorporated
1455 Pennsylvania Avenue, Suite 800
Washington, DC  20004
Attn: Stephen Buscher
Email: sbuscher@theiagroupinc.com

f.  <u>Expenses</u>. Each party will pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of this Agreement

g.  <u>Attorneys' Fees</u>. If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

*Execution Version*

h.  <u>Entire Agreement; Amendments and Waivers</u>. This Agreement, the Note and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof. The Issuer's agreements with each of the Purchasers are separate agreements, and the sales of the Note to each of the Purchasers are separate sales. Notwithstanding the foregoing, any term of this Agreement or the Note may be amended and the observance of any term of this Agreement or the Note may be waived (either generally or in a particular instance and either retroactively or prospectively) with the written consent of the Issuer and the Purchaser. Any waiver or amendment effected in accordance with this Section 14(h) will be binding upon each party to this Agreement and the Purchaser and each future holder of all such Note.

i.  <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions will be excluded from this Agreement and the balance of the Agreement will be interpreted as if such provisions were so excluded and this Agreement will be enforceable in accordance with its terms.

j.  <u>Limitations on Disposition</u>. Without in any way limiting the representations and warranties set forth in this Agreement, the Purchaser agrees not to make any disposition of all or any portion of the Securities unless and until the transferee has agreed in writing for the benefit of the Issuer to make the representations and warranties set out in Section 9 hereof and:

  i.  there is then in effect a registration statement under the Securities Act covering such proposed disposition, and such disposition is made in connection with such registration statement; or

  ii.  the Purchaser has (A) notified the Issuer of the proposed disposition; (B) furnished the Issuer with a detailed statement of the circumstances surrounding the proposed disposition; and (C) if requested by the Issuer, furnished the Issuer with an opinion of counsel reasonably satisfactory to the Issuer that such disposition will not require registration under the Securities Act.

k.  The Purchaser agrees that it will not make any disposition of any of the Securities to the Issuer's competitors, as determined in good faith by the Issuer.

l.  <u>Legends</u>. The Purchaser understands and acknowledges that the Securities may bear the following legend:

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE ISSUER OF AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

*Execution Version*

m.  <u>Exculpation among Purchasers</u>. The Purchaser acknowledges that it is not relying upon any person, firm, corporation or stockholder, other than the Issuer and its officers and directors in their capacities as such, in making its investment or decision to invest in the Issuer. The Purchaser agrees that no other Purchaser, nor the controlling persons, officers, directors, partners, agents, stockholders or employees of any other Purchaser, will be liable for any action heretofore or hereafter taken or not taken by any of them in connection with the purchase and sale of the Securities.

n.  <u>Acknowledgment</u>. For the avoidance of doubt, it is acknowledged that the Purchaser will be entitled to the benefit of all adjustments in the number of shares of the Issuer's capital stock as a result of any splits, recapitalizations, combinations or other similar transactions affecting the Issuer's capital stock underlying the Conversion Shares that occur prior to the conversion of the Note.

o.  <u>Further Assurances</u>. From time to time, the parties will execute and deliver such additional documents and will provide such additional information as may reasonably be required to carry out the terms of this Agreement and the Note and any agreements executed in connection herewith or therewith.

p.  <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER REPRESENTS AND WARRANTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first set forth above.

**THEIA GROUP INCORPORATED**
a Delaware corporation

**AITHRE CAPITAL PARTNERS LLC**
a Delaware LLC

**By: Aithre Capital Management LLC**
a Delaware LLC (as its Manager)
 By: Domus Family LLLP, its Managing Member

By: *John J. Gallagher*

By: _____
 490ABE841AE8490...

Name:   John J. Gallagher

Name:   Rachel Tolley, Esq.

Title:   Secretary of the Board and Director

Title:   Authorized Person

*Execution Version*

**SCHEDULE I**

**SECURED SPECTRUM**

Spectrum allocated for the Issuer's utilization in its construction, launch and operation of a non-geostationary-satellite orbit (NGSO) fixed-satellite service, mobile-satellite service, and earth-exploration-satellite-service constellation consisting of 112 satellites and provision of high-resolution earth-imaging data in the united states and globally consisting of the following frequency bands:

| Operations | Frequencies |
|---|---|
| Remote Sensing | 1215-1300 MHz |
| Gateway | 17.8 – 18.6 GHz (space-to-Earth) |
| | 18.8 – 19.4 GHz (space-to-Earth) |
| | 19.6 – 20.2 GHz (space-to-Earth) |
| | 25.5 – 27.0 GHz (space-to-Earth) |
| | 27.5 – 29.1 GHz (Earth-to-space) |
| | 29.5 – 30.0 GHz (Earth-to-space) |
| | 37.5 – 42.0 GHz (space-to-Earth) |
| | 47.2 – 50.2 GHz (Earth-to-space) |
| | 50.4 – 51.4 GHz (Earth-to-space) |
| User | 10.7 – 12.7 GHz (space-to-Earth) |
| | 12.75 – 13.25 GHz (Earth-to-space) |
| | 14.0 – 14.5 GHz (Earth-to-space) |

as authorized and licensed as set forth in the Federal Communications Commission Order and Authorization (34 FCC Rcd 3526(4)), adopted on May 9, 2019.

