*EXHIBIT 1-3*

*Execution Version*

GUARANTEE AND COLLATERAL AGREEMENT

made by

THEIA GROUP INCORPORATED

as the Issuer

and

THEIA HOLDINGS A, INC.

as the Guarantor

in favor of

AITHRE CAPITAL PARTNERS LLC

as the Secured Party

Dated as of January 5, 2021

*Execution Version*

## GUARANTEE AND COLLATERAL AGREEMENT

GUARANTEE AND COLLATERAL AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement" or the "Collateral Agreement"), dated as of January 5, 2021 made by THEIA GROUP INCORPORATED, a Delaware corporation ("Issuer"), THEIA HOLDINGS A, INC., a Delaware corporation (the "License Holder" or "Guarantor") (Issuer and Guarantor are also referred to together ae "Grantors", and individually as a "Grantor") in favor of AITHRE CAPITAL PARTNERS LLC, in its capacity as a secured purchaser under the Note Purchase Agreement referred to below (the "Secured Party").

W I T N E S S E T H:

WHEREAS, THEIA GROUP INCORPORATED, a Delaware Corporation (as "Issuer") and the Secured Party have entered into the Note Purchase Agreement, dated as of the date of this Agreement (as amended, supplemented or otherwise modified from time to time, the "Note Purchase Agreement"), providing for the issuance from time to time of one or more Notes thereunder; and

WHEREAS, the Definitive Agreements require that the parties hereto execute and deliver this Agreement;

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees for the benefit of the Secured Party, as follows:

## SECTION 1
## DEFINED TERMS

1.1     Definitions.

(a)     Unless otherwise defined herein, terms defined in the Note Purchase Agreement and used herein shall have the meanings given to them in such Note Purchase Agreement. All rules of construction set forth in the Note Purchase Agreement apply to this Agreement.

(b)     Any terms used in this Agreement (including for purposes of Section 3) that are defined in the UCC and pertain to Collateral shall be construed and defined as set forth in the UCC, unless otherwise defined herein.

(c)     The following terms shall have the following meanings:

"Charter Documents" means, with respect to any entity and at any time, the certificate of incorporation, certificate of formation, operating agreement, by-laws, memorandum of association, articles of association, or such other similar document, as applicable to such entity in effect at such time.

 "Collateral" has the meaning assigned to such term in Section 3.1(a).

1

*Execution Version*

"Collateral Interests" means the Equity Interests held by the Issuer in the License Holder.

"Communications Laws" means the Communications Act of 1934, as amended, and the rules, regulations and policies of the FCC.

"Contractual Obligation" means, with respect to any Person, any provision of any security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Equity Interests" means any (a) membership interest in any limited liability company, (b) general or limited partnership interest in any partnership, (c) common, preferred or other stock interest in any corporation, (d) share, participation, unit or other interest in the property or enterprise of an issuer that evidences ownership rights therein, (e) ownership or beneficial interest in any trust or (f) option, warrant or other right to convert any interest into or otherwise receive any of the foregoing.

"Governmental Authority" means the government of the United States of America or any other nation or any political subdivision of the foregoing, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Lien" means, when used with respect to any Person, any interest in any real or personal property, asset or other right held, owned or being purchased or acquired by such Person which secures payment or performance of any obligation, and will include any mortgage, lien, pledge, encumbrance, charge, retained security title of a conditional vendor or lessor, or other security interest of any kind, whether arising under a security agreement, mortgage, lease, deed of trust, chattel mortgage, assignment, pledge, retention or security title, financing or similar statement, or arising as a matter of law, judicial process or otherwise.

"Material Adverse Effect" means:

(a) with respect to the Grantors, a material adverse effect on (i) their results of operations, business, properties or financial condition, taken as a whole, (ii) their ability to conduct their business or to perform in any material respect their obligations under any Transaction Document, or (iii) the Collateral, taken as a whole;

(b) with respect to the Collateral, a material adverse effect with respect to the Collateral taken as a whole, the enforceability of the terms thereof, the likelihood of the payment of the amounts required with respect thereto in accordance with the terms thereof, the value thereof, or the Lien of the Secured Party thereon; or

(d) with respect to any Person or matter, a material adverse effect to the rights of or benefits available to, taken as a whole, the Secured Party under any Transaction Document or the enforceability of any material provision of any Transaction Document;

2

*Execution Version*

provided that where "Material Adverse Effect" is used in any Transaction Document without specific reference, such term will have the meaning specified in clauses (a) through (c), as the context may require.

"Obligations" means all amounts (including for the avoidance of doubt any Repayment Amount) owed by the Issuer to the Secured Party under the Note Purchase Agreement and the other Transaction Documents.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Payment in Full" means (a) payment in full in cash of the principal of, premium (including the Repayment Amount), fees and interest, fees or interest accruing on or after the commencement of any bankruptcy proceeding, whether or not such premium (including the Repayment Amount), fees or interest would be allowed in such bankruptcy proceeding, constituting the Obligations; and (b) payment in full in cash of all other amounts that are due and payable or otherwise accrued under the Transaction Documents in each case, solely to the extent owing by the Grantors or the Issuer, and excluding any contingent indemnification obligations for which no claim or demand for payment, whether oral or written, has been made at such time.

"Person" means an individual, corporation (including a business trust), partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated association or government or any agency or political subdivision thereof.

"Requirements of Law" means, with respect to any Person or any of its property, the Charter Documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to, or binding upon, such Person or any of its property or to which such Person or any of its property is subject, whether federal, state, local or foreign, in each case as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.

"Termination Date" has the meaning assigned to such term in Section 2.1(c).

