**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>                              Plaintiff,<br><br>                   - against -<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN";<br>THEIA AVIATION, LLC; and<br>THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS",<br><br>                              Defendants. | 1:21-cv-6995-PKC |

**DECLARATION OF REID GORMAN**

1.      I am Chief Financial Officer of Theia Group, Inc. d/b/a Thorian Group ("Theia" or the "Company"), an aerospace and technology company.  My responsibilities in this role include cash management, reporting, accounting system management, vendor management, and serving as a liaison between Theia and our legal representation.  Prior to becoming Chief Financial Officer, I was an Officer of the Company as Executive Vice President - Global Facilities.  I have been employed at the Company since November 2018.  I have previously held the role of Chief Financial Officer at another company, and I have helped multiple companies manage restructuring during my career.

2.      I submit this declaration in opposition to the application by FCS Advisors, LLC d/b/a Brevet Capital Advisors ("Brevet") for appointment of a temporary receiver in the above-captioned matter to oversee Theia.

3.      Except where indicated otherwise, I have personal knowledge of the facts contained in this declaration, and, if called as a witness, I could and would testify competently to such facts

under oath.  For statements made upon information and belief, I believe them to be true.  The exhibits to this declaration are true copies of the originals.

**Theia's Founding and Early Success**

4.      Theia was founded in 2015, by a former technical staff member of NASA Sensing and Communications and the founder of the New York Space Alliance, for the purpose of deploying a remote sensing constellation of satellites in space that could capture the same resolution and quality of data captured from aircraft for the purpose of analyzing the physical world in real-time.

5.      Theia's remote sensing technologies are in the process of being realized using a constellation of satellites known as the Thorian Satellite Network ("TSN").  Unlike traditional tasking satellites which can only snapshot "postage stamp" images here and there, the TSN will be able to acquire video imagery  over the whole earth, at once, in real-time at high resolution. The TSN will create a digital representation of nearly everything happening on earth, continuously, in real-time so that digital computers can model and understand the physical world in a complete and holistic way, with sufficient granularity to provide enormous value to governments and businesses.

6.      In addition to the remote sensing TSN project, Theia has plans to initiate a separate and distinct business referred to as Internet-in-Space.  This plan involves building a new communications and cloud satellite constellation in medium earth orbit, separate from the TSN, which has direct-to-user communications (satellite communications) and substantial storage and processing.  This constellation would be unique in that there is no other satellite constellation which (a) covers the entire earth with a communications network that has no spatial or temporal gaps, and (b) provides sufficient processing and memory (as is associated with today's terrestrial

internet) entirely within satellites to enabling traditional terrestrial-served internet applications to be domiciled and served entirely from orbit.  This constellation is designated Cypher-6.

7.     In the 84 months since its founding, and including losing nearly 18 months of sustained work effort caused by the COVID-19 pandemic, Theia has:

      A.     Completed the design, costing and schedule of the TSN constellation, which has successfully passed review by three major outside insurance companies.

      B.     Completed the design, costing and schedule of the Cypher-6 constellation, which has successfully passed review by two major investment banks.

      C.     Developed a plan to finance, build and launch both satellite constellations which has been reviewed by outside parties and financial institutions.

      D.     Advanced, negotiated and in some instances executed contracts for its supply chain with other major aerospace companies.

      E.     Processed or obtained patents in dozens of countries around the world.

8.     To fund the development of the TSN, Theia has engaged with private customers and foreign entities in countries allied with the United States to provide remote sensing services through its Master Partner Program ("MPP").  The MPP requires that each participant will pay an up-front fee, and a schedule of payments to fund the construction and launch of the TSN.  Over time, the partner will receive certain rights, deliverables, commercial support and other benefits, as well as ownership of data and analytics information products the Company produces by the TSN or Company aircraft, without further charge.

9.     By February of 2020, the Company had positioned itself with at least two agreements with MPP partners or their affiliated entities.  These agreements provided that, in exchange for Theia providing near-term aircraft-based remote sensing data, and permanent no-

further-cost access to the data and analytic products to be provided by the TSN, these governments would provide a schedule of payments.  The first of these is a payment of $200 million to assist in funding the deployment of aircraft to the counterparty region, with subsequent payments related to the TSN.

