# EXHIBIT B



745 Seventh Avenue
New York, NY 10019
United States

CONFIDENTIAL

February 8, 2021

Theia Group Incorporated
1455 Pennsylvania Ave. NW
Washington, D.C. 20004

Ladies and Gentlemen:

    This letter agreement (this "Agreement") will confirm the understanding and agreement between Barclays Capital Inc. ("Barclays") and Theia Group Incorporated (the "Company") as provided below.

    1.    The Company hereby appoints Barclays to act as its exclusive placement agent in connection with the Company's sale of at least $300 million (the "Minimum") of its debt securities (the "Securities") and authorizes Barclays, as exclusive placement agent, to endeavor to arrange a private placement of the Securities (i) inside the United States (pursuant to an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended (the "Securities Act") and (ii) outside the United States in reliance upon Regulation S ("Regulation S") under the Securities Act and, in each case, not in reliance upon any of the safe harbors set forth in Regulation D of the Securities Act) at a price and on terms satisfactory to the Company. The private placement of the Securities is to be made directly by the Company only to purchasers who (i) are institutional "accredited investors" (as defined in Rule 501 under the Securities Act) and/or (ii) the Company reasonably believes are qualified institutional buyers (as defined in Rule 144A under the Securities Act), pursuant to purchase or subscription agreements entered into by such parties, and the proceeds will be funded by the purchasers directly to the Company at the closing of the sale of the Securities.

    Additionally, Barclays will work with the Company to evaluate strategic and financial transactions, including but not limited to, alternative debt refinancings, equity and equity-linked capital raises and de-SPAC transactions (the "Additional Mandates"). Following an initial due diligence period of no more than 30 days from the date hereof, Barclays may revert to the Company with a proposed engagement letter for one or more Additional Mandates. Barclays shall have exclusivity on any Additional Mandates subject to the signing of a separate engagement letter pertaining to the Additional Mandates. If the parties do not agree to the terms of any particular Additional Mandate, the Company may seek alternative funding offers for up to 90 days. Barclays will have the opportunity to match terms to participate in any such transaction. In all cases, any Additional Mandates will include a list of target funding sources, estimated funding commitment size plus a forecast of transaction timing.

    For the avoidance of doubt, the Company has begun the following capital raising initiatives that will not be considered under the terms of this Agreement, but may be included within the scope of Additional Mandates by mutual agreement: 1) direct convertible note subscriptions by high net worth investors, 2) subscriptions of convertible notes by Aithre Capital Partners LLC, a pooled high net worth investor vehicle as sponsored by BullTick Financial Services, LLC, 3) prepaid revenue or services commitments such as the sovereign Master Partner Program or comparable private sector or retail market arrangements, 4) project financing at the Group Orion subsidiary, and 5) commodity based financing at the Theia Resources Group subsidiary. Should the Company inform Barclays that the financing in prong 4) expands such that it renders the placement of Securities by Barclays unnecessary,



amounts in excess of the Minimum shall not be considered under the Placement Fee provisions of this agreement.

In connection with its engagement hereunder, Barclays shall (a) assist the Company in preparing Marketing Materials (as defined below) to be used in the Securities offering; (b) assist the Company with negotiations with potential investors; (c) assist the Company with any roadshows involving presentations by senior executives of the Company to potential investors; and (d) carry out such other duties as are agreed with the Company.

2.     As compensation for Barclays' services hereunder, the Company will pay in cash to Barclays, promptly, on the actual sale, issuance and funding of the Securities following each closing of any sale of the Securities, a placement agent fee of 3.00% of the total gross proceeds from the sale of the Securities by the Company (the "Placement Fee"), plus an extra 100 basis points applied to all amounts placed in excess of $300 million.  In the event of multiple closings (each, a "Closing"), where the Company has committed to sell a specific aggregate principal amount of Securities but will do so in parts at separate closings, the Company agrees to pay the Placement Fee (and additional fees, if applicable) as of the date of the first of such Closings, calculated on the basis of the full aggregate principal amount of Securities to be sold at all such Closings. In addition, whether or not a sale of the Securities occurs, the Company will promptly reimburse Barclays upon demand for Barclays' reasonable expenses (including fees and expenses of counsel) incurred in connection with its acting as placement agent hereunder; provided, however, any expenditure in excess of $5,000 will require pre-approval by the Company.  The Company agrees to reimburse such expenses no later than 10 business days after the Company has received a request for reimbursement.

