# EXHIBIT 13

## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement") dated June 29, 2020 and with an effective date of August 4, 2019 is made by and between FCS Advisors, LLC, with an address at 441 Ninth Avenue, 20th Floor, New York, New York 10001 (the "Firm") and Leeds Holdings, LLC with an address at 1035 Park Avenue, New York, NY 10028 (the "Consultant" and sometimes referred to herein as "you") (each a "Party" and together, the "Parties"). This Agreement amends, restates, and supersedes in its entirety the agreements dated March 29, 2017, May 31, 2017 and January 2, 2019, respectively, and any other agreements on the subject matter hereof, between the Firm and the Consultant.

1. **Services**. The Firm hereby engages the Consultant, on a non-exclusive basis, and the Consultant hereby agrees to render certain independent advisory and consulting services (the "Services") during the Term (as defined below) upon the terms and conditions hereinafter. The Consultant understands and agrees that this Agreement is not assignable without Firm's prior written consent and that the Consultant shall be personally responsible for performing all such Services herein.

2. **Term of Agreement**. The term of this Agreement shall commence as of August 4, 2019 and shall continue until December 31, 2020, unless the Firm terminates this Agreement sooner upon five (5) business days' written notice to the Consultant (the "Term").. The Parties also may mutually agree to extend the duration of the Term, provided such agreement is confirmed in writing. Any obligation of the Firm to pay a Consulting Fee, as defined in Section 3, shall survive the termination of this Agreement. The Parties acknowledge and agree that this Agreement and the Term terminated on June 29, 2020.

3. **Consulting Fees.** The Firm shall pay the Consultant a fee (the "Consulting Fee") as set forth on Exhibit A hereto. The Consultant shall be responsible for all expenses the Consultant incurs relating to his performance of the Services except for any specific travel or other expenses that the Firm preapproves in writing. The Parties acknowledge and agree that the Consulting Fee has been fully earned.

4. **Duties**. The Consultant shall render the Services conscientiously and devote his best efforts and abilities thereto, and shall perform the Services at such times and locations as are reasonably convenient to the Consultant and the Firm. The Consultant shall observe all applicable policies and directives promulgated from time to time by Firm for independent contractors.

5. **Independent Contractor**. It is expressly agreed that the Consultant is acting solely as an independent contractor in providing the Services hereunder. Neither Party to this Agreement has any authority to bind or commit the other without that Party's prior written consent nor will either Party's acts or omissions be deemed the acts of the other. The Firm shall carry no workers' compensation insurance or any health or accident insurance to cover the Consultant. The Firm shall not pay any contributions to Social Security, unemployment insurance, federal, or state withholding taxes, or provide any other contributions or benefits that might be expected in an employer-employee relationship and the Consultant expressly waives any right to such participation, contribution, benefit or coverage.

6. **Conflicts of Interest**. The Consultant agrees to abide by the Firm's policies and procedures, as they may be modified from time to time, as applicable to an outside independent contractor. Notwithstanding anything contained therein, the Parties agree that the Consultant has outside business interests and, thus, potential conflicts of interest may arise between the Parties. Until the end of the Term, the Consultant agrees to disclose any potential conflicts of interest and the Parties shall seek to resolve any such potential conflicts of interest in a manner that is acceptable to the Firm. Until the end of the Term, any investment opportunity presented to the Consultant independent of his engagement with the Firm or that the Consultant sources independently through his outside business interests ("Independent Transaction") shall be presented to the Firm and the Firm shall have right of first refusal in accordance

with Section 3(c) of this Agreement. Notwithstanding anything contained herein, any Independent Transaction (x) that is less than $1,000,000 and is not a transaction that meets the Firm's and/or any of its affiliates' investment strategy or (y) in which the Consultant represents, or attempts to represent, Foreman Electric Service Company, Inc. (or one or more of its affiliates), in either case (x) or (y), shall not be deemed to constitute a conflict of interest and the Consultant shall be under no obligation to present such investment opportunity to the Firm.

