# EXHIBIT 17

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (this "Agreement"), effective as of April 15, 2021 (the "Effective Date"), is made by and between FCS ADVISORS, LLC D/B/A BREVET CAPITAL ADVISORS and its designees with an address at 441 Ninth Avenue, 20th Floor, New York, NY 10001 (the "Firm") and LEEDS HOLDINGS, LLC and its designees with an address at 1035 Park Avenue, New York, NY 10028 (the "Consultant") (the Firm and the Consultant are each a "Party" and together, the "Parties").

1. **Prior Agreements**. This Agreement supersedes and replaces in its entirety any and all prior agreements or arrangements, whether written or oral, between the Parties, all of which are hereby deemed terminated, null and void, provided however, that this Agreement is intended to be executed by the Parties simultaneously with that certain Common Interest Agreement dated as of the Effective Date ("CIA"), and shall only be deemed effective on the condition that the fully executed CIA is exchanged by the Parties. In the event of any conflict between this Agreement and the CIA, the CIA shall control. This Agreement shall not supersede or replace the CIA or any other agreements between affiliates of the Parties the subject matter of which is unrelated to the subject matter of this Agreement, including a certain Irrevocable Power of Attorney executed by Strongbow Holdings, LLC in favor of the Firm, which is dated on or about the date of this Agreement.

2. **Services.** The Firm hereby engages the Consultant, on a non-exclusive basis, and the Consultant hereby agrees to render certain independent advisory and consulting services (the "Services"), as requested by the Firm during the Term (as defined below) and upon the terms and conditions hereinafter set forth. The Services will relate directly and indirectly to the Firm's interests in: (a) the Secured Note Purchase and Security Agreement dated as of August 7, 2019 ("SNPSA") and the other "Transaction Documents" defined here as in the SNPSA, as all of the same may be amended and or restated prior to, on or following the Effective Date, between and among the Firm, on the on hand, and Theia Group, Incorporated, a Delaware corporation, Theia Aviation, Inc., a Delaware corporation and Theia Holdings A, LLC, a Delaware limited liability company (collectively, "Theia"), on the other hand; and (b) the guaranties from John Gallagher and Erland Olsen (collectively, the "Guarantors") which form part of the Transaction Documents ("Guaranties"). The Consultant shall render the Services conscientiously and devote reasonable efforts and abilities thereto, and shall perform the Services at such times and locations as are reasonably convenient to the Consultant and the Firm. The Consultant shall observe all applicable policies and directives promulgated and provided from time to time by the Firm for independent contractors. All capitalized terms not defined here shall have the meanings given in the Transaction Documents.

3. **Term of Agreement**. The term of this Agreement shall commence as of the Effective Date and shall continue until September 15, 2021 (the "Term"), unless either Party terminates this Agreement sooner upon five (5) business days' written notice to the other Party. The Parties also may mutually agree to extend the duration of the Term, provided such agreement is confirmed in writing.

4. **Fees**. The Consultant shall be paid a flat fee of $30,000 per month during the Term for the Services (the "Monthly Fees"), subject to the terms and conditions in this Agreement. In addition, the Consultant may be paid, at the sole discretion of the Firm, a bonus in such amount as to be determined by the Firm (the "Bonus Fee") (the Monthly Fees and the Bonus Fee are collectively, the "Fees"). The Fees, and the obligation of the Firm to pay the Fees, shall in all respects be subordinate and junior in right of payment, lien and enforcement to the prior payment and enforcement in full by Theia of all of the Obligations and by the Guarantors of the Guaranteed Obligations. The Monthly Fees shall become due and payable to Consultant only upon the following conditions precedent: 1) the Firm must first have received repayment in full of the Obligations, including the Guaranteed Obligations, from the Loan Parties, regardless

1

of whether the Term of this Agreement has (at such time) expired or been terminated, and 2) provided that Theia has first reimbursed the Firm in full for all of the Monthly Fees. If the conditions in the foregoing sentence are not satisfied, the Firm shall have no obligation to pay the Fees. In addition, the Firm shall reimburse the Consultant for all reasonable out-of-pocket expenses incurred during the Term, including but not limited to any travel, or other reasonable expenses incurred in performing the Services under this Agreement ("Expenses"). The Consultant shall send the Firm a monthly invoice for the Fees and Expenses, provided that the payment of the Fees shall be payable only upon the payment of the Obligations including the Guaranteed Obligations, as stated above. The Firm shall pay the Expenses timely.

