## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, LLC,

                    Plaintiff,

           - against -

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN";
THEIA AVIATION, LLC; and
THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS",

                  Defendants.

---

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN";
THEIA AVIATION, LLC; and
THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS",

           Counterclaim Plaintiffs,

           - against -

FCS ADVISORS, LLC; BREVET CAPITAL
MANAGEMENT, LLC; MARK CALLAHAN;
ROBERT LEEDS; LEEDS HOLDINGS, LLC;
and STRONGBOW HOLDINGS, LLC,

           Counterclaim Defendants.

1:21-cv-6995-PKC

**JURY TRIAL DEMANDED**

**ANSWER, AFFIRMATIVE
DEFENSES, AND
COUNTERCLAIMS**

1

Defendants Theia Group, Inc., Theia Aviation, LLC, and Theia Holdings A, Inc. (collectively, "Theia," the "Company" or "Defendants"), by and through its counsel, hereby answer Plaintiff's Complaint, and set forth their affirmative defenses as follows.  Except as otherwise affirmatively stated below, Theia denies all allegations in the Complaint.

## INTRODUCTION

1.      To the extent the allegations in paragraph 1 state a legal conclusion or otherwise summarize the actions or intent of FCS Advisors, LLC ("FCS"), no responsive pleading is required.  To the extent a responsive pleading is required, Theia denies the allegations in paragraph 1.

2.      Theia denies the allegation contained in the first sentence of paragraph 2 and avers that the aviation component of its business has, since 2020, been revenue producing.   To the extent the allegations in paragraph 2 state a legal conclusion or purport to characterize FCS's valuation of the FCC licenses, no responsive pleading is required.  To the extent the paragraph purports to summarize the terms of the FCC licenses, Theia refers the Court to the FCC licenses for a complete and accurate description of their contents.  To the extent a responsive pleading is required, Theia denies the allegations in paragraph 2.

3.      Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent the allegations in paragraph 3 state a legal conclusion or purport to characterize the intent of the SPNSA, no responsive pleading is required.

4.      Theia denies the allegations contained in the first sentence of paragraph 4.  Theia further respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  The second and third sentences of paragraph 4 contain legal conclusions, as to which

no responsive pleading is required. To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 4.

5.      Theia respectfully refers the Court to the Third Amendment for a complete and accurate description of its contents.  To the extent the allegations contained in paragraph 5 state a legal conclusion, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 5.

6.      Theia denies the allegations contained in paragraph 6.

7.      Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent the allegations contained in paragraph 7 state a legal conclusion or purport to summarize the intended legal strategy of FCS, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 7.

## JURISDICTION AND VENUE

8.      Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent the allegations contained in paragraph 8 state a legal conclusion, no responsive pleading is required.

9.      To the extent the allegations contained in paragraph 9 state a legal conclusion, no responsive pleading is required.

10.      Theia is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 10.

11.      To the extent the allegations contained in paragraph 11 state a legal conclusion, no responsive pleading is required.

12.     Theia admits the allegations contained in the first sentence of paragraph 12. To the extent the allegations contained in the second sentence of paragraph 12 state a legal conclusion, no responsive pleading is required.

13.     To the extent the allegations contained in paragraph 13 purport to describe the nature of the action and remedies sought, no responsive pleading is required.  To the extent a responsive pleading is required, Theia denies the allegations contained in paragraph 13.

## FACTUAL BACKGROUND

### The Parties

14.     Theia is without knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 and on that basis denies the same.

15.     Theia was founded in 2015 by Erlend Olson and Joseph Fargnoli.  Theia admits the statement in the second sentence of paragraph 15.

### Theia's Business Plan

16.     Theia admits to the statement contained in the first sentence of paragraph 16. Theia presently owns two operational aircraft. One is not presently in use and there is a lease in place for the second.

17.     Theia admits that Olson and Fargnoli had experience with surface imaging via aircraft. Theia was founded for the purpose of deploying a remote-sensing constellation of satellites in space that could capture the same resolution and quality of data captured from aircraft for the purpose of analyzing the physical world in real time.

18.     Theia refers the Court to the FCC licenses and the associated application for their complete and accurate contents.

19.     Theia denies the allegation contained in the first sentence of paragraph 19 and avers that the aviation component of its business has, since 2020, been revenue producing.  As regards the second sentence of paragraph 19, Theia further avers that the design of the satellites involved in its business plan is substantially complete.

**Theia's Secured Financing from FCS**

20.     To the extent the first sentence of paragraph 20 purports to characterize start-up businesses at large, no response is required.  Theia otherwise refers the Court to the operative loan documents for their complete and accurate contents.

21.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent the allegations contained in paragraph 21 state a legal conclusion, no responsive pleading is required.

22.     Theia respectfully refers the Court to the SPNSA and the two notes referenced in paragraph 22 for a complete and accurate description of their contents.  To the extent the second sentence of paragraph 22 purports to summarize the views of FCS either at the time of the loan or now, Theia is without knowledge or information sufficient to form a belief as to the truth of the allegation.  Theia further avers that in summer of the 2018 it was introduced to Robert Leeds who acted as Brevet's agent and, later that year, touted his abilities to raise capital from sources other than Brevet.  Despite Theia's payments to Leeds, he produced no viable sources of capital, let alone actual lenders.

23.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent the allegations contained in paragraph 23 state a legal conclusion, no responsive pleading is required.

24.     Theia is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 24.  Theia denies the allegations contained in the second sentence of paragraph 24.

25.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent that the allegations contained in the first sentence of paragraph 25 state a legal conclusion, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 25.

26.     Theia respectfully refers the Court to the documents referenced in paragraph 26 for their complete and accurate contents.  To the extent the allegations in paragraph 26 and the accompanying footnote purport to state a legal conclusion or summarize the legal strategy or intent of FCS, no responsive pleading is required.

**Theia's Reporting Obligations and Covenant Against New Debt**

27.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.  To the extent that the allegations contained in paragraph 27 state a legal conclusion, no responsive pleading is required.

28.     Theia respectfully refers the Court to the SNPSA for its complete and accurate contents.  To the extent that the allegations contained in paragraph 28 state a legal conclusion, no responsive pleading is required.

**Theia's Broken Promises and the Third Amendment**

29.     Theia avers that it communicated to FCS that it expected to obtain certain significant pre-paid revenue commitments, funding of which was dependent on achieving total commitments of approximately $14 billion.

30.     In the fall of 2019, Theia communicated to FCS that it had obtained certain pre-paid commitments from a number of counterparties, including sovereign nations, funding of which was dependent on achieving total commitments of approximately $14 billion.

31.     In the spring of 2020, Theia communicated to FCS that it had obtained pre-funding commitments from a number of counterparties, including sovereign nations, funding of which was dependent on achieving total commitments of approximately $14 billion.  As stated above, Theia's aircraft business was revenue producing in 2020 and remains revenue producing. Theia denies the allegations contained in the third sentence of paragraph 31.

32.     To the extent that the allegations contained in paragraph 32 purport to summarize the state of mind of FCS or state a legal conclusion, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 32.

33.     Theia respectfully refers the Court to the referenced documents for their accurate and complete contents and otherwise denies the allegations contained in the first and second sentences of paragraph 33.  To the extent that the allegations contained in the third and fourth sentences of paragraph 33 state a legal conclusion, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 33.

34.     Theia respectfully refers the Court to the Third Amendment for a complete and accurate description of its contents.  To the extent that the allegations contained in the first, second, and third sentences of paragraph 34 state a legal conclusion, no responsive pleading is required.  To the extent a further responsive pleading is required, Theia denies the allegations contained in paragraph 34.

35.     To the extent FCS purports to characterize its rationale in entering into the referenced documents, no responsive pleading is required.  Theia otherwise respectfully refers the Court to the SNPSA and the Third Amendment for a complete and accurate description of their contents.

**Theia's Defaults**

36.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of its contents.

37.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents.  To the extent paragraph 37 purports to state legal conclusions, no responsive pleading is required.

38.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents.  To the extent paragraph 38 purports to state legal conclusions, no responsive pleading is required.  As reflected in the accompanying counterclaims, Theia rejects FCS's position on amounts presently due and payable.

39.     To the extent paragraph 29 purports to state legal conclusions, no responsive pleading is required.

40.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents.  In 2020, Theia developed a plan to finance its operations based on a new venture referred to as Internet-in-Space.  Theia executed an agreement with Barclays to act as Theia's exclusive placement agent in connection with its sale of at least $300 million of its debt securities.  Theia notified Brevet of its liquidity plan and informed Brevet of its progress repeatedly throughout

January and February 2021.  However, Brevet neither responded to Theia's outreach nor did it engage with Theia and Barclays to help secure this liquidity.

