LAKQfcsO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
FCS ADVISORS, LLC

             Plaintiff

       v.                      21 Civ. 06995 (PKC)
                            Oral Argument
THEIA GROUP, INC.,

             Defendant

------------------------------x
                        New York, N.Y.
                        October 20, 2021
                        11:00 a.m.

Before:

              HON. P. KEVIN CASTEL

                        District Judge

                APPEARANCES

STEPTOE & JOHNSON LLP
    Attorneys for Plaintiff
CHARLES A. MICHAEL
FILBERTO AGUSTI
JEFFREY REISNER
EVAN GOLDSTICK

FRIED FRANK HARRIS SHRIVER & JACOBSON
    Attorneys for Defendant
MOTTY SHULMAN
ROBIN HARRIS
CHRISTOPHER BELL

SEQUOR LAW PA
    Attorneys for Intervenor
GREGORY S. GROSSMAN

LAKQfcsO

| | |
|---|---|
| 1 | (In open court; case called) |
| 2 | DEPUTY CLERK:  For the plaintiff. |
| 3 | MR. MICHAEL:  Good morning, your Honor.  Charles |
| 4 | Michael from Steptoe & Johnson, on behalf of the plaintiff. |
| 5 | THE COURT:  Good morning, Mr. Michael. |
| 6 | MR. MICHAEL:  With me are my partners, Filberto Agusti |
| 7 | and Jeffrey Reisner, also from Steptoe & Johnson. |
| 8 | THE COURT:  Good morning. |
| 9 | And for the defendants. |
| 10 | MR. SHULMAN:  Good morning, your Honor.  Motty Shulman |
| 11 | from Fried Frank, along with Robin Henry and Christopher Bell. |
| 12 | THE COURT:  Good to see you again.  You're on Hanks, |
| 13 | is it? |
| 14 | MR. SHULMAN:  Yes, your Honor. |
| 15 | THE COURT:  Keep your mask up.  That's the rules of |
| 16 | the road around here. |
| 17 | So, I have been through the submissions.  From the |
| 18 | movants, I have Manuel Colon declaration, initial one; the |
| 19 | Michael declaration; I have the Gorman declaration, Reid Gorman |
| 20 | in opposition; I have another declaration from you, Mr. Michael |
| 21 | and from Mr. Colon. |
| 22 | What, if anything else, does the plaintiff wish the |
| 23 | Court to consider of an evidentiary nature? |
| 24 | MR. MICHAEL:  Nothing, your Honor.  It's all in the |
| 25 | record. |

LAKQfcsO

1          THE COURT:  Thank you.

2          Mr. Shulman.

3          MR. SHULMAN:  Nothing else, your Honor.

4          THE COURT:  All right.  So the record is closed.  And

5    I hope we're not going to start from scratch because I've done

6    my homework, and I'm not approaching this from the standpoint

7    of somebody just getting up to speed.  I know about the

8    licenses.  I know about the obligation to launch half of the

9    satellites by, I believe, it's May 2025.  I know about the

10   initial notes extended.  I know about the decision to extend

11   the maturity date on the first note.  I know about the third

12   amendment.  I know about Mr. Leeds and Mr. Leeds work with

13   Brevet and Mr. Leeds hiring by Theia.  I know about, from what

14   I understand, the CEO of Theia was a Mr. Olson, and he was

15   replaced by a Mr. O'Neill, and I gather Mr. O'Neill is no

16   longer with the company.  I know about Mr. Carroll as the CFO

17   who was replaced by Steven Bucher, who has now been replaced, I

18   guess, by Reid Gorman.

19          So, I know quite a bit, but I will give each side an

20   opportunity to make their arguments and proceed.  I am going to

21   be interested in knowing from the defendant what the status of

22   things are.  They have GH Partners, Lazard Asset Management,

23   Alix Partners, TG Capital Partners.  I'm kind of curious how

24   you're paying for that.  You're being sued by a landlord.

25   You're being sued by two aircraft companies.  But I'll find

LAKQfcsO

1    out.  I'll find out if you have a CEO.

2              So, the plaintiff may proceed.

3              MR. MICHAEL:  Thank you, your Honor.

4              THE COURT:  Can you hand me a copy of whatever you're

5    showing?

6              MR. MICHAEL:  Sure.

7              THE COURT:  You don't have to do it this minute, but I

8    would appreciate receiving it.

9              MR. MICHAEL:  I will give hard copies at the end to

10   everyone and, your Honor, I take your words to heart that

11   you've read everything, so I will give what I will call the

12   expedited version of today's presentation.  We represent the

13   plaintiff FCS, which commonly goes by the name Brevet, so we

14   are referred to Brevet in the papers, so that's what I'll use.

15             I want to start with the big picture, and the one

16   overarching fact that I think looms large over all of the

17   others is that Theia is in default.  The default is

18   indisputable.  Brevet advanced hundreds of millions of dollars.

19   The maturity to date to pay that all back was June 29 of this

20   year, and Theia paid nothing.

21             We are in a situation that is a calamity that cannot

22   persist, and there are four basic reasons why the remedy for

23   this calamity is a receiver.  The first is that that was the

24   agreed remedy in the loan documents.  The second is that Theia

25   has no money or plan to dig itself out of the hole.

LAKQfcsO

1    THE COURT:  Listen, I will beat Mr. Shulman to the

2    punch:  Agreed remedy that the plaintiff may apply for; not

3    that it is the inevitable remedy.  So go ahead.

4    MR. MICHAEL:  Absolutely.

5    THE COURT:  Go ahead, your third point.

6    MR. MICHAEL:  Third is time is of the essence, and the

7    fourth is Theia's mismanagement and fraud.  I'll skip over the

8    timeline, but in the big picture Brevet started advancing money

9    in 2018.  Their prepayment trigger were these MPP, Master

10   Partnership Program, contracts that were supposed to pay back

11   that loan in 2018.  The same thing in 2019.  The same thing in

12   June 2020, December 2020.  Brevet kept giving more time and

13   more money because it wanted Theia to succeed.

