UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>Plaintiff,<br><br>—against—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>Defendants. | 21 Civ. 6995 (PKC) |

## RESPONSE OF MICHAEL FUQUA, AS RECEIVER, TO ORDER TO SHOW CAUSE

REED SMITH LLP
Kurt F. Gwynne (No. 5605206)
Christopher A. Lynch (No. 4243655)
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450

- and -

Jason D. Angelo, Esq. (admitted *pro hac vice*)
1201 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575

*Counsel for Michael Fuqua, in his capacity as Receiver of Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc.*

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

INTRODUCTION .................................................................................................. 3

THE ORDER TO SHOW CAUSE.......................................................................... 5

RECEIVER'S RESPONSE ...................................................................................... 5

    A.    The Receiver Has Engaged King & Spalding LLP to Advise the Receiver Regarding the Receivership Financing and Claims by and Against FCS and its Affiliates.............................................................................................. 5

    B.    The Receiver Will Address Contract Rejection and Related Claims Allowance Issues in a Bankruptcy Proceeding if Necessary or Appropriate. ................................................................................................................ 6

    C.    The Receiver Will Address Other Claims Allowance and Administration Issues in Bankruptcy Proceedings When Necessary or Appropriate..................... 8

    D.    The Receiver Has a Clear Plan as to Whether and When a Bankruptcy Proceeding Will Be Filed—and That Plan Is Supported by the Major Creditor Constituencies and the Receivership Entities' Former Executives, Who Were In Office When the Receivership Entities Opposed the Appointment of a Receiver. ..................................................................... 8

        1.    The Receiver's Asset Sale Processes .......................................... 8

        2.    The Receiver's Plan Regarding the Filing of Bankruptcy Petitions ......... 11

        3.    The Major Creditor Constituents and the Receivership Entities' Executives Support the Receiver's Plan as to the Filing of a Bankruptcy Petition ................................................................ 12

THE LITIGATION FUNDER'S SOLICITATION OF NOTEHOLDERS AND FALSE PROMISES ......................................................................................................... 16

PENDING MOTIONS & RECEIVERSHIP ADMINISTRATION............................ 19

CONCLUSION...................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citibank, N.A. v. Nyland (CF8), Ltd.*,
   839 F.2d 93 (2d Cir. 1983)........................................................................................2

*Samuels v. E.F. Drew & Co.*,
   292 F. 734 (2d Cir. 1923)...........................................................................................4

**Statutes**

28 U.S.C. § 2001 ................................................................................................................7

28 U.S.C. § 2004 ................................................................................................................7

**Other Authorities**

Shenon, Philip, *Abramoff Sentenced to Nearly 6 Years in Prison in Fraud Case*, N.Y. Times,
(March 29, 2006), http://www.nytimes.com/2006/03/29/politics/29cnd-
abramoff.html?hp&ex=1143694800&en=bc6e43c91aa81864&ei=5094&partner=homepage. ...13

Michael Fuqua, as receiver (the "<u>Receiver</u>") for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "<u>Receivership Entities</u>"), respectfully submits this response (this "<u>Response</u>") to the Court's *Order* dated January 26, 2022 (the "<u>Order to Show Cause</u>") (Doc. 178) and the *Declaration of Michael Fuqua, as Receiver, in Support of Response to Order to Show Cause* (the "<u>Fuqua Declaration</u>" or "<u>Fuqua Decl.</u>") filed contemporaneously herewith and states as follows:

## <u>INTRODUCTION</u>

1.       The Receiver appreciates and understands the issues raised by the Court in the Order to Show Cause.  The Receiver seeks to address all of those issues in a manner satisfactory to the Court.

2.       *First*, the Receiver has retained King & Spalding LLP ("<u>K&S</u>") to advise the Receiver regarding the receivership financing (the "<u>Receivership Financing</u>"; Docs. 149-50) to be obtained from FCS Advisors, LLC ("<u>FCS</u>") and to deal with all claims by and against FCS and its affiliates, including those counterclaims asserted by Defendants in this action prior to the appointment of the Receiver (Doc. 79).

3.       *Second*, the Receiver understands that this Court will not administer the rejection of contracts or the allowance of claims against the Receivership Entities (whether based on rejection of contracts or otherwise).  To the extent a claims allowance process is necessary, the Receiver *will file* a bankruptcy petition to address those issues.  However, as discussed below, the Receiver believes *now* is not the time for bankruptcy.

