UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>          Plaintiff,<br><br>    —against—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>          Defendants. | 21 Civ. 6995 (PKC) |

### DECLARATION OF MICHAEL FUQUA, AS RECEIVER, IN SUPPORT OF RESPONSE TO ORDER TO SHOW CAUSE

I, Michael Fuqua, hereby declare:

1. On November 8, 2021, the United States District Court for the Southern District of New York (this "Court") entered an *Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "Receivership Order") in the above-captioned case. Accordingly, I am the Court-appointed receiver ("Receiver") for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities").

2. On January 26, 2022, the Court's *Order* dated January 26, 2022 (the "Order to Show Cause") (Doc. 178).

3. I submit this declaration (this "Declaration") in support of the *Response of Michael Fuqua, as Receiver, to Order to Show Cause* (the "Response"), filed contemporaneously with this Declaration.[1]

---

[1] Capitalized terms not otherwise defined in this Declaration shall have the meanings ascribed to such terms in the Response.

4.      Unless otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge.  If I were called to testify, I would testify competently to the facts set forth below.

### Retention of King & Spalding LLP and Review of Receivership Financing and Claims by and Against FCS and its Affiliates

5.      I have retained K&S to advise me regarding the Receivership Financing and to investigate and deal with all claims by and against FCS and its affiliates.  As set forth in *Notice of Receiver's Retention of King & Spalding LLP, as Counsel to Deal with Issues Relating to FCS Advisors, LLC, Brevet Capital Management, LLC, and its Affiliates* (Doc. 186), K&S was not recommended by FCS (or its affiliates) or their counsel (or by Reed Smith LLP).  I selected K&S based solely upon my (and my firm's) prior working relationship with K&S, including in connection with several receiverships.

6.      As Receiver, I personally negotiated many of the economic terms with FCS.  As set for in my prior declaration (Doc. 173, ¶ 8), the Receivership Financing provides that (i) no interest is payable prior to maturity, (ii) there are no facility fees or unused line fees, (iii) there is no prepayment fee or charge, and (iv) the budget variance provisions are measured on a cumulative, aggregate basis.

7.      Following K&S's retention, I instructed K&S to review the proposed Receivership Financing documentation and assess such documentation from a legal perspective.  Following K&S's review, K&S provided advice to the Receiver regarding the Receivership Financing documentation.

8.      As discussed in my prior declaration (Doc. 173, ¶¶ 5 and 9), I also (a) contacted other lenders to inquire about potential receivership financing and indicative pricing for such financing and (b) reviewed recent terms in debtor-in-possession financing obtained in (among

others) a recent technology bankruptcy case filed in the United States Bankruptcy Court for the Southern District of New York. *See In re Vewd Software USA, LLC*; Bankr. S.D.N.Y.; Case No. 21-12065 (MEW); Interim DIP Order [Dkt. #35; entered on Dec. 17, 2021].

9.      In addition, no party to the Receivership has offered to finance the Receivership on terms and conditions better than FCS.

10.      Based on the legal advice I obtained from K&S based on its independent review of the Receivership Financing documentation, my consultation with my colleagues at GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley") my negotiation of the economic terms of the Receivership Financing, my efforts to obtain better Receivership Financing from other sources, my review of terms from an analogous distressed financing in a recent technology bankruptcy case in this District and the fact that no other party to the Receivership has offered better terms and conditions than FCS, I believe the Receivership Financing documentation and the terms and conditions contained therein are fair, commercially reasonable, and appropriate in light of the current facts and circumstances related to the Receivership.

11.      Most significantly, approval of the Receivership Financing is an essential prerequisite for both the Receiver and PJT to continue with the sale processes, which is expected by potential purchasers and parties in interest.

