

Michael J. Barrie
39 Broadway, 25th Floor
New York, New York 10006-3039
Direct Dial: 302.442.7068
Fax: 302.442.7012
mbarrie@beneschlaw.com

April 27, 2022

File motion by May 25.  Response due June 8.  Reply due June 15.

**Via ECF**

SO ORDERED.

The Honorable P. Kevin Castel
United States Courthouse
500 Pearl St.
New York, NY 10007

Dated: New York, NY
5/6/2022

P. Kevin Castel
United States District Judge

Re: *FCS Advisors, LLC v. Theia Group, Inc., et al.*, 1:21-cv-06995-PKC (S.D.N.Y.)
**Pre-Motion Letter Regarding Motion for Relief from Receivership Stay**

Dear Judge Castel:

We represent non-party Stephen Buscher ("Mr. Buscher") a former employee and creditor of the defendants in the above-captioned action (the "Receivership Entities").  We write pursuant to Rule 3(A) of the Court's Individual Practices to request that this Court allow Mr. Buscher to file a motion for relief (the "Motion") from this Court's Orders imposing a stay of all litigation against the Receivership Entities through July 15, 2022.  *See* D.I. 117 (the "Receivership Order") ¶ 4; D.I. 219 (extending stay to July 15, 2022; such stay, the "Receivership Stay").  Mr. Buscher wishes to file the Motion so that he may pursue an arbitration against the Receivership Entities to enforce his contractual rights for the limited purpose, at this time, of liquidating his claims.  We are unaware of any conference scheduled before the Court.

### I. FACTUAL BACKGROUND

Mr. Buscher is a former employee and CFO of Theia Group, Inc. ("Theia") who was retaliated against by Theia for exposing possible self-dealing and misrepresentations.  In May 2021, he alerted people in his chain of authority at Theia to several disturbing discoveries.  Those discoveries pertained, in part, to the actions of certain shareholders who were also executives and board members ("Concerning Individual(s)").

Mr. Buscher was concerned that the Concerning Individuals were engaged in what appeared to be self-dealing and had used misleading information to induce investments in Theia.

Within days of Mr. Buscher reporting his discoveries to persons in his chain of authority, three notable things happened: (1) the majority of Theia's Board resigned; (2) the Concerning Individuals started a campaign of harassing and threatening behavior directed towards Mr. Buscher; and (3) Theia cut off Mr. Buscher from all access to Company records and, eventually, replaced him by hiring a new CFO without his knowledge.

The Honorable P. Kevin Castel
April 27, 2022
Page 2

Following the Company's constructive discharge of Mr. Buscher, it failed to pay him wages and other compensation due to him under the parties' amended Consulting Agreement entered into as of December 31, 2020 ("Amended Consulting Agreement"). A copy of the Amended Consulting Agreement, and its exhibits, is attached hereto as **Exhibit 1**.

The Amended Consulting Agreement contains a broad arbitration provision by which Theia and Mr. Buscher "agree[d] that any dispute, interpretation, controversy, or claim arising out of or relating to this Agreement shall be settled by arbitration to be held in the State of Delaware before a single arbitrator …." Ex. 1 § 10.4.

Mr. Buscher seeks to pursue causes of action in arbitration against Theia as a result of Theia's constructive discharge and failure to pay compensation owed of no less than $2.8 million as well as indemnification. Specifically, Mr. Buscher seeks payment of compensation under the prevailing wage payment statutes, contractual compensation and severance, and indemnification for his legal fees pursuant to his Amended Consulting Agreement.

## II. LEGAL BASIS FOR MR. BUSCHER'S ANTICIPATED MOTION FOR RELIEF FROM THE RECEIVERSHIP STAY

The Receivership Order provides that "[a]ny party or non-party may seek leave from this Court to commence or maintain an action … upon a showing that such a petition is appropriate and would not interfere with the receivership estate." Receivership Order [D.I. 117] ¶ 4. When analyzing a motion to lift a litigation stay in a receivership, courts in the Second Circuit "utilize a three-part test articulated by the Ninth Circuit." *United States v. JHW Greentree Cap., L.P.*, 2014 WL 2608516, at *4 (D. Conn. June 11, 2014) (citing *S.E.C. v. Wencke*, 622 F.2d 1363 (9th Cir. 1980); *S.E.C. v. Wencke*, 742 F.2d 1230 (9th Cir. 1984) ("Wencke II")). That three-part test is as follows:

(1)  whether refusing to lift the stay genuinely preserves the status quo or whether the moving party will suffer substantial injury if not permitted to proceed;

(2)  the time in the course of the receivership at which the motion for relief from the stay is made; and

(3)  the merit of the moving party's underlying claim.

*Id.* (citation omitted).

At bottom, the *Wencke* test requires a district court to balance the interests of the receiver (here, Michael Fuqua (the "Receiver")) and the moving party. *See United States v. ESIC Cap., Inc.*, 685 F. Supp. 483, 485 (D. Md. 1988). Each of the *Wencke* factors favors a lift of the stay to allow Mr. Buscher to bring an arbitration action against the Receivership Entities to determine damages.

