UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FCS ADVISORS, LLC,

                                             Plaintiff,

—against—

THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN";

THEIA AVIATION, LLC; and

THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"

                                             Defendants.

21 Civ. 6995 (KPC)

---

**DECLARATION OF MICHAEL FUQUA**

1. I am the Court-appointed Receiver for the three defendants in this case, Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc., which I will refer to collectively as either "Theia" or the "Receivership Entities."

2. I was appointed as Theia's Receiver on November 8, 2021, pursuant to a court order, which (among other things) me gave me "exclusive custody, control, and possession of all the funds, property, mail, and other assets of" Theia. (ECF 115 ¶ 5.) It also stated that I was empowered to "initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings in state, federal or foreign court necessary to preserve or increase the value of the receivership assets or to carry out" my duties. (*Id.* ¶ 9.)

3. To that end, it was important for me as Receiver to understand Theia's financial condition (and how it got to its present financial condition) and investigate the allegations made in the counterclaims by Theia in response to the receivership complaint (the "Counterclaims") brought by FCS Advisors, LLC (d/b/a Brevet Capital Partners) ("FCS"). I did so to determine

whether I, as Receiver, should pursue the Counterclaims as alleged by Theia's former management.

4.  Because it necessarily takes time to conduct an investigation, I agreed to adjourn the counterclaim defendants' answer date three times to afford me ample time to conduct a thorough investigation.

5.  I led an investigation utilizing the services of my financial and legal professionals at B. Riley Advisory Services and King & Spalding LLP, respectively, to assess the merits of the Counterclaims filed by Theia prior to my appointment.

6.  I am submitting this declaration to explain my decision to dismiss without prejudice the Counterclaims the Receivership Entities filed in the above-referenced case before my appointment.

7.  The results of the investigation, as detailed below, lead me to conclude that, because the documents and information and interviews conducted do not support key allegations in the Counterclaims, it is not in the best interests of the Receivership at this time to pursue these Counterclaims and thereby continue to engage in needless litigation that may chill bidding for the Receivership assets (particularly the FCC and NOAA licenses) and may diminish the value of the Receivership assets.

**Background**

8.  I am a Managing Director of B. Riley Advisory Services with more than 30 years' experience in corporate finance, capital markets, forensic accounting, crisis management, bankruptcy, and providing financial services to distressed companies. I have been appointed as a Federal Equity Receiver on six prior occasions for the Federal Trade Commission and Securities Exchange Commission. I have also served as the accountant to a Federal Equity Receiver in another matter.

9. Theia was founded in 2015 for the purpose of deploying a remote sensing constellation of satellites that could capture the same resolution and quality of data captured from aircraft for the purposes of analyzing the physical world in real time. In 2016, Theia *applied* to the Federal Communications Commission ("FCC") for licenses for Non-Geostationary Satellite Orbit ("NGSO").[1] Other companies such as OneWeb, SpaceX, and Boeing participated in Round 1 of the licensing process as well. Ultimately, in May 2019, the FCC *granted* Theia's application to construct, launch and operate a NGSO satellite system consisting of 112 satellites. Theia's first milestone requirement from the FCC is to launch 50% of the proposed 112 satellites by May 2025.

10. To finance the business, Theia initially raised funds first from "Friends & Family". Later, Theia also borrowed funds from FCS, and thereafter obtained a loan from Aithre Capital Partners/Bulltick ("Aithre").

11. FCS made its first loan to Theia in October 2018 in the amount of $20 million, which had a maturity date in October 2020. In August 2019, FCS made a second loan to Theia in the amount of $5.65 million to enable Theia to purchase aircraft. This second note was set to mature in April 2021. The returns on the FCS notes were comparable to those issued to the Friends & Family. That is, instead of an interest rate, returns were calculated based on a multiple of "X" times invested principle.

12. In June 2020, FCS refinanced the ~$25 million cumulative principal and interest with two $100 million bridge notes with staggered maturities (Note A-1, which had an initial maturity date of December 29, 2020, and Note A-2, which had a maturity date of June 29,

---

[1] NGSOs are satellites that are in orbit above the earth and do not maintain a stationary position, but they move in relation to the Earth's surface.

