UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC, | : |
|                   Plaintiff, | : Civil Docket No. 21-cv-6995 (PKC) |
| —against— | : |
| THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS," | : |
|                   Defendants. | : |

**DECLARATION OF STEPHEN BUSCHER**

I, Stephen Buscher, hereby declare as follows:

1. I am over eighteen years of age and am competent to testify as to the matters set forth in this declaration (this "Declaration").

2. I am the former chief financial officer ("CFO") of Defendant Theia Group, Inc. ("Theia"). I submit this Declaration in support of *Stephen Buscher's Motion to Lift the Receivership Stay* (the "Motion").

3. Except where indicated otherwise, I have personal knowledge of the facts contained in this Declaration.

4. Attached hereto as **Exhibit 1** is a true and correct copy of that certain amended consulting agreement entered into as of December 31, 2020, amending the first contract dated October 3, 2019 as amended on July 13, 2020, by and between Theia and Mr. Buscher (the "Amended Consulting Agreement") and the exhibits thereto.

5. I was retaliated against by Theia and constructively discharged for exposing possible self-dealing and misrepresentations.

15711880

**I.    My Employment as CFO of Theia.**

6. In November 2019, I began working for the newly formed Theia Resources Group, Inc. ("Theia Resources"), a wholly owned subsidiary of Theia.

7. I initially worked for Theia Resources as a consultant.

8. Approximately a year later, in late 2020, Erlend Olson ("Olson"), who had recently assumed the role of Theia's Chief Executive Office ("CEO"), asked me to become Theia's CFO and work out of its Washington D.C. office, reporting directly to Olson.

9. According to Olson, Theia wanted me to become its Chief Financial Officer ("CFO") to spearhead Theia's next round of financing.

10. Based on this conversation, in summer of 2020 I agreed to move to Washington, D.C. to work for Theia, and we amended my original consulting contract (the "Amended Consulting Agreement"). Among the provisions of the Amended Consulting Agreement was a base compensation rate of $80,000 per month, reflecting my increased responsibilities. *See* Amended Consulting Agreement, Ex. A §§ 2, 6.

11. On December 31, 2020, I signed the Amended Consulting Agreement with Theia, appointing me as Theia's *sole* CFO. *See id.* § 3.3.

12. According to the Amended Consulting Agreement, I was to be a "W2 contract employee." *See id.* § 3.1

13. The Amended Consulting Agreement states that it will "continue in full force and effect until 31 December 2022, unless and until terminated by a party in accordance with this Agreement." *See* Amended Consulting Agreement § 7.1.

14. The Amended Consulting Agreement further stipulated certain prerequisites to either party effectuating the termination of the agreement, including the provision of thirty (30) days' prior written notice. *See id.* § 7.2.

15. The Amended Consulting Agreement also stipulated that I would receive a minimum annual bonus of 50% of my aggregate annual monthly salary rate, which bonus would equate to $40,000 per month. *See* Amended Consulting Agreement, Ex. A § 4.

16. The Amended Consulting Agreement also provided that if Theia terminated the agreement without cause, I would receive twelve times my monthly compensation plus my minimum bonus, which combined would equal $1,440,000 (the "Severance Package"). *See id.* § 7.2; *id.* at Ex. A § 7.

17. On February 4, 2021, the Theia Board signed a resolution appointing me as CFO of Theia.

18. A short period before my appointment to my new role as CFO, my family and I had moved into an apartment in Washington D.C.

19. Theia approved and paid for my apartment lease.

20. The lease—which was approved by Theia's then-controller, Paul Carroll ("Carroll")—expired at the end of June 2021.

21. By early 2021, however, Olson decided to reduce Theia's presence in Washington D.C., and had begun transitioning some of its staff to Albuquerque, New Mexico, where Olson—as CEO—resided and worked full time.

22. At Olson's direction, I began traveling to New Mexico to work out of Theia's offices there.

23. Olson eventually decided that I should relocate to New Mexico by August 2021 and agreed that Theia would pay for my relocation and housing costs. I accepted that offer.

24. On or about June 11, 2021, I began a return cross-country trip to my home on the west coast, approved by Olson, during which it was agreed that I would be working remotely as I prepared to relocate to New Mexico.

## II. "Red Flags" at Theia and My Constructive Discharge.

25. In or about June 2021, I alerted Theia's board of directors (the "Board") to several disturbing discoveries. Those discoveries pertained, in part, to the actions of two key shareholders, one of whom was also a C-Suite employee and both of whom were Board members—Olson and John Gallagher ("Gallagher").

