UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FCS ADVISORS, LLC,

                       Plaintiff,

       —against—

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN"; THEIA
AVIATION, LLC; and THEIA HOLDINGS
A, INC., d/b/a "THORIAN HOLDINGS,"

                    Defendants.

21 Civ. 6995 (PKC)

---

**RECEIVER'S MEMORANDUM OF LAW IN RESPONSE TO
STEPHEN BUSCHER'S LIMITED OBJECTION AND RESERVATION
OF RIGHTS TO THE EXPEDITED MOTION OF RECEIVER FOR AN ORDER**

REED SMITH LLP
Kurt F. Gwynne
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:   (212) 521-5450

- and -

Jason D. Angelo, Esq. (admitted *pro hac vice*)
1201 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 778-7500
Facsimile:   (302) 778-7575

Dated:  April 27, 2023

*Counsel for Michael Fuqua, in his capacity as
Receiver of Theia Group, Inc., Theia Aviation LLC,
and Theia Holdings A, Inc.*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND .............................................................................................................. 3

    A.    Procedural History .................................................................................. 3

    B.    Mr. Buscher's Involvement With The Receivership Entities ................................. 5

    C.    The Amended Consulting Agreement and the Protection of TGI's Property Interests. ................................................................................................ 7

    D.    Mr. Buscher Fails To Fulfill His Most Basic Duties As CFO And Attempts to Devalue TGI. ..................................................................... 9

    E.    Mr. Buscher Disappears, Attempts a Failed Coup, and Formally Resigns and Transfers Proprietary Information to His Personal Email Account. .............. 10

    F.    Buscher's Self-Dealing Scheme To Wrestle Control Of The Cypherian Concept Or Destroy TGI Trying To Do So. ............................................ 12

RESPONSE...................................................................................................... 17

    I.    LEGAL STANDARD................................................................ 17

    II.    THE COURT SHOULD OVERRULE THE LIMITED OBJECTION AND FURTHER EXTEND THE RECEIVERSHIP STAY. .............................. 19

CONCLUSION ........................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Belsome v. Rex Venture Grp., LLC*,
    2013 U.S. Dist. LEXIS 181160 (W.D.N.C. Dec. 30, 2013) ....................................................17

*F.T.C. v. 3R Bancorp*,
    2005 U.S. Dist. LEXIS 12503 (N.D. Ill. 2005) ........................................................17

*Huntington Nat'l Bank v. Saint Catharine Coll.*,
    2017 U.S. Dist. LEXIS 203775 (W.D. Ky. Dec. 12, 2017)........................................17

*Huntington Nat'l Bank v. Sakthi Auto. Grp. U.S., Inc.*,
    2020 U.S. Dist. LEXIS 124751 (E.D. Mich. July 16, 2020) ....................................17

*KeyBank Nat'l Assoc. v. Monolith Solar Assocs. LLC*,
    2020 U.S. Dist. LEXIS 133304 (N.D.N.Y. July 28, 2020)........................................15

*Liberte Cap. Grp., LLC v. Capwill*,
    462 F.3d 543 (6th Cir. 2006) ....................................................................................16

*S.E.C. v. Am. Bd. of Trade Inc.*,
    830 F.2d 431 (2d Cir. 1987)......................................................................................16

*S.E.C. v. Amerindo Inv. Advisors Inc.*,
    2016 U.S. Dist. LEXIS 195593 (S.D.N.Y. May 20, 2016)........................................15

*S.E.C. v. Byers*,
    609 F.3d 87 (2d Cir. 2010)........................................................................................15

*S.E.C. v. Credit Bancorp, Ltd.*,
    93 F. Supp. 2d 475 (S.D.N.Y. 2000)........................................................................15

*S.E.C. v. Pittsford Cap. Income Partners, L.L.C.*,
    2007 U.S. Dist. LEXIS 1241 (W.D.N.Y. Jan. 5, 2007) ...........................................16

*S.E.C. v. Universal Fin.*,
    760 F.2d 1034 (9th Cir. 1985) ..................................................................................17

*U.S. v. Acorn Tech. Fund, L.P.*,
    429 F.3d 438 (3d Cir. 2005).................................................................................15, 16

*U.S. v. Elk Assocs. Funding Corp.*,
    2020 U.S. Dist. LEXIS 210397 (E.D.N.Y. Nov. 10, 2020)......................................15

Michael Fuqua, as court-appointed receiver (the "Receiver")[1] for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities"), respectfully files this memorandum of law in response (this "Response") to *Stephen Buscher's Limited Objection and Reservation of Rights to the Expedited Motion of Receiver for an Order Further Extending the Stay Provided in the Receivership Order* (Doc. 344; the "Limited Objection") and in further support of the *Notice of Expedited Motion of Receiver for an Order Further Extending the Stay Provided in the Receivership Order* (together with the *Memorandum of Law in Support of Expedited Motion of Receiver for an Order Further Extending the Stay Provided in the Receivership Order* and the declaration in support thereof, the "Stay Extension Motion"; Docs. 337-40). In support of this Response, the Receiver has contemporaneously filed (i) the Declaration of Erlend Olson, Founder of Theia Group, Inc. (the "Olson Decl."), (ii) the Declaration of James Hickey, Esq., Former Counsel to Theia Group Inc. (the "Hickey Decl."), and (iii) the Transmittal Declaration of Michael Fuqua, as Receiver (the "Fuqua Decl.") and in further support respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      Stephen Buscher ("Mr. Buscher") was appointed as the chief financial officer ("CFO") of Theia Group, Inc. (the "Company" or "TGI") in January 2021 and resigned his position on or about August 8, 2021. During his short tenure as an officer of TGI, Mr. Buscher neglected the duties set forth in his contract with the Company and failed to perform even the most basic functions expected of a CFO. Mr. Buscher controlled access to the Company's financial records

---

[1] Capitalized terms not otherwise defined in this Response shall have the meanings ascribed to such terms in the Stay Extension Motion (as defined below).

