UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FCS ADVISORS, LLC,

                                   Plaintiff,

           —against—

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN"; THEIA
AVIATION, LLC; and THEIA HOLDINGS
A, INC., d/b/a "THORIAN HOLDINGS,"

                                   Defendants.

---

21 Civ. 6995 (PKC)

**[PROPOSED] ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE RECEIVERSHIP
ENTITIES' ASSETS, (II) SCHEDULING AN AUCTION FOR, AND HEARING TO
APPROVE, THE SALE, (III) APPROVING NOTICE OF AUCTION AND SALE
HEARING, (IV) FURTHER EXTENDING THE RECEIVERSHIP STAY THROUGH
JULY 31, 2023 AND (V) GRANTING RELATED RELIEF**

Upon consideration of the *Motion of Michael Fuqua, as Receiver* (the "Receiver"), *for an
Order (I) Approving Bidding Procedures in Connection With the Sale of All or Substantially All
of the Receivership Entities' Assets, (II) Scheduling an Auction for, and Hearing to Approve, the
Sale, (III) Approving Notice of Auction and Sale Hearing, (IV) Further Extending the Receivership
Stay Through August 31, 2023, and (V) Granting Related Relief* (the "Motion"),[1] in which the
Receiver seeks (among other relief) entry of an order approving (a) the *Bidding Procedures in
Connection With the Sale of the Receivership Entities' Assets* in the form attached as **Exhibit 1**
(the "Bidding Procedures") and (b) the *Notice of the Auction and Sale Hearing* in the form attached
as **Exhibit 2** (the "Sale Notice"); and this Court having reviewed the Motion, the accompanying
memorandum of law in support thereof, and the *Declaration of Michael Fuqua, as Receiver, in*

---

[1] Capitalized terms used but not defined in this Order have the meanings given in the Motion.

*Support of the Motion*; and after due deliberation, this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Receivership Entities, the Receivership Estate, and its creditors, and the Receiver having demonstrated sound business justifications for the relief granted herein:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.     **Sales Process**.  The Receiver and his advisors, including PJT, have conducted an extensive marketing process to solicit and develop the highest and otherwise best offers for the Assets.

B.     **Bidding Procedures**.  The Receiver has articulated good and sufficient business reasons for the Court to approve the Bidding Procedures attached as **Exhibit 1**.  The Bidding Procedures are fair, reasonable, and appropriate under the circumstances, and are designed to insure a fair and open process for the sale of all or substantially all of the Receivership Entities' Assets.

C.     **Sale Notice**.  The Sale Notice, attached as **Exhibit 2**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing, the Bidding Procedures, the Sale Transaction(s), and all relevant and important dates and objection deadlines with respect to the foregoing.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The Motion is **GRANTED** as set forth herein.

2.     Any objections to the relief granted in this Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled.

3.     The Bidding Procedures attached as **Exhibit 1** are hereby approved and shall govern the Bids and proceedings related to the sale of the Assets and the Auction.

4.      For purposes of the Bidding Procedures, FCS shall be deemed to have a valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount not less than $454.8 million and, in accordance with the Bidding Procedures, shall be entitled to Credit Bid up to the full amount of its debt.

5.      For purposes of the Bidding Procedures, Aithre shall be deemed to have a valid, perfected second-priority lien on all of the Assets of the Receivership Estates in an amount not less than $41,047,305.67 and, in accordance with the Bidding Procedures, shall be entitled to Credit Bid up to the full amount of its debt.

6.      The Sale Hearing shall be held before the Court on ~~August 14, 2023, at 10:00 a.m.~~ **a date to be determined by the Court** (~~Eastern~~); *provided*, that the Receiver may seek an adjournment or rescheduling of the Sale Hearing.

*PKC*

7.      All objections to the sale of any or all assets of the Receivership Entities shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, (ii) filed with the Court, and (iii) served on the Notice Parties (as defined in the Bidding Procedures) by no later than **August 7, 2023, at 4:00 p.m.** (**Eastern**) (the "Sale Objection Deadline").  Any party that fails to file and serve a timely Sale Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection to the relief requested in the Motion, or to the consummation or performance of the applicable Sale Transaction(s), including the transfer of Assets to the applicable Successful Bidder free and clear of liens, claims, interests, and encumbrances (except for permitted liens and encumbrances as determined by the Receiver and the Successful Bidder or this Court).

8.      The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the proposed sale of the Assets and any other relief set forth in the Motion, the Auction, the Sale Hearing, or the Sale Objection Deadline shall be required if the Receiver serves the Sale Notice within two (2) business days after entry of this Order.

9.      The Receivership Stay provided for in paragraph 4 of the Receivership Order is further extended through and including August 31, 2023, without prejudice to (a) the Receiver's right to seek further extensions of the Receivership Stay or (b) the right of any party or non-party under paragraph 4 of the Receivership Order to seek relief from the Receivership Stay.

10.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order and any and all aspects of the Sale.


Dated: __June 30_____, 2023
            New York, New York

                                    _____
                                    P. KEVIN CASTEL
                                    UNITED STATES DISTRICT JUDGE

**EXHIBIT 1**

<u>Bidding Procedures</u>

(Attached)

## BIDDING PROCEDURES IN CONNECTION WITH THE
## SALE OF THE RECEIVERSHIP ENTITIES' ASSETS

 Set forth below are the bidding procedures (the "**Bidding Procedures**")[3] to be used with respect to the sale or disposition (the "**Sale**") of all or substantially all of Receivership Entities' assets (collectively, the "**Assets**"), including tangible and intangible property, of Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "**Receivership Entities**" and the estates thereof, the "**Receivership Estates**") for the highest or best offer(s).

### OVERVIEW

 On November 8, 2021, the United States District Court for the Southern District of New York (the "**Court**") entered an *Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "**Receivership Order**") in the case captioned *FCS Advisors, LLC v. Theia Group, Inc.* et al., Civil Case No. 21-CV-6995 (PKC) thereby appointing Michael Fuqua as receiver (the "**Receiver**") of the Receivership Entities. On [□], 2023, the Court entered an Order (Doc. [□]) (the "**Bidding Procedures Order**"), which, among other things, approved these Bidding Procedures for the consideration of the highest or otherwise best bid(s) for some or all of the Assets (each, a "**Bid**"), on the terms and conditions set forth herein. As part of these Bidding Procedures, the Court has scheduled a hearing to consider entering an Order approving of the Sale (the "**Sale Order**") of the Assets to the Successful Bidder (as defined below), to be conducted on ~~August 14, 2023 at~~ ~~10:00 a.m. (Eastern)~~ TO BE DETERMINED (the "**Sale Hearing**").  PKC

 These Bidding Procedures set forth, among other things, the process by which the Receiver will solicit the highest or otherwise best Bid or Bids for all, or any portion of, the Assets, culminating in an auction (the "**Auction**") if competing Qualified Bids (as defined herein) are received and, in the Receiver's judgment, an Auction is necessary or appropriate. The Sale is contemplated to be implemented pursuant to the terms and conditions of one or more asset purchase agreements upon the receipt of one or more Successful Bids (as defined herein) that the Receiver has determined, in his business judgment, is/are the best or highest Bids in accordance with these Bidding Procedures (as may be revised by the Receiver from time to time).

 The Receiver reserves the right to extend any of the Bidding deadlines or other dates set forth in these Bidding Procedures without further order of the Court.

### SALE TIMELINE

| KEY EVENT | DEADLINE |
|---|---|
| Bidding Procedures Hearing | TO BE DETERMINED   PKC<br>~~June 28, 2023 at 10:00 a.m. (Eastern)~~[4] |

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order.

[4] If necessary and subject to the Court's availability.

| | | |
|---|---|---|
| Final deadline to submit Bids and good faith Deposits | ~~July 24, 2023 at 4:00 p.m. (Eastern)~~  Notwithstanding the foregoing, the Bid Deadline for FCS shall be July 26, 2023 at 4:00 p.m. (Eastern) or, to the extent the Bid Deadline is extended for other bidders, two (2) days after the Bid Deadline for such other bidders. | PKC |
| Deadline to Designate and file Notice of Qualified Bids | Approximately 2 days prior to the Auction | |
| Deadline to Designate Starting Bid | Approximately 1 day prior to the Auction | |
| Auction for Assets (if one or more Qualified Bids received) to be held at offices of Reed Smith LLP, 599 Lexington Avenue, Floor 22, New York, NY 10022. | July 31, 2023 at 10:00 a.m. (Eastern) | |
| Deadline to File Post-Auction Notice Identifying Successful Bid(s) and Back-Up Bid(s) | As soon as practicable following Auction | |
| Deadline to Object to Sale Transaction(s) | August 7, 2023 at 4:00 p.m. (Eastern) | |
| ~~Sale Hearing~~ | TO BE DETERMINED ~~August 11, 2023 at 10:00 a.m. (Eastern)[5]~~ | PKC |
| Closing Date | To be determined. | |

**DUE DILIGENCE**

**I.**    **Access to Diligence**

To ensure a fair sale process with maximum participation, the Receiver's advisors will initiate the sales process by contacting, as soon as possible, all known Potential Bidders and affording each access to the Receiver's electronic data room (the "**Data Room**") as soon as possible after receipt of the Confidentiality Agreement (as defined below).

---

[5] If necessary and subject to the Court's availability.

Any Potential Bidder[6] that (i) has executed or executes a confidentiality agreement on terms that are reasonably acceptable to the Receiver (a "**Confidentiality Agreement**"),[7] (ii) has provided or provides sufficient evidence, as reasonably determined by the Receiver, that the Potential Bidder intends to conduct due diligence and participate in the Sale process, and (iii) has provided or provides evidence of such Potential Bidder's financial capability to acquire the Assets, the adequacy of which will be assessed by the Receiver (with the assistance of his advisors) (any such Potential Bidder being referred to as an "**Acceptable Bidder**") will be eligible to receive access to certain non-public due diligence materials regarding the Assets.  For the avoidance of doubt, as set forth herein, FCS[8] shall be deemed a Qualified Bidder and shall have the right to Credit Bid up to the full amount of its debt which is an amount no less than $454.8 million.  The Receiver will post substantially all written due diligence provided to any Acceptable Bidder during the Sale process to the Data Room.  The Receiver may restrict or limit access of an Acceptable Bidder to the Data Room if the Receiver determines, in his discretion, that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Acceptable Bidder provided that such Acceptable Bidder is made aware that its access has been so restricted or limited.

The initial due diligence period will end on the Bid Deadline (as defined herein).  Following the Bid Deadline, the Receiver may, in his reasonable discretion, furnish additional non-public information to a Qualified Bidder or Qualified Bidders that submitted a Qualified Bid (each as defined herein), but shall have no obligation to do so.  Each Potential Bidder shall comply with all reasonable requests for additional information requested by the Receiver or his advisors, regarding qualification as an Acceptable Bidder or Qualified Bidder, the terms of the Potential Bidder's Bid, or the ability of the Potential Bidder to acquire the Assets.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access is a basis for the Receiver to determine that such bidder is no longer a Qualified Bidder and/or that any Bid made by such Potential Bidder is not a Qualified Bid.

In connection with the provision of due diligence information to Acceptable Bidders, the Receiver, in his discretion, may not furnish confidential information relating to the Receivership Entities, the Assets, or the Sale to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives, in each case, as provided in the applicable Confidentiality Agreement.  The Receiver and his advisors will coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Receiver may decline to provide such information to Acceptable Bidders who, in the Receiver's judgment, have not established that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate their Bid.  Unless the Receiver otherwise agrees, no conditions relating to the completion of due diligence or financing will be permitted to exist after the Bid Deadline.

---

[6]  For purposes of the Bidding Procedures, a "**Potential Bidder**" shall refer to any person or entity interested in submitting a Bid and the Secured Creditors.

[7]  Potential Bidders may obtain a Confidentiality Agreement by contacting the Receiver's advisors listed below.

[8]  For purposes of these Bidding Procedures, "**FCS**" shall refer to FCS Advisors, LLC d/b/a Brevet Capital Advisors or its successor(s) or assign(s).

Neither the Receiver nor his representatives will be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder.

Each Acceptable Bidder and Qualified Bidder will be deemed to acknowledge and represent that it: (a) either directly or through its advisors has had an opportunity to conduct any and all due diligence regarding the Assets prior to making any Qualified Bid; (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making any Qualified Bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or the Acceptable Bidder's proposed purchase agreement. Neither the Receiver nor any Secured Creditors or any of their current employees, representatives, agents, advisors, or professionals are responsible for, and will bear no liability with respect to, any information requested or obtained by Acceptable Bidders in connection with the Sale.

> **The Receiver has designated PJT Partners LP, 280 Park Avenue New York, NY 10017 Attn: Akshay Patel (akshay.patel@pjtpartners.com) and Michael Schlappig (schlappig@pjtpartners.com) to coordinate all reasonable requests for additional information and due diligence access.**

## II.    No Communications Among Acceptable Bidders

There shall be no communications regarding the Sale process between and among Acceptable Bidders unless the Receiver has previously authorized such communication in writing. The Receiver reserves the right, in his reasonable business judgment, to disqualify any Acceptable Bidders that communicated between or among themselves or otherwise engaged in collusion. Notwithstanding the foregoing, Acceptable Bidders may communicate with entities holding secured claims against the Assets and may work together with one or more Secured Creditors (as defined below) in submitting one or more Qualified Bids.

