UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, LLC,

Plaintiff,

—against—

THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"

Defendants.

21 Civ. 6995 (PKC)

**DECLARATION OF MICHAEL FUQUA, AS RECEIVER, IN SUPPORT OF MOTION OF MICHAEL FUQUA, AS RECEIVER, FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE RECEIVERSHIP ENTITIES' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES, AND OTHER INTERESTS AND (B) ENTRY INTO THE ASSET PURCHASE AGREEMENT WITH LTS SYSTEMS, LLC; (II) FURTHER EXTENDING THE RECEIVERSHIP STAY; AND (III) GRANTING RELATED RELIEF**

I, Michael Fuqua, hereby declare as follows:

1. On November 8, 2021, the United States District Court for the Southern District of New York (this "Court")[1] entered an *Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "Receivership Order") in the above-captioned case, whereby the Court appointed me as federal receiver (the "Receiver") for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities") and for all assets of, in the possession of, under the control of, or held in the name of the Receivership Entities (collectively, the "Receivership Assets"), thereby creating the Receivership Entities' estate (the "Receivership Estate").

[1] Capitalized terms used but not defined in this Declaration shall have the meanings given to such terms in the Approval Motion, the Memorandum of Law in support thereof, the proposed Approval Order, or the Purchase Agreement (as those terms are defined herein), as the context requires.

2. Since the entry of the Receivership Order, my professionals and I have focused on (i) conducting an extensive forensic analysis and reconciliation of the Receivership Entities' bank accounts and books and records, which were in complete disarray; (ii) accounting for, and protecting, the Receivership Assets located in numerous locations across the country, including, among other things, multiple large aircraft in various states of completion, data sensing equipment, the Intellectual Property, and the FCC License and NOAA License; (iii) providing extensive assistance to, and cooperating with the numerous requests of, the United States Department of Justice while protecting the Receivership Entities' legal and evidentiary privileges; and (iv) engaging in a marketing and sale process for the Receivership Assets in order to maximize value for creditors and parties in interest.

3. I submit this declaration (this "Declaration") in support of the *Motion of Michael Fuqua, as Receiver, for Entry of an Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Receivership Entities' Assets, Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests and (B) Entry Into the Asset Purchase Agreement With LTS Systems, LLC; (II) Further Extending the Receivership Stay; and (III) Granting Related Relief* (the "Approval Motion"), filed contemporaneously herewith, whereby I request entry of an order (the "Approval Order"), approving the sale of substantially all of the Receivership Assets (the "Acquired Assets") to LTS Systems, LLC ("Buyer"), pursuant to the *Asset Purchase Agreement* by and among the Receivership Entities and Buyer (including all exhibits and schedules, and as may be amended or modified from time to time, including pursuant to the terms of the Approval Order, the "Purchase Agreement" and the transaction contemplated thereunder, the "Sale Transaction").

4. Except as otherwise noted, I have personal knowledge of the matters set forth herein. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**PRELIMINARY STATEMENT**

5. As Receiver, my primary directive and goal was to sell the Receivership Entities' rights in the FCC License, NOAA License, and other Receivership Assets to maximize recoveries for creditors of the Receivership Entities. Promptly following my appointment, I retained PJT Partners LP ("PJT"), a leading global investment banking firm, to run a marketing and sale process for the Receivership Assets. Beginning in or around February 2022 and for nearly eighteen (18) months thereafter, PJT oversaw a thorough marketing and sale process for the Receivership Assets.

6. In early 2022, during the first round of the sale process, PJT conducted significant outreach in an effort to identify potential purchasers. I understand that PJT reached out to fifty-seven (57) potential purchasers based on PJT's experience in the aerospace and satellite industry and its proprietary list of potential acquirors. After eleven (11) potential bidders executed confidentiality agreements and engaged in due diligence, I ultimately received three (3) non-binding expressions of interest (each, an "EOI") in the amounts of $1 million, $10 million, and $300 million, respectively. The $300 million EOI was contingent on the potential purchaser obtaining financing, which that prospective purchaser never obtained.

