UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

FCS ADVISORS, LLC,

                     Plaintiff,


         --against--                              21 Civ. 6995 (PKC)


THEIA GROUP, INC., d/b/a "THORIAN GROUP"
and/or "CYPHERIAN"; THEIA AVIATION, LL;
and THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS,"

                     Defendants.


_____

**MEMORANDUM OF LAW IN SUPPORT OF (A) RESPONSE OF PJT PARTNERS LP
TO RECEIVER'S SALE MOTION AND REQUEST FOR RELATED RELIEF AND
(B) MOTION TO SURCHARGE COLLATERAL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

ARGUMENT ....................................................................................................................... 13

1.      FCS should be surcharged PJT's Transaction Fee ........................................ 13

2.      The Receiver should not be permitted to modify the Bidding Procedures in this way .................................................................................................................. 16

REQUESTED RELIEF ........................................................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*Atlantic Trust Co. v. Chapman*,
  208 U.S. 360 (1908) .............................................................................................. 13, 14

*In re Computer Systems*,
  446 B.R. 837 (Bankr. N.D. Oh. 2011) .......................................................................... 14

*Corporate Assets, Inc. v. Paloian*,
  368 F.3d 761 (7th Cir. 2004) ........................................................................................ 17

*In re Dalton Crane LC*,
  641 B.R. 850 (Bankr. S.D. Tex. 2022) .......................................................................... 15

*In re Financial News Network, Inc.*,
  980 F.2d 165 (2d Cir. 1992) .................................................................................... 16, 17

*First Services Group, Inc. v. O'Connell* (*In re Ceron*),
  412 B.R. 41 (E.D.N.Y. 2009) ........................................................................................ 14

*In re Flagstaff Foodservice Corp.*,
  739 F.2d 73 (2d Cir. 1984) ............................................................................................ 14

*In re Flagstaff Foodservice Corp.*,
  762 F.2d 10 (2d Cir. 1985) ............................................................................................ 14

*Gaskill v. Gordon*,
  27 F.3d 248 (7th Cir. 1994) ..................................................................................... 13, 14

*Holsinger v. Hanrahan* (*In re Mielli*),
  Bankr. No. 09-01500, Adv. No. 10-09043,
  2010 Bankr. LEXIS 3540 (Bankr. N.D. Iowa July 9, 2010),
  *aff'd*, 439 B.R. 704 (B.A.P. 8th Cir. 2010) .................................................................. 14

*KeyBank N.A. v. Monolith Solar Assocs., LLC*,
  No. 1:19-CV-1562, 2022 U.S. Dist. LEXIS 240828
  (N.D.N.Y. May 23, 2022) ............................................................................................. 13

*SEC v. Elliott*,
  953 F.2d 1560 (11th Cir. 1992) .............................................................................. 13, 14

*Three Twenty-One Capital Partners, LLC v. U.S.A. Dawgs, Inc.*,
  No. 2:18-cv-01724-APG, 2019 U.S. Dist. LEXIS 167544
  (D. Nev. Sept. 27, 2019) ............................................................................................... 15

*In re Tollenaar Holsteins*,
    538 B.R. 830 (Bankr. E.D. Cal. 2015)...........................................................................14

## STATUTES & RULES

11 U.S.C. § 506(c) ......................................................................................................... 13, 14

Fed. R. Civ. P. 66...............................................................................................................13

## OTHER AUTHORITIES

Steven R. Gross et al., *Collier Business Workout Guide* ¶ 7.05 (2023).......................................17

## PRELIMINARY STATEMENT

PJT Partners LP ("PJT"), is the investment banker for the receiver herein, Michael Fuqua (the "Receiver"). As detailed in the Receiver's declaration [Dkt. 367] ("Receiver Declaration") in support of his *Motion for Entry of an Order (I) Authorizing and Approving (A) The Sale of Substantially All of the Receivership Entities' Assets, Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests and (B) the Asset Purchase Agreement with LTS Systems, LLC; (II) Further Extending the Receivership Stay; and (III) Granting Related Relief* [Dkt. 365] (the "Sale Motion"), the Receiver directed PJT "to run a marketing and sale process for the Receivership Assets." Receiver Decl. ¶ 5. PJT's marketing process was conducted twice, the second time following entry of the Court's Order (the "Bidding Procedures Order") [Dkt. 363] approving bidding procedures (the "Bidding Procedures") and ending in the proposed transaction that is the subject of the Sale Motion. *Id.* ¶¶ 7-10.

