UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, LLC,

                          Plaintiff,

—*against*—

THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN";

THEIA AVIATION, LLC; and

THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"

                          Defendants.

21 Civ. 6995 (KPC)

**FCS ADVISORS, LLC'S MEMORANDUM OF LAW IN
OPPOSITION TO PJT PARTNERS LP'S
<u>MOTION TO SURCHARGE COLLATERAL</u>**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

    FCS Loan and Receivership............................................................................................ 3

    PJT's Engagement ......................................................................................................... 4

    PJT Fails to Find a Buyer............................................................................................... 5

    PJT's Motion................................................................................................................. 7

ARGUMENT.........................................................................................................................7

    I.      PJT IS Not Entitled to a Surcharge ...................................................................... 8

            A.      Standards for a Surcharge .......................................................................... 8

            B.      PJT Lacks Standing for a Surcharge .......................................................... 9

            C.      PJT's Services Did Not Provide a Direct Benefit to FCS.......................... 10

            D.      FCS Did Not Consent to Payment of the Transaction Fee ....................... 12

    II.     PJT Cannot Alter the Terms of Its Engagement .................................................. 14

CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Atlantic Trust Co. v. Chapman*,
   208 U.S. 360 (1908) .................................................................................................. 8

*City of Troy v. Capital District Sports*,
   759 N.Y.S.2d 795 (N.Y. App. Div. 3d Dep't 2003) ......................................................... 14

*Gaskill v. Gordon*,
   27 F.3d 248 (7th Cir. 1994) ...................................................................................... 10

*Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A.*,
   530 U.S. 1 (2000) .................................................................................................... 9

*In re Debbie Reynolds Hotel & Casino, Inc.*,
   255 F.3d 1061 (9th Cir. 2001) .................................................................................... 9

*In re Flagstaff Foodservice Corp.*,
   739 F.2d 73 (2d Cir. 1984) ............................................................................... 8, 11, 12

*In re Flagstaff Foodservice Corp.*,
   762 F.2d 10, 12 (2d Cir. 1985) ............................................................................. 10, 12

*In re Jenson*,
   980 F.2d 1254 (9th Cir. 1992) .................................................................................... 9

*In re JKJ Chevrolet, Inc.*,
   26 F.3d 481 (4th Cir. 1994) ...................................................................................... 10

*In re K & L Lakeland, Inc.*,
   128 F.3d 203 (4th Cir. 1997) ...................................................................................... 9

*In re Ketterer,*
   No. 09–15218 ELF, 2009 WL 3053710 (Bankr. E.D. Pa. Sept.18, 2009) ......................... 14

*In re Seapharm, Inc.,*
   126 B.R. 447 (Bankr. D.N.J. 1991) ............................................................................. 14

*KeyBank National Association v. Monolith Solar Associates LLC*,
   1:19-CV-1562, 2022 WL 19335877 (N.D.N.Y. May 23, 2022) ......................................... 9

*Kulhawik v. Holder*,
   571 F.3d 296 (2d Cir. 2009) ...................................................................................... 12

*MW Capital Funding, Inc. v. Magnum Health and Rehab of Monroe LLC*,
  Case No. 16-14459, 2019 WL 3451221 (E.D. Mich. July 31, 2019) ................................ 8

*SEC v. BIC Real Estate Development Corp.*,
  No. 116CV00344, 2019 WL 2162863 (E.D. Cal. May 17, 2019) .............................. 10, 12

*SEC v. Kirkland*,
  No. 6:06–cv–183, 2009 WL 4891941 (M.D. Fla. December 16, 2009) ........................... 14

*SEC v. Temme*,
  2019 WL 13077501, No. 4:11-cv-00655 (E.D. Tex. Oct. 2, 2019) .................................... 8

*South County Sand & Gravel Co. v. Bituminous Pavers Co.*,
  274 A.2d 427 (R.I. 1971) ................................................................................................... 9

**STATUTES**

11 U.S.C. § 506(c) ........................................................................................................... 8, 9

