UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>                              Plaintiff,<br><br>            —against—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>                             Defendants. | 21 Civ. 6995 (PKC) |

**RECEIVER'S MEMORANDUM OF LAW IN OPPOSITION TO (A) RESPONSE OF PJT PARTNERS LP TO RECEIVER'S SALE MOTION AND REQUEST FOR <u>RELATED RELIEF AND (B) MOTION TO SURCHARGE COLLATERAL</u>**

REED SMITH LLP
Kurt F. Gwynne
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 521-5400
Facsimile:  (212) 521-5450
E-mail:  kgwynne@reedsmith.com

REED SMITH LLP
Jason D. Angelo, Esq. (admitted *pro hac vice*)
1201 N. Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 778-7500
Facsimile:  (302) 778-7575
E-mail:  jangelo@reedsmith.com

*Counsel for Michael Fuqua, in his capacity as*
*Receiver of Theia Group, Inc., Theia Aviation LLC,  and Theia Holdings A, Inc.*

Dated:  September 11, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

COUNTER-STATEMENT OF FACTS ................................................................................... 4

      A.     The Receiver's Engagement of PJT as Investment Banker ...................... 4

      B.     PJT's Initial Marketing and Sale Process Produces Only Two Actionable Expressions of Interest in the Amounts of $1 Million and $10 Million. .... 7

      C.     The Built-In Flexibility of the Bidding Procedures ................................... 8

      D.     Round 2 of PJT's Marketing and Sale Process Produces More Disappointing Results. ............................................................................. 10

ARGUMENT ........................................................................................................................ 12

    I.     SURCHARGING COLLATERAL PURCHASED VIA CREDIT BID (AND FOR WHICH NO CASH PROCEEDS WILL BE REALIZED) IS INEQUITABLE, UNWARRANTED, AND CONTRARY TO THE PJT AGREEMENT ............................................................................................ 12

      A.     PJT Cannot Alter the Terms of its Compensation Under the PJT Agreement ............................................................................................... 12

      B.     Principles of Equity Do Not Support Imposition of a Surcharge on the Property to Sold to LTS. ............................................................................ 13

      C.     Standards Governing Surcharges ............................................................. 15

      D.     PJT's Surcharge Request Must be Denied Because There are no Proceeds of Collateral from Which to Pay a Transaction Fee ............................... 17

    II.    THE RECEIVER HAD THE EXPRESS ABILITY TO MODIFY THE BIDDING PROCEDURES AS AN EXERCISE OF HIS SOUND BUSINESS JUDGMENT. ............................................................................ 19

CONCLUSION ..................................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Amberjack Interests, Inc.*,
  326 B.R. 379 (Bankr. S.D. Tex. 2005) ................................................................12

*In re Anderson*,
  66 B.R. 97 (9th Cir. B.A.P. 1986)........................................................................15

*In re Cascade Hydraulics and Utility Service, Inc.*,
  815 F.2d 546 (9th Cir. 1987) ..........................................................................13, 14

*Corporate Assets Inc. v. Paloian (In re GGSI Liquidation Inc.)*,
  368 F.3d 761 (7th Cir. 2004) ................................................................................16

*In re Croton River Club*,
  162 B.R. 656 (Bankr. S.D.N.Y. 1993) ..................................................................13

*In re Ferncrest Court Partners Limited*,
  66 F.3d 778 (6th Cir. 1995) ..................................................................................13

*Fidelity Bank, National Association v. M.M. Group*,
  77 F.3d 880 (6th Cir. 1996) ..................................................................................13

*In re Flagstaff Foodservice Corporation*,
  762 F.2d 10 (2d Cir. 1985).....................................................................................14

*Gaskill v. Gordon*,
  27 F.3d 248 (7th Cir. 1994) ..................................................................................12

*IRS v. Boatman's First National Bank of Kansas City*,
  5 F.3d 1157 (8th Cir. 1993) ..................................................................................14

*Janey v. Alguire*,
  2014 U.S. Dist. LEXIS 193394 (N.D. Tex. July 30, 2014) ..................................12

*Keybank National Association v. Monolith Solar Associates LLC*,
  2022 U.S. Dist. LEXIS 240828 (N.D.N.Y. May 23, 2022).................................12

*In re Latam Airlines Group S.A.*,
  643 B.R. 773 (Bankr. S.D.N.Y. 2022)..................................................................14

*In re MTE Holdings LLC*,
  2021 Bankr. LEXIS 2225 (Bankr. D. Del. Aug. 17, 2021) ..................................18

*MW Capital Funding, Inc. v. Magnum Health and Rehab of Monroe LLC*,
   2019 U.S. Dist. LEXIS 127463 (E.D. Mich. July 31, 2019) ...................................................12

*In re Northwest Airlines Corporation*,
   382 B.R. 632 (Bankr. S.D.N.Y. 2008) ...................................................................................14

*In re Nucentrix Broadband Networks, Inc.*,
   314 B.R. 574 (Bankr. N.D. Tex. 2004) ..................................................................................12

*In re Orfa Corporation*,
   170 B.R. 257 (E.D. Pa. 1994) ...............................................................................................14

*Precision Steel Shearing Inc. v. Fremont Fininancial Corp. (In re Visual Indusustries, Inc.)*,
   57 F.3d 321 (3d Cir. 1995)....................................................................................................14

*In re Pudgie's Development of New York*,
   223 B.R. 421 (Bankr. S.D.N.Y. 1998) ..................................................................................13

*Pursuit Capital Management Fund I, L.P. v. Burtch (In re Pursuit Capital Management, LLC)*,
   874 F.3d 124 (3d Cir. 2017)..................................................................................................18

*SEC v. Credit Bancorp, Limited*,
   2000 U.S. Dist. LEXIS 17171 (S.D.N.Y. Nov. 29, 2000) ....................................................12

*SEC v. Elliott*,
   953 F.2d 1560 (11th Cir. 1992) ............................................................................................11

*SEC v. Lincoln Thrift Association*,
   577 F.2d 600 (9th Cir. 1978) ................................................................................................11

*SEC v. Safety Finance Service, Inc.*,
   674 F.2d 368 (5th Cir. 1982) ................................................................................................11

