UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, LLC,

                                        Plaintiff,

            —against—                                           21 Civ. 6995 (PKC)

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN"; THEIA
AVIATION, LLC; and THEIA HOLDINGS A,
INC., d/b/a "THORIAN HOLDINGS,"

                                        Defendants.

### DECLARATION OF MICHAEL FUQUA, AS RECEIVER, IN OPPOSITION TO (A) RESPONSE OF PJT PARTNERS LP TO RECEIVER'S SALE MOTION AND REQUEST FOR RELATED RELIEF AND (B) MOTION TO SURCHARGE COLLATERAL

I, Michael Fuqua, hereby declare as follows:

1.      On November 8, 2021, the United States District Court for the Southern District of New York (this "Court")[1] entered an *Order Appointing Michael Fuqua as Receiver* (Doc. 117) in the above-captioned case.  Accordingly, I am the Court-appointed receiver for the Receivership Entities.

2.      I submit this declaration (this "Declaration") in support of the *Receiver's Memorandum of Law in Opposition to (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral* (the "Opposition") filed contemporaneously herewith.

3.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

---

[1] Capitalized terms used but not defined here shall have the meanings given to such terms in the Opposition.

A.    **Engagement of PJT and Available Sources for Payment of Fees.**

4.      As part of my efforts to "seek a bona fide purchaser of the Receivership Entities'
Federal Communications Commission ("FCC") License Assets . . . and . . . take all steps necessary
to effectuate a transfer or sale of the assets" of the Receivership Entities, I retained PJT to provide
investment banking services regarding a Transaction (as defined in the PJT Agreement).  Among
other things, PJT agreed to assist my team and me with "analyzing, structuring, negotiating and
effecting one or more Transactions," preparation of marketing materials, and identification of
potential purchasers.

5.      I agreed to compensate PJT for its services based on a fee structure providing for,
among other things, payment of (i) a $500,000 Work Fee, which was nonrefundable and fully-
earned upon execution and Court approval of the PJT Agreement (PJT has received the Work Fee)
and (ii) a Transaction Fee "payable in cash" at the closing of a Transaction "directly and solely out
of the gross proceeds of the Transaction."   The purpose of the provision requiring that any
Transaction Fee be payable in cash and only out of the gross proceeds of a Transaction was to
make clear that, if a Transaction brought no cash into the receivership estate, PJT would not be
entitled to a Transaction Fee because there would be no cash to pay the Transaction Fee.

6.      My efforts to sell the Receivership Entities' assets were made possible only through
receipt of $6.8 million in Financing from FCS to cover the administrative costs of the receivership
estate.  However, the receivership could only use the Financing in accordance with the budget
annexed to the *Receiver's Certificate Purchase and Security Agreement* (as amended from time to
time).  The fees or expenses of PJT (other than the $500,000 Work Fee) are not (and have never
been) included in the approved budget.  Accordingly, the Financing was never a source of PJT's

Transaction Fee, which agreed to payment thereof in "cash" "solely" out of the proceeds of a Sale Transaction.

### B.    PJT's Initial Sale and Marketing Process

7.      As part of the initial round of the sales and marketing process, PJT compiled a list of prospective purchasers, set up a virtual data room populated with a marketing presentation and available information and documentation regarding the Receivership Assets, reportedly contacted fifty seven (57) potentially-interested parties, and distributed a one-page teaser, nine-page asset summary, and form confidentiality agreement (which my counsel drafted).

8.      Following PJT's outreach efforts, only eleven (11) potentially interested parties executed non-disclosure agreements.  Only two (2) of those parties submitted actionable EOIs that were not contingent upon financing.  Those EOIs were in the amounts of $1 million and $10 million, respectively.  Although a $300 million EOI was submitted, it was contingent on the potential purchaser obtaining financing (which quickly failed to occur).  Thus, after an initial round of marketing and solicitation of indications of interest, the only actionable EOIs (which were for the purchase and sale of the FCC License and NOAA License) were for $1 million and $10 million.

9.      While PJT conducted the initial sale and marketing process, I entered into parallel negotiations with Rising Sky.  The ultimate purchase price that I agreed to with Rising Sky was approximately $800 million—over 80 times the highest actionable EOI from PJT's initial sale process.  As a result of the Risking Sky APA, I paused PJT's sale efforts.  Ultimately, despite many promises of imminent financing from multiple financing sources over several months, Rising Sky failed to obtain the necessary financing and was unable to pay the $40 million deposit required under the Rising Sky APA.

