UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

FCS ADVISORS, LLC,

                        Plaintiff,

         --against--                                 21 Civ. 6995 (PKC)

THEIA GROUP, INC., d/b/a "THORIAN GROUP"
and/or "CYPHERIAN"; THEIA AVIATION, LLC;
and THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS,"

                        Defendants.
_____

**DECLARATION OF MICHAEL SCHLAPPIG IN SUPPORT OF PJT PARTNERS LP'S MEMORANDUM IN SUPPORT OF REPLY TO OBJECTIONS OF (I) FCS ADVISORS, LLC AND (2) THE RECEIVER TO PJT PARTNERS LP'S (A) RESPONSE TO SALE MOTION AND (B) MOTION TO SURCHARGE COLLATERAL**

        I, Michael Schlappig, pursuant to 28 U.S.C. § 1746, declare that the following is true to the best of my knowledge, information and belief:

        1.    I am a Managing Director in the Restructuring and Special Situations Group at PJT Partners LP ("PJT"). PJT was retained as investment banker to Michael Fuqua in his capacity as the receiver (the "Receiver") for Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc (the "Receivership Entities"), pursuant to the *Order Granting Motion of Receiver for an Order Authorizing the Retention of PJT Partners LP as Investment Banker* [Docket No. 207] (the "Retention Order").

        2.    I submit this declaration (this "Declaration") in support of *PJT Partners LP's Memorandum in Support of Reply to Objections of (I) FCS Advisors, LLC and (2) the Receiver to*

*PJT Partners LP's (A) Response to Sale Motion and (B) Motion to Surcharge Collateral* (the "Reply"), filed contemporaneously herewith.[1]  I have reviewed the Reply, and based on my personal knowledge, agree with the factual allegations set forth therein.

3. Unless otherwise indicated, all of the statements set forth in this Declaration are based upon (i) my personal knowledge, (ii) my discussions with other members of the PJT team, other professional advisors to the Receivership Entities or other interested parties, and/or (iii) information learned from my review of relevant documents. If called upon, I would and could testify competently to the statements set forth herein.

4. PJT was retained pursuant to the engagement letter between the Receiver and PJT dated December 28, 2021 (the "Engagement Letter").  The Engagement Letter, a copy of which is attached to the Receiver's application to retain PJT, provided that PJT could terminate its engagement at any time, with or without cause, on thirty days written notice.  *See* Engagement Letter at 7.  Moreover, when the Receiver asked PJT to conduct the second round of the sale process, PJT had already earned its Work Fee in connection with the first round of the sale process and, had PJT chosen to terminate the Engagement Letter, would have been under no obligation to return all or any portion of it.  Specifically, the Engagement Letter provided that if PJT terminated the Engagement Letter without cause, PJT was required to return a portion of the Work Fee only if such termination occurred within 150 days after Court approval of the Engagement Letter, *see* Engagement Letter at 8,  and when PJT was asked to engage in the second round of the sale process, well over 150 days had passed since the entry of the Retention Order.

5. Being under no obligation to continue providing services under the Engagement Letter, PJT carefully considered the Receiver's request to conduct the second round of the sale

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Reply.

process, especially in light of all parties' understanding at that time that, as was not anticipated for round one of the sale process, a credit bid by FCS would most likely be the winning bid. Asking PJT to facilitate the effective equivalent of a foreclosure by FCS, including a fair sale process, for no compensation, as would have been the result under the Engagement Letter if the winning bidder did not provide sufficient cash to pay PJT's Transaction Fee, would have been an unacceptable proposition to PJT. Accordingly, PJT determined that it would require certain assurances of payment if the winning bid was a cashless credit bid, and expressed this position to the Receiver's counsel. PJT would not have agreed to conduct the second round of the sale process if it had known that it was expected to do so for free.