*Execution Version*

## SCHEDULE II

### Form of Secured Convertible Promissory Note

THIS INSTRUMENT AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY THE ISSUER OF AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

### SECURED CONVERTIBLE PROMISSORY NOTE

**No. CN-[NUMBER]**                                                                    **Date of Issuance**

**US$[PRINCIPAL AMOUNT]**                                                        **January 5, 2021**

      **FOR VALUE RECEIVED**, THEIA GROUP INCORPORATED, a Delaware corporation (the "**Issuer**"), THEIA HOLDINGS A, INC., a Delaware corporation (as "**Guarantor**" under the Collateral Agreement (as defined in the Note Purchase Agreement) hereby promises to pay to the order of AITHRE CAPITAL PARTNERS LLC (the "**Holder**"), the principal sum of US$[PRINCIPAL AMOUNT], together with an amount equal to fifty percent (50%) of the Principal Amount (such total amount, the "**Repayment Amount**") in accordance with the terms and conditions of this secured convertible promissory note (this "**Note**"). Unless earlier converted into Conversion Shares pursuant to Section 5 of that certain Note Purchase Agreement dated January 5, 2021, by and among the Issuer, the Holder and the other parties thereto (the "**Purchase Agreement**"), the Repayment Amount will be due and payable by the Issuer at any time on Maturity Date.

      This Note is one of a series of Notes issued pursuant to the Purchase Agreement, and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

    1.    Payment. All payments will be made in lawful money of the United States of America at the principal office of the Issuer, or at such other place as the Holder may from time to time designate in writing to the Issuer. Prepayment of principal may not be made without the written consent of the Holder. Upon the Note becoming due and payable after the occurrence and continuance of an Event of Default, interest shall accrue at a rate per annum equal to 25% of the Repayment Amount, calculated daily and paid on a quarterly basis from the Maturity Date until the date on which payment is made.

    2.    Security. This Note is a senior secured obligation of the Issuer and will be secured by the Collateral pledged as security therefor pursuant to the Collateral Agreement.

*Execution Version*

3.     <u>Conversion of the Note</u>. This Note and any amounts due hereunder will be convertible into Conversion Shares in accordance with the terms of Section 4 of the Purchase Agreement.

4.     <u>Amendments and Waivers; Resolutions of Dispute; Notice</u>. The amendment or waiver of any term of this Note, the resolution of any controversy or claim arising out of or relating to this Note and the provision of notice among the Issuer and the Holder will be governed by the terms of the Purchase Agreement.

5.     <u>Successors and Assigns</u>. This Note applies to, inures to the benefit of, and binds the respective successors and assigns of the parties hereto; provided, however, that the Issuer may not assign its obligations under this Note without the written consent of the Holder. Any transfer of this Note may be effected only pursuant to the Purchase Agreement and by surrender of this Note to the Issuer and reissuance of a new note to the transferee. The Holder and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Issuer and any other Purchasers (or their respective successors or assigns).

6.     <u>Officers and Directors not Liable</u>. In no event will any officer or director of the Issuer be liable for any amounts due and payable pursuant to this Note.

7.     <u>Limitation on Interest</u>. In no event will any interest charged, collected or reserved under this Note exceed the maximum rate then permitted by applicable law, and if any payment made by the Issuer under this Note exceeds such maximum rate, then such excess sum will be credited by the Holders as a payment of principal.

8.     <u>Choice of Law</u>. This Note, and all matters arising out of or relating to this Note, whether sounding in contract, tort, or statute will be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York.

THEIA GROUP INCORPORATED


By_____

Name:

Title:

*Execution Version*

## SCHEDULE III

[Theia Group Valuation Report]

*Execution Version*

**SCHEDULE IV**

[Unaudited Financial Statements of the Issuer and the Guarantor]

*Execution Version*

## SCHEDULE V

[Form of Opinion from the Office of the General Counsel of the Issuer and the Guarantor]