"Transaction Documents" means the Note Purchase Agreement, the Notes, the Guarantee and Collateral Agreement, the Secured Spectrum, and any additional document identified as a "Transaction Document" in amendments to the foregoing agreements and any other material agreements entered into, or certificates delivered, pursuant to the foregoing documents.

## SECTION 2
## GUARANTEE

2.1     Guarantee.

(a)     The Guarantor hereby unconditionally and irrevocably, guarantees to the Secured Party, the prompt and complete payment and performance by the Issuer when due (whether at the stated maturity, by acceleration or otherwise, including amounts that would become due but for the operation of the automatic stay under the Bankruptcy Code) of the Obligations, including all interest, fees, premium and expenses accrued or incurred subsequent to the

3

commencement of any bankruptcy or insolvency proceeding with respect to any Obligation, whether or not such interest, fees, premium or expenses are enforceable or allowed as a claim in such proceeding. In furtherance of the foregoing and not in limitation of any other right that the Secured Party has at law or in equity against the Guarantor by virtue hereof, upon the failure of the Issuer to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration or otherwise, the Guarantor hereby promises to and shall forthwith pay, or cause to be paid, to the Secured Party for distribution to the applicable Secured Party in accordance with the Note Purchase Agreement, in cash, the amount of such unpaid Obligation.

(b)    The Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of the Guarantor hereunder without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of the Secured Party hereunder.

(c)    The guarantee contained in this Section 2 shall remain in full force and effect until the date (the "Termination Date") on which this Agreement ceases to be of further effect in accordance with Article X of the Note Purchase Agreement, notwithstanding that from time to time prior thereto the Issuer may be free from any Obligations.

(d)    The guarantee in this Section 2 is a continuing guarantee and is a guarantee of payment and not merely of collection, and shall apply to all Obligations whenever arising.

(e)    No payment made by any of the Issuer, the Guarantor, any other guarantor or any other Person or received or collected by the Secured Party from the Issuer, the Guarantor, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of the Guarantor which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable hereunder until the Termination Date.

2.2    No Subrogation. Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of the Guarantor by the Secured Party, the Guarantor shall not be entitled to be subrogated to any of the rights of the Secured Party against the Issuer or the Guarantor or any collateral security or guarantee or right of offset held by the Secured Party for the payment of the Obligations, nor shall the Guarantor seek or be entitled to seek any contribution or reimbursement from the Issuer or the Guarantor in respect of payments made by the Guarantor hereunder, until Payment in Full of the Obligations. If any amount shall be paid to the Guarantor on account of such subrogation, contribution or reimbursement rights at any time when a Payment in Full has not occurred, such amount shall be held by the Guarantor in trust for the Secured Party, segregated from other funds of the Guarantor, and shall, forthwith upon receipt by the Guarantor, be turned over to the Secured Party in the exact form received by the Guarantor (duly endorsed by the Guarantor to the Secured Party, if required), to be applied against the Obligations, whether matured or unmatured.

2.3    Amendments, etc. with respect to the Obligations. The Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Guarantor

4

*Execution Version*

and without notice to or further assent by the Guarantor, any demand for payment of any of the Obligations made by the Secured Party may be rescinded by the Secured Party and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Secured Party, and the Note Purchase Agreement and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, from time to time, and any collateral security, guarantee or right of offset at any time held by the Secured Party for the payment of the Obligations may be sold, exchanged, waived, surrendered or released (it being understood that this Section 2.3 is not intended to affect any rights or obligations set forth in any other Transaction Document). The Secured Party shall have no obligation to protect, secure, perfect or insure any lien at any time held by it as security for the Obligations or for the guarantee contained in this Section 2 or any property subject thereto.

2.4     <u>Guarantee Absolute and Unconditional</u>.

(a)     <u>Guarantee Absolute</u>. The Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Secured Party upon the guarantee contained in this Section 2 or acceptance of the guarantee contained in this Section 2; all Obligations shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 2 and the grant of the security interests pursuant to Section 3; and all dealings between any of the Issuer and the Guarantor, on the one hand, and the Secured Party, on the other hand, likewise shall be conclusively presumed to have occurred or been consummated in reliance upon the guarantee contained in this Section 2 and the grant of the security interests pursuant to Section 3. The Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon any of the Issuer or the Guarantor with respect to the Obligations. The Guarantor understands and agrees that the guarantee contained in this Section 2 and the grant of the security interests pursuant to Section 3 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to:

(i)     any settlement, compromise, release, liquidation or enforcement by the Secured Party of any of the Obligations;

(ii)     any application by the Secured Party of the proceeds of any other guaranty of or insurance for any of the Obligations to the payment of any of the Obligations;

(iii)     the giving by the Secured Party of any consent to the merger or consolidation of, the sale of substantial assets by, or other restructuring or termination of the corporate existence of, the Guarantor or any other Person, or to any disposition of any equity interest by the Guarantor or any other Person;

(iv)     any proceeding by the Secured Party against the Guarantor or any other Person or in respect to any collateral for any of the Obligations, or the exercise by the Secured Party of any of their rights, remedies, powers and privileges under the Transaction Documents, regardless of whether the Secured Party shall have proceeded against or exhausted any collateral,

right, remedy, power or privilege before proceeding to call upon or otherwise enforce this Agreement; or

(v)     the entering into any other transaction or business dealings with the Guarantor or any other Person.