**Theia's FCC License**

10.     In November 2016, Theia applied to the Federal Communications Commission ("FCC") for a license For Non-Geostationary Satellite Operations (NGSO) in the "Round 1" licensing process, initiated by OneWeb, with SpaceX, Telesat Canada, Boeing and other major companies participating.

11.     After two and a half years of dedicated legal and regulatory effort, in May 2019, the FCC granted Theia's application and authorized Theia to "construct, launch, and operate a NGSO satellite system using frequencies in the earth exploration satellite service (EESS) and fixed-satellite service (FSS)" (the "FCC License").  Ex. A.

12.     The FCC license contemplates that Theia will build and operate a network of 112 low-Earth orbit satellites.  *Id.*  The FCC's authorization conditions the license upon Theia's successful launch of 56 of the satellites by May 2025.  *Id.*

13.     The FCC's decision to grant this license to Theia represents a clear and considered endorsement of the Company's technical capabilities.  Such licenses are not merely available to the highest bidder.  Rather, the FCC evaluates each applicant's capabilities, technical acumen, management, and business plan to ascertain whether they are legitimate licensees with a high probability of success, and whether the granting of the licenses are in the public interest.

14.     In addition, Theia applied for a NOAA license for remote sensing.  After nearly 2 and a half years of effort involving meetings with several United States Government agencies, Theia was granted the license necessary to proceed with its business.

15.     Theia's remote sensing analytics business (TSN) does not in essence rely on communications license(s) from the FCC, as the FCC NGSO spectrum granted (the "Spectrum") is primarily for communications, not for remote sensing.  As stated in Theia's narrative in its FCC application materials, the Spectrum is intended to implement a communications system for machine-to-machine communications and to gather data from contact sensors on the ground when needed (as opposed to non-contact remote sensing from space).  However, the NOAA license process required Theia to ensure that all systems associated with the Spectrum use are fully separate from the remote sensing sensors licensed by NOAA.  This helps deter against a foreign adversary from "hacking" or controlling the remote sensing systems and illicitly downloading data via the communications systems authorized for general public use by the FCC license.

16.     In late 2020, the Company developed plans to disaggregate its planned communications and remote sensing systems into two physically separate constellations.  This disaggregation would make it easier for Theia to comply with the requirements of its NOAA license, which provides that satellites such as the planned TSN must maintain full electrical and physical separation of the NGSO communications systems from the systems associated with the remote sensing.  Disaggregation also has the benefit of enabling traditional funding of the Internet-in-Space constellation, because of its lower cost, while Theia continues to secure financing for the TSN through its MPP program.

17.     Theia's plan to launch and monetize a separate satellite constellation to support its Internet-in-Space business had the potential to establish the Company's reputation and attract

financing that would help fund the more expensive development of the TSN.  To effectuate this plan, Theia executed an agreement with Barclays to act as Theia's exclusive placement agent in connection with the Company's sale of, at a minimum, $300 million of its debt securities.  Ex. B. Theia approached Brevet with this plan and informed Brevet of their progress on multiple occasions.  Exs. C, D, E, F.  Brevet did not respond to this outreach from Theia.

**Robert Leeds**

18.     In June of 2021 I was offered and accepted the role of Chief Financial Officer, and have since taken over the daily responsibilities of cash management, reporting, accounting system management, vendor management, and serving as a liaison between Theia and our legal representation, among other tasks.

19.     After taking on the role of CFO at Theia, I was tasked to undertake a full forensic review of the Company's finances and understand how funds were previously spent in the Company so that accurate financial reports could be produced.  I conducted a thorough review of bank statements, Theia online bank account audit reporting, audit log activity reports from Theia's accounting platform, Quickbooks Online, and interviewed Theia staff.

20.     As a result of my review, I concluded that Mr. Leeds arranged for himself to be paid $4,262,500 out of the $117 million in proceeds from the loan Theia received from Brevet.  Of that amount, some of it appears to be outright fraud and some of it appears, at this point in time, to be highly suspicious.  This effort was aided and abetted by Paul Carroll, Theia's prior Controller and CFO.

21.     Theia was first introduced to Robert Leeds in summer of 2018, when he represented himself as an advisor at Brevet, operating alongside Mark Callahan (founder and President of Brevet) on the Brevet side of the negotiating table.  After the initial meeting with the entire Brevet

team in their offices in New York, Mr. Leeds became the point of contact for Theia in its subsequent dealings with Brevet.