The Company acknowledges and agrees that (i) Barclays will act as sole placement agent and will have exclusive responsibility for all distribution and marketing of the Securities to investors and (ii) league table credit for the offering of the Securities shall be applied solely to Barclays 100%.

The Company agrees that Barclays (or its affiliates) shall have the exclusive right to arrange any risk management transactions related to the offering of the Securities.  Notwithstanding the above or any oral representations made to the contrary, this Agreement does not constitute a commitment by Barclays (or its affiliates) to participate in any such transaction and such a commitment will exist only upon the execution of a separate, written agreement containing terms and conditions applicable to such transaction.

All amounts payable to Barclays hereunder shall be paid in U.S. dollars, free and clear of all deductions or withholdings unless the deduction or withholding is required by law, in which event the Company shall pay such additional amounts as shall be necessary to ensure that the net amount received by Barclays will equal the full amount that would otherwise have been received by Barclays had no such deduction or withholding been made.

3.     The Company agrees with Barclays that:

(a)     Neither the Company nor any of its affiliates has, directly or indirectly, made any offer or sale, or will, directly or indirectly, make any offer or sale, of any security which is or would be integrated with the sale of the Securities in a manner that would require the Securities to be registered under the Securities Act.  As used herein, the terms "offer" and "sale" have the meanings specified in Section 2(a)(3) of the Securities Act.



Page 3 of 10

(b) The Company will fully cooperate with Barclays in any due diligence investigation reasonably requested by Barclays with respect to the offer and sale of the Securities and will furnish Barclays with such information, including financial statements, with respect to the business, operations, assets, liabilities, financial condition and prospects of the Company as Barclays may reasonably request in order to permit it to conduct due diligence and assist the Company in preparing marketing materials appropriate for the financing contemplated herein (collectively, the "Marketing Materials") for use in connection with the offering of the Securities. Barclays may rely upon the accuracy and completeness of all such information and the Company acknowledges that Barclays has not been retained to independently verify any of such information. The Company will be solely responsible for the contents of the Marketing Materials and any and all other written or oral communications provided by or on behalf of the Company to any actual or prospective purchaser of the Securities, and the Company represents and warrants that the Marketing Materials (other than with respect to any financial projections contained therein) and such other communications will not, as of the date of the offer or sale of the Securities, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. With respect to any financial projections to be contained in the Marketing Materials (the "Projections"), the Company represents and warrants that the Projections will be made by the Company with a reasonable basis and in good faith and that the Projections will represent the Company's best then available estimate and judgment as to the future financial performance of the Company based on the assumptions to be disclosed therein, which assumptions will be all the assumptions that are material in forecasting the financial results of the Company and which will reflect the Company's best then available estimate of the events, contingencies and circumstances described therein. The Company authorizes Barclays to provide the Marketing Materials and any other written and oral communications related to the Securities offering to prospective purchasers of the Securities.

If at any time prior to the completion of the offer and sale of the Securities an event occurs that would cause the Marketing Materials (as supplemented or amended) or any other written or oral communications provided by or on behalf of the Company to any actual or prospective purchaser of the Securities to contain an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, or that would cause a material change in the Company's view of the likelihood of achievement of the Projections or the reasonableness of the underlying assumptions, then the Company will notify Barclays immediately of such event and Barclays will suspend solicitations of the prospective purchasers of the Securities until such time as the Company shall prepare a supplement or amendment to the Marketing Materials that corrects such statement or omission or revises the Projections or such assumptions.