7.  **Confidentiality**. While performing the Services, the Consultant has developed and acquired, and may continue to develop or acquire, knowledge in his work or from directors, officers, employees, agents, or the consultants of the Firm or its affiliates or otherwise of Confidential Information relating to the Firm, its business, potential business or that of its clients and investors. "Confidential Information" includes all trade secrets, know-how, show-how, theories, technical, operating, financial, and other business information, whether or not reduced to writing or other medium and whether or not marked or labeled confidential, proprietary or the like, specifically including, but not limited to, information regarding investment strategies, actual or prospective client and investor lists, source codes, software programs, computer systems, algorithms, formulae, concepts, creations, costs, plans, materials, enhancements, research, specifications, works of authorship, techniques, documentation, models and systems, sales and pricing techniques, designs, inventions, discoveries, products, improvements, modifications, methodology, processes, concepts, records, files, memoranda, reports, plans, proposals, price lists, customer, client, and supplier lists and information, product development and project procedures. Confidential Information does not include (a) general skills, experience, or information that is generally available to the public, other than information that has become generally available as a result of the Consultant's direct or indirect act or omission, or (b) information that is required to be disclosed pursuant to any applicable law, regulation, judicial or administrative order or decree, or request by any other regulatory organization having authority pursuant to law; provided, however, that the Consultant shall have first given prompt written notice to the Firm to afford it a reasonable opportunity to obtain a protective order requiring that the Confidential Information not be disclosed and, in the event such protective order is not obtained, the Consultant shall disclose only that portion of the Confidential Information that the Consultant is legally obligated to disclose and otherwise maintain the confidentiality of such portion. With respect to Confidential Information of the Firm and its clients and investors:

(a)  The Consultant will use Confidential Information only in the performance of the Services for Firm. The Consultant will not use Confidential Information at any time for his/her own personal benefit, for the benefit of any other individual or entity, or in any manner adverse to the interests of the Firm or its clients or investors;

(b)  The Consultant will not disclose Confidential Information at any time (during or after the Consultant's engagement by Firm) except to authorized Firm personnel, unless the Firm consents in advance in writing or unless the Confidential Information indisputably becomes public knowledge or enters the public domain (other than through the Consultant's direct or indirect act or omission);

(c)  The Consultant will safeguard the Confidential Information by all reasonable steps and abide by all policies and procedures of the Firm in effect from time to time regarding storage, copying, destruction, and handling of documents;

(d)  In the course of performing the Services, the Consultant may learn, or have reason to suspect, that he/she has been provided with Confidential Information or material nonpublic information. If so, the Consultant agrees to immediately contact the Firm's Chief Compliance Officer prior to either communicating such material non-public

        information to anyone else or providing the Firm with investment analysis with respect to such information;

(e)     During the Term, the Consultant may become aware of positions that the Firm's advisory clients may own, may be considering owning, short selling, liquidating or covering. Inclusive of the Services, with respect to any publicly held company, the Consultant agrees not to buy, sell short or otherwise trade any security or derivative that is directly related to that company or any other company that the Firm may be analyzing until at least sixty (60) days after the termination of this Agreement;

(f)     The Consultant acknowledges that the Firm may be required to sign non-disclosure or confidentiality agreements with clients, prospective clients, and other third parties in which the Firm agrees that its employees and agents will not disclose Confidential Information of such clients, prospective clients, or other third parties. By executing this Agreement, the Consultant acknowledges and agrees that the Firm may rely, and will rely, on this Agreement for purposes of entering into such other agreements. Further, the Consultant will execute and abide by all confidentiality agreements reasonably requested by the Firm's clients, prospective clients, investors, and other third parties; and

(g)     The Consultant will return all materials containing and/or relating to Confidential Information, together with all other property of the Firm and its clients to the Firm when the Consultant's consulting relationship with the Firm terminates or otherwise on demand and, at that time the Consultant will certify to the Firm, in writing, that the Consultant has complied with this Agreement. The Consultant will not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, databases, diskettes, or other documents or electronically stored information of any kind relating in any way to the business, potential business or affairs of the Firm and its clients and investors.