5. **Independent Contractor**. It is expressly agreed that the Consultant is acting solely as an independent contractor in providing the Services hereunder. Neither Party to this Agreement has any authority to bind or commit the other without that Party's prior written consent, nor will either Party's acts or omissions be deemed the acts or omissions of the other. The Firm shall carry no workers' compensation insurance or any health or accident insurance to cover the Consultant. The Firm shall not pay any contributions to Social Security, unemployment insurance, federal, or state withholding taxes, or provide any other contributions or benefits that might be expected in an employer-employee relationship and the Consultant expressly waives any right to such participation, contribution, benefit or coverage.

6. **Confidentiality**. While performing the Services, the Consultant may develop or acquire knowledge in his work or from directors, officers, employees, agents, lawyers, or other consultants of the Firm or its affiliates or otherwise of Confidential Information relating to the Firm, its business, potential business or that of its clients and investors, including Theia. "Confidential Information" includes all trade secrets, know-how, show- how, theories, technical, operating, financial, and other business information, whether or not reduced to writing or other medium and whether or not marked or labeled confidential, proprietary or the like, specifically including, but not limited to, information regarding investment strategies, actual or prospective client and investor lists, source codes, software programs, computer systems, algorithms, formulae, concepts, creations, costs, plans, materials, enhancements, research, specifications, works of authorship, techniques, documentation, models and systems, sales and pricing techniques, designs, inventions, discoveries, products, improvements, modifications, methodology, processes, concepts, records, files, memoranda, reports, plans, proposals, price lists, customer, client, and supplier lists and information, product development and project procedures. Confidential Information does not include (a) general skills, experience, or information that is generally available to the public, other than information that has become generally available as a result of the Consultant's direct or indirect act or omission, or (b) information that is required to be disclosed pursuant to any applicable law, regulation, judicial or administrative order or decree, or request by any other regulatory organization having authority pursuant to law; provided, however, that the Consultant shall have first given prompt written notice to the Firm to afford it a reasonable opportunity to obtain a protective order requiring that the Confidential Information not be disclosed and, in the event such protective order is not obtained, the Consultant shall disclose only that portion of the Confidential Information that the Consultant is legally obligated to disclose and otherwise maintain the confidentiality of such portion.

With respect to Confidential Information of the Firm and its clients and investors:

a. The Consultant will use Confidential Information only in the performance of the Services for the Firm. The Consultant will not use Confidential Information at any time for its own benefit, for the benefit of any other individual or entity, or in any manner adverse to the interests of the Firm or its clients or investors;

b. The Consultant will not disclose Confidential Information at any time (during or after the Consultant's engagement by Firm) except to authorized Firm personnel and to the

    Consultant's own legal counsel, unless the Firm consents in advance in writing or unless the Confidential Information indisputably becomes of public knowledge or enters the public domain (other than through the Consultant's direct or indirect act or omission);

c. The Consultant will safeguard the Confidential Information by all reasonable steps and abide by all policies and procedures of the Firm in effect from time to time regarding storage, copying, destruction, and handling of documents;

d. In the course of performing the Services, the Consultant may learn, or have reason to suspect, that it has been provided with Confidential Information or material nonpublic information. If so, the Consultant agrees to immediately contact the Firm's Chief Compliance Officer prior to either communicating such material non-public information to anyone else or providing the Firm with investment analysis with respect to such information;