41.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents. Theia interviewed multiple candidates for the CRO position in January and February 2021, and informed Brevet of those efforts.  Theia ultimately put forward five separate candidates for the position.  Brevet approved two of these candidates, both of whom ultimately declined the position due to conflicts outside Theia's control.  Theia then approved three additional candidates in February 2021, none of whom were approved by Brevet.  As a result, no CRO was selected.

42.     Beyond the retention of Barclays (summarized above), Theia retained three additional financial advisors to assist it in charting a path forward:  GH Partners, Alix Partners, and Lazard Asset Management.  GH Partners was retained as a Selected Advisor to advise Theia on the monetization strategy of its assets, including the FCC licenses.  Alix Partners was retained to review and analyze Theia's financial statements position the company for capital raising. Lazard Asset Management was retained to assist with a workout and restructuring plan.  Theia thus denies the allegations in paragraph 42 of the complaint.

43.     Theia has not yet completed certified, audited financial records for fiscal year 2020. Theia provided FCS with unaudited balance sheets for the periods of Quarter 4 2020, November 2020, and January 2021 during the month of September. Theia provided FCS with a liquidity plan and budget for Cypherian (the Internet in Space Business) on March 8, 2021.

44.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents.

Theia admits that it made no payments to FCS that were specifically denominated as administrative fees.

45.     Theia respectfully refers the Court to the SNPSA and other loan documents (including the Third Amendment) for a complete and accurate description of their contents. Through its agent, Robert Leeds, Brevet was notified of and consented to the Aithre transaction.

46.     Theia respectfully refers the Court to the Notice for a complete and accurate description of its contents.  To the extent paragraph 46 purports to summarize the legal position taken by FCS or purports state a legal conclusion, no responsive pleading is required.

47.     Theia respectfully refers the Court to the Notice for a complete and accurate description of its contents.  To the extent paragraph 47 purports to summarize the legal position taken by FCS or purports to state a legal conclusion, no responsive pleading is required.

48.     To the extent paragraph 47 purports to state a legal conclusion no responsive pleading is required.  For the avoidance of doubt, Theia does not agree that it owes FCS the amounts claimed by FCS.

**Additional Troubling Developments**

49.     As of June 25 2021, Theia began to miss payroll for those employees who are paid on a monthly basis.  Theia has continued to stay current on its payment obligations to employees paid on a bi-weekly basis.

50.     Theia respectfully refers the Court to the publicly-filed documents in the case referred to in paragraph 50, which was settled prior to the commencement of this action.  To the extent that the allegations contained in paragraph 50 state a legal conclusion, no responsive pleading is required.

51.     Theia respectfully refers the Court to the documents referred to in the first sentence of paragraph 51 for a complete and accurate of their contents.  Theia otherwise admits the allegations contained in paragraph 51.

**The Urgent Need for a Course Correction**

52.     To the extent paragraph 52 purports to summarize the state of mind of FCS, Theia lacks knowledge or information sufficient to form a belief as to the accuracy of the allegations made.  To the extent paragraph 52 purports to state legal conclusions, no responsive pleading is required.  To the extent paragraph 52 contains any factual allegations requiring a response from Theia, they are denied.

53.     To the extent that the allegations contained in paragraph 53 state a legal conclusion, no responsive pleading is required.  To the extent a responsive pleading is required, Theia denies the allegations contained in paragraph 53 and affirmatively avers that Brevet is actively hindering Theia's ability to operate its business, including for the benefit of Brevet.

54.     Theia denies the allegations contained in paragraph 54.

55.     To the extent that the allegations contained in the first sentence of paragraph 55 state a legal conclusion, no responsive pleading is required.  Theia respectfully refers the Court to the FCC guidance and directives referred to (directly or indirectly) in the second, third, and fourth sentences of paragraph 55 for a complete and accurate description of their contents.  To the extent paragraph 55 purports to summarize the needs of an as yet unidentified third-party buyer, Theia lacks knowledge or information sufficient to form a belief as to the accuracy of those statements or such future events.

56.     Theia respectfully refers the Court to the SNPSA for a complete and accurate description of their contents.  To the extent that the allegations contained in paragraph 56 state a

legal conclusion, no responsive pleading is required.  To the extent a responsive pleading is required, Theia denies the allegations contained in paragraph 56.

## COUNT I
## Breach of Contract

57.     Theia hereby incorporates by reference its responses to all above paragraphs, as if fully set forth herein.

58.     To the extent that the allegations contained in paragraph 58 state a legal conclusion, no responsive pleading is required.

59.     To the extent that the allegations contained in paragraph 59 state a legal conclusion, no responsive pleading is required. Theia otherwise denies the allegations of this paragraph.

60.     To the extent that the allegations contained in paragraph 60 state a legal conclusion, no responsive pleading is required.  Theia otherwise denies the allegations of this paragraph.

## COUNT II
## Appointment of a Temporary Receiver

61.     Theia hereby incorporates by reference its responses to all above paragraphs, as if fully set forth herein.

62.     Theia respectfully refers the Court to the cited Federal Rule of Civil Procedure and case law for their accurate and complete contents, and to Theia's brief and submissions in this matter regarding the basis of Theia's opposition to Brevet's request for the appointment of a temporary receiver.  Theia denies that Brevet is entitled to the relief it seeks.

63.     Theia respectfully refers the Court to the cited provision of the New York CPLR for its accurate and complete contents, and to Theia's brief and submissions in this matter

regarding the basis of Theia's opposition to Brevet's request for the appointment of a temporary receiver.  Theia denies that Brevet is entitled to the relief it seeks.

64.     Theia respectfully refers the Court to the cited caselaw for their accurate and complete contents, and to Theia's brief and submissions in this matter regarding the basis of Theia's opposition to Brevet's request for the appointment of a temporary receiver.  Theia denies that Brevet is entitled to the relief it seeks.

65.     Theia denies that Brevet is entitled to the relief it seeks.

## RESPONSE TO PRAYER FOR RELIEF

Theia denies that Plaintiff is entitled to the judgment, relief, and/or amounts described in the Prayer for Relief that follows paragraph 65.  Theia denies any and all remaining allegations in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

Theia asserts the following defenses, without assuming the burden of proof on such defenses that would otherwise rest with Plaintiff.  Theia reserves the right to assert other defenses and claims (including, but not limited to, cross-claims and counterclaims) not asserted herein if and when they become appropriate and/or available.  Theia incorporates herein all of the factual averments set forth in its Answer.

## FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

Plaintiff cannot meet its burden of proof with respect to any of the elements of any of its causes of action.

13

### THIRD DEFENSE

Plaintiff has failed to plead their claims against Theia with the requisite particularity, as required by the Federal Rules of Civil Procedure.

### FOURTH DEFENSE

Theia is not liable to Plaintiff because it has not breached any alleged contractual or legal duty owed to Plaintiff, and at all relevant times Theia complied with all applicable contractual obligations owed to Plaintiff.

### FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because the contract upon which they are based does not entitle them to their claims.

### SIXTH DEFENSE

Plaintiff cannot recover for breach of contract because Plaintiff has not suffered any recoverable damages.

### SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's inequitable conduct and unclean hands.

### EIGHTH DEFENSE

Plaintiff's claims are barred by Plaintiff's own breach(es) of the parties' contracts.

### NINTH DEFENSE

Plaintiff's claims are barred, in whole or part, by Plaintiff's own acts, omissions, or fault.

### TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff would be unjustly enriched if it was permitted to obtain any recovery in this action.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by operation of the doctrines of waiver, laches, estoppel, and/or acquiescence.

## TWELFTH DEFENSE

Plaintiff's claims are barred for lack of causation.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate their alleged damages.  Any potential damages award would be limited by the legal duty to mitigate any alleged damages.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because other parties not named in the Complaint may be indispensable parties to this action.

## FIFTEENTH DEFENSE

Plaintiff's claims are barred, either in whole or in part, by operation of the applicable statute(s) of limitation and/or repose.

## SIXTEENTH DEFENSE

To the extent Theia is found liable for any of Plaintiff's claims, Theia is entitled to contribution from other persons whose acts or omissions contributed to the occurrence of the alleged injury and/or loss.

## SEVENTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of release or accord and satisfaction.

## EIGHTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification.

## NINETEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of law of the case, res judicata, and collateral estoppel.

## TWENTIETH DEFENSE

For the reasons and on the bases set forth in Theia's counterclaims, Section 7 of the Third Amendment to the SNPSA is invalid and unenforceable.

## PRESERVATION OF DEFENSES

Theia has not knowingly or intentionally waived any applicable affirmative defenses and specifically reserves the right to assert other affirmative defenses that it may have, or which may be revealed by discovery or further investigation in this matter, as this action proceeds.

*       *       *

## COUNTERCLAIMS

Defendants and Counterclaim Plaintiffs Theia Group, Inc., d/b/a "Thorian Group" and/or "Cypherian", Theia Aviation LLC, and Theia Holdings A, Inc., d/b/a "Thorian Holdings" (collectively "Theia," "the Company," or "Defendants") for its counterclaims against Plaintiff FCS Advisors, LLC, Counterclaim Defendant Brevet Capital Management, LLC (together with FCS Advisors, LLC, "Brevet"), Counterclaim Defendant Mark Callahan ("Callahan"), Counterclaim Defendant Robert Leeds ("Leeds"), Counterclaim Defendant Leeds Holdings, LLC ("Leeds Holdings"), and Counterclaim Defendant Strongbow Holdings, LLC ("Strongbow," and together with Callahan, Leeds, Leeds Holdings, and Brevet "Counterclaim Defendants") allege upon information and belief as follows:

## NATURE OF ACTION

1.      Brevet's loan to Theia is a textbook case of predatory lending.  Following the *modus operandi* of loan sharks, Brevet's management, including Doug Monticciolo and Mark Callahan, recognized Theia as the perfect target.  Theia was both financially inexperienced and strapped for cash.  Brevet took full advantage:  it pushed a loan of its investors' money on Theia at outrageously high interest rates and unjustifiably excessive fees.

2.      Once Theia was indebted to Brevet, Brevet physically installed one of their agents, Robert Leeds, at Theia's offices to take control of and loot the company for the direct financial benefit of Brevet.  Brevet, through Leeds and his entities Leeds Holdings and Strongbow, effectively took over management of Theia's financial operations by dictating how it spent its money, directing employees and forcing Theia to manage its business in ways that were against Theia's interest and that of its stakeholders.  Brevet did this with an eye toward forcing

Theia into having to borrow more money from Brevet at even more extortionate rates as the lender of last resort.

3.     There is no dispute that a lender has the right to legally appropriate security for its loan.  However, that is not what happened here, and that is not what this case is about.  A lender has no right to dominate, control and ultimately steal from its borrower and yet that is exactly what Brevet did to Theia.  Brevet's actions here crossed every line of the lender-borrower relationship.

4.     Theia is a company with revolutionary ideas and technology that has the potential to be worth tens of billions of dollars.  In its few short years of operation, the Company obtained licenses for and designed and assembled a supply chain for a satellite constellation that is capable of taking continuous digital imagery of the earth's surface.  The commercial, agricultural and military uses for this technology has almost inestimable value.  Indeed, the significance of Theia's technology has been recognized both by Brevet and other investors who conducted thorough due diligence on Theia and ultimately invested hundreds of millions of dollars toward the development work in which Theia has been engaged.

5.     Theia still has the capability and wherewithal to develop and monetize its technology and know-how, but that effort has been put into jeopardy by Brevet and Leeds' self-dealing and outright interference with Theia's operations.  For example, Leeds, who worked for Brevet and whom Brevet installed as its on-site representative, used his power and influence as Theia's largest lender to effectively control Theia's activities and prevent Theia from raising additional capital on better terms.  More than that, Leeds helped himself to more than $4 million of Theia's money in part by co-opting the services of Theia's then-Controller Paul Carroll, for either Leeds' personal benefit or that of Brevet.

6.      In addition, over the past year Brevet repeatedly overruled Theia's management and required the Company to adhere to a strict budget that required Theia to spend tens of millions of dollars to purchase aircraft, despite Brevet's obvious lack of technical and business acumen to make such decisions on Theia's behalf.  Despite the critical need for working capital to put the FCC Licenses (as defined herein) into use, Brevet and Leeds insisted on dictating the Company's line item expenditures in accordance with Brevet's budget.  This at-best questionable strategy is impossible to explain unless they were accompanied by fees or other payments of which Theia is unaware.

7.      At bottom, Brevet was not simply Theia's creditor; it was its de facto manager. Brevet managed and controlled Theia in a gangster-like fashion solely for its own benefit.  This type of conduct appears to be typical for Brevet who is accused in several ongoing litigations of engaging in a hacking campaign and stealing from their own partner.  *See e.g., Iacovacci v. Brevet Holdings LLC et. al.* (S.D.N.Y. 18-CV-8048, Judge Keenan).  Theia thus brings this action for claims sounding in breach of contract and tort, and seeks declaratory judgment and other relief to recover the lost value to Theia as the result of Brevet, Callahan and Leeds' actions in an amount of no less than $1 billion.

## PARTIES

8.      Counterclaim Plaintiff Theia is a Washington, D.C.-based business founded in 2015, by a former technical staff member of NASA Sensing and Communication and founder of the New York Space Alliance, for the purpose of deploying a remote sensing constellation of satellites in space that could capture the same resolution and quality of data captured from aircraft for the purpose of analyzing the physical world in real time.

9.      Counterclaim Defendant FCS Advisors, LLC is an investment firm founded in 1998 and located in New York.  FCS is affiliated with and controlled by the SEC-registered investment advisory firm Brevet Capital Management LLC.

10.      Counterclaim Defendant Brevet Capital Management LLC is a privately-held limited liability company organized under the laws of Delaware, with its principal place of business in New York, N.Y.

11.      Counterclaim Defendant Mark Callahan is a resident of New York, N.Y. and is the President and co-founder of Brevet.

12.      Counterclaim Defendant Robert Leeds is a resident of New York, N.Y. who, at all times relevant to these Counterclaims, served as an agent of Brevet, acted on behalf of Brevet and was subject to Brevet's control.

13.      Counterclaim Defendant Leeds Holdings, LLC is a privately held foreign limited liability company organized under the laws of Delaware, with its principal place of business in New York, N.Y.  On information and belief, Leeds exercises exclusive control of Leeds Holdings.

14.      Counterclaim Defendant Strongbow Holdings, LLC is a privately held limited liability company organized under the laws of Delaware, with its principal place of business in New York, N.Y.  Leeds is the Trustee for Strongbow.  On information and belief, Leeds exercises exclusive control of Strongbow.

## JURISDICTION AND VENUE

15.     These counterclaims arise under New York State Law.  This Court has subject

matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1332, 1367, and 2201.

16.     This Court has personal jurisdiction over Brevet, Callahan, Leeds, Leeds

Holdings and Strongbow because they reside and/or conduct business in this District.

17.     Venue is proper in this District under 28 U.S.C. § 1391 and the parties explicit

agreement in the SNPSA § 16.

## BACKGROUND FACTS

A.     **Theia's Founding and Early Success**

18.     Theia was founded in 2015, by a former technical staff member of NASA Sensing

and Communications and the founder of the New York Space Alliance, for the purpose of

deploying a remote sensing constellation of satellites in space that could capture the same

resolution and quality of data captured from aircraft for the purpose of analyzing the physical

world in real-time.

19.     Theia's remote sensing technologies are in the process of being realized using a

constellation of satellites known as the Thorian Satellite Network ("TSN").  Unlike traditional

tasking satellites which can only snapshot "postage stamp" images here and there, the TSN will

be able acquire video imagery of the entire earth, at once, in real-time at high resolution.  The

TSN will create a digital representation of nearly everything happening on earth, continuously, in

real-time so that digital computers can model and understand the physical world in a complete

and holistic way, with sufficient granularity that will provide enormous value to industry,

governments and businesses.

20.     In addition to the remote sensing TSN project, Theia has plans to initiate a

separate and distinct business referred to as Internet-in-Space.  This plan involves building a new

communications and cloud satellite constellation in medium earth orbit, separate from the TSN, which has direct-to-user communications (satellite communications) and substantial storage and processing.  This constellation would be unique in that there is no other satellite constellation which  (i) covers the entire earth with a communications network that has no spatial or temporal gaps; and (ii) has sufficient processing and memory (as is associated with today's terrestrial internet) entirely within satellites to enable traditional terrestrial-served internet applications to be domiciled and served entirely from orbit.  This constellation is designated Cypher-6.