14   Let's get to the first part, the agreed remedy of a

15   receiver.  It says, the purchaser, which is Brevet, empowered

16   the request --

17   THE COURT:  I got it.

18   MR. MICHAEL:  This is more or less the same language.

19   THE COURT:  I got it.

20   MR. MICHAEL:  Even better.

21   Point two:  Theia has no money or plan.

22   The case law is clear that when you have a debtor with

23   mounting obligations and no concrete plan for repayment, that

24   strongly militates in favor of a receiver.  That is exactly the

25   scenario we're in today, your Honor.  Let's walk through the

LAKQfcsO

1    money we know they received.  This isn't a schedule of face

2    values of the notes.  This is money in the door.  The three

3    tranches of funds we advanced: 20, then 5 then 117.  Attached

4    to our June 2020 loan is a schedule of existing note-holders.

5    We now know that's incomplete, but it lists 203 lenders.  You

6    add up the principal, that's 53 million.  We have this newly

7    discovered plaintiff in Delaware, a Singaporean businessman,

8    Mr. Ahunai, if I'm saying that right.  That's another

9    10 million.  We have an intervenor in this case, 25 million,

10   Aithre Capital Partners.  That's $230 million in the door.

11   There's likely more because, as I said, Theia hasn't given us

12   complete discovery, but suffice it to say there has been

13   massive influx of cash over the last three years.  And What

14   does Theia have to show for it?

15        Well, their bank accounts show next to nothing.  The

16   most recent statements we have are from July.  We are talking

17   under $60,000.  Theia is earning no revenue.  Here is their

18   most recent P&L they provided to us in the second quarter of

19   2021 -- no revenue, none whatsoever against almost 6 million in

20   expenses.

21        To put it simply, Theia is running out of money.  We

22   also know, because Theia admitted in its answer it filed last

23   week, that Theia has been missing its payroll obligations.  We

24   know of at least seven lawsuits from vendors and lenders.  We

25   know those lawsuits raise serious allegations about its

LAKQfcsO

1    operations.  One of them --

2              THE COURT:  Is the airport where the pilot said, gee,

3    let me test out how the repairs went, and then took off with

4    the plane, never to return and never to pay the bill.  Got it.

5              MR. MICHAEL:  Correct.  And in that case, Theia didn't

6    even file an answer.  It's in default.  So it doesn't deny

7    those allegations.

8              So, what's its plan to get out?  Your Honor, you

9    mentioned the Gorman declaration.  I encourage you to look at

10   it closely and see if you can find a concrete plan.  What we

11   see is Mr. Gorman saying that Theia has engaged professionals

12   to chart a course forward.

13             What is that course?  I don't see it.  If I charted a

14   course to lose weight and exercise more and eat better, that

15   doesn't mean I've actually lost any weight or done anything.

16   Maybe there is no plan.

17             THE COURT:  That's the problem I have.  I was

18   following that plan, and it may not be enough just to make a

19   solemn declaration of intent.

20             Anyway, go ahead.

21             MR. MICHAEL:  That's what we have here, is a solemn

22   declaration of intent to do better.  But what's most striking,

23   your Honor, about that solemn declaration to do better is that

24   Theia was supposed to do better long ago.  In December 2020 in

25   the third amendment, there was an agreement that Theia was to

LAKQfcsO

```
1   develop by January of this year an comprehensive financial
2   proposal to find --
3               THE COURT:  A liquidity plan.
4               MR. MICHAEL:  Yes.
5               THE COURT:  And you got a one-page document.
6               MR. MICHAEL:  Exactly.  And so now they've hired all
7   these people to do what should have been done ages ago.  And so
8   the simple answer from our side is, it's too little, it's too
9   late.
10              Point three:  Time is of the essence.  Your Honor
11  already previewed you got this issue down, so I won't dwell on
12  it.  The birds have to be up in the air and operating by
13  May 2025.  Is that a long time?  Is that a little time?  Well,
14  I don't know if it's going to be enough because we have Theia's
15  own projections that they provided in May of this year showing
16  that they were going to use all of the allotted time.  This is
17  before they ran out of cash.
18              THE COURT:  Right.  And they also say that there is
19  nothing that stops them from going back and seeking an
20  extension based on the extraordinary circumstance of the
21  pandemic.
22              MR. MICHAEL:  That's very possible, your Honor, but
23  we're trying to maximum value here, and if we're looking, for
24  example, for a buyer of this license or someone to finance it,
25  that's a big role of the dice that's going to affect value,
```

LAKQfcsO

1    unquestionably.

2              Now, setting up -- even apart from the timeline, you

3    know, we have to ask ourselves, how far has Theia gone in

4    making progress to getting these things up in the air and

5    operational?  And the answer the record reveals, your Honor, is

6    not very far at all.

7              Theia agreed to produce all contracts for the design

8    and/or construction of satellites, but produced nothing.

9    Again, if we go to what Mr. Gorman said, he says in the 84

10   months since its founding, Theia has developed a plan to

11   finance, build and launch satellites.  That is just as good as

12   my plan to eat better, my plan to wake up and go to the gym

13   every morning.  That's all it is.  We don't have concrete

14   evidence of progress.

15             Now, the last point:  Theia's mismanagement and fraud.

16   There are four categories of this I will touch on briefly.  The

17   phony billions in master partnership program funds, the looting

18   by principals, their hidden and unauthorized debt, and the

19   fraudulent transfer scheme.

20             Let's start with the MPP scheme.  For years, Theia had

21   a practice of raising money, getting extension on the loans

22   from Brevet by claiming it had billion dollar contract with

23   with sovereign nations --

24             THE COURT:  From an unnamed foreign entity, and then

25   it was from an unnamed individual.