4.       *Third*, the Receiver respectfully submits that the sale processes for the disposition of the Receivership Entities' assets should occur in the context of the receivership (as opposed to a bankruptcy case) *before* bankruptcy petitions are filed to administer contract rejection and

claims.  Since his appointment, the Receiver has engaged with potential purchasers of the Receivership Entities' assets regarding the receivership process and with respect to a sale process that has been initiated within the parameters set forth in the Receivership Order.  Pivoting to a sale in the context of chapter 11 bankruptcy proceedings in the midst of the ongoing sale process would upend the expectations of these potential purchasers and other parties in interest, who have been operating under the assumption that the asset sale would occur in this receivership proceeding.  In addition to causing confusion and uncertainty among various constituencies, a bankruptcy filing would disrupt the timing of the sale process and lead to further delays—an issue of particular concern due to the milestones associated with the FCC license, one of the Receivership Entities' most valuable assets.

5.     Significantly, creditors holding approximately 80% of the outstanding principal amount of funded debt (loans) owed by the Receivership Entities *support* the Receiver's position that the sale processes should take place in the receivership context.  Even more telling, the management of the Receivership Entities (which *opposed* the appointment of the Receiver) also agrees that the sale processes should take place in the receivership context.

6.     In any event, the Receiver, as an officer of the court, will take whatever actions the Court deems appropriate, including the filing of bankruptcy petitions for the Receivership Entities by March 9, 2022, if that is what the Court deems appropriate notwithstanding the Receiver's responses herein to the issues identified by the Court in the Order to Show Cause.  *See Citibank, N.A. v. Nyland (CF8), Ltd.*, 839 F.2d 93, 98 (2d Cir. 1983) (receiver acts as "an officer of the court").

## THE ORDER TO SHOW CAUSE

7.    In the Order to Show Cause, the Court identified the following issues:

- The Receiver ought to have conflict-free counsel to deal with the proposed Receivership Financing from FCS and claims by and against FCS and its affiliates;

- The Receiver seeks to reject approximately 160 executory contracts and leases (for which some of the affected persons reside in foreign countries) and the Receiver seeks an order extinguishing the rights of counterparties to certain contracts without an explanation of what those rights may be or why it is equitable given Theia's possession of FCC licenses said to be capable of generating billions in revenue;

- The Court is concerned about serving as a claims tribunal; and

- Although the Receiver's first interim report reflects that he has made serious progress in assessing and organizing the affairs of Theia, it is unclear whether or when he intends to file for a bankruptcy proceeding.

8.    The Receiver respectfully responds to each of the issues raised by the Court as follows:

## RECEIVER'S RESPONSE

**A.    The Receiver Has Engaged King & Spalding LLP to Advise the Receiver Regarding the Receivership Financing and Claims by and Against FCS and its Affiliates.**

9.    As indicated in the *Notice of Receiver's Retention of King & Spalding LLP, as Counsel to Deal with Issues Relating to FCS Advisors, LLC, Brevet Capital Management, LLC, and its Affiliates* (Doc. 186), the Receiver has retained K&S to advise the Receiver regarding the Receivership Financing and to deal with all claims by and against FCS and its affiliates.  Fuqua Decl., ¶ 5.  As set forth in that Notice, K&S was not recommended by FCS (or its affiliates) or their counsel (or by Reed Smith LLP).  *Id*.  K&S was selected by the Receiver based solely upon his and his firm's prior working relationship with K&S, including in connection with several receiverships.  *Id*.

10. K&S has reviewed the proposed Receivership Financing documentation and assessed such documentation from a legal perspective.  Fuqua Decl., ¶ 7.

11. Based on K&S' independent legal review of the Receivership Financing documentation and the Receiver's consultation with his colleagues at GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley"), his negotiation of the economic terms of the Receivership Financing, his efforts to obtain better Receivership Financing from other sources, his review of terms from (among others) an analogous distressed financing in a recent technology bankruptcy case in this District and the fact that no other party to the Receivership has offered better terms and conditions than FCS, the Receiver believes the Receivership Financing documentation and the terms and conditions contained therein are fair, commercially reasonable, and appropriate in light of the current facts and circumstances related to the receivership.[1]  Fuqua Decl., ¶ 10.  Indeed, the Receivership Financing very favorably provides that (i) no interest is payable prior to maturity, (ii) there are no facility fees or unused line fees, (iii) there is no prepayment fee or charge, and (iv) the budget variance provisions are measured on a cumulative, aggregate basis.  *Id.*, ¶ 6.  Most significantly, approval of the Receivership Financing is an essential prerequisite for both the Receiver and PJT to continue with the sale processes, which is expected by potential purchasers and parties in interest.  *Id.*, ¶ 11.

**B.** **The Receiver Will Address Contract Rejection and Related Claims Allowance Issues in a Bankruptcy Proceeding if Necessary or Appropriate.**

12. On December 10, 2021, the Receiver filed the *Motion of Receiver for an Order Rejecting Certain Executory Contracts and Unexpired Leases Effective Immediately Prior to Entry*

---

[1] Aithre Capital Partners LLC ("Aithre Capital"), a junior secured creditor, supported the Receivership Financing.  (Doc. 179).  Only the Litigation Funder (as defined below) opposed the Receivership Financing.  (Doc. 169).