## Contract Rejection and Claims Allowance Processes

12.      Although I do not believe I am required affirmatively to reject any executory contracts or unexpired leases, I filed the *Motion of Receiver for an Order Rejecting Certain Executory Contracts and Unexpired Leases Effective Immediately Prior to Entry of the Receivership Order* (the "Motion to Reject"; Doc. 127) and the accompanying *Memorandum of*

*Law* (Doc. 128) to put counterparties on notice that I did not want to assume their executory contracts or unexpired leases, as applicable.

13.     In addition, I wanted to insure that multiple investment bankers would not be asserting administrative receivership claims (as opposed to pre-receivership claims) from the proceeds of the sales conducted by PJT.  I understand that parties to rejected contracts should be able to assert pre-receivership claims.

14.     Based on the Court's concerns in the Order to Show Cause, as indicated in the Response, I agree to the Court's denial, without prejudice of the Motion to Reject.  I will address such issues in a bankruptcy proceeding (if necessary or appropriate).  For example, to the extent the proceeds of the sale processes are insufficient to pay claims in full (or if such claims are not consensually resolved regardless of the amount of the sale proceeds), I will pursue contract rejection and allowance of related damages claims in a bankruptcy proceeding.  I will *not* seek to pursue contract rejection and claims allowance relief in this receivership proceeding.

15.     Thus, I have no objection to the Court entering an order (i) approving the relief requested by the Motion to Reject while expressly reserving all counterparties' rights and claims related thereto for future adjudication (to the extent necessary) in the context of a bankruptcy proceeding or (ii) denying the Motion to Reject without prejudice.[2]

16.     I also will not pursue other claims administration and allowance (*i.e.*, establishing deadlines for filing proofs of claim and analyzing and administering claims allowance) in this receivership proceeding and instead will pursue any such relief in a bankruptcy case to the extent

---

[2] I also could withdraw the Motion to Reject without prejudice, but I understand that may be procedurally more burdensome as multiple objections have been filed to the Motion to Reject and such parties may need to consent to such withdrawal.  Of course, nothing herein constitutes my agreement to the assumption of any executory contract or unexpired lease.

sale proceeds are insufficient to pay claims in full or claims allowance disputes otherwise require resolution.

### Proposed Sale Processes for the Receivership Entities' Assets

17.     Since my appointment, I have worked diligently with my team at B. Riley and my counsel to develop an actionable plan for the disposition of the Receivership Entities' assets.

18.     To facilitate the sale of the Receivership Entities' major assets (the interests in licenses issued by the Federal Communications Commission (the "FCC") and the National Oceanic and Atmospheric Administration (the "NOAA")), I filed a motion requesting an order authorizing the retention of PJT Partners LP ("PJT") as investment banker.  *See Notice of Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (the "PJT Retention Motion"; Doc. 152) and accompanying *Memorandum of Law in Support of Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 154).

19.     While no objections to the PJT Retention Motion were filed, I did receive comments from counsel for Aithre Capital Partners LLC ("Aithre Capital") to the proposed order approving PJT's retention.  PJT agreed to certain revisions requested by Aithre Capital and, accordingly, on January 24, 2022, I filed a *Certification of Counsel for the Receiver Regarding Revised Proposed Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 175).

20.     To date, with the assistance of my team and counsel, PJT has, among other things, (i) identified potential bidders, (ii) analyzed the technical nature of the Receivership Entities' assets, (iii) built out the data room for interested bidders on the FCC and NOAA licenses, (iv) prepared the form of non-disclosure agreement for potential bidders, and (v) prepared initial

communications to potentially interested bidders.  Concurrently, I have been engaged with numerous parties regarding a sale process initiated in this Court pursuant to the Receivership Order—a process which the potential purchasers have come to expect.  I believe that putting the Receivership Entities into bankruptcy at this juncture would delay substantially the sale processes despite the substantial progress that has been accomplished in the three months since my appointment.  Such delay necessarily would require the expenditure of funds that otherwise could be available to creditors.