The Honorable P. Kevin Castel
April 27, 2022
Page 3

The Balance of Interests Weighs in Favor of Lifting the Stay. The first *Wencke* factor balances the interests in preserving the receivership estate with the interests of the moving party. *Id.* Here, this balance weighs in favor of lifting the Receivership Stay because (i) Mr. Buscher's arbitration will not disturb the Receivership estate; and (ii) Mr. Buscher will be substantially injured, both economically and due to the resulting abrogation of his right to contractual arbitration, if he cannot commence his arbitration.

Mr. Buscher's Demand will not interfere with the Receivership estate because at this time Mr. Buscher seeks only to establish liability and liquidate his claim against the Receivership Entities. Indeed, courts have held that an action such as the arbitration that Mr. Buscher seeks to commence *cannot* be enjoined as part of a receivership. *See Wolff v. Cash 4 Titles,* 351 F.3d 1348, 1354 n.19 (11th Cir. 2003) (noting that *in personan* lawsuits against a defendant in receivership "cannot be enjoined" and that "[t]he Receiver's interest would be implicated only after the plaintiffs' [*sic*] obtained a money judgment and sought to execute their judgment against the defendants' assets" (citing *Riehle v. Margolies*, 279 U.S. 218 (1929); 65 Am. Jur. 2d Receivers § 365 (2003))).

Moreover, Mr. Buscher faces serious prejudice if he is barred from prosecuting his arbitration rights against the Receivership Entities. He has already been delayed by several months. Mr. Buscher should be permitted to liquidate his claims so that it is possible for the Receiver and the Court to determine whether the proceeds from the Receiver's anticipated sale of the Receivership Entities' primary assets, interests in licenses issued by the FCC and the National Oceanic and Atmospheric Administration (the "Licenses"), are sufficient to pay all creditors' claims—including Mr. Buscher's claims—in full. *See U.S. Sec. & Exch. Comm'n v. Ahmed*, 2020 WL 468443, at *5-6 (D. Conn. Jan. 29, 2020) (lifting receivership stay, in part; holding that first *Wencke* factor weighed in favor of lifting stay because "[g]iven the possible dissipation of assets if and when the Court releases assets after the judgment has been secured, [creditor] … faces a risk that it would not ever recover its unpaid fees from the Relief Defendants if forced to wait to pursue its claims for payment until after the resolution of this case").

If the Receiver determines that the sale proceeds from the Licenses are insufficient to pay all claims in full and commences bankruptcy proceedings, Mr. Buscher would still be denied his day in court until he can obtain relief from the automatic stay in bankruptcy. *See* 11 U.S.C. § 362. Thus, it is likely that Mr. Buscher will be waiting several months more at a minimum, and likely much longer, before he will be able to even *begin* to liquidate his claims. Further delay in this regard is extremely prejudicial to Mr. Buscher, who has been patient so far, but is an individual that remains unemployed after being wrongfully terminated by Theia nearly a year ago already. Obtaining prompt relief is critical to Mr. Buscher.

Mr. Buscher is further prejudiced by the abrogation of his contractual rights to arbitrate his claims. The Court here should lift the Receivership Stay given the strong federal policy in favor of arbitration. Indeed, bankruptcy courts have lifted the automatic stay of the bankruptcy code to allow plaintiffs to pursue broad contractual arbitration rights, such as Mr. Buscher's rights under the Amended Consulting Agreement. *See In re Winimo Realty Corp.*, 270 B.R. 108, 124-26 (S.D.N.Y. 2001) (holding that bankruptcy court lacked discretion to refuse to compel arbitration where claims were "simply contractual claims derivative of pre-bankruptcy agreements"); *Atl.*

*Marine, Inc. v. American Classic Voyages, Co.* (*In re: American Classic Voyages, Co.*), 298 B.R. 222, 226 (D. Del. 2003) (reversing and remanding bankruptcy court's denial of motion to modify automatic stay to permit arbitration proceeding noting "strong federal policy favoring arbitration"); *see also In re Transp. Assoc., Inc.*, 263 B.R. 531, 535-37 (Bankr. W.D. Ky. 2001) (holding that bankruptcy trustee, "standing in the shoes of the debtor, a party to the mutually agreed-upon arbitration clause …, must proceed to arbitrate the contractual dispute," arising from claim objection and that delay and expense to estate "associated with the arbitration itself are insufficient reasons to deny arbitration").

In contrast, any impact on the Receiver as a result of Mr. Buscher filing his arbitration Demand will be minimal, because the Receiver has already made substantial progress with respect to the Licenses and has retained separate professionals to exclusively handle the sale process regardless of any arbitration proceeding commenced by Mr. Buscher. *See* D.I. 195-1, Ex. 1 at pp.1-2 (noting separate counsel retained to handle filings with the FCC and other intellectual property work); D.I. 207 (Order authorizing retention of PJT Partners LP as investment banker). These professionals can continue to handle the Receiver's sale efforts undisturbed by Mr. Buscher's anticipated arbitration demand.

Finally, allowing Mr. Buscher to proceed with arbitration (involving claims of $2.8 million plus indemnification) is necessary for the Receiver to accurately determine if the sale proceeds are sufficient to pay all claims, which he has stated is his intention. *See* D.I. 195 ¶¶ 17, 21, 28.