2021). The notes provided additional liquidity for Theia to acquire assets and for development purposes to enable Theia to agree to memoranda of understanding with certain foreign governments, which required provision of aircraft. Note A-1 was amended in December 2020 to provide for the same June 29, 2021 maturity date as Note A-2. These two bridge notes were structured with a traditional interest rate return calculation.

13. Theia's initial capital plan was centered around securing financing from foreign governments through its Master Partner Program or "MPP". The MPP agreements were structured to provide for a $200 million payment/deposit to Theia with the balance being paid at a later date. The second payments were expected to be well in excess of $1 billion. Theia represented it had several MPPs ready to fund, but COVID scuttled the momentum of the deals. In June 2021, more than eighteen months into the COVID-19 pandemic, Theia re-signed a Memorandum of Agreement with one government, but it never closed and funds were never delivered. Theia also had not found alternative financing to refinance the maturing FCS loan.

14. Instead of moving straight to foreclosure, I have seen evidence that FCS was working with Theia on a restructuring plan, which was subject to certain conditions that are common in situations where a lender is dealing with a distressed credit. Typically, a lender providing forbearance from default will (among other things) require the borrower to hire a Chief Restructuring Officer or financial consultant who is qualified to assist the borrower turnaround its operations, require development of a 13-week cash flow model and budget, require adherence and reporting against that budget, put restrictions on certain spending, and establish performance milestones. The investigation has revealed that FCS followed these types of practices and Theia agreed to employ them, but Theia would not or could not comply with its contractual obligations and defaulted on its loans. Consequently, FCS moved to have a Receiver put in place.

15. In October 2021, before any ruling had been made on whether to appoint a receiver, Theia filed the Counterclaims against FCS and against other people and entities that are or were affiliated with FCS, including FCS Capital Management, LLC, Mark Callahan (the President and co-founder of FCS), Robert Leeds (who had served as a consultant to both FCS and Theia), and two entities affiliated with Mr. Leeds (Leeds Holdings, LLC and Strongbow Holdings, LLC).

16. I am aware that Mr. Leeds worked as a contract consultant to FCS at least for the periods from August 4, 2019 through June 29, 2020 (and his consulting agreement with FCS suggests there were earlier consulting agreements dating back to March 2017) and from at least April 2021 through September 2021. It is my understanding that Mr. Leeds worked as a consultant to Theia from or about June 30, 2020 until April 2021. I have not been able to locate a copy of any written agreement for services and compensation between Mr. Leeds and Theia, but I have seen invoices for consulting services rendered.

17. The essence of the Counterclaims is that FCS worked with Mr. Leeds to impair Theia's ability to repay FCS and thereby harm Theia. The Counterclaims essentially characterize Mr. Leeds as a "double agent" planted to ensure the demise of Theia. As alleged in the Counterclaims, among other things, Mr. Leeds and FCS:

    (a) Caused Theia to default on the loan provided by FCS because FCS schemed to deprive the business of all other sources of capital, which (in turn) forced Theia to take actions detrimental to the business;

    (b) Forced Theia to adhere to a budget that Theia developed;

    (c) Caused harm to Theia as a result of requiring Theia to adhere to typical loan terms found in transactions with distressed borrowers; and

  (d) Acted to foreclose all opportunities for Theia to secure financing to refinance the FCS loan.

**The Investigation**

18. As noted, I have extensive experience with working with distressed companies and serving as a receiver. In those capacities, I have gained extensive experience conducting investigations.

19. First, in the beginning of the Receivership, my team and I secured the company's emails and other electronically stored information. My team and I also secured other documents found while inspecting Theia's facilities in Washington DC, Albuquerque, NM, and Riverside, CA. We also took control of the accounting records and other assets of the Receivership.

20. To better understand how Theia came to be placed into receivership, my team and I reviewed a voluminous number of documents, including (but not limited to):

  a. Exhibits to pleadings on the docket;

  b. Financial documents (including bank statements);

  c. Emails and attachments;

  d. Loan documents;

  e. Theia's presentations to lenders, investors and potential clients;

  f. Theia's board minutes; and

  g. Other miscellaneous information.

21. My team and I used this information to analyze and evaluate the factual accuracy of the allegations in the Counterclaims.