26. Soon after becoming CFO, I learned that Theia had purportedly defaulted on a $250 million loan from Brevet Capital Management, LLC ("Brevet Loan") and had purportedly not been fulfilling its obligations under the Third Amendment to the Brevet Loan agreement.

27. I worked from February to April 2021 to correct Theia's loan compliance reporting and to recapitalize Theia. I also tried to persuade the Board of the immediate need to reduce expenditures.

28. To correct Theia's loan compliance reporting and recapitalize Theia, I hired Riveron Consulting, LLC as Chief Restructuring Officer, hired legal counsel, hired GH Partners as selected advisor, and hired Barclays Bank to advise on recapitalizing Theia.

29. I also engaged Deloitte Touche Tohmatsu Limited ("Deloitte") to review and improve Theia's pre-2019 audited accounts and perform an audit for 2020. Deloitte raised various accounting concerns to me.

30. From March to May 2021, I and my accounting team worked with Deloitte to remedy our concerns, and to re-audit the 2019 and 2020 accounts and uplift them for S4 reporting compliance. During this period, I uncovered evidence that Theia had made a concerning amount

of prior "bonuses" and "success fee" payments to Olson, Gallagher, and Carroll from the proceeds of short-term loans borrowed by Theia.

31.     I and my team were concerned that these payments could have constituted self-dealing transactions.

32.     During this time, I familiarized myself with Theia's records and also discovered a series of materials that caused him to have concern about possible misrepresentations to investors.

33.     As I became aware of these concerning issues, I concluded that Theia was in critical need of deleveraging and developed a recapitalization plan that involved raising equity from the capital markets.

34.     To effectuate this plan, I formed of a new "workout entity," Cypherian LLC ("Cypherian"), in order to seek a SPAC partner through which to raise equity from the capital markets.  I consulted with the Chairman, CEO, CTO, and chief general counsel, among others, all of whom approved of this course of action.

35.     In order to ensure that Cypherian remained "ring-fenced" from Theia and its issues, I proposed, and Olson and Gallagher agreed, that Olson and myself would be Cypherian's initial sole LLC members, with Olson operating as CEO and me as CFO.  I asked Olson and Gallagher, as the two controlling shareholders, to execute in advance a resolution exchanging the necessary intellectual property and licenses to Cypherian upon the essential conditions precedent as stipulated by Deloitte in exchange for Cypherian's admission of Theia's existing shareholders as new members to the LLC.

36.     I had several conversations with Olson and Gallagher about my concern that they paid themselves excessive bonuses that Theia may have to disgorge or convert into loans.

37. In response, Olson and Gallagher lashed out at me by sending harassing and threatening text messages and voicemail messages.

38. On April 12, 2021, for example, Olson harangued me via text message, calling me a "motherfucking piece of shit" and threatened my termination, stating "You're full of shit. Fuck you. Your [*sic*] fired."

39. By May 2021, however, I had compiled a formal list of my "red flag" concerns with two categories: (1) self-dealing; and (2) misrepresentations.

40. Shortly thereafter, on May 21, 2021, Olson resigned, noting that he had committed certain "indiscretions" that made it impossible for him to continue as CEO.

41. On May 25, 2021, Theia's Board convened an emergency Board meeting. The Board signed a resolution removing Olson as CEO and as a Board member, and simultaneously appointed Steve O'Neill ("O'Neill") as the interim CEO of Theia.

42. At the May 25, 2021 emergency Board meeting, I gave a presentation to the Board about Theia's financial state, identifying several urgent issues:

   a. I believed that there was a lack of financial controls at Theia, which led to the apparent self-dealing transactions engaged in by Olson and Gallagher.

   b. I believed that Theia was over-leveraged and in need of recapitalization.

   c. I believed that Theia may have issued too many equity conversion rights to its debtholders and that Theia needed a global restructuring.

   d. I warned the Board that Theia should add more explicit warnings of potential default in its notes that it issued to future lenders.

   e. I presented an update of my Cypherian recapitalization plan, and the progress the company had made together with our advisors to restructure Theia under that plan and in compliance with the Third Amendment of the Brevet Loan.

43. After O'Neill was appointed CEO, I spoke with O'Neill and further disclosed my red flag concerns.

44. O'Neill claimed that he relayed these red flags to some other members of the Board.

45. On June 10, 2021, I was instructed to discuss my red flag concerns directly with one Board member, and that Board member articulated to me the procedure by which my red flag concerns would be reviewed and handled.

46. A Theia Board meeting was scheduled for June 14, 2021. At the meeting, O'Neill and I planned to have third-party advisors present their recommendations for:

    a. Managing the looming default on the Brevet Loan and other loans referred to within Theia as the "high net-worth notes;"

    b. Removing the apparent unilateral authority of Olson and Gallagher to authorize further expenditures; and

    c. Addressing the red flags.