[2] Capitalized terms not otherwise defined in this section shall have the meanings ascribed to such terms in the remainder of this Response.

and accounting software, and he had access to his Company email account up until the day he resigned.  Despite knowing the state of the Receivership Entities' financial affairs, Mr. Buscher made misrepresentations to at least one (1) creditor (BullTick) regarding the Receivership Entities' finances.  Furthermore, unbeknownst to Company officers and Board members, rather than perform his CFO duties, Mr. Buscher had been concocting a nefarious scheme to wrest control of the Company's most valuable assets from its owners—the FCC spectrum and other government-issued licenses and related intellectual property, including the "Cypherian" concept—and divert them to an entity under his control.

2.      When his scheme was discovered, Mr. Buscher went "AWOL," leaving the Company without a CFO during a critical time.  In an appropriate exercise of its oversight duties, the Company's Board appointed J. Reid Gorman as interim CFO in Mr. Buscher's absence.  Upon Mr. Buscher's resignation from the Company on August 8, 2021, the Board appointed Mr. Gorman as "permanent" CFO.

3.      Now, in yet another attempt to compel preferential payments from the Receivership Entities, Mr. Buscher has submitted an unnecessary Limited Objection to reserve rights that, time and again, have been expressly protected by this Court and respected by the Receiver.  As discussed at length below, Mr. Buscher comes to this Court with unclean hands, having attempted (prior to the filing of the complaint in this receivership case) to set in motion a nefarious scheme to wrest control of the TGI and the Receivership Entities' most valuable assets.  Despite multiple opportunities to withdraw the ill-advised Limited Objection, Mr. Buscher has refused to do so.  The Court should disregard Mr. Buscher's failed efforts to extract preferential payments from the Receivership Entities and call into question the Receiver's business judgment.

4.     To the extent the Limited Objection could be interpreted as requesting that the Court not further extend the Receivership Stay, the Receiver submits that granting such relief would be imprudent and is not warranted.  Extending the Receivership Stay while the Receiver continues his work to maximize value of the Receivership Entities' assets (the "Receivership Assets") will preserve the status quo without any cognizable injury to Mr. Buscher.  Indeed, Mr. Buscher will not be prevented from pursuing his claims against the Receivership Entities in the ordinary course—once the Receiver has completed the duties ascribed to him under the Receivership Order.  Lifting the Receivership Stay would derail the ongoing sale process to the detriment of all parties-in-interest, who (unlike Mr. Buscher) have been cooperative.  Indeed, no other creditor has objected to the Receiver's request in the Stay Extension Motion to extend the Receivership Stay through June 30, 2023.

5.     Accordingly, for the foregoing reasons, as discussed more fully below, the Court should overrule Mr. Buscher's Limited Objection and grant the relief requested by the Receiver in the Stay Extension Motion.

## BACKGROUND

### A.     Procedural History

6.     On November 8, 2021, the United States District Court for the Southern District of New York (this "Court") entered an *Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "Receivership Order") in the above-captioned case (the "Receivership Case").  Pursuant to the Receivership Order, this Court appointed the Receiver as a federal receiver for the Receivership Assets and the estates of the Receivership Entities (collectively, the "Receivership Estates").

7.     The Receivership Order also provides that "[t]he Receiver may seek a bona fide purchaser of the Receivership Entities' Federal Communications Commission ("FCC") License Assets . . . and to take all steps necessary to effectuate a transfer or sale of the assets, except any

*transfer of control of such FCC License shall be submitted to the Court for approval*." *Id.*, ¶ 6 (emphasis added). *See* Receivership Order, ¶ 4.

8. To effectuate the foregoing provisions and provide the Receiver with the requisite breathing room to perform his duties, the Receivership Order also provides for a stay of all litigation (the "Receivership Stay") against Receivership Entities:

> For a period of 120 days, no person or entity, including any creditor or claimant of the Receivership Entities, shall commence or maintain an action, proceeding, lawsuit or bankruptcy case against the Receivership Entities or impacting the property and assets subject to this Order, including an action, proceeding or lawsuit heretofore commenced, without having first obtained leave of this Court. Any party or non-party may seek leave from this Court to commence or maintain an action, proceeding, lawsuit or bankruptcy case upon a showing that such a petition is appropriate and would not interfere with the receivership estate.

*See* Receivership Order, ¶ 4.

9. The Receivership Stay initially was set to expire on March 9, 2022, which was the 120th day following the Court's entry of the Receivership Order on November 8, 2021.  By a series of motions and orders, the Receiver requested, and the Court granted, extensions of the Receivership Stay.  *See* Doc. 211-12, Doc. 219 (granting first extension); Doc. 258-59, Doc. 270 (granting second extension).

10. On June 24, 2022, Mr. Buscher filed a motion (the "Stay Relief Motion") seeking to lift the Receivership Stay to allow him to pursue certain alleged claims against the Receivership Entities in arbitration.  *See* Docs. 250-53.

11. On July 7, 2022, Mr. Buscher filed a *Limited Objection and Reservation of Rights* with respect to the Receiver's second request to extend the Receivership Stay.  *See* Doc. 266 (the "First Limited Objection").

12.     On July 14, 2022, the Court entered an Order (i) denying the Stay Relief Motion, (ii) overruling the First Limited Objection; and (iii) granting the Receiver's second request to extend the Receivership Stay.  *See* Doc. 270.

13.     In accordance with the Court's directive, the Receiver filed a *Notice of Filing of Undertaking of Receiver Pursuant to July 14, 2022 Order* (the "Undertaking"; Doc. 273), whereby the Receiver, on behalf of himself and the Receivership Entities, undertook (a) "to preserve all documents relating to Mr. Buscher's proposed claims" and (b) "not to assert the statute of limitations or laches to any claim asserted in Exhibit 2 to the Buscher Declaration of June 20, 2022 (Doc 252) under any stay or extension of a stay ordered by [the] Court."