## AUCTION QUALIFICATION PROCEDURES

## I.    Bid Deadline

An Acceptable Bidder that desires to make a Bid on the Assets shall deliver electronic copies of its Bid in both PDF and MS-WORD format to the Notice Parties (as defined herein) so as to be received no later than **July 24, 2023 at 4:00 p.m. (Eastern)** (the "**Bid Deadline**"); *provided*, *however*, that the Receiver may extend the Bid Deadline for any reason whatsoever, in his reasonable business judgment after consultation with FCS, for all or certain Potential Bidders without further order of the Court. Notwithstanding the foregoing, the Bid Deadline for FCS shall be July 26, 2023 at 4:00 p.m. (Eastern) or, to the extent the Bid Deadline is extended for other bidders, two (2) days after the Bid Deadline for such other bidders.

Any party that does not submit a Bid by the applicable Bid Deadline will not be allowed (unless the Receiver agrees otherwise) to (i) submit a Bid or (ii) participate in the Auction.

## II.     Form and Content of Qualified Bids

To be eligible to participate in the Auction, a Potential Bidder must deliver to the Receiver and his advisors, a written, irrevocable offer that must be determined by the Receiver, in his reasonable business judgment, to satisfy each of the following conditions:

a. **Identity of Potential Bidder**.  Each Bid must fully disclose the identity of each entity that will be participating in connection with such Bid (including ultimate equity owners and sponsors of private companies), and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered, by power of attorney or otherwise, to complete the transactions on the terms contemplated by the parties.   A Bid must also fully disclose any connections or agreements with the Receivership Entities, any known, potential, prospective bidder, or Qualified Bidder (as defined herein), or any current or former officer, director, or equity security holder of any of the Receivership Entities.

b. **Purpose.**  Each Potential Bidder must state that the Bid includes an offer by the Potential Bidder to purchase some or all of the Assets and identify the Assets to be purchased with reasonable specificity.

c. **Purchase Price.**  Each Bid must clearly set forth the purchase price to be paid for the Assets (the "**Purchase Price**") and must (a) indicate the source of cash or (if acceptable to the Receiver and FCS) other consideration, including funding commitments, and confirm that such consideration is not subject to any financing contingencies or due diligence and (b) identify separately the cash and non-cash components of the Purchase Price, which (unless the Receiver otherwise agrees in writing) non-cash components shall be limited only to Credit Bids and shares of stock in public companies.  The Bid should include a detailed sources and uses schedule.  The Purchase Price must include sufficient cash consideration to provide for payment in full of (i) to the extent not otherwise paid or satisfied, any outstanding amounts on account of the financing approved pursuant to Court's (a) *Order Authorizing Receiver to Obtain Receivership Financing from FCS Advisors, LLC* (Doc. 206) entered on February 16, 2022 and (b) *Order (I) Authorizing Receiver to Enter Certain First Amendment to Receiver's Certificate Purchase and Security Agreement With FCS Advisors, LLC and (II) Granting Related Relief* (Doc. 329) entered on March 22, 2023 (together, the "Financing Orders") and (ii) all costs of administration of the Receivership Estates, including, without limitation, any transaction fee payable to PJT Partners LP ("PJT") in accordance with the Court's *Order Granting Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 207), entered on February 16, 2022 (the "PJT Retention Order" and such fee, the "Transaction Fee") and any taxes incurred by the Receivership Estates in, or as a result of, consummating the Sale; *provided*, *however*, that any Credit Bid shall also include, in addition to the foregoing, cash consideration sufficient to pay in full, and earmarked exclusively for the payment of, all claims for which there are valid, perfected, and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to Credit Bid (unless such senior lien holder consents to alternative treatment); *provided further*, *however*, that, solely with respect to the Transaction Fee, any Credit

Bid shall include cash consideration sufficient to pay only the minimum Transaction Fee payable to PJT pursuant to that certain *Engagement Letter*, dated as of December 28, 2021, by and between PJT and the Receiver, a copy of which is attached as <u>Exhibit 1</u> to the PJT Retention Order.[9]  Notwithstanding the foregoing, with the express written consent of FCS, a Bid may include the assumption of some or all of the debts and amounts owed to FCS; *provided*, however, that such a Bid shall still be required to provide the required cash consideration necessary to pay amounts due under the Financing Orders and the costs of administration of the Receivership Estates (as described above).  The Receivership Estates acknowledge that (i) FCS has valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount no less than $454.8 million and (ii) Aithre[10] has a valid second priority lien on the Assets of the Receivership Estates in an amount no less than $41,047,305.67.

d.  **Modifications or Amendments to FCC License and/or NOAA License**.  Each Bid must include a statement explaining any proposed amendments to or modifications of the FCC License and/or NOAA License that would require governmental or regulatory approval required for the Potential Bidder to consummate the applicable Sale that involves such licenses.

e.  **Good Faith Bid Deposit**.  Each Bid must be accompanied by a cash deposit (made by wire transfer or certified or cashier's check) equal to 10% (or such other amount, if any, to which the Receiver may agree in writing) of the aggregate value of the cash (in USD) *and* non-cash consideration of the Bid (the "**Deposit**"), which will be held in a segregated account established by the Receiver.   To the extent that any Deposit (i) consists of (in whole or in part) non-cash consideration in the form of stock of a publicly traded company and (ii) the value of such stock at the time that the applicable Bid is deemed by the Receiver to be a Qualified Bid is less than the value of such stock at the time the Potential Bidder submits its Bid, such Potential Bidder shall be required to supplement their Deposit, within one (1) business day of the Receiver's designation of such Bid as a Qualified Bid, so that such Deposit shall be equal to ten percent (10%) of the total cash and non-cash consideration of the Bid calculated as of the date Potential Bidder submitted such Bid.  To the extent a Qualified Bid is modified before, during, or after the Auction in any manner that increases the Purchase Price, as determined solely by the Receiver, contemplated by such Qualified Bid, the Receiver reserves the right to require that such Qualified Bidder increase its Deposit so that it equals 10% of the increased Purchase Price.   Other than as provided herein, the Successful Bidder (as defined below) and the Back-Up Bidder (as defined below) shall be required to supplement their Deposits, if necessary, within one (1) business day of the close of the Auction so that such Deposits shall be an amount equal to ten percent (10%) of the total cash and non-cash consideration of the Successful Bid or the Back-

---

[9]  For the avoidance of doubt, the Receiver, PJT, any entity making a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest reserve all rights with respect to the Transaction Fee due to PJT in connection with a Credit Bid.

[10] For purposes of these Bidding Procedures, "**Aithre**" shall refer to Aithre Capital Partners, LLC or its successor(s) or assign(s).

Up Bid, as applicable. For the avoidance of doubt, the Receiver in consultation with his advisors shall have the right to value non-cash consideration for purposes of determining the required amount of any Deposit.

f. **Ability to Close**. Each Bid must contain written evidence, documented to the Receiver's satisfaction, that demonstrates the Potential Bidder has available consideration, including cash or a firm and unconditional commitment for financing to close the transaction as set forth in the related Proposed APA if selected as the Successful Bidder or Back-Up Bidder (*provided*, *however*, that the Closing (as defined herein) shall not be contingent in any way on satisfying any conditions to obtain such financing), and such other evidence of ability to consummate the transaction that the Receiver may request, including proof that such funding commitments or other financing are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals ("Evidence of Financial Wherewithal"). Potential Bidders are encouraged to provide the Receiver with their Evidence of Financial Wherewithal in advance of the Bid Deadline to ensure that the Evidence of Financial Wherewithal is sufficient. The Receiver has determined that FCS has the ability to close if it elects to submit a Credit Bid (or other Bid).

g. **Pro Forma Capital Structure**. Each Bid must include a description of the Potential Bidder's pro forma capital structure.

h. **Good Faith Offer**. Each Bid must constitute a good faith, *bona fide* offer to purchase the Assets set forth in such Bid.

i. **Asset Purchase Agreement**. Each Bid must be accompanied by duly executed transaction documents including, at a minimum, a draft purchase agreement, including the exhibits and schedules related thereto (the "**Proposed APA**"), and any related documents pursuant to which the Potential Bidder proposes to effectuate the Sale. In addition to submitting an executed clean copy of the Proposed APA, each Bid must include a redline of the Proposed APA against the form of asset purchase agreement attached to these Bidding Procedures as **Exhibit A**.

j. **Binding and Irrevocable**. Each Bid must include a statement providing that the Potential Bidder's offer is binding and irrevocable until the later of (i) the conclusion of the Auction, (ii) if the Bid is selected as a Back-Up Bid, the Back-Up Bid Termination Date (as defined below); and (iii) if the Bid is selected as a Successful Bid, the occurrence of the closing of the Sale (the "**Closing**").

k. **Joint Bids**. The Receiver will be authorized to approve joint Bids in his reasonable discretion, on a case-by-case basis; *provided*, *however*, that the Receiver must make such determination no later than one (1) week before the Bid Deadline, unless the Receiver and FCS extend this deadline in writing.

l. **No Contingencies**. Each Bid must include a statement that the Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the applicable Proposed APA), is not subject to or conditioned on (x) obtaining any financing,

(y) shareholder, board of directors, or other internal approval, or (z) due diligence. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand (or other immediately available cash), each Bid must include committed financing documented to the Receiver's satisfaction that demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. An agreement in writing with the applicable Secured Creditors may also provide evidence of such funding commitments.

m. **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) and, if required, its equity holders with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

n. **Regulatory Approvals and Covenants**. A Bid must set forth, if any, each regulatory and third-party approval required for the Potential Bidder to consummate the applicable Sale, and the time period within which the Potential Bidder expects to receive such governmental, licensing, regulatory, or third-party approvals (and in the case that receipt of any such approval is expected to take more than sixty (60) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Receiver's legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Proposed APA. Notwithstanding the foregoing, a Bid may waive the condition of governmental approval provided that the payment obligation by the Potential Bidder is irrevocable and that payment or Closing is not conditioned or revocable or returnable if the governmental approval is not received. Waiver of governmental approval is a material factor in consideration of Bids.

o. **No Fees or Expense Reimbursement**. Each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction. By submitting its Bid, each Potential Bidder agrees to waive all rights to request or receive a break-up or other fee or expense reimbursement. Without limiting the foregoing, each Bid must expressly state that the Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

p. **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to (a) abide by and honor the terms of these Bidding Procedures and agrees not to seek to reopen the Auction after its conclusion and (b) serve as Back-Up Bidder, if its Bid is selected as the next highest or next best Bid after the Successful Bid(s) with respect to the applicable Assets. Notwithstanding the foregoing, nothing in these Bidding Procedures shall require FCS to serve as a Back-Up Bidder.

q. **No Collusion**. Each Bid must include a written acknowledgement and representation

that the Potential Bidder has not engaged in any collusion with respect to the submission of its Bid.

r. **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and liabilities prior to making its Bid, (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets and liabilities in making its Bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, liabilities, or the accuracy or completeness of any information provided by any other party including the Receiver and his professionals in connection therewith or the Auction, except as expressly stated in the Potential Bidder's proposed purchase agreement for the Assets.

s. **Time Frame for Closing**. A Bid by a Potential Bidder must be reasonably likely to be consummated, if selected as the Successful Bid (as defined herein), within a time frame reasonably acceptable to the Receiver.

t. **Consent to Jurisdiction**. The Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Receiver's qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, the Sale process, and the Closing, as applicable.

Bids fulfilling all of the preceding requirements, as determined by the Receiver and his advisors, in their reasonable business judgment, will be deemed to be "**Qualified Bids**," and those parties submitting Qualified Bids will be deemed to be "**Qualified Bidders**." The Receiver reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. In addition, the Receiver reserves the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any noncompliance with such requirements.

For the avoidance of doubt, each of FCS and Aithre (or their respective designee or administrative agent) (each, a "**Secured Creditor**") shall be deemed a Potential Bidder and Qualified Bidder, and a Bid by any such Secured Creditor that satisfies the requirements set forth herein will be a Qualified Bid. Each Secured Creditor may participate in any Auction.

Within one (1) business day after the Bid Deadline, the Receiver and his advisors will initially determine which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute, alone or together with other Bids, Qualified Bids so as to enable such Qualified Bidders to Bid at the Auction.

## III.    **Right to Credit Bid**

At the Auction, any Secured Creditor shall have the right to Bid all or a portion of the value of such Secured Creditor's claim within the meaning of applicable law (such Bid, a "**Credit Bid**"); *provided* that a Secured Creditor shall have the right to Credit Bid its claim, or a portion of its

claim, only with respect to the collateral by which such Secured Creditor is secured; *provided further* any Credit Bid shall include a cash component sufficient to pay in full, in cash, (i) all claims for which there are valid, perfected, and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party making such Credit Bid (unless such senior lien holder consents to alternative treatment), including (for Credit Bids other than by FCS) the obligations arising under the Financing Orders; and (ii) the additional amount that the Receiver deems necessary to pay the costs and expenses of administering the Receivership (the foregoing amounts, collectively, the "**Minimum Cash Component**"); *provided, further*, that any Secured Creditor intending to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to such participation, (i) notify the Receiver and his counsel at least two (2) calendar days prior to the Bid Deadline that it intends to submit a Credit Bid; (ii) to the extent that such Secured Creditor submits a Credit Bid for less than all of the Assets, at least two (2) calendar days prior to the Bid Deadline, provide the Receiver and his counsel an allocation of value among the categories of Assets included in its Credit Bid in detail acceptable to the Receiver; and (iii) provide all documentation requested by the Receiver regarding the liens, claims, and encumbered Assets that will be the subject of the Secured Creditor's potential Credit Bid. The Receiver has examined FCS's security interest, liens, and claims, and therefore, notwithstanding the foregoing sentence, FCS shall not be required to provide notice of intent to submit a Credit Bid prior to the Bid Deadline and shall not be required to provide documentation regarding the liens, claims, and encumbered Assets that would be the subject to a Credit Bid by FCS. For the avoidance of doubt, a Secured Creditor shall be required to provide cash consideration in respect of any Assets to be acquired that are not collateral securing such Secured Creditor's claim(s). Notwithstanding anything to the contrary herein, FCS has valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount no less than $454.8 million and shall be entitled to Credit Bid up to the full amount of its debt.