7. While PJT was conducting its sales process, I held separate discussions with Rising Sky, LLC ("Rising Sky"), which declined to be part of any bidding process. Based on the magnitude of the potential sale price in a transaction with Rising Sky, coupled with Rising Sky's aversion to being part of a formal bidding process, the PJT sale process (which at that point only had potential bids of $1 million and $10 million) effectively remained at a standstill and did not progress to the previously contemplated 'naked' auction. In the meantime, my negotiations with

Rising Sky eventually led to the execution of an asset purchase agreement (the "Rising Sky APA"), which was economically superior to the prior EOIs as the purchase price was in excess of $800 million. Rising Sky failed to make a required $40 million cash deposit pursuant to the terms of the Rising Sky APA. In fact, Rising Sky was unable to raise any meaningful cash despite repeated, broken promises regarding available financing (from multiple alleged lenders) and the imminence thereof. As a result of Rising Sky's inability to consummate a transaction, and with the approaching 2025 satellite launch deadline, I directed PJT to resume the sale process.

8. Following the Court's approval of the Bidding Procedures in late June 2023, PJT again reached out to potential bidders to determine their interest in purchasing the Receivership Assets. Following PJT's second outreach to potential bidders, I received two (2) bids by the Bid Deadlines (as extended by one (1) day for FCS). The first bidder ("Bidder #1") submitted a $20.5 million bid solely for aircraft owned by the Receivership Entities. I determined that such bid was not a Qualified Bid under the terms of the Bidding Procedures because, among other things, the bid was not accompanied by a Deposit, did not include a draft form of asset purchase agreement, failed to include sufficient Evidence of Financial Wherewithal to consummate the proposed transaction, and (despite bid language to the contrary) appeared to be contingent on financing as it was not accompanied by a firm financing commitment.

9. The second bid was a Credit Bid from the Buyer for substantially all the assets of the Receivership Entities (including the Aircraft), ultimately in the amount of $40 million, which also provided for the assumption of $40 million of obligations owed to FCS. Initially, I believed that such bid was not qualified because, among other things, it contained a due diligence provision. After working with the Buyer, I was able to negotiate revisions to its bid that rendered it a Qualified Bid.

10. In an effort to get competing bidders engaged in an Auction, I reached out to Bidder #1 and asked if it would proceed to an Auction if issues with its bid were resolved so as to render it a Qualified Bid. Bidder #1 indicated that it was not interested in paying any more for the aircraft, let alone the amount necessary to "top" Buyer's Credit Bid.

11. In accordance with the terms of the Bidding Procedures Order, I designated the Buyer as the Successful Bidder for substantially all of the Receivership Assets and directed my counsel to file a notice with the Court indicating that the Auction was canceled due to the receipt of only one (1) Qualified Bid.

12. In my business judgment, the Qualified Bid submitted by the Buyer provides fair and reasonable consideration to the Receivership Entities for the Acquired Assets and Assumed Liabilities, represents the highest or otherwise best (and only) Qualified Bid for the Acquired Assets, and will provide a greater recovery for Receivership Estate than would have been provided by any other available alternative.

13. For the foregoing reasons, in light of the fact that the Receivership Assets have been for sale for over a year and a half and that no meaningful alternative exists, I believe that the Court should approve the Purchase Agreement as the highest or otherwise best and only Qualified Bid for the Acquired Assets.

## **THE MARKETING AND SALE PROCESS**

14. PJT is a leading global investment banking firm with a dedicated team focused on the aerospace and satellite industry across the finance, business development, and engineering sectors. PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and special situations.

15. I engaged PJT to identify and approach parties with whom I could negotiate a potential value-maximizing transaction for the benefit of the Receivership Entities and their stakeholders. To that end, since their engagement, PJT has advised and assisted me in the marketing of the Receivership Assets, including designing and executing a marketing process that sought to maximize bids and obtain the highest value for those assets.