The Sale Motion and Receiver Declaration detail PJT's extensive work and the Receiver's satisfaction with it. The Receiver describes PJT as "a leading global investment banking firm with a dedicated team focused on the aerospace and satellite industry across the finance, business development, and engineering sectors" as well as being "an industry leader in advising companies and creditors in all aspects of complex restructurings and special situations." *Id.* ¶ 14. The Receiver also states that "[d]espite the limited access to pre-receivership information and systems, the lack of any employees of the Receivership Entities, and the fact that the Receivership Entities have no current operations, PJT was able to deliver a marketing presentation and supporting diligence materials to prospective buyers and used appropriate methods to market the assets," *id.* ¶ 18, and that he asked PJT to conduct a second sale process after his negotiations with a prospective buyer fell through, such that "PJT and I expended considerable time, energy and resources engaging with potential bidders and other parties for

nearly eighteen (18) months" that "afford[ed] the Receivership Entities a fulsome opportunity to maximize the value of the Receivership Assets." *Id.* ¶ 30.

PJT agrees with all of these statements by the Receiver.

What the Sale Motion does not state, though – except implicitly in a list of Assumed Liabilities attached as Schedule 1.01(i) to the proposed Asset Purchase Agreement that is an exhibit to the Motion, as well as that Agreement's definition of "Excluded Liabilities" – is now, after PJT has done its work (including review and comments on a proposed declaration to be provided by PJT in support of the sale, the bulk of which appears in essentially the same form in the Receiver Declaration), the Receiver and the credit bidder propose to pay PJT none of the remaining $1.5 million of the $2 million minimum transaction fee that was provided in the Bidding Procedures to be paid to PJT in connection with the proposed credit bid or any of its expenses provided for in its Engagement Letter.

The Sale Motion does not explain why it is now proposed that PJT not be paid. Possibly the Receiver bowed to pressure from the primary lender/credit bidder.[1] Or he may not want to share available consideration under the Asset Purchase Agreement that is now proposed to be paid only to the Receiver, his firm and his other professionals, who, it appears, will be paid in full from such consideration and other assets in the receivership estate. Given PJT's rights to payment under the Bidding Procedures as approved by the Bidding Procedures Order and, separately, equitable principles governing the compensation of receivership professionals, the

---

[1]   As set forth in paragraph 6 of the Declaration of Mark Dunseath, dated August 13, 2023, filed in support of the Sale Motion [Dkt. 368], the proposed buyer, LTS Holdco, LLC (the "Credit Bidder") "acquired $40 million of the obligations and debt owed by the Receivership Entities to [FCS Advisors, LLC]" ("FCS"), which covers the Credit Bid portion of the purchase price that, "together with certain cash and the Assumed Liabilities, constitutes the Purchase Price as set forth in the Purchase Agreement." The Credit Bidder is an acquisition vehicle for FCS, which is the Credit Bidder's designee for notice, through its counsel, as stated in section 7.04 of the Purchase Agreement, and is referred to herein interchangeably with FCS.

reason ultimately does not matter much: PJT is entitled to be paid for its work, and it files this response to ensure that occurs before the proposed "free and clear" sale moves forward and the Court effectively loses its jurisdiction over this matter.

To be clear, PJT does not seek to block the proposed sale; it just wants the sale to conform, as the Sale Motion inaccurately states it does by calling it a "Qualified Bid," to the Bidding Procedures' provision for payment of PJT's transaction fee in the event of a credit bid. (Indeed, understanding the condition of the receivership estate and everyone's desire to conclude the sale process, PJT was amenable to a somewhat reduced fee if it was paid in the same manner and proportion as the Receiver and his other professionals, but unfortunately such a settlement could not be achieved.[2])

## STATEMENT OF FACTS

By Opinion and Order dated October 29, 2021 [Dkt. 105], the Court granted FCS' motion for appointment of a receiver, and by Order dated November 8, 2021 [Dkt. 117] ("Appointment Order") appointed the Receiver, to, among other things, "take all steps necessary to effectuate a transfer or sale of the [receivership estate's] assets." Appointment Order ¶ 6. In fact, the Receiver viewed this task as "his primary directive and goal." Receiver Decl. ¶ 5. The Receiver also was authorized to "retain professionals ('Retained Personnel') to assist him in carrying out the duties and responsibilities of the Court's Order on terms the Receiver determines to be reasonable in his discretion." Appointment Order ¶ 11. The Appointment Order further provided, "The Receiver and Retained Personnel are entitled to reasonable compensation from the Receivership Entities for the performance of duties pursuant to this Order and for the cost of actual and reasonable out-of-pocket expenses incurred by them for those services authorized by this Order that when