**TREATISES**

Ralph Ewing Clark, Treatise on the Law and Practice of Receivers § 618 (1959) ......................... 8

**INTRODUCTION**

Nearly two years ago, FCS Advisors, LLC ("FCS") successfully moved this Court to place into receivership defendants Theia Group Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, "Theia"). At the time, FCS had not been paid a penny of its secured loans to Theia—which today amount to over $450 million—and FCS has since poured in another $6.8 million to fund efforts to monetize Theia's assets. That money included $500,000 as a fee to the bankers at PJT Partners LP ("PJT"), who failed in their core task of finding a buyer. Ultimately, FCS was forced to credit bid for Theia's assets, in what amounts to a foreclosure (which awaits the Courts' approval).

PJT now has the gall to ask this Court to be paid another $1.5 million "Transaction Fee" from collateral that was pledged to FCS from the start. But the law does not allow it. Absent a direct and provable benefit to the collateral, secured creditors generally cannot be forced to release collateral, or to supply funding to another entity, as PJT requests here. PJT's motion fails to meet the governing standards to "surcharge" FCS's collateral, for multiple reasons.

First, generally only a receiver or trustee has standing to surcharge collateral. The Receiver is not asking for a surcharge and, in fact, supports FCS's position.

Second, a surcharge may be appropriate where the receiver or trustee provides a concrete, quantifiable benefit to the collateral, such as paying to store inventory or helping collect accounts receivable. The rationale here is evident enough: a party conferring a direct benefit to the collateral should be paid from the value it created in the collateral. But PJT has not in any way benefitted FCS. PJT failed in its effort to find a buyer. FCS's credit bid is effectively a foreclosure, which it did not need an investment bank to do. PJT acknowledges that the credit bid—the only real transaction available—is not a transaction that it brought to the table, and that the transaction leaves no funds available for its sought-after additional fee. It would be one thing if PJT had brought a

buyer to the table that paid cash or some other concrete consideration to FCS. But that never happened, and PJT has been paid in full the agreed upon $500,000 fee for its efforts.

Third, a surcharge may be appropriate if the secured creditor consents to it. Nowhere in PJT's motion is any evidence that FCS ever agreed to pay a fee from its collateral. PJT points to certain "Bidding Procedures" from the Receiver's auction process by which credit bids were to be accompanied by a cash component. But the Receiver was free under the Bidding Procedures to waive that requirement, and it made sense to do so here, where there was no competing bid nor a real auction. FCS was not willing to pay cash for its own collateral—no secured creditor would— which means that there are no unencumbered assets in Theia from which PJT can collect any fee over above the $500,000 that it was paid already. The outcome might be different if FCS had been bidding against a cash offer (*i.e.*, value introduced by PJT), but that was not the case.

Finally, PJT's overarching complaint about the unfairness of the situation gets matters exactly backwards. It would be unfair to diminish FCS's collateral further in order to pay PJT a fee that is not contemplated by its own Engagement Letter. PJT agreed to be paid a Transaction Fee based on a sliding-scale percentage of a transaction it generated, and that the fee was payable in "cash" and "directly and solely" from the "gross proceeds" of the transaction. Thus, from the beginning, PJT knew that it would be entitled to no fee unless it generated the type of transaction with "proceeds" in "cash" from which it could be "directly" paid (*e.g.*, if it found a third-party buyer willing to pay cash). A credit bid does not generate "proceeds," and a "cash" fee cannot be extracted "directly" from a credit bid. This arrangement makes business sense, as it incentivized PJT to generate value from which its fee could be paid. It never did. At bottom, PJT has gotten exactly what it bargained for, and the Court should not allow PJT to renegotiate the terms of its

engagement via this motion. Indeed, PJT has impeded the progress of the case, as there has been no other true objection to the sale. The motion should be denied.