*SEC v. Wells Fargo Bank, N.A.*,
   848 F.3d 1339 (11th Cir. 2017) ............................................................................................13

*Tanzer v. Huffines*,
   315 F.Supp. 1140 (D. Del. 1970)..........................................................................................11

*U.S. v. FDIC*,
   899 F. Supp. 50 (D. R.I. 1995)........................................................................................12, 15

*Unisys Financial Corporation v. Resolution Trust Corporation*,
   979 F.2d 609 (7th Cir. 1992) ................................................................................................13

*United States Trustee v. Messer (In re Pink Cadillac Associates.)*,
   1997 U.S. Dist. LEXIS 4382 (S.D.N.Y. Apr. 7, 1997)..........................................................15

**Statutes**

11 U.S.C. § 328 ........................................................................................................................13

11 U.S.C. § 506 ...............................................................................................................15, 16, 17

**Other Authorities**

Ralph E. Clark, TREATISE ON THE LAW AND PRACTICE OF RECEIVERS (3d. 1959) ........................12

Michael Fuqua, as court-appointed receiver (the "Receiver")[1] for Theia Group, Inc. ("TGI"), Theia Aviation LLC ("Theia Aviation"), and Theia Holdings A, Inc. ("Theia Holdings," and collectively with TGI and Theia Aviation, the "Receivership Entities"), through his undersigned counsel, respectfully submits this memorandum of law in opposition (the "Opposition") to the *Notice of Motion* (Doc. 378), *Memorandum of Law in Support of (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral* (Doc. 379) (together, the "Surcharge Motion"), and *Declaration of Michael Schlappig in Support of Memorandum of Law in Support of (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral* (Doc. 380) (the "Schlappig Declaration") and in further support of the *Notice of Motion of Michael Fuqua, as Receiver, for Entry of an Order (I) Authorizing and Approving (A) the Sale of Substantially All of the Receivership Entities' Assets, Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests and (B) Entry into the Asset Purchase Agreement with LTS Systems, LLC; (II) Further Extending the Receivership Stay; and (III) Granting Related Relief* (the "Sale Motion") (Doc. 365).  In support of this Opposition, the Receiver relies upon the Receiver's Declaration[2] filed contemporaneously herewith and respectfully represents as follows:

## PRELIMINARY STATEMENT

In furtherance of his obligations under the Receivership Order, the Receiver retained PJT Partners LP ("PJT") as his investment banker to assist with the marketing and sale of the

---

[1]  Capitalized terms used but not otherwise defined in this Opposition have the meanings ascribed to such terms in the PJT Agreement, the Bidding Procedures (as those terms are defined herein), the *Memorandum of Law* in support of the Sale Motion (Doc. 366), or the Purchase Agreement, as the context requires.

[2]  *See Declaration of Michael Fuqua, as Receiver, in Opposition to (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral* (the "Receiver's Declaration" or "Receiver Decl.").

Receivership Entities' assets.  In engaging PJT for these services, the Receiver and his counsel specifically negotiated a fee structure designed to avoid the very situation now presented to the Court by way of the Surcharge Motion.  That fee structure calls for an up-front non-refundable payment to PJT of $500,000 (which was made) and payment of a Transaction Fee based upon the results of PJT's efforts and payable in "cash" "solely" from the proceeds of a Transaction.  The PJT Agreement (as defined herein) could not be clearer:  the Transaction Fee can be paid only out of cash proceeds of a Transaction.  Neither communications from the Receiver's counsel nor the language of the Bidding Procedures (or PJT's self-serving interpretation thereof) was intended to, or did, supersede or otherwise modify the court-approved terms of the PJT Agreement.  Where no cash proceeds exist, PJT gets no Transaction Fee—that was the deal from the beginning.

That should be the end of the story, but PJT goes further in its Surcharge Motion in an attempt to make an end-run around the very terms to which it agreed in undertaking this engagement.  No one doubts PJT's credentials, and the firm's experience speaks for itself.  However, it is difficult to understand how PJT could be proud of the results of its efforts in this case or (especially given the express terms of the PJT Agreement) why it believes it deserves what would amount to a $1.5 million windfall in a case where PJT already has received $500,000 (as agreed) and creditors at all levels of the capital structure are being wiped out.  The reality is that PJT conducted a sale and marketing process for the Receivership Assets that, despite their efforts, resulted in just three (3) actionable offers, two (2) of which were mere expressions of interest for $1 million and $10 million, respectively, for the Receivership Entities' FCC License and NOAA License.  The third actionable offer (which materialized only after it was clear that PJT could bring nothing else to the table) was a non-cash Credit Bid from LTS Systems, LLC ("LTS") in the amount of $40 million, plus the assumption of $40 million in certain liabilities for substantially all

of the Receivership Entities' assets.  The LTS Credit Bid (as defined below) is the highest, best, and only actionable offer for the Receivership Assets.  Faced with this stark reality, the Receiver, in an exercise of his business judgment (and consistent with the unambiguous terms of the court-approved Bidding Procedures), determined to modify the Bidding Procedures, name the LTS Credit Bid as the sole Qualified Bid, and seek approval of the proposed Sale Transaction.

Prior to and since the filing of the Surcharge Motion, the Receiver, FCS, and their respective professionals have made multiple attempts to resolve the issues presented to the Court by PJT to no avail.  To date, overtures to PJT have been unsuccessful (at least in part) due to PJT's unwillingness to accept anything but a "*somewhat* reduced fee . . . paid in the same manner and proportion as the Receiver and his other professionals," *see* Surcharge Motion, at 3 (emphasis added), despite the plain language of the PJT Agreement, the express terms of the Financing Orders and the loan documents approved thereby (which prohibit the use of the Financing provided by FCS to pay the Transaction Fee), and the unexceptional results of the sale and marketing process.[3]

Following these unproductive discussions with PJT, the Receiver is now forced to respond to PJT's unsupported assertions.  As set forth below, surcharging a secured creditor's collateral where the disposition thereof resulted in no cash proceeds is contrary to the PJT Agreement, unwarranted, and inequitable.  The Court should not countenance such a result.  The Court should also reject any assertion that the Receiver acted outside the bounds of his authority or the express terms of the Bidding Procedures in determining that the LTS Credit Bid is a Qualified Bid.  The circumstances of this receivership case, the disappointing outcome of the sale process, and principles of equity dictate denial of PJT's requested relief.  Instead, and mindful that "PJT does

---

[3] PJT inappropriately delved into settlement negotiations.  *See* Surcharge Motion, n.2.  The Receiver responds only as necessary to avoid the misconception that PJT attempts to create.

not seek to block the proposed sale," *see* Surcharge Motion, at 3, the Court should approve the relief requested by the Sale Motion and enter the Approval Order forthwith.