**C.   The Bidding Procedures Were Purposefully Drafted to be as Flexible as Possible.**

10.      Rather than consummate a $10 million transaction for a portion of the Receivership Assets, I decided to restart the marketing and sale process.  To that end, in June 2023, I sought (and obtained) Court approval of Bidding Procedures to govern the second round of the process. The Bidding Procedures purposely provided me the maximum amount of flexibility necessary to fulfil my fiduciary duty to maximize value for the receivership estate.

11.      Specifically, I was expressly permitted to modify the Bidding Procedures in the exercise of my business judgment, and I also reserved the right to waive *any* of the Qualified Bid requirements set forth in the Bidding Procedures and thereby deem a bid to be a Qualified Bid notwithstanding any noncompliance with such requirements.  That flexibility was important to make sure that I would have an actionable purchase and sale agreement without any further delay in the resolution of this receivership.

12.      I actively worked to avoid a dispute over payment of the Transaction Fee by ensuring that the initial Bidding Procedures required any Credit Bid to include cash sufficient to pay the minimum Transaction Fee payable to PJT under the PJT Agreement.  Given the fluid nature of the sale process and the potential that a cashless Credit Bid could be the only actionable offer and given that FCS steadfastly reserved its rights with respect to the payment of any Transaction Fee in connection with submitting its Credit Bid, I directed my counsel to include an express reservation of rights regarding the Transaction Fee.  The reservation of rights language was intended to fully preserve the rights of *all parties* (including PJT, any party that might submit a Credit Bid, such as FCS or Aithre, and me) with respect to payment of any Transaction Fee.  In other words, PJT was free to argue that it was entitled to more than its minimum Transaction Fee

under the PJT Agreement and, conversely, a party submitting a Credit Bid was free to argue that PJT was entitled to nothing if the Credit Bid contained no cash proceeds.

13.     On June 16, 2023 (the day the motion seeking approval of the Bidding Procedures was filed), my counsel left a voicemail with Michael Schlappig of PJT at 12:34 p.m. regarding the status of how the Transaction Fee would be provided for under the Bidding Procedures.  However, this communication occurred *before* it became clear that FCS would not agree to include cash in any Credit Bid it submitted and *before* my counsel inserted the unequivocal reservation of rights regarding the Transaction Fee payable in the event of a Credit Bid into the Bidding Procedures.

14.     PJT's suggestion that it would not have conducted the second stage of the sale process if it understood the plain language of the reservation of rights in the Bidding Procedures applied to the minimum Transaction Fee is baseless.  The PJT Agreement *required* PJT to conduct the sale process, and PJT had already received the $500,000 Work Fee.

**D.     More Disappointing Results in Round 2 of the Sale and Marketing Process.**

15.     Once the Court approved the Bidding Procedures, PJT renewed its outreach to potentially interested parties, including three (3) parties that it had not previously contacted.  This outreach led to the execution of a confidentiality agreement by just one (1) new party.

16.     Ultimately, the second round of the sale and marketing process resulted in only two (2) bids:  (i) a $20.5 million bid solely for the Receivership Entities' aircraft assets (which, even if I had accepted, would not have been part of the "Transaction Value" upon which PJT's Transaction Fee could be based under the express terms of the PJT Agreement) and (ii) the LTS Credit Bid for all Receivership Assets (including the aircraft) in exchange for a $40 million Credit Bid of the FCS Obligations and assumption of $40 million in certain liabilities.

17.     I determined that the Aircraft Bid was not a Qualified Bid because (among other things) it was contingent on the bidder obtaining financing and failed to include a draft asset purchase agreement.  Notwithstanding that the Aircraft Bid was not a Qualified Bid, in an attempt to stimulate competitive bidding at an Auction, I reached out to the bidder to inquire whether it was interested in increasing the amount of the Aircraft Bid in an Auction, but the bidder told me that it was not interested in doing so.

18.     I initially determined that the LTS Credit Bid was not a Qualified Bid due to, *inter alia*, a due diligence contingency and the failure to provide for payment of certain items (including the Transaction Fee).  After additional negotiations, LTS removed the due diligence contingency and, without another actionable Bid, I modified the Bidding Procedures to waive the minimum cash requirement.  Accordingly, I deemed the LTS Credit Bid to be the sole Qualified Bid. Because the LTS Credit Bid indisputably was the highest and best non-contingent, actionable offer for the Receivership Assets following a two-round sales and marketing process spanning over one (1) year, I declared LTS to be the Successful Bidder and cancelled the Auction.

19.     More than a year after the commencement of the receivership, after the conclusion of the two-stage PJT sale process and my own direct negotiations with parties outside of that sale process, I believe that the LTS Credit is the highest and best actionable offer to purchase the Acquired Assets (as defined in the Sale Motion).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  September 11, 2023

By:     */s/ Michael Fuqua* _____
        Michael Fuqua