6. I was informed by the Receiver's counsel that FCS agreed that PJT would receive payment in cash in the amount of PJT's minimum $2.0 million Transaction Fee (less the Work Fee already paid) in connection with the second round of the sale process, including in the event of any credit bid. My understanding is that FCS communicated to the Receiver that FCS was concerned that PJT may seek to be paid *more* than its minimum Transaction Fee in the case of a pure credit bid. As a consequence, the Receiver's counsel was able to resolve the issue of PJT's fee in the event of an otherwise pure credit bid by agreeing to set a floor that would be paid in cash—$1.5 million (crediting the Work Fee already paid)—with the possibility for PJT to receive more depending on the terms of any credit bid. That was the clear understanding of the resolution as communicated to me by the Receiver's counsel on the day that the Bidding Procedures Motion was filed, as reflected in the exhibits to my prior Declaration in Support of PJT's Response and Surcharge Motion [Dkt. 380] (the "First Schlappig Declaration"). I understood then and thereafter that FCS, which I understood was in consultation with the Receiver's counsel throughout, was

amenable to this resolution. PJT relied on the representations made by the Receiver's counsel in agreeing to provide services in respect of the second round of the sale process.

7. The Receiver's objection nevertheless attempts to backtrack on this agreement. For example, the Receiver attempts to discredit the voicemail left for me by his counsel by stating that the voicemail was left "*before* it became clear that FCS would not agree to include cash in any credit bid it submitted and *before* my counsel inserted the unequivocal reservation of rights regarding the Transaction Fee payable in the event of a credit bid into the Bidding Procedures." Receiver Decl. ¶ 13 (emphasis in original). Yet, on Monday, June 19—the first weekday day after the voicemail was left and the Bidding Procedures were filed—I sent an email to Receiver's counsel stating that I had received his voicemail and the resolution suggested in the voicemail was acceptable. The Receiver's counsel responded with a copy of the Bidding Procedures and form asset purchase agreement redlined to reflect the reservation of rights. *See* **Exhibit A** (the "June 19 Email"). Nowhere in that communication or later did the Receiver's counsel suggest that in the time between the voicemail and the filing of the Bidding Procedures (a matter of hours at most), "it became clear that FCS would not agree to include cash in any credit bid it submitted" and that the Receiver and FCS were reneging on the deal with PJT. Indeed, in a telephone conversation between the Receiver's counsel and me after I received the redlined copy on June 19, Receiver's counsel *re-confirmed* my understanding that PJT's minimum Transaction Fee would be paid in a credit bid situation, as detailed in the voicemail.

8. The Receiver's characterization is further contradicted by the July 20 Email and Spreadsheet, attached at **Exhibit B** to the First Schlappig Declaration, sent by the Receiver's counsel to the Receiver, FCS's attorneys, and me. As set forth in the First Schlappig Declaration, over a month after the Bidding Procedures were filed, and before the hearing on them, the

4

Receiver's counsel sent an email attaching a spreadsheet "setting forth the minimum cash portion required for any bids." That spreadsheet included a line item for a "Minimum PJT Transaction Fee" of $1.5 million, and a comment that the "[m]inimum fee payable to PJT is $2 million; $500,000 previously paid to PJT." The spreadsheet further included a line item for an "Additional PJT Transaction Fee," with the outstanding amount "TBD." A footnote to the spreadsheet provided that all rights were reserved with respect to any PJT Transaction Fee "*in excess of*" $1.5 million. (Emphasis added.)

9. In fact, not until PJT completed its work on the second round of the sale process was FCS's refusal to pay PJT's minimum Transaction Fee as part of a cashless credit bid communicated to PJT. Around this same time, PJT was advised that the Receiver and FCS intended to use the "reservation of rights" language in the Bidding Procedures to undermine PJT's basis for performing its services in respect of the second round of the sale process.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my information, knowledge and belief.

Dated: September 18, 2023
New York, New York

_____
Michael Schlappig
PJT Partners LP

*[Remainder of page intentionally left blank]*