When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Guarantor, the Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Issuer, the Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Issuer, the Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Issuer, the Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve the Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Secured Party against the Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

(b)     <u>Waiver of Defenses</u>. The enforceability of this Agreement and the liability of the Guarantor and the rights, remedies, powers and privileges of the Secured Party under this Agreement shall not be affected, limited, reduced, discharged or terminated, and the Guarantor hereby expressly waives to the fullest extent permitted by law any defense now or in the future arising, by reason of:

(i)     the illegality, invalidity or unenforceability of any of the Obligations, any Transaction Document or any other agreement or instrument whatsoever relating to any of the Obligations;

(ii)     any disability or other defense with respect to any of the Obligations, including the effect of any statute of limitations, that may bar the enforcement thereof or the obligations of the Guarantor relating thereto;

(iii)     the illegality, invalidity or unenforceability of any other guaranty of or insurance for any of the Obligations or any lack of perfection or continuing perfection or failure of the priority of any lien on any collateral for any of the Obligations;

(iv)     the cessation, for any cause whatsoever, of the liability of the Issuer or the Guarantor with respect to any of the Obligations;

(v)     any failure of the Secured Party to marshal assets, to exhaust any collateral for any of the Obligations, to pursue or exhaust any right, remedy, power or privilege it may have against the Issuer or any other Person, or to take any action whatsoever to mitigate or reduce the liability of the Guarantor under this Agreement, the Secured Party being under no obligation to take any such action notwithstanding the fact that any of the Obligations may be due

and payable and that the Issuer may be in default of its obligations under any Transaction Document;

(vi)     any counterclaim, set-off or other claim which the Issuer or the Guarantor has or claims with respect to any of the Obligations;

(vii)     any failure of the Secured Party to file or enforce a claim in any bankruptcy, insolvency, reorganization or other proceeding with respect to any Person;

(viii)     any bankruptcy, insolvency, reorganization, winding-up or adjustment of debts, or appointment of a custodian, liquidator or the like of it, or similar proceedings commenced by or against the Issuer or any other Person, including any discharge of, or bar, stay or injunction against collecting, any of the Obligations (or any interest on any of the Obligations) in or as a result of any such proceeding;

(ix)     any action taken by the Secured Party that is authorized by this Section 2.4 or otherwise in this Agreement or by any other provision of any Transaction Document, or any omission to take any such action; or

(x)     any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor.

(c)     <u>Waiver</u>. The Guarantor expressly waives, to the fullest extent permitted by law, for the benefit of the Secured Party, all diligence, presentment, demand for payment or performance, notice of nonpayment or nonperformance, protest, notice of protest, notice of dishonor and all other notices or demands whatsoever, and any requirement that the Secured Party exhaust any right, remedy, power or privilege or proceed against the Issuer under the Note Purchase Agreement or any other Transaction Document or any other agreement or instrument referred to herein or therein, or against any other Person, and all notices of acceptance of this Agreement or of the existence, creation, incurring or assumption of new or additional Obligations. Each Grantor further expressly waives the benefit of any and all statutes of limitation, to the fullest extent permitted by applicable law.

(d)     <u>Other Waivers</u>. The Guarantor expressly waives, to the fullest extent permitted by law, for the benefit of the Secured Party, any right to which it may be entitled:

(i)     that the assets of the Issuer first be used, depleted and/or applied in satisfaction of the Obligations prior to any amounts being claimed from or paid by the Guarantor; and

(ii)     to require that the Issuer be sued and all claims against the Issuer be completed prior to an action or proceeding being initiated against the Guarantor.

2.5     <u>Reinstatement</u>. The guarantee contained in this Section 2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Issuer , or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer

7

for, the Issuer or any substantial part of its property, or otherwise, all as though such payments had not been made. The reinstatement provided for in this Section 2.5 shall survive the termination of this Agreement.

2.6     <u>Remedies</u>. The Guarantor agrees that, as between the Guarantor and the Secured Party, the obligations of the Issuer under the Note Purchase Agreement may be declared to be forthwith due and payable as provided in the Note Purchase Agreement (and shall be deemed to have become automatically due and payable in the circumstances provided in said Article XII) for purposes of Section 2.1 notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Issuer and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Issuer) shall forthwith become due and payable by the Guarantor for purposes of Section 2.1.

2.7     <u>Payments</u>. The Guarantor hereby guarantees that payments hereunder shall be paid to the Secured Party in immediately available funds in U.S. Dollars at the office of the Secured Party or another place of its choosing.

2.8     <u>Information</u>. The Guarantor assumes all responsibility for being and keeping itself informed of the Issuer's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that the Guarantor assumes and incurs hereunder, and agrees that the Secured Party shall have no duty to advise the Guarantor of information known to it regarding such circumstances or risks.

2.9     <u>General Limitation on Obligations</u>. In any action or proceeding involving any state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Guarantor under Section 2.1 would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 2.1, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by the Guarantor, the Secured Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding. The Guarantor agrees that the Obligations may at any time and from time to time be incurred or permitted in an amount exceeding the maximum liability of the Guarantor under this Section 2.9 without impairing the guarantee contained in Section 2 or affecting the rights and remedies of the Secured Party hereunder.

**SECTION 3**
**SECURITY**

3.1     <u>Grant of Security Interest</u>.