22.     It is my understanding that after Brevet made its first loan to Theia in late 2018, Mr. Leeds approached Theia executives and touted his extensive Wall-Street experience, offering that he could easily help Theia raise more money from sources other than Brevet.  Theia accepted Mr. Leeds' help, given the importance of raising more money from sources other than Brevet, which at the time was critical to allow Theia to pay back its loan from Brevet and position the Company for long term success.

23.     Despite Mr. Leeds' clear and explicit charge to raise money on behalf of Theia, Mr. Leeds produced no money or financing for Theia, nor any viable prospects.  Mr. Leeds was provided with an office at 1455 Pennsylvania Ave Suite 800 Washington DC 20004, the Company's headquarters, which he occupied regularly.  Executives at the Company regularly spoke with Mr. Leeds regarding his efforts to raise money for Brevet.  Mr. Leeds represented that his efforts were continuing in earnest.

24.     Throughout his tenure, Mr. Leeds served as an agent of Brevet, and was Theia's primary point of contact for that organization.  Mr. Leeds communicated regularly with Brevet, and represented Brevet's position with regards to Theia's expenditure of funds and other business operations.  Despite Theia Executives' efforts to communicate directly with Mark Callahan, Brevet's response would invariably come from Mr. Leeds himself.  Ex. G.

25.     Based on this established pattern of behavior, Theia relied on Mr. Leeds to convey the position of Brevet on any number of issues.  For instance, in December of 2020 Mr. Leeds conveyed Brevet's position that Theia must sign a pre-negotiation agreement with various representations before Brevet would discuss forbearance of its loan to Theia.  Ex. H.

26.     On the same day that Theia and Brevet executed the Amended and Restated Secured Note Purchase and Security Agreement dated June 29, 2020 (the "SNPSA"), Ex. I, Brevet, consisting of Mr. Callahan and Mr. Leeds, exerted enormous pressure on a Theia board member to execute a side letter to the SNPSA (the "Side Letter").  Ex. J.  In particular, Brevet conditioned the transfer of proceeds of its loan to Theia, under the parties' agreement already signed and executed, on Theia's execution of the Side Letter.  Brevet has never explained this demand.

27.     The Side Letter provided that Mr. Leeds and "any entity owned or controlled by him" are "Permitted Holders" as defined in the Second Amendment.  *Id*.  In accordance with the SNPSA, the Side Letter effectively provides that Brevet may transfer its entire debt to Mr. Leeds or any of his entities without notice to Theia.  This arrangement re-confirmed the fact that Mr. Leeds and Brevet were and would continue to be one and the same with respect to Brevet's loan to Theia.

28.     The Second Amendment to the SNPSA, also dated June 29, 2020 (the "Second Amendment") required Theia to strictly adhere to a budget which provided that, of the approximately $117 million in proceeds from Brevet's loan to Theia, approximately $84 million must be spent on aircraft purchases and operations.  Ex. K.  My investigation shows that numerous executives and management at Theia objected to this allocation of resources because at the time Theia did not have sufficient aircraft-based work to justify this budget allocation, and because Theia needed to progress with the manufacturing of the TSN satellites to put its FCC License into use and to advance its MPP funding opportunities.

29.     Brevet through Mr. Leeds ensured that Theia strictly adhered to the Second Amendment budget through almost daily over-the-shoulder oversight of the Company's controller,

Paul Carroll, Theia's CFO and Controller.  Exs. L, L-1.  Mr. Leeds was in regular communication with Mr. Carroll and spent hour together managing Theia's finances.

30.     In addition to in-person influence and direction, emails I reviewed show that Mr. Leeds exercised a strong degree of influence over Mr. Carroll, and that Mr. Leeds exerted this influence to convince Carroll to steal money from the Company.  For instance, in December of 2020 Mr. Carroll forwarded to Mr. Leeds a confidential discussion between Theia principals regarding the negative influence Mr. Leeds was exerting on Theia.  Ex. M.  Shortly thereafter, Mr. Carroll confided in Mr. Leeds and made light of an urgent funding situation, where in fact Mr. Carroll's refusal to make payments to commercial partners jeopardized the Company's relationships.  Ex. N.