(c) The Company will (i) not offer or sell the Securities by means of any form of general solicitation or general advertising or (ii) offer or sell the Securities (A) inside the United States, only to institutional "accredited investors" (as defined in Rule 501 under the Securities Act) or qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (B) outside the United States in accordance with Regulation S. The Company will exercise reasonable care to assure that the purchasers of the Securities are not underwriters within the meaning of Section 2(a)(11) of the Securities Act.

(d) The Company shall cause to be furnished to Barclays at each closing of a sale of Securities copies of such agreements, opinions, certificates and other documents (including, without



limitation, accountant's letters) as Barclays may reasonably request. In addition, the Company shall be deemed to make all the representations and warranties to Barclays that the Company has made to the purchasers of Securities in any purchase agreement or other document and Barclays shall be entitled to rely upon, the same opinions of counsel and accountant's letters that are provided to purchasers of the Securities.

(e)     The Company agrees that it will be responsible for making all necessary notifications of, and filings with, all federal, state and other applicable securities regulatory authorities with respect to the offer and sale of the Securities; provided, that the Company shall not make any filings, including without limitation any Form D filings, with the Securities and Exchange Commission with respect to the offer and sale of the Securities without Barclays' prior consent.

4.     The Company hereby agrees to indemnify and hold harmless each of Barclays, its affiliates and their respective directors, officers, employees, advisors and other representatives (each, an "Indemnified Party") against any and all losses, claims, damages or liabilities, joint or several (collectively, "Liabilities"), to which an Indemnified Party may become liable or may become subject (i) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in the Marketing Materials or in any other written or oral communication provided by or on behalf of the Company to any actual or prospective purchaser of the Securities or arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading or (ii) arising in any manner out of or in connection with the services or matters relating to Barclays' engagement hereunder (including, without limitation, the offer and sale of the Securities) (collectively, the "Indemnity Coverage"); provided, however, that the Company shall not be liable under clause (ii) of this paragraph in respect of any Liabilities to the extent a court of competent jurisdiction determines in a final, non-appealable judgment that the Liabilities directly resulted from the gross negligence or willful misconduct of such Indemnified Party (other than with respect to actions taken at the direction or request of the Company).

The Company further agrees to reimburse each Indemnified Party promptly upon request for all out-of-pocket expenses (including reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for the defense of or providing evidence in any action, claim, suit, proceeding or investigation, whether pending or threatened (each and collectively, an "Action"), arising out of or otherwise relating to the Indemnity Coverage (including, without limitation, in connection with the enforcement of this Agreement and the indemnification obligations set forth herein). The Company also agrees that no Indemnified Party shall have any liability of any nature to the Company or any other person asserting any Action on behalf of or in right of the Company, whether arising out of or otherwise relating to the Indemnity Coverage, except to the extent a court of competent jurisdiction determines in a final, non-appealable judgment that such Liabilities resulted directly from the gross negligence or willful misconduct of such Indemnified Party (other than with respect to actions taken at the direction or request of the Company).

The Company agrees that the indemnification, reimbursement and contribution commitments set forth in this paragraph 4 shall apply whether or not any Indemnified Party is a formal party to any such Action and the rights that any of the Indemnified Parties referred to in this paragraph 4 shall be in addition to any other rights that any Indemnified Party may otherwise have against the Company. The Company further agrees that, without Barclays' prior written consent, it will not agree to any settlement of, compromise or consent to the entry of any judgment in or other termination of any Action (each and collectively, a "Settlement") (whether or not Barclays or an Indemnified Party is an actual or potential party



Page 5 of 10

to such Action) unless (i) such Settlement includes an unconditional release of each Indemnified Party from any liabilities arising out of such Action and does not include any findings of fact or admissions of culpability as to the Indemnified Party and (ii) the parties agree that the terms of such Settlement shall remain confidential. The Company further agrees that the Indemnified Parties are entitled to retain one separate counsel (in addition to local counsel) of their choice in connection with any single Action in respect of which indemnification, reimbursement or contribution may be sought hereunder.