(h)     Nothing herein shall be construed as limiting the Consultant's: (i) right to file a charge or complaint with a federal, state or local governmental agency or commission ("Government Agency"), including, but not limited to, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission; (ii) ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to Firm; or (iii) right to receive an award for information provided to any Government Agency.

8.     **Intellectual Property Rights**. To the fullest extent permissible under applicable law, all material, documentation, deliverables, and other tangible expressions of information, including but not limited to, software programs and software documentation, designs, technical data, formulae, and processes, whether in final production or draft, which result from any work performed by the Consultant in providing the Services under this Agreement, or any extension or renewal thereof, shall be deemed to be works for hire and all related rights, title, and interest, including any copyright, patent rights, and all other intellectual property rights, shall belong exclusively to the Firm. Without limiting the foregoing, the Firm shall have all right, title, and interest in the Consultant's work product in providing the Services under this Agreement, including the exclusive right to obtain and hold in its own name copyrights, registrations, and other appropriate statutory protections and the Consultant shall not retain any rights of any kind therein. The Consultant agrees to cooperate with the Firm (at the Firm's expense) to obtain any

3

further assignments, copyrights, patents, and such other statutory protections as may be available under law. To the extent any work performed by the Consultant under this Agreement, or any extension or renewal thereof, is construed not to be a "work for hire," all rights under the copyright law in the Consultant's work product are hereby irrevocably assigned and transferred by the Consultant to the Firm and the Consultant agrees to execute all documents requested by the Firm necessary or advisable to evidence such assignment and transfer.

9.   **Non-Competition/No-Raiding/Non-Solicitation.** During the term of this Agreement, and for a period of six (6) months following the end of such term, you will not (a) recruit or hire or induce any employee or consultant of the Firm to leave, or cease work for, the Firm and join or work for an entity with which you are associated; and/or (b) solicit the trade or business of any of the Firm's borrowers, transaction parties, counterparties, partners, co-investors or investors with which you had direct contact or about which you acquired knowledge while providing Services to the Firm, unless consented to in writing by the Firm before you initiate any such solicitation. You agree that these restrictive covenants are reasonable and are in exchange for the opportunity to receive fees (and be provided with office space) as set forth in Section 3 and to provide the Services as presented herein.

10.   **Obligations to Others.** The Consultant represents and warrants that the Consultant does not have any agreement with, or duty to, any previous employer or other person or entity that would prevent, limit, or inhibit the Consultant from performing the Services under this Agreement. The Consultant agrees not to use any proprietary or confidential information belonging to any other person or entity in performing the Services or disclose any proprietary or confidential information belonging to any other person or entity to the Firm or its clients.

11.   **Non-Disparagement.** Each Party agrees that during the Term and all times thereafter, neither Party shall disparage the reputation of the other Party, its products or services, or any of its officers, directors, employees, or representatives.

12.   **Waiver.** The failure of either of the Parties to at any time enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provision, nor to in any way affect the validity of this Agreement or any provision hereof or the right of either of the Parties to thereafter enforce each and every provision of this Agreement. No waiver of any breach of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed by the Party against whom or which enforcement of such waiver is sought; and no waiver of any such breach shall be construed or deemed to be a waiver of any other or subsequent breach.

13.   **Capacity of Parties.** Each Party hereby represents and warrants to the other Party that: (a) it has full power, authority and capacity to execute and deliver this Agreement, and to perform its obligations hereunder, (b) such execution, delivery and performance will not (and with the giving of notice or lapse of time or both would not) result in the breach of any agreements or other obligations to which it is a Party or by which it is otherwise bound and (c) this Agreement is a valid and binding obligation, enforceable against such Party in accordance with its terms.