e. During the Term, the Consultant may become aware of positions that the Firm's advisory clients may own, may be considering owning, short selling, liquidating or covering. Inclusive of the Services, with respect to any publicly held company, the Consultant agrees not to buy, sell short or otherwise trade any security or derivative that is directly related to that company or any other company that the Firm may be analyzing until at least sixty (60) days after the termination of this Agreement;

f. The Consultant acknowledges that the Firm may be required to sign non-disclosure or confidentiality agreements with clients, prospective clients, and other third parties in which the Firm agrees that its employees and agents will not disclose Confidential Information of such clients, prospective clients, or other third parties. By executing this Agreement, the Consultant acknowledges and agrees that the Firm may rely, and will rely, on this Agreement for purposes of entering into such other agreements. Further, the Consultant will execute and abide by all confidentiality agreements reasonably requested by the Firm's clients, prospective clients, investors, and other third parties;

g. The Consultant will return all materials containing and/or relating to Confidential Information, together with all other property of the Firm and its clients to the Firm when the Consultant's consulting relationship with the Firm terminates or otherwise on demand and, at that time the Consultant will certify to the Firm, in writing, that the Consultant has complied with this Agreement. The Consultant will not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, databases, diskettes, or other documents or electronically stored information of any kind relating in any way to the business, potential business or affairs of the Firm and its clients and investors; and

h. Nothing herein shall be construed as limiting the Consultant's: (i) right to file a charge or complaint with a federal, state or local governmental agency or commission ("Government Agency"), including, but not limited to, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission; (ii) ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to Firm; or (iii) right to receive an award for information provided to any Government Agency.

7. **Intellectual Property Rights**. To the fullest extent permissible under applicable law, all material, documentation, deliverables, and other tangible expressions of information, including but not limited to, software programs and software documentation, designs, technical data, formulae, and processes, whether in final production or draft, which result from any work performed by the Consultant in providing the Services under this Agreement, or any extension or renewal thereof, shall be deemed to be works for hire and all related rights, title, and interest, including any copyright, patent rights, and all other intellectual property rights, shall belong exclusively to the Firm. Without limiting the foregoing, the Firm shall have all right, title, and interest in the Consultant's work product created under this agreement, including the exclusive right to obtain and hold in its own name copyrights, registrations, and other appropriate statutory protections and the Consultant shall not retain any rights of any kind therein. The Consultant agrees to cooperate with the Firm (at the Firm's expense) to obtain any further assignments, copyrights, patents, and such other statutory protections as may be available under law. To the extent any work performed by the Consultant under this Agreement, or any extension or renewal thereof, is construed not to be a "work for hire," all rights under the copyright law in the Consultant's work product are hereby irrevocably assigned and transferred by the Consultant to the Firm and the Consultant agrees to execute all documents requested by the Firm necessary or advisable to evidence such assignment and transfer.

8. **Non-Competition/No-Raiding/Non-Solicitation**. In consideration of the Fees and reimbursement of reasonable out of pocket Expenses and the other promises of the Firm in this Agreement, during the Term of this Agreement and for a period of six (6) months following the end of such Term, Consultant will not (a) recruit or hire or induce any employee of the Firm to leave the Firm and join or work for an entity with which Consultant is associated; and/or (b) solicit the trade, business, of any of the Firm's clients, borrowers, counterparties, partners, co-investors or investors with which Consultant had direct contact or about which it acquired knowledge while providing Services to the Firm, unless consented to in writing by the Firm before Consultant initiates any such solicitation. Consultant agrees that these restrictive covenants are reasonable and that the consideration therefor is valid, received, good, sufficient, and adequate.

9. **Obligations to Others**. The Consultant represents and warrants that the Consultant does not have any agreement with, or duty to, any previous employer or other person or entity that would prevent, limit, or inhibit the Consultant from performing the Services under this Agreement. The Consultant agrees not to use any proprietary or confidential information belonging to any other person or entity in performing the Services or disclose any proprietary or confidential information belonging to any other person or entity to the Firm or its clients. Notwithstanding the foregoing, the Firm expressly acknowledges that the Consultant has previously worked in an advisory role to Theia and its affiliates, including the Guarantors. Consultant represents and warrants that nothing, including any agreements or obligations that it or its principals may have had at any time to Theia prohibit or limit the ability of Consultant from fully performing the Services.