21.     In the six years since its founding, and including losing nearly 18 months of sustained work effort caused by the COVID-19 pandemic, Theia has:

a)  completed the design, costing and schedule of the TSN constellation, which has successfully passed review by three major outside insurance companies;

b)  completed the design, costing and schedule of the Cypher-6 constellation, which has successfully passed review by two major investment banks;

c)  developed a plan to finance, build and launch both satellite constellations which has been reviewed by outside parties and financial institutions;

d)  advanced, negotiated and in some instances executed contracts for its supply chain with other major aerospace companies; and

e)  processed or obtained patents in dozens of countries around the world.

22.     To fund the development of the TSN, Theia has engaged with private customers and foreign entities in countries allied with the United States to provide remote sensing services through its Master Partner Program ("MPP").  The MPP provides for participants to pay an up-front fee, and a schedule of payments to fund the construction and launch of the TSN.  Over time, the partner will receive certain rights, deliverables, commercial support and other benefits,

as well as ownership of data and analytics information products the Company produces by the TSN or Company aircraft, without further charge.

23.     By February of 2020, the Company had positioned itself with at least two agreements with MPP countries or their affiliated entities.  These agreements provided that, in exchange for Theia providing near-term aircraft-based remote sensing data, and permanent no-further-cost access to the data and analytic products to be provided by the TSN, these governments would provide a schedule of payments.  The first of these is a payment of $200 million to assist in funding the deployment of aircraft to the counterparty region, with subsequent payments related to the TSN.

###     B.     Theia's FCC Licenses

24.     In November 2016, Theia applied to the Federal Communications Commission ("FCC") for licenses for Non-Geostationary Satellite Operations ("NGSO") in the "Round 1" licensing process, initiated by OneWeb, with SpaceX, Telesat Canada, Boeing and other major companies participating.

25.     After two and a half years of dedicated legal and regulatory effort, in May 2019 the FCC granted Theia's application and authorized Theia to "construct, launch, and operate a NGSO satellite system using frequencies in the earth exploration satellite service . . . and fixed-satellite service" (the "FCC Licenses").

26.     The FCC Licenses contemplate that Theia will build and operate a network of 112 low-Earth orbit satellites.  The FCC's authorization conditions the licenses upon Theia's successful launch of 56 of the satellites by May 2025.

27.     The FCC's decision to grant these licenses to Theia represents a clear and considered endorsement of the Company's technical capabilities.  Such licenses are not merely available to the highest bidder.  Rather, the FCC evaluates each applicant's capabilities, technical

acumen, management, and business plan to ascertain whether they are legitimate licensees with a high probability of success, and whether the granting of the licenses are in the public interest. As FCC Commissioner Jessica Rosenworcel noted regarding the authorization of Theia's FCC Licenses: "There's a lot of good that can come from all this new activity in the atmosphere. It means more capacity to connect more people in more places, expanded access to education and health care, and ability to grow economies beyond the limits of today's terrestrial networks. Because this order and authorization is a small part of making all these big things possible, it has my support." ECF 45 ¶ 11 (Ex. A at 26).

28.     In addition, Theia applied for a NOAA license for remote sensing. After nearly two and a half years of effort involving meetings with several United States Government agencies, Theia was granted the license necessary to proceed with its business.

29.     Theia's remote sensing analytics business (TSN) does not in essence rely on communications licenses from the FCC, as the FCC NGSO spectrum granted (the "Spectrum") is primarily for communications, not for remote sensing. As stated in Theia's narrative in its FCC application materials, the Spectrum is intended to implement a communications system for machine-to-machine communications and to gather data from contact sensors on the ground when needed (as opposed to non-contact remote sensing from space). However, the NOAA license process required Theia to ensure that all systems associated with the Spectrum use are fully separate from the remote sensing sensors licensed by NOAA. This helps deter against a foreign adversary from "hacking" or controlling the remote sensing systems and illicitly downloading data via the communications systems authorized for general public use by the FCC Licenses.

### C.    The Brevet Loans

30.    Theia began engaging with Brevet in mid-to-late 2018.  After conducting diligence on Theia's business model and operations, Brevet loaned Theia $20 million in October of 2018, and another $5 million in August of 2019, around the time Theia was granted the FCC Licenses, to provide Theia the necessary funding to operationalize its licenses and advance its other business interests.

31.    As the relationship developed, Brevet's investment grew from $25 million to $200 million, as reflected in the SNPSA dated June 29, 2020.  To this point, Theia's entire relationship with Brevet was centered on Theia getting its operations off the ground to be able to then pay Brevet back at an enormous profit.  Indeed, Brevet took steps to ensure that it would be repaid prior to issuing its $200 million loan to Theia by conducting rigorous due diligence.  In connection with that process, in the spring of 2020 Brevet asked for and Theia provided details regarding Theia's MPP agreements, which provided direct insight into Theia's efforts to acquire additional streams of revenue.

32.    The terms of the SNPSA are striking.  The SNPSA provided that, out of the ostensible $200 million in principal, Theia would receive only $117 million.  Cutting into the proceeds was a payment of over $59 million to pay off the balance of Theia's prior loan, based on interest and fees accrued on a principal of $25 million on notes issued less than two years prior.  Brevet further required an interest pre-payment of over $20 million.  Finally, Brevet charged an "Upfront Fee" of over $4 million (entirely separate from the $4 million that Leeds later stole or otherwise took from Theia).  Interest would accrue on the loan at a rate of 20%, rising to 22% in case of default.  Brevet currently claims an outstanding balance of $300 million on the $142 million ($20 million plus $5 million plus $117 million) actually provided to Theia.

Well over half this total is accounted for in interest and "fees" (apart from the $4 million taken by Leeds discussed *infra*).

33.     The SNPSA further provided Brevet control over any "New Indebtedness" which Theia may obtain to finance its operation.  SNPSA § 6(a)(ii).  Brevet explicitly retained the right to approve any new loans which Theia desired to obtain, leaving Brevet in a position to control and influence Theia's capital raising effort.  The SNPSA further required that each and every bank account opened by Theia was subject to an account control agreement that allowed Brevet access to practically all transactions made by Theia.  SNPSA § 8(e).  Theia was also prohibited from engaging "in any line of business, directly or indirectly, other than the lines of business existing on the date hereof."  SNPSA § 6(a)(ix).  Finally, Brevet demanded a gratuitous annual "administrative fee" of $1.3 million (0.65% of the outstanding principal) payable in monthly installments.  SNPSA § 24(b).

34.     Prior to providing Theia with the loan proceeds, Brevet also exercised control and influence to require Theia to sign yet another document specifying and restricting how Theia could spend the loan proceeds.  The Second Amendment to the SNPSA, also dated June 29, 2020 (the "Second Amendment") deliberately imposed a strict monthly budget with line items of expenditures down to the dollar.  The Second Amendment required that $84,095,219 (over 70% of the loan proceeds) be spent on aircraft purchases and operations.  The remaining $33 million was allowed to be spent on monthly overhead, employee compensation and board compensation. The Second Amendment notably provided no allocation whatsoever for the design, construction and launch of satellites.  The only item in the budget which Theia could allocate to such work is $10 million designated as "Theia Misc."  For this privilege, Brevet required Theia to pay an "Amendment Fee" of $1 million.  Second Amendment § 2(d).  The SNPSA explicitly required

that proceeds from Brevet's loan could be spent only in accordance with this budget.  SNPSA §
6(c).

35.     Theia pushed back from this effort by its lender to control the minutiae of its
business, and on multiple occasions asked Brevet, via Leeds, to adjust the budget because
months into the COVID-19 pandemic, it did not have sufficient aircraft-based work to justify this
expenditure.  Even more importantly, this money was critically needed elsewhere.  Allocation of
capital towards the satellites was and remains critical because satellites are at the core of Theia's
business objectives.  As Brevet is and was aware, Theia's larger financing strategy depends in
large part on the receipt of funds from its foreign partners under its MPP program, which in turn
require the development and launch of the TSN.  Further, the Company's FCC licenses require
that it bring the spectrum into use through the deployment of at least 56 satellites by May 2025.
Yet despite warnings from Theia, Brevet took it upon itself to control and intimately direct the
course of Theia's business as it saw fit.

36.     Finally, and deliberately, on the same day the parties executed the SNPSA, but
before any money was transferred from Brevet to Theia, Brevet conditioned the transfer of the
loan proceeds on the Company's execution of a separate side letter to the SNPSA (the "Side
Letter") that Theia had never seen before.  The Side Letter intentionally and deliberately placed
even more onerous restrictions on Theia's access to Reserve Funds and placed Brevet's man,
Leeds, in the special position of Permitted Holder under the SNPSA.  As a Permitted Holder,
Brevet was permitted to transfer its entire debt to Leeds, or any of his LLC's or controlled
entities, without so much as notice to Theia.