LAKQfcsO

```
 1              MR. MICHAEL:  Yes.

 2              THE COURT:  Yes, I got it.

 3              MR. MICHAEL:  Yeah.  And no money has materialized.

 4     It seems the whole thing is a gigantic fraud.

 5              So, again, your Honor mentioned Mr. Colon's

 6     declaration in your earlier remarks.  He gives specific

 7     testimony about specific dates that Theia said money was coming

 8     in.  In November 2019, it was 2 billion coming in 30 days.  In

 9     March 2020, 18 and a half billion in 120 days.  None of this is

10     disputed.  We even have in writing from Theia, Theia has signed

11     18.5 billion worth of upfront prepaid definitive contracts with

12     creditworthy counterparties.

13              Well, where is the money, or where are the lawsuits to

14     enforce the obligations of these counterparties?

15              THE COURT:  And this is April 2020 they made that

16     statement?

17              MR. MICHAEL:  Yes, April 2020, so before the loan was

18     made.

19              And then let's look at what we've learned since the

20     lawsuit was filed.  We have an intervenor, whose counsel is in

21     the courtroom with us today, who disclosed a balance sheet used

22     to raise the $25 million loan, and the dishonesty in this

23     balance sheet, your Honor, is breathtaking.  Theia is claiming

24     that as of December 2020, it had -- look at note one --

25     6 billion in revenue in escrow set aside.  Your Honor, if Theia
```

LAKQfcsO

```
 1    had 6 billion or 5 billion or one billion set aside, we
 2    wouldn't be in this courtroom today.
 3                 THE COURT:  Okay.
 4                 MR. MICHAEL:  We have monthly balance sheets produced
 5    in this litigation where none of this revenue appears.  This is
 6    the age-old fraud, your Honor, of keeping two sets of books.
 7                 Now, another thing we've learned --
 8                 THE COURT:  Pull that slide up again, please?
 9                 MR. MICHAEL:  Sure.
10                 You'll see in note 2, 12 and a half billion due in 120
11    days.  120 days from December 2020, that time has long passed.
12    We haven't seen a penny of this money.
13                 THE COURT:  Go ahead.
14                 MR. MICHAEL:  Another thing we learned in this
15    litigation, we found on the public dockets from the District
16    Court in Delaware, a Singaporean businessman, whose existence
17    we didn't know, and whose existence should have known disclosed
18    when we first loaned the money, filed a complaint.  Attached to
19    his complaint is a letter from February 2020 where he's being
20    told by Theia:  We presently have 14 and a half billion of
21    signed prepaid contracts and are finalizing two more.
22                 Theia just recently filed its answer in that complaint
23    and admitted the authenticity of this letter, this letter,
24    which, of course, is a gigantic fraud.
25                 A third example.
```

LAKQfcsO

1              THE COURT:  Put that back up, please.

2              MR. MICHAEL:  Sure.  Sure.

3              THE COURT:  Go ahead.

4              MR. MICHAEL:  The next one you got to feel

5    particularly bad for is an anesthesiologist in Rhode Island

6    named Robert Chin.  Robert Chin loaned a hundred thousand

7    dollars to Theia, okay?  So, not some big, sophisticated

8    financial firm, and this is what he was told when he loaned his

9    money.  He was told there was private sector contracts that

10   were going to produce revenue in 2020.  This is revenue we've

11   never seen.  And then, again, this is now starting to sound

12   familiar:  MPP contracts with sovereign nations around the

13   world, $16 billion prepaid income in 2019 and 2020, unlocked in

14   tranches through 2020.  If these tranches ever existed, we've

15   never seen them be unlocked.

16             And this isn't the first time this MPP mystery has

17   come up in litigation.  You may recall, your Honor, there is

18   some discussion in the papers of the trademark litigation that

19   gave rise to Theia trying to do business under a different

20   name.  Well, in that trademark litigation on the public dockets

21   in the Eastern District of Pennsylvania, the plaintiff, another

22   entity that did business as Theia, found documents that

23   appeared to discuss major commercial transactions, it looks

24   like the MPP contracts, but Theia hadn't produced the

25   contracts.  We have a special master saying, okay, you've got

LAKQfcsO

to produce the contracts.  And the question arises, what is
Theia hiding?  What is the real story?  We don't know it.  What
we do know is there's no money.

Now, a separate category of wrongdoing is the looting
by Theia's principals.  The loan documents prohibit
distributions, but that didn't stop the two shareholders John
Gallagher and Erlend Olson, from taking out $14.2 million.  We
just yesterday received accounting documents that corroborate
this figure.  The figure we calculated from bank statements is
slightly lower, but it's a staggering sum to be taken out from
a company that's making no money.

THE COURT:  Now, Mr. Olson was CEO; he is not any
longer.  What is his position, or you don't know?

MR. MICHAEL:  I don't know.  I don't believe he is the
CEO, but I know that he and Mr. Gallagher remain the
shareholders, and I know by statute because the entity holding
the license isn't allowed to transfer the license even by
operation of a corporate change in control.  That's generally
been interpreted to mean the shareholders have to state who
they are.  So, as far as we know, these are the two guys who
have been running the show from the start, calling the shots,
and feathering their own nest.

THE COURT:  Now, this 5.7 to Gallagher, does that
include the money to Leeds that was funneled through
Gallagher's law firm allegedly?

LAKQfcsO

1          MR. MICHAEL:  I'm glad you asked that.  It does not.
2     We just subtracted it.  We took the Gorman declaration numbers
3     at face value and said, okay, take out the three and change
4     that allegedly ultimately landed to Mr. Leeds.  Let's just
5     subtract those.  So this is net of that.  This is what went to
6     Gallagher, went to his law firm, and went to his consulting
7     firm.  And you've got to wonder why these two guys who are
8     running this business have put consulting firms between
9     themselves and Theia to be paid.  But that's what they did.