*of the Receivership Order* (the "<u>Motion to Reject</u>"; Doc. 127) and an accompanying *Memorandum of Law* (the "<u>Memo of Law</u>"; Doc. 128).

13.     Although "[t]he Second Circuit has held that a 'receiver is under no obligation to renounce an executory contract. . . .' *Samuels v. E.F. Drew & Co.*, 292 F. 734, 739 (2d Cir. 1923)" (Memo of Law at 10), the Receiver filed the Motion to Reject to put counterparties on notice that the Receiver did not want to assume their contracts.  *See* Memo of Law at ¶ 12 ("In an abundance of caution, and to provide notice to counterparties of the rejection of their contracts and/or leases, the Receiver seeks entry of an Order rejecting (to the extent executory or unexpired) the contracts and leases listed . . . ."); Fuqua Decl., ¶ 12.

14.     The Receiver did request an order "providing that no financial advisor or investment banker is entitled to the payment of any fees or expenses under any rejected contract from the proceeds of the Receiver's sale of any assets of the Receivership Entities."  *See* Motion to Reject ("wherefore" clause).  The Receiver does not want multiple financial advisors or investment bankers seeking a fee from the sale of the Receivership Entities' assets as an expense of the receivership estate.  Fuqua Decl., ¶ 13.  The Receiver understands that non-debtor counterparties would be entitled to *pre*-receivership rejection damages claims (although the language in the Motion to Reject and the proposed order is too broad and would preclude such claims for financial advisors and investment bankers).  *Id.*

15.     In any event, the Receiver will pursue contract rejection and allowance of related damages claims in a bankruptcy proceeding if the sale proceeds are insufficient to pay claims in full (or if such claims are not consensually resolved).  Fuqua Decl., ¶¶ 14, 16.  The Receiver will *not* seek to pursue contract rejection and claims allowance relief in this receivership proceeding. *Id.*

16.     Thus, the Receiver has no objection to the Court entering an order (i) approving the relief requested by the Motion to Reject while expressly reserving all counterparties' rights and claims related thereto for future adjudication (to the extent necessary) in the context of a bankruptcy proceeding or (ii) denying the Motion to Reject without prejudice.[2]  Fuqua Decl., ¶ 15.

**C.      The Receiver Will Address Other Claims Allowance and Administration Issues in Bankruptcy Proceedings When Necessary or Appropriate.**

17.     The Receiver does not intend to and will not pursue other claims administration and allowance (*i.e.*, establishing deadlines for filing proofs of claim and analyzing and administering claims allowance) in this receivership proceeding.   Fuqua Decl., ¶ 16.   To the extent such proceedings are necessary, the Receiver will pursue any such relief in a bankruptcy case (to the extent sale proceeds are insufficient to pay claims in full or claims allowance disputes otherwise require resolution).  *Id*.

**D.      The Receiver Has a Clear Plan as to Whether and When a Bankruptcy Proceeding Will Be Filed—and That Plan Is Supported by the Major Creditor Constituencies and the Receivership Entities' Former Executives, Who Were In Office When the Receivership Entities Opposed the Appointment of a Receiver.**

**1.      The Receiver's Asset Sale Processes**

18.     The Receiver has thoughtfully developed a plan for the disposition of the Receivership Entities' assets—which the Receiver and the Receivership Entities' major creditors *and* former Executives (as defined below) all believe should be completed before the Receiver determines whether the filing of bankruptcy petitions for the Receivership Entities is necessary or appropriate.  Fuqua Decl., ¶ 17.

---

[2] The Receiver also could withdraw the Motion to Reject without prejudice, but that may be procedurally more burdensome as multiple objections have been filed to the Motion to Reject and such parties may need to consent to such withdrawal.  Of course, nothing herein constitutes the Receiver's agreement to the *assumption* of any executory contract or unexpired lease.

19.     The Receiver has filed a *Notice of Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP* ("<u>PJT</u>") *as Investment Banker* (the "<u>PJT Retention Motion</u>"; Doc. 152) and an accompanying *Memorandum of Law in Support of Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 154).

20.     No objections to the PJT Retention Motion were filed.  Based on comments from counsel for Aithre Capital, PJT did agree to certain revisions to the proposed order approving their retention.  Fuqua Decl., ¶ 19.  Accordingly, on January 24, 2022, the Receiver filed a *Certification of Counsel for the Receiver Regarding Revised Proposed Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 175).