21.     The sale processes for the Receivership Entities' major assets would be subject to the Court's approval and control and notice to interested parties.  Upon soliciting initial bids for such assets, I anticipate selecting (with PJT's assistance) a "stalking horse bidder," whose bid will set the floor for the bidding process.  After selecting a "stalking horse bidder," I would file a motion with this Court for approval of the stalking horse bid, the stalking horse asset purchase agreement, any bid protections (such as a breakup fee or expense reimbursement), and the bidding and auction procedures.  After any auction, I would seek this Court's approval of the successful bidder (and potentially a backup bidder).

22.     Depending upon whether and when the Court enters Orders approving the PJT Retention Motion and the Receivership Financing, I understand that the sale processes, including an auction and the selection of successful bidder(s), could be completed by July 15, 2022. I understand that the timing of the closing of such sale(s) may depend upon the identity of the successful purchaser(s) and whether such purchaser(s) seek(s) any amendments to the FCC and/or NOAA licenses, as regulatory approvals will be required.  On the contrary, I believe that a bankruptcy filing at this time would significantly and materially delay the sale process, which in

turn would negatively impact value due, in part, to the milestones related to the FCC license (which includes the requirement that over fifty (50) satellites be launched by 2025).

23.     With respect to the sale of the aircraft and related equipment owned by the Receivership Entities located at a hangar in Riverside, California, I am working with an auctioneer to arrange a sale (subject to Court approval).

24.     I also am working to sell the office furniture and equipment located in the Receivership Entities' former offices in Washington, D.C.  To date, I have received one offer to purchase the office furniture (and miscellaneous equipment), and I expect to receive another offer this week.  If the Court enters an Order approving the *Motion of Receiver for an Order Authorizing and Approving Procedures for Sale, Transfer, or Abandonment of De Minimis Assets* (Doc. 139) (to which no objection has been lodged), I anticipate that such sale would constitute a "*de minimis* asset sale."

### Filing of Voluntary Bankruptcy Petitions for the Receivership Entities

25.     I believe that only once the sale processes have concluded, the Court (and all interested parties) will know the true market value of the Receivership Entities' assets and whether the sale proceeds will be sufficient to pay all creditors in full.  Notably, the Litigation Funder obtained a preliminary valuation that valued the FCC license well in excess of the Receivership Entities' debt.

26.     I believe it would be easier to resolve consensually and pay such claims in full if the Receivership Entities are solvent.  I further believe that if the Receivership Entities are solvent and all creditors would be paid in full from sale proceeds, a bankruptcy proceeding may be entirely unnecessary and wasteful.  If the sale proceeds were significantly lower than the amount necessary to pay all creditors in full (or if claims could not be consensually resolved even if the Receivership

- 7 -

Entities are solvent), I would pursue a bankruptcy proceeding at that time to address the claims allowance process.

27.     I believe that filing bankruptcy petitions prematurely would disrupt the expectations of potential purchasers, create uncertainty regarding a new or different sale process, and send the wrong message to potential bidders—*i.e.*, that the Receivership Entities are admittedly insolvent and the value of their assets is insufficient to pay their creditors in full.  Since my appointment, I have engaged with potential purchasers of the Receivership Entities' assets regarding the receivership process and with respect to a sale process that has been initiated within the parameters set forth in the Receivership Order.  I believe that pivoting to a sale in the context of chapter 11 bankruptcy proceedings in the midst of the ongoing sale process would upend the expectations of these potential purchasers and other parties in interest, who have been operating under the assumption that the asset sale would occur in this receivership proceeding.  I further believe that filing premature bankruptcy petitions would delay the sale processes for many months and would necessarily increase related costs and expenses.  For example, I understand that PJT would have to be retained again (on notice to all parties) and the sale processes would be significantly delay and potentially have to restart.  Additionally, I understand that (i) the FCC license has a major a milestone event such that even a delay as short as thirty (30) days could be detrimental and (ii) under the terms of the FCC license, over fifty (50) satellites must be launched by May 2025.

28.     At the conclusion of the sale processes, I believe that all parties in interest will know whether a bankruptcy proceeding is necessary or appropriate to administer contracts and claims.  At that time, I will file bankruptcy petitions for the Receivership Entities if necessary or

appropriate to administer contracts and claims.  In the interim, I will not seek to use this Court to administer contracts or claims.