<u>Mr. Buscher is Entitled to Have His Claim Adjudicated Promptly</u>. The second *Wencke* factor is "the time in the course of the receivership at which the motion for relief from the stay is made." In this regard, the Ninth Circuit has recognized that, "[a]t some point, persons with claims against the receivership should have their day in court. The receivership cannot be protected from suit forever." *Wencke II*, 742 F.2d at 1231.

This second *Wencke* factor also weighs in favor of Mr. Buscher. The Receiver has made substantial progress in his efforts to sell the Receivership Entities' primary assets, the interests in the Licenses. *See generally* D.I. 195, 229. During that time, Mr. Buscher has been unemployed since his wrongful termination last year and has been unable to pursue his claims. There is no good reason to require Mr. Buscher to wait any longer to pursue his bargained-for rights to arbitration. The Court should permit Mr. Buscher to pursue his claims now rather than denying Mr. Buscher his day in court indefinitely while the Receiver pursues a sale of the Licenses and thereafter determines whether to put the Receivership Entities into bankruptcy.

<u>Mr. Buscher Holds Colorable Claims Against the Receivership Entities</u>. To satisfy the third *Wencke* factor, the movant need only have a "colorable claim that entitle[s] [him] to a trial on the merits," and courts should not attempt to "decide the merits" of the movant's claim when considering a motion to lift a litigation stay. *Ahmed*, 2020 WL 468443, at *5; *see also Wencke II*, 742 F.2d at 1232 (holding that district court abused its discretion when it ruled on merits of movant's intended claim in proceeding to lift stay).

Mr. Buscher's claims are more than colorable. Among other things, Theia undoubtedly breached the Amended Consulting Agreement's requirement that Mr. Buscher was to be the "*sole*

The Honorable P. Kevin Castel
April 27, 2022
Page 5

CFO" of Theia Group, Inc. with "chief oversight of all accounting and financial control functions" (*see* Ex. 1, § 3.3 & Ex. B (emphasis added)). Theia has admitted in this proceeding that it appointed a new CFO in June 2021, without Mr. Buscher's knowledge and while Mr. Buscher was still serving as CFO. *See* Declaration of Reid Gorman (D.I. 45) ¶18 (stating the Mr. Gorman was "offered and accepted the role of [CFO]" in June 2021). Nor could Theia reasonably dispute that it revoked Mr. Buscher's access to key financial information and controls that he required to perform his job duties as CFO of Theia.

Theia therefore constructively discharged Mr. Buscher without cause in violation of the terms of the Amended Consulting Agreement, entitling Mr. Buscher to compensation as provided for by the Amended Consulting Agreement. *See* Ex. 1, §7.2 & Ex. A. Yet Theia has failed to pay Mr. Buscher all amounts owing to him under the Amended Consulting Agreement.

These breaches of the Amended Consulting Agreement damaged Mr. Buscher in an unspecified amount to be proven in arbitration. That amount, however, will be no less than $2,800,000 based on the terms of the Amended Consulting Agreement. Thus, Mr. Buscher's claims are colorable and the third *Wencke* factor also weighs in favor of Mr. Buscher.

For all these reasons, we respectfully request that this Court allow Mr. Buscher to file a motion for relief from the Receivership Stay to allow Mr. Buscher to pursue his contractual arbitration rights and liquidate his claims against the Receivership Entities.

### III.    PROPOSED SCHEDULE

Mr. Buscher is prepared to file the Motion as soon as the Court grants him leave to do so and respectfully requests that the Court require any opposition to the Motion ("Answer") be filed within fourteen (14) days after service of the Motion and that any reply to the Answer be filed within seven (7) days after service of the Answer in accordance with Local Civil Rule 6.1(b).

\* \* \*

We thank the Court for its consideration of this request.

        Very truly yours,

        BENESCH, FRIEDLANDER,
          COPLAN & ARONOFF LLP

        */s/ Michael J. Barrie*

        Michael J. Barrie

cc: All Counsel of Record (via ECF)

# EXHIBIT 1

# CONSULTING AGREEMENT

This amended Consulting Agreement ("**Agreement**") is entered into as of 31 December 2020 by and between Theia Group, Incorporated, a company incorporated according to the laws of the State of Delaware, having a principal place of business at 1455 Pennsylvania Ave Suite 800 Washington DC 20004 (the "**Company**" or "**TGI**"), and Stephen Buscher ("**Consultant**").  The **Effective Date** shall remain the same as in the first contract originally entered into on 3 October 2019, amended on 13 July 2020 and terms shall commence as of 1 January 2021.

WHEREAS, the Company desires to continue to retain Consultant to perform certain services for the Company, and Consultant is willing to perform such services, on the terms set forth more fully below,

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, it is hereby agreed by and between the parties hereto as follows:

1. DEFINITIONS.

Capitalized terms shall have the meanings defined in this Section or defined elsewhere in this Agreement.