22. Additionally, after multiple requests and extensive negotiations, we recovered documents from Fried, Frank, Harris, Shriver, & Jacobson ("Fried Frank"), the law firm that filed the Counterclaims on behalf of Theia. My team was informed that the documents produced

6

and provided to us by Fried Frank were all the documents relied on to prepare and file the Counterclaims.

23.  Second, we spoke with two witnesses: John Gallagher, a substantial shareholder of Theia, and Reid Gorman, Theia's most recent former CFO. Mr. Gorman submitted a sworn declaration containing many of the allegations in the Counterclaims.

24.  After completing our review of the documents set forth in Paragraph 20, I interviewed Mr. Gorman for more than two hours about the contents of his declaration.

25.  Finally, I discussed the elements of the Counterclaims and the legal validity of the claims with counsel. Counsel also reviewed the FCS loan documents to determine whether FCS's and other creditors' liens on Theia's assets were valid and properly perfected. While I am not a lawyer, I understand that FCS's liens on Theia's assets were granted by Theia under the loan documents and were perfected when FCS filed financing statements and mortgages with the appropriate authorities. I also understand that FCS's security interests on all of Theia's assets were filed first in time.

## Dismissing the Counterclaims Without Prejudice Is Appropriate

26.  We have not been able to substantiate the allegations in the Counterclaims, and in fact, have found evidence that contradicts the allegations. By way of example:

    (a)  While the Counterclaims allege that Theia was forced to spend money on aircraft against its will, the documents we have reviewed show that Theia requested such funding (and set the budget) and needed to fund its aircraft operations as a first step toward building and financing the satellite network. In fact, the documents we reviewed confirm that Theia had an obligation to deliver aircraft as a condition to receiving certain subsequent

7

payments under Theia's "Master Partnership Program." Theia's requested funding was therefore consistent with its contractual obligations.

(b) We have seen no documents indicating that Mr. Leeds was responsible to locate new capital for Theia. To the contrary, the contemporaneous evidence indicates that Theia anticipated repaying FCS from proceeds of the Master Partnership Program.

(c) We have seen no evidence that FCS approved Theia obtaining new debt in 2021 from a third party, Aithre, as was required under FCS's loan documents.

(d) We have seen no evidence that FCS unreasonably or arbitrarily prevented Theia from pursuing business opportunities that may have solved Theia's mounting debt and other financial problems. In fact, all indications are that Theia's financial difficulties arose from factors having nothing to do with FCS. Theia tried, via the Master Partnership Program, to secure substantial upfront payments from customers that would then have the right to use the satellite network. Those payments were expected to both pay off Theia's debt and fund the construction of the satellites. But the payments never materialized.

27. I have personally spoken at least twice with Mr. Gorman, and he consistently stated that he did not have personal knowledge of most of the information in his declaration and that his testimony was based on what he was told by others. In fact, despite being an executive of Theia prior to becoming CFO in July 2021, Mr. Gorman told me that he had never seen Theia's financial statements until he assumed that role.

8

28. Finally, based on my personal experience in situations where lenders interact with distressed borrowers, the actions taken by FCS were consistent with actions that other lenders would have taken. That is to require a financially distressed borrower to: hire a CRO, provide a weekly cash budget to be adhered to and measured weekly, stop or limit certain expenditures, etc. In fact, during my interview with Mr. Gorman, he agreed with my characterization of FCS's actions being out of the "loan workout playbook."

**Conclusion**

29. The Receivership Order empowers me to "compromise" or "dispose of" litigation in order to "preserve or increase the value of the receivership assets." (ECF 115 ¶ 9.)

30. Given the information set forth above and the other information I have obtained through my investigation, I have concluded that dismissing the Counterclaims without prejudice is the proper course of action at this time.

31. An important aspect of the Court's receivership order is to sell Theia's most valuable assets—namely the rights associated with its FCC and NOAA licenses. I am focused on maximizing value for these and other assets and maximizing recovery for creditors. Dismissing the Counterclaims without prejudice will help relieve any perceived purchase-risk cloud on the sale process and allow the sale to proceed in an effort to maximize the value for all creditors. It will also eliminate the immediate need to prosecute the Counterclaims and incur substantial costs to do so to the detriment of Theia's creditors.

32. Thus, based on my judgment, I have decided to dismiss the Counterclaims without prejudice at this time.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Atlanta, Georgia
      May 19, 2022

_____
Michael Fuqua