47. Ultimately, the June 14, 2021 meeting was cancelled and almost all of the Board resigned.

48. After the resignation of most of the Board, Olson and Gallagher informed me that Olson was purportedly reinstated as Theia's CEO.

49. Meanwhile, Olson and Gallagher continued to harass and threaten me for doing my job.

50. On June 8, 2021, for example, in response to an email from me, Gallagher threatened me, stating: "Don't fucking do that. I'll be back in a week. We can handle it. Don't send me a fucking email like I just received" and further demanded that Mr. Buscher not detail his concerns in emails to O'Neill.

51. Gallagher also accused me of setting Gallagher up and threatened me, stating: "This set up – this play – you understand I'm coming after you, right?" and "Stephen, this is my game you're in."

52. Gallagher ended the conversation by demanding that I "write emails that impress me, not cover your ass."

53. Similarly, Olson responded to my concerns by giving me an ultimatum with respect to my employment, stating:

> I can't take you yelling crap into the phone and to others about you claiming I'm some fraud or whatever you're upset about at the moment. I built a great company. Many times. It's clear you don't believe in me and think, as you say, all I have done is fraud. Fine, I got it for the 18th time. So **go find someone else to partner with Steve**, I can't take it anymore. Just let me have some peace.

54. Since June 2021, I have had no access to information about the lender negotiations, no longer had authority over payments, and unbeknownst to me, Theia informed my staff that they were to report to Reid Gorman ("Gorman") and that Gorman planned to terminate Deloitte.

55. Two weeks later, I was told that Olson was no longer the CEO and that I would report to Jim Hickey ("Hickey").

56. On June 30, 2021, I was informed by Theia personnel that the Internal Revenue Service ("IRS") raided Theia's offices in Washington, D.C. and Albuquerque, and ostensibly the homes of key related parties as well.

57. After the IRS raids, Olson and Gallagher immediately accused me of reporting Theia to the authorities and sent me harassing messages.

58. Despite the harassment, I continued to work remotely for Theia while organizing the agreed move of my family to New Mexico in August, participating in numerous video conferences, and even making a trip back to Theia's Washington D.C. offices in early July 2021 for a series of meetings.

59. When asked, Olson, Gallagher, and Hickey each assured me that Theia was not a target of the IRS investigation, claiming instead that certain Theia shareholders had been identified as subjects of investigation.

8

60. On July 29, 2021, Deloitte informed me that they had been served multiple subpoenas related to Theia, at least one of which identified Theia itself as the target of investigation.

61. By August 2021, and before, I no longer had the financial information and controls promised to me in the Amended Consulting Agreement and that were necessary for me to perform my role as CFO.

62. On August 8, 2021, after my constructive discharge and replacement as Theia's CFO, I sent my resignation. In that resignation letter, I made clear that Theia had forced my resignation by removing my access to information and eliminating my authorization power.

63. Following my resignation, I was unemployed for over nine months.

64. Even after my constructive discharge, Olson continued to harass and intimidate me and my family through veiled threats. For example, on August 12, 2021, Olson sent me text messages claiming that I was in jeopardy of imminent physical harm and advising me to alert authorities and seek protection.

65. In another text message approximately two months later, Olson made an opaque reference to my lawyers taking care of my wife and child when I am "not available" – a phrase Olson placed in quotation marks to insinuate a more nefarious message.

66. On September 10, 2021, Gorman filed an affidavit with the U.S. District Court for the Southern District of New York stating that Theia hired him as its CFO, replacing me in June 2021. *See* D.I. 45.

67. Notably, Theia never provided me written notice that it was terminating the Amended Consulting Agreement, which installed me as Theia's sole CFO.

68. Following my constructive discharge, Theia failed to pay wages and other compensation due to me under the Amended Consulting Agreement which total no less than $2,800,000 including (1) my "Monthly Fee" of $80,000 from August 2021 through December 2022 (i.e., $1,360,000); and (2) my Severance Package of $1,440,000.

69. In accordance with Section 10.4 of the Amended Consulting Agreement, I am seeking to pursue causes of action in arbitration against Theia as a result of Theia's constructive discharge and failure to pay compensation owed as detailed in the Demand for Arbitration (the "Demand") attached hereto as **Exhibit 2**.  Specifically, I am seeking payment of compensation under the prevailing wage payment statutes, contractual severance, and indemnification for my legal fees pursuant to my Amended Consulting Agreement.

70. Further Declarant Sayeth naught.

[*Signature Page Follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 20, 2022.                                   _____
                                                                                                  Stephen Buscher