14.     Since the second extension of the Receivership Stay, through a series of motions and orders, the Court further extended the Receivership Stay through April 30, 2023.  *See* Doc. 298 (*sua sponte* granting third extension); Doc. 307-08, Doc. 312 (granting fourth extension); Doc. 316-18, Doc. 323 (granting fifth extension).

15.     On April 17, 2023, based on the progress in the sale of the Receivership Assets and the fact that all interested parties (including Rising Sky, LLC, the potential purchaser) believe that the sale should close outside of chapter 11 (as contemplated by the Receivership Order), the Receiver filed the current Stay Extension Motion, whereby he seeks to extend the Receivership Stay through June 30, 2023, without prejudice to the Receiver's right to request further extensions. *See* Doc. 337.  Opposing affidavits and answering memoranda with respect to the Stay Extension Motion were due on April 24, 2023.  *Id.*  As of the date of this Response, the only pleading filed in response to the Stay Extension Motion is the Limited Objection.

**B.     Mr. Buscher's Involvement With The Receivership Entities**

16.     In or around June 2020, the Company hired Mr. Buscher as an independent contractor consultant.  *See Consulting Agreement* dated July 13, 2020 but effective as of

July 1, 2020 (the "Consulting Agreement"), a copy of which is attached to the Fuqua Decl. as **Exhibit A**.[3]  Upon information and belief, Mr. Buscher was employed as a "Senior Executive" with the Company serving as chief executive officer of Theia Resources Group, Incorporated ("TRG").  The scope of Mr. Buscher's work at TRG included "executive services for natural resource exploration to" the Company and service as "CEO of TGI's natural resource subsidiary." *Id.*, Exhibits A and B.

17.     In or around November 2020, the Company engaged Mr. Buscher to conduct "fundraising."  *See* Minutes of Board Meeting held on November 10, 2020, a copy of which is attached to the Fuqua Decl. as **Exhibit B**.  During the month of December 2020, Mr. Buscher became increasingly involved in the Company's financial affairs as he was raising funds for the Company from, among others, Aithre Capital Partners, LLC ("BullTick").

18.     Upon information and belief, Mr. Buscher coordinated a $25 million infusion of capital from BullTick (from which he received a bonus of approximately $380,000).

19.     On or about December 31, 2020, a few weeks after Mr. Buscher's began holding himself out as CFO of the Company, Mr. Buscher and the Company entered into an *Amended Consulting Agreement*, a copy of which is attached to the Fuqua Decl. as **Exhibit C** (the "Amended Consulting Agreement"), pursuant to which Buscher became the Company's CFO.

20.     Exhibit B (Statement of Work) to the Amended Consulting Agreement provides that Mr. Buscher agreed "to serve as the CFO of the Company" and that he would "have chief oversight of all accounting and financial control functions."  *See id*, p. 13.

---

[3]  In accordance with this Court's Order granting Mr. Buscher's letter request to seal, the Receiver has redacted Mr. Buscher's personal email address from **Exhibits A and C**.  *See* Docs. 138, 162.

C.     **The Amended Consulting Agreement and the Protection of TGI's Property Interests.**

21.     In light of Mr. Buscher's position with TGI, it was important to have a clear understanding regarding the treatment of TGI's confidential information and the ownership of all intellectual property developed during Mr. Buscher's employment with TGI.

22.     To that end, the Amended Consulting Agreement provides that the Company—not Mr. Buscher—owns, "*solely and exclusively*, all right, title, and interest in and to" (i) "the Proprietary Information and all Intellectual Property Rights relating thereto"[4] and (ii) "all Deliverables and all Consultant work-product which is created pursuant to"[5] the Amended Consulting Agreement, along with "all Intellectual Property Rights relating thereto…" *Id.*, §§ 5.1-5.2 (emphasis added).

23.     Consistent with the foregoing, Mr. Buscher "**irrevocably assign[ed]** to the Company all of [Mr. Buscher's] right, title, and interest in and to all Deliverables and all Consultant work-product and all Intellectual Property Rights relating thereto." *Id.*, § 5.3 (emphasis added).

24.     The Amended Consulting Agreement created "a relationship of confidence and trust between [Mr. Buscher] and the Company with regard to Proprietary Information." *See*

---

[4] "Proprietary Information" is defined, in part and without limitations, as " technical data, trade secrets, know-how, ideas, improvements, techniques, research, product development plans, products, services, . . . software, developments, inventions, processes, . . . technology, designs, drawings, graphic content, . . . engineering, configuration information, marketing information, branding information, finances or any other information relating to the Company's actual or anticipated business" and "*[a]ll work-product of the Consultant shall be considered Proprietary Information*."  Amended Consulting Agreement, § 1.2 (emphasis added).  "Intellectual Property Rights" are defined as "the right to the complete enjoyment and exclusive ownership of any Proprietary Information, including but not limited to the right to trademark, copyright, patent, trade-secret, mask rights, or otherwise formally or informally register any Proprietary Information or work product of [Mr. Buscher] as intellectual property under the laws or jurisdictions of claim or trade methods of any jurisdiction, in any country in the world." *See id.*, § 1.4.

[5] "Deliverables" means any work-product produced by Mr. Buscher, "including but not limited to any Proprietary Information." *See* Amended Consulting Agreement, § 1.3.

Amended Consulting Agreement, § 6.1.  For example, Mr. Buscher agreed that "[d]uring *and subsequent to* the Term" of the Amended Consulting Agreement, he would "treat as strictly confidential all Proprietary Information"  and would "not disclose, disseminate, distribute, or transfer such Proprietary Information to any third party without the Company's prior written consent;" "not use the Proprietary Information for [his] own benefit or for the benefit of any third party, except with the Company's prior written consent;" and "not use such Proprietary Information except solely for the purpose of [his] performance under" the Amended Consulting Agreement. *Id.*, § 6.1.