The Deposit for an entity asserting its right to Credit Bid shall be equal to the greater of (a) ten percent (10%) of the cash portion of the Bid and (b) the Minimum Cash Component. Notwithstanding anything to the contrary, there shall be no Deposit requirement for FCS.

<b><span style="font-variant: small-caps;">Pre-Auction Procedures</span></b>

## I.    Determination and Announcement of Starting Bid

Prior to the Auction, the Receiver and his advisors will evaluate Qualified Bids and identify one or more Qualified Bid that is, in the Receiver's reasonable business judgment, the highest or otherwise best Bid (the "**Starting Bid**") with respect to the Assets subject to such Bid(s). In determining the Starting Bid, the Receiver will take into account, among other things, (i) the amount and nature of consideration offered in each Qualified Bid, (ii) the execution risk attendant to any submitted Bids, (iii) the tax consequences of such Qualified Bid, and (iv) any other factors that the Receiver deems appropriate (including the time or conditions to close). Approximately one (1) day prior to the date of the Auction, the Receiver will distribute copies of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid.

If any Bid is determined by the Receiver not to be a Qualified Bid, the Receiver will refund such Potential Bidder's Deposit (without interest) within ten business days after the Bid Deadline, or as soon as reasonably practicable thereafter.

The Receiver may elect, in his reasonable discretion, to adjourn the Auction.

At any time prior to the conclusion of the Auction, the Receiver (in his discretion) may negotiate with any two (2) or more Potential Bidders or Qualified Bidders (including, for the avoidance of doubt, any such Potential Bidder or Qualified Bidder that submits a Credit Bid) to join them into a joint Bid for purposes of submitting a joint or combined Bid, including joining Qualified Bids at the Auction.

Notwithstanding anything to the contrary contained herein, the Receiver is under no obligation to (i) select any Starting Bid or (ii) conduct one or more Auctions for any Assets, whether before or after selecting a Starting Bid.

## II.      Failure to Receive One or More Competing Qualified Bids

If no Qualified Bid is received by the Bid Deadline (including the Bid Deadline for FCS), in the event only one Qualified Bid is received by the Bid Deadline, or if the Receiver determines that an Auction is neither necessary or appropriate despite more than one Qualified Bid for some or all of the Assets, the Receiver, in his discretion, after consulting with FCS, may choose not to conduct an Auction and may determine, in the Receiver's business judgment, to designate the Qualified Bid(s) or any other Bid(s) (in the case of having received no Qualified Bid) as the Successful Bid(s), and pursue entry of the Sale Order approving a Sale to the Qualified Bidder(s), or other Bid(s), as applicable.  In such circumstances,  the Receiver shall promptly file and serve a notice with the Court indicating that the Auction has been cancelled, advising that the designated sole Qualified Bidder(s) is/are the Successful Bidder(s), and setting forth the date and time of the Sale Hearing.

### AUCTION PROCEDURES

If there are one or more Qualified Bids competing for some or all of the Assets, the Receiver may conduct an Auction, telephonically, by Zoom videoconference, or in person, or a combination thereof, on a date to be announced (though tentatively scheduled for **July 31, 2023 at 10:00 a.m. (Eastern)**) at the offices of Reed Smith LLP, 599 Lexington Avenue, Floor 22, New York, NY 10022, or such later time or such other place as the Receiver may designate in a filing with the Court and in a notice to all Qualified Bidders who have submitted Qualified Bids.

Any Auction will be conducted in accordance with the following procedures (the "**Auction Procedures**"):

(i)      Only Qualified Bidders will be entitled to Bid at the Auction;

(ii)      the Qualified Bidders, must appear (whether, at the Receiver's discretion, in person, telephonically, or by video via Zoom) at the Auction with a decision maker;

(iii)      professionals, principals, and duly-authorized representatives for each Qualified Bidder shall be able to attend and observe an Auction, and the Receiver may permit other parties in interest to attend the Auction; *provided*, *however*, that any such Secured Creditor (other than a Qualified Bidder) that would like to attend an Auction shall be required to provide a written request to the Receiver at least five

(5) days prior to the Auction by sending an email to Kurt F. Gwynne, Esq. (kgwynne@reedsmith.com) and Jason D. Angelo, Esq. (jangelo@reedsmith.com), counsel to the Receiver; Notwithstanding the foregoing, FCS shall be authorized to attend the Auction without providing such notice.

(iv)    Bidding at an Auction will begin at the Starting Bid;

(v)    Subsequent Bids at the Auction must be made in minimum increments of $2,000,000 or such other amount as the Receiver may determine from time to time during the Auction;

(vi)    each Qualified Bidder will be informed of the terms of the previous Bid and the Receiver shall, during the course of the Auction, promptly inform each Qualified Bidder of which Subsequent Bids reflect, in the Receiver's reasonable business judgment, the highest or otherwise best Bid(s) for the Assets;

(vii)    the Bidding at the Auction will be transcribed to ensure an accurate recording;

(viii)    each Qualified Bidder will be required to confirm on the record of the Auction that it has not engaged in any collusion with respect to the Bidding or the Sale;

(ix)    the Auction will not close unless and until all Qualified Bidders have been given an opportunity to submit an overbid at the Auction to the then prevailing highest or otherwise best Bid, with all such Bids to be open Bids and bidding to continue until every Qualified Bidder has been given the opportunity to submit an overbid to the then prevailing highest or otherwise best Bid and has declined to submit such an overbid.  For the avoidance of doubt and notwithstanding anything to the contrary elsewhere herein, all Bids shall be open, and the Receiver shall not utilize blind bidding or close the Auction prior to each Qualified Bidder that has not been disqualified being provided the opportunity to overbid the then-prevailing highest or otherwise best Bid;

(x)    the Receiver reserves the right, in his reasonable business judgment, after consultation with any affected Secured Creditor, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Receiver and Qualified Bidders, (b) allow Qualified Bidders to consider how they wish to proceed, (c) provide Qualified Bidders the opportunity to provide the Receiver with such additional evidence as the Receiver, in his reasonable business judgment, may require to establish that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and (d) consider other means of sale or disposition of the Assets pursuant to the "Fiduciary Out" (as set forth below); and

(xi)    the Auction will be governed by such other Auction Procedures as may be announced by the Receiver or his advisors, from time to time on the record at the Auction.

At the start of the Auction, the Receiver shall describe the terms of the Starting Bid. Bidding at the Auction will begin with the Starting Bid and continue, in one (1) or more rounds of Bidding, so long as during each round at least one (1) Subsequent Bid (defined below) is submitted by a Qualified Bidder that (i) improves on such Qualified Bidder's immediately prior Qualified Bid (a "**Subsequent Bid**") and (ii) the Receiver reasonably determines that such Subsequent Bid is (a) for the first round, a higher or otherwise better offer than the Starting Bid, and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). After the first round of Bidding and between each subsequent round of Bidding, the Receiver shall announce the Bid that he determines to be the highest or otherwise best offer (the "**Leading Bid**"). A round of Bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid of the prior round, subject to the Receiver's authority, after consulting with FCS, to revise the Auction Procedures.

Unless the Receiver determines otherwise at the Auction, to remain eligible to participate in the Auction, in each round of Bidding, (i) each Qualified Bidder must submit a Bid in such round of Bidding that is a higher or otherwise better offer than the prior round of Bidding, and (ii) to the extent a Qualified Bidder fails to submit a Bid in such round of Bidding that is a higher or otherwise better offer than the prior round of Bidding, as determined by the Receiver in his business judgment, such Qualified Bidder may be disqualified from continuing to participate in the Auction. Notwithstanding the foregoing, FCS shall not be disqualified from continuing to participate in the Auction. FCS shall be permitted to continue to participate and submit a Bid in any round even if it did not submit a higher or otherwise better offer in a prior round of bidding. The Auction will not conclude until FCS and each remaining Qualified Bidder have been given the opportunity to submit an overbid to the then-prevailing highest or otherwise best Bid and has declined to submit such an overbid.

All Bids will be made and received in one (1) room, on an open basis, and all other Qualified Bidders participating in the Auction will be entitled to be present for all Bidding with the understanding that the identity of each Qualified Bidder will be disclosed to all other Qualified Bidders participating in the Auction and that all material terms of each Qualified Bid submitted in response to the Starting Bid or to any successive Bids made at the Auction will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Receiver from taking or omitting any action that the Receiver in good faith believes (after consultation with his counsel) is required by his fiduciary duties.

Each Qualified Bidder's participation in the Sale and Auction process, both before and after the Auction, shall constitute such Qualified Bidder's confirmation that it (and any person or entity with an interest therein) has not engaged in any collusion with respect to the submission of any Bid, the Bidding, or the Auction at any time, and it shall provide an affidavit to that effect at the Receiver's request.

The Receiver, after consulting with FCS, reserves the right, from time to time, to change any of the Auction Procedures or other rules and procedures provided herein, whether prior to, or during, the Auction.

The Receiver also reserves the right to withdraw some or all of the Assets from the Sale process and the Auction, whether prior to, during, or after the Bidding at the Auction.

## POST-AUCTION PROCESS

Upon the conclusion of any Auction (if such Auction is conducted), the Receiver, in the exercise of his reasonable business judgment, will (i) determine the highest or best Bid or collection of Bids (the "**Successful Bid(s)**," and the bidder(s) submitting a Successful Bid, the "**Successful Bidder(s)**"); (ii) determine which Bid or collection of Bids is the next highest or best Bid or collection of Bids (the "**Back-Up Bid(s)**"); and (iii) notify all Qualified Bidders participating in the Auction, prior to its conclusion, the Successful Bidder(s), the amount and other material terms of the Successful Bid(s), and the identity of the bidders(s) that submitted the Back-Up Bid(s) (the "**Back-Up Bidder(s)**").

Each Successful Bidder and Back-Up Bidder shall, within one (1) business day after the close of the Auction, submit to the Receiver fully executed revised documentation memorializing the terms of its Successful Bid or Back-Up Bid, as applicable, which shall be in form and substance acceptable to the Receiver and each affected Secured Creditor. Promptly following the submission of such documentation, the Receiver shall file a notice (the "**Post-Auction Notice**") identifying the Successful Bidder and attaching the proposed asset purchase agreement with the Successful Bidder, approximately one (1) business day after the conclusion of the Auction. Such Post-Auction Notice shall also identify the Back-Up Bidder and contain either (i) a summary of the material terms of the Back-Up Bid or (ii) proposed asset purchase agreement with the Back-Up Bidder.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) 5:00 p.m. (Eastern) on the date that is sixty (60) days after the date of entry of the Court's Order approving any transaction with the Successful Bidder, (ii) the consummation of the transaction with the Successful Bidder, and (iii) the release of such Bid by the Receiver (such date, the "**Back-Up Bid Termination Date**"). If the transaction with a Successful Bidder is terminated prior to the Back-Up Bid Termination Date, the Back-Up Bidder shall be deemed the Successful Bidder and shall be obligated to consummate the Back-Up Bid as if it were the Successful Bid. The Back-Up Bidder will prepare to and be ready to close its proposed transaction as requested by the Receiver.

The Receiver will present the results of the Auction to the Court at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that (a) the Auction was fair in substance and procedure and (b) consummation of the Successful Bid will provide the highest or otherwise best value for the Assets and is in the best interests of the Receivership Estates.

If an Auction is held, the Receiver will be deemed to have accepted a Qualified Bid only when (a) such Qualified Bid is declared a Successful Bid at the Auction, and (b) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court of the Successful Bid and entry of the Sale Order approving the Sale to the Successful Bidder.

## SALE HEARING

Each Successful Bid and Back-Up Bid will be subject to and conditioned upon approval by the Court. The hearing to approve a Successful Bid and any Back-Up Bid will take place on **August 14, 2023 at 10:00 a.m. (Eastern)**. **The Sale Hearing may be continued to a later date by the Receiver by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party. In addition, in the Receiver's discretion, the hearing to approve a Back-Up Bid may take place at a subsequent hearing.**

At the Sale Hearing, except as provided above, the Receiver will seek entry of an Order that, among other things: (i) authorizes and approves the Sale to the Successful Bidder and/or the Back-Up Bidder, free and clear of all liens, claims, and encumbrances, to the maximum extent permitted by applicable law; and (ii) includes a finding that the Successful Bidder and/or the Back-Up Bidder is a good faith purchaser pursuant to applicable law.

The Receiver's presentation to the Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Receiver's acceptance of such Bid. The Receiver will have accepted a Successful Bid *only* when such Successful Bid has been approved by the Court at the Sale Hearing. The Receiver and the Successful Bidder shall close the Sale on or before the date that is fourteen (14) calendar days following the receipt of all requisite governmental and/or regulatory approvals with respect to the Sale, unless another time or date, or both, are agreed to in writing by the Receiver and the Successful Bidder or (if applicable) the Back-Up Bidder.

At any time before entry of an Order of the Court approving the Sale, the Receiver may reject any Bid that, in the Receiver's judgment, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of applicable law or the Bidding Procedures, or (iii) contrary to the best interests of the Receivership Entities and Receivership Estates.