16. Throughout the entire marketing and sale process, my advisors and I, including PJT, were committed to obtaining higher and otherwise better offers for the Receivership Assets and achieving a successful sale for the benefit of the Receivership Entities and their stakeholders.

**A. Round 1 of the Sale Process (2022)**

17. At my directive, PJT launched a comprehensive marketing process for the Receivership Assets in February 2022.

18. Despite the limited access to pre-receivership information and systems, the lack of any employees of the Receivership Entities, and the fact that the Receivership Entities have no current operations, PJT was able to deliver a marketing presentation and supporting diligence materials to prospective buyers and used appropriate methods to market the assets.

19. PJT compiled a list of prospective purchasers based on its knowledge of the aerospace and satellite industry, as well as various parties who proactively contacted the Receiver to express interest in the Receivership Assets. In "Round 1" of the sale process, PJT contacted fifty-seven (57) potentially interested parties, with the aim of attracting multiple proposals, selecting a stalking horse bidder, and conducting an auction to maximize the value for the Receivership Estate.

20. Non-binding EOIs initially were due on March 31, 2022, which I extended to April 8, 2022 to facilitate the receipt of additional indications. After receipt of the EOIs, PJT

distributed a teaser and form confidentiality agreement to potentially interested parties, and I executed confidentiality agreements with eleven (11) prospective buyers, which were granted access to the virtual data room set up by PJT. The data room contained a marketing presentation and available information and documentation pertinent to investors' evaluation of the Receivership Entities' business and assets. PJT was responsive to follow-up requests from investors and provided supplemental disclosures where appropriate.

21. Round 1 of the sale process resulted in three (3) non-binding EOIs for the Receivership Assets: (i) EOI #1, which offered consideration in the amount of $1 million; (ii) EOI #2, which offered consideration in the amount of $10 million; and (iii) EOI #3, which offered consideration in the amount of $300 million. EOI #3 also was contingent on financing, which the potential bidder was unable to procure even after being provided ample time to obtain the required financing. After it became clear that the potential bidder that submitted EOI #3 was unable to obtain financing, such potential bidder became unresponsive to both me and PJT.

**B. Discussions with Rising Sky and Its Inability to Raise Financing**

22. After reviewing the three (3) non-binding EOIs following Round 1 of the sale process, I began holding discussions with Rising Sky about the terms of a potential bid. John Gallagher (a former officer and/or director of the Receivership Entities) introduced me to Rising Sky. As discussions with Rising Sky progressed positively, the sale process being coordinated by PJT effectively came to a standstill and did not proceed to the previously contemplated 'naked' auction, as Rising Sky did not wish to take part in a formal bidding process, and I did not want to proceed to a 'naked' auction with such low-level EOIs. Thereafter, I focused my efforts on negotiating and executing a value-maximizing transaction with Rising Sky.

23. After nearly nine (9) months of negotiations with Rising Sky, in January 2023, I executed the Rising Sky APA on behalf of the Receivership Entities and filed a copy of the Rising Sky APA (as amended) with the Court. The consideration payable from Rising Sky under the Rising Sky APA totaled more than $800 million, an amount that would have made whole all or nearly all of the Receivership Entities' creditors. As part of the proposed transaction memorialized by the Rising Sky APA, Rising Sky had negotiated certain deals with FCS and a substantial number of "friends and family" noteholders to acquire their respective debt.[2] Rising Sky was required to remit a $40 million cash deposit on or before March 31, 2023, with the remaining cash consideration due at closing of the proposed transaction.

24. Notwithstanding numerous extensions to allow Rising Sky to procure the necessary financing commitment, Rising Sky failed to make the $40 million cash deposit by the March 31, 2023 deadline. Rising Sky often changed its potential financing sources and, despite repeatedly assuring me (and others) that the necessary financing was imminent, Rising Sky failed to obtain any meaningful financing. Due to Rising Sky's failure to perform under the Rising Sky APA (and with the approaching 2025 satellite launch deadline), I determined that the Receivership Entities needed to finalize the sale process that PJT had started.