---

[2]    PJT does not provide this information as evidence on the merits.

rendered were (1) reasonably likely to benefit the receivership estate or (2) necessary to the administration of the estate." *Id.*

The Receiver promptly retained PJT to perform a marketing and sale process. He did so after interviewing four investment banking firms and concluding that PJT's fee structure and expense reimbursement were negotiated at arms-length and in good faith. *Declaration of Michael Fuqua in Support of Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker*, dated December 28, 2021 [Dkt. 155] ¶ 7. The Court approved PJT's retention by Order dated February 16, 2022 [Dkt. 207]. That Order provided for the payment to PJT of (x) a $500,000 work fee, which has been paid, and (y) the Transaction Fee under the terms of PJT's engagement letter (the "Engagement Letter"), *id.* ¶ 5, a copy of which was appended as an exhibit to PJT's retention application [Dkt. 152]. The Engagement Letter provides that, PJT's Transaction Fee would be paid, after crediting the work fee, in cash at the closing of the applicable Transaction "directly and solely out of the gross proceeds of the Transaction" as calculated under the formula set forth therein, which includes debt "assumed" or "paid" or "retired" by the Transaction, with a minimum Transaction Fee of $2 million. *Id.* at. 2-3.

As described in the Receiver Declaration, PJT then began its "thorough marketing and sale process for the Receivership Assets," Receiver Decl. ¶ 5, preparing a marketing presentation and supporting diligence materials, *id.* ¶ 18, reaching out to fifty-seven potential purchasers, *id.* ¶ 19, and distributing a teaser and form of confidentiality agreement that eleven prospective buyers returned and executed. *Id.* ¶ 20. Those parties then obtained access to the virtual data room established by PJT which – notwithstanding the difficulties faced by PJT in the absence of any ongoing business or employees of the receivership entities and the poor condition of information about the entities and their assets pre-receivership – contained a marketing presentation and other

information pertinent to potential purchasers' evaluation of the assets. *Id.* ¶¶ 18, 20. PJT also responded to follow-up requests and provided supplemental disclosures where appropriate. *Id.* ¶ 20.

In connection with this 2022 sale process run by PJT, three parties submitted non-binding expressions of interest ("EOIs") in the amounts of $1 million, $10 million, and $300 million, respectively. The $300 million EOI was contingent on the potential purchaser's financing, and, after multiple weeks of unanswered follow-up requests from PJT, significant doubts arose over whether the required financing would be obtained.

Around this time, a separate interested party, Rising Sky, LLC ("Rising Sky") held discussions with the Receiver and certain creditors including FCS about a potential offer to acquire the Receivership Assets. PJT was not asked to participate in these discussions. Following approximately nine months of negotiations outside of the sale process, on January 17, 2023 Rising Sky and the Receiver entered into an *Asset Purchase Agreement* dated as of January 17, 2023 (the "Rising Sky APA") by and among Theia Group, Inc., Theia Aviation, Theia Holdings, as sellers, and Rising Sky, as buyer. *See* Dkt. 318; Dkt. 320. The Rising Sky APA provided for a transaction that was on its face economically superior to the prior EOIs (as the purchase price was approximately $804 million consisting of $175 million in cash and a credit bid of approximately $629 million, contingent on Rising Sky's purchase of certain claims).

However, after Rising Sky was unable or unwilling to fund its $40 million deposit by the March 31, 2023 deadline therefor, the Receiver asked PJT to conduct a second sale process (i.e., Round 2). Receiver Decl. ¶ 24.

Given the results of outreach to third-party buyers during the 2022, Round 1 sale process conducted by PJT and the Receiver's several months of negotiations with Rising Sky, it was

anticipated, perhaps likely, that the ultimate buyer of the receivership assets would be a credit bidder in some form or another. (Indeed, the Bidding Procedures Order that was eventually entered to address Round 2 contained provisions addressing possible credit bids by FCS and another, junior lienholder,[3] and the Bidding Procedures contained a separate section on the "Right to Credit Bid," Bidding Procedures at 9-10, as well as several other provisions addressing acceptable terms of credit bids that specifically address FCS' right to credit bid, which apparently the Receiver negotiated with FCS. *Id.* at 5-6.)