## BACKGROUND

**FCS Loan and Receivership**

In June 2020, FCS and Theia entered into a Secured Note Purchase and Security Agreement (the "SNPSA") that refinanced certain prior debt owed to FCS with two $100 million promissory notes, one due on December 29, 2020, and the other on June 29, 2021. (ECF 14 ¶¶ 10-11.) The parties agreed to an amendment of the SNPSA that extended the due date on the first note to June 29, 2021, the same date the second note was due. (*Id.* ¶ 24.) Theia did not make payment on either note. (*Id.* ¶ 31.)

In August 2021, FCS filed this case, and simultaneously moved the Court to appoint a receiver for Theia. (ECF 13.) Following a hearing on October 20, 2021, the Court granted the motion. (ECF 105.) In November 2021, the Court appointed Michael Fuqua as the receiver (the "Receiver"). (ECF 117.) The Receiver was granted the authority to take control of the assets of the Theia (*id.* ¶ 3), to sell Theia's assets (*id.* ¶ 6), to hire professionals (*id.* ¶ 11), and to borrow funds to operate the receivership (*id.* ¶ 13).

In February 2022, the Court approved FCS loaning Theia $5 million, on a secured, first-priority basis to fund the operations of the Receiver. (ECF 206.)

One year later, in February 2023, the Court approved FCS loaning Theia another $1.8 million, for a total of $6.8 million. (ECF 329.)

All proceeds of the loans were required to be used by the Receiver "strictly in accordance with the Budget." (ECF 150-1, at 2 (loan agreement); ECF 206 ¶ 2 (authorizing Receiver to enter into and comply with loan agreement).) PJT does not contend there was ever any item in the Budget for a Transaction Fee.

To date, none of the $6.8 million ($500,000 of which went to PJT) has been repaid.

**PJT's Engagement**

In December 2021, the Receiver moved the Court for authority to hire PJT as the investment banker to help monetize Theia's assets. (ECF 152, 154-56.) The Receiver's motion explained that he interviewed other firms, and ultimate chose PJT and negotiated their proposed engagement terms at "at arm's-length and in good faith." (ECF 155 ¶ 7.)

In February 2022, at the same time as the Court approved FCS's $5 million loan to the receivership, the Court approved PJT's retention and its Engagement Letter. (ECF 207.)

The Engagement Letter, dated December 28, 2021, contemplated two fees to PJT.

First, it was to be paid an initial $500,000 "Work Fee" that was "fully earned upon the execution and court approval" of the Engagement Letter. (ECF 152-2, at 2.) There is no dispute that this amount has been paid. (ECF 80 ¶ 4.)

Second, PJT could earn a "Transaction Fee," calculated as a sliding-scale percentage of the proceeds of any transaction. (ECF 152-2, at 2.) Critically, the Transaction Fee was "payable *in cash* at the closing of such Transaction *directly and solely out of the gross proceeds of the Transaction*. . . ." (*Id.* at 2 (emphasis added).) This language makes clear that any Transaction Fee is not payable from the general assets of Theia, but only payable in "cash," and "solely" from cash that came "directly" from the "gross proceeds" of a transaction. Accordingly, if a transaction had no gross proceeds in cash, no Transaction Fee would be payable.

The Order approving PJT's engagement further provided (echoing standards from the Bankruptcy Code) that the Court could revise PJT's engagement terms only if the the original terms "prove to have been improvident in light of developments not capable of being anticipated at the time of the approval of the Engagement Letter." (ECF 207 ¶ 5.) PJT does not invoke this provision in its motion.

4

**PJT Fails to Find a Buyer**

PJT reached out to 57 potential purchasers, but ultimately received only three non-binding expressions of interest, none of which went anywhere. (ECF 367 ¶ 6.) In parallel, the Receiver negotiated with an entity called "Rising Sky" that was claiming to offer $800 million for Theia's assets, but failed to obtain financing. (*Id*. ¶¶ 23-24.) Those discussions also went nowhere. (*Id*.)