## COUNTER-STATEMENT OF FACTS

Since his appointment,[4] the Receiver has acted consistent with this Court's mandate that he "seek a bona fide purchaser of the Receivership Entities' Federal Communications Commission ("FCC") License Assets . . . and . . . take all steps necessary to effectuate a transfer or sale of the assets" of the Receivership Entities, all while pursuing the common goal of maximizing the value of the Receivership Assets for the benefit of the Receivership Entities and their creditors. *See* Receivership Order, ¶ 6. Those efforts were made possible only through receipt of $6.8 million in receivership financing (the "Financing") from the Receivership Entities' first-lien lender, FCS Advisors, LLC d/b/a Brevet Capital Advisors ("FCS").[5] *See* Receiver Decl., ¶ 6. FCS agreed to extend the Financing to cover the administrative costs of the receivership estate, but only as set forth in the budget annexed to the *Receiver's Certificate Purchase and Security Agreement* (as amended from time to time). *Id*. The Financing cannot be utilized to pay the fees or expenses of PJT (other than the $500,000 Work Fee) because such amounts are not (and have never been) included in the approved budget. *Id*. The Financing was never a source of PJT's Transaction Fee, which agreed to payment thereof in "cash" "solely" out of the proceeds of a Sale Transaction. *Id*.

### A.    The Receiver's Engagement of PJT as Investment Banker

Mindful that the Financing could not be utilized to pay the Transaction Fee due to PJT (or its expenses), and not wanting to create a large administrative claim if PJT's efforts did not yield

---

[4] *See Order Appointing Michael Fuqua as Receiver* (Doc. 117) (the "Receivership Order"), which the Court entered on November 8, 2021.

[5] *See Order Authorizing Receiver to Obtain Receivership Financing from FCS Advisors, LLC* (Doc. 206); *see also Order (I) Authorizing Receiver to Enter Certain First Amendment to Receiver's Certificate Purchase and Security Agreement with FCS Advisors, LLC and (II) Granting Related Relief* (Doc. 329).

a substantial cash offer, the Receiver and his professionals negotiated the terms of how PJT would be paid for providing services to an administratively insolvent receivership estate that had no funds other than what FCS was willing to provide as part of the Financing. Following weeks of hard-fought (and at times contentious) negotiations with PJT, the final terms of the engagement were memorialized in that certain *Engagement Letter*, dated as of December 28, 2021, by and between PJT and the Receiver (the "PJT Agreement"), which the Court thereafter approved. *See Order Granting Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* (Doc. 207) (the "PJT Retention Order"), Exhibit 1.

As detailed in the PJT Agreement, the Receiver retained PJT "solely to provide investment banking services regarding a Transaction."[6] *See* PJT Agreement, at 2; Receiver Decl., ¶ 4. PJT agreed to "assist the Receiver in analyzing, structuring, negotiating and effecting one or more Transactions" and, among other things, to "prepar[e] marketing materials," "identify[] potential buyers," "assist and advise the Receiver concerning the terms, condition, and impact of any proposed Transaction," and "provide such other advisory services as are customarily provided by PJT Partners in connection with the analysis and negotiation of a transaction similar to potential Transaction." *See* PJT Agreement, at 2. To compensate PJT for these services, the Receiver agreed to a fee structure providing for, among other things, payment of a Work Fee and a Transaction Fee. *See* Receiver Decl., ¶ 5. The initial $500,000 Work Fee was nonrefundable and fully-earned upon execution and Court approval of the PJT Agreement. *Id*. PJT acknowledges, as it must, that it has received the full amount of the Work Fee, *see* Surcharge Motion, at 4, which

---

[6] The PJT Agreement defines "Transaction" as "the sale, merger or other disposition of all or any portion of the Receivership Entities' equity or assets for which PJT Partners is providing the investment banking services described" therein.

"shall be credited . . .against any Transaction Fee" payable pursuant to the PJT Agreement, *see*

PJT Agreement, at 2.

Regarding the Transaction Fee, the PJT Agreement provides that

upon the consummation of a Transaction which is deemed earned and **payable in cash** at the closing of such Transaction **directly and solely out of the gross proceeds of the Transaction** calculated as follows: (a) 3% of the first $500,000,000 of Transaction Value . . . (b) 2% of the next $250,000,000 of Transaction Value; and (c) 1% of Transaction Value above $750,000,000; provided that, the minimum Transaction Fee payable to PJT Partners upon consummation of a Transaction hereunder shall be $2,000,000.

*See* PJT Agreement, at 2 (emphasis added).  In turn, the Receiver and PJT agreed that the term

"Transaction Value" would mean "the gross value of all cash, securities and other properties paid

or payable, directly or indirectly, in one transaction or in a series or combination of related

transactions, in connection with the Transaction or a transaction related thereto."[7] They further

agreed that "Transaction Value" would include:

in the case of a sale or disposition of assets by the Receivership Entities the principal amount of any indebtedness for borrowed money . . . and any other long-term liabilities indirectly or directly assumed by . . . a purchaser (and not discharged or permanently enjoined under applicable law), and (ii) any indebtedness for borrowed money . . . and any other long-term liabilities that are or otherwise repaid or retired by . . . a purchaser (and not discharged or permanently enjoined under applicable law), in connection with or in anticipation of the Transaction.

*See id.*  Lastly, PJT agreed that its retention by the Receiver would be

subject to the standard of review such that **the court may subsequently allow compensation different from the compensation provided in this Agreement** . . . **if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the approval of this Agreement**.