(a)     As collateral security for the Payment in Full of the Obligations and the obligations of the Grantors under this Agreement, each Grantor hereby pledges and grants to the Secured Party as hereinafter provided a security interest in all of such Grantor's right, title and interest in, to and under the following property, in each case whether tangible or intangible,

8

wherever located, and whether now owned by such Grantor or hereafter acquired and whether now existing or hereafter coming into existence (all of the property described in this Section 3.1(a) being collectively referred to herein as "Collateral"):

> (i)     the Collateral Interests;

> (ii)    the Secured Spectrum (as defined in the Note Purchase Agreement), all lease payments and receivables of any kind payable by the Lessee under the Secured Spectrum, all rights of the License Holder thereunder and all supporting obligations in respect thereof, including any right to payments as a result of any termination event thereunder;

> (iii)   all proceeds from any sale, lease, assignment or transfer of all or any portion of the Secured Spectrum;

> (iv)    all accounts, chattel paper, inventory, equipment, instruments, investment property, intellectual property, documents, deposit accounts, commercial tort claims, letter-of-credit rights, money, goods, fixtures, general intangibles and supporting obligations relating to the Secured Spectrum (each term in this clause having the meaning given to it under the UCC in effect in the State of New York on the Effective Date); and

> (v)     the books and records (whether in physical, electronic or other form) of the Grantors;

(b)     The foregoing grant is made in trust to secure the Obligations and to secure compliance with the provisions of this Agreement by the Grantors, all as provided in this Agreement. The Secured Party acknowledges such grant and accepts the trusts under this Agreement in accordance with the provisions of this Agreement. The Collateral shall secure the Obligations equally and ratably without prejudice, priority or distinction (except, as otherwise stated in the applicable provisions of the Note Purchase Agreement or Note).

3.2     Certain Rights and Obligations of the Grantors Unaffected.

(a)     The grant of the security interest by the Grantors in the Collateral to the Secured Party shall not (i) relieve any Grantor from the performance of any term, covenant, condition or agreement on such Grantor's part to be performed or observed under or in connection with any of the Transaction Documents or (ii) impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on such Grantor's part to be so performed or observed or impose any liability on the Secured Party for any act or omission on the part of such Grantor or from any breach of any representation or warranty on the part of such Grantor.

(b)     Each Grantor hereby jointly and severally agrees to indemnify and hold harmless the Secured Party (including its directors, officers, employees and agents) from and against any and all losses, liabilities (including liabilities for penalties), claims, demands, actions, suits, judgments, and reasonable and documented costs and expenses arising out of or resulting from the security interest granted hereby, whether arising by virtue of any act or omission on the part of such Grantor or otherwise, including the reasonable and documented costs, expenses and

*Execution Version*

disbursements (including reasonable attorneys' fees and expenses) incurred by the Secured Party in enforcing this Agreement or preserving any of its rights to, or realizing upon, any of the Collateral; *provided* that the foregoing indemnification shall not extend to any action by the Secured Party which constitutes gross negligence, bad faith or willful misconduct (as determined in a final non-appealable order from a court of competent jurisdiction) by the Secured Party or any other indemnified person hereunder. The indemnification provided for in this Section 3.2 shall survive the termination of this Agreement.

3.3     Performance of Transaction Documents. Upon the occurrence of a default or breach (after giving effect to any applicable grace or cure periods) by any Person party to a Transaction Document promptly following a request from the Secured Party to do so and at the Grantors' expense, the Grantors agree jointly and severally to take all such lawful action as permitted under this Agreement as the Secured Party may reasonably request to compel or secure the performance and observance by such Person of its obligations to any Grantor, and to exercise any and all rights, remedies, powers and privileges lawfully available to any Grantor to the extent and in the manner requested by the Secured Party, including the transmission of notices of default and the institution of legal or administrative actions or proceedings to compel or secure performance by such Person of its obligations thereunder or to facilitate the disposal of the Collateral.

3.4     Stamp, Other Similar Taxes and Filing Fees. The Grantors shall jointly and severally indemnify and hold harmless the Secured Party from any present or future claim for liability for any stamp, documentary or other similar tax and any penalties or interest and expenses with respect thereto, that may be assessed, levied or collected by any jurisdiction in connection with this Agreement, any other Transaction Document to which the Grantors are a party, or any Collateral. The Grantors shall pay, and jointly and severally indemnify and hold harmless the Secured Party against, any and all amounts in respect of all search, filing, recording and registration fees, taxes, excise taxes and other similar imposts that may be payable or determined to be payable in respect of the execution, delivery, performance and/or enforcement of this Agreement or any other Transaction Document to which the Grantors are a party. The indemnification provided for in this Section 3.4 shall survive the termination of this Agreement.

3.5     Authorization to File Financing Statements.

(a)     Each Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file or record in any filing office in any applicable jurisdiction financing statements and other filing or recording documents or instruments with respect to the Collateral, including to perfect or record evidence of the security interests of the Secured Party under this Agreement. Each Grantor authorizes the filing of any such financing statement, other filing, recording document or instrument naming the Secured Party as secured party and indicating that the Collateral includes (a) "all assets" or words of similar effect or import regardless of whether any particular assets comprised in the Collateral fall within the scope of Article 9 of the UCC, or (b) as being of an equal or lesser scope or with greater detail. Each Grantor agrees to furnish any information necessary to accomplish the foregoing promptly upon the Secured Party's request. Each Grantor also hereby ratifies and authorizes the filing on behalf of the Secured Party of any financing statement with respect to the Collateral made prior to the date hereof.