31.     Mr. Leeds took $4,262,500 from Theia, out of the $117 million in proceeds from the loan Theia received from Brevet.  On September 2, 2020, Mr. Leeds provided Theia board member John Gallagher with a letter claiming Strongbow Holdings, LLC ("Strongbow"), of which Mr. Leeds is the Trustee, was entitled to $3,675,000 based on a conversion of his equity interest in Theia, stemming from a convertible loan of $550,000 Strongbow allegedly provided to Theia. Ex. O.

32.     I have reviewed Theia's corporate records and found no evidence whatsoever of either the alleged agreement between Theia and Strongbow or any loan made to Theia by either Strongbow or Mr. Leeds.

33.     Mr. Carroll wired Mr. Leeds the first $900,000 as was requested on the letter from Strongbow on September 2, 2020 to an account owned by Leeds Holdings.  Ex. P.  Understanding the fraudulent nature of this payment, Mr. Leeds emailed Mr. Carroll on September 19, 2020 stating that "The $900k payment to Leeds Holdings is a problem- need a resolution."  Ex. Q.  Two

days later, Mr. Carroll asked Mr. Leeds how he could help facilitate the "Leeds Holdings" payment.  Ex. R.

34.    Subsequently, and in response to Mr. Leeds' concerns about being paid transaction fees from the proceeds of Brevet's loan to Theia, on October 22, 2020 Mr. Carroll edited the September 2, 2020 transaction to Leeds Holdings in the Company's accounting system to change the vendor from Strongbow Holdings LLC to Gallagher Law PC.  Ex. S.  In effect, this modified transaction changed the outbound 1099 taxable revenue for this transaction from Mr. Leeds (a reduction in taxable income) to Gallagher Law PC (an increase in taxable income).

35.    Between July and December 2020, Mr. Gallagher made three payments totaling $3,362,500 to the Leeds Holdings account, from an account owned and controlled by Gallagher Law, P.C., Mr. Gallagher's law firm.  Ex. T.  Gallagher Law was reimbursed for these payments by three roughly corresponding payments from Theia to Gallagher law over this same period.  Ex. U.

36.    In total Mr. Leeds extracted $4,262,500 from Theia, or $587,500 more than demanded in his fraudulent September 2, 2020 invoice.

37.    I understand that on September 17, 2020 Theia held a meeting at its offices with Aithre Capital Partners, LLC ("Aithre") to discuss the possibility of a loan.  Mr. Leeds attended the meeting, as did Theia executives, and spoke with members of Aithre.  Mr. Leeds was substantively involved in subsequent discussions regarding capitalization by Aithre, and raised no objections or concerns.

38.    On January 18, 2021, Mr. Olson emailed Mr. Leeds regarding the raising of additional capital.  Ex. V.  Mr. Olson noted that Theia was engaged in several efforts to secure needed capital for business operations (as Mr. Leeds was well aware).  *Id*.  Mr. Olson asked Mr.

Leeds explicitly: (1) whether Theia needs Brevet approval for additional financing arrangements, provided Brevet's notes continued to have priority; and (2) whether Theia must provide notice of such arrangements to Brevet.  *Id.*

39.     Mr. Leeds responded, in clear terms, that "my view also is we do not need permission to raise additional equity or debt.  No waiver is required so long as money raised is subordinated (agree Brevet top and secured on collateral.)"  *Id.*  He further responded that "I agree and see no reason need to disclose the terms of current Debt to other investors (note to manage disclosures in the audited financials.)"  *Id.*

40.     Given that Mr. Leeds had at all times acted as an agent of Brevet, a role confirmed by his designation as a Permitted Holder pursuant to the Side Letter, Theia interpreted Mr. Leeds' response as explicit authority to raise capital without the need for further approval from or notice to Brevet.  This email served as further confirmation of the arrangement with Brevet that Theia understood was, and would continue to be, in effect.

41.     In addition to Brevet's actions and representations, as conveyed by Mr. Leeds and others, Theia understood that it was permitted to raise capital and issue debt without further approval by Brevet (or notice to other parties of Brevet's position) because this was the only viable way for Theia to obtain critical financing.