The Company and Barclays agree that if any indemnification or reimbursement sought pursuant to this paragraph 4 is judicially determined to be unavailable or insufficient to hold any Indemnified Party harmless, then, whether or not Barclays is the Indemnified Party, the Company and Barclays shall contribute to the Liabilities for which such indemnification or reimbursement is unavailable or insufficient (x) in such proportion as is appropriate to reflect the relative benefits to the Company on the one hand, and Barclays on the other hand, in connection with the transactions to which such indemnification or reimbursement relates, or (y) if the allocation provided by clause (x) above is judicially determined not to be permitted, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (x) but also the relative faults of the Company on the one hand, and an Indemnified Party on the other hand, as well as any other equitable considerations; provided, however, that in no event shall the amount to be contributed by Barclays pursuant to this paragraph exceed the amount of the fees actually received by Barclays hereunder.

5. Barclays will not have any rights or obligations in connection with the sale and purchase of the Securities contemplated by this Agreement except as expressly provided in this Agreement. In no event shall Barclays be obligated to purchase the Securities for its own account or for the accounts of its customers. Notwithstanding the foregoing, Barclays will have the right, but not the obligation and subject to the provisions of Barclays' allocation policy in force from time to time to determine the allocation of the Securities among potential purchasers, provided that such allocation is reasonably acceptable to the Company.

6. (a) The appointment and authorization of Barclays under paragraph 1 of this Agreement shall extend from the date hereof until terminated as set forth below. Either the Company or Barclays may terminate Barclays' engagement hereunder at any time upon at least ten days' prior written notice to the other party, including without limitation in the event that Barclays, in its sole judgment, is not satisfied with the results of its due diligence investigation of the Company and its business, operations, assets, liabilities, financial condition and prospects. Notwithstanding any such termination, the Company shall remain responsible for the reimbursement of Barclays' expenses under paragraph 2 of this Agreement and the provisions of paragraphs 4 through 16 shall survive any such termination of Barclays' engagement hereunder. Such obligations shall also survive the offer and sale of the Securities.

(b) If during a period of 12 months following the termination of Barclays' engagement hereunder, the Company sells any Securities or securities materially similar to the Securities, then for 6 months following such termination the Company shall pay to Barclays upon the closing of such sale a fee equal to the Placement Fee which would have been payable to Barclays on the lesser of (x) the amount sold in such sale and (y) the Minimum, pursuant to paragraph 2 if the closing of such sale had occurred during the term of Barclays' appointment and authorization hereunder and the securities sold were the Securities. After the 6month period, until 12 months following such termination, the Company shall pay to Barclays upon the closing of such sale a fee equal to 50% of the Placement Fee which would have been payable to Barclays on the lesser of (x) the amount sold in such sale and (y) the Minimum, pursuant to



paragraph 2 if the closing of such sale had occurred during the term of Barclays' appointment and authorization hereunder and the securities sold were the Securities.

(c) If Barclays obtains a commitment from an investor or investors ("Investor(s)") to purchase the Securities, subject only to the completion of documentation that is mutually satisfactory to the Company and the Investor(s) on terms and conditions to which the Company has agreed and has indicated its acceptance (a "Circle"), and the proposed Securities offering (the "Financing") is not consummated due either to (i) the Company's inability due to factors and/or conditions solely within the Company's control to close the Financing on terms and conditions which it had agreed to at the time of obtaining the Circle or (ii) the Company's decision due to factors and/or conditions solely within the Company's control not to proceed with or close the Financing for any reason other than the unwillingness of the Investor(s) (such unwillingness to be determined by the Company based upon a reasonable, good faith assessment made in consultation with Barclays) to close the Financing on terms to which the Company and the Investor(s) agreed at the time of Circle and which, with respect to those provisions that were not determined at the time of Circle, are consistent with customary market practice for transactions that are similar to the Financing and which are not unreasonable (in the good faith determination of the Company made in consultation with Barclays) (a "Company Refusal"), then Barclays shall be entitled to receive the full fee pursuant to paragraph 2 as if the Financing had been completed. Such fee shall be payable promptly after a Company Refusal, provided that the operation of this paragraph shall be suspended if, and for so long as, the Company and Barclays mutually agree that the Financing can reasonably be expected to close.