14.   **Indemnification.** The Consultant hereby indemnifies the Firm and holds it harmless from any and all liability, loss, damage or expense, including legal fees, which may be suffered or incurred as a result of claims, demands, actions, costs, or judgments against the Firm arising out of the Consultant's grossly negligent performance of the Services pursuant to this Agreement, including, without limitation, any actions or omissions.

15. **Assignment**. The Consultant shall not voluntarily or by operation of law assign the Consultant's obligations under this Agreement without the prior written consent of the Firm. Any attempted assignment or transfer by the Consultant of its obligations without such consent shall be wholly void.

16. **Notice**. Any notice required or permitted to be given hereunder shall be sufficient only if in writing and if sent (i) by certified or registered mail (return receipt requested) to the address for such Party as is set forth below or (ii) by email to the address for such Party as is set forth below.

   (a) Addresses for notices or communications to the Firm:

   FCS Advisors,, LLC
   441 Ninth Avenue, 20th Floor, New York, NY 10001
   Email: mark@brevetcapital.com
   with a copy to legal@brevetcapital.com

   (b) Address for notices or communications to the Consultant:

   Leeds Holdings, LLC
   Robert Leeds
   1035 Park Avenue
   New York, NY 10028
   Email: rleeds@silarcapital.com

17. **Governing Law; Jurisdiction**. Any and all actions or controversies arising out of this Agreement, including, without limitation, tort and contract claims, shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to the choice of law principles thereof. The Parties agree to the exclusive forum of the state and federal courts located in Manhattan, New York with regard to any dispute regarding this Agreement, the Consultant's performance or failure to perform the Services hereunder, or any other matter.

18. **Survivorship**. The respective rights and obligations of the Parties under this Agreement shall survive any termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations.

19. **Entire Agreement**. This Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements and understandings (whether oral or written) between the Parties concerning the subject matter hereof. This Agreement may be modified by the Parties hereto only by a written supplemental agreement executed by both Parties.

20. **Binding Agreement**. This Agreement shall inure to the benefit of the Firm and its successors and assigns (including, without limitation, the purchaser of all or substantially all of its assets) and shall be binding upon the Firm and its successors and assigns. This Agreement shall also inure to the benefit of and be binding upon the Consultant and the Consultant's heirs, administrators, executors and permitted successors and assigns.

21. **Severability**. If any term or provision of this Agreement shall be found to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary by the adjudication to render such term or provision enforceable, and the rights and obligations of the Parties shall be construed and enforced accordingly, preserving to the fullest extent permissible the intent and agreements of the Parties set forth in this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

FIRM:
FCS ADVISORS, LLC

By: */signature/*

Name: Mark Callahan
Title: Managing Director

Date: 07/29/2020

CONSULTANT:
LEEDS HOLDINGS, LLC

By: Robert Leeds
Title: Authorized Signatory

Date: 7/30/2020

Error!

## EXHIBIT A

1. **Theia Notes**

    (a) The Firm shall pay the Consultant a Consulting Fee of $1,643,000.00, of which $48,000.00 has been satisfied and discharged by payment of certain expenses of the Consultant, and the remaining $1,595,000.00 of which is payable by the assignment to the Consultant, upon execution and delivery of this Agreement by both Parties, of $1,595,000.00 in principal amount of the Series A-2 Notes issued to the Firm under an Amended and Restated Secured Note Purchase and Security Agreement, dated as of June 29, 2020, among the Borrower, certain of its subsidiaries and the Firm (as amended and supplemented from time to time, the "2020 Note Purchase Agreement") pursuant to paragraph (b) below.

    (b) The Firm hereby assigns and transfers to the Consultant, effective as of June 29, 2020, ownership of $1,595,000.00 in principal amount of the Series A-2 Notes issued under the 2020 Note Purchase Agreement (the "Fee Interest"); provided that (i) the Firm shall continue to hold the Fee Interest in its name, solely as nominee for the Consultant, as part of the Theia Notes held in the name of the Firm, (ii) the Fee Interest shall be subordinated to the other amounts owing under the Theia Notes and 2020 Note Purchase Agreement and the other Transaction Documents entered into in connection therewith, and (iii) simultaneously with and as a condition to the execution and delivery of this Agreement, the Consultant shall have executed and delivered to the Firm the letter agreement addressed to them in the form of Exhibit 1 attached hereto (the "Nominee and Subordination Agreement") to evidence the parties agreements with respect to the foregoing clauses (i) and (ii).