10. **Non-Disparagement**. Each Party agrees that during the Term and all times thereafter, neither Party shall disparage the reputation of the other Party, its products or services, or any of its officers, directors, employees, or representatives.

11. **Waiver**. The failure of either of the Parties to at any time enforce any of the provisions of this Agreement shall not be deemed or construed to be a waiver of any such provision, nor to in any way affect the validity of this Agreement or any provision hereof or the right of either of the Parties to thereafter enforce each and every provision of this Agreement. No waiver of any breach of any of the provisions of this Agreement shall be effective unless set forth in a written instrument executed by the Party against whom or which enforcement of such waiver is sought; and no waiver of any such breach shall be construed or deemed to be a waiver of any other or subsequent breach.

12. **Capacity of Parties**.  Each Party hereby represents and warrants to the other Party that: (a) it has full power, authority and capacity to execute and deliver this Agreement, and to perform its obligations hereunder, (b) such execution, delivery and performance will not (and with the giving of notice or lapse of time or both would not) result in the breach of any agreements or other obligations to which it is a Party or by which it is otherwise bound and (c) this Agreement is a valid and binding obligation, enforceable against such Party in accordance with its terms.

13. **Mutual Release of All Claims**.  For and in consideration of mutual benefit conferred and received by the Parties hereto, and for and in consideration of other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, each of the Parties, including any of the Parties' owners, principals, trustees, trustors, beneficiaries, representatives, agents, assignees, attorneys, heirs, relatives, lien holders, beneficiaries, predecessors, successors, and any other person or entity acting by or through them, hereby RELEASES AND FOREVER DISCHARGES the other Party, including such Party's representatives, heirs, predecessors, successors, employees, agents, attorneys, assignees, affiliates, insurers, reinsurers, and employers (collectively "Released Parties"), from any and all claims, complaints, grievances, and demands of any and every kind, name, nature or description, and from any and all damages, liens, suits, actions or causes of action, either administrative, at law or in equity, which they now have or in the future may have, whether based on theories of tort, contract, negligence, gross negligence, intentional conduct, reckless conduct, premises liability, statutory violations, statutory penalties, economic damages, non-economic damages, emotional distress, financial loss of any kind or nature whatsoever, pre-judgment interest, or any other theory of liability, provided however, the provisions of this Section relate solely to events occurring prior to the Effective Date, which events do not constitute or involve Misconduct (as defined below) by the Released Parties.

14. **Indemnification.**

   a. As additional consideration for Consultant being willing to provide the Services, the Firm agrees to indemnify, hold harmless and exonerate Consultant against all Indemnification Expenses actually and reasonably incurred or suffered by Consultant, or on Consultant's behalf, in connection with any Assertion against Consultant which arises out of, or is related directly or indirectly to (i) Consultant's prior work for Theia and its affiliates, and (ii) the Services, provided that Consultant acted: (1) in good faith; (2) in a manner Consultant reasonably believed to be in and not opposed to the best interests of the Firm; and (3) not found by a court of competent jurisdiction to be a result of Consultant's Misconduct. The Firm shall pay the Consultant's Indemnification Expenses in a timely manner.

   b. To the fullest extent permitted by applicable law, Consultant shall indemnify, hold harmless and exonerate the Firm against all Expenses actually and reasonably incurred by the Firm or on the Firm's behalf in connection with any Assertion against the Firm arising out of or relating to directly or indirectly to the Consultant's Misconduct in rendering the Services.

   c. To the fullest extent permitted by applicable law, the Firm shall indemnify, hold harmless and exonerate the Consultant against all Expenses actually and reasonably incurred by the Consultant or on the Consultant's behalf in connection with any Assertion against the Consultant arising out of or relating to directly or indirectly to the Firm's Misconduct in relation to Theia, the Guarantors and the transaction evidenced by the Transaction Documents (including the SNPSA and the Guaranties).