### D.     Robert Leeds

37.     Leeds has served as an employee and agent of Brevet for years, well before
Brevet began lending money to Theia in October 2018.  In that time Leeds has served in various

capacities, always as an agent of Brevet, acting on Brevet's behalf and subject to Brevet's control. This is true for all periods relevant to this litigation, including when Leeds and Brevet attempted to conceal his role, and insisted that Leeds was acting for Theia.

38.     Leeds began working for Brevet in 2016, long before Brevet's first loan to Theia. Theia was first introduced to Robert Leeds in summer of 2018, when he represented himself as an advisor at Brevet, operating alongside Mark Callahan (founder and President of Brevet) on the Brevet side of the negotiating table. After the initial meeting with the entire Brevet team in their offices in New York, Leeds became the point of contact for Theia in its subsequent dealings with Brevet.

39.     After Brevet made its first loan to Theia in late 2018, Leeds approached Theia executives and touted his extensive Wall Street experience, offering that he could easily help Theia raise more money from sources other than Brevet. Theia accepted Leeds' help, given his purported expertise and the importance of raising more money from sources other than Brevet, which at that time, as Leeds was well aware, was critical to allow Theia to pay back its loan from Brevet and position the Company for long-term success.

40.     With this mutual understanding, Leeds was put in charge of Theia's capital raising efforts and was responsible to find investors who would provide funding to allow Theia to pay back Brevet's loan, among other things. This role placed Leeds in a unique position of influence and confidence with Theia as he had unprecedented access and control over Theia's money-raising efforts and finances.

41.     Despite Leeds' clear and explicit charge to raise money on behalf of Theia, Leeds intentionally produced no money or financing for Theia, nor any viable prospects. Theia thus relied on Leeds' special expertise and placed trust and confidence in his ability to no avail and to

its detriment.  Importantly, the reasons for Leeds' actions are now clear; despite his representations to the contrary, Leeds remained an agent under the authority of Brevet and directed opportunities to finance Theia towards Brevet.

42.    The special relationship and ongoing agreement between Leeds and Brevet is reflected in its payments to him.  Between October 2019 and July 2020 alone, Brevet paid Leeds' company, Leeds Holdings, over $330,000.  This is precisely the period during which Leeds was ostensibly working to raise capital from alternative sources in order to buy out Brevet's initial high-interest loans.  Neither Leeds nor Brevet, despite knowledge of Leeds' and Brevet's influence over the company, saw fit to bring to Theia's attention that its fundraiser was in fact working on behalf of its largest lender.

43.    It is now readily apparent that Leeds (and by extension Brevet) stood in the way of Theia's capital raising efforts, so Theia would have no option but to re-up with Brevet for an even larger loan at predatory rates.  This came to pass on June 29, 2020 when Brevet and Theia executed the SNPSA.  Leeds, as a purported trusted confidant of Theia specifically employed for such efforts, served as Theia's point of contact at Brevet during the parties' negotiation.

44.    As discussed *supra*, in a further move that was inexplicable to Theia at the time, Brevet (via Callahan and Leeds) subsequently and deliberately conditioned the transfer of the loan proceeds under the SNPSA (already signed and executed) on Theia's execution of the Side Letter.  The Side Letter provided that Leeds and "any entity owned or controlled by him" are "Permitted Holders" as defined in the Second Amendment.  This arrangement also re-confirmed the fact that Leeds and Brevet were and would continue to be one and the same with respect to Brevet's loan to Theia.

45.     The fateful day of June 29, 2020 contained yet further business for Brevet and Leeds, this time completely without Theia's knowledge or involvement.  That same day Brevet and Leeds executed an "Independent Contractor Agreement" with an effective date of August 4, 2019 and, bizarrely, a termination date of June 29, 2020.  ECF 58 Ex. 21.  Pursuant to its terms, and as a reward for Leeds' success in backing Theia into Brevet's predatory loan terms, Brevet paid a different Leeds' holding company, Strongbow Holdings LLC, $1,495,000.  ECF 59 Ex. G.  A further letter agreement between Brevet and Leeds Holdings, again executed on June 29, 2020, provided that Brevet would transfer to Leeds Holdings $405,000 of the principal owed by Theia.  ECF 58 Ex. 21 ¶ 4.  The agreement also provided that Leeds would be paid $230,000 for covering $100,000 of Brevet's earlier loan, made in July of 2019.  *Id*. ¶ 2.

46.     Thus, as Brevet's agent, Leeds received from Brevet:  (i) a consulting fee of $1,495,000; (ii) $230,000 of Brevet's profits from its 2019 loan; and (iii) $405,000 of Theia's newly issued debt.

47.     Unsatisfied with this windfall, in the latter half of 2020 Leeds arranged for himself to be paid an additional $4,262,500 from Theia, out of the $117 million in proceeds from Brevet's loan.

48.     On September 2, 2020 Leeds provided Theia board member John Gallagher with a letter claiming Strongbow Holdings, of which Leeds is the Trustee, was entitled to $3,675,000 based on a conversion of his purported equity interest in Theia, stemming from a convertible loan of $550,000 Strongbow allegedly provided to Theia.  While such a request would normally be rejected out of hand, Leeds understood that as the in-house representative of Theia's largest lender (who now effectively controlled Theia's business), he could leverage Brevet's influence to demand loan-shark style returns of more than 600%.  Thus, between July and December 2020,

Gallagher made three payments totaling $3,362,500 to the Leeds Holdings account, from an account owned and controlled by Gallagher Law, P.C., Gallagher's law firm.  Gallagher Law was reimbursed for these payments by three roughly corresponding payments from Theia to Gallagher law over this same period.

49.     Leeds then went one step further, using his enormous control and influence to co-opt Theia's then-Controller, Paul Carroll, to illicitly convert money directly from Theia's coffers.  At Leeds' urging, Carroll wired Leeds $900,000, as was requested on the letter from Strongbow on September 2, 2020, to an account owned by Leeds Holdings.  In total, Leeds extracted $4,262,500 from Theia, $587,000 more than his outrageous demand for $3,675,000.  Understanding the fraudulent nature of this payment, Leeds emailed Carroll on September 19, 2020 stating that "The $900k payment to Leeds Holdings is a problem- need a resolution."  Two days later, Carroll asked Leeds how he could help facilitate the "Leeds Holdings" payment.

50.     Subsequently, and in response to Leeds' concerns about being paid transaction fees from the proceeds of Brevet's loan to Theia, on October 22, 2020 Carroll edited the September 2, 2020 transaction to Leeds Holdings in the Company's accounting system to change the vendor from Strongbow Holdings LLC to Gallagher Law PC.  In effect this modified the transaction, and changed the outbound 1099 taxable revenue for this transaction from Leeds (a reduction in taxable income) to Gallagher Law PC (an increase in taxable income).

51.     Unfortunately, Leeds' influence over Carroll appears to have convinced Carroll that he could also disregard his duties as Theia's then-Controller.  From September-December 2020, a critical period of fundraising and development for Theia, the pair were regularly in contact via private email and behind closed doors.  The two ignored or otherwise made light of

Theia's fundraising challenges, despite their positions of trust and ostensible duty to help Theia to succeed.

52.     In addition to his overt and covert extortion, Leeds at all times acted as an agent of Brevet, and was Theia's primary point of contact for that organization.  Leeds communicated regularly with Brevet, and, going beyond any term contemplated by the loan agreements, represented Brevet's position with regards to Theia's expenditure of funds and other business operations.  Despite Theia executives' efforts to communicate directly with Mark Callahan, Brevet's response would invariably come from Leeds himself.

53.     Based on this established pattern of behavior, Theia relied on Leeds to convey the position of Brevet on any number of issues.  For instance, in December of 2020, Leeds conveyed Brevet's position that Theia must sign a pre-negotiation agreement with various representations designed to further prejudice Theia's position before Brevet would discuss forbearance of its loan to Theia.

54.     Leeds was also the instrument through which Brevet exercised its control over Theia's operations and budget.  As noted, the SNPSA and Second Amendment required Theia to strictly adhere to a budget which provided that, of the approximately $117 million in proceeds from Brevet's loan to Theia, $84 million must be spent on aircraft purchases and operations.  As the effects of the COVID-19 pandemic became clear in the summer and fall of 2020, Theia repeatedly requested that Brevet permit Theia to conserve its resources as a result of the pandemic reducing the market for Theia's aircraft-based work.  Theia also needed to allocate capital to progress with the manufacturing of the TSN satellites, which would put its FCC Licenses into use and ultimately secure funding from its MPP counterparties.