10         And so at the same time as we hear from Theia all
11    these complaints about how the money that Mr. Leeds apparently
12    received was the straw that broke the camel's back and caused
13    all of this calamity, their own principals were taking out
14    multiples of what Mr. Leeds did.

15         The third category of wrongdoing is hidden and
16    unauthorized debt.  This is pretty standard in loan agreements,
17    your Honor, to allow only for debt that predates the loan, debt
18    that's disclosed, that's existed indebtedness, plus permitted
19    new indebtedness on terms and conditions acceptable to the new
20    lender; in this case, Brevet.  Again, the point here is you're
21    going to have a secured lender advancing a bunch of money, you
22    need transparency as to what debt is on the books today, and
23    you need to approve debt coming on the books tomorrow.

24         Well, Theia didn't honor either of these obligations.
25    And we know that only because we have stumbled upon other

LAKQfcsO

1    debtors in the course of this litigation:  The plaintiff in

2    Delaware, and then three entities who I believe are affiliated

3    with one another, but who have intervened in this case.  They

4    described debt that predated June 2020 but isn't on the

5    disclosure schedule.  And there are likely others, your Honor.

6    And the reason I say there are likely others is we have a

7    stipulated so-ordered order in this case where Theia was

8    supposed to produce, I believe by September 1, a schedule of

9    note-holders updated through the present.  They never produced

10   that.

11            THE COURT:  By September 1?

12            MR. MICHAEL:  I believe that's the date on the

13   so-ordered stipulation.  But here we are towards the end of

14   October, we have nothing.  Clearly -- I shouldn't say clearly,

15   but -- all signs point to the fact that there are other people

16   out there; others like Dr. Chin, the anesthesiologist.  Who

17   knows?  Friends and family, people who received these

18   promissory notes or -- excuse me -- issued these promissory

19   notes in exchange for money.  We can't even get handle on what

20   debt is out there.

21            The other side of the coin is what I'll call the new

22   debt after the Brevet loan.  Again, we learned about Aithre

23   Capital Partners and we learned from three intervenors who

24   showed up in this case and described loans that occurred after

25   June 29, 2020.  We should have been in the position to approve

LAKQfcsO

1   those, but we weren't.  And, again, there are likely others

2   because Theia hasn't complied with its discovery obligations.

3        THE COURT:  Let me ask you on this.  Under the loan

4   agreements, are they required to notify you in a particular

5   form?  How does this work?  So there's this contention that --

6   well, as I understand, Mr. Leeds was retained by Theia to come

7   up with non-Brevet financing sources, and apparently there is

8   the financing from -- I don't know how it's pronounced --

9   Aithre Capital Partners.

10        MR. MICHAEL:  Right.

11        THE COURT:  And as I read the papers, the claim is,

12   well, Mr. Leeds knew, Mr. Leeds, Theia's consultant; and since

13   he used to be a consultant to Brevet, that, therefore, you're

14   on notice.  Is there a particular manner in which you are to be

15   notified of new debt?

16        MR. MICHAEL:  Well, I don't believe there's particular

17   manner, but the contract language, which I'll put it back up,

18   is on terms and conditions acceptable to Brevet.  And there are

19   a number of problems with Theia pointing to Mr. Leeds as

20   evidence that the terms and conditions were acceptable to

21   Brevet.

22        Number one, they point to an email that doesn't

23   mention Aithre; it doesn't mention the particular transaction

24   at all.  He just says, if the lawyers say we can raise money

25   without telling Brevet, that's okay with me.  So, he's not even

LAKQfcsO

expressing his own opinion.  That's number one.

Number two, this email is sent two weeks after a
letter from Mr. Gallagher's own law firm saying that no -- to
Aithre saying no consents were needed to do the transaction.
That letter is itself fraudulent and is before the email that
they're using to say the debt was permitted.

Number three, the idea that Mr. Leeds can be deemed an
agent or, you know, the voice of Brevet in this time period
when he's being paid 30,000 a month by them, not by us, is,
respectfully, your Honor, ridiculous.  He was working for
Theia.  He was visiting Theia.

THE COURT:  Did you pay him anything -- I think on or
about July 10, you paid the invoice for June's services to
Leeds.

MR. MICHAEL:  Precisely.

THE COURT:  Did you pay anything after that date to
Leeds?

MR. MICHAEL:  Not consulting fees.  He was paid his
return on some personal money he had put in in the 2018 and
2019 debt.  So, the '18 and '19 debt was retired by being
rolled into the 2020 debt, which was $200 million.  And so
Mr. Leeds was entitled to a return on that, and he was paid out
for that.  But no consulting fees.  He's not on the payroll.
He was not an employee.  He wasn't coming to the office.  And
you add on top of that the fact that he sent multiple emails in

LAKQfcsO

1    this exact time frame saying I don't speak to Brevet.

2         THE COURT:  He said, "I don't speak for Brevet."

3         MR. MICHAEL:  Precisely.  Precisely.

4         THE COURT:  Yes.

5         MR. MICHAEL:  And I think the evidence is pretty

6    powerful, your Honor, that this was not an accidental

7    concealment of the debt.  The sheer number of these incidents

8    is proof enough that we're talking about a deliberate pattern.

9    And then you add to that the fact that the Aithre debt was done

10   via newly created bank account never disclosed to Brevet.  The

11   deal documents require Theia to promptly disclose any new

12   accounts, but Theia didn't do that.  So, why would Theia create

13   a new account just for this one loan?  Well, obviously, to

14   conceal it from Brevet.