21.     PJT is working to sell the Receivership Entities' major assets—interests in licenses issued by the Federal Communications Commission (the "<u>FCC</u>") and the National Oceanic and Atmospheric Administration (the "<u>NOAA</u>").  Fuqua Decl., ¶ 18.

22.     Specifically, PJT (with the assistance of the Receiver and its counsel) (i) identified potential bidders, (ii) analyzed the technical nature of the Receivership Entities' assets, (iii) built out the data room for interested bidders on the FCC and NOAA licenses, (iv) prepared the form of non-disclosure agreement for potential bidders, and (v) prepared initial communications to potentially interested bidders.  Fuqua Decl., ¶ 20.  Concurrently, the Receiver has been engaged with numerous parties regarding a sale process initiated in this Court pursuant to the Receivership Order—a process which the potential purchasers have come to expect.  *Id.*  Putting the Receivership Entities into bankruptcy at this juncture would require the sale process to start back at square one notwithstanding the substantial progress that has been accomplished in the short time since the Receiver's appointment, which necessarily would require the expenditure of funds that otherwise could be available to creditors.  *Id.*

23.     Upon soliciting initial bids for such assets, PJT and the Receiver anticipate selecting a "stalking horse bidder."  Fuqua Decl., ¶ 21.  At that time, the Receiver will file a motion with this Court for approval of the stalking horse bid (which merely sets a floor for the bidding process), the stalking horse asset purchase agreement, any bid protections (such as a breakup fee or expense reimbursement), and the bidding and auction procedures.  *Id*.  After any auction, the Receiver would obtain this Court's approval of the successful bidder (and potentially a backup bidder).  *Id*. Therefore, the sale processes for the Receivership Entities' major assets would be subject to notice to interested parties and the Court's approval and control.  *Id*.

24.     Assuming that the Court approves the retention of PJT and the Receivership Financing, the Receiver believes that the sale processes, including an auction and the selection of successful bidder(s), could be completed by July 15, 2022.[3]  Fuqua Decl., ¶ 22.  On the contrary, a bankruptcy filing at this time would significantly and materially delay the sale process, which in turn would negatively impact value due, in part, to the milestones related to the FCC license (which includes the requirement that over fifty (50) satellites be launched by 2025).  *Id*.

25.     The Receiver also is working with an auctioneer to sell the aircraft and related equipment owned by the Receivership Entities located at a hangar in Riverside, California. *See* 28 U.S.C. §§ 2004 and 2001; Fuqua Decl., ¶ 23.

26.     Finally, the Receiver is also working to sell the office furniture and equipment located in the Receivership Entities' former offices in Washington, D.C.  Fuqua Decl., ¶ 24.  The Receiver has received one offer to purchase the office furniture (and miscellaneous equipment) and expects to receive another offer this week.  *Id*.  If the Court enters an Order approving the

---

[3] The timing of a sale closing may depend upon the identity of the successful purchaser(s) and whether such purchaser(s) seek(s) any amendments to the FCC or NOAA licenses, as regulatory approvals will be required.  Fuqua Decl., ¶ 22.

*Motion of Receiver for an Order Authorizing and Approving Procedures for Sale, Transfer, or Abandonment of De Minimis Assets* (the "*De Minimis* Sale Motion"; Doc. 139),[4] the Receiver anticipates that such sale would constitute a *de minimis* asset sale.  *Id.*

### 2.    The Receiver's Plan Regarding the Filing of Bankruptcy Petitions

27.    In the Order to Show Cause, the Court referred to "Theia's possession of FCC licenses said to be capable of generating billions in revenue."   Order to Show Cause, p. 3. In October 2021, TG Capital Services LLC (together with its affiliate Galactic Litigation Partners, LLC, the "Litigation Funder") obtained a preliminary valuation that valued the FCC license *well in excess* of the amount of the Receivership Entities' debt.  Fuqua Decl., ¶ 25.

28.    After the sale processes have concluded, the Court (and all parties in interest, including the Receiver) will know whether the Litigation Funder's valuation is low, high, or on point.  Fuqua Decl., ¶ 25.  Only at that time will the Court, the Receiver and the parties in interest know whether the sale proceeds are sufficient to pay all creditors in full.  Id.  If so, a bankruptcy proceeding may prove to be entirely unnecessary and wasteful.  *Id.*, ¶ 26.  It certainly will be easier to consensually resolve and pay claims in full if the Receivership Entities are solvent.  *Id.*

29.    On the other hand, if the sales proceeds were significantly lower than the amount necessary to pay all creditors in full, the Receiver would pursue a bankruptcy proceeding at that time to address the claims allowance process.  *Id.*  However, filing a bankruptcy petition prematurely would disrupt the expectations of potential purchasers, create uncertainty regarding a new or different sale process, and send the wrong message to potential bidders—*i.e.*, that the Receivership Entities are admittedly insolvent and the value of their assets is insufficient to pay their creditors in full.  *Id.* at ¶ 27.  A premature bankruptcy petition would also delay the sale