**Support of Major Creditor Constituents and Receivership Entities' Executives**

29.     Major creditor constituencies support my plan to sell the Receivership Entities' assets in this receivership proceeding and outside of bankruptcy proceedings.  FCS ($255 million in principal), Aithre Capital ($25 million in principal), "friends and family" noteholders represented by Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. ($7 million) and the distraught "friends and family" noteholders ($3.275 million) that issued the Noteholder Emails (collectively, the "Supporting Creditors") have affirmatively expressed their support for that sale process.  *See, e.g.*, *Aithre Capital Partners, LLC's Response to the Court's Order to Show Cause* (Doc. 187); *The Singer Family Limited Partnership and FGMK Investments, LLC's Response to the Court's Order to Show Cause* (Doc. 191); *Plaintiff FCS Advisors, LLC's Response to Order to Show Cause* (Doc. 192).  I understand that those Supporting Creditors hold approximately $290.275 million—or over 80%—of the outstanding principal amount of funded debt (loans) owed by the Receivership Entities.[3]

30.     Moreover, after learning of the Order to Show Cause, each of Erlend Olson (founder, significant shareholder, former COO and CEO of the Receivership Entities, and guarantor of certain of the Receivership Entities' debts) and John J. Gallagher, Esq. (former Secretary and member of the Board of Directors of Theia Group, Inc., significant shareholder, and

---

[3] I understand that the total principal outstanding of funded debt is $355 million, which includes the following:  FCS principal outstanding in the approximate amount of $255 million, Aithre Capital principal outstanding in the amount of $25 million, and the "friends and family" notes principal outstanding in the apparent amount of $75 million (My team and I are still organizing and reviewing voluminous documents records regarding the "friends and family" notes).  Therefore, $290.275 million out of $355 million (more than 80%) in outstanding principal of the funded debt affirmatively support my efforts to continue to sell the Receivership Entities' assets outside of bankruptcy in this receivership proceeding.

guarantor of certain of the Receivership Entities' debts) *reached out* to me (or my counsel) to express their support for my continuation of the receivership proceedings outside of bankruptcy. During the three (3) months since my appointment, Mr. Gallagher (and his law firm) has worked collaboratively with me, my team, and my counsel to insure the preservation of assets and the transfer to me of control of the assets and the Receivership Entities books and records.

31.     As indicated above, I understand that both Executives were officers of the Receivership Entities when the Receivership Entities *opposed* my appointment (and filed counterclaims against FCS and its affiliates).  I believe that the Executives (one of which founded the Receivership Entities) presumably understand the nature of the Receivership Entities' assets and whether selling them in or outside of bankruptcy is most likely to maximize the value of those assets.  Both Executives *strongly* agree that the sale processes should continue before this Court. The fact that the Executives—who controlled the Receivership Entities when they opposed my appointment—support the proposed sale processes is a testament to my willingness to work openly with interested parties to maximize the value of the assets for the benefit of all constituents.

32.     I believe that it should speak volumes that the Supporting Creditors *and* the Executives of the Receivership Entities agree that the best course of action to maximize value is for the sale processes to take place before this Court and within the context of these receivership proceedings.

### Litigation Funder's Solicitation of Noteholders and Related False Promises

33.     On February 5, 2022, it came to my attention that the Litigation Funder[4] has been offering to represent holders of "friends and family" notes on a 35% contingency fee basis and that

---

[4] It's unclear what, if any, stake the Litigation Funder has in this receivership proceeding.  To the best of my knowledge, no equity interest in the Receivership Entities has been issued to the Litigation Funder.

the Litigation Funder has suggested to such noteholders that, among other things, they should pursue a bankruptcy filing for the Receivership Entities.