    1.1 **"Services"** mean the work effort to produce Deliverables, work products, and any other results, whether partial or intermediary, of Consultant's Services under this Agreement, and all related documentation which Consultant makes, conceives, reduces to practice, or develops in whole or in part, either alone or jointly with others, in connection with the Services, or which relate to any Proprietary Information.

    1.2 **"Proprietary Information"** means any data, information, or materials in any form which is disclosed to or becomes known to Consultant hereunder, or specific information which is identified or designated as "confidential," "proprietary," or in some other manner to indicate its confidential nature, or else is data, information, or materials that Consultant or the Company would reasonably expect to be confidential or proprietary information of the Company, or of personnel associated with the Company, or of a third party from whom the Company received the data, information, or material in confidence.  Proprietary Information shall at all times include, whether or not specifically identified, but is not limited to, technical data, trade secrets, know-how, ideas, improvements, techniques, research, product development plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, composition, technology, designs, drawings, graphic content, samples, engineering, configuration information, marketing information, branding information, finances or any other information relating to the Company's actual or anticipated business.  All work-product of the Consultant shall be considered Proprietary Information.  The material terms of this Agreement are considered Proprietary Information.

    1.3 **"Deliverables"** means any work-product produced by the Consultant pursuant to this Agreement, including but not limited to any Proprietary Information.

    1.4 **"Intellectual Property Rights"** means the right to the complete enjoyment and exclusive ownership of any Proprietary Information, including but not limited to the right to trademark, copyright, patent, trade-secret, mask rights, or otherwise formally or informally

*SB*

register any Proprietary Information or work product of the Consultant as intellectual property under the laws or jurisdictions of claim or trade methods of any jurisdiction, in any country in the world.

2. CONSULTING SERVICES.

    2.1 <u>Description of Services</u>. Consultant agrees to provide to the Company the Services set forth in <u>Exhibit A</u> in accordance with the terms and conditions of this Agreement and any executed Statement of Work as set forth in <u>Exhibit B</u>. Consultant shall deliver to the Company in written form or other tangible form or other form appropriate any Deliverables in a timely and prompt manner, as determined between the Consultant and the Company from time to time.

    2.2 <u>Efforts</u>. Consultant shall use its best efforts to perform the Services and to complete and deliver to the Company the Deliverables in accordance with this Agreement. Consultant's performance under this Agreement shall be conducted with due diligence and in a professional manner and in compliance with the professional standards of practice in the industry. Consultant shall comply with all applicable laws and Company's safety and security rules and regulations in the course of performing the Services.

    2.3 <u>Statement of Work</u>. In addition to <u>Exhibit A</u>, the parties may identify a more detailed description of the Services to be provided by the Consultant in a statement of work for each project assignment (**"Statement of Work"**). The Statement of Work, including any amendments or additions thereto, is attached to and incorporated herein as <u>Exhibit B</u> and shall be adjusted by both parties from time to time. In the event of any inconsistency or conflict between the terms of a Statement of Work and the terms of this Agreement, the terms of this Agreement shall prevail. The parties agree to discuss in good faith any issues that may arise in performance of the work tasks associated with each Statement of Work, including compliance with any schedule set forth in the Statement of Work. The Company will evaluate any Deliverables for acceptance under the Company's reasonable acceptance criteria or procedures; however, any partial acceptance or rejection of Deliverables for the purposes of judging the completion or not of any Statement of Work item shall not in any way diminish the Company's Intellectual Property Rights to any and all of Consultant's work-product.

    2.4 <u>Location</u>. Except as otherwise specified in this Agreement, Consultant shall perform the Services at the Consultant's facility, the Company's facilities or other Company-approved designated locations.

    2.5 <u>Reports</u>. Consultant will: (a) be available on a reasonable basis to discuss activities, progress, and/or development of the Services provided by Consultant; and (b) provide written reports regarding the activities, progress, and/or development of such Services upon the Company's request.

    2.6 <u>Third Party's Confidential Information</u>. Consultant shall not use any third party confidential or proprietary information or intellectual property right which was acquired by Consultant in confidence or in trust prior to the Effective Date of this Agreement or independent of this Agreement, unless: (a) such third party has given Consultant the right to license or use such information or intellectual property rights to the Company; or (b) the third party has a prior disclosure agreement with the Company which permits the Company to acquire or understand

Type text here

the third party's confidential information; and (b) Consultant complies with the other confidentiality provisions of this Agreement.

  2.7 Equipment.  Except as expressly agreed to by the Company in writing or as otherwise stated in Exhibit A, Consultant will be responsible for providing all tools, equipment, and instrumentality required to perform the Services under this Agreement ("**Equipment**").  From time to time, the Company may license, rent, loan, or sell Equipment to Consultant for Consultant to use in performing the Services; provided, however, that Consultant agrees:  (a) to comply fully with any license or any other agreement entered into with the Company governing the Equipment; (b) to comply fully with any license or any other agreement with the owner of the Equipment (if the Company is not the owner) at least to the same extent as the Company is obligated to comply with such agreement; (c) to use the Equipment exclusively and solely for performance of the Services; (d) not to transfer, sublicense, assign, rent, or loan the Equipment to any third party, except with the Company's prior written consent; (e) to keep the Equipment free and clear at all times from any liens or other encumbrances, except with the Company's prior written consent; and (f) to use due care in maintaining and operating such Equipment to the same extent that Consultant maintains and operates its own equipment of like importance, but no event less than reasonable care.