25.     Mr. Buscher also agreed that, "[e]xcept with the Company's prior written consent," he would "not remove any Proprietary Information from the Company's business premises or other Company designated locations." *Id.*, § 6.3.

26.     On January 22, 2021, the Company's Board of Directors (the "Board") approved a resolution, by written consent, which simultaneously appointed (among others) Mr. Buscher as CFO and Mr. Olson as "interim" chief executive office ("CEO").[6]  *See Unanimous Written Consent in Lieu of a Special Meeting of the Board of Directors of Theia Group, Incorporated* dated January 22, 2021, a copy of which is attached to the Fuqua Decl. as **Exhibit D** (the "Jan. 22 Resolution"); *see also* Olson Decl., ¶ 4.

27.     The Jan. 22 Resolution further provided that it was "*conditionally*" appointing Mr. Buscher as CFO "at the recommendation of senior management and as required by BullTick." *Id.* (emphasis added).

---

[6] Mr. Olson, founder and (prior to January 22, 2021) chief operating office of the Company, replaced Stephen O'Neill as CEO, a role in which Mr. Olson served until his resignation on May 19, 2021.  Olson Decl., ¶¶ 3-4.  Mr. Olson did not become an officer of TGI following his resignation, but he remained a member of the Board.  Mr. Olson never was not removed from the Board.

**D.    Mr. Buscher Fails To Fulfill His Most Basic Duties As CFO And Attempts to Devalue TGI.**

28.    After his appointment as CFO, Mr. Buscher controlled access to the login credentials to the Company's accounting system.

29.    Once he restricted access to the Company's accounts and after the Company received the initial $25 million from BullTick (and Mr. Buscher received his $380,000 bonus), Mr. Buscher disengaged from his most basic responsibilities as CFO—despite the clear requirements of the Amended Consulting Agreement.  *See* Amended Consulting Agreement, § 4.4 (indicating Mr. Buscher's agreement to keep "clear, complete, and accurate records and files in connection with the performance" of the services as CFO and the Company's "right to inspect and audit all such records and files.").

30.    For example, from approximately March 21, 2021 until his resignation on August 8, 2021, Mr. Buscher did not log in to the Company's accounting software (QuickBooks) at all. From approximately February through August 2021—Mr. Buscher's entire tenure as CFO—the Company's accounting records were not reconciled.

31.    In his role as CFO, Mr. Buscher also failed to produce a customary year-end audit for 2020, failed to file tax returns for the Company for the years 2019 and 2020, and had no ability to produce proper monthly financials.  In fact, Mr. Buscher appears to have outsourced the Company's accounting to his handpicked, offshore accountant in Cyprus.

32.    As CFO, Mr. Buscher also refused to allow regular oversight of the Company's accounts or enable staff to reconcile invoices and payments with bank records.  At the same time, he repeatedly told other executives and staff that payments had been made when in fact they had not been made, which damaged the Company's relationship with its key suppliers and other outside parties.

33.   In some cases, Mr. Buscher purposely intercepted late payment notices in order to prevent others from seeing them.  For example, Mr. Buscher purposely did not pay rent on one of the Company's primary offices, which became known only after the landlord issued a notice prior regarding its commencement of eviction proceedings.

34.   In addition, Mr. Buscher took other action designed to depress the value of the Company as part of his takeover bid.  For example, despite substantial knowledge to the contrary, Mr. Buscher purposely represented to auditors that the Company had no assets.  For example, Mr. Buscher told auditors that the following assets were worthless:  (i) the new and nearly new aircraft used in the Company's remote sensing activities; (ii) the FCC spectrum licenses and other government-issued licenses and approvals; and (iii) the Company's extensive intellectual property, including patents, trademarks and documented trade secrets.

### E.   Mr. Buscher Disappears, Attempts a Failed Coup, and Formally Resigns and Transfers Proprietary Information to His Personal Email Account.

35.   Rather than relocate to New Mexico to work from the Company's Albuquerque office, in April 2021, Mr. Buscher purchased a home and moved to Aspen, Colorado, which (upon information and belief) *he bought with Company funds as a loan*.  *See, e.g.*, E-mail from J. Fargnoli to S. Buscher dated March 5, 2021, a copy of which is attached to the Fuqua Decl. as **Exhibit E** ("Aspen, here you come.").   Far from being involved in actually running the Company, Mr. Buscher visited the Company's New Mexico facilities on only approximately two (2) occasions.  He was generally unavailable with limited phone reception.

36.   In the spring of 2021, several individuals in the Company began to suspect that Mr. Buscher had ulterior motives and was working for another party who wished to destroy the Company, or at least certainly its remote sensing business sector, with Mr. Buscher then taking control of the FCC spectrum licenses.  *See* Olson Decl., ¶ 11.

37.     Mr. Buscher organized an improperly noticed "emergency" Board meeting originally set for June 11, 2021, which was then rescheduled for June 14, 2021.  *See* Olson Decl., ¶ 12.  Following the June 14, 2021 Board meeting, Messrs. Olson, Gallagher, and Sullivan, Sr. were the sole remaining members of the Board.  *Id.*  The Board recognized that Mr. Buscher had staged a choreographed attempt to execute a "boardroom coup," force the Company into bankruptcy, and allow him to take control of the Company's assets.  *Id.*

38.     Mr. Buscher was "missing in action" for several weeks following the June 14, 2021 Board meeting.  *See* Olson Decl., ¶ 13.  His absence and failure to discharge any of his duties was tantamount to constructive resignation.