## RETURN OF GOOD FAITH DEPOSITS

The Deposit (including interest thereon) of the Successful Bidder will, upon consummation of the Successful Bid, become property of the Receivership Estate and be credited to a portion of the Purchase Price (and, to the extent the cash portion of the Deposit is in excess of the cash portion of the Purchase Price, such excess portion will be returned to the Successful Bidder). If the Successful Bidder (or Back-Up Bidder) does not consummate the Successful Bid (or Back-Up Bid) as and when provided in these Bidding Procedures, then the Deposit (and interest thereon) of such Successful Bidder (or Back-Up Bidder) will be irrevocably forfeited to the Receivership Estate and may be retained by the Receivership Estate as liquidated damages, with such proceeds subject to the lien of FCS on account of the Financing Orders.

The Deposit (without interest) of any unsuccessful Qualified Bidders (except for the Back-Up Bidder) will be returned within the earlier of five (5) business days after the conclusion of the Auction or upon the permanent withdrawal of the proposed Sale of the Assets; *provided*, *however*, that the Deposit (and interest thereon) of a Qualified Bidder will be forfeited to the Receivership Estate if (i) the applicable Qualified Bidder attempts to modify, amend, terminate, or withdraw its Qualified Bid, except as permitted by these Bidding Procedures, during the time the Qualified Bid

remains binding and irrevocable under these Bidding Procedures, or (ii) the Qualified Bidder is selected as the Successful Bidder and fails to enter into the required definitive documentation or to consummate the transaction according to these Bidding Procedures.

The Deposit (without interest) of the Back-Up Bidder, if any, will be returned to such Back-Up Bidder no later than five (5) business days after the Closing with the Successful Bidder, unless they become the Successful Bidder.

Except as set forth above, all Deposits shall be held in a segregated account maintained by the Receiver.

## NOTICE PARTIES

Information that must be provided to the "**Notice Parties**" under these Bidding Procedures must be provided to the following parties: (i) the Receiver, Michael Fuqua (Attn: mfuqua@brileyfin.com); (ii) counsel to the Receiver, (x) Reed Smith LLP (Attn: Kurt F. Gwynne, Esq. (kgwynne@reedsmith.com) and Jason D. Angelo, Esq. (jangelo@reedsmith.com)) and (y) King & Spalding LLP (Attn: Thaddeus (Thad) Wilson, Esq. (thadwilson@kslaw.com)); (iii) the Receiver's Investment Banker, PJT Partners, LP (Attn: Akshay Patel (akshay.patel@pjtpartners.com) and Michael Schlappig (schlappig@pjtpartners.com); and (iv) counsel to FCS, Steptoe & Johnson LLP (Attn: Jeffrey Reisner, (jreisner@steptoe.com) and Joshua Taylor (jrtaylor@steptoe.com)).

## CONSENT TO JURISDICTION AND AUTHORITY TO CONDITION TO BIDDING

All Potential Bidders (including a Qualified Bidder, the Successful Bidder, and the Back-Up Bidder) shall be deemed to have (i) consented to the jurisdiction of the Court to enter any order or orders, which shall be binding in all respects, in any way related to the Bidding Procedures, the Auction Procedures, an Auction, or the construction and enforcement of any agreement or any other document relating to the Sale and (ii) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction Procedures, an Auction, or the Sale (including, but not limited to, any disputes relating to the construction and enforcement of any agreement or any other document relating to the Sale, including any order approving the Sale).

Any parties raising a dispute relating to these Bidding Procedures may request that such dispute be heard by the Court on an expedited basis.

## RESERVATION OF RIGHTS

As indicated above, the Receiver may modify the Bidding Procedures, the Auction Procedures, and the other rules set forth herein. In addition, the Receiver may impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction or the Sale Hearing, or withdraw all or a portion of the Assets from the Sale at any time.

## FIDUCIARY OUT

Nothing in these Bidding Procedures will require the Receiver to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, that would violate his

fiduciary duties. For the avoidance of doubt, the Receiver reserves the right to suspend or terminate the Sale process under these Bidding Procedures at any time in favor of an alternative transaction that the Receiver believes is in the best interest of the Receivership Estates and their creditors.

<u>**SALE IS AS IS/WHERE IS**</u>

The Assets sold pursuant to these Bidding Procedures will be conveyed at the Closing in their then present condition, "as is, with all faults, and without any warranty whatsoever, express or implied."

**EXHIBIT A**

<u>Form of Asset Purchase Agreement</u>

(Attached)

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**THEIA GROUP, INC. d/b/a "THORIAN GROUP" and/or "CYPHERIAN,"**

**THEIA AVIATION, LLC,**

**AND**

**THEIA HOLDINGS A, INC. d/b/a "THORIAN HOLDINGS,"**

**collectively, as Sellers,**

**AND**

**[●]**

**as Buyer,**

**Dated as of [●], 2023**

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS ............................................................................................. 1

    **Section 1.01** ........................................................................................................... 1

ARTICLE II PURCHASE AND SALE OF ASSETS ....................................................... 9

    **Section 2.01**     *Purchase and Sale of Acquired Assets* ........................................ 9

    **Section 2.02**     *Assumed Liabilities* ................................................................. 10

    **Section 2.03**     *Excluded Assets* ...................................................................... 10

    **Section 2.04**     *Excluded Liabilities* ................................................................ 10

    **Section 2.05**     *Purchase Price* ....................................................................... 10

    **Section 2.06**     *Cash Deposit and Balance of Cash Payment* .......................... 11

    **Section 2.07**     *Purchase Price Allocation* ....................................................... 11

    **Section 2.08**     *Closing Date; Effective Time* .................................................. 11

    **Section 2.09**     *Time is of the Essence* ............................................................. 11

    **Section 2.10**     *Closing Obligations* ................................................................ 11

ARTICLE III REPRESENTATIONS OF SELLERS ...................................................... 12

    **Section 3.01**     *Corporate Authorization; District Court Approval* ................. 12

    **Section 3.02**     *Licenses* ................................................................................. 12

    **Section 3.03**     *Title to Acquired Assets* .......................................................... 12

    **Section 3.04**     *Correctness of Representations* ............................................... 13

    **Section 3.05**     *No Survival* ............................................................................ 13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ...................... 13

    **Section 4.01**     *Organization* .......................................................................... 13

    **Section 4.02**     *Authority for this Agreement* .................................................. 13

    **Section 4.03**     *Consents and Approvals* ......................................................... 13

    **Section 4.04**     *Non-Contravention* ................................................................. 13

    **Section 4.05**     *Sufficiency of Funds; Solvency* .............................................. 14

    **Section 4.06**     *Brokers* .................................................................................. 14

    **Section 4.07**     *F&F Obligations* ............................................. **Error! Bookmark not defined.**

    **Section 4.08**     *Identification of Bid Participants* ........................................... 14

    **Section 4.09**     *Amendments to Licenses* ......................................................... 14

    **Section 4.10**     *Capital Structure* ................................................................... 14

| | | |
|---|---|---|
| Section 4.11 | *Binding and Irrevocable* | 14 |
| Section 4.12 | *No Breakup Fee or Expense Reimbursement* | 14 |
| Section 4.13 | *No Contingencies* | 15 |
| Section 4.14 | *No Reliance* | 15 |
| Section 4.15 | *No Liability* | 15 |
| Section 4.16 | *No Collusion* | 15 |
| Section 4.17 | *Compliance with Bidding Procedures and Orders* | 15 |
| Section 4.18 | *Correctness of Representations* | 15 |
| ARTICLE V COVENANTS | | 15 |
| Section 5.01 | *Access to Information, Retention of Records; Copies* | 15 |
| Section 5.02 | *Reasonable Best Efforts; Governmental Approvals* | 16 |
| Section 5.03 | *Notification of Certain Matters* | 17 |
| Section 5.04 | *Payment of Taxes Resulting from Sale of Assets by Sellers* | 18 |
| Section 5.05 | *Payment of Transfer Taxes* | 18 |
| Section 5.06 | *Survival* | 18 |
| ARTICLE VI CLOSING CONDITIONS | | 18 |
| Section 6.01 | *Conditions Precedent to Obligations of Buyer* | 18 |
| Section 6.02 | *Conditions Precedent to Obligations of Sellers* | 19 |
| ARTICLE VII MISCELLANEOUS | | 19 |
| Section 7.01 | *Entire Agreement; Assignment; Amendments* | 19 |
| Section 7.02 | *Severability; Expenses; Further Assurances* | 20 |
| Section 7.03 | *Enforcement of the Agreement; Jurisdiction; No Jury Trial* | 20 |
| Section 7.04 | *Notices* | 21 |
| Section 7.05 | *Governing Law* | 22 |
| Section 7.06 | *Descriptive Headings* | 22 |
| Section 7.07 | *No Third-Party Beneficiaries* | 22 |
| Section 7.08 | *Execution; Counterparts* | 22 |
| Section 7.09 | *Termination; Deposit* | 22 |
| Section 7.10 | *Alternative Transactions* | 23 |
| Section 7.11 | *Interpretation* | 24 |

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into as of [●], 2023, by and among Theia Group, Inc. d/b/a "Thorian Group" and/or "Cypherian," a Delaware corporation ("**TGI**"), Theia Aviation, LLC, a Delaware limited liability company ("**TA**"), and Theia Holdings A, Inc. d/b/a "Thorian Holdings," a Delaware corporation ("**THA**," and together with TGI and TA, "**Sellers**"), and [●], a [●] (on behalf of itself, its designees, and or assignees, "**Buyer**") and together with the Sellers, the "**Parties**"), and all transactions contemplated by this Agreement, collectively, the "**Transactions**."

### R E C I T A L S

**WHEREAS**, Sellers engaged in the business of data analytics of data acquired by satellites and/or aircraft via remote sensing and spectral analysis (the "**Business**") by virtue of its licenses from (a) the National Oceanic and Atmospheric Administration, an agency of the United States Department of Commerce ("**NOAA**") and (b) the Federal Communications Commission, an agency of the government of the United States of America ("**FCC**") and (c) other proprietary licenses and patents registered in non-United States locations;

**WHEREAS**, on November 8, 2021, in a civil action styled *FCS Advisors, LLC v. Theia Group, Inc., d/b/a "Thorian Group" and/or "Cypherian," Theia Aviation, LLC, and Theia Holdings A, Inc., d/b/a "Thorian Holdings,"* 21 Civ. 6995 (PKC) (the "**Receivership Action**"), the United States District Court for the Southern District of New York (the "**District Court**") entered an Order Appointing Michael Fuqua as Receiver (Doc. 117) for the Sellers (the "**Receiver**"); and

**WHEREAS**, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, substantially all of Sellers' right, title and interest in their assets used and/or useful in the operation of the Business, and Sellers desire to assign to Buyer, and Buyer desires to accept the assignment of, certain rights and contracts of Sellers with respect to the operation of the Business, in each case for consideration and in accordance with the terms and conditions of this Agreement.

### A G R E E M E N T

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

1.

### DEFINITIONS

The following terms have the meanings specified or referred to below:

(i)      "**Acquired Assets**" has the meaning set forth in <u>Section 2.01</u>.

(ii)      "**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

(iii)    "**Affiliate**" of a Person means any other entity or Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(iv)    "**Agreement**" has the meaning set forth in the preamble.

(v)    "**Aircraft**" means aircraft, aircraft parts (including spare parts) and support equipment, sensors and remote sensing equipment or accessories, including, without limitation, the items listed on attached Schedule 1.01(e).

(vi)    "**Aithre**" means Aithre Capital Partners LLC.

(vii)    "**Aithre Obligations**" means all obligations under the Secured Note Purchase and Security Agreement dated as of January 5, 2021, by and between TGI and Aithre, as may be amended from time to time, and any related documents.

(viii)    "**Alternative Transaction**" means any transaction or series of transactions involving a sale of all or substantially all of the Acquired Assets to a purchaser or purchasers other than Buyer.

(ix)    "**Ancillary Documents**" means the Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities, the Intellectual Property Assignments, and any other agreements, instruments and documents required to be delivered at the Closing or that the Parties otherwise agree (in writing) to exchange at Closing.

(x)    "**Approval Order**" means an Order entered by the District Court approving this Agreement, authorizing the sale and purchase of the Acquired Assets "as is, where is" and "free and clear" of Liens, Claims, and Indebtedness (other than Assumed Liabilities), and authorizing the Sellers to consummate the Transactions hereunder, and that is not stayed or vacated.

(xi)    "**Assigned Contracts**" means the contracts listed on attached Schedule 1.01(k) to the extent the foregoing are assignable to Buyer without the consent or approval of the counterparty, including the Intellectual Property Agreements.

(xii)    "**Assumed Liabilities**" means strictly the liabilities and obligations on attached Schedule 1.01(l), including, without limitation, any Taxes for which the Buyer is liable pursuant to Section 5.05, and any other liabilities and obligations under the Assigned Contracts.

(xiii)    "**Auction**" has the meaning set forth in the Bidding Procedures (as defined below).

(xiv)    "**Back-Up Bid**" has the meaning set forth in the Bidding Procedures.

(xv)    "**Back-Up Bid Termination Date**" has the meaning set forth in the Bidding Procedures.

(xvi)    "**Bid**" has the meaning set forth in the Bidding Procedures.

(xvii)    "**Bidding Procedures**" means the *Bidding Procedures in Connection with the Sale of the Receivership Entities' Assets* as may be entered by the District Court in connection with a sale of the Assets.

(xviii)    "**Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities**" means a document, in the form attached as Exhibit A, to be executed and delivered to Sellers at Closing pursuant to which Buyer (i) purchases the Acquired Assets, "as is, where is" and free and clear of Liens, Claims and Indebtedness (other than the Assumed Liabilities), and without representation or warranty by the Sellers and (ii) accepts the assignment of and assumes the Assigned Contracts and Assumed Liabilities.