**C. Round 2 of the Sale Process (2023).**

25. On June 16, 2023, I filed a motion requesting that the Court approve Bidding Procedures and a timeline for Round 2 of the sale process. The Court granted the requested relief and approved the Bidding Procedures on June 30, 2023.

26. The Bidding Procedures approved by the Court set forth certain key dates with respect to the sale process, including a general Bid Deadline of July 24, 2023 (with FCS's Bid

---

[2] Rising Sky had some preliminary discussions with Aithre but did not have an agreement to acquire Aithre's debt.

Deadline of July 26, 2023), an Auction (to the extent more than one Qualified Bid was submitted) date of July 31, 2023; and a deadline to object to the sale transaction.

27. Pursuant to the Bidding Procedures Order, PJT renewed its outreach to potentially interested parties in accordance with the Bidding Procedures, including re-contacting all of the parties contacted during Round 1 of the sale process, sending periodic emails with updates on the process, fielding calls from various interested parties, and posting updates and additions to the data room.

28. PJT contacted fifty-three (53) potentially interested parties, fifty (50) of which previously had been contacted. One (1) new party executed a confidentiality agreement and was granted access to the virtual data room. In addition, one (1) party that previously executed a confidentiality agreement was granted access to the virtual data room.

29. I followed up with prospective purchasers and continued to facilitate buyer due diligence until the Bid Deadline established by the Bidding Procedures Order.

30. PJT and I expended considerable time, energy, and resources engaging with potential bidders and other parties for nearly eighteen (18) months. Pursuant to the Financing Orders, FCS funded the receivership process during all relevant times to afford the Receivership Entities a fulsome opportunity to maximize the value of the Receivership Assets.

31. Round 2 of the sale process resulted in two (2) bids: (i) Bid #1, a $20.5 million bid for the Receivership Entities' aircraft, and (ii) the Buyer's Credit Bid, a $40 million Credit Bid for substantially all of the Receivership Assets (including the aircraft) with the assumption of certain obligations, including certain obligations owed by the Receivership Entities to FCS in the amount of $40 million.

32. I thoroughly evaluated the two (2) bids and all my alternatives with PJT, my financial advisors, and my counsel, after which I concluded, in my business judgment, that the bid submitted for the aircraft failed to comply with numerous provisions of the Bidding Procedures and, therefore, was not a Qualified Bid. Bidder #1 did not submit a Qualified Bid under the terms of the Bidding Procedures because, among other things, the bid was not accompanied by a Deposit, did not include a draft form of asset purchase agreement, failed to include sufficient Evidence of Financial Wherewithal to consummate the proposed transaction, and (despite bid language to the contrary) appeared to be contingent on financing as it was not accompanied by a firm financing commitment.

33. The Buyer's Credit Bid was for substantially all the assets of the Receivership Entities (including the aircraft), which also provided for the assumption of amounts owed to FCS. Initially, I believed that such bid was not qualified because it contained a due diligence provision and did not provide for the payment of certain costs of administering the Receivership Estate. After working with the Buyer, I was able to negotiate revisions to its bid that rendered it a Qualified Bid.

34. In an effort to generate an Auction among competing bids, I reached out to Bidder #1 to determine whether it would engage in an Auction if we were able to resolve the issues with its bid. Bidder #1 was not interested in an Auction at the prices indicated by the Buyer's Credit Bid.