Before commencing Round 2, PJT was concerned, as undoubtedly were the Receiver and his other professionals, that the cash portion of a credit bid in Round 2, unlike the Rising Sky APA's cash portion, might not satisfy the receivership's administrative costs, including PJT's minimum Transaction Fee. *Declaration of Michael Schlappig in support of (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral*, dated August 28, 2023 (the "Schlappig Declaration") ¶ 8. The proposed Bidding Procedures provided to PJT by the Receiver's counsel resolved this concern by setting forth procedures generally for all Qualified Bids that required cash consideration to cover expenses of the administration of the receivership, including payment of PJT's Transaction Fee, as well as a specific proviso for payment of cash consideration sufficient to pay PJT's minimum Transaction Fee of $2 million in the event of a credit bid (whether by FCS or another creditor). Schlappig Decl. ¶ 8. While PJT believed that the language of the proposed Bidding Procedures, even without this proviso specifically related to PJT's minimum Transaction Fee, required any

---

[3]  Paragraphs 4 and 5 of the Bidding Procedures Order stated that "[f]or purposes of the Bidding Procedures," each of FCS and Aithre were deemed to have valid, perfected liens on all of the assets of the receivership estates in the amount and priority respectively stated and "shall be entitled to Credit Bid up to the full amount of its debt."

Qualified Bid to pay cash sufficient to cover all costs of the administration of the receivership including PJT's Transaction Fee, PJT viewed the addition of the proviso as extra protection.

Without that certainty, PJT would have had serious reservations about proceeding with Round 2 of the sale process after more than a year of work. Schlappig Decl. ¶ 8.

The Bidding Procedures provide in section II, detailing the required form and content of Qualified Bids, that

> (c)    The Purchase Price **must include sufficient cash consideration to provide for payment in full of** (i) to the extent not otherwise paid or satisfied, any outstanding amounts on account of the financing approved pursuant to the Court's (a) *Order Authorizing Receiver to Obtain Receivership Financing from FCS Advisors, LLC (Doc. 206) entered on February 16, 2022 and (b) Order (I) Authorizing Receiver to Enter Certain First Amendment to Receiver's Certificate Purchase and Security Agreement With FCS Advisors, LLC and (II) Granting Related Relief (Doc. 329) entered on March 22, 2023* (together the 'Financing Orders') and (ii) **all costs of administration of the Receivership Estates, including, without limitation, any transaction fee payable to PJT Partners LP ('PJT') in accordance with the Court's** *Order Granting Motion of Receiver for an Order Authorizing Retention of PJT Partners LP as Investment Banker* **(Doc. 207), entered on February 16, 2022 (the 'PJT Retention Order') and such fee, the 'Transaction Fee')** and any taxes incurred by the Receivership Estates in, or as a result of, consummating the Sale; *provided, however*, that any Credit Bid shall also include, in addition to the foregoing, cash consideration sufficient to pay in full, and earmarked exclusively for the payment of, all claims for which there are valid, perfected, and unavoidable liens on any Assets included in such Bid that are senior in priority to those of the party seeking to Credit Bid (unless such senior lien holder consents to alternative treatment; *provided further, however*, **that solely with respect to the Transaction Fee, any Credit Bid shall include cash consideration sufficient to pay only the minimum Transaction Fee payable pursuant to that certain** *Engagement Letter*, **dated as of December 28, 2021, by and between PJT and the Receiver, a copy of which is attached as Exhibit 1 to the PJT Retention Order.**

(Emphasis added.)[4] This provision ensures that, among the receivership's other administration costs, PJT would be paid at least its $2 million minimum Transaction Fee ($1.5 million after

---

[4]    This provision continues by stating that FCS has the right to waive payment of amounts referred to above that are due to FCS, but that if it makes a credit bid it "shall still be required to provide the required cash

*(cont'd)*

crediting the work fee) in the event of a successful credit bid that would not otherwise generate sufficient additional cash proceeds to pay such fees. Schlappig Decl. ¶ 8. Moreover, to alleviate PJT's concern that this provision fixed the amount of PJT's Transaction Fee with respect to *any* Transaction Value that had a credit bid component (for example, even if a credit bid contained, as had the Rising Sky APA, significantly more than the minimum prescribed cash component), the Receiver's counsel represented to Mr. Schlappig on the same day that the Bidding Procedures motion was filed (June 16, 2023) that PJT would receive "at least" the $2 million Transaction Fee in the event of a winning credit bid, with any increase in that fee to be decided at a later time. *Id.* ¶ 11 and Exhibit 1 (transcript) attached to the Schlappig Declaration. A credit bid that does not satisfy those terms, contrary to the Sale Motion's assertion that the proposed Credit Bid is a Qualified Bid, therefore is not a Qualified Bid under the Bidding Procedures, and it was on those terms that PJT proceeded with Round 2 of its marketing process. *Id.*