In June 2023, 16 months after PJT's engagement was approved, and with no buyer in sight, the Receiver moved the Court to approve certain "Bidding Procedures" by which the Receiver would auction substantially all of Theia's assets. (ECF 357-59.) The motion specifically highlighted that the proposed Bidding Procedures provided the Receiver with flexibility to modify the bidding requirements: "The Bidding Procedures do not impair the Receiver's ability to consider all Qualified Bids made at or prior to the Auction, and they preserve the Receiver's right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Receivership Estates." (ECF 358, at 18-19.) The Court granted the motion. (ECF 363.)

The Bidding Procedures provide that "FCS has a valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount no less than $454.8 million." (*Id*. Ex. 1, at pg. 6.) As is relevant here, the Bidding Procedures set forth various conditions for any "Purchase Price" proposed, including the following: "solely with respect to the Transaction Fee, any Credit Bid shall include cash consideration sufficient to pay the minimum Transaction Fee payable pursuant to that certain Engagement Letter, dated December 28, 2021, by and between PJT and the Receiver . . . ." (*Id.* at pp. 5-6 (§ II(c).) This condition makes clear that absent such a cash component, there was no mechanism for the payment of fees to PJT. The same provision is also clear that all parties reserved their rights on the question of whether and to what extent PJT would be paid its Transaction Fee: "the Receiver, PJT, any entity making a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest reserve all rights with respect to the

5

Transaction Fee due to PJT in connection with a Credit Bid." (*Id.* pg. 6 n.9.) This was likely to be relevant only where there was an actual auction involving a cash bidder.

Two other provisions provided the Receiver flexibility to alter the cash consideration requirement. First, the Receiver could waive any requirements for a bid: "the Receiver reserves the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any noncompliance with such requirements." (*Id*. pg. 9.) Second, the Receiver was authorized to modify the Bidding Procedures: "the Receiver may modify the Bidding Procedures, the Auction Procedures, and other rules set forth herein." (*Id*. pg. 16.)

PJT states that, in anticipation of the auction, it "contacted 53 potentially interested parties on behalf of the Receiver, 50 of which had been contacted" in the pre-auction period. (ECF 380 ¶ 13.) In other words, almost all of PJT's work was performed in the pre-auction period, before the Court authorized the Bidding Procedures which PJT claims as the source of its right to a Transaction Fee. PJT's outreach almost exclusively to parties that had passed on the deal before was not successful. Only two bids came in.

One was a $20.5 million bid for Theia's aircraft assets. (ECF 367 ¶ 8.) This was not a "qualifying bid" because of multiple, material problems. As the Receiver has explained: "the bid was not accompanied by a Deposit, did not include a draft form of asset purchase agreement, failed to include sufficient Evidence of Financial Wherewithal to consummate the proposed transaction, and (despite bid language to the contrary) appeared to be contingent on financing as it was not accompanied by a firm financing commitment." (*Id*. ¶ 8.) This bid is in all events not relevant here. PJT is not claiming any fee relating to the sale of aircraft assets, which were exempted from the Transaction Fee in PJT's Engagement Letter. (ECF 152-2, at 1.)

The only other bid was a credit bid from an FCS affiliate. (ECF 367 ¶ 31.)

On August 12, 2023, the Receiver cancelled the auction because it received no qualifying bids, except the credit bid from FCS's affiliate, which it designated as the buyer. (ECF 364.) The same day, the Receiver moved to approve the FCS sale, because in his judgment it is in the best interests of the receivership estate. (ECF 367.)

**PJT's Motion**

On August 28, 2023, PJT moved to surcharge FCS's collateral from which it would be paid a $1.5 million Transaction Fee. (ECF 378-80.) Importantly, PJT agrees with the Receiver that the sale should go forward. Its motion candidly states "PJT does not seek to block the proposed sale." (ECF 379.) The terms of the proposed sale do not leave Theia with assets from which PJT could be paid, but PJT wants the Court to alter the terms of the sale so that it is paid from a different source—assets that were pledged to FCS years before PJT became involved. This drastic remedy is not justified nor legally permissible, and PJT's motion should be denied.