---

[7]  Notably, under the terms of the PJT Agreement, the Transaction Value does not include any value for the Receivership Entities' airplanes or aircraft.  *See* PJT Agreement, at 2 ("PJT Partners' Transaction Fee shall not be calculated based on the inclusion of any value for the airplanes and aircraft (i.e., PJT Partners shall not be entitled to any fee relating to such sale)").

*Id.* (emphasis added); *see also* PJT Retention Order, ¶ 5.

It bears repeating that PJT agreed that it would only be entitled to a Transaction Fee "payable in cash" received "directly and ***solely*** out of the gross proceeds" of a Transaction. The purpose of this provision—which was heavily negotiated between the Receiver and PJT— was to make clear that, in the event a Transaction occurred but no cash came into the receivership estate as a result of such Transaction, PJT would not be entitled to a Transaction Fee. *See* Receiver Decl., ¶ 5. This makes logical sense: if there is no cash in the receivership estate to pay the Transaction Fee to PJT, then PJT does not get a Transaction Fee. This provision also takes into consideration that the Financing could not be a source of payment of the Transaction Fee. *Id.*, ¶ 6.

**B.    PJT's Initial Marketing & Sale Process Produces Only Two Actionable Expressions of Interest in the Amounts of $1 Million and $10 Million.**

Following the Court's approval of the PJT Agreement, PJT commenced the initial round of the sales and marketing process, which included compiling a list of prospective purchasers, setting up a virtual data room containing a marketing presentation and available information and documentation regarding the Receivership Assets, contacting fifty seven (57) potentially interested parties, and distributing a one-page teaser, nine-page asset summary, and form confidentiality agreement (which was drafted by the Receiver's counsel). *See* Receiver Decl., ¶ 7. Eventually, eleven (11) potentially interested parties executed non-disclosure agreements and were granted access to the virtual data room (which was populated by the Receiver). *Id.*, ¶ 8. Ultimately, only two (2) of those parties submitted actionable expressions of interest ("EOIs") that were not contingent upon financing in the disappointing amounts of $1 million and $10 million, respectively. *Id.* Although a $300 million EOI was submitted, it was contingent on the potential purchaser obtaining financing (which failed to occur). *Id.* Thus, after an initial round of marketing

and solicitation of indications of interest, the only actionable EOIs (which were solely for the FCC License and NOAA License) were for $1 million and $10 million. *Id*.

While PJT conducted the initial sale and marketing process, the Receiver entered into parallel negotiations with Rising Sky. *See* Receiver Decl., ¶ 9. The ultimate purchase price that the Receiver and Rising Sky agreed to was approximately $800 million—over 80 times the highest actionable EOI from PJT's initial sale process. *Id*. Ultimately, despite many promises of imminent financing from multiple financing sources over several months, Rising Sky failed to obtain the necessary financing and was unable to pay the $40 million deposit required under the Rising Sky APA. *Id*.

### C.    The Built-In Flexibility of the Bidding Procedures.

Left with the option of pursuing either a $1 million or $10 million transaction for a portion of the Receivership Assets or restarting the marketing and sale process, the Receiver opted for the latter approach. *See* Receiver Decl., ¶ 10. To that end, in June 2023, the Receiver sought (and obtained) Court approval of Bidding Procedures to govern the second round of the marketing and sale process. *Id*. The Bidding Procedures purposely provided the Receiver with the maximum amount of flexibility necessary to fulfil his fiduciary duty to maximize value for the receivership estate and its creditors. *Id*. In keeping with this flexibility, the Receiver (i) was expressly permitted to "modify the Bidding Procedures, the Auction Procedures, and the other rules set forth" therein and (ii) reserved the right to waive any of the Qualified Bid requirements set forth in the Bidding Procedures and thereby deem a bid to be a Qualified Bid notwithstanding any noncompliance with such requirements. *See* Bidding Procedures, pp. 9, 11, 16; Receiver Decl., ¶ 11. The Bidding Procedures also provide that FCS or its designee "shall be deemed a Potential Bidder and a Qualified Bidder." Bidding Procedures, at 9.

As PJT points out, the Bidding Procedures provided that any Credit Bid must "include a cash component sufficient to pay in full, in cash . . . the additional amount that the Receiver deems necessary to pay the costs and expenses of administering the Receivership" and, as to PJT's Transaction Fee specifically, a Credit Bid must "include cash consideration sufficient to pay only the minimum Transaction Fee payable to PJT pursuant to" the PJT Agreement.  However, the Bidding Procedures contain a *clear and unequivocal* reservation of rights regarding the Transaction Fee:  "the Receiver, PJT, any entity making a Credit Bid, any other creditors of the Receivership Entities, or any parties-in-interest *reserve **all rights** with respect to the Transaction Fee due to PJT* in connection with a Credit Bid."  *See* Bidding Procedures, n. 9.  (emphasis added). By reserving the rights of *any entity making a Credit Bid* (such as FCS or its designee), the Bidding Procedures again provided the requisite flexibility that ultimately was necessary for the Receiver to present an actionable transaction to the Court.  *See* Receiver Decl., ¶ 12.  The voicemail from Receiver's counsel cited by PJT (and other communications among the Receiver's counsel and PJT) recognizes the fluid nature of the situation facing the Receiver—and the very real possibility that a Credit Bid could be the only actionable offer for the Receivership Assets.  *See* Schlappig Declaration, Ex. A ("leave it at that for now . . . [and] leave . . . figuring out the rest for another day").  Notably, that voicemail was left by Receiver's counsel at 12:34 p.m. on June 16, 2023 (the same day the Receiver filed his motion seeking approval of the Bidding Procedures).  *See* Receiver Decl., ¶ 13.  This communication occurred *prior to the addition of the reservation of rights regarding the Transaction Fee* payable in the event of a Credit Bid.[8]  *Id.*

---

[8] PJT asserts that it viewed the reservation of rights language as "extra protection" and that "[w]ithout that certainty, PJT would have had serious reservations about proceeding with Round 2 of the sale process." *See* Surcharge Motion, at 7.  Regardless of such reservations, however, PJT would have been obliged to perform under the terms of the PJT Agreement and proceed with round 2 of the sale process (or seek termination of the PJT Agreement in accordance with its terms, in which case it also would not be entitled to any Transaction Fee).  *See* Receiver Decl., ¶ 14.