*Execution Version*

## SECTION 4
## <u>REPRESENTATIONS AND WARRANTIES</u>

Each Grantor hereby represents and warrants, for the benefit of the Secured Party, as follows as of the date hereof and as of each Effective Date:

4.1     <u>Existence and Power</u>. Each Grantor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and is duly qualified to do business as a foreign entity and in good standing under the laws of each jurisdiction where the character of its property, the nature of its business or the performance of its obligations under the Transaction Documents make such qualification necessary except where the failure to be in good standing or to be so qualified could not reasonably be expected to result in a Material Adverse Effect. Each Grantor has all limited liability company, corporate or other powers and all governmental licenses, authorizations, consents and approvals required to (i) carry on its business as now conducted except where the failure to be in good standing or to be so qualified could not reasonably be expected to result in a Material Adverse Effect and (ii) for consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

4.2     <u>Company Authorization</u>. The execution, delivery and performance by each Grantor of this Agreement and the other Transaction Documents to which it is a party (a) are within such Grantor's limited liability company, corporate or other powers and have been duly authorized by all necessary limited liability company, corporate or other action and (b) do not contravene, or constitute a default under, any Requirements of Law with respect to such Grantor or any Contractual Obligation with respect to such Grantor or result in the creation or imposition of any lien on any property of any Grantor (other than any permitted liens), except for liens created by this Agreement or the other Transaction Documents, except in the case of clause (b) above, the violation of which would not reasonably be expected to result in a Material Adverse Effect. This Agreement and each of the other Transaction Documents to which each Grantor is a party has been executed and delivered by a duly Authorized Officer of such Grantor.

4.3     <u>No Consent</u>. No consent, action by or in respect of, approval or other authorization of, or registration, declaration or filing with, any Governmental Authority or other Person is required for the valid execution and delivery by each Grantor of this Agreement or any Transaction Document to which it is a party or for the performance of any of the Grantors' obligations hereunder or thereunder other than such consents, approvals, authorizations, registrations, declarations or filings as shall have been obtained or made by such Grantor prior to the Effective Date or as are permitted to be obtained subsequent to the Effective Date in accordance with Section 4.6 hereof.

4.4     <u>Binding Effect</u>. This Agreement and each other Transaction Document to which a Grantor is a party is a legal, valid and binding obligation of each such Grantor enforceable against such Grantor in accordance with its terms (except as may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general equitable principles, whether considered in a proceeding at law or in equity and by an implied covenant of good faith and fair dealing).

*Execution Version*

4.5     <u>Subsidiaries</u>. The Issuer is the sole shareholder of the License Holder and the License Holder has no subsidiaries or does not own any Equity Interests in any other Person.

4.6     <u>Security Interests</u>.

(a)     Each Grantor owns and has good title to or leasehold interests in, as applicable, its Collateral, free and clear of all liens other than any permitted liens and the liens evidenced in Schedule I. This Agreement constitutes a valid and continuing lien on the Collateral in favor of the Secured Party, which lien on the Collateral has been perfected or evidence of which lien has been recorded, in each case in accordance with the provisions of the Note Purchase Agreement, and is prior to all other liens (other than any permitted liens and the liens evidenced in Schedule I), and is enforceable as such as against creditors of and purchasers from each Grantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws affecting creditors' rights generally or by general equitable principles, whether considered in a proceeding at law or in equity, and by an implied covenant of good faith and fair dealing. The Grantors have received all consents and approvals required by the terms of the Collateral to the pledge of the Collateral to the Secured Party hereunder. Each Grantor has caused, or shall have caused, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect or otherwise record evidence, as applicable, of the first-priority security interest (subject to any permitted liens) in the Collateral granted to the Secured Party hereunder within ten (10) days of the date of hereof.

(b)     Other than as evidenced in Schedule I and the security interest granted to the Secured Party hereunder, pursuant to the other Transaction Documents or any other permitted lien, none of the Grantors has pledged, assigned, sold or granted a security interest in the Collateral by grant, pledge, sale, assignment or other means. All action necessary (including the filing of UCC-1 financing statements) to protect and evidence the Secured Party's security interest in the Collateral has been, or shall be, duly and effectively taken, consistent with the obligations set forth in Section 4.6(a) and Section 5.1. No security agreement, financing statement, equivalent security or lien instrument or continuation statement authorized by any Grantor and listing such Grantor as debtor covering all or any part of the Collateral is on file or of record in any jurisdiction, except in respect of any permitted liens, the liens evidenced in Schedule I, or such as may have been filed, recorded or made by such Grantor in favor of the Secured Party in connection with this Agreement, and no Grantor has authorized any such filing.

(c)     All authorizations in this Agreement for the Secured Party to execute or file financing statements, continuation statements, security agreements and other instruments with respect to the Collateral and to take such other actions with respect to the Collateral authorized by this Agreement are powers coupled with an interest and are irrevocable.

## SECTION 5
## COVENANTS

5.1    Further Assurances.

(a)    Each Grantor shall do such further acts and things, and execute and deliver to the Secured Party such additional assignments, agreements, powers and instruments, as are necessary or desirable to obtain or maintain the security interest of the Secured Party in the Collateral as a perfected security interest or to record evidence of such security interest, as applicable, subject to no prior liens (other than any permitted liens and the liens evidenced in Schedule I), to carry into effect the purposes of this Agreement or the other Transaction Documents or to better assure and confirm unto the Secured Party its rights, powers and remedies hereunder including the filing of any financing or continuation statements or amendments under the UCC in effect in any jurisdiction with respect to the liens and security interests granted in the Collateral hereby. The Grantors intend the security interests granted pursuant to this Agreement in favor of the Secured Party to be prior to all other liens (other than any permitted liens and the liens evidenced in Schedule I) in respect of the Collateral, and each Grantor shall take all actions necessary to obtain and maintain, in favor of the Secured Party, a second lien on and a second-priority perfected security interest in the Collateral or to record evidence of such security interest in the Collateral (in each case, except with respect to any permitted liens and the liens evidenced in Schedule I). If any Grantor fails to perform any of its agreements or obligations under this Section 5.1(a), after written notice to such Grantor by the Secured Party, then the Secured Party may perform such agreement or obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantors upon the Secured Party's demand therefor in accordance with the Priority of Payments. The Secured Party is hereby authorized to execute and file any financing statements, continuation statements, amendments or other instruments necessary or appropriate to perfect or maintain the perfection or record evidence, as applicable, of the Secured Party's security interest in the Collateral in the manner authorized in Section 3.5(a).