42.     Based upon Theia's well-established understanding of its authority to raise capital and issue debt, on January 4, 2021 Theia counsel James Hickey represented to Aithre that the parties' Secured Convertible Promissory Note and the Guarantee and Collateral Agreement (the "Aithre Agreements") would not violate any of Theia's written agreements or require approval of third parties not already obtained. Ex. W.  The parties accordingly executed the Aithre Agreements

on January 5, 2021, which provided Theia with a secured loan of approximately $25 million.  Ex. X.

43.    Aithre further showed interest in a substantially larger loan to Theia.  As late as January 13, 2021, Aithre expressed interest in increasing its stake in Theia to over $250 million. Ex. Y.

**Theia's Attempts to Finance its Business**

44.    Despite the infusion of $25 million from Aithre, in the first quarter of 2021 Theia was forced to reduce its workforce and pause its relationships with its various contractors.

45.    A primary reason for Theia's liquidity position during this period is that the budget Brevet imposed via the Second Amendment required Theia to spend $84,404,781 of the $117,595,219 million in proceeds from Brevet's loan to Theia on aircraft purchases and operations, irrespective of Theia's limited aircraft operations as a result of the COVID-19 pandemic.  Ex. K. at Annex 2(c).  Per the budget, the remaining $33,997,000 is divided among monthly overhead, employee compensation, and board compensation.  *Id.*  There is no allocation whatsoever for the design, construction and launch of satellites, or advancement of the Company's satellite programs. *Id.*  The only item in the budget which may be allocated to such work is $10 million designated as "Theia Misc."  *Id.*

46.    Allocation of capital towards the satellites was and remains critical because satellites are at the core of Theia's business objectives.  The Company's FCC licenses require that it bring the spectrum into use through the deployment of at least 56 satellites by May 2025.  In addition, Theia's short and medium-term financing would be enhanced by the anticipated receipt of funds from MPP agreements, which in turn require the development and launch of the TSN.  If

Theia fails to progress towards satellite deployment, it risks the FCC revoking its licenses and MPP counterparties withdrawing their interest and support.

47.     The severe disadvantage of having to strictly comply with the Second Amendment budget was compounded by the effects of the COVID-19 pandemic.  The pandemic inevitably caused the MPP counterparties to put these agreements on hold for a period of time as the counterparties sought to conserve their resources in containing the pandemic and recovering economically.

48.     Despite these challenges, the Company has made every effort to preserve its relationships with MPP clients whose agreements are an important part of Theia's planned financing.  On June 21, 2021, one of the MPP clients reconfirmed its commitment to pay Theia $2 billion in exchange for remote sensing services to be provided by the TSN.

49.     As part of the re-confirmed deal, Theia is entitled to a $200 million deposit.  A portion of that deposit is earmarked to pay FCS to release the liens on two of the Company's aircraft that will be supporting this MPP.  Theia possesses these aircraft, and, if properly financed, has the ability to supply them in exchange for the release of these funds.

50.     However, Brevet has stated that they will not permit Theia to provide these aircraft. Further, in a recent letter dated September 6, 2021 Brevet stated their intent to auction these aircraft to recover their debt.  Ex. Z.  Brevet's inability or unwillingness to allow Theia to provide these aircraft has detrimentally impacted Theia's business.

**The Cypherian Network**

51.     As noted, in 2020 the Company developed a plan to finance its operations based on a new venture referred to as Internet-in-Space.  This plan involves building a new communications and cloud system by leveraging a new medium earth orbit satellite constellation, separate from the

TSN, which encompasses direct-to-user communications (satellite communications) and substantial storage and processing.  This plan has the added benefit of enabling traditional funding of the Internet-in-Space constellation, because of its lower cost, while Theia continues to secure financing for the TSN through its MPP program.

52.     To effectuate this plan, Theia lined up the supply chain to begin production of the Cypherian satellites.  Theia also executed an agreement with Barclays to act as Theia's exclusive placement agent in connection with the Company's sale of at least $300 million of its debt securities.  Ex. B.

53.     Theia approached Brevet with this plan and informed Brevet of their progress repeatedly throughout January and February of 2021.  Exs. C, D, E, F.  However, Brevet did not respond to this outreach or engage with Theia and Barclays to help secure this financing.

**Theia Compliance with the Third Amendment**

54.     In return for more time to seek out alternative financing, on December 15, 2020 Theia executed the third amendment to the SNPSA with Brevet dated December 15, 2020 (the "Third Amendment").  Ex. AA.  Theia made regular and repeated efforts to comply with its obligations under the Third Amendment.