(d) In addition, as further consideration for Barclays' services as placement agent hereunder, the Company agrees that Barclays shall have the right, but not the obligation, which right is exercisable in Barclays' sole discretion, to provide investment banking services (except as defined in the third section of paragraph 1) to the Company for a period of 4 months after the date hereof. Such services may include acting as lead managing underwriter and active bookrunner for an initial public offering of the Company's equity securities or other offerings of the Company's debt and/or equity securities, assisting the Company with respect to any mergers, acquisitions or divestitures, including in connection with a sale or de-SPAC transaction, acting as exclusive placement agent for any private placement of debt and/or equity securities and providing other financial advisory services. In the event that Barclays agrees to provide such services, Barclays shall be paid fees to be mutually agreed between the Company and Barclays, based upon Barclays customary fees for such services. The Company and Barclays hereby further agree that, notwithstanding anything to the contrary contained herein or any oral representations or assurances previously or subsequently made by the parties, this Agreement does not constitute a commitment by or obligation of Barclays to act as underwriter or placement agent in connection with any such offering of securities or as a financial advisor. Such a commitment on the part of Barclays will exist only upon the effectiveness of a registration statement satisfactory to Barclays (if applicable) and the execution of a final, written underwriting or placement agent agreement, or the execution of a financial advisory agreement, as appropriate, and then only in accordance with the terms and conditions of such agreement. In any event Barclays may determine in its sole discretion for any reason (including, without limitation, the results of its due diligence investigation, a material change in the Company's financial condition business or prospects, the lack of appropriate internal Barclays committee approvals or then current market conditions) not to participate in such an offering of securities or act as a financial advisor.

7. The Company and Barclays each represent to the other that:

(a) there is no other person or entity that is or will be entitled to a finder's fee or any type of brokerage commission in connection with the transactions contemplated by this Agreement as a result of any agreement or understanding with it; and



Page 7 of 10

    (b) without the consent of Barclays, the Company agrees that during the term of Barclays' engagement hereunder (i) it will not pursue any financing transaction which would be in lieu of a sale of Securities hereunder and (ii) all inquiries, whether direct or indirect, from prospective purchasers of Securities will be referred to Barclays.

   8. Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth herein, the Indemnified Party, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Barclays hereunder. The parties acknowledge that Barclays is not acting in a fiduciary capacity with respect to the Company and that Barclays is not assuming any duties or obligations other than those expressly set forth in this Agreement.

   9. The benefits of this Agreement shall inure to respective successors and assigns of the parties hereto and of the Indemnified Parties, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns.

   10. Upon the pricing of the Securities, the Company expressly authorizes Barclays to advertise and/or publicize its role(s) with regard to the offering of the Securities, including by (i) placing a "tombstone" or similar advertisements in financial or other publications (with the Company's consent) or (ii) a summary of the offering of the Securities in marketing materials provided to prospective issuers, any of which advertisements and marketing materials may contain the Company's logo, in each case describing its services to the Company hereunder, at Barclays' own expense. The Company will not publicly refer to Barclays or its engagement hereunder without the prior written consent of Barclays.

   11. This Agreement may not be amended or modified except in writing signed by each of the parties hereto and shall be governed by and construed and enforced in accordance with the laws of the State of New York. The Company and Barclays hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States District Courts located in the City of New York, Borough of Manhattan, for any lawsuits, actions or other proceedings, whether in contract, tort or otherwise, arising out of or relating to this Agreement or the relationship between the parties created or contemplated hereunder and agree not to commence any such lawsuit, action or other proceeding except in such courts. The Company and Barclays hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, action or other proceeding, whether in contract, tort or otherwise, arising out of or relating to this Agreement or the relationship between the parties created or contemplated hereunder, in the courts of the State of New York or the United States District Courts located in the City of New York, Borough of Manhattan and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, action or other proceeding brought in any such court has been brought in an inconvenient forum. **Any right to trial by jury with respect to any lawsuit, claim or other proceeding arising out of or relating to this Agreement or the services to be rendered by Barclays hereunder is expressly and irrevocably waived.**

   12. The Company and Barclays represent and warrant that each has all requisite power and authority to enter into and carry out the terms and provisions of this Agreement and the execution, delivery and performance of this Agreement does not breach or conflict with any agreement, document or instrument to which it is a party or bound.