2. **Alaska – Cactus Loan**

    (a) The Firm agrees to grant the Consultant an ORRI participation equal to eighteen basis points (0.18%) of any overriding royalty interests paid to the Firm or its designee.

**Error!**

BREVET CAPITAL ADVISORS
441 Ninth Avenue, 20th Floor
New York, NY 10001

June 29, 2020

Leeds Holdings, LLC
1035 Park Avenue
New York, NY 10028

Re :    Certain Notes issued by Theia Group, Incorporated (the "Borrower")

Ladies and Gentlemen:

We refer to:

(i) a Secured Note Purchase and Security Agreement, dated as of August 7, 2019, as amended prior to June 29, 2020, including by a First Amendment to Secured Note Purchase and Related Transaction Documents dated August 7, 2019 (as so amended, the "2019 NPA"), among the Borrower, as issuer, certain subsidiaries of the Borrower that have granted liens to secure the obligations thereunder (the "Subsidiaries"), and FCS Advisors, LLC d/b/a Brevet Capital Advisors ("FCS"), as purchaser, pursuant to which the Borrower issued to FCS a secured promissory note in the principal amount of $5,650,000.00 (as amended, the "2019 Note"); and

(ii) an Amended and Restated Secured Note Purchase and Security Agreement, dated as of June 29, 2020, among the Borrower, the Subsidiaries, and FCS, as purchaser (as amended and supplemented from time to time, the "2020 NPA"), which, among other things, amends and restates the 2019 NPA, pursuant to which the Borrower issued to FCS certain promissory notes.

Capitalized terms used but not defined herein shall have the meanings given to them in the 2020 NPA.

This letter confirms our agreement as follows:

1. The purchase price for the 2019 Note was $5,650,000.00, of which $100,000.00 was funded by Leeds Holdings, LLC ("Holdings"). As a result, notwithstanding that FCS was the sole named purchaser and record holder of the 2019 Note, Holdings owned

$100,000.00 in principal amount thereof (the "Holdings 2019 Interest"), and FCS held the Holdings 2019 Interest as nominee for Holdings.

2. Holdings has received payment in full of the Holdings 2019 Interest, including all returns thereon due under the 2019 NPA, in the aggregate amount of $230,000.00.

3. Holdings and FCS are parties to an Independent Contractor Agreement with an effective date of August 4, 2019 (the "Consulting Agreement") pursuant to which FCS is paying the consulting fee to Holdings by assigning to Holdings ownership of $1,595,000.00 in principal amount of the Series A-2 Note issued under the 2020 NPA effective as of June 29, 2020 (the "Holdings Fee Interest"). FCS is holding and will continue to hold the Holdings Fee Interest as nominee for Holdings.

4. Holdings has acquired, effective June 29, 2020, an additional $405,000.00 in principal amount of the Series A-2 Note issued under the 2020 NPA (the "Holdings Additional 2020 Interest" and together with the Holdings Fee Interest, the "Holdings 2020 Interest"), for which (i) Holdings funded $237,944.45 of the purchase price by set off against an equivalent amount owed to it by the Borrower in respect of the Holdings 2020 Interest, for the 2% up front fee payable under the 2020 NPA and an agreed holdback of approximately five months of interest, and (ii) FCS advanced the remaining $167,055.55 purchase price to the Borrower on Holdings behalf (the "FCS Advance"). Notwithstanding that FCS is the sole named Purchaser in the 2020 NPA, (i) Holdings owns the Holdings Additional 2020 Interest, and (ii) FCS is holding and will continue to hold the Holdings Additional 2020 Interest as nominee for Holdings.

5. Promptly following execution and delivery of this letter agreement, Holdings shall repay to FCS the FCS Advance.

6. Holdings, for itself and its successors and assigns (collectively, the "Subordinated Parties"), has agreed that the Holdings 2020 Interest is and shall be subordinate, to the extent and in the manner set forth on <u>Attachment 1</u>, to the full and unconditional payment in cash of all of the other obligations owing under the 2020 NPA, the Notes issued thereunder (collectively, the "2020 Notes") and the other Transaction Documents (collectively, the "Senior Interests").

7. FCS's sole role as nominee with respect to the Holdings 2019 Interest and the Holdings 2020 Interest (collectively, the "Nominee Interests") was to deliver to Holdings, and is to deliver to Holdings, a proportionate amount, based on the outstanding amount of the applicable Nominee Interest relative to the total outstanding amount of 2019 Notes or Series A-2 Notes, as applicable, of the payments received from the Borrower or a Grantor or other Theia Loan Party in respect of the applicable note(s), subject to the subordination provisions set forth in this agreement.

8. The authority to agree to, grant and exercise (or refrain from agreeing to, granting and exercising) any amendments, consents or waivers, and otherwise to exercise (or refrain from exercising) rights and remedies with respect to the 2020 NPA and the 2020 Notes issued thereunder and the other Transaction Documents shall be exercised by or as determined

by persons or entities owning a majority in interest of the 2020 Notes or if applicable, the Series A-1 Notes or the Series A-2 Notes separately.

    9. Other than to Robert Leeds or an entity wholly owned or controlled by him and who acknowledges that it is bound by this agreement, Holdings shall not transfer any portion of the Holdings 2020 Interest without the prior consent of FCS, and must first provide evidence to FCS of the Borrower's consent to such transfer.

    10. Holdings represents and warrants to FCS that the Borrower did not issue to it at any time any promissory notes evidencing any of the Nominee Interests.

    11. None of FCS nor any of its affiliates shall have any liability to Holdings in connection with the Nominee Interests, this letter agreement or the 2019 NPA or the 2020 NPA, and Holdings will indemnify FCS and its affiliates and hold them harmless from all claims, losses, liabilities and damages (collectively, "Damages") incurred by any such indemnified person as a result of FCS holding the Nominee Interests, including a proportionate amount of any Damages incurred by virtue of being a holder of the 2019 Note and the 2020 Notes. The foregoing indemnity shall not apply to any failure by the Borrower to make payments owing under the 2020 NPA or the other Transaction Documents.

    12. FCS did not and does not undertake any fiduciary or other duties or obligations to Holdings by virtue of holding the Nominee Interests as Holdings' nominee, other than to deliver to Holdings amounts received from the Borrower or a Grantor or other Theia Loan Party in respect of the applicable Nominee Interests, subject to the terms and conditions hereof.

This letter agreement may not be amended nor any provision hereof waived or modified except by an instrument in writing signed by all parties.

Any and all actions or controversies arising out of this agreement, including, without limitation, tort and contract claims, shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to the choice of law principles thereof. The parties agree to the exclusive forum of the state and federal courts located in Manhattan, New York with regard to any dispute regarding this Agreement.

This letter contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all other agreements and understandings (whether oral or written) between the parties concerning the subject matter hereof.

The terms hereof shall inure to the benefit of and be binding on each of the parties and their respective successors and assigns (in the case of FCS, including, without limitation, a purchaser of all or substantially all of its assets, and any other direct or indirect holder or owner of the Senior Interests).

If any term or provision herein shall be found to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this agreement, but such term or provision shall be deemed modified to the extent necessary by the adjudication to render such term or provision enforceable, and the rights and obligations of the parties shall be construed and enforced

- 4 -

accordingly, preserving to the fullest extent permissible the intent and agreements of the parties set forth in this letter.

       This letter agreement may be executed in counterparts and may be delivered in pdf or other electronic form.

*[Signatures on following page]*

      Please sign and return a copy of this letter agreement to each other party hereto to confirm your agreement to the terms set forth herein.

                Very truly yours,

                FCS Advisors, LLC
                d/b/a Brevet Capital Advisors

                By: _____
                    Name:  Mark Callahan
                    Title:   Managing Director

**Acknowledged and Agreed to by:**

                Leeds Holdings, LLC

                By: _____
                    Name:  Robert Leeds
                    Title:   Authorized Signatory

**Attachment 1**
**Terms of Subordination**

1. <u>Agreement to Subordinate</u>. These subordination provisions shall be applicable irrespective of (i) anything to the contrary contained in any other document, filing or agreement related to the creation, attachment, perfection or existence of any security interest, (ii) the time, place, order or method of attachment or perfection of any security interest, (iii) the time or order of filing or recording of financing statements, deeds of trust or other documents, filed or recorded to perfect security interests, or (iv) any statutes, rules of law, or judicial interpretations to the contrary. The provisions in this agreement are for the benefit of and shall be enforceable directly by FCS (or any other holder or owner of, or agent for a holder or owner of, the Senior Interests) and their respective successors and assigns. For avoidance of doubt, these subordination provisions shall be applicable upon and following any bankruptcy or insolvency event, distribution of the assets or properties or dissolution, winding-up, liquidation or reorganization involving the Borrower or any other Theia Loan Party (whether in bankruptcy, insolvency or receivership proceedings or any other proceeding or upon an assignment for the benefit of creditors or otherwise).

2. <u>Payments</u>. Holdings, for itself and the other Subordinated Parties, hereby agrees that, notwithstanding anything provided in the 2020 NPA, any 2020 Note or the other Transaction Documents to the contrary, so long as the Senior Interests have not been unconditionally paid in full in cash, it shall not ask, demand, sue for, take or receive from the Borrower or any other person or entity, whether a direct or indirect Obligor, by set-off or any manner, payment or recovery of the whole or any part of the Holdings 2020 Interest.

3. <u>When Distributions Must be Paid Over</u>. If a payment is made in respect of the Holdings 2020 Interest to Holdings or any other Subordinated Party in contravention of these subordination terms, the Subordinated Party who receives such payment shall hold it in trust for the holders of the Senior Interests, segregated from other funds and property held by the Subordinated Party, and pay it over to FCS for the benefit of the holders of the Senior Interests.

4. <u>Exercise of Remedies</u>.

(a) Notwithstanding anything to the contrary in this agreement, the 2020 NPA, any 2020 Note or any other agreement, none of Holdings or any other Subordinated Party shall directly or indirectly, at any time when the Senior Interests have not been unconditionally paid in full in cash, (i) exercise or seek to exercise any rights or remedies with respect to any of the Holdings 2020 Interest, (ii) institute any action or proceeding with respect to such rights or remedies, (iii) contest, protest, object to or take any action to hinder any proceeding or action brought by FCS (or any other holder or owner of, or agent for a holder or owner of, the Senior Interests) or any other exercise by any of them of any rights and remedies relating to the 2020 NPA, any 2020 Note or any other Transaction Document or otherwise, (iv) object to the forbearance by any of them from bringing or pursuing any proceeding or action or any other exercise of any rights or remedies relating to the 2020 NPA or any 2020 Note, or (v) demand, accept or obtain any lien on any assets of the Borrower or any other Theia Loan Party.

(b) FCS (or any other holder or owner of, or agent for a holder or owner of, the Senior Interests), each in its sole discretion, shall have the exclusive right to object in any bankruptcy or insolvency proceeding or otherwise to any action taken by Holdings or any other Subordinated Party to the extent such action is inconsistent with the terms of this agreement, including, without limitation, the assertion by Holdings or any other Subordinated Party of any of its rights and remedies under the 2020 NPA, any 2020 Note or any other Transaction Document or otherwise.