   d. The following terms have the following meanings:

- "<u>Misconduct</u>" means act(s) or omission(s) which constitute one or more of the following if proven by a court of competent jurisdiction and non-appealable: (i) gross negligence; (ii) fraud; (iii) an intentional tort; (iv) recklessness; (v) willful or wanton misconduct; (vi) habitual neglect or continued incapacity to perform Consultant's Services; (vii) dishonesty; (viii) fraud; (ix) misrepresentation; (x) moral turpitude; (xi) a crime; (xii) personal dishonesty materially injurious to the Firm; and/or (vxiii) willful breach of this Agreement.

- "<u>Assertion</u>" means demand, claim, cause of action, liability, or threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether of a civil, criminal, administrative or investigative or related nature (including without limitation a request for deposition or other testimony or documents).

- "<u>Indemnification Expenses</u>" shall include all direct costs, fees and expenses of any type or nature whatsoever in responding to or defending an Assertion, including without limitation all reasonable attorneys' fees and costs, judgments, liabilities, and amounts paid in settlement (including interest).

- "<u>Indemnified Party</u>" means the Party obtaining the indemnification under this Section 14.

- "<u>Indemnifying Party</u>" means the Party providing the indemnification under this Section 14.

e.  Indemnification under this Section 14 shall follow the following rules:

   i. The Indemnified Party shall give the Indemnifying Party reasonably prompt written notice of the making of an Assertion, but in any event not later than twenty (20) days after receipt of such notice. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party is materially and adversely prejudiced by reason of such failure. Such notice by the Indemnified Party shall describe the Assertion in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Expenses that have been or may be sustained by the Indemnified Party.

   ii. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Assertion at the Indemnifying Party's expense and by the Indemnifying Party's own counsel reasonably acceptable to the Indemnified Party, and the Indemnified Party shall cooperate in good faith in such defense. The Indemnifying Party shall not be entitled to assume control of such defense (unless otherwise agreed to in writing by the Indemnified Party) if (a) the Assertion relates to or arises in connection with any criminal or quasi-criminal action against the Indemnified Party; (b) the Assertion seeks an injunction or equitable relief against the Indemnified Party; or (c) upon petition by the Indemnified Party, the appropriate court rules that the Indemnifying Party failed or is failing to prosecute or defend such Assertion. In the event that the Indemnifying Party assumes the defense of any

     Assertion, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Assertion in the name and on behalf of the Indemnified Party. In the event the Parties cannot agree, or no longer agree, that one counsel cannot by reason of conflict or any other reason represent both Indemnified Party and Indemnifying Party, Indemnified Party shall have the right to participate in the defense of the Assertion with counsel selected by Indemnified Party with the consent of Indemnifying Party and subject to the Indemnifying Party's right to control the defense thereof and the reasonable fees and disbursements of such counsel shall be at the expense of the Indemnifying Party.

   iii. Consultant and the Firm shall cooperate with each other in all reasonable respects in connection with the defense of any Assertion.

   iv. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Assertion without the prior written consent of the Indemnified Party, except as provided in this Section 14. If a firm offer is made to settle an Assertion without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Assertion and does not contain an admission of liability or provide for any injunctive relief and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within five (5) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Assertion, and in such event, the maximum liability of the Indemnifying Party as to such Assertion shall not exceed the amount of such settlement offer. If the Indemnified Party has assumed the defense pursuant to Section 14, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).

  15. **Assignment**. The Consultant shall not voluntarily or by operation of law assign or delegate the Consultant's obligations under this Agreement without the prior written consent of the Firm. Any attempted assignment or transfer by the Consultant of its obligations without such consent shall be wholly void.

  16. **Notice**. Any notice required or permitted to be given hereunder shall be sufficient only if in writing and if sent (i) by certified or registered mail (return receipt requested) to the address for such Party as is set forth below or (ii) by email to the address for such Party as is set forth below.

   a. Addresses for notices or communications to the Firm:

    FCS Advisors, LLC
    441 Ninth Avenue, 20th Floor
    New York, NY 10001
    Email: mark@brevetcapital.com
    with a copy to: legal@brevetcapital.com

   b. Address for notices or communications to the Consultant:

>Leeds Holdings, LLC, c/o Robert Leeds
>1035 Park Avenue
>New York, NY 10001
>Email: rleeds@silarcapital.com
>with a copy to: bberlandi@bnrllp.com

17. **Governing Law; Jurisdiction**. Any and all actions or controversies arising out of this Agreement, including, without limitation, tort and contract claims, shall be construed and enforced in accordance with the internal laws of the State of New York, without regard to the choice of law principles thereof. The Parties agree to the exclusive forum of the state and federal courts located in Manhattan, New York with regard to any dispute regarding this Agreement.

18. **Survival**. The respective rights and obligations of the Parties under this Agreement shall survive any termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations.

19. **Entire Agreement**. Except as stated in Section 1, this Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all other agreements and understandings (whether oral or written) between the Parties concerning the subject matter hereof. This Agreement may be modified by the Parties hereto only by a written supplemental agreement executed by both Parties.

20. **Binding Agreement**. This Agreement shall inure to the benefit of each Party and its successors and assigns (including, without limitation, the purchaser of all or substantially all of its assets) and shall be binding upon each Party and its successors and assigns.

21. **Severability**. If any term or provision of this Agreement shall be found to be illegal or otherwise unenforceable, the same shall not invalidate the whole of this Agreement, but such term or provision shall be deemed modified to the extent necessary by the adjudication to render such term or provision enforceable, and the rights and obligations of the Parties shall be construed and enforced accordingly, preserving to the fullest extent permissible the intent and agreements of the Parties set forth in this Agreement.

22. **Representation by Counsel**. The Parties each represent, warrant and agree that they have obtained the advice of independent counsel of their own choice, or have had an opportunity to consult with counsel and have voluntarily elected not to do so, and that the provisions of this Agreement are deemed to be an arm's length transaction.

23. **Counterparts**. The Parties may execute this Agreement, via original or electronic signature, in counterparts which shall constitute one agreement, and each counterpart shall be deemed an original instrument against any Party who signed it.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first above written.

FIRM:

FCS ADVISORS, LLC

By: _____
    Mark Callahan (May 11, 2021 12:41 EDT)
    Name: Mark Callahan
    Title: Managing Director

CONSULTANT:

LEEDS HOLDINGS, LLC

By: _____
    Name:    Robert Leeds
    Title:    Authorized Signatory

9

# LEEDS Brevet Consulting Agreement (FINAL) Signed May 6 2021 15.13.22

Final Audit Report                                                                 2021-05-11

| | |
|---|---|
| Created: | 2021-05-11 |
| By: | Lucas Lieberman (llieberman@brevetcapital.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAEUAUaR5PuDqJF2Y36qLvbWD102OielL0 |

## "LEEDS Brevet Consulting Agreement (FINAL) Signed May 6 2021 15.13.22" History

- Document digitally presigned by DocuSign\, Inc. (enterprisesupport@docusign.com)
  2021-05-06 - 3:45:03 PM GMT- IP address: 74.64.105.220

- Document created by Lucas Lieberman (llieberman@brevetcapital.com)
  2021-05-11 - 4:34:52 PM GMT- IP address: 74.64.105.220

- Document emailed to Mark Callahan (mark@brevetcapital.com) for signature
  2021-05-11 - 4:35:47 PM GMT

- Email viewed by Mark Callahan (mark@brevetcapital.com)
  2021-05-11 - 4:40:42 PM GMT- IP address: 100.8.111.210

- Document e-signed by Mark Callahan (mark@brevetcapital.com)
  Signature Date: 2021-05-11 - 4:41:52 PM GMT - Time Source: server- IP address: 100.8.111.210

- Agreement completed.
  2021-05-11 - 4:41:52 PM GMT

Adobe Sign