55.     As noted, satellites are at the core of Theia's business objectives.  The Company's FCC Licenses require that it bring the spectrum into use through the deployment of at least 56 satellites by May 2025.  In addition, Theia's short and medium-term financing would be enhanced by the anticipated receipt of funds from MPP agreements, which in turn require the development and launch of the TSN.  If Theia fails to progress towards satellite deployment, it risks the FCC revoking its licenses and MPP counterparties withdrawing their interest and support, risks and harms deliberately ignored by Brevet and Leeds.

56.     Despite the importance of advancing Theia's satellite program, Brevet directed Leeds to ensure that Theia strictly adhered to the Second Amendment budget.  Leeds accomplished this through almost daily over-the-shoulder oversight of the then-Controller Paul Carroll.  Leeds was in regular communication with Carroll, exerting influence over him (and by extension Theia) as they spent hours "managing" Theia's finances, again beyond any responsibilities contemplated for Leeds by any operative agreement.  Due to Brevet's influence over Carroll, he acted against Theia's interests and management's instructions; for instance, he simply refused to make critical payments to certain Theia suppliers and vendors to advance Theia's satellite program.  These actions directly impeded Theia's business and damaged its reputation.

57.     Leeds' work for Brevet continued through at least September 2021, and may continue today.

58.     Leeds and Brevet have worked together for years, are in regular communication, and operate as a unified front.  Unsurprisingly, as of a few weeks ago they were still represented by the same legal counsel.

E.      **Aithre Capital Partners, LLC**

59.     On September 17, 2020, Theia held a meeting at its offices with Aithre Capital

Partners, LLC ("Aithre") to discuss the possibility of a loan.  Leeds attended the meeting, as did

Theia executives, and Leeds spoke with members of Aithre.  Leeds was substantively involved in

subsequent discussions regarding capitalization by Aithre, and raised no objections or concerns.

60.     By January of 2021 it had become abundantly clear to Theia that Leeds was

Brevet's agent and under Brevet's control.  Thus on January 18, 2021, Erlend Olson emailed

Leeds regarding the raising of additional capital.  Olson noted that Theia was engaged in several

efforts to secure needed capital for business operations (as Leeds was well aware).  Olson asked

Leeds explicitly:  (i) whether Theia needs Brevet's approval for additional financing

arrangements, provided Brevet's notes continued to have priority; and (ii) whether Theia must

provide notice of such arrangements to Brevet.

61.     Leeds responded, in clear terms, that "my view also is we do not need permission

to raise additional equity or debt.  No waiver is required so long as money raised is subordinated

(agree Brevet top and secured on collateral.)"  He further responded that "I agree and see no

reason need to disclose the terms of current Debt to other investors (note to manage disclosures

in the audited financials)."  This response from Brevet's agent served as further confirmation of

the arrangement with Brevet that Theia understood was, and would continue to be, in effect.

62.     Based in part on the explicit direction from Brevet that "[n]o waiver is required so

long as money raised is subordinated", Theia represented to Aithre that their note would not

violate any of Theia's written agreements or require approval of third parties not already

obtained.  The parties executed the loan documents, which provided Theia with a secured loan of

approximately $25 million.  Per the parties' agreements, Aithre's rights to enforce and collect its

security for the loan were subordinated to that of Brevet, as required by the SNPSA.

63.     Aithre further showed interest in a substantially larger loan to Theia.  In the months preceding its loan, and as late as January 13, 2021, Aithre expressed interest in increasing its stake in Theia to over $250 million.

64.     Brevet was aware of this representation and opportunity, yet now stridently claims that Theia's securing of only $25 million of critically needed capital (which was subordinated to Brevet) was somehow harmful to Brevet's interests.  On August 2, 2021, Brevet sent a letter to Aithre claiming that Aithre's loan to Theia violated the SNPSA, demanding that Aithre inform Brevet if Aithre intends to loan Theia additional funds, and threatening Aithre with legal action. Brevet also purported to withdraw Leeds' prior approval of Aithre's loan to Theia.

**F.      Under Duress, and as a Result of Brevet's Fraud, Theia is Forced to Accept the Terms of the Third Amendment**

65.     Despite the pending infusion of $25 million from Aithre, by late 2020 it was clear that Theia would not be able to raise sufficient capital to pay back Brevet's loan by the maturity date.  While Theia was undoubtedly hampered by the effects of the COVID-19 pandemic, the fundamental causes of Theia's liquidity problems were the deliberate onerous obligations placed on Theia by Brevet and the intentional and active undermining of Theia's business by Brevet and its agent, Robert Leeds.

66.     This liquidity crunch was caused in significant part by Brevet, both directly and indirectly, diverting Theia's funds from more appropriate uses via Leeds and Carroll, over the objections of Theia.

67.     As a result of the forgoing fraudulent, intentional and wrongful acts by Brevet and Leeds, by December of 2020 Brevet had placed Theia in a state of economic duress, giving Theia no choice but to accept any and all terms Brevet might require to avoid default.  Left with no

alternative, on December 15, 2020, Theia executed the third amendment to the SNPSA with

Brevet dated December 15, 2020 (the "Third Amendment").

68.     Understanding the illegality of its prior conduct and seeking to insulate itself from

liability, Brevet insisted that the Third Amendment include a broad waiver that protected it (and,

notably, its agents) from any and all claims arising prior to December 15, 2020.  Brevet further

demanded that Theia indemnify it against claims by *anyone* related to the loan documents.

### G.     Theia Complies with the Terms of the Third Amendment

69.     The Third Amendment was designed explicitly to ensure Theia's default and

perfect Brevet's scheme to sell Theia's FCC Licenses.  Specifically, the Third Amendment

required Theia to, among other things, follow a strict budget, develop a plan to liquidate Theia's

assets (including the spectrum FCC Licenses), engage a restructuring officer and selected advisor

to effectively implement the plan for liquidity and plan for monetization of Theia's assets, and

release Brevet and Leeds from all claims under the SNPSA.

70.     While onerous in theory, in practice, Brevet made compliance literally impossible

by simply withholding its approval or failing to engage on any number of items requiring

Brevet's approval.  Because the obligations under the Third Amendment were completely one-

way, by deliberately being obstinate, Brevet ensured it could imminently hold Theia in default.

71.     Despite Brevet's refusal to engage in good faith, Theia made regular and repeated

efforts to comply with its obligations under the Third Amendment.

72.     In particular, Theia made a monumental effort to develop and market its Internet-

in-Space concept with the explicit intention of speeding up the monetization of its FCC licenses

and other assets in order to repay its debts.  This venture had the potential to establish the

Company's reputation and attract financing that would help fund the more expensive

development of the TSN.  This plan has the added benefit of enabling traditional funding of the

Internet-in-Space constellation, because of its lower cost, while Theia continues to secure financing for the TSN through its MPP program.  To effectuate this plan, Theia lined up the supply chain to begin production of the Cypherian satellites.  Theia also executed an agreement with Barclays to act as Theia's exclusive placement agent in connection with the Company's sale of, at a minimum, $300 million of its debt securities.

73.     Theia developed this plan to monetize its FCC Licenses in a manner that would capitalize its assets with the explicit intention of using the financing to pay off its short-term, high-interest loan from Brevet.  This plan was instituted in direct response to Brevet's demands for a liquidity plan, as provided for in the Third Amendment.  At all points Theia sought Brevet's input and approval.  Theia approached Brevet with this plan and informed Brevet of their progress repeatedly throughout January and February of 2021.  Inexplicably, Brevet would not engage in a meaningful way, despite the SNPSA requiring Brevet's sign-off on the venture.  Due to Brevet's and Leeds' lack of support and engagement, Theia was irreparably harmed by being deprived of a lucrative opportunity that could have raised sufficient capital to buy out Brevet's interest.

74.     Despite the pressing needs of its business, Theia continued to make every effort to comply with all remaining provisions of the Third Amendment.  Theia engaged GH Partners as a Selected Advisor, specifically to advise Theia on the monetization strategy of its assets, including its NOAA and FCC licenses.  Theia also retained Lazard Asset Management to assist with a workout and restructuring plan.

75.     Theia put forward five separate candidates for the position of Chief Restructuring Officer ("CRO").  Theia interviewed multiple candidates for the position in January and February of 2021, and informed Brevet of these efforts.  Theia would go on to propose five

individuals for the position.  Brevet approved two of these candidates, Robert Cardillo and Kevin O'Connel.  However, these candidates ultimately declined the position due to conflicts outside of Theia's control.  Theia then proposed three additional candidates in February.  Brevet did not accept these candidates.

       **H.**    **Brevet Continues to Undermine Theia's Business**

76.    Despite the challenges imposed by Brevet and the COVID-19 pandemic, the Company has made every effort to preserve its relationships with MPP clients whose agreements are an important part of Theia's planned financing.  Brevet directly undermined this effort when it contacted one of Theia's MPP clients in June of 2020 to demand information about the parties' dealings against Theia's express wishes.  Brevet's actions undermined Theia's relationship with this client.

77.    On June 21, 2021, one of the MPP clients reconfirmed its commitment to pay Theia $2 billion in exchange for remote sensing services to be provided by the TSN.  As part of the re-confirmed deal, Theia is entitled to two up-front payments of $100 million each in exchange for supplying at least two remote sensing aircraft and supporting infrastructure and staff.  Theia possesses these aircraft, and, if properly financed, has the ability to supply them in exchange for the release of these funds.

78.    However, Brevet, knowing full well the circumstances surrounding the aircraft and the status of the reconfirmed MPP agreement, has stated that they will not permit Theia to provide these aircraft.  Further, in a recent letter dated September 6, 2021 Brevet stated their intent to auction these aircraft to recover their debt.  Brevet's unwillingness to allow Theia to provide these aircraft has detrimentally impacted and harmed Theia's business.

## CAUSES OF ACTION

### COUNT I
**(Fraudulent Inducement – Third Amendment; Brevet, Leeds, Leeds Holdings)**

79.     Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

80.     Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, made material, knowing and false representations to Theia that Leeds was not acting as Brevet's agent and at Brevet's direction, or that Leeds was compensated with a salary, bonuses and a share of Brevet's notes from Theia, during the periods when Leeds was explicitly charged with (i) working on behalf of Theia to secure additional sources of financing of Theia's business, (ii) representing Theia in dealings with Brevet and others and (iii) otherwise assisting Theia to achieve Theia's corporate objectives.

81.     Brevet and Leeds were aware that these representations were false.

82.     Brevet and Leeds made these representations intending for Theia to rely upon them.

83.     Theia reasonably and justifiably relied on Brevet and Leeds' representations without knowledge of their falsity.

84.     Theia has been damaged in an amount to be proven at trial by Brevet and Leeds' knowing, false and material representations.  The misrepresentations by Brevet and Leeds caused Theia to place Leeds in a position of trust and authority, which he used to carry out a scheme that deprived Theia of capital from sources other than Brevet, caused Theia to take actions or not take actions that were in all cases detrimental to Theia's business, and otherwise ensured that Theia would not be able to repay Brevet's high-interest loans to Theia.  Leeds further used his position

of trust within Theia to induce Theia to meet all of Brevet's demands in those parties'

negotiations regarding the Third Amendment, including the release of claims contained in § 7.

## COUNT II
**(Economic Duress – Third Amendment; Brevet, Leeds, Leeds Holdings)**

85.     Theia restates and incorporates each and all the foregoing paragraphs of the

Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

86.     Brevet and Leeds, acting through mutual understanding at the direction and

control of Brevet, threatened Theia's business by threatening to place Theia in default of

Brevet's loan unless Theia agreed to accept any and all terms imposed by Brevet as conditions of

forbearance via the Third Amendment.

87.     Brevet and Leeds' threat was unlawful because these parties were themselves the

cause of the alleged default.  Brevet and Leeds worked to place Leeds in a position of trust and

authority within Theia under false pretenses, then executed a scheme that deprived Theia of

capital from sources other than Brevet, caused Theia to take actions or not take actions that were

in all cases detrimental to Theia's business, and ensured that Theia would not be able to repay

Brevet's high-interest loans to Brevet.

88.     Given the success of Brevet and Leeds' scheme to deprive Theia of all other

sources of capital and to force Theia to take actions detrimental to its business, the circumstances

presented Theia with no alternative but to involuntarily accept the terms of the Third

Amendment.

89.     Theia has been damaged in an amount to be proven at trial by Brevet and Leeds'

threats under economic duress.  The threats made by Brevet and Leeds were made with

knowledge that Brevet and Leeds were themselves the cause of any alleged default, and were

thus made without a lawful basis in order for Brevet to induce Theia to meet all of Brevet's

demands in those parties' negotiations regarding the Third Amendment, including the release of claims contained in § 7.

<u>**COUNT III**</u>
**(Breach of Implied Covenant of Good Faith and Fair Dealing – SNPSA; Brevet)**

90.     Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

91.     Theia and Brevet entered into the SNPSA with the intention that Theia would receive financing from Brevet in order to successfully achieve its corporate objectives, including the establishment of its TSN satellite constellation to provide remote sensing services. Brevet's loan to Theia was short-term and high-interest, made with the expectation that Theia could acquire alternate sources of stable, long-term financing.

92.     Brevet had a duty to act in good faith and conduct fair dealing in the performance of this contract, in a manner that would not deprive Theia of the benefits of this contract.

93.     The SNPSA provides that any debt issued by Theia subsequent to that agreement is subject to Brevet's approval. The SNPSA also provides that Theia cannot engage in a new line of business without Brevet's approval. The SNPSA further provided that Theia could not spend the proceeds of Brevet's loan in a way that deviated from the precise terms of Brevet's approved budget without Brevet's approval.

94.     Brevet breached its duty by actively seeking to prevent Theia from repaying its loan from Brevet, accomplished by placing its agent Leeds in a position of trust and control within Theia which Leeds exercised to Theia's detriment. From this position Leeds and Brevet executed a scheme that deprived Theia of capital from sources other than Brevet, and caused Theia to take actions or not take actions that were in all cases detrimental to Theia's business, ensuring that Theia would not be able to repay Brevet's high-interest loans to Brevet.

95.     Brevet breached its duty by attempting to withdraw its approval of a $25 million loan from Aithre, despite the importance of this capital to Theia's ongoing business.

96.     Brevet breached its duty by declining to approve of Theia's proposed Cypherian (Internet-in-Space) line of business, despite Theia's frequent engagement with Brevet on this subject and the potential of this venture to establish the Company's financing and retire Brevet's debt.

97.     Brevet breached its duty by directing Leeds to ensure that Theia strictly adhered to its budget, despite Brevet's lack of qualifications to make such decisions on Theia's behalf and the harms this budget posed to achieving Theia's long-term business objectives.

98.     Brevet's breach of its duty is the proximate cause of harm to Theia.  Brevet's actions withheld from Theia the benefits of the bargain including, *inter alia*, progressing with development of the TSN, establishing relationships with vendors and MPP counterparties, and securing long-term alternative financing.

99.     Theia has been damaged by Brevet and Leeds' conduct in an amount to be proven at trial.

## COUNT IV
### (Breach of Fiduciary Duty; Brevet, Leeds, Leeds Holdings)

100.     Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

101.     Brevet established a fiduciary relationship with Theia by imposing contractual terms as a condition of its loans that provided Brevet with control over nearly all aspects of Theia's business.  As detailed above those terms include, but are not limited to, (i) holding Theia's debt at usurious interest rates, (ii) veto power over any additional debt offerings, (iii) full

visibility into all bank account balances and transactions and (iv) veto power over establishing new lines of business.

102.    Because of the level of control exercised by Brevet over Theia, Brevet had an obligation to exercise its authority in a manner that would not be detrimental to Theia's interests.

103.    Brevet further established a fiduciary duty to Theia by placing its agent Leeds in a position of trust and control within Theia under false pretenses.  From this position Leeds and Brevet had near total insight into Theia's operations and decision-making.  Theia relied on Leeds' purported fundraising expertise to direct Theia's efforts to secure alternative financing, in order to retire Brevet's debt and place Theia on stable financial footing.  Finally, Theia relied on Leeds' (allegedly prior) association with Brevet as he assumed responsibility for representing the position of Theia in dealings with Brevet and others.

104.    Because of the level of trust and control Leeds held at Theia, Brevet and Leeds had an obligation not to exercise their positon of authority in a manner adverse to Theia's interests.  Brevet and Leeds had a further obligation to disclose Leeds' ongoing role as an agent of Brevet, including compensation paid by Brevet to Leeds and the fact that Leeds held a portion of Theia's debt.

105.    Brevet and Leeds abused their position of trust and control by carrying out a scheme that deprived Theia of capital from sources other than Brevet, caused Theia to take actions or not take actions that were in all cases detrimental to Theia's business, and otherwise ensured that Theia would not be able to repay Brevet's high-interest loans to Brevet.

106.    Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, exploited this position of trust to push Theia into Brevet's exclusive financial control and foreclosed all other financial and business opportunities to Theia.

107.     Theia has suffered damages as a result of Brevet and Leeds' breach of their duty, in an amount to be proven at trial.

## COUNT V
### (Intentional Infliction of Temporal Damages; Brevet, Leeds, Leeds Holdings)

108.     Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

109.     As detailed above, Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, intentionally harmed Theia by placing Leeds in a position of trust within Theia under false pretenses, executing a scheme that deprived Theia of capital from sources other than Brevet, and causing Theia to take actions or not take actions that were in all cases detrimental to Theia's business.

110.     Theia has been damaged as a result of Brevet and Leeds' intentional infliction of harm, in amounts to be proven at trial.

111.     Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, had no valid justification for these actions.

## COUNT VI
### (Tortious Interference with Prospective Business Relations – MPP clients; Brevet)

112.     Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

113.     Theia has an important business relationship with an MPP counterparty that the parties re-confirmed on June 21, 2021.  The agreement provides that Theia is entitled to up to $2 billion in exchange for remote sensing services to be provided by the TSN.  As part of the re-confirmed deal, Theia is entitled to two up-front payments of $100 million each in exchange for supplying at least two remote sensing aircraft and supporting infrastructure and staff.  Theia

possesses these aircraft, and, if properly financed, has the ability to supply them in exchange for the release of these funds.

114.     Brevet is aware of and has intentionally interfered with this business relationship. Brevet has stated that they will not permit Theia to provide aircraft in furtherance of Theia's MPP agreement, and on September 6, 2021 stated its intent to auction these aircraft to recover its debt.

115.     Brevet interfered with this business relationship with the wrongful purpose and intention of severing Theia's relationship with the MPP counterparty, and preventing Theia from acquiring critical working capital to finance its business.

116.     Theia has been damaged as a result of Brevet's intentional conduct, in amounts to be proven at trial.

117.     Theia also has an important business relationship with a separate prospective MPP client regarding a potentially lucrative arrangement to provide remote sensing services on an ongoing basis in return for hundreds of millions of dollars to finance its business.

118.     Theia informed Brevet of this relationship during Brevet's due diligence of Theia's business immediately prior to Brevet's loan of $200 million in the spring of 2020.  Theia expressly told Brevet not to contact its prospective MPP client in order to preserve the confidentiality and trust central to that relationship.  Against Theia's express wishes, Brevet contacted this client and demanded details regarding the prospective relationship.

119.     Brevet interfered with this business relationship with the wrongful purpose and intention of severing Theia's relationship with the MPP counterparty, and preventing Theia from acquiring critical working capital to finance its business.

120.    Theia has been damaged as a result of Brevet's intentional conduct, in amounts to be proven at trial.

## COUNT VII
**(Tortious Interference with Prospective Business Relations – Aithre; Brevet)**

121.    Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

122.    Theia has an important business relationship with Aithre, the lender who provided Theia with a loan of $25 million in January of 2021.

123.    Brevet is aware of and has intentionally interfered with this business relationship. In the months preceding Aithre's loan to Theia, and in the weeks afterwards, Aithre expressed interest in a loan to Theia of at least $250 million.  However, on August 2, 2021, Brevet sent a letter to Aithre claiming that Aithre's loan to Theia violated the SNPSA, demanding that Aithre inform Brevet if Aithre intends to loan Theia additional funds, and threatening Aithre with legal action.  Brevet has further attempted to withdraw its approval of Aithre's loan of $25 million to Theia.

124.    Brevet interfered with this business relationship with the wrongful purpose and intention of depriving Theia of critical working capital and keeping Theia firmly within Brevet's financial and operational control.

125.    Theia has been damaged as a result of Brevet's intentional conduct, in amounts to be proven at trial.

## COUNT VIII
**(Negligent Misrepresentation Causing Harm; Brevet, Leeds, Leeds Holdings)**

126.    Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

127.    Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, placed Leeds in a position of trust and care at Theia, such that Theia relied upon Leeds with regards to fundraising, budget allocation and representing the position of Theia in dealings with Brevet and others.

128.    As a result of this special relationship, Brevet and Leeds had a duty and obligation to disclose the conflict of interest posed by Leeds' ongoing role as an agent of Brevet, including compensation paid by Brevet to Leeds and the fact that Leeds held a portion of Theia's debt.

129.    Brevet and Leeds, acting through mutual understanding at the direction and control of Brevet, did not inform Theia of Leeds' ongoing role as Brevet's agent, and in fact made representations expressly to the contrary.

130.    Theia reasonably relied on the misrepresentations of Brevet and Leeds.

131.    Theia has been damaged as a result of this conduct, in amounts to be proven at trial.

## COUNT IX
### (Fraud; Brevet, Leeds, Leeds Holdings, Strongbow)

132.    Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

133.    Brevet, Leeds, and Strongbow, acting through mutual understanding at the direction and control of Brevet, made material misrepresentations of fact by demanding payment of $3,675,000 on behalf of Strongbow (for which Strongbow was ultimately paid $4,262,500), without legal right or justification.

134.    Brevet, Leeds and Strongbow were aware that these representations were false.

135.   Brevet, Leeds and Strongbow, acting through mutual understanding at the direction and control of Brevet, intended to induce Theia to rely on their misrepresentations in order to convince Theia to pay Strongbow $3,675,000.

136.   Theia justifiably relied on Brevet and Leeds' material misrepresentations of fact based upon Leeds' position of authority within Theia, and his (allegedly prior) relationship with Theia's largest lender.

137.   Theia has suffered damages as a result of this conduct, in an amount to be proven at trial.

## COUNT X
### (Conspiracy; all Counterclaim Defendants)

138.   Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

139.   Brevet, Leeds, Leeds Holdings, and Strongbow committed a series of tortious actions against Theia as detailed in counts IV through IX.

140.   In furtherance of these tortious actions, Counterclaim Defendants entered into a corrupt agreement to manipulate and control Theia's operations in a manner detrimental to Theia and beneficial to Counterclaim Defendants.

141.   Counterclaim Defendants took overt acts in furtherance of this agreement.

142.   Counterclaim Defendants understood the purpose of the acts taken in furtherance of their agreement, and were knowing and willing co-conspirators.

143.   Theia has been damaged as a result of this conspiracy, in amounts to be proved at trial.

## COUNT XI
### (Aiding and Abetting; Callahan)

144.    Theia restates and incorporates each and all the foregoing paragraphs of the Answer, Affirmative Defenses and Counterclaims as if set forth fully herein.

145.    On Counts IV through IX, Brevet, Leeds, Leeds Holdings, and Strongbow committed tortious violations upon Theia.

146.    On counts IV through IX, Callahan, as aider and abettor, was in agreement with other Counterclaim Defendants to manipulate and control Theia's operations in a manner detrimental to Theia and beneficial to Counterclaim Defendants.

147.    On counts IV through IX, Callahan, as aider and abettor, was fully aware of other Counterclaim Defendants' purposes, and knowingly, substantially and jointly participated with other Counterclaim Defendants in the alleged conduct.

148.    As detailed above, Theia has been damaged as a result of this conduct, in amounts to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Theia respectfully requests that the Court enter judgment dismissing the Complaint with prejudice and in favor of Theia on all counts of its Counterclaims, granting the following relief:

    a.   issuing a declaratory judgment on counts I and II voiding Section 7 of the Third Amendment to the SNPSA;

    b.   awarding Theia damages on counts III through XI in an amount to be determined at trial;

    c.   awarding Theia its costs and reasonable attorneys' fees;

    d.   awarding Theia pre- and post-judgment interest to the extent allowed by law; and

    e.   granting such other and further relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Theia hereby demands a jury trial on all issues so triable.

Dated:    New York, New York
           October 12, 2021

                      FRIED, FRANK, HARRIS, SHRIVER
                        & JACOBSON LLP

                      By:   */s/ Motty Shulman*
                            Motty Shulman
                            Robin Henry

                      One New York Plaza
                      New York, New York 10004-1980
                      Tel:  (212) 859-8000
                      Fax:  (212) 859-4000
                      robin.henry@friedfrank.com
                      motty.shulman@friedfrank.com

                      *Attorneys for Defendants and*
                        *Counterclaim Plaintiffs Theia*
                        *Group, Inc., Theia Aviation, LLC,*
                        *and Theia Holdings A, Inc.*