15        And the dishonesty continued.  We learned about the

16   Aithre loan.  My partner, Mr. Agusti, wrote a letter to

17   Aithre's counsel.  Aithre predictably emails Theia and says, in

18   essence, what is going on?  And the response from Mr. Olson:

19   We had permission in writing for the Bulltick deal, no question

20   about it.  Okay?

21        THE COURT:  Woa, woa, woa, woa.  Who is Gonzalo?

22        MR. MICHAEL:  Gonzalo is somebody affiliated with

23   Aithre, the entity that loaned $25 million to Theia in January

24   of this year without our knowledge.  So, Mr. Gil, Gonzalo Gil,

25   writes to Mr. Olson, one of the two principals of Theia, and

LAKQfcsO

1    says -- I'm going to quote his words here:  "We need to

2    understand what's going on."

3              And Mr. Olson's answer that they had permission in

4    writing, and there was no question about it, it's a lie, plain

5    and simple.  There's no permission in writing.  The closest

6    thing they could come up with, like I said, was this email from

7    Mr. Leeds, which was after the fact, didn't mention the loan,

8    isn't from Brevet.  They didn't have permission for the deal,

9    but they did it anyway.

10             And the final one, which I'll just talk about briefly

11   is the scheme to transfer assets out of the reach of creditors.

12   This was ostensibly occasioned by this trademark litigation

13   where a software company called Theia was suing the defendants

14   in this case.

15             THE COURT:  Instead of changing names, they -- or

16   using a doing business name, they incorporated two entities,

17   but the stipulation you entered into in this case, stipulation

18   and order would prevent any transfers, right?

19             MR. MICHAEL:  It would prevent any transfer today.

20   But I think for the question for your Honor is should a

21   receiver be appointed.  And a subsidiary question that goes

22   into that is, can you trust the existing management?  And if

23   the existing management team are the type of people that would

24   secretly create new entities -- we went out and found them

25   because we did our own searches -- and then would say in

LAKQfcsO

1    interrogatory response they were going to transfer business to

2    the new entities, those people should not continue to have the

3    keys.  These why it's relevant.  It's true, your Honor, they

4    didn't complete or pull off the scheme to completion, but they

5    certainly tried.

6         Now, let me briefly address Theia's two primary

7    defenses.  The first one we've already hinted at:  Let's blame

8    everything on Robert Leeds.  Theia's theory is that Mr. Leeds

9    was acting for Brevet to sabotage Theia by failing to raise

10   money for Theia and paying himself too much.  There are a

11   number of obvious flaws to this theory.  First, he is

12   irrelevant to the receiver issue.  Nobody is trying to make

13   Mr. Leeds the receiver or to have him have any ongoing role

14   whatsoever.

15        THE COURT:  Indeed, presumably, if a receiver

16   appointment looks like the kind of orders that I've seen in

17   other cases, the receiver could sue leads.

18        MR. MICHAEL:  Exactly.  Exactly.  Now, the cause of --

19        THE COURT:  Can sue Gallagher and Olson and presumably

20   even Brevet.

21        MR. MICHAEL:  Presumably.

22        THE COURT:  If he had a good cause of action against

23   somebody.

24        MR. MICHAEL:  Absolutely.  Absolutely.

25        So, let's keep in mind, your Honor, the cause of

LAKQfcsO

Theia's predicament at its core is, it never came through with
the MPP money it had been promising to us and everybody else
for years and years and years.  There's no allegation that
Mr. Leeds had anything to do that.  So, the reason Theia is in
a hole is not because of anything Mr. Leeds said or did.  It's
because Theia was making out-sized promises that it never came
through on.

         We also have to keep in mind that while Theia
complains mightily that Mr. Leeds was paid 4 million, Theia
chose to pay him those sums.  Most of that money went through
the bank account of the law firm of John Gallagher, Theia's
primary shareholder.  So, whatever else you may say about these
payments, they were approved at the highest levels of Theia.
There's also a small fraction of what Mr. Gallagher himself and
his co-conspirator, Mr. Olson, extracted from the company.

         At its core, your Honor, Theia's problems run much
deeper than the alleged overpayment of one consultant.  Even if
we assume that Mr. Leeds wasn't entitled to the money he
received, Theia's attempt to lay that issue at the feet of our
client, Brevet, is, in a word, ridiculous.  Why?  Because that
money was our collateral.  Why in the world would Brevet plot
with Mr. Leeds to have Brevet's own collateral go out the door?
It doesn't make any sense.  Okay?  And then on top of that we
have the emails I referenced, that your Honor is clearly aware
of, where Mr. Leeds is saying again and again, "I don't speak

LAKQfcsO

1    for Brevet."

2          Now, I want to take just one moment to talk

3    specifically about the theory that Mr. Leeds is the one

4    responsible for Theia being in so much debt in the first place.

5    The theory is that Theia is depending on Mr. Leeds to raise

6    money to pay off the 2018 debt and the 2019 debt, so this is

7    the first 25 million our client advanced.

8          Mr. Leeds was unable to raise the money, the theory

9    goes, and so Theia was forced, forced to take more of our

10   money, 117 million more of our money.  Your Honor, this is

11   preposterous.  It's preposterous because Theia didn't have to

12   take on more debt.  It could have said no.  If its technology

13   were so valuable, it could have borrowed money from others.  If

14   the MPP money, if all these deals with foreign countries were

15   real, they could have paid off everyone.

16         The idea that Theia was solely dependent on the

17   Mr. Leeds to take care of that first 25 million is not

18   supported by a single document in the record.  There's no

19   email.  There's no contract that says, "Rob, Mr. Leeds, we're

20   depending on you to raise money to retire this debt."  Not one.

21   In fact, the original deal documents greatly undermine this

22   characterization of the facts.

23         Let me just show you two.  Let's start with the 2018

24   loan.  The deal documents refer explicitly to the MPP money

25   that I've talked about again and again this morning.  When that

LAKQfcsO

money comes in, Theia is required to prepay the debt.  So, this

undermines any suggestion that Theia was reliant on Mr. Leeds.

In fact, Theia was supposed to get the MPP money in the door.

Second, the connection is even more explicit the following year

in 2019 in the deal documents.  What I put up on the screen,

your Honor, is Theia's own board resolutions.  They described

the loan as a bridge to closing by Theia with an MPP country of

an MPP contract.

        So, by Theia's own admission, it's not relying on

Mr. Leeds to come up with some borrower to take out this loan;

it's taking out a bridge loan because this MPP money is

supposed to come in, this MPP money that we all know now is a

gigantic fraud.

        Now, the second defense is that there are new sheriffs

in town.  Your Honor referenced some of them.  Theia says it's

hired new consultants that will fix everything.  This is no

answer to the problem.  To begin with, this is a road we've

been down before with Theia promising again and again that a

turnaround was under way.  There's been a merry-go-round of

advisors coming in and out and no one has solved the issues;

four law firms, multiple financial advisors, management

shuffles.  And even at one point Theia said, "We brought on

board Tom Ridge."  Tom Ridge, who used to be the governor of

Pennsylvania and Homeland Security Director, and he was among

many other people on the merry-go-round who was going to usher

LAKQfcsO

1    in a new era of change.

2            THE COURT:  As a member of the board of directors.

3            MR. MICHAEL:  As a member of the board of directors.

4            THE COURT:  But he's not on the board of directors.

5            MR. MICHAEL:  Exactly.  We have an email to my

6    partner, Mr. Agusti, sitting right here from Theia confirming

7    he's on the board.  Well, there's sworn interrogatories listing

8    current and former board members that don't list him at all.

9            THE COURT:  Who is Eugene Sullivan?

10           MR. MICHAEL:  He is a former judge and at least at one

11   point was the general counsel, maybe still is.

12           THE COURT:  Of Theia?

13           MR. MICHAEL:  Of Theia, yes.  So, all appearances are

14   that this Tom Ridge business was just another fiction.

15           Even if we assume -- you can imagine, of course,

16   Brevet's skepticism when there's been this constant cycle of

17   advisors who have accomplished nothing.

18           THE COURT:  Put that back up on the screen, please.

19           MR. MICHAEL:  Sure.

20           THE COURT:  Thank you.

21           MR. MICHAEL:  So let's take Theia at its word that we

22   have new consultants in town.  They're imminently qualified.

23   Okay, they're great and wonderful turnaround people.  That

24   still doesn't solve the problem because there's no proof they

25   have authority or control to actually do anything.  You've got

LAKQfcsO

Olson and Gallagher in charge who can ignore their advice and
fire them.

And there's also, your Honor, an implementation
problem.  How in the world will these consultants get anything
done when they have no money?  Theia supplies no answer to this
problem.  We just got midday yesterday redacted versions of the
agreements with these consultants.  It's not going to surprise
you, your Honor, that their role is to provide advice.  That's
it.  Advice that can be ignored.  You'll see in the Alix
Partners one, for example, they can be fired.  So how does this
solve the problem, or how does this give us any comfort that
this calamity we're in will be solved?  It gives us no comfort
whatsoever.

The last thing I'll say, your Honor, is let's contrast
that proposal, let these consultants who can be ignored or
fired fix it with what a receiver would accomplish.

First, the receiver will have the authority to get
things done.

Second, the receiver process will be transparent.  As
it stands, it's like pulling teeth to get information from
Theia.  What Theia's consultants are doing is completely opaque
to us.  We don't know if they're doing anything today.  We
don't know if they're being paid, as your Honor raised.

Third, while Theia complains about a receiver
destroying its business, the receiver will be an eminently

LAKQfcsO

1    qualified professional who can decide what should be sold, what

2    order it should be sold in, what's the best way to preserve

3    value.  We shouldn't just assume that the receiver is going to

4    go in and blow up the place.

5              THE COURT:  Obvious question.  You've made out a case

6    that in your view the defendant cannot pay their debts when

7    due, correct?

8              MR. MICHAEL:  Correct.

9              THE COURT:  So why doesn't your client file an

10   involuntary petition for bankruptcy?

11             MR. MICHAEL:  That's a good question.  We're a secured

12   creditor, so we can't.  You need unsecureds to do that.

13             THE COURT:  I didn't realize that was the law, but

14   okay.

15             MR. MICHAEL:  That's correct.  And we'd be happy to be

16   doing this in front of a bankruptcy court, but to date they've

17   resisted.

18             THE COURT:  Okay.  Certainly, however, Theia has that

19   option also.

20             MR. MICHAEL:  Theia has that option, absolutely.

21             THE COURT:  Okay.

22             MR. MICHAEL:  Just to pick up on this last point, so

23   the receiver can do things smartly, can preserve value, but it

24   should be emphasized that the path that guarantees failure,

25   that guarantees value destruction is the status quo.  The

LAKQfcsO

status quo is untenable.

            Fourth, while Theia complains about wrongdoing by

Mr. Leeds and others, those claims can be investigated by a

receiver and pursued exactly as your Honor mentioned a moment

ago.

            Finally, there have been a lot of accusations flying

back and forth in this case; that a receiver will not be a

partisan for this side of the table or that side of the table.

He or she will be an independent fiduciary charged with

maximizing value.  We are in a situation, your Honor, that

desperately cries out for order to be restored, and restored

quickly, and by someone with credibility to do it, and to do it

fairly.

            THE COURT:  It would have to be somebody with

clearance though, wouldn't it?

            MR. MICHAEL:  Quite possibly, yes.  So, we have a

couple of names we've already shared with Theia, eminently

qualified people.  We're happy to provide more, but there's no

shortage of people with receivership experience, with telecom

experience, who can come in and have the credibility to do this

right.  And that, we respectfully submit, is what the Court

should order.

            THE COURT:  Thank you much very much.

            Mr. Shulman.

            MR. SHULMAN:  Good morning, your Honor.

LAKQfcsO

1         THE COURT:  Good morning.

2         MR. SHULMAN:  So, there are a lot of things that Theia

3    and Brevet agree upon, but I would like to actually start,

4    because this may make this a lot shorter, with your Honor's

5    very last question.  And, that is, why are we here?  We should

6    really be down in Bowling Green in front of the bankruptcy

7    court because the bankruptcy court has the ability to deal with

8    Brevet, to deal with Theia, to deal with all the note-holders,

9    to deal with all the issues --

10        THE COURT:  So let me flip that on you.  Why haven't

11   you filed?

12        MR. SHULMAN:  That's an excellent question, your

13   Honor.

14        THE COURT:  Everybody is complimenting my questions.

15   Let's see how they do with their own answers.

16        MR. SHULMAN:  We have not filed yet, but, in fact, we

17   believe the only path for anybody getting their money back is

18   to sell this license, and sale of this license will inevitably

19   require some type of bankruptcy proceeding.  Because nobody is

20   going to buy this license with the cloud that Brevet has now

21   put over this company and over this license.  So the path where

22   we are all likely going to end up is in bankruptcy.

23        We are trying to figure out how to do that in the way

24   that optimizes things for the company, for Brevet.  We've got

25   to get funding its process.  I think it's fair to say that

LAKQfcsO

1   within 60 days, we will be down in some type of bankruptcy

2   proceeding, either because we found a buyer or we found a

3   funder or because we didn't find all of that, and we just need

4   to move forward.

5          There is no company today.  There's no money being

6   spent in any meaningful way.  There's no assets that are being

7   diminished.  All there really is, is a license and a business

8   plan.  That license is not going anywhere.  There's no

9   irreparable harm here.  That license cannot be transferred

10  without FCC approval.  So, there's no real need for a receiver

11  because there's no money that's going to disappear.  Yes, there

12  are some airplanes and there are some computers and things like

13  that, but that's not getting anybody to first base.

14         THE COURT:  Let me ask you, Mr. Shulman -- and you can

15  educate me on this, but it would seem to me that the

16  appointment of a receiver would not preclude the filing of a

17  bankruptcy petition.  In fact, the receiver might conclude that

18  that's the best way to go, I assume, right?  Correct?  There's

19  nothing inconsistent with a receiver being appointed and the

20  filing for bankruptcy that I'm aware of, but happy to be

21  educated otherwise if you know of something that I don't know.

22         MR. SHULMAN:  Your Honor, I think those are two

23  different paths, right?

24         THE COURT:  They are usually two different paths, I

25  agree with that.  But the point is if you had a receiver, it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LAKQfcsO

1    would not foreclose the -- well, certainly, you could be put in

2    involuntarily, but presumably the receiver would have the power

3    to conclude that that was the better path.

4        MR. SHULMAN:  The receiver may conclude that.  The

5    company can conclude that without a receiver.  The company

6    likely will need to go into bankruptcy no matter what.  Now

7    there is a very practical problem over here.  One of the

8    problems is, who's paying for all of this?  The company has no

9    money -- zero.  The company has less than 150 or 200,000 in the

10   bank, and that keeps the electric going and pays the rent,

11   maybe.

12       THE COURT:  This does not sound good for Fried Frank.

13       MR. SHULMAN:  Your Honor, I appreciate you looking

14   out.

15       So the company does not have any money.  So, who is

16   paying for this receiver?  Who is paying for this bankruptcy?

17   That is what we're trying to figure out.

18       A receiver only does half the job.  A receiver can

19   come and figure out how to sell this license, but what does it

20   do with the money?  Does it give it to Brevet?  Does it give it

21   to the note-holders?  What does it do with the money?  Are we

22   going to litigate that in front of your Honor?  This is going

23   to have to end up in some type of bankruptcy because Theia has

24   claims against Brevet.  Brevet has claims against Theia.

25   Everybody's got claims against Leeds, the note-holders, the

LAKQfcsO

1    intervenors.  I mean, your Honor has seen the pleadings.  So,

2    bankruptcy is almost inevitable given all of these problems.

3          All we need is 60 days to be able to get there, which

4    will probably take that much time to find a receiver and find a

5    way to pay the receiver and all of that.  That's all we need.

6    We're asking for a 60-day stay to be able to get this to

7    bankruptcy in an orderly fashion; frankly, to work with Brevet

8    to get in this to bankruptcy in an orderly fashion, because

9    that is the only solution that gets -- that has the most likely

10   probability of getting everybody paid.

11         If a receiver comes in, it's going to be harder to

12   find a buyer.  Everything becomes a mess.  There's a lot of

13   money being spent.  And ultimately we all end up at Bowling

14   Green or some bankruptcy court.  That is why we think that a

15   receiver -- separate and apart from we don't think they're

16   legally entitled to it.  Yes, there are issues at this company.

17   I'm not going to stand up or sit down, as it may be now, and

18   tell your Honor there are no issues.  There are issues.

19         THE COURT:  That sounds like a rather severe

20   understatement, but I take it, I take it for what -- as you

21   intend it.

22         MR. SHULMAN:  But what's the plan for?  What's the

23   receiver going to do?  This is all going to end up in the same

24   place.  So, why are we going through this process when we all

25   kind of know what's going to happen, and we think we can get

LAKQfcsO

1    there within 60 days.  No harm is going to come to Brevet in

2    the next 60 days.  This license is sitting there.  Nobody can

3    transfer it.  I haven't heard them articulate what is the great

4    urgency that they come running to the court for relief -- if

5    they want to go find a buyer?  Find a buyer.  We'll be happy to

6    talk to them.  What is the great harm that is going to happen

7    that requires the machinations of a receiver, finding a

8    receiver, paying for a receiver, when we will be at a place

9    that can actually -- the bankruptcy courts are designed for

10   this type of process; that's what they do.  That's where this

11   should end up, and all we're asking for is 60 days to get

12   there.

13          I'm happy to go through some of the legal arguments,

14   but I think this is really what the question is, you know, is

15   this really the best path forward or is waiting 60 days, let's

16   just stay this case for 60 days.  We'll come back here.  If we

17   are not in bankruptcy yet, your Honor, we will have a very good

18   reason as to why we're not in bankruptcy.

19          THE COURT:  Thank you.

20          Let me hear from Mr. Michael.

21          MR. MICHAEL:  Thank you, your Honor.

22          The first thing I would say is, if Theia wants to file

23   for bankruptcy, they should.  We're first hearing about this

24   today, and Theia's position before today was no bankruptcy, no

25   way, no how.  They were emphatic, okay?

LAKQfcsO

1          And Mr. Shulman question of, what's the harm of

2    waiting 60 days.  My first response would be, turn it around

3    the other way.  What's the harm of getting a receiver going?

4    We're under some time pressure, but what a receiver can do --

5    the receiver will be paid from the estate's assets, but if

6    they're short term need --

7          THE COURT:  Say that again.  The receiver will be paid

8    through?

9          MR. MICHAEL:  From the assets the receiver covers, but

10   short-term payments can come from Brevet.  The receiver can be

11   paid.  That's an issue we can solve.  We're not talking about a

12   huge amount of money, just the fees of the receiver.  But the

13   receiver will be someone well-equipped to find a buyer, but the

14   other thing the receiver can do that's important is secure our

15   collateral.  A big part of the collateral in addition to

16   license are these planes that have these expensive sensors on

17   them.  Planes can fly away.  Theia has already shown it's

18   willing to fly planes away from obligations.

19         We need someone who can get ahold on this and get

20   ahold of the information and impose some order.  So, if a

21   receiver spends a month or two getting the house in order and

22   then they file for bankruptcy, fine.  What's the harm?

23         And then my second response to what's the harm of

24   waiting is, you know, this has been -- this whole matter has

25   been rope-a-dope between Brevet and Theia again and again and

LAKQfcsO

```
 1    again, and more delay, your Honor, sounds like just more
 2    stalling.  And, you know, May 2025 may sound like a long way
 3    away, but with each of these delays, it becomes more and more
 4    challenging to find a buyer that's going to have to from
 5    scratch get these satellites up in the air and operating.  The
 6    asset is much more valuable and much more attractive if buyers
 7    have a longer window.  Now, I understand the FCC can extend it.
 8    But this game of the delaying and the stalling has gone on long
 9    enough.  The receiver should be installed and installed soon to
10    get a handle on this catastrophe, I would say, at the company.
11            THE COURT:  Thank you.  All right.  So what do I
12    think?  This is what I think.  Taking both sides at face value,
13    you know, I have heard from Mr. Shulman today, the only path
14    forward is selling the license, the company has no money, and
15    we expect to file for bankruptcy in 60 days.
16            This is what I propose:  You have principals, but you
17    need to get together very quickly.  I don't know if very
18    quickly is this afternoon or very quickly is tomorrow morning,
19    but that kind of very quickly.  And see if there is comfort
20    that can be given to Brevet with regard to the collateral, for
21    example, the planes, and what can be done there, punishable by
22    contempt.  Receivers order things.  Receivers go to judges to
23    order things.  This is, in essence, a shortcut.  Let's see what
24    can be negotiated, what commitments can be reduced to writing
25    and ultimately reflected in an order.
```

LAKQfcsO

1          In the meantime, the application for the appointment

2     of a receiver would remain pending.  It's pending.  Nothing is

3     stayed.  The case isn't stayed.  The motion isn't stayed.  But

4     there will be an interim package of protection, and that

5     protection is good to have if I issue an order appointing a

6     receiver until the receiver takes office.  It's also good to

7     have if there is going to be any wait for 60 days for a

8     bankruptcy petition to be filed.  It's good in either event.

9     So that should be nailed down.

10          But you actually -- listen, as a judge, I like things

11     to proceed orderly; that you all have your discussions, and the

12     discussions have taken place last week, and you've explored all

13     possibilities.  Sometimes life doesn't work that way.  So, some

14     new things were said today.  I hope you understand that I'm on

15     top of this case and the facts of this case.  I'm not going

16     anywhere, I hope.  And so anything -- I'm in a position to act

17     quickly any which way, any which way.

18          But this is what I want you to do, is work between now

19     and I think it's reasonable to say noon on Tuesday on an order,

20     and if you need more time -- both sides.  Not one side says "I

21     need more time," but both sides say "we agree we could benefit

22     from a little more time," then I will extend the Tuesday noon

23     deadline.  If the two sides are in disagreement and one side

24     says, "As far as I'm concerned, we're done here," and the other

25     side says, "I'd like to talk some more over the coming days and

LAKQfcsO

weeks," that's not going to be enough.  If I know that there

isn't interim protection in place, that may affect the next

steps I take.  If there are interim protections in place, that

may affect the next steps I take.  And that's all I really need

to say for today's purposes.

        Thank you for your hard work on all of this.  I want

to say for the record I've read all of the intervenor's

submissions.

        Is there anything further from the plaintiff?

        MR. MICHAEL:  No, except to say thank you, your Honor,

for your time today.

        THE COURT:  Anything further from the defendant?

        MR. SHULMAN:  Thank you, your Honor.

        THE COURT:  Thank you all very much.  And what you may

do is email me by noon on Tuesday to the chambers email box,

and then we'll see where we are from there.  Thank you all very

much.

        (Adjourned)