---

[4] No objection was filed with respect to the *De Minimis* Sale Motion.

processes for many months and would necessarily increase related costs and expenses.  *Id.*  For example, PJT would have to be retained again, notice of PJT's proposed retention would again need to be provided to all parties, and the sale processes would have to start over.  *Id.*  Additionally, the FCC license has a major a milestone event such that even a delay as short as thirty (30) days could be detrimental.  Id.  Under the terms of the FCC license, over fifty (50) satellites must be launched by May 2025.  *Id.*

30.     In addition, since his appointment, the Receiver and his team have acted swiftly and competently to secure and protect the assets of the Receivership Entities (including, among other things, intellectual property, aircraft, legal files, bank accounts, cash, and the FCC and NOAA licenses), conduct in-depth forensic analyses of the Receivership Entities' books and records, ensure that the Receivership Entities are current with respect to the tax-related obligations, and engage with a multitude of different creditor constituencies and other parties in interest.  Those accomplishments are detailed in Exhibit 1 to the Fuqua Declaration.

31.     As evidenced by the fact that the Receiver's plan is supported by the Supporting Creditors, the Litigation Funder's quest for the appointment of itself (or someone controlled by it) as a bankruptcy trustee promotes delay and threatens efficiency and the Receiver's accomplishments to the detriment of other parties in interest.

> **3.     The Major Creditor Constituents and the Receivership Entities' Executives Support the Receiver's Plan as to the Filing of a Bankruptcy Petition**

32.     Creditors in three (3) major creditor constituencies, including FCS ($255 million in principal), Aithre Capital ($25 million in principal), "friends and family" noteholders represented by Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ($7 million) and the distraught "friends and family" noteholders ($3.275 million) that issued the Noteholder Emails (collectively, the "Supporting Creditors") affirmatively support the Receiver's plan to sell the Receivership Entities'

assets outside of bankruptcy in this receivership proceeding.  Fuqua Decl., ¶ 29.  Those Supporting

Creditors hold approximately $290.275 million—or over 80%—of the outstanding principal of

funded debt owed by the Receivership Entities.[5]  *Id.*

33.     The Supporting Creditors agree with the Receiver that the sale processes should

continue before this Court in the receivership context.  *See, e.g.*, *Aithre Capital Partners, LLC's*

*Response to the Court's Order to Show Cause* (Doc. 187); *The Singer Family Limited Partnership*

*and FGMK Investments, LLC's Response to the Court's Order to Show Cause* (Doc. 191); *Plaintiff*

*FCS Advisors, LLC's Response to Order to Show Cause* (Doc. 192).

34.     Moreover, after learning of the Order to Show Cause, each of Erlend Olson

(founder, significant shareholder, former COO and CEO of the Receivership Entities, and

guarantor of certain of the Receivership Entities' debts) and John J. Gallagher, Esq. (former

Secretary of the Board of Directors of Theia Group, Inc., significant shareholder, and guarantor of

certain of the Receivership Entities' debts) reached out to the Receiver (or his counsel) to express

their support for the Receiver and the continuation of the receivership proceedings outside of

bankruptcy.  Fuqua Decl., ¶ 30.  Messrs. Olson and Gallagher are referred to herein as the

"Executives."

35.     Attached as Exhibit A is the *Declaration of Erlend Olson, Founder of Theia Group,*

*Inc., in Response to Order to Show Cause* ("Olson Declaration"), dated February 6, 2022, which

provides as follows:

---

[5] The total principal outstanding of funded debt is $355 million, which includes the following:  FCS
principal outstanding in the approximate amount of $255 million, Aithre Capital principal outstanding in
the amount of $25 million, and the "friends and family" notes principal outstanding in the apparent amount
of $75 million (The Receiver is still organizing and reviewing voluminous documents records regarding
the "friends and family" notes).  Fuqua Decl., ¶ 29 n.3.  Therefore, $290.275 million out of $355 million
(more than 80%) in outstanding principal of the funded debt affirmatively support the Receiver's efforts to
continue to sell the Receivership Entities' assets outside of bankruptcy in this receivership proceeding.  *Id.*

1.      I am the founder, former board member, former Chief Operating Officer, and briefly former Chief Executive Officer of the Theia Group, Inc. ("TGI").

. . . .

3.      I have a significant interest as a creditor of the Companies because I am a guarantor of the entire debt owed to FCS Advisors, LLC.  I am also the guarantor of many (if not all) of the so-called "Friends and Family" loans which were entered into prior to the loan from FCS Advisors. I also am a significant equity holder in TGI.

. . . .

5.      For almost three months, the Receiver has been engaging with outside parties and professionals to develop a process for the sale of the Companies' assets, including the FCC licenses.

. . . .

7.      At this time, I am strongly opposed to terminating the receivership or commencing bankruptcy cases for the Companies.  I believe that a sale of the Companies' assets outside of bankruptcy is the best course of action.  First, the Receiver can maximize the value of the Companies' assets in a receivership sale as opposed to a bankruptcy sale by a trustee. Second, the Receiver already has engaged a Tier 1 investment banking firm to oversee the sale process which is already underway in principle.  Third, an expensive bankruptcy filing and process will be wholly unnecessary if the sale process yields proceeds sufficient to pay all or nearly all of the Companies' liabilities in full.  No one, however, will know the amount of sale proceeds until after the sale process (including an auction) concludes.

8.      ***Although I originally opposed the appointment of a receiver for the Companies, now that the Receiver has made so much progress, and for the above reasons, I now strongly support the Receiver's position that the sale process already in process under the receivership should run its course before the Receiver files (if necessary) a bankruptcy petition.  The filing of a bankruptcy case at this time will serve only to distract from, interfere with, and otherwise delay the important sale process.***

*See* Olson Declaration (Exhibit A), ¶¶ 1, 3, 5, 7-8 (emphasis added).

36.     In addition, attached as <u>Exhibit B</u> is the *Declaration of John J. Gallagher, Former Board Member of Theia Group, Inc., in Response to the Order to Show Cause* (the "<u>Gallagher Declaration</u>"), dated February 7, 2022.

37.     During the three (3) months since the appointment of the Receiver, Mr. Gallagher (and his law firm) has worked collaboratively with the Receiver.  *Id.*, ¶ 6; Fuqua Decl., ¶ 30.

38.     Mr. Gallagher is "strongly opposed to terminating the receivership or commencing bankruptcy cases for the Companies" and believes that "a sale of the Companies' assets outside of bankruptcy is the appropriate course of action to maximize the value of" the Receivership Entities' assets.  Gallagher Declaration, ¶ 9.  Mr. Gallagher also recognizes that a "bankruptcy filing may be entirely unnecessary if the sale process yields proceeds sufficient to pay all or nearly all of the Companies' liabilities in full.  No one, however, will know the amount of sale proceeds until *after* the sale process (including an auction) concludes."  *Id.*, ¶ 10.

39.     "For all of those reasons, although the [Receivership Entities] opposed the appointment of a receiver," Mr. Gallagher "strongly supports the Receiver's position that the sale process in the receivership should run its course *before* the Receiver files (if necessary) a bankruptcy petition."  *Id.*, ¶ 11.  "The filing of a bankruptcy case at this time would likely serve only to distract from, interfere with, or delay, the important sale process and, at least presently, might actually adversely affect the maxim[iz]ation of the sale price for the assets of the [Receivership Entities] and be counterproductive to the Receiver's efforts to maximize the value and receive the highest possible proceeds."  *Id.*

40.     As indicated above, both Executives were officers of the Receivership Entities when the Receivership Entities *opposed* the appointment of the Receiver (and filed counterclaims against FCS and its affiliates).

41.     The Executives (one of which founded the Receivership Entities) presumably understand the nature of the Receivership Entities' assets and whether selling them in or outside

of bankruptcy is most likely to maximize the value of those assets.  Both Executives strongly agree with the Receiver that the sale processes should continue before this Court.

42.     The fact that the Executives—who controlled the Receivership Entities when they opposed the Receiver's appointment—support the Receiver's sale processes is a testament to the Receiver's ability to work openly with interested parties to maximize the value of the assets for the benefit of all constituents.

43.     Accordingly, it should speak volumes that the Receiver, the Supporting Creditors, *and* the Executives of the Receivership Entities all agree that the best course of action to maximize value is for the sale processes to take place before this Court and within the context of these receivership proceedings.

44.     At the conclusion of the sale processes, the Court, the Receiver and the parties in interest will know whether a bankruptcy proceeding is necessary or appropriate to administer contracts and claims.  Fuqua Decl., ¶ 28.  At that time, the Receiver will file bankruptcy petitions for the Receivership Entities if necessary or appropriate to administer contracts and claims.  *Id*.  In the interim, the Receiver will not seek to use this Court to administer contracts or claims.  *Id*.

## THE LITIGATION FUNDER'S SOLICITATION OF NOTEHOLDERS AND FALSE PROMISES

45.     The Litigation Funder has been offering to represent holders of "friends and family" notes on a 35% contingency fee basis.  Fuqua Decl., ¶ 33.  Attached as Exhibit C is an example of the Litigation Funder's solicitations of the "friends and family" noteholders.  In the Litigation Funder's solicitation, it suggests (among other things) that the noteholders should pursue a bankruptcy filing for the Receivership Entities.[6]

---

[6] It is unclear what, if any, stake the Litigation Funder has in this receivership case or with respect to the Receivership Entities because, to the best of Receiver's knowledge, the Litigation Funder does not own any equity interest in the Receivership Entities.  Fuqua Decl., ¶ 33 n.4.  To the extent the Litigation Funder

46.     The Receiver was unaware of the Litigation Funder's solicitation efforts until they were brought to the Receiver's attention on February 5, 2022.  Fuqua Decl., ¶ 33.

47.     It has come to the Receiver's attention, however, that the Litigation Funder (at best) has provided misleading information and false promises to "friends and family" noteholders in an effort to garner their support for a bankruptcy proceeding.  Fuqua Decl., ¶ 34.  Attached as <u>Exhibit D</u> are emails (the "<u>Noteholder Emails</u>") that five (5) "distraught" "friends and family" noteholders recently sent to the Litigation Funder expressing their extreme dismay with the Litigation Funders "at best" misleading statements and promises and withdrawing the noteholders' support for the Litigation Funder's scheme.  The identities of the noteholders who sent the Noteholder Emails to the Litigation Funder have been redacted to protect the privacy of such noteholders.[7]

48.     The Noteholder Emails provide, in general, as follows:

> From: [REDACTED] <REDACTED>
> To:     fred@galacticlitigation.com          <fred@galacticlitigation.com>;
> bruce@galacticlitigation.com          <bruce@galacticlitigation.com>;
> branden@galacticlitigation.com <branden@galacticlitigation.com>
> Cc: maureen@galacticlitigation.com <maureen@galacticlitigation.com>
> Sent: Monday, February 7, 2022, [REDACTED]
> Subject: Theia
>
> Dear Fred, Bruce and Branden,
>
> We are extremely distraught over what appears to be at best **misleading information and promises**, and what may be actually be much worse, **perhaps even gross negligence or willful misconduct**. Regardless, it appears that **(a) you do NOT actually have any confirmed funder(s) who will be able to take out any of the debt of Theia, nor are you even**

---

asserts that it does own equity in the Receivership Entities, any purported transfer of equity is void as against this Court's Order entered on August 23, 2021, which provides, in relevant part, that a Receivership Entity "*will not transfer any of its assets* except (a) as provided in the Parties' loan documents, (b) with consent of FCS, or (c) pursuant to an order of this Court permitting such Transfer." *See Stipulation Regarding Discovery and Briefing Schedule*, at ¶ 1 (Doc. 22) (emphasis added).  Stock in subsidiaries is an "asset" of a Receivership Entity subject to the Court's restrictions on transfer.

[7] Contemporaneously with the filing of this Response, the Receiver has filed a letter motion to seal the names and email addresses of the noteholders who sent the Noteholder Emails attached as Exhibit D.

**strongly down a path to do so with anyone, nor (b) did you disclose to us that your plan was instead to take the company into bankruptcy and install yourself in effect as the trustee, nor (c) did you disclose some of the serious problems of the backgrounds of the people who are involved in your enterprise at large.**[8] In addition, you did not advise of any criminal nature of any activities (per Section 3(a)(ii) or as to why you even put Section 3(a)(ii) in the document.

Therefore **we respectfully withdraw our support to your group** in this matter and cite that no complete definitive documentation per Section 8(f) has been proffered, **nor at this time do we believe that your party can act "in good faith" to help negotiate an actual definitive agreement** with the cited law firms, and so we also therefore terminate the interim consent to the draft agreement that was previously provided to you by email. Furthermore, **there has been no proper representation agreement sent along from the lawyers**. Your proposal was that a certain law firm represent my/our debt, and therefore there needs to be a proper representation agreement with that law firm. You, as a consultant, cannot represent me legally and any attempt to do so would of course have to be referred to the NY Bar.

Having said the above, if nevertheless we have misunderstood anything, we recommend that you discuss the detailed business and technical matters of this with the founder of Theia, Mr. Erlend Olson. He brought us into Theia, he has worked tirelessly on our behalf, and we trust his understanding and judgement. To the extent you can convince him that we have either misunderstood, or that you now have a real buyer and/or a verifiable believable plan to make us whole, we will reconsider.

Sincerely,

[REDACTED]

*See* Exhibit D (emphasis added).[9]

---

[8] The reference to the "serious problems" of the "people involved" in the Litigation Funder's business apparently refers to the federal convictions of Jack Abramoff, who (on behalf of the Litigation Funder) attended multiple meetings with Erlend Olson. Mr. Abramoff's latest run-in with the law involved a July 2020 guilty plea to conspiracy and violating the Lobbying Disclosure Act in connection with a $5 million cryptocurrency deal. *See* http://www.nytimes.com/2006/03/29/politics/29cnd-abramoff.html?hp&ex=1143694800&en=bc6e43c91aa81864&ei=5094&partner=homepage. Previously, in 2006, Mr. Abramoff was sentenced to five years and ten months in prison after pleading guilty to fraud, tax evasion, and conspiracy to bribe public officials.

[9] Neither the Receiver nor his counsel solicited the Noteholder Emails. Fuqua Decl., ¶ 34 n.5.

49.     As the noteholders recognize in the Noteholder Emails, the Litigation Funder's plan is (and has been) to force the Receivership Entities into a bankruptcy proceeding so that the Litigation Funder or its counsel can seek to take control of the Receivership Entities for the benefit of the Litigation Funder.  However, a premature bankruptcy filing is not in the best interests of "friends and family" noteholders and will not advance the interests of the noteholders.  Fuqua Decl., ¶ 35.  Notably, such efforts (whether or not permitted) would only serve to delay any sale in a bankruptcy case while the control of the Receivership Entities is resolved.  Noteholders represented by competent counsel (Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C.) recognize that fact and support the Receiver's plan to sell the Receivership Entities' assets outside of a bankruptcy case.  *See* Doc. 191.

## PENDING MOTIONS & RECEIVERSHIP ADMINISTRATION

50.     If the Court permits the Receiver to continue administering the receivership estates, the Receiver respectfully requests that the Court enter Orders (i) approving the Receivership Financing; (ii) approving the retention of PJT; (iii) approving the *De Minimis S*ale Motion; (iv) extending the receivership stay (which currently ends on March 9, 2022) through and including July 15, 2022;[10] and (v) granting such further relief to the Receiver as is appropriate.

## CONCLUSION

51.     Based on the foregoing, the Receiver respectfully requests that the Court permit the Receiver to continue with this receivership proceeding to maximize the value of the Receivership Entities' assets, especially the FCC and NOAA licenses, before determining whether a bankruptcy proceeding is necessary or appropriate.  The Receiver understands that this Court does not intend

---

[10] The Receiver will file a separate motion requesting an extension of the receivership through July 15, 2022 (which is currently the time estimated to complete bidding, the auction process, and Court approval of the successful bidder(s)).

to address the rejection of executory contracts and leases or the administration of claims and that the Court believes such matters are better addressed in the bankruptcy court.

52.     Notwithstanding the foregoing, if the Court believes that the Receiver should file bankruptcy petitions for the Receivership Entities by March 9, 2022, the Receiver, as an officer of the Court, will do so.[11]  Fuqua Decl., ¶ 37.

WHEREFORE, should the Receiver's responses be satisfactory to the Court and should the Court permit the Receiver to continue with this receivership proceeding, the Receiver respectfully requests that the Court enter Orders:  (i) approving the Receivership Financing; (ii) approving the retention of PJT; (iii) approving the *De Minimis* Sale Motion; (iv) extending the receivership stay (which currently ends on March 9, 2022) through and including July 15, 2022; and (v) granting such further relief to the Receiver as is appropriate.  If the Court believes that the Receiver should file bankruptcy petitions for the Receivership Entities prior to March 9, 2022, the Receiver respectfully requests that the Court approve the Receivership Financing so that the Receiver can pay the costs and expenses of the receivership prior to the filing of the bankruptcy petitions.

[*The remainder of this page has been left intentionally blank.*]

---

[11] Even if the Court determines that the Receiver should file bankruptcy petitions for the Receivership Entities prior to March 9, 2022, the Receiver still requests that the Court enter an Order approving the Receivership Financing so that the Receiver can pay the costs and expenses of the receivership before commencing a bankruptcy case.

Dated: February 9, 2022
      New York, New York

                              Respectfully submitted:

                              REED SMITH LLP

By:     */s/ Kurt F. Gwynne*
             Kurt F. Gwynne
             Christopher A. Lynch
             599 Lexington Avenue
             New York, New York 10022
             Telephone:  (212) 521-5400
             E-mail:  kgwynne@reedsmith.com
                     clynch@reedsmith.com

                and

             Jason D. Angelo (admitted *pro hac vice*)
             1201 N. Market Street, Suite 1500
             Wilmington, Delaware 19801
             Telephone:  (302) 778-7500
             Email:  jangelo@reedsmith.com

             *Counsel for Michael Fuqua, in his capacity as*
             *Receiver of Theia Group, Inc., Theia Aviation LLC,*
             *and Theia Holdings A, Inc.*