34.     Based on my review of the Noteholder Emails[5] that recently were sent to the Litigation Funder by five (5) "distraught" "friends and family" noteholders, it appears that the Litigation Funder (at best) has provided misleading information and false promises in an effort to garner their support for a bankruptcy proceeding.   It further appears, as recognized in the Noteholder Emails, that the Litigation Funder's plan is (and has been) "to take the company into bankruptcy and install yourself [Litigation Funder] in effect as the trustee."   *See* Noteholder Emails.   In essence, having unsuccessfully opposed the appointment of a receiver, the Litigation Funder seeks to change the venue for a "second bite at the apple" and to undo all of the work that I have done over the last three (3) months.   A description highlighting the significant work that I have done as Receiver is set forth in Exhibit 1 to this Declaration.

35.     As indicated above, I believe that a premature bankruptcy filing is not in the best interests of any creditor constituency (including the "friends and family" noteholders) and will not advance their interests or the interests of other creditors or parties in interest.   In addition to the noteholders that authored the Noteholder Emails, I understand that noteholders represented by competent counsel (Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C.) recognize that fact and support my plan to sell the Receivership Entities' assets outside of a bankruptcy case.

### Pending Motions & Receivership Administration

36.     If the Court permits me to continue administering the receivership estates through the sale processes, I respectfully request that the Court enter Orders (i) approving the Receivership Financing; (ii) approving the retention of PJT; (iii) approving the De Minimis Sale Motion;

---

[5] Neither I nor my counsel solicited the Noteholder Emails.

(iv) extending the receivership stay (which currently ends on March 9, 2022) through and including July 15, 2022; and (v) granting such further relief to the Receiver as the Court deems appropriate.

37.    Notwithstanding the foregoing, as an office of this Court, if the Court still believes that I should file bankruptcy petitions for the Receivership Entities by March 9, 2022, I will do so. In that event, the Receiver still requests that the Court approve the Receivership Financing to pay the costs and expenses of the receivership estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  February 9, 2022

By:  */s/ Michael Fuqua*_____
        Michael Fuqua

**EXHIBIT 1**

<u>Comprehensive Summary of Receivership Team's Activities</u>

(Attached)

Since the Court's entry of the *Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "Receivership Order") on November 8, 2021, Michael Fuqua (the "Receiver"), receiver for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities"), together with his counsel and other advisers (collectively, the "Receivership Team"), have acted, among other things, to obtain control of and secure the assets of the Receivership Entities, to analyze and reconcile the Receivership Entities' books and records, and to prepare for the sale of the Receivership Entities' assets.

### A.  Qualifications of the Receiver

The Receiver earned both his undergraduate degree (AB in Economics) and graduate degree (MBA) from Duke University's Fuqua School of Business.  He and his team at GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley") have been involved in numerous federal receivership cases, including, without limitation:  *SEC v. CRE Capital Corporation & James G. Ossie*, Case No. 09-cv-0114 (N.D. Ga.) (Ponzi scheme); *FTC v. Pinnacle Payments Systems*, et al., Case No. 13-cv-3455 (N.D. Ga.) (debt collection); *FTC v. Williams, Scott & Associates*, et al., Case No. 14-cv-1599 (N.D. Ga.) (debt collection); *SEC v. Zhunrize, Inc. & Jeff Pan*, Case No. 14-cv-03030 (N.D. Ga.) (Ponzi scheme); *FTC v. Global Processing Solutions*, et al., Case No. 17-cv-4192 (N.D. Ga.) (debt collection); and *FTC v. Critical Resolution*, et al., Case No. 20-cv-3932 (N.D. Ga.) (debt collection).

### B.  Retention of Professionals

Following his appointment, the Receiver retained (a) the law firms of Reed Smith LLP (general receivership counsel); Akin Gump Strauss Hauer & Feld LLP (to continue working on Federal Communications Commission (the "FCC") licensing issues); Frank Bonnino, Esquire (to continue his intellectual property work); King & Spalding LLP ("K&S") (to address the

Receivership Financing and to investigate the claims by, and counterclaims against, FCS Advisors, LLC, Brevet Capital Management, LLC, and its affiliates; (b) B. Riley as his financial advisor; and (c) PJT Partners LP ("PJT"), subject to the Court's approval, to facilitate the sale of the Receivership Entities' interests in licenses issued by the FCC and the National Oceanic and Atmospheric Administration (the "NOAA").

## C. Protecting and Securing Assets of the Receivership Entities

Since his appointment, the Receiver has taken a number of steps to secure, take possession of, and/or control the assets of the Receivership Entities, as more fully set forth below.

### i. Court Filings to Protect Assets

Upon his appointment, the Receiver acted quickly, through counsel, to protect the assets of the Receivership Entities, which were located in various jurisdictions across the country.  First, the Receiver caused the filing of *Notices of Receivership* pursuant to 28 U.S.C. § 754 in seven (7) federal District Courts in which property of the Receivership Entities is or may be located.  Second, the Receiver caused the filing of *Notices of Receivership Stay* in fifteen (15) pending litigation and arbitration matters in state and federal courts across the country and has corresponded and/or met with counsel to adversaries in such actions regarding the receivership process.  The filing of such notices has put third parties on actual or constructive notice of entry of the Receivership Order and the 120-day stay of, *inter alia*, actions, proceedings, and lawsuits provided thereby.

### ii. Actions with Respect to Specific Assets

To date, the Receiver has taken the following additional actions to secure and control property of the receivership estate:

- **FCC License**:  Completion of necessary filings with the FCC to transfer control of the FCC license to the receivership.

- **Bank Accounts**:  Closing of twelve (12) Receivership Entity bank accounts at various domestic financial institutions (four (4) accounts in the Receivership

Entities' names at Citizens Bank, two (2) at Wells Fargo Bank, N.A. and six (6) at JPMorgan Chase), transferring of funds in the aggregate amount of $89,089.31 to the receivership account at East West Bank, and communications with the Commercial Bank of Dubai regarding Receivership Entity bank account with a balance of $5,000.

- **Aircraft**:  Collecting payments from a short-term lease of an aircraft and otherwise accounting for aircraft owned by the Receivership Entities located at various locations across the country.  The Receivership Team also has (i) reviewed lien search results regarding the Receivership Entities' aircraft; (ii) solicited a proposal from an asset liquidator for the sale of a disabled aircraft and sensing equipment; and (iii) entered into discussions regarding the sale of three (3) aircraft in various stages of manufacturing.

- **Intellectual Property**:  Protecting the Receivership Entities' domestic *and* international intellectual property (*i.e.*, trademarks and patents) by insuring the payment of renewal and other required fees and amounts due.

- **Books and Records**:  Taking control of the Receivership Entities' books and records, including tangible personal property and their electronic systems and records (*e.g.* accounting system, email system, cloud-based document storage system, servers, and other digital files) and restricting access to same. Specifically, the Receiver has sole control over both the internet-based ("Cloud" version) of QuickBooks used by the Receivership Entities for accounting and the Microsoft 365 system (which includes email, documents, and other data) and a data room.

- **Legal Files**:  Contacting numerous law firms and attorneys previously engaged by the Receivership Entities and seeking the turnover of their legal files concerning the Receivership Entities.  Most firms have cooperated and voluntarily turned over the requested files to the Receiver.  Notably, Fried, Frank, Harris, Shriver & Jacobson LLP, which firm was retained by the Receivership Entities at the behest of the Litigation Funder, has not cooperated with the turnover request.

### iii.    On-Site Field Visits

The Receiver has conducted numerous on-site visits to Receivership Entity locations for the purpose of recovering computer servers, hard copy documents, and other equipment. Specifically, the Receiver has physically traveled to and inspected a number of locations at which the Receivership Entities were known to operate, including (i) offices located in Washington, D.C.;

(ii) offices located in Philadelphia, Pennsylvania; (iii) leased premises at two separate locations in Albuquerque, New Mexico; and (iv) a hangar located in Riverside, California.

### D.  Forensic Analysis of Books, Records, & Recovered Documents

Following his appointment, the Receiver conducted a preliminary forensic analysis and reconciliation of the Receivership Entities' books and records.  The Receivership Team has reviewed thousands of emails and other documents and records that have been instrumental to tracing the source and use of funds.  This analysis and reconciliation of the Receivership Entities' sources and uses of funds is complex and remains ongoing.

#### i.    Financial Data

To date, the Receiver has (a) collected Receivership Entity bank account statements, (b) analyzed variances between the Receivership Entities' QuickBooks data and bank statement data, and (c) prepared a database of individual transactions from the Receivership Entities' bank and credit card statements for further analysis.  The Receivership Team continues to work with multiple banking institutions (including Wells Fargo, PNC, and JPMorgan Chase) to recover details of wire transfers, account and credit card/line of credit statements, and other related information (including, without limitation, drafting and serving subpoenas for such information). An investigation of the Receivership Entities' application for, receipt of, and spending of "Paycheck Protection Program" loans also is ongoing.  Further, an analysis of trade accounts payable has revealed that approximately 231 vendors are owed nearly $42 million.

#### ii.   Tax Matters

With respect to tax matters, the Receivership Team prepared and distributed IRS Form W-2s and IRS Form 1099s for 2021 and is working with recipient to make amendments as necessary. Additionally, after soliciting proposals from various firms, the Receiver continues to negotiate an

agreement for the preparation of the Receivership Entities' outstanding tax returns for 2019, 2020, and 2021.

### iii.    "Friends and Family" Noteholders

After obtaining hard copies from James Hickey, Esq. (which were stored at the Gallagher Law Firm in Philadelphia), the Receivership Team reviewed and analyzed secured note purchase agreements and secured convertible promissory notes with respect to over 100 "friends and family" noteholders. Such review is ongoing. The promised returns are generally stated in "X times" the face amount of the respective notes. Additionally, many notes have matured and have not been amended or otherwise extended.

### iv.    Leases and Contracts

The Receivership Team has conducted a review and analysis of lease agreements concerning premises previously occupied by one or more of the Receivership Entities, including in Washington, D.C., New Mexico, Colorado, and North Carolina, and has engaged in preliminary discussions with certain landlords regarding the receivership process. In addition to the offices in Washington, D.C. and Philadelphia and the premises in New Mexico, the Receivership Entities had (i) commenced activities to develop and build a satellite manufacturing facility, the Orion Center, in Albuquerque, New Mexico; (ii) leased significant hangar and office space at the airport in Riverside, California; (iii) leased office space in Greenwood Village, Colorado; and (iv) conducted activities or stored aircraft for a limited period of time in hangars located in Statesville, North Carolina; Santa Barbara, California; Long Beach, California; and Santa Fe, New Mexico.

The Receiver also reviewed and analyzed numerous employment, consulting, and other service agreements to which the Receivership Entities were a party. As part of that analysis, the

Receiver compiled from available documents an extensive list of contact information (where available) for the related counterparties.  To put parties on notice that the Receiver had no intention of assuming those contracts, the Receiver filed a motion for an order authorizing the rejection (to the extent executory or unexpired) of such contracts and leases.  As indicated in the Response, the Receiver instead will address such issues in bankruptcy proceedings (to the extent necessary or appropriate).

### E.  Asset Sale Process

#### i.    FCC and NOAA Licenses

Following interviews of multiple investment banking firms, the Receiver selected PJT to facilitate the sale (and related marketing process) of the FCC and NOAA licenses.  Since selecting PJT, the Receivership Team negotiated the terms of the PJT engagement and subsequently moved the Court for an order authorizing PJT's retention, which motion is currently pending.   In the interim, the Receiver has worked with PJT to (i) identify potential bidders, (ii) populate the data room with relevant documents, (iii) provide an interface with counsel handling filings related to the FCC license and intellectual property, (iv) prepare a form of non-disclosure agreement for potential bidders, and (v) prepare asset sale marketing materials.

#### ii.    Office Furniture

With respect to other receivership assets, the Receiver has solicited bids (and to date, has received one) for office furniture and other miscellaneous equipment located in the Washington, D.C. office.  To aid in the efficient liquidation of the Receivership Entities' *de minimis* assets, the Receiver filed a motion for an order establishing procedures for the sale or disposition of *de minimis* assets (defined as assets that are proposed to be sold with a gross selling price less than or equal to $100,000 in the aggregate and which are proposed to be sold in a transaction, or in a series

of related transactions, to a single buyer or group of related buyers), which motion remains pending before the Court.

### iii.    Aircraft

The Receivership Team has reviewed lien search results regarding the Receivership Entities' aircraft.  The Receiver has solicited a proposal from an asset liquidator for the sale of a disabled aircraft and sensing equipment owned by the Receivership Entities that is located in the hangar in Riverside, California.

The Receiver also has entered into discussions regarding the sale of the Receivership Entities' three (3) aircraft in various stages of manufacturing.

### F.  Other Activities by the Receivership Team

In addition to the foregoing activities, the Receivership Team continues to respond to questions and other inquiries from investors, vendors and other parties in interest.  The analysis of emails and other Receivership Entity documents for information related to, among other things, claims and flow of funds remains ongoing in an effort to maximize recovery to the Receivership Entities' stakeholders.

### i.    Investigation of Pre-Receivership Counterclaims Against Secured Lender

The Receiver retained K&S to work with the Receiver regarding the investigation of claims by and against FCS Advisors, LLC, Brevet Capital Management, LLC, and their affiliates in connection with the pre-receivership financing and related counterclaims filed by the Receivership Entities prior to the appointment of the Receiver.  The Receiver is working with K&S to provide all relevant background documents, emails, and other information to assist with their investigation and evaluation of such claims and counterclaims filed by the Receivership Entities.

### ii.      Receivership Financing

The Receiver also retained K&S to work with the Receiver regarding the Receivership Financing.  In accordance with the authority granted under the Receivership Order, the Receiver negotiated a term sheet at arms' length for a $5,000,000 loan to fund the sale processes. In December 2021, the Receiver filed a motion for an order approving such financing, which motion remains pending before the Court.  The term sheet, which has been memorialized in a draft *Receiver's Certificate Purchase Agreement* (the "Loan Agreement"), provides for a first-priority, priming lien, interest at the rate of 12% per annum, and a maturity date six (6) months after execution.  The Receivership Financing is reasonable and very favorably provides that (i) no interest is payable prior to maturity, (ii) there are no facility fees or unused line fees, (iii) there is no prepayment fee or charge, and (iv) the budget variance provisions are measured on a cumulative, aggregate basis.

Aithre Capital affirmatively supported the financing, and the only objection thereto was filed by the Litigation Funder.

### iii.      Engagement / Interview of Former Management, Directors & Officers

The Receivership Team has engaged with current and former officers and members of the board of directors of the Receivership Entities and their subsidiaries and affiliates, and has requested that any property of the Receivership Entities in their possession or control be turned over to the Receiver.  To centralize management and avoid potential misunderstandings, the Receiver also terminated any agency or other authority of the foregoing persons to bind the Receivership Entities.  To date, the Receivership Team has interviewed the following individuals: (i) Erlend Olson (former COO & CEO); (ii) Joseph D. Fargnoli (former CTO); (iii) John J. Gallagher, Esq. (former member of the Board); (iv) James Hickey, Esq. (former Secretary of the

Board and General Counsel); (v) James Reid Gorman (former CFO); (vi) Eugene Sullivan (former General Counsel); and (vii) Ryan Coughlin (former President, Theia Risk Management Solutions and Commercial Aviation).  The Receivership Team has been in contact with other individuals regarding their roles with the Receivership Entities and has requested information from such individuals to the extent the Receivership Team believes they are in possession of such information.