3. EXECUTIVE STATUS

  3.1 Status.   The Consultant acknowledges that Consultant is being engaged by the Company as a W2 contract employee (the Company will assist in restating year 2020 as W2 salary).

  3.2 No Power.  Neither party is the legal representative, joint venturer, partner, franchisee, agent of the other.  Consultant does not have the right to assume or create any obligations of any kind on behalf of, to incur any liability, or otherwise to bind, the Company in any respect whatsoever except as authorized in writing by the Company.  Consultant shall not make any verbal or written representations on behalf of the Company except as authorized by the Company.

  3.3 Executive Title and Role.  Consultant shall be the sole CFO (Chief Financial Officer) of the Company.  The CFO shall report on a daily basis to the CEO and/or by the Company's Board of Directors as requested.

  3.4 Non-Solicitation.  During the Term of this Agreement and for one (1) year thereafter, Consultant shall not encourage or solicit any employee or consultant of the Company to terminate any employment or other relationship with the Company and shall not hire or retain any such employee or consultant.

  3.5 Conflict.  During the Term of this Agreement, Consultant shall not perform consulting or other services for any person or entity that is, or as a result of such services would become, involved in any aspect of business that is or may be competitive with that of Company's actual or anticipated business, except with the Company's prior written consent.

  3.6 Subcontract.  Except with the Company's prior written consent, Consultant shall not subcontract any part of the Services.

4. FEES.

    4.1 <u>Fees</u>.  In consideration of the Services provided hereunder, the Company will pay to Consultant the amounts specified on, or computed in accordance with <u>Exhibit A</u>.  Except with the Company's prior written approval, time spent by Consultant traveling for, or on behalf of the Company shall not be compensable.  Consultant's sole and exclusive compensation for the Services provided shall be as set forth in this Section and as specified in <u>Exhibit A</u>.

    4.2 <u>Expenses</u>.  Except as expressly set forth herein, Consultant shall be fully responsible for all costs and expenses related to the performance of the Services by the Consultant, including, but not limited to, all fees, fines, licenses, bonds, taxes required or imposed against Consultant and all other of Consultant's cost of doing business.  Travel-related expenses and other out-of-pocket expenses incurred by Consultant which are directly related to the furnishing of the Services will be reimbursed by the Company.  As a condition to any authorized reimbursement, Consultant is required to submit to the Company itemized statements, including copies of bills, receipts, or other written documentation of such reimbursable expense, and reimbursement will be made in accordance with the Company's then current expense reimbursement policies.

    4.3 <u>Payment</u>.  Except as otherwise specified herein, the Company will make payments within thirty (30) days of the Company's receipt of invoices detailing the nature and duration of the Services rendered and/or the expenses incurred for the specified period.

    4.4 <u>Audit</u>.  During the Term of this Agreement and for three (3) years thereafter, Consultant will keep clear, complete, and accurate records and files in connection with the performance of the Services, including, but not limited to, time spent performing the Services, its use and handling of Proprietary Information, and the development of the Deliverables.  The Company or its designated independent auditor will have the right to inspect and audit all such records and files of the Consultant, to obtain true and correct photocopies of such records and files, and to obtain such other information or material as necessary to determine Consultant's compliance with this Agreement.  The Company shall give Consultant reasonable notice of such audit, and shall conduct such audit during regular business hours in a manner that does not unreasonably interfere with the Consultant's business.  At the Company's request, Consultant shall provide reasonable assistance to the Company or its independent auditor in conducting such inspection and audit.

5. OWNERSHIP.

    5.1 <u>Proprietary Information</u>.  The Company owns solely and exclusively all right, title, and interest in and to the Proprietary Information and all Intellectual Property Rights relating thereto, and the Company reserves and retains to itself all rights relating to all of the foregoing.

    5.2 <u>Deliverables and Work Product</u>.  The parties agree that the Company owns solely and exclusively all right, title, and interest in and to all Deliverables and all Consultant work-product which is created pursuant to this Agreement, and all Intellectual Property Rights relating thereto, except for that part which contains the intellectual property of a third party not the Consultant, and which has been so identified by the Consultant as belonging to a third party.

5.3 <u>Assignment</u>.  Consultant agrees to assign, and hereby irrevocably assigns, to the Company all of Consultant's right, title, and interest in and to all Deliverables and all Consultant work-product and all Intellectual Property Rights relating thereto.

5.4 <u>Assistance</u>.  Consultant agrees to perform, during and after the Term of this Agreement, all acts deemed necessary or desirable by the Company to permit and assist the Company with evidencing, confirming, securing, recording, perfecting, obtaining, maintaining, protecting, defending, and enforcing Consultant's assignment to the Company and/or the Company's rights in and to the Proprietary Information, the Deliverables, any Consultant work-product, or any Intellectual Property Rights relating to any of the foregoing.  Without limiting the generality of the foregoing, Consultant agrees, during and after the Term of this Agreement, to: (a) make clear and full disclosure to the Company of all pertinent information and data relating to Consultant's obligations under this paragraph; and (b) execute and deliver such documents and do such proper acts as may be necessary to carry out and confirm Consultant's obligations under this paragraph, including but not limited to, assisting the Company with filing copyright applications or patent applications and obtaining patents on any Deliverables or Intellectual Property Rights.  Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agents and attorneys-in-fact to act for and in behalf of and instead of Consultant, to execute and file documents and to do all other lawfully permitted acts with the same legal force and effect as if executed by Consultant.

5.5 <u>License</u>.  Consultant agrees that if in the course of performing the Services, Consultant incorporates or embeds into a Deliverable or work product any Intellectual Property Right or other proprietary information, data, or material owned by Consultant or in which Consultant has an interest, license, or other right and which is not owned by the Company (together, **"Consultant Materials"**), the Consultant shall promptly make full and clear written disclosure to the Company of any such Consultant Material prior to incorporating or embedding such Consultant Materials into any Deliverables or work product.  Consultant Materials may include, but are not limited to, any Intellectual Property Rights which are required or necessary or useful for the operation or use of the Deliverables or work-product by the Company.  Consultant hereby grants to the Company a non-exclusive, royalty-free, fully paid-up, perpetual, irrevocable, worldwide right and license to make, have made, reproduce, modify, sell, distribute, assign, sublicense, make derivative works from, and otherwise use or commercialize such Consultant Materials as part of or in connection with the Deliverables or work product.  If Consultant fails to make the requisite disclosure set forth in this paragraph, the Consultant shall be deemed to waive its rights in and to the Consultant Materials and such Consultant Materials will be deemed part of the Deliverables or work product and owned solely and exclusively by the Company.

6. PROPRIETARY INFORMATION.

6.1 <u>Restrictions</u>.  Consultant agrees that the consulting arrangement under this Agreement creates a relationship of confidence and trust between Consultant and the Company with regard to Proprietary Information.  During and subsequent to the Term of this Agreement, Consultant: (a) shall treat as strictly confidential all Proprietary Information; (b) shall not disclose, disseminate, distribute, or transfer such Proprietary Information to any third party without the Company's prior written consent; (c) shall not use the Proprietary Information for its own benefit or for the benefit of any third party, except with the Company's prior written consent; (d) shall

not use such Proprietary Information except solely for the purpose of its performance under this Agreement; and (e) shall protect the Proprietary Information by using at least the same degree of care as Consultant uses to protect its own confidential information of similar nature but in no event less than reasonable care. Consultant further agrees to disclose such Proprietary Information only to its employees and affiliates with a direct need to know to perform their work responsibilities for purposes of Consultant's performance of the Services hereunder and agrees to require such employees to execute nondisclosure agreements containing protections substantially similar to this Section of the Agreement.

6.2 Exclusion.  Proprietary Information does not include information which as evidenced in writing by Consultant: (a) is known or rightfully becomes known to Consultant from a third-party source without breach of any confidentiality obligation; (b) is or becomes publicly available and made generally available through no wrongful act of Consultant or any third party without breach of any confidentiality obligation; or (c) is or was independently developed by Consultant without use of or reference to the Company's Proprietary Information.

6.3 Removal.  Except with the Company's prior written consent, Consultant shall not remove any Proprietary Information from the Company's business premises or other Company designated locations.

6.4 Return.  Upon the expiration or termination of this Agreement or upon the Company's earlier written request, Consultant will promptly return to the Company or destroy as requested by the Company: (a) the original and all copies of any Proprietary Information; (b) any documents, materials, or other tangible items that contain or embody the Proprietary Information, whether such items have been prepared by Consultant or others; and (c) any summaries or analyses thereof or studies or notes thereon, whether such items have been prepared by Consultant or others.  Within five (5) days after such return or destruction, Consultant shall provide a written declaration to the Company which will attest to the complete return or destruction of all of the Company's Proprietary Information.

6.5 Conflict; Other NDA. In the event of any conflict relating to confidentiality between the terms of this Agreement and the terms of any non-disclosure agreement in force between the parties, whichever terms are more restrictive to the Consultant shall prevail.

7.   TERM AND TERMINATION.

7.1 Term.  This Agreement will become effective on the Effective Date and will continue in full force and effect until 31 December 2022, unless and until terminated by a party in accordance with this Agreement (the **"Term"**).

7.2 Termination.  Either party may immediately terminate this Agreement upon written notice if the other party does not cure a material breach of this Agreement within thirty (30) days of receipt of written notice detailing such breach.  The Company may terminate this Agreement without cause and for convenience with thirty (30) days prior written notice to Consultant.  The parties may mutually agree to terminate this Agreement in writing.  In the event that the Company terminates this Agreement without cause due to breach by Consultant, then the Consultant shall be entitled to payment of the Minimum Monthly Fee Payment (as defined in Exhibit A).

7.3 <u>Effect of Termination</u>.  Except as otherwise expressly provided herein or in 7.4, upon the expiration or termination of this Agreement, all rights and obligations of each party to the other will terminate.

7.4 <u>Survival</u>.  Upon the expiration or termination of this Agreement for any reason, any Section which contemplates an on-going obligation of the parties to each other will survive such termination or expiration and continue in full force and effect, including but not limited to Sections 3.4, 4.4, 5, 6, 8 and 9.

8. WARRANTIES; INDEMNIFICATION.

8.1 <u>General</u>.  Consultant represents, covenants, and warrants that:  (a) it has the full right, power, and authority to enter into the Agreement, to grant the rights and licenses herein, and to perform all of its respective obligations and undertakings herein; (b) the execution of this Agreement has been duly authorized by all necessary action and the representative executing the Agreement on its behalf has been duly authorized to do so; (c) the execution of this Agreement, the grant of the rights and licenses herein, and the performance of its obligations and duties hereunder, do not and will not violate or breach any agreement to which it is a party or by which it is otherwise bound; and (d) it has not and shall not enter into any agreement or other arrangement that would prevent it from fully performing its obligations or conveying any rights under this Agreement, or in any way is in contravention to the terms of this Agreement, or that would interfere with or impair the complete enjoyment of the rights and licenses granted to the Company.

8.2 <u>Services</u>.  Consultant further represents, covenants, and warrants that:  (a) the Deliverables are wholly original with Consultant; (b) the Deliverables do not and will not infringe, misappropriate or violate any third party's proprietary rights or intellectual property rights; and (c) any software Deliverables do not and will not contain any viruses, which shall mean any computer code or routine designed to disrupt, disable, harm, or otherwise impede in any manner, including aesthetic disruptions or distortions, the operation of any software Deliverable, or any other associated software, firmware, hardware, or computer system (including local area or wide-area networks), in a manner not intended by the Company.

8.3 <u>Indemnification.</u>  Except as otherwise provided by applicable law, while Consultant is employed by Company and thereafter while potential liability exists (but in no event less than five (5) years after any termination), in the event Consultant is made a party to any threatened, pending, or contemplated action, suit, or proceeding, whether civil, criminal, administrative, regulatory or investigative, by reason of the fact that Consultant is or was performing services under this Agreement, then Company shall indemnify, defend and hold harmless Consultant to the fullest extent permitted by applicable law against all expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement, as actually incurred by Consultant in connection therewith.  In the event that both Consultant and Company are made a party to the same third party action, complaint, suit, or proceeding, Company will engage competent legal representation, and Consultant will use the same representation, provided that if counsel selected by Company shall have a conflict of interest that prevents such counsel from representing Consultant, then Company may engage separate counsel on Consultant's behalf, and subject to the provisions of this paragraph, Company will pay all attorneys' fees of such separate counsel.

Page 7

9.  LEGAL COMPLIANCE

    9.1 <u>FCPA</u>. Consultant shall comply with all applicable laws, regulations, statutes, and directives including, but not limited to, the United States Foreign Corrupt Practices Act ("FCPA") and any other applicable fraud and/or bribery statutes. Consultant agrees that it has not promised, paid or offered, and will not promise, pay or offer, directly or indirectly, any commission, finder's fee, referral fee or other payment in connection with the services provided under this Agreement, and that no governmental or public official has, or will have, directly or indirectly, any legal or beneficial interest in Consultant, in this Agreement, in a referral fee, in a bonus payable under this Agreement, or in a fee paid under this Agreement. Consultant shall not offer, pay, or promise to pay money, nor offer, give or promise to give anything of value, directly or indirectly, to any governmental employee or official or public employee or official.

10. GENERAL TERMS.

    10.1   <u>Notices</u>.  Any notices provided hereunder must be in writing and shall be deemed effective upon the earlier of personal delivery (including personal delivery by telex) or the third (3rd) day after mailing by first class mail, registered or certified, with postage prepaid. All notices shall be addressed to the party to be notified at such party's address as set forth herein, or as subsequently modified by written notice, and all notices shall include a notice by email as well as to the following addresses:

    THEIA email: admin@theiagroupinc.com

    Consultant email: ███████████████

    1110 23rd St. N.W., Apt 805, Washington DC 20037

    10.2   <u>Assignment</u>.  Consultant shall not assign its rights or obligations herein or this Agreement in whole or in part by operation of law or otherwise, except with the Company's prior written consent.  The Company may assign this Agreement upon notice to Consultant.  Any attempt to assign this Agreement other than in accordance with this paragraph will be null and void. This Agreement will be binding on and inure to the benefit of the parties and their respective successors and permitted assigns.

    10.3   <u>Law; Forum</u>. The rights and obligations of the parties under this Agreement will be governed by and construed in all respects under the laws of the State of Delaware, without regard to its conflict of laws principles.  The parties agree and irrevocably consent to the exclusive and sole jurisdiction of the courts located in Wilmington Delaware for any dispute, interpretation, controversy, or claim arising out of or relating to this Agreement. The prevailing party in any arbitration or judicial proceeding shall be entitled to its costs and reasonable attorneys' and experts' fees.

    10.4   <u>Arbitration</u>.  Except as provided below, the Company and Consultant agree that any dispute, interpretation, controversy, or claim arising out of or relating to this Agreement shall be settled by arbitration to be held in the State of Delaware before a single arbitrator, in accordance with the Commercial Rules then in effect of the American Arbitration Association.

The arbitrator may grant monetary, injunctive, or other relief.  The decision of the arbitrator shall be final, conclusive, and binding on the parties to the arbitration.  Judgment may be entered on the arbitrator's decision in any court of competent jurisdiction.

       10.5    Equitable Relief.  Each party agrees that a breach of the confidentiality provisions of this Agreement constitutes a material breach of this Agreement, which shall cause the non-breaching party to suffer irreparable harm.  Accordingly, the non-breaching party shall be entitled to seek injunctive relief in state or federal court in addition to all other legal and equitable remedies, and the parties further agree that no bond or other security shall be required in obtaining such equitable relief.

       10.6    Waivers; Modification.  If either party waives any breach of any provisions of this Agreement, such party shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Agreement.  No modification of any provision of this Agreement will be effective unless in writing and signed by all parties.

       10.7    Integration. This Agreement, including all Exhibits attached hereto and incorporated by reference herein, constitutes the entire agreement between the parties and is the complete, final, and exclusive embodiment of their agreement with regard to this subject matter.

       10.8    Counterparts.  This Agreement may be executed in separate counterparts, any one of which need not contain signatures of more than one party, but all of which taken together will constitute one and the same Agreement.

       10.9    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

       10.10    Caption. The headings of the sections hereof are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof.

       10.11    Construction.  This Agreement reflects the wording accepted by the parties. No rule of construction will apply against either party as drafter or preparer of this Agreement.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have executed this Agreement as of the Effective Date.

COMPANY:                                        CONSULTANT:

THEIA GROUP, INC.                               STEPHEN BUSCHER


By: _____                 _____*[signature]*_____
                                                Signature

Name:                                           Name:   Stephen Buscher

Title:                                          Title:   Consultant

# EXHIBIT A

## SERVICES AND COMPENSATION

1. Consultant will act as CFO of Theia Group, Inc. and CEO of Theia Resources Group, Inc.

2. Compensation to Consultant shall be $80,000 per month (the "Monthly Fee").

3. Consultant shall be eligible for a restricted stock grant or options, at the discretion of the Board of Directors of the Company, after 1 month of service.

4. Consultant shall be paid a minimum bonus of 50% his aggregate annual Monthly Fee as bonus each year and/or fund raising or refinancing commissions as mutually agreed with the CEO and/or Board of Directors ("Bonus").

5. Company will reimburse Consultant for any reasonable pre-approved expenses incurred by Consultant in the course of rendering the Services. The Consultant is eligible for business class service in Europe and Asia and first-class service in the United States and trans-oceanic.

6. The consultant shall be eligible for reimbursement of his accommodation and utilities while he and his family reside in either Washington D.C. or Albuquerque.

7. Minimum Monthly Fee Payment equals the greater of the following:

    a. Provided any of BullTick's clients remain invested in the Company, the aggregate payment of all remaining Monthly Fees, plus minimum Bonus, from 30 days after notice until the two-year anniversary of the BullTick's share subscription with the Company plus any residual residence lease commitments, all to be paid by Company within 30 days from termination notice; or,

    b. The Monthly Fees times twelve, plus minimum Bonus, commencing 30 days from termination notice plus any residual residence lease commitments, all to be paid by Company within 30 days from termination notice.

Initial Consultant: _ɛƄ_ Initial Company: ____

## EXHIBIT B

### STATEMENT OF WORK

1. Consultant shall report to the CEO of the Company, as directed.

2. Consultant agrees to serve as the CEO of the Company's natural resources subsidiary and agrees this consulting agreement may be transferred thereto.

3. Consultant agrees to serve as the CFO of the Company. The CFO's responsibilities and authorities should be in accord with those stated in the BullTick share subscription contracts:

For a period of two years to coincide with the Maturity Date, Stephen Buscher shall be designated as key-man CFO with reporting obligations and certain undertakings agreed upon by the Parties. The CFO shall report to the CEO, have chief oversight of all accounting and financial control functions via a double key payment system, and shall be a member of the Audit Committee. The CFO shall have the responsibility to deliver all materials to satisfy the Issuer's reporting obligations to the Purchaser and to keep the Purchaser informed of the Company's progress, milestones and any key developments in a timely manner. Accordingly, the CFO shall have access to all of the company's commercial contracts plus share subscription, shareholder, loan, note, pledge, lien, collateral, escrow and assignment agreements plus shareholder ledger. The CFO shall be able to review all un-redacted contracts, including as applicable any and all escrow agreements pertaining thereto, and the CFO and Company undertake to obtain sufficient security clearances as soon as possible for the CFO as necessary to be read-in to all of the Company's programs, or will otherwise designate two individuals possessing such clearances and approved of by the CFO to provide details necessary for the CFO to have financial insight sufficient to verify their existence and rely upon them in accordance with GAAP/IFRS standards. The CFO and Company further undertake to update as soon as possible the Company's MIS system to enable better financial and accounting management of the Issuer's vertically integrated businesses, according to GAAP / IFRS standards, on stand-alone or consolidated bases and to manage the procurement of satellite equipment and components according to industry standards.