39.     Considering Mr. Buscher's failure to discharge any normal duties as CFO, his attempts to devalue TGI and his attempt to effectuate a coup, the TGI board approved, by consent, a resolution dated as of July 28, 2021, designating J. Reid Gorman ("Mr. Gorman") as *interim* CFO of the Company.  *See* Unanimous Consent Resolution dated July 28, 2021, a copy of which is attached to the Fuqua Decl. as **Exhibit F**; *see also* Olson Decl., ¶ 13.

40.     On or about August 8, 2021, Mr. Buscher formally resigned as CFO of the Company.  *See* Declaration of Stephen Buscher, 1:21-cv-06995-PKC (S.D.N.Y.) (Doc. 144; filed on Dec. 27, 2021), ¶ 5 ("On August 8, 2021, I tendered my resignation to TGI in writing.") and ¶ 6 ("Further Declarant Sayeth naught.").

41.     Before doing so, however, Mr. Buscher—in violation of the Amended Consulting Agreement—sent hundreds of emails containing the Company's proprietary information to his unencrypted personal email account to insure that he had access to the Company's "Proprietary Information" as part of his planned coup.[7]

---

[7] Notably, Mr. Buscher's access to the Company email was not removed until *after* his resignation, and the last email he sent from that account was dated July 31, 2021.

42.     After Mr. Buscher's formal resignation, on August 25, 2021, the Board appointed Mr. Gorman as "the permanent CFO."  *See* Unanimous Consent Resolution dated August 25, 2021, a copy of which is attached to the Fuqua Decl. as **Exhibit G**; *see also* Olson Decl., ¶ 14.

**F.      Buscher's Self-Dealing Scheme To Wrestle Control Of The Cypherian Concept Or Destroy TGI Trying To Do So.**

43.     In March 2021, Mr. Buscher prepared a pitch book for potential investors for "Cypherian Theia Holdings A DBA" (the "Cypherian 03/21 Deck").[8]

44.     The Cypherian 03/21 Deck provided that "Cypherian" purportedly would be spun-out by "Theia Group Inc." to separate communications and related functions from the remote sensing instruments and related business.  Cypherian 03/21 Deck, 12.

45.     Mr. Buscher, however, had other plans for the Cypherian concept.   On April 20, 2021, Mr. Buscher formed a Delaware corporation named Cypherian Corp. on April 20, 2021.  Then, on May 24, 2021, Mr. Buscher formed a Delaware limited liability company named Cypherian LLC (together with Cypherian Corp., "Cypherian Entities").

46.     Notably, even though "Cypherian" was merely a d/b/a for TGI, Mr. Buscher did not create either Cypherian Entity as a subsidiary of the Receivership Entities.   Instead, Mr. Buscher created the Cypherian entities as part of a scheme—in violation of the Amended Consulting Agreement—to own and control the Receivership Entities' intellectual property embodied in the Cypherian (a d/b/a for TGI) concept.

47.     In June 2021, approximately two (2) months after Mr. Buscher formed Cypherian as a separate entity from TGI, another investor pitch book was prepared, this time for "Cypherian" (*i.e.,* no reference to Cypherian as a d/b/a of TGI) (the "Cypherian 06/21 Deck").

---

[8]  The Receiver has not attached a copy of the Cypherian 03/21 Deck or the Cypherian 06/21 Deck (as defined below) because they contain proprietary and sensitive business information.

48.     In the Cypherian 06/21 Deck, Mr. Buscher was listed as the CFO *and "Co-Founder"* of Cypherian.  Mr. Buscher was also listed as a "Director" of Cypherian.

49.     Mr. Buscher formed the Cypherian Entities to take ownership and control of the Company's assets, including its patent portfolio, FCC spectrum licenses, satellites, and offices. *See* Cypherian 06/21 Deck at 15 (referring to "4 patents filed with 1 issued," all of which were owned by TGI), at 25 (identifying patents); at 26 (listing FCC spectrum licenses); at 40 (referring to the "Theia-Thales Superbus$^{TM}$"); at 43 (referring to TGI's offices as "Existing Cypherian Facilit[ies]"); at 48 (stating that "THEIA/Cypherian have exclusive IP and right to manufacture the bus in US or France").

50.     To further his scheme, Mr. Buscher repeatedly proposed that he resign as CFO of TGI, but continue serving as CFO of "Cypherian"—even though it was merely a d/h/a for the Company, not a separate entity.  *See* Olson Decl., ¶ 15.  Mr. Olson questioned Mr. Buscher's plan to resign as CFO for TGI while continuing on as CFO for Cypherian because Cypherian was really just a d/b/a of TGI.  *Id.*

51.     Mr. Buscher's scheme to steal the Company's intellectual property embodied in the Cypherian concept was laid bare in a secretly recorded July 6, 2021, office conversation between Messrs. Buscher and Olson.  *See* Olson Decl., ¶ 16.  In that conversation, in derogation of the terms of the Amended Consulting Agreement (*e.g.,* §§ 5.1-5.3 and 6.1), Mr. Buscher threatened:

> ***I'll bet you anything the Cypherian concept will live on. . . . Somehow with the spectrum.  So I'm just sitting here trying to figure out how can I stay attached to that because there's a part of me that's saying hey Cypherian was not really [TGI's] intellectual property anyway.  It was mine.  I've got Cypherian LLC Delaware corporation [sic] as well as Cypherian C Corp Delaware both incorporated with the Delaware registrar by me***.  And we're all over the market.  So, this is something where I don't know that we're in the same [inaudible] . . .  But, we're all adults. We all make our own decisions. . . .  It doesn't mean like I'm going to hand Rob Leeds Cypherian without a fight.  [They] only have 255 million bucks

- 13 -

out, they don't have a lien on everything up to an infinite amount. So fuck them. Fuck them. Yeah you want your money back? Why don't you go to a judge?  Go to a fucking judge because the Cypherian concept is mine.  It's not in your license you think you're going to foreclose on. There's no mention of it. Another company exists. . . .  ***I'll say fine, that's fine, and you know what, the moment I see any variant of your group pop up with a concept that looks like Cypherian, I will sue you until the last fucking day on earth***.  **So what do you want?**  Here's the bottom line, if they just take those licenses they're not getting shit.

*See* July 6, 2021 Taped Conversation at 20:43-22:53 (emphasis added); Olson Decl., ¶ 16.

52.     Mr. Buscher's scheme to own and control Cypherian also was manifest in his July 8, 2021 e-mail to Messrs. Olson, Gallagher, Newfrock and Hickey regarding "Cypherian," in which Buscher asserted that "You are on notice that not one cent and not one share from Cypherian will go to JN or RL. None."  *See* E-mail from S. Buscher to E. Olson, J. Gallagher, J. Newfrock, and J. Hickey dated July 8, 2021, a copy of which is attached to the Fuqua Decl. as **<u>Exhibit H</u>**.[9]

53.     Despite his confessions, Mr. Buscher feigned that he created Cypherian LLC with the intention to transfer it to TGI in exchange for $300 million (a bargain price) from Cypherian.

54.     Specifically, by an email dated July 11, 2021 from his Company email account to his personal account (with an apparent bcc: to "Tim"), Mr. Buscher (falsely) wrote:

> For context, please understand that at the moment Cypherian LLC is not a subsidiary of [TGI], as to my understanding there has not yet been a final Theia Group, Inc. shareholders/board decision as to the exact structural means by which Cypherian and [TGI] (Thorian) would be disaggregated. Therefore at Cypherian LLC, as was the case at Cypherian Corp., there are only two officers appointed (Olson and Buscher) and only two membership certificates issued (Olson and Buscher). There exists a fully drafted and executed set of agreements by which Olson and Buscher assigned the LLC to Theia Group, Inc. for free in exchange for $300 million from Cypherian paid to [TGI] to purchase the licenses and IP of Theia Holdings-A. I no longer am certain that this is the prefered [*sic*.] structure (it triggers tax consequences).
>
> Also, for clarity, *if it looks odd that Cypherian is at present under the control of Buscher and Olson, please understand that this was entirely at*

---

[9] "JN" refers to James Newfrock and "RL" refers to Robert Leeds.

>*my initiative*.  As I explained to Erlend at the time, if we do not know how
>to connect Cypherian to TGI's structure yet, then *for expedience it would
>be easiest if the CEO and CFO of TGI and Cypherian just formed the
>company and assigned it cost-free once the decision was made*. I had made
>Erlend, John Gallagher, Jim Hickey and Gene Sullivan aware that I had
>created Cypherian this way while we worked out the final structure.

*See* Email from S. Buscher dated July 11, 2021, a copy of which is attached to the Fuqua Decl. as

**Exhibit I** (emphasis added).

55.     As his *prior* statements just five days earlier in the taped July 6, 2021 conversation

demonstrate, however, Mr. Buscher had no intention of transferring control of Cypherian to TGI.

*See* Olson Decl., ¶ 17.  Instead, and as further demonstrated below by Mr. Buscher's own words,

Mr. Buscher was intent on either owning or controlling TGI's Cypherian concept or destroying

the Company and its licenses to the detriment of the Receivership Entities' creditors.  *Id.*

56.     In late July 2021 (unaware that his true intentions already were recorded on July

6th), Mr. Buscher tried to cajole Mr. Olson to keep Mr. Buscher involved with the Cypherian

concept.  *See* Olson Decl., ¶ 18.  Specifically, in a taped July 27, 2021, conversation, Mr. Buscher

inquired whether Mr. Olson saw Buscher as "part of that" (*i.e.,* Cypherian) going forward and

expressed Mr. Buscher's desire to take Cypherian public through a de-SPAC.  *See* July 27, 2021

Taped Conversation at 1:14-1:16 and 31:01-31:05; *see also* Olson Decl., ¶ 18.

57.     In support of his plea for continued involvement with the Receivership Entities, Mr.

Buscher said—contrary to the allegations in his Stay Relief Motion—that he (i)"doesn't know of

any wrongdoing" (*id.* at 13:46-49); (ii) "likes" Olson and considers him "one of his closest

friends", and would help Olson "clear [him]self" "in any way" (*id.* at 14:50-15:03); (iii) "respects"

Erlend unbelievably (*id.* at 22:31-22:34); (iv) would help Erlend "anyway [he] can" (23:13-23:15);

(v) "can make Cypherian happen," which will "more than pay[] everyone back" at which time

"everyone will love" Olson (*id.* at 24:09-18); (vi) asked Olson, "off the record," what Buscher can

do "most helpful" to Olson (*id.* at 28:25-28:30); and (vii) indicated that he did "not trust" the Department of Justice because it was "very political" (*id.* at 30:10-30:19); *see also* Olson Decl., ¶ 19.  These documented and recorded statements are inconsistent with Mr. Buscher's current statements regarding the Receivership Entities.  *See* Stay Relief Motion (Doc. 251), ¶¶ 1, 35-72; 75.

58.     Unrelenting, in a taped August 7, 2021, conversation with Mr. Olson—one day prior to resigning as CFO of the Company—Mr. Buscher continued to press for control of "Cypherian," advising Mr. Olson that Mr. Buscher wanted to resign as CFO of the Company and remain in that capacity for Cypherian.  *See* Olson Decl., ¶ 20.  Mr. Olson, however, rightly observed that Cypherian was simply a "d/b/a" for, and part of, TGI.  *See* Aug. 7, 2021 Recorded Conversation at 7:29-8:4 and 24:52-26:30; *see also* Olson Decl., ¶ 20.

59.     In another taped conversation with Mr. Olson, on September 30, 2021, Mr. Buscher once again reiterated his desire to stay on as CFO of Cypherian.  *See* Sept. 30, 2021 Recorded Conversation at 6:45-7:20; *see also* Olson Decl., ¶ 21.

60.     Unsuccessful in his other attempts to take control of Cypherian, in a September 30, 2021, taped conversation (nearly two months after his resignation as CFO of the Company), Mr. Buscher changed his tactics, turning up the pressure by threatening to testify against Mr. Olson and/or the Receivership Entities if Mr. Buscher's claims for compensation under the Amended Consulting Agreement were not resolved.  *See* Olson Decl., ¶ 22.  Specifically, Mr. Buscher warned that, "**I think we should just settle and, uh, to be really blunt, before I have to testify**[.]"  *See* Sept. 30, 2021 Recorded Conversation at 2:40-2:45; *see also* Olson Decl., ¶ 22.

61.     Unable to coax the Receivership Entities into voluntarily placing Mr. Buscher in control of the Cypherian concept, and unable to employ the threat of testimony to force TGI into

settling his claim under the Amended Consulting Agreement, Mr. Buscher again laid bare his desire to destroy the Receivership Entities as part of his scheme to control the Receivership Entities' intellectual property.  In a September 1, 2021 text message to Joseph Fargnoli (another former TGI representative), Mr. Buscher wrote:

> **I do have this dream though Joe that maybe someone could go to the FCC and confiscate the permits.  Any chance?**

*See* Sept. 1, 2021 text to J. Fargnoli, a copy of which is attached to the Fuqua Decl. as **<u>Exhibit J</u>**.

62.     Adding to his malicious conduct, Mr. Buscher continued to threaten former TGI representatives that were exposing Mr. Buscher's scheme to destroy the Receivership Entities and obtain control of their FCC license and intellectual property, including the Cypherian concept. Upon information and belief, in a text message sent on Friday, May 6, 2022, Mr. Buscher implied that he had the ability to cause criminal charges to be filed against one former TGI representative (James Hickey, Esq.), as follows:

> Hi Jim, you do know that framing or slandering me will bring extra criminal charges, no?

*See* Text Message from Mr. Buscher to James Hickey, Esq., a copy of which is attached to the Hickey Decl. as **<u>Exhibit 1</u>**; *see also* Olson Decl., ¶ 23.

## <u>RESPONSE</u>

## I.     **LEGAL STANDARD**

63.     Under well-established Second Circuit precedent, this Court has the inherent equitable power to impose and extend a stay to prevent nonparties from initiating or continuing litigation against an entity in a receivership, thereby preventing "interference with the administration of th[e] estate."  *KeyBank Nat'l Assoc. v. Monolith Solar Assocs. LLC*, 2020 U.S. Dist. LEXIS 133304,*3-4 (N.D.N.Y. July 28, 2020) (quoting *S.E.C. v. Credit Bancorp, Ltd.*, 93 F. Supp. 2d 475, 477 (S.D.N.Y. 2000)); *see also S.E.C. v. Amerindo Inv. Advisors Inc.*,

2016 U.S. Dist. LEXIS 195593, at *6 (S.D.N.Y. May 20, 2016) (citation omitted); *S.E.C. v. Byers,* 609 F.3d 87, 91 (2d Cir. 2010) ("*Byers II*") (authorizing blanket stay of all litigation against receivership property in SEC receivership context).

64.     The Court's power to impose and extend a receivership stay is "effective against all persons [and] all proceedings against the receivership entities" and "rests as much on [the court's] control over the property placed in receivership as on its jurisdiction over the parties" to the underlying claim.  *Byers II*, 609 F.3d at 91.  This is because a litigation stay gives the receiver a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant.  *See, e.g.*, *U.S. v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005) ("[t]he interests of the Receiver are very broad and include not only protection of the receivership *res*, but also protection of . . . investors and considerations of judicial economy."); *U.S. v. Elk Assocs. Funding Corp.*, 2020 U.S. Dist. LEXIS 210397, *8 (E.D.N.Y. Nov. 10, 2020) (same).

65.     In determining whether to implement, extend, or lift the stay in a receivership case, District Courts "give appropriately *substantial* weight to the receiver's need to proceed unhindered by litigation, and the very real danger of litigation expenses diminishing the receivership estate." *U.S. v. Acorn Tech. Fund, L.P.*, 429 F.3d at 443 (emphasis added); *see also S.E.C. v. Pittsford Cap. Income Partners*, *L.L.C.*, 2007 U.S. Dist. LEXIS 1241, *2 (W.D.N.Y. Jan. 5, 2007) (recognizing that "[t]he preservation of the receivership estate is paramount.").

66.     Here, the Receiver has set forth ample reasons in the Stay Extension Motion for further extending the Receivership Stay.  Mr. Buscher, however, has failed to make *any* argument or showing that not further extending the Receivership Stay either warranted or appropriate.

Accordingly, the Court should overrule the Limited Objection and grant the relief requested by the Stay Extension Motion.

## II.    THE COURT SHOULD OVERRULE THE LIMITED OBJECTION AND FURTHER EXTEND THE RECEIVERSHIP STAY.

67.    As set forth in the Stay Extension Motion, extending the Receivership Stay to June 30, 2023 is necessary to preserve the Receivership Assets and allow the Receiver the further opportunity to maximize the value of the Receivership Entities' assets for the benefit of all creditors.  Allowing the Receivership Stay to expire would severely prejudice the Receivership Estates and thwart the work of the Receiver at a pivotal moment in this Receivership Case.  *See, e.g.*, *S.E.C. v. Am. Bd. of Trade Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (primary purpose of a receivership is to protect the estate property and ultimately return that property to the proper parties in interest) (citations omitted).

68.    "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets" for the benefit of all creditors of the receivership estate.  *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006).  As the Receiver is charged with protecting the interests of all creditors, the Receiver has a substantial interest in preserving the status quo.  Under the circumstances of this Receivership Case, the best way to maintain the status quo is to permit the Receiver to carry on with the sale process and administration of the Receivership Estates unhindered.  *See also Huntington Nat'l Bank v. Saint Catharine Coll.*, 2017 U.S. Dist. LEXIS 203775, *20 (W.D. Ky. Dec. 12, 2017) (maintaining the status quo would allow receiver to focus its attention on finalizing the sale of receivership assets).

69.    While Mr. Buscher points to the length of the Receivership Stay in this Receivership Case, a court may further extend a litigation stay anywhere from a few months to a few years into the receivership, depending on the particular circumstances of the case.  *See, e.g.*,

*S.E.C. v. Universal Fin.*, 760 F.2d 1034, 1039 (9th Cir. 1985) (upholding a stay four (4) years into the receivership); *F.T.C. v. 3R Bancorp*, 2005 U.S. Dist. LEXIS 12503, *3 (N.D. Ill. 2005) (upholding a stay because the receiver had mere months to unravel the "labyrinthine entanglements" of the receivership).

70.     The facts of this Receivership Case warrant further extension of the Receivership Stay.  The Receiver, together with his advisors, are focused on a sale process involving complex assets (including FCC and NOAA licenses and foreign and domestic intellectual property) that could yield hundreds of millions of dollars.  Part of that process necessarily involves accounting records left in disarray by Mr. Buscher.  Generally, courts are reluctant to allow a litigation stay to expire where (as here) doing so would disrupt the receiver's duty to organize and understand its assets.  *See, e.g.*, *Belsome v. Rex Venture Grp., LLC*, 2013 U.S. Dist. LEXIS 181160, at *6 (W.D.N.C. Dec. 30, 2013) (timing factor weighed in favor of receiver "engaged in intensive investigation and analysis, reconstructing the financials of [the entity], analyzing large volumes of documents, liquidating the company's assets, and preparing for the filing of clawback actions"); *Huntington Nat'l Bank v. Sakthi Auto. Grp. U.S., Inc.*, 2020 U.S. Dist. LEXIS 124751, *6 (E.D. Mich. July 16, 2020) (refusing to lift stay where although receivership order had been in effect for a year, receiver was still in the process of organizing and understanding the entities, and was deep into the process of untangling assets and preparing for their sale).

71.     Extending the Receivership Stay also is in accord with permitting the Receiver to discharge his duty under paragraph 6 of the Receivership Order, which charges the Receiver with the pursuit of a sale of the FCC License.  Indeed, the Court has recognized that the continuation of the Receivership Stay is "in the best interest of the Receivership Entities, their creditors and other potentially affected third parties" because the "sale of the largest assets represents the best

hope of creditors who are able to prove their claims for receiving payment."  *See* Order, Doc. 270 at 2.

72.     Moreover, no third parties (including Mr. Buscher) will be prejudiced by the further extension of the Receivership Stay because the Receivership Order provides a mechanism by which such parties can request that the Court lift the Receivership Stay.  *See* Receivership Order, ¶ 4 ("Any party or non-party may seek leave from this Court to commence or maintain an action, proceeding, lawsuit or bankruptcy case upon a showing that such a petition is appropriate and would not interfere with the receivership estate.").  With respect to Mr. Buscher specifically, the Receiver previously filed an Undertaking with the Court to preserve any alleged claims that he may have.  *See* Doc. 273.

73.     In the Limited Objection, Mr. Buscher asserts that he "supports maximizing the value of the Receivership Assets."  *See* Limited Objection, at ¶ 3.  His conduct (both prior to and during these Receivership Cases), as well as the filing of the Limited Objection, belies any such assertion.

74.     Mr. Buscher has not provided any alternative to the Potential Sale Transaction or otherwise indicated how placing the Receivership Entities into bankruptcy would be the best course of action at this moment for all creditors.  The Court has previously recognized "that the potential purchaser's continued interest is 'contingent upon' the sale transaction occurring in the receivership."  *See* Order, (Doc. 270), at 1.  The requirement that the Potential Sale Transaction occur in the context of the Receivership Cases has not changed.

75.     At bottom, Mr. Buscher has provided no reason for the Court to deny the Stay Extension Motion.  His questioning of the Receiver's business judgment in seeking a further

extension of the Receivership Stay—especially in light of prior conduct as detailed above—should be disregarded.

## **CONCLUSION**

76.     Considering the facts and circumstances of this Receivership Case, maintaining the Receivership Stay is justified because doing so is essential to the Receiver's substantial interest in preserving the status quo and protecting the interests of *all* creditors.   Accordingly, the Court should overrule Mr. Buscher's Limited Objection and grant the relief requested by the Stay Extension Motion.

WHEREFORE, the Receiver, Michael Fuqua, by and through his undersigned counsel, respectfully requests that this Honorable Court enter an Order (i) overruling the Limited Objection; (ii) granting the relief requested by the Stay Extension Motion; and (iii) granting such other relief as is appropriate.

Dated:  April 27, 2023
       New York, New York

                         Respectfully submitted,

                         REED SMITH LLP

By:    */s/ Kurt F. Gwynne*
        Kurt F. Gwynne
        599 Lexington Avenue
        New York, New York 10022
        Telephone:  (212) 521-5400
        Facsimile:  (212) 521-5450
        E-mail:  kgwynne@reedsmith.com

        - and -

        Jason D. Angelo, Esq. (admitted *pro hac vice*)
        1201 N. Market Street, Suite 1500
        Wilmington, Delaware 19801
        Telephone:  (302) 778-7500
        Facsimile:  (302) 778-7575
        E-mail:  jangelo@reedsmith.com

        *Counsel for Michael Fuqua, in his capacity as*
        *Receiver of Theia Group, Inc., Theia Aviation LLC,*
        *and Theia Holdings A, Inc.*