(xix)    "**Books and Records**" means books, e-mails, records, ledgers, files, documents, correspondence, lists, plats, architectural plans, drawings, specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials used and/or useful in the operation of the Business.

(xx)    "**Business**" has the meaning set forth in the Recitals.

(xxi)    "**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

(xxii)    "**Buyer**" has the meaning set forth in the preamble.

(xxiii)    "**Buyer's Closing Certificate**" means a certificate, based on Buyer's Knowledge, executed by Buyer as to the accuracy of its representations and warranties as of the date hereof and as of the Closing and as to its compliance with and performance of its covenants and obligations to be performed or complied with at or before the Closing.

(xxiv)    "**Buyer's Deliverables**" has the meaning provided in Section 2.10(b).

(xxv)    "**Buyer's Knowledge**" or any other similar knowledge or qualification means the actual or constructive knowledge, after reasonable inquiry, of Buyer.

(xxvi)    "**Cash Payment**" means Buyer's payment to Sellers of immediately available cash in the amount of [●] ($[●]), including the Deposit.  For the avoidance of doubt, in no event may the Cash Payment be less than the amount sufficient to pay in full (i) to the extent not otherwise paid or satisfied, any outstanding amounts on account of the financing approved pursuant to Court's (a) *Order Authorizing Receiver to Obtain Receivership Financing from FCS Advisors, LLC* (Doc. 206) entered on February 16, 2022 and (b) *Order (I) Authorizing Receiver to Enter Certain First Amendment to Receiver's Certificate Purchase and Security Agreement with FCS Advisors, LLC and (II) Granting Related Relief* (Doc. 329) entered on March 22, 2023 and (ii) all costs of administration of the Sellers' receivership estates, including, without limitation, any Transaction Fee payable to PJT in accordance with the PJT Retention Order, and any taxes incurred by the Sellers' receivership estates in, or as a result of, consummating the

Sale; *provided*, *however*, that any Credit Bid shall also include, in addition to the foregoing, cash consideration sufficient to pay in full, and earmarked exclusively for the payment of, all claims for which there are valid, perfected, and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to Credit Bid (unless such senior lien holder consents to alternative treatment); *provided further*, *however*, that, solely with respect to the Transaction Fee, any Credit Bid shall include cash consideration sufficient to pay only the minimum Transaction Fee payable to PJT pursuant to that certain *Engagement Letter*, dated as of December 28, 2021, by and between PJT and the Receiver, a copy of which is attached as Exhibit 1 to the PJT Retention Order.[11]

(xxvii) "**Claim**" means any contest, claim, demand, assessment, Action, cause of action, complaint, litigation, proceeding, hearing or notice involving any Person that can or may be asserted.

(xxviii) "**Closing**" has the meaning set forth in Section 2.08.

(xxix) "**Closing Date**" has the meaning set forth in Section 2.08.

(xxx) "**Code**" means the Internal Revenue Code of 1986, as amended.

(xxxi) "**Confidentiality Agreement**" has the meaning set forth in the Bidding Procedures.

(xxxii) "**Contracts**" means contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

(xxxiii) "**Credit Bid**" has the meaning set forth in the Bidding Procedures.

(xxxiv) "**Deposit**" means cash in the amount of the greater of (i) $10 million or (ii) 10% of the Purchase Price.

(xxxv) "**Deposit Rights**" means Sellers' rights, title and interest in deposits (other than the Deposit) and prepaid expenses and claims for refunds and rights to offset in respect thereof.

(xxxvi) "**District Court**" has the meaning set forth in the preamble.

(xxxvii) "**Dollars**" or "**$**" means the lawful currency of the United States.

(xxxviii) "**Excluded Assets**" means any assets or properties other than the Acquired Assets. For the avoidance of doubt, and without limiting the foregoing, (a) cash, (b) cash equivalents, (c) all defenses, offsets, and recoupments against any Claims against, or liabilities of, any or all of the Sellers, (d) all claims, causes of action and rights against any person or entity, including without limitation, current or former directors or officers of any of the Sellers, (e) all defenses, including defensive rights of

---

[11] For the avoidance of doubt, the Receiver, PJT, any entity that submits a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest reserve all rights with respect to the Transaction Fee due in connection with a Credit Bid.

recoupment and offset, relating to Excluded Liabilities and Excluded Assets, and (f) the rights of Sellers under this Agreement, are Excluded Assets.

(xxxix) "**Excluded Liabilities**" means all Indebtedness other than the Assumed Liabilities. By way of illustration, Excluded Liabilities include (i) any Taxes arising as a result of Sellers' operation of its business or ownership of the Acquired Assets prior to the Closing, (ii) any employment Taxes paid or to be paid by Sellers for any reason whatsoever, (iii) any deferred Taxes of any nature, (iv) any Liability under any Contract not assigned to Buyer under this Agreement, (v) any liability under any employee benefit plans or relating to payroll, severance, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Sellers' employees or former employees or both, including any Liability with respect to the payment of bonuses for any reason, (vi) any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers, and (vii) any Liability arising out of or resulting from Sellers' compliance or noncompliance with any Law or Order of any Governmental Authority.

(xl) "**FCC**" has the meaning set forth in the Recitals.

(xli) "**FCC License**" means all rights, title and interest in and to the "Order and Authorization for NGSO-like satellite operation in the 10.7-12.7 GHz, 14.0-14.5 GHz, 17.8-18.6 GHz, 18.819.3 GHz, 27.5-28.35 GHz, 28.35-29.1 GHz, and 29.5-30.0 GHz frequency bands" or any replacement or successor license.

(xlii) "**FCS**" means FCS Advisors, LLC d/b/a Brevet Capital Advisors.

(xliii) "**FCS Loan Documents**" means, as may be amended from time to time and together with all restatements, supplements, and other modifications thereto, (a) the *Secured Note Purchase and Security Agreement* dated as of October 4, 2018 between TGI and FCS, including all amendments thereto; (b) the *Amended and Restated Secured Note Purchase and Security Agreement*, dated as of June 29, 2020, including all amendments thereto, (c) the *Receiver's Certificate Purchase and Security Agreement* dated as of February 2022, including all amendments thereto, (d) the *Receiver's Certificate,* including all amendments thereto, dated as of February 2022, (e) the *Order Authorizing Receiver to Obtain Receivership Financing from FCS Advisors, LLC* (Doc. 206), entered by the Court on February 16, 2022; (f) the *Order (I) Authorizing Receiver to Enter Certain First Amendment to Receiver's Certificate Purchase and Security Agreement with FCS Advisors, LLC and (II) Granting Related Relief* (Doc. 329) entered on March 22, 2023, (g) and any other amendment(s) to the Receiver's Certificate Purchase and Security Agreement; (h) any District Court orders authorizing the Receiver's entry into any subsequent amendments or authorizing the Receiver to obtain any other borrowing or loan from FCS; and (i) all other mortgages, assignments, instruments, and other documents executed in connection with the foregoing.

(xliv) "**FCS Obligations**" means all loans, advances, debts, liabilities, and obligations (monetary and nonmonetary) of every kind and description, whether direct or indirect, fixed or contingent, mature or unmatured, now existing or hereafter arising, under, or related to, any of the FCS Loan Documents, or any related documents or transactions.

(xlv)    "**F&F Obligations**" means the scheduled loans, advances, debts, liabilities, and obligations, and any nonmonetary obligations, in each case of every kind and description, whether direct or indirect, fixed or contingent, mature or unmatured, now existing or hereafter arising, under, or related to, all Secured Note Purchase Agreements and Secured Convertible Promissory Notes (as may be amended, restated, or supplemented from time to time) entered into between any of the Sellers and the investors listed on Schedule 1.01(ss). For the avoidance of doubt, the amount of "outstanding principal investment" on Schedule 1.01(ss) reflects only the principal invested by holders of F&F Obligations that remains outstanding (*i.e.*, does not include promised returns).

(xlvi)    "**Governmental Approval**" means any approval, order, writ, judgment, injunction, decree, stipulation, determination or award, granted or entered by or with any Governmental Authority.

(xlvii)    "**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

(xlviii)    "**Indebtedness**" means, with respect to any Person, at a particular time, without duplication, (i) any obligations of such Person under any indebtedness for borrowed money, (ii) any indebtedness of such Person evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness of such Person pursuant to a guarantee to a creditor of another Person, (iv) any obligations under capitalized leases or with respect to which such Person is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which obligations such Person assures a lender or lessor under any such lease against loss, (v) any borrowing of money or other obligation secured by a Lien on such Person's assets, (vi) any obligations under factoring or similar agreements with respect to receivables that have been factored or pledged, (vii) any off-balance sheet obligations that by the nature of their terms will ultimately be deemed to be, by conversion or otherwise, or treated, for tax purposes or otherwise, as debt, (viii) any obligation for interest, premiums, penalties, fees, make-whole payments, expenses, indemnities, breakage costs and bank overdrafts with respect to items described in clauses (i) through (vii) above, (ix) any obligations of such Person for the deferred and unpaid purchase price of property or services (other than trade and other payables, accrued expenses and other current liabilities, but including earnout payments), (x) any unfunded pension liabilities or commitments, (xi) any reserves or provisions which have a cash-out effect, (xii) any transaction or stay bonuses or payment, and (xiii) all liabilities for reserves for any of the foregoing.

(xlix)    "**Intellectual Property**" means any and all of Sellers' rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks,

logos, trade dress, trade names, and other similar indicia of source or origin, whether or not registered, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing, excluding "Theia" (the "**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating hereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein; (h) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; and (i) all other intellectual or industrial property and proprietary rights.

(l)     "**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property that is or was used or held for use in the conduct of the Business (as conducted as of the commencement of the Receivership Action) to which any of Sellers is a party, beneficiary or otherwise bound, to the extent the foregoing are assignable to Buyer without the consent or approval of the counterparty.

(li)     "**Intellectual Property Assets**" means all Intellectual Property that is owned by Sellers and used or held for use in the conduct of the Business (as conducted as of the commencement of the Receivership Action), together with all (i) royalties, fees, income, payments, and other proceeds due or payable to Sellers with respect to such Intellectual Property after the Closing; and (ii) other claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the Closing, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation thereof, including without limitation, the Intellectual Property listed on attached Schedule 1.01(yy).

(lii)     "**Intellectual Property Assignments**" means the assignments of Intellectual Property in the form(s) attached as Exhibit B that the Sellers shall have executed and delivered that assign, convey, and transfer to Buyer its entire right, title, interest, and ownership, to all Intellectual Property owned by Sellers.

(liii)     "**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

(liv)     "**Liability**" or "**Liabilities**" means any direct or indirect Indebtedness, liability, Claim, loss, damage, deficiency, obligation, responsibility or other liability of any kind (whether known or

unknown, fixed or unfixed, choate or inchoate, liquidated or un-liquidated, secured or unsecured, accrued, absolute, contingent or otherwise), and including all costs and expenses related thereto.

(lv)     "**Licenses**" means the FCC License and the NOAA License.

(lvi)    "**Lien**" means any lien (statutory or otherwise), security interest, mortgage, deed of trust, priority, pledge, charge, conditional sale, title retention agreement, financing lease or other encumbrance, or any agreement to give or grant any of the foregoing.

(lvii)   "**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the value of the Acquired Assets in the amount of at least $25 million; *provided, however*, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operated or may operate in the future; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any pandemic or epidemic; (vi) any action required or permitted by this Agreement; (vii) any changes in applicable Laws or accounting rules, including GAAP; (viii) the passage of time; or (ix) the public announcement, pendency or completion of the Transactions contemplated by this Agreement; *provided, however*, that once Governmental Approvals to transfer the Licenses to Buyer have been obtained, no event, occurrence, fact, condition or change will be or may become a Material Adverse Effect.

(lviii)  "**NOAA**" has the meaning set forth in the Recitals.

(lix)    "**NOAA License**" means the authorization that NOAA granted to Theia Group, Inc. for remote sensing in space capability.

(lx)     "**Parties**" has the meaning set forth in the preamble.

(lxi)    "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

(lxii)   "**PJT**" means PJT Partners LP.

(lxiii)  "**PJT Retention Order**" means the *Order Granting Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 207), entered by the District Court on February 16, 2022.

(lxiv)   "**Purchase Price**" has the meaning set forth in Section 2.05.

(lxv)    "**Receiver**" has the meaning set forth in the Recitals.

(lxvi)   "**Receivership Action**" has the meaning set forth in the Recitals.

(lxvii) "**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

(lxviii) "**Sellers**" has the meaning set forth in the preamble.

(lxix) "**Sellers' Closing Certificate**" means a certificate executed by Receiver that, to Sellers' Knowledge, the representations of Sellers set forth in this Agreement are true and correct as of the Closing.

(lxx) "**Sellers' Deliverables**" has the meaning provided in <u>Section 2.10(a)</u>.

(lxxi) "**Sellers' Knowledge**" or any other similar knowledge qualification means the actual knowledge of the Receiver.

(lxxii) "**Successful Bidder**" has the meaning set forth in the Bidding Procedures.

(lxxiii) "**Tangible Personal Property**" means all tangible personal property, including, without limitation, all equipment, furniture, office equipment listed on attached <u>Schedule 1.01(uuu)</u>.

(lxxiv) "**Tax**" or "**Taxes**" means any and all U.S. federal, state, local and non-U.S. taxes, assessments and other governmental charges, duties (including stamp duty), impositions and liabilities, in each case in the nature of a tax, including capital gains tax, taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes as well as public imposts, fees and social security charges (including health, unemployment, workers' compensation and pension insurance), together with all interest, penalties, and additions imposed by a Governmental Authority with respect to such amounts.

(lxxv) "**TA**" has the meaning set forth in the preamble.

(lxxvi) "**TGI**" has the meaning set forth in the preamble.

(lxxvii) "**THA**" has the meaning set forth in the preamble.

(lxxviii) "**Transaction**" has the meaning set forth in the preamble.

(lxxix) "**Transaction Fee**" has the meaning set forth in the Bidding Procedures.

## 2.
## PURCHASE AND SALE OF ASSETS

(a) *Purchase and Sale of Acquired Assets*. Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Sellers shall sell, transfer, assign, convey, and deliver to Buyer, and Buyer shall purchase and acquire from Sellers, all of the Acquired Assets, free and clear of all Liens, Claims and Indebtedness (other than the Assumed Liabilities) of any nature whatsoever. "**Acquired Assets**" means all of Sellers' right, title, and interest in and to the following assets:

(i) All Tangible Personal Property;

       (ii)      All Aircraft and spare parts;

       (iii)     All Intellectual Property Assets (including, without limitation, all Intellectual Property Assets, Licensed Intellectual Property and Intellectual Property listed on <u>Schedule 1.01(yy)</u> attached hereto);

       (iv)     All Assigned Contracts;

       (v)      All Books and Records; *provided*, *however*, that Sellers may maintain copies of all of the Books and Records;

       (vi)     Other than Excluded Assets, all Claims, choses in action, causes of action, claims, and demands of Sellers (whether known or unknown, matured or unmatured, accrued or contingent), including rights to returned or repossessed goods and rights as an unpaid vendor; rights of recovery, rights of warranty and indemnity, rights of set-off and rights of recoupment; all security deposits, utility deposits and other deposits, all supplies and miscellaneous assets.

       (vii)    Other than Excluded Assets, all Claims, choses in action, causes of action and demands of Sellers against third parties relating to the Acquired Assets, whether choate or inchoate, known or unknown, contingent or noncontingent.

       (viii)   All insurance benefits, including rights and proceeds, arising from or relating to the Acquired Assets prior to the Closing, to the extent not utilized as of the Closing; and

       (ix)     All Deposit Rights.

    (b)        *Assumed Liabilities.*  At the Closing, Buyer will assume and agree to pay, perform and discharge when due the Assumed Liabilities.

    (c)        *Excluded Assets.*  Notwithstanding any other provision of this Agreement, the Acquired Assets shall not include the Excluded Assets.

    (d)        *Excluded           Liabilities.* Notwithstanding any other provision of this Agreement, Buyer does not assume and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the Transactions contemplated by this Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform, any liability unless it is an Assumed Liability as reflected on Schedule 1.01(l).

    (e)        *Purchase Price*.  In exchange for the Acquired Assets, Buyer shall provide consideration to the Sellers (the "**Purchase Price**"), as follows:

       (i)      the Cash Payment.

       [or (a) a credit bid of $_____ of the FCS Obligations and/or Aithre Obligations; and

       (b) the Cash Payment]

(f) *Cash Deposit and Balance of Cash Payment*.

(i) Contemporaneously with the submission of this Agreement to the Sellers, Buyer shall pay the Deposit to Sellers by wire transfer to an account designated by the Receiver.

(ii) At Closing, Buyer shall pay the balance of the Cash Payment to Sellers by wire transfer of immediately available funds to an account designated by the Receiver.

(g) *Purchase Price Allocation*. The Parties agree to allocate the Purchase Price (and all other capitalizable costs) among the Acquired Assets for all purposes (including financial accounting and Tax purposes) in accordance with the allocation set forth in attached Schedule 2.07 to this Agreement (the "**Allocation Schedule**"). After the Closing, the Parties shall make consistent use of the Allocation Schedule for all Tax purposes and in all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Code (26 U.S.C. § 1060). Buyer shall prepare and deliver IRS Form 8594 to Sellers within 60 days after the Closing Date to be filed with the IRS.

(h) *Closing Date; Effective Time*. The closing of the Transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Reed Smith LLP**;** 599 Lexington Avenue, New York, New York 10022 (or at another time or place as the Parties mutually agree in their sole discretion) on the earlier of (a) three (3) Business Days after Governmental Approval to transfer the Licenses to Buyer or (b) a date and time mutually agreed upon in writing by the Parties. The date on and time at which the Closing occurs is referred to in this Agreement as the "**Closing Date**."

(i) *Time is of the Essence.* Time is of the essence with respect to payment of the Deposit and the occurrence of the Closing Date and the Closing.

(j) *Closing Obligations*.

(i) At the Closing, Sellers shall deliver to the Buyer (the "**Sellers' Deliverables**")**:**

(A) Sellers' Closing Certificate;

(B) An executed Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities,

(C) Executed Intellectual Property Assignments,

(D) Copies of Governmental Approvals of the transfer or assignment of the Licenses to Buyer; and

(E) Any other executed Ancillary Documents as reasonably requested by Buyer in form and substance reasonably acceptable to the Parties.

(ii) At the Closing, Buyer shall deliver to the Sellers (the "**Buyer's Deliverables**"):

-11-

(A)     The balance of the Purchase Price not previously paid to Sellers, including the balance of the Cash Payment [and the satisfaction of the FCS Obligations and/or Aithre Obligations in the amount credit bid in section 2.05 hereof];

(B)     Buyer's Closing Certificate;

(C)     An executed Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities,

(D)     Executed Intellectual Property Agreements,

(E)     A certificate of the Secretary (or equivalent officer) of Buyer certifying as to (A) the resolutions of the board of managers (or equivalent) of Buyer, which authorize the execution, delivery and performance of this Agreement, the Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities, and any other Ancillary Document required to be delivered in connection with this Agreement or at the Closing and the consummation of the Transactions contemplated hereby and thereby, (B) the names and signatures of the officers of Buyer authorized to sign this Agreement and the other Ancillary Documents; and

(F)     Any other executed Ancillary Documents as reasonably requested by Sellers in form and substance reasonably acceptable to the Parties.

3.

## REPRESENTATIONS OF SELLERS

Sellers hereby represent and warrant severally, and not jointly to Buyer as follows:

(a)                    *Corporate Authorization*; *District Court Approval*.  Subject to and conditioned upon the District Court's entry of the Approval Order, Sellers have the requisite power and authority to execute and deliver this Agreement and to consummate the Transactions contemplated hereby and to perform their obligations hereunder.  Subject to and conditioned upon the Approval Order, this Agreement constitutes the legal, valid and binding agreement of Sellers, enforceable against Sellers in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, receivership moratorium and similar Laws, now or hereafter in effect, affecting creditors' rights generally and by general principles of equity.

(b)                    *Licenses*.  To Sellers' Knowledge, the Licenses are valid and in full force and effect, and Sellers have not received written notice from any Governmental Authority threatening to revoke, or indicating that it is investigating whether to revoke, any such License.

(c)                    *Title to Acquired Assets.*  To Sellers' Knowledge, Sellers own good and transferable title to all of the Acquired Assets, and subject to and conditioned upon the Approval Order, may transfer the Acquired Assets free and clear of any Liens, Claims and Indebtedness (other than the Assumed Liabilities).

(d)                                                  *Correctness of Representations*.  To Sellers' Knowledge, no representation of Sellers in this Agreement contains, or on the Closing Date will contain, any untrue statement of material fact or omission**.**

(e)                                                  *No Survival*.  No representations of Sellers under this Article III shall survive the Closing.

4.

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Sellers as follows:

(a)                                                  *Organization***.**  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite power to carry on its business as now conducted.

(b)                                           *Authority for this Agreement***.**  Buyer has all necessary company power and authority to enter into this Agreement and to consummate the Transactions contemplated by this Agreement.  The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the Transactions contemplated hereby have been duly and validly authorized by all necessary company action on the part of Buyer and no other company authorization or proceedings on the part of Buyer are necessary to authorize this Agreement or to consummate the Transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery of this Agreement by Sellers, constitutes a legal, valid and binding agreement of Buyer, enforceable in accordance with its terms against Buyer, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally and by general principles of equity.  Evidence of such due authorization and approval is being submitted to Sellers with this Agreement.

(c)                                           *Consents and Approvals***.**  The execution and delivery of this Agreement by Buyer and the consummation by Buyer of the Transactions contemplated hereby require no consent, approval, authorization or filing with or notice to any Governmental Authority, other than (i) compliance with any applicable requirements of the Hart-Scott-Rodino Act and any applicable foreign competition laws; (ii) compliance with any applicable requirements of the Securities Act or the Exchange Act and any other U.S. state or federal securities laws; (iii) Governmental Approvals for the transfer of the Licenses, (iv) entry of the Approval Order, and (v) any actions or filings the absence of which are not reasonably likely to prevent, materially delay or materially impair the ability of Buyer to consummate the Transactions contemplated by this Agreement.

(d)                                           *Non-Contravention***.**  The execution, delivery and performance of this Agreement by Buyer and the consummation of the Transactions contemplated by this Agreement do not and will not (with or without notice or lapse of time or both) (i) contravene, conflict with, or result in any violation or breach of any provision of the limited liability company of Buyer; (ii) assuming compliance with the matters referred to in <u>Section 4.03</u>, contravene, conflict with or result in a violation or breach of any Law or Order; or (iii) require any consent or approval under, violate, conflict with, result in any breach of any loss of any benefit under, or constitute a change of control or default under, or result in termination or give to others any right of termination, vesting, amendment, acceleration or cancellation of any contract to which Buyer is a party, or by which its properties or assets may be bound or affected, with such exceptions, in the case of each of clauses (ii) and (iii) of this

-13-

Section 4.04, as would not reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Transactions contemplated by this Agreement.

(e)        *Sufficiency of Funds; Solvency.* Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Cash Payment and consummate the Transactions contemplated by this Agreement; *provided* that, contemporaneously with the execution of this Agreement, Buyer shall provide to Sellers evidence (which evidence must be acceptable to Sellers in their reasonable discretion) of the foregoing.  Immediately after giving effect to the Transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all Liabilities); and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the Transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Sellers.  In connection with the Transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

(f)        *Brokers.*  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions contemplated by this Agreement or any other Ancillary Document based upon arrangements made by or on behalf of Buyer.  In addition, should any Broker Fee be due as a result of any obligation the Seller entered into then the Seller shall be solely responsible for any and all such Broker Fee (which may be payable from the Purchase Price).

(g)        *Identification of Bid Participants.* On behalf of Buyer, the following individuals and entities (including ultimate equity owners and sponsors of private companies) are participating (directly or indirectly) in the Sale in the manner described:  [●]. Such individuals have the following (if any) connections with any of the Receivership Entities, other potential or actual bidders, or any current or former officer, director, or equity security holder of any of the Receivership Entities:  [●].

(h)        *Amendments to Licenses.*  The Buyer does not propose any amendments or modifications to the FCC License and/or NOAA License that would require governmental or regulatory approval, except as follows: [●]

(i)        *Capital Structure.*  Buyer has submitted to Sellers a copy of Buyer's pro forma capital structure.

(j)        *Binding and Irrevocable.*  The offer to purchase the Assets on the terms set forth in this Agreement is binding and irrevocable upon Buyer until the later of (i) the conclusion of the Auction, (ii) if the offer is selected as a Back-Up Bid, the Back-Up Bid Termination Date (as defined below); and (iii) if the offer is selected as a Successful Bid, the occurrence of the Closing.

(k)        *No Breakup Fee or Expense Reimbursement.* Buyer will bear its own costs and expenses (including legal fees) in connection with the proposed transaction.  Buyer agrees to waive all rights to request or receive a break-up or other fee or expense reimbursement.  The offer to purchase the Assets set forth in this Agreement does not entitle the Buyer to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement.

(l)                                                          *No Contingencies.* Buyer represents that the offer set forth in this Agreement is formal, binding, and unconditional (except for those conditions expressly set forth herein) and is not subject to or conditioned on (a) obtaining any financing, (b) shareholder, board of directors, or other internal approval, or (c) due diligence.  To the extent (if any) that the Buyer's ability to consummate the Sale is based on committed financing, Buyer has furnished the Sellers with documentation (contemporaneously with this Agreement) demonstrating that Buyer has such committed financing.

(m)                                                          *No Reliance.*  Buyer acknowledges that, either directly or through its advisors, Buyer (a) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making any bid for such Assets; (b) has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making any such bid; and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in this Article III.

(n)                                                          *No Liability.*  Neither the Receiver nor any of his employees, representatives, agents, advisors, or professionals are responsible for, and will bear no liability with respect to, any information requested or obtained by Buyer connection with the Sale.

(o)                                                          *No Collusion.*  Buyer has not engaged in any collusion with any other potential purchaser of the Assts with respect to the submission of this Agreement.

(p)                                                          *Compliance     with     Bidding Procedures and Orders*.  Buyer complied with all Bidding Procedures and related orders approved or entered by the District Court.

(q)                                                          *Correctness of Representations*.  To Buyer's Knowledge, no representation of Buyer in this Agreement contains, or on the Closing Date will contain, any untrue statement of material fact or omission**.**

## 5.
## COVENANTS

Buyer and Sellers represent and warrant to each other, as follows:

(a)                                                          *Access to Information, Retention of Records; Copies*.

(i)          From and after the date the Buyer enters into a Confidentiality Agreement, Sellers shall (i) give to Buyer access to the Sellers' Books and Records as Buyer may reasonably request, (ii) furnish to Buyer such financial, tax and operating data and other information as Buyer may reasonably request (including the work papers of any certified public accountant of the Sellers upon receipt of any required consent from such certified public accountant), and (iii) reasonably cooperate with Buyer in Buyer's preparation for Closing.  Buyer hereby agrees that it shall treat any such information in accordance with any Confidentiality Agreement by and between Sellers and Buyer**.**

(ii)      From and after the Closing, Buyer shall (i) give to Sellers access to the purchased Books and Records, (ii) furnish to Buyer such financial, tax and operating data and other information as Buyer may reasonably request from such Books and Records, and (iii) reasonably cooperate with Sellers in providing documents and information to Sellers as requested by the Receiver (or other representative of Sellers) in the discharge of the Receiver's (or such representative's) obligation and duties, including in responding to third-party discovery requests.

(iii)      After the Closing Date, Buyer shall retain for a period consistent with Buyer's record-retention policies and practices those Books and Records of Sellers delivered to Buyer. Sellers shall have the right to retain copies of any and all Books and Records for all legitimate purposes of Sellers, including without limitation, preparation of financial statements and Tax returns. Buyer also shall provide reasonable access thereto, during normal business hours and on at least three days' prior written notice, to enable them to prepare financial statements or Tax returns or deal with Tax audits. Prior to the destruction of any Books and Records of Sellers delivered to Buyer, Buyer shall notify Sellers of such proposed destruction and shall offer Sellers the option, exercisable within 30 days after Sellers' receipt of such notice, to retake possession and ownership of any such Books and Records.

(b)      *Reasonable Best Efforts; Governmental Approvals*.

(i)      Each of Sellers and Buyer shall use their respective reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under Law to consummate Transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or non-actions, waivers, consents and Governmental Approvals for the transfer of the Licenses to Buyer and otherwise as necessary or appropriate to consummate the Transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(ii)      Nothing in this <u>Section 5.02</u> shall be interpreted to prohibit, restrict, limit or restrain Buyer from engaging in litigation, including litigation to prevent the imposition by any Governmental Authority of any undertaking, condition, consent decree, hold separate order, divestiture, operational restriction or limitation or other action by any Governmental Authority that, if effected, would reasonably be expected to restrict, limit, restrain or impair Buyer's ability to own, operate, retain or change all or a material portion of the Acquired Assets (including the Licenses), operations, rights, product lines, businesses or interest therein of Buyer.

(iii)      After the Auction, if Buyer is the Successful Bidder and is not then in breach of this Agreement, notwithstanding anything in this Section 5.02 to the contrary, with respect to the matters covered in this Section 5.02, (i) it is agreed that Buyer, after consulting with Sellers, may lead all discussions, negotiations and other proceedings, and coordinate all activities with respect to any requests that may be made by, or any actions, consents, undertakings, approvals, or waivers that may be sought by, any Governmental Authority, including determining the manner in which to contest or otherwise respond, by litigation or otherwise, to objections to, or proceedings challenging, the consummation of Transactions contemplated by this Agreement, (ii) Sellers agree to take such reasonable and lawful actions to secure Governmental Approvals to transfer the Licenses to Buyer, and (iii) Sellers shall not participate in any

meeting with any Governmental Authority in respect of the transfer of the Licenses unless it consults with Buyer in advance and, to the extent permitted by such Governmental Authority, gives Buyer the opportunity to attend and participate thereat.

(iv) *Press Releases*. Buyer and Sellers shall consult with each other before issuing any press release or making any other public statement with respect to this Agreement or the Transactions contemplated hereby and shall not issue any such press release or make any such other public statement without the written consent of the other Party, which shall not be unreasonably withheld, conditioned, or delated, except as such release or statement may be required by Law or any listing agreement with or rule of any national securities exchange, in which case the Party required to make the release or statement shall consult with the other Party about, and allow the other Party reasonable time (to the extent permitted by the circumstances) to comment on, such release or statement in advance of such issuance, and the Party will consider such comments in good faith. For the avoidance of doubt, nothing herein shall prevent the Sellers from filing a motion and a copy of this Agreement (and all related documents) with the District Court to seek approval of this Agreement.

(c) *Notification of Certain Matters*. Except as prohibited by Law, each of Sellers and Buyer shall promptly notify the other Parties in writing of:

(i) any inaccuracy of any representation or warranty contained in this Agreement that could reasonably be expected to cause the conditions set forth herein not to be satisfied;

(ii) the failure of such Party to perform in any material respect any obligation to be performed by it under this Agreement;

(iii) any notice or other communication from any third party (other than the FCC and NOAA) alleging that such third party's notice to or consent of such person is required in connection with the Transactions contemplated by this Agreement;

(iv) to the extent permitted by Law, any material notice or other material communication from any Governmental Authority in connection with the Transactions contemplated by this Agreement, and a copy of any such notice or communication shall be furnished to Buyer;

(v) any filing or notice made by a Party with any Governmental Authority in connection with the transfer of the Licenses, and a copy of any such filing;

(vi) to the extent permitted by Law, any actions, suits, claims, investigations or proceedings commenced or, to Sellers' Knowledge, threatened against, relating to or involving or otherwise affecting Sellers that relate to the consummation of the Transactions contemplated by this Agreement; and

(vii) the occurrence of any matters or events that individually or in the aggregate would be reasonably likely to result in any condition to the Transactions contemplated hereby and set forth herein not being satisfied;

*provided*, however, that no such notification shall operate as a waiver or otherwise affect any representation, warranty, covenant, agreement or other provision in this Agreement, or the obligations of Sellers or Buyer or the conditions to the obligations of Sellers or Buyer under this Agreement.

(d) *Payment of Taxes Resulting from Sale of Assets by Sellers*.

(i) Subject to Section 5.04(b) and Section 5.05, Sellers shall pay (from the Purchase Prince) in a timely manner all income taxes owed by Sellers resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement.

(ii) Under no circumstances, however, shall Sellers be obligated to pay income taxes of any of their shareholders (except to the extent such shareholder is one of the Sellers).

(iii) Nothing herein shall create any rights, as a third-party beneficiary or otherwise, in favor of any person or entity other than Buyer or Sellers.

(e) *Payment of Transfer Taxes*. All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

(f) *Survival*. The covenants of Buyer and Sellers in Sections 5.01(b)-(c) and 5.04 shall survive the Closing. No other covenants in this Article V shall survive the Closing.

6.

## CLOSING CONDITIONS

(a) *Conditions Precedent to Obligations of Buyer*. Unless waived by the Buyer, the obligations of the Buyer under this Agreement to proceed with the Closing shall be subject to the satisfaction by the Sellers on or prior to the Closing Date of each of the following conditions precedent:

(i) *Accuracy of Representations*. The representations of Sellers set forth in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though made on and as of that date.

(ii) *Performance and Compliance*. Sellers shall have performed or complied in all material respects with each covenant and agreement to be performed or complied with by it under this Agreement on or prior to the Closing Date.

(iii) *Consents and Approvals*. Sellers shall have obtained (with Buyer's best efforts to assist) or made each filing required to obtain Governmental Approvals of the transfer of the Licenses to Buyer.

(iv)     *Litigation*.   There shall be no pending action by any Governmental Authority (i) seeking to restrain, prohibit, or invalidate any of the Transactions contemplated by this Agreement or (ii) seeking monetary relief against Buyer by reason of the consummation of this Agreement.

(v)     *Material Adverse Change*.   No event shall have occurred and existing as of the Closing that constitutes a Material Adverse Effect.

(vi)     *Sellers' Deliverables*.  Sellers shall have delivered the Sellers' Deliverables at the Closing.

(vii)     *District Court Approval*.   The District Court shall have entered the Approval Order.

(b)                                                    *Conditions Precedent to Obligations of Sellers*.  Unless waived by Seller, the obligations of Sellers under this Agreement to proceed with the Closing shall be subject to the satisfaction by Buyer on or prior to the Closing Date of each of the following conditions precedent:

(i)     *Accuracy of Representations and Warranties*.  The representations and warranties of Buyer set forth in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though made on and as of that date.

(ii)     *Performance and Compliance*.   Buyer shall have performed or complied in all material respects with each covenant and agreement to be performed or complied with by it under this Agreement on or prior to the Closing Date.

(iii)     *Consents and Approvals*.   Buyer shall have obtained (with Sellers' best efforts to assist) or made each filing required to obtain Governmental Approvals of the transfer of the Licenses to Buyer.

(iv)     *Litigation*.   There shall be no pending or threatened action by any Governmental Authority (i) seeking to restrain, prohibit, or invalidate any of the Transactions contemplated by this Agreement or (ii) seeking monetary relief against Sellers by reason of the consummation of this Agreement.

(v)     *Buyer's Deliverables*.  Buyer shall have delivered the Buyer's Deliverables at the Closing.

(vi)     *District Court Approval*.   The District Court shall have entered the Approval Order.

## 7.
## MISCELLANEOUS

(a)                                                    *Entire Agreement; Assignment; Amendments*.  This Agreement (including the exhibits and schedules to this Agreement) constitute the entire agreement and supersede all oral agreements and understandings and all written agreements prior to the date hereof between or on behalf of the Parties with respect to the subject matter hereof.  This Agreement

shall not be assigned by any Party by operation of law or otherwise without the prior written consent of the other Parties hereto.  This Agreement may be amended only by a writing signed by each of the Parties, and any amendment shall be effective only to the extent specifically set forth in that writing.

(b)                                                                                            *Severability; Expenses; Further Assurances*.  If any term, condition or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions contemplated by this Agreement is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.  Except as otherwise specifically provided in this Agreement, each Party shall be responsible for the expenses it may incur in connection with the negotiation, preparation, execution, delivery, performance, and enforcement of this Agreement.  The Parties shall from time to time do and perform any additional acts and execute and deliver any additional documents and instruments that may be required by Law or reasonably requested by any Party to establish, maintain, or protect its rights and remedies under, or to effect the intent and purpose of, this Agreement.

(c)                                                                                            *Enforcement of the Agreement; Jurisdiction; No Jury Trial*.

(i)        The Parties agree that irreparable damage would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, the Parties agree that the non-breaching Party or Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the District Court, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the Chancery Court of the State of Delaware or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware or another court sitting in the state of Delaware, this being in addition to any other remedy to which they are entitled at law or in equity.  In addition, each of the Parties to this Agreement irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising under this Agreement brought by another Party to this Agreement or its successors or assigns, shall be brought and determined exclusively in accordance with this section.  Each of the Parties to this Agreement hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the aforesaid courts and in accordance with this section.  Each of the parties to this Agreement hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement,(a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to comply with this section; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in

-20-

such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by the Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum; (ii) the venue of such suit, action or proceeding is improper; or (iii) this Agreement, or the subject matter of this Agreement, may not be enforced in or by such courts. Each of Sellers and Buyer hereby agrees that service of any process, summons, notice, or document by U.S. registered mail to the respective addresses set forth in the notice provision of this Agreement shall be effective service of process for any proceeding arising out of, relating to or in connection with this Agreement or the Transactions contemplated hereby.

(ii)     EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(d)                              *Notices.*     All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by registered or certified mail, postage prepaid, or by reputable overnight courier service, or by email with acknowledgment of receipt of complete transmission further confirmed by a copy sent by reputable overnight courier service. Any notice or other communication so given shall be validly given hereunder upon receipt if delivered by hand, upon receipt if sent by registered or certified mail or by overnight courier service, and upon confirmation of successful transmission if sent by email subject to receipt of the confirming copy sent by overnight courier service:

If to Buyer, to:

[●]
Email: [●]

with a copy (which will not constitute notice to Buyer) to:

[●]
Email: [●]

If to Sellers, to:

Michael Fuqua Receiver

B. Riley Advisory Services
3445 Peachtree Road
Suite 1225
Atlanta, GA 30326
Email: mfuqua@brileyfin.com

with a copy (which will not constitute notice to Sellers) to:

Kurt F. Gwynne, Esquire
Reed Smith LLP
1201 N. Market Street
Suite 1500
Wilmington, DE 19801
Email: kfgwynne@reedsmith.com

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above. Rejection or other refusal to accept or the inability for delivery to be effected because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal, or inability to deliver.

(e)     *Governing Law.* This Agreement, and any dispute arising out of, relating to, or in connection with this Agreement, shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

(f)     *Descriptive Headings.* The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

(g)     *No Third-Party Beneficiaries.* This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing in this Agreement, express or implied, is intended, or shall be construed, to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

(h)     *Execution; Counterparts.* This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. Similarly, at the Closing, signature pages of counterparts may be exchanged by facsimile or email of scanned images thereof, in each case subject to appropriate customary confirmations in respect thereof by the signatory for the Party providing a facsimile or scanned image and that Party's closing counsel.

(i)     *Termination; Deposit.*

(i)     This Agreement may be terminated at any time prior to the Closing:

(A)  by mutual agreement of Buyer and Sellers;

(B)  by Buyer (A) if there has been a material misrepresentation by Sellers under this Agreement or a material breach by the Sellers of any of its covenants set forth in this Agreement or (B) if any of the conditions specified in <u>Section 6.01</u> shall not have been fulfilled within the time required and shall not have been waived by Buyer;

(C)  by Sellers (A) if there has been a misrepresentation by Buyer under this Agreement or a material breach by Buyer of any of its warranties or covenants set forth in this Agreement or (B) if any of the conditions specified in <u>Section 6.02</u> shall not have been fulfilled within the time required and shall not have been waived by Sellers;

(D)  by the Receiver, for and on behalf of the Sellers, if the Receiver determines in good faith after consultation with counsel that their continued performance or closing under this Agreement or any other Transaction Document would be inconsistent with his fiduciary or other duties under applicable law;

(E)  by Sellers if they choose to enter into an Alternative Transaction; or

(F)  by Sellers if the Closing shall not have occurred on the Closing Date as provided in <u>Section 2.08</u>.

(ii)  *Deposit; Liquidated Damages*.

(A)  If the Closing does not occur on the Closing Date (and Buyer does not obtain specific performance and thereafter consummate this Agreement) or this Agreement is terminated, in each case due to a breach by Sellers in the performance of a Sellers' obligation under this Agreement, Buyer shall be entitled to the return of the Deposit as its sole remedy.

(B)  If the Closing does not occur on the Closing Date (and Sellers do not obtain specific performance and thereafter consummate this Agreement) or this Agreement is terminated, in each case for any reason other than a breach by Sellers in the performance of a Sellers' obligation under this Agreement, Sellers shall retain the Deposit as liquidated damages, and all Parties shall be relieved of and released from any further liability hereunder except for those obligations specifically designated to survive termination or expiration of this Agreement. Sellers and Buyer agree that the Deposit is a fair and reasonable amount to be retained by Sellers as liquidated damages in light of the decline in value of the Acquired Assets during the negotiation and failed consummation of this Agreement and the costs incurred by Sellers, and Sellers retention of the Deposit shall not constitute a penalty or a forfeiture.

(j)  *Alternative Transactions.* From the date hereof and until the Closing, Sellers are permitted to, and to cause their Representatives and Affiliates to, initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person (in addition to Buyer and its Affiliates and Representatives) in connection with an Alternative Transaction. Without limiting the foregoing, Sellers also may identify and enter into agreements respecting a "back-up" offer relating to an Alternative Transaction to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

     (k)           *Interpretation*.  The words "hereof," "herein," "hereby," "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.  Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."  The words describing the singular number shall include the plural and vice versa, words denoting either gender shall include both genders and words denoting natural Persons shall include all Persons and vice versa.  The phrases "the date of this Agreement," "the date hereof," "of even date herewith" and terms of similar import, shall be deemed to refer to the date set forth in the preamble to this Agreement.  Any reference in this Agreement to a date or time shall be deemed to be such date or time in New York City, unless otherwise specified.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf by its duly authorized representative, as of the date set forth in the preamble paragraph.

**BUYER**

[●]


By: _____
Name:
Title:


**SELLERS**

THEIA GROUP, INC.


By: _____
Michael Fuqua
Title: Receiver


THEIA HOLDINGS A, INC.

By:_____
Michael Fuqua
Title: Receiver


THEIA AVIATION, LLC


By: _____
Michael Fuqua
Title: Receiver


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SCHEDULE 1.01(e)**

**"AIRCRAFT"**

1.      Douglas DC3C-S1C3G, Serial Number 13342, Registration N131PR

2.      1996 Jetstream Limited Series 4100, Model J4101, Serial Number 41084, Registration
N42AX.

3.      All rights, title, and interests in the three (3) DC3 repurposed aircraft in various stages of
construction pursuant to a contract with Basler Turbo Conversions

**SCHEDULE 1.01(k)**

**"ASSIGNED CONTRACTS"**

(i)     Contract with Basler Turbo Construction for purchase of three (3) DC3 repurposed aircraft.

**SCHEDULE 1.01(l)**

**"ASSUMED LIABILITIES"**

1.      Any and all Taxes for which Buyer is liable pursuant to Section 5.05.

**SCHEDULE 1.01(ss)**

**"F&F OBLIGATIONS"**

Attached is a list of anonymized investors that entered into the Secured Note Purchase Agreements and/or Secured Convertible Promissory Notes referenced in the definition "F&F Obligations."

**SCHEDULE 1.01(yy)**

**"INTELLECTUAL PROPERTY ASSETS"**

1.      All patents, licenses, and trademarks owned by Sellers as set forth on the attached.

**SCHEDULE 1.01(uuu)**

**"TANGIBLE PERSONAL PROPERTY"**

(i)                                                                      **Oso Grande, New Mexico Storage**

- Server (5)

(ii)  **B. Riley**

- Lenovo Server (1)
- Hard Drive (4)
- NUC desktop mini computer (2)
- Apple i-Pad mini (3)
- Apple iPhone (1)

(iii)  **Riverside, California Hangar**

- Data sensing equipment.

**SCHEDULE 2.07**

**ALLOCATION SCHEDULE**

To be agreed upon by Buyer and Sellers.

**EXHIBIT A**

<u>Bill of Sale, Assignment and Assumption of Contracts and Assumed Liabilities</u>

(Attached)

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF
## CONTRACTS AND ASSUMED LIABILITIES

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND ASSUMED LIABILITIES (this "**Agreement**") is made, executed and delivered as of [●], 2023, by and among by and among Theia Group, Inc. d/b/a "Thorian Group" and/or "Cypherian", a Delaware corporation ("**TGI**"), Theia Aviation, LLC, a Delaware limited liability company ("**TA**"), and Theia Holdings A, Inc. d/b/a "Thorian Holdings", a Delaware corporation ("**THA**," and together with TGI and TA, the "**Sellers**") and [●], a [●] (together with its designees, "**Buyer**" and together with the Sellers, the "**Parties**").

## W I T N E S S E T H :

**WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated as of [●], 2023 (as amended, restated, or otherwise modified from time to time, the "**APA**"), by and among Buyer and Sellers, Sellers have agreed to sell to Buyer, and Buyer has agreed to purchase from Sellers, all of Sellers' rights, titles, and interests in, to and under the Acquired Assets (including, without limitation, the Assigned Contracts) and, in connection therewith, Buyer has agreed to assume the Assumed Liabilities; and

**WHEREAS**, the execution and delivery of this Agreement is contemplated by Section 2.10(a)(ii) and Section 2.10(b)(vii) of the APA; and

**NOW, THEREFORE**, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Defined Terms; Interpretation.  Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the APA.  This Agreement shall be interpreted in accordance with the rules of construction set forth in Section 7.10 of the APA.  This Agreement is delivered pursuant to and is in all respects subject to the terms and conditions of the APA, including the representations, warranties, covenants, agreements, and other terms and conditions set forth therein, are incorporated herein by reference.

2.    Sale, Assignment, and Assumption.  Subject to the terms and conditions of the APA, Sellers hereby sell, assign, transfer, convey, and deliver to Buyer, all of Sellers' rights, titles, and interests in, to and under the Acquired Assets free and clear of all Liens, Claims, and Indebtedness (other than Assumed Liabilities).  Subject to the terms and conditions of the APA, Buyer hereby accepts such sale, assignment, transfer, conveyance, and delivery of Sellers' rights, titles, and interests in, to, and under the Acquired Assets, and, in connection therewith, hereby assumes and agrees to perform and discharge as and when due the Assumed Liabilities.  The Parties agree that, notwithstanding anything to the contrary herein, Sellers do not sell, assign, transfer, convey, or deliver to Buyer any Excluded Assets and Buyer does not assume or agree to perform or discharge as and when due any Excluded Liabilities.

3.    As is, where is.  Buyer acknowledges, agrees, warrants and represents that (a) Sellers are selling, and Buyer is purchasing the Acquired Assets on an "**AS-IS, WHERE-IS, WITH ALL FAULTS, AND WITHOUT RECOURSE TO SELLER**" basis based solely on Buyer's own investigation of the Acquired Assets and (b) neither Sellers nor any of their respective Representatives has made any warranties,

representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or any part of the Acquired Assets, except as set forth in this Agreement, the Ancillary Documents or the APA. Buyer agrees, warrants, and represents that, except for the representations and warranties set forth in this Agreement, the Ancillary Documents or the APA, Buyer has relied, and shall rely, solely upon its own investigation of all such matters, and that Buyer assumes all risks with respect thereto. **THE BUYER ACKNOWLEDGES AND AGREES THAT THE SELLERS ARE CONVEYING THE ACQUIRED ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH THE SELLERS HEREBY DISCLAIM), RELATING TO (I) TITLE, SUITABILITY OR ADEQUACY, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF THE ACQUIRED ASSETS, (III) THE FITNESS OR QUALITY OF THE ACQUIRED ASSETS, (IV) COMPLIANCE WITH APPLICABLE LAWS, (V) ANY ESTIMATES OF THE VALUE OF THE ACQUIRED ASSETS OR FUTURE REVENUES GENERATED BY THE ACQUIRED ASSETS, (VI) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO THE BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTION OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, OR (IX) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO THE BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT THE BUYER WILL BE DEEMED TO BE OBTAINING THE ACQUIRED ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND WITH ALL FAULTS AND THAT THE BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS THE BUYER DEEMS APPROPRIATE**.

4.     <u>Terms of the APA</u>.  This Agreement is subject to the terms and conditions of the APA, and nothing contained in this Agreement shall be deemed to modify, limit, expand, supersede, or amend any of the terms, conditions, limitations, obligations, agreements, covenants, or warranties of any Party contained in the APA.  In the event of any conflict or inconsistency between the terms of the APA and this Agreement, the terms of the APA shall govern and control.

5.     <u>Entire Agreement</u>.  This Agreement, the Ancillary Documents, and the APA contain the entire agreement between the Parties hereto with respect to the subject matter of this Agreement and supersede any and all prior or contemporaneous agreements and discussions, whether written or oral, express or implied.  The preamble and recitals appearing at the beginning of this Agreement are incorporated into its terms and conditions in full by this reference thereto.

6.     <u>Indemnification</u>.  Buyer hereby accepts the assignment of the Acquired Assets and agrees to assume and discharge, in accordance with the terms thereof, the Assumed Liabilities, whether arising prior to or after the date hereof.  Buyer agrees to indemnify and hold harmless Sellers, their respective partners, shareholders, members, managers, owners, and affiliates and their respective officers, managers,

directors, employees, agents, and representatives from any cost, liability, damage, or expense (including attorneys' fees) arising out of or relating to Buyer's failure to perform any of the foregoing obligations.

7.  <u>No Third-Party Beneficiaries</u>.  This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing herein, express or implied, is intended, or shall be construed, to confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

8.  <u>Further Assurances</u>.  The Sellers and the Buyer agrees to use their respective commercially reasonable efforts to take or cause to be taken such further action, to execute, deliver, and file or cause to be executed, delivered, and filed such further documents and instruments, as may be necessary or as may be reasonably requested in order to effectuate fully the purposes, terms, and conditions of this Agreement; *provided, however,* that Buyer, its successors, and assigns shall prepare, at Buyer's expense, all necessary documentation.

9.  <u>Governing Law; Jurisdiction; WAIVER OF JURY TRIAL</u>.

All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and all claims or disputes arising hereunder, related hereto, or in connection herewith, whether purporting to sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the Laws of the State of New York, without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or of any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York.

The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, the Parties agree that the non-breaching Party or Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the United States District Court for the Southern District of New York, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the Chancery Court of the State of Delaware or in the event (but only in the event) that such court does not have subject matter jurisdiction over such action or proceeding, in the United States District Court for the District of Delaware or another court sitting in the state of Delaware, this being in addition to any other remedy to which they are entitled at law or in equity.  In addition, each of the Parties to this Agreement irrevocably agrees that any legal action or proceeding with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of this Agreement and the rights and obligations arising under this Agreement brought by another Party to this Agreement or its successors or assigns, shall be brought and determined exclusively in accordance with this section.  Each of the Parties to this Agreement hereby irrevocably submits with regard to any such action or proceeding for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any action relating to this Agreement or any of the Transactions contemplated by this Agreement in any court other than the aforesaid courts and in accordance with this section.  Each of the Parties to this Agreement hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to comply with this section; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment

- 3 -

or otherwise); and (c) to the fullest extent permitted by the Law, any claim that (i) the suit, action or proceeding in such court is brought in an inconvenient forum; (ii) the venue of such suit, action or proceeding is improper; or (iii) this Agreement, or the subject matter of this Agreement, may not be enforced in or by such courts. Each of Sellers and Buyer hereby agrees that service of any process, summons, notice, or document by U.S. registered mail to the respective addresses set forth in the notice provision of this Agreement shall be effective service of process for any proceeding arising out of, relating to or in connection with this Agreement or the Transactions contemplated hereby.

EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER, RELATING TO OR IN CONNECTION WITH THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY HERETO CERTIFIES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (II) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (IV) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10. <u>Binding Effect; Amendment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. Neither this Agreement, nor any term or provision hereof, may be amended, modified, superseded, or cancelled except by an instrument in writing signed by all Parties hereto.

11. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12. <u>Successors and Assigns</u>. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Buyer and Sellers, and their respective successors and permitted assigns.

13. <u>Assignment</u>. Neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned in whole or in part (whether by operation of law or otherwise), without the prior written consent of Sellers.

14. <u>Severability</u>. If any part or provision of this Agreement is determined by a court of competent jurisdiction to be void, invalid, or unenforceable, the remainder of this Agreement shall remain in full force and effect.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK.]

IN WITNESS WHEREOF, this Bill of Sale, Assignment and Assumption Contracts and Assumed Liabilities has been duly executed and delivered by a duly authorized representative of each of Sellers and Buyer as of the date first above written.

**BUYER**

[•]

By: _____
        Name:
        Title:

| **SELLER** | **SELLER** |
|---|---|
| THEIA GROUP, INC. | THEIA HOLDINGS A, INC. |
| | |
| By: _____ | By: _____ |
| Michael Fuqua | Michael Fuqua |
| Title: Receiver | Title: Receiver |

**SELLER**

THEIA AVIATION, LLC

By: _____
        Michael Fuqua
        Title: Receiver

[SIGNATURE PAGE TO BILL OF SALE, ASSIGNMENT AND ASSUMPTION OF CONTRACTS]

**EXHIBIT B**

Intellectual Property Assignments

(Attached)