35. Upon determining that the sole Qualified Bid was the Credit Bid submitted by the Buyer, my counsel and I negotiated with the Buyer and FCS regarding the terms of the proposed Purchase Agreement and the proposed Approval Order. Following several rounds of arms'-length, hard-fought negotiations on a number of key issues, and subject to this Court's approval after

notice and a hearing, I have executed the Purchase Agreement on behalf of the Receivership Entities, as Sellers, for the proposed Sale Transaction. The Purchase Agreement provides for the Buyer to acquire substantially all of the assets of the Receivership Entities, including the assignment and transfer of a number of contracts, in exchange for the Credit Bid in the amount of $40 million and the assumption of $40 million of Assumed Liabilities, including, without limitation, obligations owed to FCS under the *Amended and Restated Secured Note Purchase and Security*, dated as of June 29, 2020, as well as my fees and expenses as Receiver and those of my financial advisors (B. Riley Financial Advisors) and legal counsel (Reed Smith LLP, King & Spalding LLP, Akin Gump Strauss Hauer & Feld LLP, and Frank Bonini, Esq.).

36. Based on my professional experience, and in light of the comprehensive marketing and sale process overseen by PJT (which yielded only one (1) actionable purchase agreement—the Purchase Agreement), I do not believe that further marketing of the Receivership Assets would result in higher or otherwise better offers. The duration and outcome of the sale process have made it clear to me that potential bidders either are unwilling (or if willing, unable) to pay more for the Receivership Assets than the consideration being provided by the Buyer. I believe that the additional costs, expenses, and delay associated with continuing to market the Receivership Assets would not benefit the Receivership Estate. Given the duration of the sale process administered by PJT (a leading investment banker) and the lack of interest evidenced by both Round 1 and Round 2 thereof, I believe that the Credit Bid is fair and reasonable and constitutes the highest and best offer for the Acquired Assets.

37. I believe that the notice of the Approval Motion, the Sale Hearing, and the Sale Transaction contemplated under the Purchase Agreement was proper, timely, adequate, sufficient, and appropriate under the circumstances, and that no other or further notice should be required.

Over the 18-month sale process, I was in frequent communication with the Notice Parties (as defined in the Approval Order) and responsive to their inquiries, concerns, and objections, and each of the Notice Parties was afforded a reasonable opportunity to object or be heard regarding the relief requested in the Sale Motion and approval of the Purchase Agreement and consummation of the Sale Transaction. I further believe that the disclosures made concerning the Purchase Agreement, the Sale Transaction, and the Sale Hearing have been sufficient, complete, and adequate.

## THE PROPOSED SALE TRANSACTION SHOULD BE APPROVED

### A. The Sale Transaction Is the Best and Only Offer for the Receivership Assets

38. I believe that the proposed Sale Transaction is in the best interests of the Receivership Entities, the Receivership Estate, and its creditors, and that consummating the Sale Transaction is a prudent exercise of my business judgment.

39. First, PJT conducted a fair and open sale process in a manner reasonably calculated to produce the highest or otherwise best offer for the Receivership Assets and in compliance with the Bidding Procedures. The entire marketing and sale process was conducted in a non-collusive, fair, and good-faith manner, and a reasonable opportunity was provided to any interested party to submit a bid for the Receivership Assets. Indeed, some interested parties emerged, but none (other than the Buyer) made an actionable bid.

40. PJT thoroughly and fairly marketed the Receivership Assets and conducted the related sale process in good faith and in compliance with the Bidding Procedures. Over the course of nearly 18 months, all interested persons and entities have been afforded a full, fair, and reasonable opportunity to (a) conduct due diligence investigations; (b) submit bids and higher or

otherwise better bids to purchase the Receivership Assets; and (c) object or be heard with respect to the proposed Sale Transaction.

41. In my professional opinion, the sale process was effective in testing the market value of the Receivership Assets, the time period for marketing the Receivership Assets was more than adequate, and the outcome from the sale process yielded the highest or otherwise best market value for the Acquired Assets. I further believe that a longer marketing and sale process would result in the Receivership Estate incurring additional fees and expenses without a material benefit to the Receivership Estate's creditors, equity holders, and other parties in interest. Accordingly, the consideration provided by the Buyer for the Receivership Assets provides fair and reasonable consideration to the Receivership Entities for the sale of the Receivership Assets and the assumption of all Assumed Liabilities (as defined and limited in the Purchase Agreement).

42. As a result, the Sale Transaction contemplated by the Purchase Agreement is, in my business judgment, in the best interests of the Receivership Estate and its stakeholders because it is the highest or otherwise best (and only) offer for substantially all of the Receivership Assets. Thus, in accordance with the Bidding Procedures, I have determined, in a valid and sound exercise of my business judgment, that the highest or otherwise best Qualified Bid for the Receivership Assets was that of the Buyer under the Purchase Agreement. In fact, it was the only Qualified Bid. For all of these reasons, my decision to enter into and consummate the Purchase Agreement is a reasonable exercise of my sound business judgment consistent with my fiduciary duties, and such decision is in the best interests of the Receivership Entities and the Receivership Estate.

43. I further believe that time is of the essence in effectuating the consummation of the Sale Transaction as contemplated under the Purchase Agreement. For example, if certain requirements are not satisfied by May 2025, the FCC License is expected to terminate. If the Sale

Transaction does not close quickly, Buyer may not be able to satisfy those requirements, and Buyer would no longer have an interest in acquiring the Acquired Assets (at least not at the price provided in the Purchase Agreement). Moreover, I believe it is unlikely that FCS will commit to providing additional financing to support the administrative expenses of the receivership case should the Sale Transaction contemplated by the Purchase Agreement not be consummated expeditiously. Thus, to maximize the value of the Receivership Assets and avoid a decline in value of the Receivership Assets, which may occur if the Sale Transaction is delayed, it is essential that the Sale Transaction occur promptly.

44. Finally, the assignment and/or transfer of the Assigned Contracts to the Buyer pursuant to the terms of the Approval Order is integral to the Purchase Agreement. Buyer has had limited access to some of the Assigned Contracts due to confidentiality restrictions and has therefore negotiated for a post-Approval Order period to determine the final list of Assigned Contracts. In my professional opinion, the assignment and/or transfer of the Assigned Contracts and the post-Approval Order period are in the best interests of the Receivership Entities and the Receivership Estate and represent the reasonable exercise of my business judgment.

45. At bottom, given the fulsome marketing process undertaken by PJT and the results therefrom, consummation of the Sale Transaction maximizes the value for, and minimize claims against, the Receivership Estate. Accordingly, I submit that entry into the Sale Transaction is a sound exercise of my business judgment.

**B. The Sale Transaction Should Be Free and Clear of Encumbrances**

46. I believe that the Court should direct that the sale of the Acquired Assets, as contemplated by the Purchase Agreement, should be "free and clear" of all Encumbrances of any

kind or nature whatsoever (except as expressly set forth in the Purchase Agreement with respect to the Assumed Liabilities).

47. Among other things, I believe that the Buyer would not have entered into the Purchase Agreement (and would not otherwise consummate the Sale Transaction) if the sale of the Acquired Assets (including the assignment and/or transfer of the Assigned Contracts) were not "free and clear" of Encumbrances, or if the Buyer, or any of its affiliates or subsidiaries or successors, would, or in the future, could be liable for any of such Encumbrances (except as expressly set forth in the Purchase Agreement with respect to the Assumed Liabilities).

48. But for the protections afforded to the Buyer (including its assigns and successors) under the Approval Order, I believe that the Buyer would not (i) enter into the Purchase Agreement, (ii) offer the consideration contemplated in the Purchase Agreement, or (iii) consummate the Sale Transaction on the terms set forth in the Purchase Agreement. Accordingly, a sale of the Receivership Assets, other than one free and clear of all Encumbrances (other than Assumed Liabilities), may not be achievable, and in any event would yield substantially less value for the Receivership Estate. A sale "free and clear" of all Encumbrances is therefore necessary to maximize the value of the Acquired Assets.

49. I am unaware of any self-dealing or manipulation of any kind in the sale process or the negotiation of the Purchase Agreement. I have acted at all times in good faith and consistent with my duty to maximize the value of the Receivership Assets. Among other things: (a) I was free to (and did) deal with any other party interested in acquiring the Receivership Assets; (b) my advisors and I negotiated the Purchase Agreement, and I seek approval of, the Purchase Agreement without collusion, in good faith, and from an arm's-length bargaining position; (c) neither I nor my advisors have engaged in any conduct that would cause or permit the avoidance of the Sale

Transaction or the Purchase Agreement, or the imposition of costs or damages, and (d) I am unaware of any improper influence or conduct by the Buyer in connection with the negotiation of the Purchase Agreement and related documents.

50. I have not entered into the Purchase Agreement with the intent to, nor for the purpose of (nor does the Purchase Agreement have the effect of) hindering, delaying, or defrauding the Receivership Entities or their creditors or otherwise improper purpose.

51. To my knowledge, all payments to be made by the Buyer to Sellers in connection with the Purchase Agreement have been disclosed.

52. I further understand that the Sale Transaction could not be consummated without the protections in the Approval Order against any claims based upon "successor liability" theories because the Buyer would not acquire the Acquired Assets without the inclusion of such protections in the Approval Order.

**C. The Purchase Agreement Was Negotiated at Arms'-Length and in Good Faith**

53. Neither I nor any of my advisors are aware of any self-dealing or manipulation of any kind in the sale process or the negotiation of the Purchase Agreement, and we have received no such allegations.

54. Further, after my appointment, I retained King & Spalding LLP, as independent legal counsel, to assist me in investigating claims asserted by each of the Receivership Entities against FCS, Brevet Capital Management, LLC, and Mark Callahan and certain other defendants (collectively, "Defendants") as asserted by the Receivership Entities in their *Answer, Affirmative Defenses, and Counterclaims* (Doc. 79) and the documents submitted in support thereof in *FCS Advisors, LLC v. Theia Group, Inc., et al.*, 21 Civ. 6995 (S.D.N.Y.).

55. My investigation, which was full and complete and utilized the services of my financial and legal professionals at B. Riley Advisory Services and King & Spalding LLP, respectively, lasted approximately six (6) months, included a review of the documents and records of the Receivership Entities (including records held by counsel for the Receivership Entities), and multiple interviews of individuals involved with, and employed by, the Receivership Entities at the time the alleged counterclaims accrued. The results of this investigation led me to conclude that the documents, information, and key interviews my team and I conducted did not support key allegations in the counterclaims asserted by the Receivership Entities against the Defendants and, therefore, the allegations could not be substantiated. *See* Declaration of M. Fuqua, dated May 20, 2022 (Doc. 244-1). In fact, my investigation uncovered evidence that contradicts the allegations in the counterclaims. As a result, I previously dismissed the counterclaims against the Defendants without prejudice. *See* Doc. 244. Based on my investigation, and to allow the Sale Transaction to proceed, the release of all claims against the Defendants is justified and in the best interests of the Receivership Entities.

**FURTHER EXTENSION OF THE RECEIVERSHIP STAY IS WARRANTED**

56. The stay provided in paragraph 4 of the Receivership Order (*see* Doc. 117, ¶ 4) (the "Receivership Stay") should be extended until fourteen (14) days after the later of the Closing Date or governmental approval of the transfers of the FCC License and the NOAA License to Buyer.

57. The proposed extension of the Receivership Stay will, among other things, enable the orderly Closing of the Sale Transaction and transfer of the FCC License and NOAA License to the Buyer. In addition, the extension of the Receivership Stay will afford me time to prepare and file a final accounting.

**CONCLUSION**

58. Based on the foregoing, I believe that the Purchase Agreement represents the highest and best offer for the Receivership Assets. I therefore respectfully request that the Court enter the Approval Order, thereby approving the Purchase Agreement with the Buyer on the terms set forth therein, and grant such other relief as is appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 12, 2023

By: */s/ Michael Fuqua*
Michael Fuqua, as Receiver for
Theia Group, Inc., Theia Aviation LLC,
and Theia Holdings A, Inc.