The following footnote appears at the end of Bidding Procedures § II(c) quoted above: "For the avoidance of doubt, the Receiver, PJT, any entity making a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest reserve all rights with respect to the Transaction Fee due to PJT in connection with a Credit Bid." *Id.* It is possible that either the Receiver or FCS will argue that what they agreed to in the text quoted in the prior paragraph can be taken away by this footnote. But what does it mean to reserve rights in the face of a provision aimed at requiring a minimum cash payment? Surely not that the provision is meaningless, forcing one back to the status quo ante.

---

consideration necessary to pay amounts due under the Financing Orders and the costs of administration of the Receivership Estates" and then sets the amount and priority of FCS' valid and perfected lien. *Id.*

As set forth in the Schlappig Declaration, the actual purpose of the footnote was to preserve PJT's arguments, and arguments in response, that if a Qualified Credit Bid also contained additional consideration other than a pure credit bid and the minimum cash requirement (such as the prior Rising Sky APA did), or was materially increased because of third-party bidding, PJT could seek to be paid more than its $2 million floor. *Id.* ¶ 9. This fact is supported not only by the voicemail from the Receiver's counsel quoted above but also by Exhibit 2 to the Schlappig Declaration, consisting of a chart listing the minimum cash bid requirements for the Assets in a credit bid. Exhibit 2 was prepared by the Receiver's counsel and circulated to PJT and counsel for FCS after the Receiver's Bidding Procedures motion was filed and before the bid deadline. *Id.* ¶ 12. It clearly shows that the required minimum cash proceeds would include payment of the remaining $1.5 million of PJT's $2 million credit bid Transaction Fee, but it also treats this sum as a floor, describing this amount as the "Minimum" PJT Transaction Fee and noting that the total required cash component could be "**Plus any Additional PJT Transaction Fee**, Capital Gains/Income Tax, and/or Personal Property Tax due" (emphasis added), with a reservation of the Receiver's right to modify the above amounts.

On June 16, 2023, the Receiver filed a motion requesting that the Court approve the Bidding Procedures and a timeline for Round 2 of the sale process [Dkt. 357]. The Court granted the requested relief, which was unopposed, in the Bidding Procedures Order, approving the Bidding Procedures without change on June 30, 2023. The Bidding Procedures were attached as Exhibit 1 to the Bidding Procedures Order, which provided in decretal paragraph 3 that the Bidding Procedures "shall govern the Bids and proceedings related to the sale of the Assets and the Auction."

As described in the Schlappig Declaration, and consistent with the Receiver Declaration, after the Court's approval of the Bidding Procedures, and in furtherance of Round 2 of its sale process, PJT renewed its outreach to potentially interested parties, including re-contacting potential bidders from Round 1, sending periodic emails with updates on the process, fielding calls from various interested parties, and posting updates and additions to the data room. In all, PJT contacted 53 potentially interested parties on behalf of the Receiver, 50 of which had been contacted in 2022 during Round 1. Schlappig Decl. ¶ 13. One new party executed a confidentiality agreement and was granted access to the virtual data room. In addition, one party under an NDA from the 2022 Round 1 process was also granted access to the virtual data room. Following PJT's second round of outreach to potentially interested parties, the Receiver ultimately received two bids by the Bid Deadline (as extended by one day for FCS). The first bidder ("Bidder #1") submitted a $20.5 million bid solely for aircraft owned by the Receivership Entities. The Receiver determined that it was not a Qualified Bid under the terms of the Bidding Procedures. The second bid was the credit bid from FCS for substantially all the assets of the Receivership Entities. Receiver Decl. ¶¶ 8-9; Schlappig Decl. ¶ 14.

As noted, contrary to the Bidding Procedures and Bidding Procedures Order, the FCS bid does not provide for payment of PJT's Transaction Fee as required by the Bidding Procedures. Nonetheless, the Receiver now contends that it is a Qualified Bid, Receiver Declaration ¶ 9, and seeks such a finding from the Court, as well as a declaration that the sale shall be free and clear of all claims with the exception of Assumed Liabilities, which under the Asset Purchase

Agreement primarily comprise the fees and expenses of the Receiver, his firm and his other professionals, but not PJT.[5]

Also as noted, the Sale Motion and accompanying Receiver Declaration do not give a reason for this decision, leaving PJT and ultimately the Court to speculate on the Receiver's basis for taking it.

The Bidding Procedures state that "the Receiver reserves the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any noncompliance with such requirements," Bidding Procedures at 9, and provides, "Nothing in these Bidding Procedures will require the Receiver to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, that would violate his fiduciary duties." *Id.* at 16-17. Moreover, Section III of the Bidding Procedures, governing the right to Credit Bid at the Auction, requires cash payment of "the additional amount that the Receiver deems necessary to pay the costs and expenses of administering the Receivership." *Id.* at 9-10.

Perhaps, the Receiver relies on one of these provisions to deprive PJT of its minimum Transaction Fee in the event of a credit bid otherwise specifically provided for as discussed above after PJT has completed its work. But, in any event, the Receiver's judgment, if he were to

---

[5]     Payment of the Receiver and his other professionals would appear to be provided for in full. From (a) the Orders approving the award and payment of compensation to the Receiver, his firm and his primary counsel, (b) the Schedule of Assumed Liabilities appearing as Schedule 1.01(i) to the Asset Purchase Agreement, and (c) Exhibit 2 to the Schlappig Declaration, as well as (d) PJT's understanding of the Receivership Entities' current cash position, it appears that the Receiver, his firm and his primary counsel have been paid $4,044,361.65 in the aggregate, that they and other professionals (excluding PJT) will be paid up to an additional aggregate $1,550,000 under the Asset Purchase Agreement, and that such payments would eventually constitute payment in full to all such parties. On the other hand, if the Sale Motion is granted, PJT will have been paid only 25% of its $2 million fee.

invoke such provisions, must be supported by a valid reason, not simply because the Receiver "deems" such expense unnecessary.[6]

As discussed below, such reasons must be especially strong to justify changing court-approved bidding procedures. For such procedures to be taken seriously by parties in interest and prospective bidders, a seller's exercise of discretion to vary them must be limited because of the tightrope a court walks between a predictable, fair and orderly sale process and the opportunistic maximization of value for all.

Importantly here, the Receiver would be invoking such provisions in the face of FCS' at least implied consent to PJT's Transaction Fee in the event of a credit bid, memorialized not only by the circumstances detailed above but also by the following provision of the Bidding Procedures: "**Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder **is agreeing to (a) abide by and honor the terms of these Bidding Procedures**. . . . Notwithstanding the foregoing, nothing in these Bidding Procedures shall require FCS to serve as a Back-Up Bidder." Bidding Procedures at 8 (emphasis added). That agreement is further enforced by paragraph 3 of the Bidding Procedures Order, which in addition to approving the Bidding Procedures states that they "shall govern the Bids and proceedings related to the sale of the Assets and the Auction." Giving the Receiver a free pass to waive PJT's compensation in the event of a credit bid therefore would be tantamount to rendering the Bidding Procedures, and future bidding procedures, meaningless for no real gain – and in fact a loss – to the Receivership Estates.

---

[6]   Again, the Receiver Declaration describes and commends PJT's extensive work, for which PJT was agreed a minimum Transaction Fee and expense reimbursement.

## ARGUMENT

**1.    FCS should be surcharged PJT's Transaction Fee.**

It has long been recognized that the mere inadequacy of the property under a receiver's control to meet administrative expenses in itself does not warrant surcharging the secured creditor who invoked the petition. *See Atlantic Tr. Co. v. Chapman*, 208 U.S. 360, 375-76 (1908). On the other hand, consistent with historical federal practice, as recognized by Fed. R. Civ. P. 66, "the district court has the authority to impose a lien on property in a receivership to satisfy the receivership expenses. Receivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership." *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994); *accord SEC v. Elliott*, 953 F.2d 1560, 1576-77 (11th Cir. 1992); *see also KeyBank N.A. v. Monolith Solar Assocs., LLC*, No. 1:19-CV-1562, 2022 U.S. Dist. LEXIS 240828, at *7 (N.D.N.Y. May 23, 2022) ("'[I]n accordance with justice,' courts overseeing equitable receiverships have 'broad discretion' to 'apportion the costs among the various parties.'" (citation omitted)).

Based on the receivership court's equitable jurisdiction, this power is broader than the Bankruptcy Code's statutory surcharge provision, 11 U.S.C. § 506(c), but receivership courts look to that stricter provision and the caselaw applying it for some guidance when considering whether collateral should be surcharged. *See KeyBank N.A.*, 2022 U.S. Dist. LEXIS 240828, at *10-13.

The surcharge requirements under each regime are generally similar: a surcharge of a creditor's collateral is appropriate if the receiver/bankruptcy trustee's acts, including through his professionals, benefitted the collateral or if the creditor consented to the act or expense, although Bankruptcy Code § 506(c) has been interpreted to require a primary and direct benefit to the creditor in the absence of consent and to rule out mere acquiescence in the trustee's disposition

of the collateral, recognizing only express or implied consent. *See KeyBank N.A.*, 2022 U.S. Dist. LEXIS 240828, at \*11; *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985); *In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76-77 (2d Cir. 1984). On the other hand, the receivership caselaw permits more discretion in recognizing benefits to the secured creditor and, in addition to express or implied consent, the creditor's acquiescence in the receiver's actions as a basis for imposing a surcharge. *See KeyBank N.A.*, 2022 U.S. Dist. LEXIS 240828, at \*16-17 (citing *Gaskill*, 27 F.3d at 251; *Elliott*, 953 F.2d at 1576-77); *see also Atlantic Tr.*, 208 U.S. at 375-76 (qualifying its general rule of not charging the collateral merely because the receivership's unencumbered assets were insufficient to situations where the secured creditor did not take "any improper advantage").

As noted, even under Bankruptcy Code § 506(c), the secured creditor's consent to expenses may be implied if the creditor's conduct arose to more than simple cooperation with the trustee. *First Servs. Group, Inc. v. O'Connell* (*In re Ceron*), 421 B.R. 41, 51-2, (E.D.N.Y. 2009), and the cases cited therein; *see also In re Tollenaar Holsteins*, 538 B.R. 830, 842 (Bankr. E.D. Cal. 2015). *Cf. In re Computer Sys.*, 446 B.R. 837, 842 (Bankr. N.D. Ohio 2011) (no consent found because no consent to fee in retention order and no express carve out in cash collateral order or anywhere else: "There is simply no reference in any pleading with this Court, or document attached in support of such pleading, that indicates that [the secured creditor] would pay the Transaction Fee.").

Under Section 506(c), a secured creditor that makes a credit bid may be surcharged based on (a) consent, *see Holsinger v. Hanrahan* (*In re Mielli*), Bankr. No. 09-01500, Adv. No. 10-09043, 2010 Bankr. LEXIS 3540, at \*8 (Bankr. N.D. Iowa July 9, 2010) (agreed Section 506(c) surcharge in connection with credit bid), *aff'd*, 439 B.R. 704 (B.A.P. 8th Cir. 2010); *cf. Three*

*Twenty-One Cap. Partners, LLC v. U.S.A. Dawgs, Inc.*, No. 2:18-cv-01724-APG, 2019 U.S. Dist. LEXIS 167544, at *5 (D. Nev. Sept. 27, 2019) (no consent where creditor objected to broker's employment when it first sought to credit bid "and continuously objected throughout the proceedings"), or (b) the provision of a benefit to the creditor. *See In re Dalton Crane, L.C.*, 641 B.R. 850, 863-66 & nn.84-85 (Bankr. S.D. Tex. 2022) and the cases cited therein (recognizing propriety of broker's surcharge in the context of a credit bid, such as in establishing a value for the sale through a fair sale process).

As discussed above, FCS as a prospective credit bidder well knew of the requirement to pay cash consideration for PJT's services in connection with making its credit bid, and under the terms of the Bidding Procedures agreed to "abide by and honor" that requirement as it did all of the Bidding Procedures. It was also bound by the Bidding Procedures Order, which provided that the Bidding Procedures "shall govern the Bids and proceedings relating to the sale of the Assets and the Auction." Based on FCS' fingerprints on the Bidding Procedures, as well as the transmittal to its counsel of Exhibit 2 to the Schlappig Declaration, there also is little doubt that FCS understood that PJT's $2 million Transaction Fee in the event of a credit bid was a minimum fee not subject to renegotiation.

FCS also clearly sought and benefited from PJT's entire sale process, which resulted in a data room and marketing materials derived almost from scratch, and a thorough identification of possible third-party buyers and marketing, twice, of the assets, all of which set the context for FCS' proposed purchase as being in good faith and for fair value. Moreover, it can be reasonably assumed that those efforts will materially benefit FCS in ultimately monetizing what it is

buying.[7] Under those circumstances FCS should be charged PJT's minimum Transaction Fee of the net amount of $1.5 million.

Not to award PJT this surcharge therefore would be inequitable. While PJT, like other investment banks (and law firms, for that matter), does not readily come to mind as a beneficiary of equity, there is a significant equitable principle at stake here: professionals who are qualified to perform these types of engagements do so on the assumption that they will be paid in accordance with the terms approved by the court. If other parties thwart those expectations by changing the rules, advisors will be less likely to seek such work to the detriment of those who would want to hire them.

**2.      The Receiver should not be permitted to modify the Bidding Procedures in this way.**

As noted above, although the Sale Motion does not attempt to do so, the Receiver may nevertheless respond that various provisions of the Bidding Procedures could permit him to waive PJT's minimum credit bid Transaction Fee set forth in those Procedures. Such a modification, or "deeming" of what is and is not a necessary expense of administration should not be permitted under these facts, however.

Reservations of the seller's rights to modify bidding procedures are fairly common and under the right facts beneficial to the estate if the reason for the change is to clarify uncertainty in the conduct of the sale or, at least in some cases, materially maximize the sale price. But ensuring that parties in interest and bidders can rely on court-approved sale procedures is at least an equally important means to maximize the sale price. As stated in *In re Financial News Network, Inc.*, 980 F.2d 165 (2d Cir. 1992), a court "walks a tightrope between, on the one hand,

---

[7]      FCS was entitled to be fully informed of the PJT sale process, and PJT believes that it in fact availed itself of that right..

providing an orderly bidding process, recognizing the danger that absent such a fixed and fair process bidders may decline to participate in the auction; and, on the other hand, retaining the liberty to respond to differing circumstances so as to obtain the greatest return for the . . . estate." *Id.* at 166. There, as in most of the reported decisions where a court was asked to modify bidding procedures, the Second Circuit based its analysis on whether the procedures themselves were confusing under the facts and whether, in addition, modifying the procedures would lead to a substantially improved price. *See id.* at 170; *see also Corporate Assets, Inc. v. Paloian*, 368 F.3d 761, 770-73 (7th Cir. 2004) (trustee's invocation of modification right in bidding procedures upheld where (a) the auction had not proceeded on an entirely level playing field, notwithstanding the bidding procedures, and (b) the modification offered significantly more money to the estate).

*Financial News Network*, *Corporate Assets* and most of the other cases on the modification of sale procedures deal with attempts to reopen an arguably closed auction to accommodate a later bid, *see* Steven R. Gross et al., *Collier Business Workout Guide* ¶ 7.05[3][c][iii] & nn.24-25 (2023) (citing, inter alia, *Financial News Network* and *Corporate Assets*), but their logic applies to other proposed changes to such procedures, each of which should balance alleged improvements deriving from the change against undercutting reasonable expectations that the procedures will be followed. As the Seventh Circuit observed, the "court's discretion to reopen the bidding in pursuit of estate maximization diminishes as the sale comes closer to becoming a fait accompli and the expectations of the participants solidify." *Corporate Assets*, 368 F.3d at 768. Here, PJT's expectations were at their final stage, PJT's work having been done and a bidder chosen, before PJT's treatment under the Bidding Procedures was changed. Moreover, there was no confusion under the Bidding Procedures as to PJT's minimum

Transaction Fee in respect of a credit bid and no material improvement for the estate based on the change that the Receiver has made; indeed, the estate is diminished by the Receiver's not insisting that FCS be surcharged what it at least implicitly agreed to pay. FCS should not be permitted to escape what it had agreed to "abide and honor."

## **REQUESTED RELIEF**

PJT therefore requests that the Court, in addition to granting any other relief that is just and proper, enter an order granting the Sale Motion with the imposition of a surcharge on FCS' collateral in the amount of PJT's minimum Transaction Fee in the case of a credit bid ($1.5 million, after crediting the work fee), plus PJT's reasonable unpaid professional fees and expenses,[8] to be paid by FCS' acquisition vehicle.

Dated: August 28, 2023
      New York, New York

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Robert D. Drain*
Robert D. Drain
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Fax: (212) 735-2000
Email: Robert.Drain@skadden.com

-and-

Jacqueline M. Dakin (*pro hac vice* motion forthcoming)
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001
Email: Jacqueline.Dakin@skadden.com

*Counsel for PJT Partners LP*

---

[8]    Expense reimbursement of the PJT's reasonable expenses, including the reasonable fees and expenses of PJT's counsel is expressly provided for in paragraph (iii) of the Engagement Letter. Engagement Letter at 4.