## ARGUMENT

As detailed below, a surcharge motion is generally brought by a receiver or trustee—not creditors, who lack standing—and, in all events, requires a showing that the proponent of the surcharge (i) benefited the secured collateral in a direct, quantifiable way, or (ii) received express consent from the secured party. PJT has failed to make this showing because nothing it has done benefitted FCS in any way, and because FCS did not consent. The sale (if approved) represents FCS essentially foreclosing on collateral it has held for years because PJT failed in its core task of finding a new buyer. FCS never agreed to—nor would it make any sense to agree to—pay PJT out of its collateral, or, worse yet, to write a further check to PJT.

PJT complains that the outcome is unfair, when, in reality, it reflects exactly the terms PJT agreed to from the start. It was paid a $500,000 flat fee, and any further compensation was, in essence, a success fee, payable if and only if PJT generated cash or other new value from

7

which a fee could be paid. That the risk PJT knowingly took from the outset did not work out is not grounds to renegotiate its contract after the fact.

**I.      PJT IS NOT ENTITLED TO A SURCHARGE**

     **A.      Standards for a Surcharge**

As a general rule, secured creditors "cannot be deprived of their property nor of their property rights" by forcing them to incur the "charges and expenses of the receivership." Ralph Ewing Clark, Treatise on the Law and Practice of Receivers § 618, at pg. 1070 (1959). Those expenses generally must come from receivership assets that are **unencumbered**, and, "in the event the estate has no unencumbered funds from which to pay such expenses," that does not mean "the secured creditor becomes obligated to satisfy these obligations." *In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir. 1984). After all, the "mere inadequacy of the property or fund to meet . . . expenses constitutes in itself no reason why liability should be fastened" upon a third party. *Atlantic Tr. Co. v. Chapman*, 208 U.S. 360, 376 (1908).

An exception to this general rule, commonly known as a "surcharge," is appropriate in two limited circumstances.

First, a surcharge may be appropriate if the proponent of the surcharge "show[s] that the expenses were reasonable, necessary, and provided a direct benefit to the secured creditor." *MW Cap. Funding, Inc. v. Magnum Health & Rehab of Monroe LLC*, Case No. 16-14459, 2019 WL 3451221, at *5 (E.D. Mich. July 31, 2019). This standard, like much of the case law governing receiverships, is borrowed from the Bankruptcy Code, specifically the case law interpreting 11 U.S.C. § 506(c). *Id.* That provision states: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c); *see also SEC v. Temme*, 2019 WL 13077501, No. 4:11-cv-00655, at *4 (E.D. Tex. Oct. 2, 2019) (noting

8

that courts overseeing receiverships commonly "'borrow' from bankruptcy law"). Thus, for example, a receiver or bankruptcy trustee that "stores or maintains the collateral pending liquidation," *In re Jenson*, 980 F.2d 1254, 1260 (9th Cir. 1992), or helps collect pledged accounts receivable, *South Cnty. Sand & Gravel Co. v. Bituminous Pavers Co.*, 274 A.2d 427, 431 (R.I. 1971), should fairly expect to be paid from the very collateral that his or her actions improved.

Second, if "the holder of a secured claim expressly consents to the payment of a specific administrative claim from its collateral, then the secured creditor's consent may be enforceable to ensure payment of the claim of the administrative claimant from the collateral." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 n.4 (9th Cir. 2001) (citation omitted).

As discussed below, PJT fails to meet the standards for a surcharge. It falters from the start because it lacks standing (surcharges are for receivers or trustees to assert), but, regardless, it has provided no direct benefit to FCS's collateral, nor gained FCS's express consent to be paid from its collateral.

### B. PJT Lacks Standing for a Surcharge

PJT lacks standing to request a surcharge of FCS's collateral. Courts overseeing receiverships "look to bankruptcy cases for guidance," *KeyBank Nat'l Ass'n v. Monolith Solar Assocs. LLC*, 1:19-CV-1562, 2022 WL 19335877, at *4 (N.D.N.Y. May 23, 2022), and it is well-settled that the Bankruptcy Code's surcharge provision, 11 U.S.C. § 506(c), allows only trustees (the analogue to receivers) the right to pursue a surcharge—not claimants. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 14 (2000) ("We conclude that 11 U.S.C. § 506(c) does not provide an administrative claimant an independent right to use the section to seek payment of its claim."). *In re K & L Lakeland, Inc.*, 128 F.3d 203, 206 (4th Cir. 1997).

There is good reason for this limitation. "Allowing a claimant to proceed directly against a secured creditor would circumvent" the fundamental principles of priority in bankruptcy,

9

"potentially causing an inequitable division of the estate." *In re JKJ Chevrolet, Inc.*, 26 F.3d 481, 484 (4th Cir. 1994). This is equally true in a receivership. *Accord Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994) ("As an agent of the court, the receiver has standing to come before the court that appointed it on matters related to the costs relating to administration of the receivership property.") (citation omitted).[1]

### C. PJT's Services Did Not Provide a Direct Benefit to FCS

To justify a surcharge based on a "benefit" theory, the proponent of a surcharge "must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral," and any recovery must be "limited to the extent that the secured creditor benefited from the services." *SEC v. BIC Real Est. Dev. Corp.*, No. 116CV00344, 2019 WL 2162863, at *1 (E.D. Cal. May 17, 2019). Put simply, the proponent must show benefits that are "clear, direct and quantifiable," *id.* (citation omitted), as opposed to "possible or hypothetical benefits." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985).

Here, there was no benefit to the collateral. PJT tried to sell the assets for well over a year and failed to do so. PJT has already received $500,000 for the work performed in this case, which is more than reasonable compensation for the limited time and work PJT performed. The Transaction Fee component of PJT's compensation was, in effect, a success fee, and PJT simply was not successful in bringing new value to the table. FCS's collateral is in no better position than it was before PJT was hired; if anything, the passage of time has only diminished its value. Moreover, the work PJT performed after the Bidding Procedures were approved was minimal. It concededly reached out almost exclusively to parties that had passed on the transaction before. (ECF 380 ¶ 13.)

---

[1] This is not an administrative expense of the Receivership, but, even if it were, only the Receiver could seek payment.

10

The Second Circuit's decision in *In re Flagstaff Foodservice Corp.,* 739 F.2d 73 (2d Cir. 1984) is instructive. There, a secured creditor had been funding the operations of a business that went into bankruptcy. *Id*. at 74. The creditor advanced funds to keep the business operating for a limited period, but the "reorganization ultimately failed" because "no buyer emerged to take over any of the debtor companies." *Id*. at 74-75. Thus, the "the realizable value of the collateral which remained was insufficient" to pay off the company's debts. *Id*. at 75. Various attorneys and accountants sought to have approximately $250,000 in unpaid fees surcharged against the collateral, and the District Court agreed. *Id*.

The Second Circuit reversed, however, because the fees related to services that did not directly benefit the secured creditor. While the bankruptcy "proceedings were initiated with the hope of effectuating [the company's] rehabilitation and with optimism that this could be accomplished," any benefit "might be said to have accrued to [the secured creditor] from the attempt to reorganize were incidental to the reorganization efforts." *Id*. at 76. In reality, the failed effort to reorganize only harmed the collateral position, and there was no reason to reduce "the remaining collateral another quarter of a million dollars to pay" professionals. *Id*.

Here, just as in *Flagstaff*, FCS's collateral position was not improved in the slightest by the actions of PJT, which did not bring a buyer or new money to the table. And, as in *Flagstaff*, the fact of allegedly unpaid fees is not reason to reduce FCS's remaining collateral even more.

PJT apparently recognizes that it cannot point to a direct benefit to FCS, and so it relies on more ephemeral ones. It speculates that the "data room and marketing materials" it created "will materially benefit FCS in ultimately monetizing what it is buying." (ECF 378, at 15-16.) This assertion is not supported by affidavits or other evidence about what exactly PJT did or why it is of any value to FCS. "An attorney's unsworn statements in a brief are not evidence," *Kulhawik v.*

11

*Holder*, 571 F.3d 296, 298 (2d Cir. 2009), and so the Court should dismiss this argument out of hand. Regardless, even assuming PJT's work product may prove useful at some unspecified point in the future, this is hardly a "clear, direct and quantifiable" benefit. *BIC*, 2019 WL 2162863, at *1. Instead, it represents exactly the sort "possible or hypothetical benefit[]" that the Second Circuit has held is insufficient. *Flagstaff*, 762 F.2d 10 at 12.

### D. FCS Did Not Consent to Payment of the Transaction Fee

"Although a secured creditor may consent to bearing the costs of professional fees . . . such consent is not to be lightly inferred." *Flagstaff*, 739 F.2d at 77. The glaring omission in PJT's application is any evidence that FCS agreed to make its collateral available to PJT. There is none.

FCS is not a party to PJT's Engagement Letter which, in all events (discussed below, see § II, *infra*), does not call for PJT to paid out of FCS's collateral.

The only other possible source for FCS's alleged "agreement" is the Bidding Procedures, which nowhere state that FCS would make its collateral available to pay FCS.

PJT highlights a portion of the Bidding Procedures stating that "any Credit Bid shall include cash consideration sufficient to pay only the minimum Transaction Fee payable pursuant to that certain Engagement Letter, dated as of December 28, 2021" (ECF 379, at 7 (quoting ECF 363, at Ex. 1, pg. 5 (§ II.c)).) But this does not say anything about charging FCS's collateral.

Further, the language refers back to the Engagement Letter, which is clear (as discussed below) that PJT is entitled to no Transaction Fee at all. If there were any doubt about whether this language somehow reflects FCS's consent to pay a fee, the Bidding Procedures themselves preserved all of FCS's rights with respect to whether a Transaction Fee was due to PJT: "the Receiver, PJT, any entity making a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest reserve all rights with respect to the Transaction Fee due to PJT in connection with a Credit Bid." (ECF 363, at Ex. 1, pg. 6 n.9.)

12

To be sure, the Bidding Procedures require a Credit Bid to "include cash consideration," but the Receiver was in all events free to waive the bid requirements or otherwise alter the Bidding Procedures. (*Id*. at pg. 9 ("In addition, the Receiver reserves the right to waive any of the Qualified Bid requirements set forth above and deem a Bid to be a Qualified Bid notwithstanding any noncompliance with such requirements."); *id.* pg. 16 ("[T]he Receiver may modify the Bidding Procedures, the Auction Procedures, and other rules set forth herein.").)[2]

PJT wonders why the cash consideration requirement should be waivable (ECF 379, at 8), but it surely knows the answer. Had PJT brought a real buyer to the table, FCS would risk noncompliance—and potentially having the Receiver select another bidder as the winner—if its bid did not include a cash component to satisfy PJT's fee. It makes sense in that context, where PJT has introduced value, to require FCS to put up cash. But the idea of adding cash to a credit bid when there are no other bids is nonsensical.

PJT further asserts that FCS somehow consented based on a voicemail from the Receiver to PJT and an email from the Receiver to PJT and counsel for FCS showing the potential minimum bid requirements. (ECF 379, at 8, 15). There is no basis to bind FCS based on a conversation to which it was not a party. Nor can FCS be bound by an email prepared by the Receiver simply because it was sent a copy of the email. Regardless, PJT again overlooks that larger point that none of these communications reflect consent by FCS to take expenses out of its collateral.

---

[2] Whether the Receiver is deemed to have modified the Qualified Bid Requirements (which he was allowed to do), allowed a foreclosure or surrender of collateral to the senior secured creditor or otherwise should not dictate the outcome here. The bottom line is that the senior secured creditor is going to end up with a tremendous loss and its collateral. PJT will have received $500,000 but less than it wanted, and several other parties will have their debts assumed.

13

## II.   PJT CANNOT ALTER THE TERMS OF ITS ENGAGEMENT

PJT's failure to meet the stringent surcharge standards is grounds alone to deny its motion. In seeking to avoid the surcharge standards, PJT litters its brief with references to "equitable principle[s]" and the suggestion that there is an unfairness here that the Court must correct. (ECF 379, at 16.) To the extent that the Court is inclined to indulge these appeals, they should be rejected. Far from any unfairness, PJT is seeking to rewrite the terms it agreed to, to obtain an unjustified windfall, all of which is unfair to FCS.

The terms of PJT's Engagement Letter provide for a $500,000 Work Fee—which it was paid—along with a Transaction Fee "payable *in cash* at the closing of such Transaction *directly and solely out of the gross proceeds* of the Transaction. . . ." (ECF 152-2, at 2.) PJT knew at that time, and agreed to take the risk, that if no third-party buyer purchased the assets, a credit bid may not generate "gross proceeds" in "cash" and that therefore the Transaction Fee would not be payable. That is exactly what happened. The credit bid has produced no gross proceeds and therefore the cash Transaction Fee is not payable.

PJT's motion appears to assume that its Engagement Letter triggers Transaction Fee here, but does not explain how a credit bid could produce "gross proceeds" from which a "cash" fee could be "directly" paid. Common English usage and case law hold that "credit bids produce no proceeds for an underlying estate." *SEC v. Kirkland*, No. 6:06–cv–183, 2009 WL 4891941, at *3 (M.D. Fla. December 16, 2009), because the term "proceeds" refers to "something actually received." *In re Seapharm, Inc.,* 126 B.R. 447, 448 (Bankr. D.N.J. 1991) (no net proceeds where bank made credit bid); *see also In re Ketterer,* No. 09–15218 ELF, 2009 WL 3053710, *2 (Bankr. E.D. Pa. Sept.18, 2009) (no sales proceeds when the successful bid is a credit bid); *accord City of Troy v. Capital Dist. Sports*, 759 N.Y.S.2d 795 (N.Y. App. Div. 3d Dep't 2003) (for purposes of attorney's statutory right to lien on "proceeds" of a client's claims, the attorney's achievement of

14

a debt reduction did not generate "proceeds"). This conclusion is reinforced by the fact that the fees were to be paid in "cash" and "directly and solely" out of the proceeds. How would PJT receive "cash . . . directly and solely" from a credit bid? It makes no sense.

By contrast, it was eminently practical for the parties to reward PJT with a portion of a transaction if and only if it created value from which PJT could share in the cash proceeds. FCS's secured creditor relationship with Theia pre-existed the engagement PJT, and the fact that FCS was forced to credit bid means that PJT's efforts to bring new value failed. No secured creditor would ever agree to pay a cash out-of-pocket for the right the creditor had from the start to foreclose. PJT's approach defies logic.

PJT argues that not awarding a surcharge would be inequitable because PJT performs these types of engagements "on the assumption that they will be paid in accordance with the terms approved by the court." (ECF 379, at 16.) But it is PJT that seeks the inequitable result of altering its payment terms and changing the rules. PJT is in effect seeking a success fee—above the $500,000 already paid—when its work did not succeed.

## **CONCLUSION**

For the stated reasons, the grant the Receiver's Sale Motion and deny PJT's Motion to Surcharge FCS's collateral.

| | |
|---|---|
| Dated: Washington, D.C.<br>September 11, 2023 | Respectfully Submitted,<br><br>STEPTOE & JOHNSON LLP<br><br>*/s/ Charles Michael*<br>Jeffrey M. Reisner<br>Charles Michael<br>1114 Avenue of the Americas<br>New York, NY<br>(212) 506-3900<br>jreisner@steptoe.com<br>cmichael@steptoe.com<br><br><br>Filiberto Agusti<br>Joshua Taylor<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>(202) 429-3000<br>fagusti@steptoe.com<br>jrtaylor@steptoe.com<br><br>*Counsel for Plaintiff FCS Advisors, LLC* |