Consistent with the cited voicemail and other communications with PJT, the Receiver, recognizing the very real possibility that PJT's efforts may result in no actionable bids (leaving FCS to decide whether it wanted to (or would) make a Credit Bid), actively worked to avoid a dispute over payment of the Transaction Fee.  *See* Receiver Decl., ¶ 12.  However, following the voicemail from Receiver's counsel, it became clear that FCS would not agree to pay the minimum Transaction Fee to PJT in connection with submitting a cashless Credit Bid.  *Id*.  Recognizing the reality of the situation, after counsel's voicemail and prior to filing the motion seeking approval of the Bidding Procedures, the Receiver inserted the reservation of rights footnote.  *Id*., ¶ 13.  This language was meant to (and did) fully preserve the rights of *all parties* (including PJT and any party that might submit a Credit Bid, such as FCS or Aithre) with respect to payment of the Transaction Fee—including the ability of PJT to argue that it was entitled to more than its minimum Transaction Fee under the PJT Agreement and, conversely, the ability of a party submitting a Credit Bid to argue that PJT was entitled to nothing.  *Id*., ¶ 12.

### D. Round 2 of PJT's Marketing and Sale Process Produces More Disappointing Results.

Upon Court approval of the Bidding Procedures, PJT renewed its outreach to potentially interested parties, including three (3) potentially interested parties that it had not previously contacted.  *See* Receiver Decl., ¶ 15.  This outreach led to the execution of a confidentiality agreement by just one (1) new potentially interested party.  *Id*.  As with the initial round of the sale process, the second round resulting in only two (2) bids:  (i) a $20.5 million bid (the "Aircraft Bid") solely for the Receivership Entities' aircraft assets (which, even if the Receiver had accepted, would not have been part of the "Transaction Value" upon which PJT's Transaction Fee could be based under the express terms of the PJT Agreement, *see* n. 7, *supra*) and (ii) a bid from LTS Systems, LLC (the "LTS Credit Bid") for all Receivership Assets (including the aircraft) in

exchange for a $40 million Credit Bid of the FCS Obligations and assumption of $40 million in certain liabilities. *Id.*, ¶ 16. The Receiver determined that the Aircraft Bid (the amount of which was substantially less than the market value of the aircraft assets) was not a Qualified Bid because (among other things) it was contingent on the bidder obtaining financing. *Id.*, ¶ 17. In any case, in an effort to generate an Auction, the Receiver reached out to the bidder to inquire whether it was interested in increasing the amount of the Aircraft Bid in an Auction. *Id.* The bidder was not interested. *Id.*

Initially, the Receiver also determined that the LTS Credit Bid was not a Qualified Bid due to, *inter alia*, a due diligence contingency and the failure to provide for payment of certain items, including the Transaction Fee. *See* Receiver Decl., ¶ 18. Following further negotiations with LTS, however, LTS removed the due diligence contingency, the Receiver agree to waive the minimum cash requirement, and the Receiver deemed the LTS Credit Bid to be the sole Qualified Bid. *Id.*

Ultimately, despite two (2) separate rounds of a sale and marketing process spanning more than a year, the only other actionable (*i.e.*, not contingent on financing) EOIs that would have provided cash for the receivership estate were for $1 million and $10 million, respectively. The LTS Credit Bid indisputably is the highest and best non-contingent, actionable offer obtained for the Receivership Assets. *See* Receiver Decl., ¶ 19. Accordingly, the Receiver declared LTS to be the Successful Bidder and cancelled the Auction. *See Notice of (I) Cancellation of Auction and (II) Designation of Successful Bidder* (Doc. 364).[9]

---

[9] Notably, if PJT's sale process actually had produced *any* party willing to engage in competitive bidding at an Auction, the Receiver may not have needed to waive the minimum cash requirement in the Bidding Procedures.

## ARGUMENT

I.   **SURCHARGING COLLATERAL PURCHASED VIA CREDIT BID (AND FOR WHICH NO CASH PROCEEDS WILL BE REALIZED) IS INEQUITABLE, UNWARRANTED, AND CONTRARY TO THE PJT AGREEMENT.**

     A.   **PJT Cannot Alter the Terms of its Compensation Under the PJT Agreement.**

As is common for investment bankers, the Receiver and PJT agreed that the terms of PJT's retention could not be altered unless they were later determined to be "improvident in light of developments not capable of being anticipated" at the time PJT's retention was approved. *See* PJT Agreement, at 2; PJT Retention Order, ¶ 5. Such is the standard under section 328 of the Bankruptcy Code. *See* 11 U.S.C. § 328(a). Investment bankers require that standard of approval to protect against adverse changes to their fees based on the results of their services. Just as the "improvident" standard protects investment bankers from adverse changes to their fees, that standard also protects the counterparty (here, the receivership) from an investment banker's attempts to improve the terms of their compensation. Thus, the certainty and predictability of the improvident standard "come[s] at the expense of flexibility in fee structures." *In re Latam Airlines Grp. S.A.*, 643 B.R. 773, 789 (Bankr. S.D.N.Y. 2022). An investment banker, such as PJT, that "obtains the protection of" the improvident standard also "must live with the conditions of that" standard. *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 580-81 (Bankr. N.D. Tex. 2004); *Latam Airlines*, 643 B.R. at 789 (citing *Nucentrix*).

Here, PJT and the Receiver agreed that PJT would be paid (i) $500,000 up front as a non-refundable payment and (2) at least $1.5 million in "cash" but "solely" from any sale proceeds. PJT enjoyed the benefits of its bargain and received the $500,000 non-refundable Work Fee for which PJT has had to do only a moderate amount of work. A cashless Credit Bid was certainly capable of being anticipated when PJT was retained (*see* Receiver Decl., ¶ 5) and, therefore, the improvident standard prohibits the relief requested by PJT, which must live with the other terms

of its court-approved deal in the PJT Agreement:  Having failed to garner a Successful Bid that included cash proceeds, PJT has no claim to the $1.5 million minimum Transaction Fee.  *See, e.g.*, *Latam,* 643 B.R. at 783 (finding that improvident standard was not satisfied and, therefore, rejecting attempt to enhance PJT's compensation based on equitable considerations); *In re Amberjack Interests, Inc.*, 326 B.R. 379, 387 (Bankr. S.D. Tex. 2005) ("[fee applicant who] enjoyed the benefit of [improvident standard] in protecting his fee from potential reduction . . . must also accept [its] rigid standard in attempting to enhance his fee") (alterations added).[10]

For the foregoing reason alone, the Court should deny PJT's request to alter the terms of its compensation, whether based upon some generalized equity considerations or otherwise.  PJT simply cannot make the showing necessary to satisfy the improvident standard as required to alter its compensation.

### B.   Principles of Equity Do Not Support Imposition of a Surcharge on the Property to Sold to LTS.

Even assuming *arguendo* that PJT is entitled to modify the PJT Agreement without satisfying the improvident standard (and it is not), PJT still is not entitled to the relief it requests.  At least where the improvident standard has not been invoked, the inherent powers of an equity court imbue District Courts with wide discretion to fashion appropriate relief in an equity receivership.  *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372 (5th Cir. 1982); *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir. 1978).  This discretion extends to the Court's "power to tax receivership costs and expenses" to parties or assets (*i.e.*, impose a surcharge) as appropriate.

---

[10] PJT's argument that the Bidding Procedures somehow altered its compensation rights under the PJT Agreement lacks merit.  Nothing in the Bidding Procedures purports to alter the PJT Agreement. Moreover, PJT's interpretation of the reservation of rights as applying only to the amount in excess of the minimum Transaction Fee is baseless.  The reservation of rights in the Bidding Procedures expressly reserved "all" rights to challenge the payment of any "Transaction Fee" to PJT.  Moreover, PJT downplays the unambiguous language in the Bidding Procedures providing that the Receiver has the right to modify the Bidding Procedures in his discretion.  *See* Bidding Procedures, p. 16.

*Tanzer v. Huffines*, 315 F.Supp. 1140, 1142 (D. Del. 1970).  It therefore has long been recognized that:

> in equity [receivership] proceedings allowance and imposition of costs and expenses rests with the sound discretion of the Court to be assessed in accordance with justice, unburdened by any fixed rule. Hence, ***governed by a sense of what is fair and just under the circumstances***, this Court could tax costs prior to a final disposition of the litigation, could determine which of the parties may be assessed, and could apportion the costs among the various parties.

*Id*. at 1143 (internal citations and quotations omitted) (emphasis added).  A court sitting in equity therefore may impose liens for receivership expenses that take priority over secured creditors' interests in their collateral when the receiver's acts have benefited the property, *SEC v. Elliott*, 953 F.2d 1560, 1576-77 (11th Cir. 1992), as well as where the creditor acquiesced to the receivership (as opposed to a surcharge specifically), *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994).   *See also Keybank Nat'l Assoc. v. Monolith Solar Assocs. LLC*, 2022 U.S. Dist. LEXIS 240828, at *12-13 (N.D.N.Y. May 23, 2022).

Wide as it may be, however, a District Court's discretion to surcharge a secured creditor's collateral is not unlimited, and surcharge requests are not granted routinely or automatically.  The fact that a party (such as PJT) *might* be entitled to recover costs from a secured creditor's collateral "does not end the inquiry in an equity receivership because equitable concerns may supersede those . . . rights." *SEC v. Credit Bancorp, Ltd.*, 2000 U.S. Dist. LEXIS 17171, at *95 (S.D.N.Y. Nov. 29, 2000).  As PJT has received the full amount of its $500,000 Work Fee and is not entitled to any other compensation under the PJT Agreement, the balance of the equities and underlying circumstances do not warrant imposition of a surcharge, and this Court should deny PJT's requested relief.  *See In re Nw. Airlines Corp.*, 382 B.R. 632, 638 (Bankr. S.D.N.Y. 2008) ("it would be inappropriate and inequitable for the Court to grant a success or completion fee to a

professional that was not only fully compensated but also refused to provide evidence why it is entitled to receive an additional award").

### C.   Standards Governing Surcharges.

A court of equity should "follow wherever practical" analogous insolvency law.  Ralph E. Clark, 3 TREATISE ON THE LAW AND PRACTICE OF RECEIVERS, § 667.4 at 1215 and n. 447 (3d. 1959); *Janey v. Alguire*, 2014 U.S. Dist. LEXIS 193394, *3 (N.D. Tex. July 30, 2014) ("Bankruptcy law repeatedly borrow[s] principles from receivership law and vice versa. Thus, in some ways the two bodies of law evolved together . . .".).  As a result, in determining whether a surcharge is warranted, receivership courts consistently take cues from well-established bankruptcy law interpreting section 506(c) of the Bankruptcy Code, which permits a trustee (or debtor in possession) to recover from a secured creditor's collateral any reasonable and necessary cost of preserving such collateral to the extent that such efforts directly benefit the secured creditor. *See, e.g.*, *MW Cap. Funding, Inc. v. Magnum Health and Rehab of Monroe LLC*, 2019 U.S. Dist. LEXIS 127463, at *5-7 (E.D. Mich. July 31, 2019) (considering acquiescence after discussing §§ 506(c) and 507 by way of analogy); *accord*, *U.S. v. FDIC*, 899 F. Supp. 50, 54 (D. R.I. 1995) ("[w]hen determining whether a surcharge is appropriate in a receivership proceeding, courts look to bankruptcy law for guidance"); *SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017); *Unisys Fin. Corp. v. Resolution Trust Corp.,* 979 F.2d 609, 611 (7th Cir. 1992) (same).  This is, in part, because the primary purpose of both receivership and bankruptcy proceedings is to promote the efficient and orderly administration of estates for the benefit of creditors.  *See Fidelity Bank, Nat'l Ass'n v. M.M. Grp.*, 77 F.3d 880, 882 (6th Cir. 1996).

Imposition of a surcharge under section 506(c) requires a showing that the expenses sought were reasonable, necessary, and provided a direct and *quantifiable* benefit to the secured creditor. *See In re Cascade Hydraulics and Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987); *In re*

*Ferncrest Court Partners Ltd.*, 66 F.3d 778 (6th Cir. 1995).  Any such recovery "is limited to the extent that the secured creditor benefited from the services" because a surcharge "is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the . . . estate." *Id*. (citation omitted).  To that end, courts in this District have allowed estate professionals to recoup their fees and costs in administratively insolvent cases when the efforts of such professionals generated a sale of assets when there otherwise would have been no recovery to secured creditors.  *See, e.g.*, *In re Pudgie's Dev. of N.Y.*, 223 B.R. 421, 424 (Bankr. S.D.N.Y. 1998) ("It is my conclusion that an award under Section 506(c) to Debtors' counsel . . . is appropriate in the circumstances of this case. The . . . firm played an *exceptional and vital role in bringing the sale of the Debtors' assets* to fruition.") (emphasis added); *In re Croton River Club*, 162 B.R. 656 (Bankr. S.D.N.Y. 1993) (granting Debtor's attorney's request to surcharge *proceeds* from a sale pursuant to section 506(c) with its fees).

The opposite must be true:  where a professional seeking to surcharge a secured creditor's collateral to pay its fees and expenses did not play an "exceptional and vital role" in bringing a disposition of the collateral to fruition and no cash proceeds from such sale exist, surcharging that collateral is unwarranted and inequitable.  This comports with the equitable common law rule on which section 506(c) is based, which "is designed to prevent a windfall to the secured creditor at the expense of the claimant."  *Precision Steel Shearing Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (citing *IRS v. Boatman's First Nat'l Bank of Kansas City*, 5 F.3d 1157, 1159 (8th Cir. 1993)).  It follows that where, as here, there is no "windfall" to the secured creditor, a party is not entitled to surcharge that secured creditor's collateral.

PJT also fails to demonstrate that its efforts provided a direct and quantifiable benefit to FCS.  *See Cascade Hydraulics*, 815 F.2d at 548 ("To satisfy the benefit test of section 506(c), [the

debtor] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral."). The law is clear that unless a tangible benefit to a secured creditor can be shown, a surcharge of that creditor's collateral is impermissible. Broad assertions that "FCS clearly sought and benefitted from PJT's entire sale process" are insufficient. *See* Surcharge Motion, at 15. PJT's rank speculation of hypothetical, future benefits, such as a 'reasonable assumption' that its "efforts will materially benefit FCS in ultimately monetizing what it is buying," is not a substitute for proof of a direct, quantifiable benefit. *Id.*; *see also In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985). PJT is therefore unable to demonstrate that surcharging FCS' collateral is appropriate under the circumstances.

**D. PJT's Surcharge Request Must Be Denied Because There Are No Proceeds of Collateral From Which to Pay a Transaction Fee.**

Principles of equity dictate (and analogous case law supports) the conclusion that a surcharge on a secured creditor's collateral is limited to the collateral itself or the proceeds therefrom. Neither section 506(c) nor receivership case law on surcharges permits direct recovery from the secured creditor. *E.g.*, *In re Orfa Corp.*, 170 B.R. 257, 274 (E.D. Pa. 1994) (noting that "costs and expenses may be recovered under section 506(c) only from the proceeds of the property with respect to which they were expended") (citation omitted); *United States Tr. v. Messer (In re Pink Cadillac Assocs.)*, 1997 U.S. Dist. LEXIS 4382, at *16 (S.D.N.Y. Apr. 7, 1997) (no right under section 506(c) to seek compensation directly from a secured creditor); *In re Anderson,* 66 B.R. 97, 99 (9th Cir. B.A.P. 1986) (payment of section 506(c) surcharge is to be paid out of sale proceeds before distribution to the secured creditors). In the context of a credit bid, there are *no* cash proceeds. Consequently, a secured creditor can have no liability for the costs and expenses of sale if there are no proceeds from its collateral.

In arguing its purported entitlement to surcharge FCS' collateral, PJT conveniently ignores the realities of this case.  The fact is that, despite marketing the Receivership Assets for over a year during a two (2) stage process, PJT failed to bring any actionable offer to the table in excess of $10 million.  *E.g.*, Receiver Decl., ¶ 19.  The LTS Credit Bid is the only game in town.  Thankfully, the PJT Agreement contemplated this scenario where no cash proceeds were available to pay the Transaction Fee.  That is why the Receiver specifically negotiated that any Transaction Fee due to PJT must be paid in "cash" and "solely" from the proceeds of a Transaction.  *Id.*, ¶ 5.

Finally, any argument that FCS' collateral should be surcharged on the basis of express or implied acquiescence thereto should be rejected outright.  Even where a secured creditor consents to or acquiesces in the receivership itself (or, as here, sought and obtained the appointment of the Receiver), a professional such as PJT cannot recover expenses from the proceeds of the creditor's collateral solely on that basis.  This is because the sale of assets in a receivership case is conducted independent of the creditors under the authority of the court and for the interest of the general creditors, not on the authority of the secured creditors and for their particular interests.  *See U.S. v. FDIC*, 899 F. Supp. at 56.  This also is not a case where the secured creditor that sought appointment of a receiver seeks to shirk its duty to pay its fair share of administrative expenses.  Indeed, FCS has single-handedly financed this receivership case for nearly two (2) years to the tune of nearly $7 million, which Financing provided the Receiver with the necessary runway and opportunity to determine if a sale could be achieved that would benefit creditors generally.  Receiver Decl., ¶ 6.  Any assertion that FCS' collateral is subject to surcharge because it sought (and obtained) appointment of the Receiver must be rejected.

Given the lack of any proceeds from the proposed sale of FCS' collateral, the Receiver respectfully submits that imposition of the requested surcharge would be incongruent with

controlling case law and principles of equity.  Accordingly, the Court should deny the Surcharge Motion and enter the Approval Order granting the relief sought in the Sale Motion and approving the Sale Transaction, free and clear of all interests, Liens, and Encumbrances.

## II.   THE RECEIVER HAD THE EXPRESS ABILITY TO MODIFY THE BIDDING PROCEDURES AS AN EXERCISE OF HIS SOUND BUSINESS JUDGMENT.

The Court can quickly dispense with PJT's argument regarding the Receiver's ability to modify the Bidding Procedures.  As PJT acknowledges, reservations of rights such as those in the Bidding Procedures are fairly commonplace.  *See* Surcharge Motion, at 16.  Citations to inapposite case law aside, PJT provides no authority for its assertion that the modification of court-approved bidding procedures is permissible *only* when doing so would either clarify uncertainty or maximize value (which, here, was the case).  *Cf. Corp. Assets Inc. v. Paloian (In re GGSI Liquidation Inc.)*, 368 F.3d 761 (7th Cir. 2004) (court-approved bidding procedures contained modification provision allowing the debtor to reject any bid contrary to its best interests prior to the sale hearing).  If that were truly the case, such broad reservations of rights would not be "fairly common."  PJT's suggestions to the contrary imply that courts merely rubber-stamp such provisions.  Surely PJT is not suggesting that this Court approved the Bidding Procedures without considering the import of allowing the Receiver to make modifications to the procedures as necessary.

The circumstances of this case are exactly what a broad reservation of rights in bidding procedures is intended to address.  Once the Rising Sky deal fell through and he determined to pursue another round of the sale process with PJT, the Receiver was mindful of the very real possibility that the end result of such process would be a cashless credit bid.  *See* Receiver Decl., ¶¶ 10-11.  The Bidding Procedures appropriately reflect the Receiver's desire to balance the realities of the case with the goal of obtaining an actionable bid that would bring cash into the receivership estate.  To that end, the Bidding Procedures were purposefully drafted with an eye

toward providing the maximum amount of flexibility to enable the Receiver to propose an acceptable transaction for court approval. *Id*., ¶ 11. Thus, the Receiver can "modify the Bidding Procedures, the Auction Procedures, and the other rules" ***and*** waive any of the Qualified Bid requirements. *See* Bidding Procedures, at 16. PJT cannot simply ignore this clear language. Such rights were necessary to enable the Receiver to maximize value and (as in this case) reach an agreement with LTS—the ***only*** Qualified Bidder that provided an actionable bid. If the Receiver did not exercise his powers to modify the Bidding Procedures and waive certain Qualified Bid Requirements, there would be no sale transaction to put before the Court notwithstanding two (2) attempts by PJT to obtain bids and stimulate an Auction.

The goal of any sale in a receivership case is to obtain the highest and best offer for the assets. Ideally, modification of the Bidding Procedures would never be necessary to accomplish that goal. The Receiver never desired to be in a position where the highest, best, and only actionable offer for the Receivership Assets was a cashless Credit Bid. Indeed, PJT was engaged to *avoid* such a result. Case law discussing modifications to bidding procedures teaches that parties who contribute to the circumstances requiring modifications of such procedures cannot complain when such procedures are modified to that party's detriment:

> This all sounds a bit like the old story of the boy who shot his parents and then asked for special treatment because he was an orphan. The changed auction procedures in this case were, in significant measure, a function of the Pursuit Parties' contentious and at times obstreperous behavior. It is clear that the Trustee had the authority to move to a sealed-bid procedure and did so precisely so that he could comply with his fiduciary duties. A trustee has the duty to "close [the] estate as expeditiously as is compatible with the best interests of parties in interest[.]"

*Pursuit Cap. Mgmt. Fund I, L.P. v. Burtch (In re Pursuit Cap. Mgmt., LLC)*, 874 F.3d 124, 137 (3d Cir. 2017). Applying the Third Circuit's logic here, PJT cannot now complain that the

modification of the Bidding Procedures was inequitable where it was PJT's marketing and sale process that resulted in the LTS Credit Bid being the highest, best, and *only* actionable offer.

In sum, notwithstanding PJT's arguments to the contrary, the Receiver at all times acted well within the scope of his authority and consistent with his fiduciary duties and the sound exercise of his business judgment in overseeing the sale of the Receivership Assets—including in making the determination to modify the Bidding Procedures and Qualified Bid requirements and deeming the LTS Credit Bid a Qualified Bid. The Bidding Procedures allowed the Receiver significant latitude to make such a determination for good reason: the lackluster results of a lengthy sale and marketing process led by a well-respected investment banker, coupled with FCS' reticence in outright agreeing to provide cash to pay (among other things) the Transaction Fee in connection with a Credit Bid, made it apparent that a cashless Credit Bid very well could be the ultimate outcome.

At bottom, in the absence of exceptional circumstances, the Court should "not second guess the [Receiver's] determination of a bidder's qualifications." *In re MTE Holdings LLC*, 2021 Bankr. LEXIS 2225, at *29-30 (Bankr. D. Del. Aug. 17, 2021). No such exceptional circumstances exist here. For these reasons, the Receiver submits that the modifications of the Bidding Procedures made in connection with his determination that the LTS Credit Bid is a Qualified Bid were (i) permissible under the plain terms of the Bidding Procedures and (ii) made in an exercise of his sound business judgment based on the circumstances of this case. These modifications cannot now be collaterally attacked by a party that, in many senses, bears at least partial responsibility for the outcome of the sale process. Accordingly, the Receiver respectfully requests that the Court reject PJT's assertions and approve the proposed Sale Transaction "free and clear" in accordance with the Approval Order.

## CONCLUSION

WHEREFORE, the Receiver respectfully requests that this Court:  (i) deny the relief sought by PJT in the Surcharge Motion; (ii) enter the Approval Order, substantially in the form attached as **Exhibit A** to the Sale Motion, granting the relief requested therein; and (iii) grant the Receiver such other relief as is appropriate.

Dated: September 11, 2023
      New York, New York

Respectfully submitted,

REED SMITH LLP

By:   */s/ Kurt F. Gwynne*
      Kurt F. Gwynne
      599 Lexington Avenue
      New York, New York 10022
      Telephone:  (212) 521-5400
      Facsimile:  (212) 521-5450
      E-mail:  kgwynne@reedsmith.com

      - and -

      Jason D. Angelo, Esq. (admitted *pro hac vice*)
      1201 N. Market Street, Suite 1500
      Wilmington, Delaware 19801
      Telephone:  (302) 778-7500
      Facsimile:  (302) 778-7575
      E-mail:  jangelo@reedsmith.com

      *Counsel for Michael Fuqua, in his capacity as*
      *Receiver of Theia Group, Inc., Theia Aviation LLC,*
      *and Theia Holdings A, Inc.*