(b)    Each Grantor shall warrant and defend the Secured Party's right, title and interest in and to the Collateral and the income, distributions and proceeds thereof, for the benefit of the Secured Party, against the claims and demands of all Persons whomsoever subject to any permitted liens and the liens evidenced in Schedule I.

5.2    Legal Name, Location Under Section 9-307 or 9-301. No Grantor shall change its location (within the meaning of Section 9-307(e), including for purposes of Section 9-301, of the applicable UCC) or its legal name.

5.3    Covenants Under Note Purchase Agreement. Each Grantor agrees to comply with each of the covenants in the Note Purchase Agreement that are applicable to such Grantor.

5.4    No Petition. Each Grantor agrees that, prior to the date that is one year (or, if longer, the applicable preference period then in effect) and one day after the Obligations have been satisfied and performed in full of all outstanding obligations to pay interest, principal and any other amounts due at maturity or earlier redemption in full under any financing, it will not initiate against, or join any person in initiating against, the License Holder, in connection with this Agreement, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings

13

under any applicable federal or state bankruptcy or similar law (collectively, an "Insolvency Proceeding"). Notwithstanding anything to the contrary in this Agreement, this Section 4.04 does not prohibit or limit any Grantor from proving any claim, exercising any rights or taking any other action in connection with any Insolvency Proceeding not in breach of this Section 5.4. Notwithstanding anything to the contrary in this Agreement, this Section 5.4 shall restrict the Grantors from taking action only against the License Holder. This Section 5.4 will survive the termination of this Agreement.

## SECTION 6
## REMEDIAL PROVISIONS

6.1     Certain Rights of the Secured Party upon Event of Default.

(a)     Proceedings To Collect Money. In case any Grantor shall fail to pay any amounts payable under this Agreement when due, the Secured Party, may institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Grantor and collect in the manner provided by law out of the property of the Grantor, wherever situated, the moneys adjudged or decreed to be payable.

(b)     Other Proceedings. The Secured Party will upon acceleration of the Notes following an Event of Default promptly:

(i)     proceed to protect and enforce its rights by such appropriate proceedings (including any FCC and/or other regulatory filings) as the Secured Party shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or any other Transaction Document or in aid of the exercise of any power granted therein, or to enforce any other proper remedy or legal or equitable right vested in the Secured Party by this Agreement or any other Transaction Document or by law, including any remedies of a secured party under applicable law;

(ii)     institute proceedings from time to time for the complete or partial foreclosure with respect to the Collateral; and/or

(iii)     sell all or a portion of the Collateral at one or more public or private sales called and conducted in any manner permitted by law and otherwise in compliance with Communications Laws; *provided* that the Secured Party shall provide notice to the Grantors and the Issuer of a proposed sale of Collateral.

(c)     Sale of Collateral. In connection with any sale of the Collateral (which may proceed separately and independently from the exercise of other remedies under the Note Purchase Agreement) or under any judgment, order or decree in any judicial proceeding for the foreclosure or involving the enforcement of this Agreement or any other Transaction Document to the extent permitted by law:

(i)     the Secured Party may bid for and purchase the property being sold, subject to the Communications Laws, and upon compliance with the terms of the sale may hold,

14

retain, possess and dispose of such property in its own absolute right without further accountability;

> (ii)     the Secured Party may make and deliver to the purchaser or purchasers a good and sufficient deed, bill of sale and instrument of assignment and transfer of the property sold;

> (iii)     all right, title, interest, claim and demand whatsoever, either at law or in equity or otherwise, of any Grantor of, in and to the property so sold shall be divested; and such sale shall be a perpetual bar both at law and in equity against any Grantor, its successors and assigns, and against any and all Persons claiming or who may claim the property sold or any part thereof from, through or under such Grantor or its successors or assigns; and

> (iv)     the receipt of the Secured Party making such sale shall be a sufficient discharge to any purchaser at such sale for their purchase money, and such purchaser, and their assigns or personal representatives, shall not, after paying such purchase money and receiving such receipt of the Secured Party, be obliged to see to the application of such purchase money or be in any way answerable for any loss, misapplication or non-application thereof.

> (d)     <u>Application of Proceeds</u>. Any amounts obtained by the Secured Party on account of or as a result of the exercise by the Secured Party of any of its respective rights hereunder, not exceeding the outstanding amount of the Obligations,  shall be held by the Secured Party as additional collateral for the repayment of the Obligations.

> (e)     <u>Attorney in Fact</u>. Upon the occurrence and during the continuance of any Event of Default the Secured Party is hereby appointed (without the obligation) the attorney in fact of each Grantor for the purpose of carrying out the provisions of this Section 6 and taking any action and executing any instruments that the Secured Party may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney in fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, so long as the Secured Party shall be entitled under this Section 6 to make collections in respect of the Collateral, the Secured Party shall have the right and power to receive, endorse and collect all checks made payable to the order of any Grantor representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same; provided the Secured Party's powers hereunder shall be subordinated, unless otherwise agreed with the Grantors and prior secured creditors under the claims recorded in the UCC filing statements filed in the state of Delaware by FCS Advisors, LLC d/b/a Brevet Capital Advisors attached hereto as <u>Schedule I</u>.

> (f)     <u>Additional Remedies</u>. In addition to any rights and remedies now or hereafter granted hereunder or under applicable law with respect to the Collateral, the Secured Party shall have all of the rights and remedies of a secured party under the UCC as enacted in any applicable jurisdiction.

> (g)     <u>Proceedings</u>. The Secured Party may maintain a Proceeding even if it does not possess any of the Notes or does not produce any of them in the Proceeding, and any such Proceeding instituted by the Secured Party shall be in its own name. All remedies are cumulative to the extent permitted by law.

6.2     <u>Waiver of Appraisal, Valuation, Stay and Right to Marshaling</u>. To the extent it may lawfully do so, each Grantor for itself and for any Person who may claim through or under it hereby:

(a)     agrees that neither it nor any such Person shall step up, plead, claim or in any manner whatsoever take advantage of any appraisal, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (i) the performance, enforcement or foreclosure of this Agreement, (ii) the sale of any of the Collateral or (iii) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(b)     waives all benefit or advantage of any such laws;

(c)     waives and releases all rights to have the Collateral marshaled upon any foreclosure, sale or other enforcement of this Agreement; and

(d)     consents and agrees that, subject to the terms of this Agreement, all the Collateral may at any such sale be sold by the Secured Party as an entirety or in such portions as the Secured Party may determine.

6.3     <u>The Secured Party May File Proofs of Claim</u>. The Secured Party is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Secured Party (including any claim for the reasonable compensation, expenses and disbursements of the Secured Party, its agents and counsel) allowed in any judicial proceedings relative to any Grantor (or any other obligor upon the Notes), its creditors or its property, and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claim and any custodian in any such judicial proceeding is hereby authorized to make such payments to the Secured Party; provided that this does not waive the Grantor's rights to object to any claim under Sec. 3007 of the Federal Rules of Bankruptcy Procedure or any related statute. To the extent that the payment of any such compensation, expenses and disbursements of the Secured Party, its agents and counsel, and any other amounts due under the Note Purchase Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, money and other properties which the Secured Party may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize, consent to or accept or adopt on behalf of the Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the Secured Party.

6.4     <u>Undertaking for Costs</u>. In any suit for the enforcement of any right or remedy under this Agreement or in any suit against the Secured Party for any action taken or omitted by it as a Secured Party, a court in its discretion may require the filing by any party litigant in the suit of any undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable and documented attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.

6.5     <u>Restoration of Rights and Remedies</u>. If the Secured Party has instituted any Proceeding to enforce any right or remedy under this Agreement and such Proceeding has been discontinued or abandoned or dismissed for any reason or has been determined adversely to the Secured Party, then and in every such case the Secured Party shall, subject to any determination in such proceeding, be restored severally and respectively to its former positions hereunder, and thereafter all rights and remedies of the Secured Party shall continue as though no such Proceeding had been instituted.

6.6     <u>Rights and Remedies Cumulative</u>. No right or remedy herein conferred upon or reserved to the Secured Party is intended to be exclusive of any other right or remedy, and every right or remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given under this Agreement or any other Transaction Document or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy under this Agreement or any other Transaction Document, or otherwise, shall not prevent the concurrent or future assertion or employment of any other appropriate right or remedy.

6.7     <u>Delay or Omission Not Waiver</u>. No delay or omission of the Secured Party to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Section 6 or by law to the Secured Party may be exercised from time to time to the extent not inconsistent with the Note Purchase Agreement or this Agreement, and as often as may be deemed expedient, by the Secured Party.

6.8     <u>Waiver of Stay or Extension Laws</u>. Each Grantor covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement or any other Transaction Document; and each Grantor (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantages of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Secured Party, but shall suffer and permit the execution of every such power as though no such law had been enacted.

6.9     <u>Government Approvals</u>. Notwithstanding anything to the contrary contained in any Transaction Document, any foreclosure on or sale or other transfer or disposition of any of the Collateral, including by way of a sale, transfer, or disposition of Equity Interests in the License Holder, or other exercise of remedies in respect of the Collateral (a "<u>Disposition</u>"), that results in changing the *de jure* or *de facto* control of the License Holder from the Issuer to any other Person shall be conducted in accordance with the Communications Laws and, if and to the extent required thereby, subject to the prior approval of the FCC or any other applicable Governmental Authority. Each Grantor agrees to take any lawful action that may be necessary or desirable which the Secured Party may reasonably request in order to obtain and enjoy the full rights and benefits granted to the Secured Party by the Transaction Documents, including specifically, after the occurrence and during the continuance of an Event of Default, the use of such Grantor's best efforts to assist in obtaining any approval of the FCC and any other Governmental Authority that is then required under the Communications Laws or under any other applicable Requirements of Law and any required consents for any action or transaction contemplated by any Transaction Document, including the sale or other transfer or disposition of Collateral following the occurrence and during

17

the continuance of an Event of Default. Such efforts shall include, to the extent permitted by the Communications Laws, sharing with the Secured Party any FCC registration numbers, account numbers and passwords for the FCC's electronic filing system, and preparing, certifying and filing (or causing to be prepared, certified and filed) with the FCC or any other applicable Governmental Authority any portion of any application or applications for approval of the assignment or other transfer of control of the Secured Spectrum, or the Issuer or Grantor required to be filed under Communications Laws for approval of any sale or other transfer or disposition of any part of the Collateral.

## SECTION 7
## THE SECURED PARTY'S AUTHORITY

Each Grantor acknowledges that the rights and responsibilities of the Secured Party under this Agreement with respect to any action taken or omitted by the Secured Party or the exercise or non-exercise by the Secured Party of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Secured Party and the Grantors, be governed by the Note Purchase Agreement and by such other agreements with respect thereto as may exist from time to time among the Grantors. The Secured Party shall be afforded all of the same rights, protections, immunities and indemnities afforded to it under the Note Purchase Agreement as if the same were specifically set forth herein.

## SECTION 8
## MISCELLANEOUS

8.1     <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, supplemented, waived or otherwise modified except in accordance with Article XIV of the Note Purchase Agreement.

8.2     <u>Notices</u>.

(a)     Any notice or communication by the Grantors or the Secured Party to any other party hereto shall be in writing and delivered in person or mailed by first-class mail (registered or certified, return receipt requested), facsimile or overnight air courier guaranteeing next day delivery, to such other party's address:

<u>If to any Grantors</u>:

Theia Group Incorporated & Theia Holdings A, Inc.
1455 Pennsylvania Avenue, Suite 800
Washington, DC  20004
Attn: Stephen Buscher
Email: sbuscher@theiagroupinc.com

<u>If to the Secured Party</u>:

Aithre Capital Partners LLC
c/o Bulltick Financial Advisory Services, LLC
333 SE 2nd Avenue, Ste. 3950

18

Miami, FL 33131

(b)     The Grantors or the Secured Party by notice to each other party may designate different addresses for subsequent notices or communications.

(c)     Any notice (i) given in person shall be deemed delivered on the date of delivery of such notice, (ii) given by first class mail shall be deemed given five (5) days after the date that such notice is mailed, (iii) delivered by facsimile shall be deemed given on the date of delivery of such notice, (iv) delivered by overnight air courier shall be deemed delivered one (1) Business Day after the date that such notice is delivered to such overnight courier, (v) other than any notices to be provided to the Secured Party (which notices shall be provided in accordance with clauses (i) through (iv) of this clause (c)) when posted on a password-protected website shall be deemed delivered after notice of such posting has been provided to the recipient and (vi) delivered by email shall be deemed delivered on the date of delivery of such notice.

(d)     Notwithstanding any provisions of this Agreement to the contrary, the Secured Party shall have no liability based upon or arising from the failure to receive any notice required by or relating to this Agreement or any other Transaction Document.

8.3     <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.4     <u>Successors</u>. All agreements of each of the Grantors in this Agreement and each other Transaction Document to which it is a party shall bind its successors and assigns; *provided*, that no Grantor may assign its obligations or rights under this Agreement or any Transaction Document, except with the written consent of the Secured Party or as expressly contemplated by the Transaction Documents.  All agreements of the Secured Party in the Note Purchase Agreement and in this Agreement shall bind its successors as permitted by the Transaction Documents.

8.5     <u>Severability</u>. In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

8.6     <u>Counterpart Originals</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single agreement.

8.7     <u>Table of Contents, Headings, etc</u>. The Table of Contents and headings of the Sections of this Agreement have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

8.8     <u>Waiver of Jury Trial</u>. EACH OF THE GRANTORS AND THE SECURED PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL

19

PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.9     <u>Submission to Jurisdiction; Waivers</u>. EACH OF THE GRANTORS AND THE SECURED PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(a)     SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN THE COUNTY OF NEW YORK, THE COURTS OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS FROM ANY THEREOF;

(b)     CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH ACTION OR PROCEEDING IN ANY SUCH COURT OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT AND AGREES NOT TO PLEAD OR CLAIM THE SAME;

(c)     AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO THE GRANTORS OR THE SECURED PARTY, AS THE CASE MAY BE, AT ITS ADDRESS SET FORTH IN SECTION 8.2 OR AT SUCH OTHER ADDRESS OF WHICH THE SECURED PARTY OR GRANTORS SHALL HAVE BEEN NOTIFIED PURSUANT THERETO;

(d)     AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION; AND

(e)     WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION 8.9 ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES. FOR THE AVOIDANCE OF DOUBT, THIS CLAUSE (e) SHALL NOT LIMIT THE RIGHT OF ANY INDEMNIFIED PARTY HEREUNDER TO THE INDEMNIFICATION AMOUNTS OWED TO SUCH PARTY IN ACCORDANCE WITH THE TERMS HEREOF.

8.10     <u>Termination; Partial Release</u>.

(a)     This Agreement and any grants, pledges and assignments hereunder shall become effective on the date hereof and shall terminate on the Termination Date.

*Execution Version*

(b)     On the Termination Date, the Collateral shall be automatically released from the liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Secured Party and each Grantor shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors. At the request and sole expense of any Grantor following any such termination, the Secured Party shall deliver to such Grantor any Collateral held by the Secured Party hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request and prepare to evidence such termination.

8.11     <u>No Third Party Beneficiaries</u>. There are no third-party beneficiaries of this Agreement.

8.12     <u>Entire Agreement</u>. This Agreement, together with the Note Purchase Agreement and the other Transaction Documents, contain a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all previous oral statements and writings with respect thereto.

[<em>Signature pages to follow</em>]

IN WITNESS WHEREOF, each of the Grantors and the Secured Party has caused this Guarantee and Collateral Agreement to be duly executed and delivered by its duly authorized officer as of the date first above written.

THEIA GROUP INCORPORATED

By: *John J. Gallagher*

Name:  John J. Gallagher

Title:  Secretary of the Board and Director

THEIA HOLDINGS A, INC.

By: *John J. Gallagher*

Name:  John J. Gallagher

Title:  Secretary of the Board and Director

AGREED AND ACCEPTED:

AITHRE CAPITAL PARTNERS LLC,
by its Sponsor Member,

AITHRE CAPITAL MANAGEMENT LLC
By: Domus Family LLLP, its Managing Member

By:

Name:  Rachel Folley, Esq.

Title:  Authorized Person

SCHEDULE I

UCC FINANCING STATEMENTS