55.     Theia engaged GH Partners as a Selected Advisor, specifically to advise Theia on the monetization strategy of its assets, including its NOAA and FCC licenses.  Ex. BB.  Theia also retained Lazard Asset Management to assist with a workout and restructuring plan.  Ex. CC.

56.     Theia also put forward five separate candidates for the position of Chief Restructuring Officer ("CRO").  Theia interviewed multiple candidates for the position in January and February of 2021, and informed Brevet of these efforts.  Ex. F.  Theia would go on to propose five individuals for the position.  Ex. CC.  Brevet approved two of these candidates, Robert

Cardillo and Kevin O'Connel.  However, these candidates ultimately declined the position due to conflicts outside Theia's control.  Theia then proposed three additional candidates in February. Ex. DD.  Brevet did not accept these candidates.

57.     Theia has also provided Brevet with information related to its budget, expenses, and balance sheets.  Among other things, Theia provided Brevet with a spreadsheet titled "Management Accounts 2020" on April 15, 2021, that included year-end income statements and balance sheets for Theia Group, Inc., and Theia Aviation.

**Theia Engages Professionals To Chart a Course Forward**

58.     Over the last few months, Theia has engaged several professionals to chart a course forward for Theia and monetize Theia's assets in a manner that will allow it to pay off its creditors (including Brevet) and move forward with the development and construction of its satellite network.

59.     Specifically, Theia has engaged the services of Alix Partners to review and analyze its financial statements and position it for capital raising.

60.     Theia has also entered into a consulting arrangement with TG Capital Services LLC ("TGC"), a consulting firm with expertise in business management.  TG Capital's principal is Fredrick Schulman who has nearly four decades of experience as an investment banker, commercial banker, business owner and attorney.  Ex. EE.

61.     Mr. Schulman is being joined in this engagement by Adonis Hoffman of The Advisory Counsel, LLC and Chairman of Business in the Public Interest, Inc.  Mr. Hoffman has extensive experience with FCC licenses and his prior role as Chief of Staff and Senior Legal Advisor at the FCC.  Ex. FF.  Mr. Hoffman also a lawyer, business strategist and has over three decades of government experience in, among other things, public policy and corporate affairs.  *Id*.

62.     This team has spent significant time working with management and external professionals on positioning Theia to chart a course forward and secure the value of Theia's assets to, among other things, pay off Brevet's loans.

**Theia Begins to Operate as Thorian Group**

63.     On January 6, 2020 Theia was served with a complaint by Theia Technologies LLC, claiming that Theia was liable for trademark infringement, and demanding that Theia immediately cease all use of the name in connection with its business, and other monetary relief.

64.     Theia denied that it had ever infringed on the trademark of Theia Technologies LLC.  Nonetheless, to avoid the need for further litigation, Theia declared that it would voluntarily and permanently cease all use of the allegedly infringing trademark.

65.     On June 4, 2021, Theia applied to the United States Patent and Trademark Office for the right to do business under the name Thorian Group.  James Hickey filed to incorporate and register a new entity under this name in the state of Delaware.  He did so in order to ensure that Theia would hold the rights to operate an entity under this name.  Neither I nor anyone associated with Theia intend to use the Thorian Group entity to avoid Theia's legal and financial obligations.

66.     Theia's present intention is to operate using the name Thorian Group on a "doing business as" or "d/b/a" basis.  The Thorian Group entity currently has no assets.  Theia has no present intention to transfer any of the assets of Theia to the registered Thorian Group entity at this time.  Theia will not do so unless and until it has the legal right to do so.

67.     As with Thorian Group, Theia registered the trademark Cypherian and incorporated an entity in Delaware under this name following its decision to stop doing business under the name Theia.  As with Thorian Group, Theia did so in order to ensure that Theia would hold the rights to

operate an entity under this name.  Neither I nor anyone associated with Theia intended to use the Cypherian entity to avoid Theia's legal and financial obligations.

68.     Because Theia's Internet-in-Space line of business is distinct from the TSN, Theia anticipates that in the future Cypherian will house this line of business.  However, as with Thorian Group, Theia has no present intention to make any such transfers of assets from Theia, and will not do so unless and until it has the legal right to do so.

Date:   Washington, D.C.
        September 10, 2021


_____
J. Reid Gorman