   13. The Company acknowledges and agrees that:



(a)    Barclays is a full service securities firm engaged in a wide range of businesses and from time to time, in the ordinary course of its business, Barclays or its affiliates may hold long or short positions and trade or otherwise effect transactions for its own account or the account of its customers in debt or equity securities or loans (or any derivatives thereof) of the companies which may be the subject of the transactions contemplated by this Agreement or in other financial products and instruments.  Unless otherwise expressly agreed or provided for in other applicable Barclays disclosures governing such transactions or required by law or regulation, Barclays conducts these activities as principal and executes its principal transactions as an arm's length counterparty. Barclays does not act as a fiduciary in relation to these transactions and such trading is conducted, of course, with strict informational barriers in place to protect the confidentiality of client information and in strict compliance with applicable securities laws.  Additionally, as a full service investment and commercial bank, Barclays and its affiliates may have investment and commercial banking, lending, asset management, prime brokerage services and other relationships with companies which are or may become involved in the transactions contemplated by this Agreement and/or which may have interests which could potentially conflict with the interests of the Company.  During the course of Barclays' engagement with the Company, Barclays may have in its possession material, non-public information regarding other companies that could potentially be relevant to the Company or the transactions contemplated herein but which cannot be shared due to an obligation of confidence to such other companies.

(b)    Barclays may arrange for all or any of the services to be performed by it hereunder to be performed by any of its respective direct or indirect holding companies and/or any direct or indirect subsidiaries of Barclays or such holding companies.

14.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

15.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be the same agreement.  A signed copy of this Agreement delivered by email, or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. The parties agree that this Agreement may be signed by means of ink on a paper medium or by means of an electronic signature applied to an electronic copy of this Agreement, and an electronic signature of a party on this Agreement will be deemed valid and binding as if the same were an original ink signature of such party and will be admissible in any proceeding by either party against the other as if the same were an original ink signature on this Agreement.

16.    This Agreement constitutes the entire understanding and agreement between the Company and Barclays with respect to the subject matter hereof and supersedes all prior understanding or agreements between the parties with respect thereto, whether oral or written, express or implied.  The Company acknowledges that (i) Barclays is not providing any advice on tax, legal, regulatory or accounting matters and that the Company will seek the advice of its own professional advisors for such matters and make an independent decision regarding any transaction contemplated herein based upon such advice, (ii) Barclays has not been asked to opine or make any recommendation as to the Company's underlying business decision to proceed with or effect the transactions referred to herein or any other transaction and is not providing any such opinion or recommendation by providing any financial analysis or services hereunder or otherwise, (iii) any advice provided by Barclays pursuant to this


engagement, including prior to the date of this Agreement, is to be used by the Company exclusively for commercial or business purposes and not by any individual for personal, family or household purposes.

[The rest of this page has intentionally been left blank.]

<2˘>
</2˘>
<2˘>
</2˘>
<2˘>
</2˘>

<2˘></2˘>



If the foregoing correctly sets forth the understanding and agreement between Barclays and the Company, please so indicate in the space provided for that purpose below, whereupon this letter shall constitute a binding agreement as of the date first above written.

Very truly yours,

BARCLAYS CAPITAL INC.

By: _____

Name: Craig Molson
Title: Managing Director

Agreed and accepted:

THEIA GROUP INCORPORATED

By: _____
Name: Stephen Busdel
Title: CFO

If the foregoing correctly sets forth the understanding and agreement between Barclays and the Company, please so indicate in the space provided for that purpose below, whereupon this letter shall constitute a binding agreement as of the date first above written.

Very truly yours,

BARCLAYS CAPITAL INC.

By: ______________________________

Name: Craig Molson

Title: Managing Director

Agreed and accepted:

THEIA GROUP INCORPORATED

By: ______________________________

Name:

Title: