UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

FCS ADVISORS, LLC,

                              Plaintiff,

        --against--                            21 Civ. 6995 (PKC)

THEIA GROUP, INC., d/b/a "THORIAN GROUP"
and/or "CYPHERIAN"; THEIA AVIATION, LLC;
and THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS,"

                              Defendants.
_____

## PJT PARTNERS LP'S WITNESS LIST
## IN CONNECTION WITH OCTOBER 5, 2023 HEARING

PJT Partners LP ("PJT") hereby identifies, in accordance with this Court's Order dated September 29, 2023 [Dkt. No. 398] (the "Order"), Michael Schlappig, Managing Director at PJT Partners LP, investment banker to the Receiver (the "Witness"), as the sole witness PJT intends to call at the hearing scheduled for October 5, 2023 at 3 pm ET (the "Hearing"):

Counsel to PJT and counsel to each of (i) Michael Fuqua, in his capacity as receiver of Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (the "Receiver") and (ii) FCS Advisors, LLC ("FCS" and together with PJT and the Receiver, the "Parties") have met and conferred, and have narrowed the disputed factual issues requiring live testimony from PJT to those set forth below, subject to the review process based on the Parties' witness designations set forth in this Court's Order. Accordingly, the disputed issues of fact that turn on witness credibility

on which PJT wishes to call the Witness, and the proposed substance of his testimony, are as follows:

    I.    **Issue**: The factual grounds supporting the bases in equity and/or acquiescence or implied consent for PJT's claim that either (a) the Receiver should not be allowed to waive the requirement in the bidding procedures (the "<u>Bidding Procedures</u>") to declare the LTS Systems, LLC ("<u>LTS</u>") credit bid a Qualified Bid[1] without providing for payment of PJT's minimum Transaction Fee and/or (b) FCS's collateral should be surcharged the amount of such fee.

    1.    **Testimony**: PJT's understanding of the minimum Transaction Fee prior to agreeing to run the second sale process in light of (a) the engagement letter dated December 28, 2021, by and between PJT and the Receiver (the "<u>Engagement Letter</u>"), (b) discussions with the Receiver's counsel, and (c) the Bidding Procedures. Specifically, Mr. Schlappig will testify to the following:

    (a)    PJT was retained pursuant to the Engagement Letter. The Engagement Letter provided that PJT could terminate its engagement at any time, with or without cause, on thirty days written notice. When the Receiver asked PJT to conduct the second round of the sale process, PJT had already earned and had been paid its Work Fee in connection with the first round of the sale process and, had PJT chosen at that time to terminate the Engagement Letter, would have been under no obligation to return all or any portion of the Work Fee. Specifically, the Engagement Letter provided that if PJT terminated the Engagement Letter without cause, PJT was required to return a portion of the Work Fee only if such termination occurred within 150 days after Court approval of the Engagement Letter, *see* Engagement Letter at 8, and when PJT was asked to engage in the second round of the sale process, well over 150 days had passed since the entry of the Retention Order. Second Schlappig Declaration ¶ 4. Accordingly, when the Receiver approached PJT about running a second sale process, PJT understood that it was *not* required to do so to retain the full amount of the Work Fee because more than 150 days had elapsed since approval of PJT's engagement.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Declaration of Michael Schlappig in Support of Memorandum of Law in Support of (A) Response of PJT Partners LP to Receiver's Sale Motion and Request for Related Relief and (B) Motion to Surcharge Collateral* [Dkt. No. 380] (the "<u>First Schlappig Declaration</u>") and the *Declaration of Michael Schlappig in Support of PJT Partners LP's Memorandum in Support of Reply to Objections of (I) FCS Advisors, LLC and (2) the Receiver to PJT Partners LP's (A) Response to Sale Motion and (B) Motion to Surcharge Collateral* [Dkt No. 393] (the "<u>Second Schlappig Declaration</u>").

(b)     PJT only agreed to run the second sale process based on the understanding that PJT would receive at least its minimum Transaction Fee in respect thereof. First Schlappig Declaration ¶ 13.

(c)     At the time PJT agreed to run the second sale process, PJT understood that a credit bid by FCS would most likely be the winning bid. Second Schlappig Declaration ¶ 5.

(d)     It was PJT's understanding that the following language in the Bidding Procedures ensured that, even if a purchaser were to propose to buy the Receivership Entities' assets through a credit bid, PJT's fee would be provided for in cash: any bid, including a credit bid, "must include sufficient cash consideration to provide for payment in full of … all costs of administration of the Receivership Estates, including, without limitation, any transaction fee payable to PJT" and "solely with respect to the Transaction Fee, any Credit Bid shall include cash consideration sufficient to pay only the minimum Transaction Fee payable pursuant to" the Engagement Letter (that is $1.5 million after crediting the Work Fee) (Bidding Procedures at 5-6).  First Schlappig Declaration ¶ 8.

(e)     PJT was informed by the Receiver's counsel that FCS and FCS's counsel were supportive of the intent of the language, i.e., that PJT receive at least its minimum Transaction Fee in a credit bid scenario, with the possibility to receive more. First Schlappig Declaration ¶ 9.

(f)     PJT was further informed that FCS had communicated to the Receiver that FCS was concerned that PJT may seek to be paid *more* than its minimum Transaction Fee in the case of a credit bid. As a consequence, the Receiver's counsel was able to resolve the issue of PJT's fee in the event of an otherwise pure credit bid by agreeing to set a floor that would be paid in cash—$1.5 million (crediting the Work Fee already paid)—with the possibility for PJT to receive more depending on the terms of any credit bid. Second Schlappig Declaration ¶ 6.

(g)     Based on conversations with the Receiver's counsel, PJT understood that it would receive *at least* its minimum Transaction Fee of $2 million (less the Work Fee), and that the reservation of rights included at page 9, footnote 7 of the Bidding Procedures (the "Reservation of Rights") reserved the parties' rights to object to PJT's receipt of fees **beyond** its minimum Transaction Fee depending on the "Transaction Value."  First Schlappig Declaration ¶ 11.

(h)     In a voicemail Mr. Schlappig received on June 16, 2023 (the "Voicemail"), on the same day that the Receiver filed the Bidding Procedures Memorandum and related motion papers, the Receiver's counsel informed him of the following: "After talking with Michael [Fuqua] and Kurt [Gwynne], I think we have come to a resolution that I think you all would be ok with, but I wanted to run it by you. Obviously, in the event of a credit bid, I think, we will put language in the Bid Procedures and APA saying that you will get *at least* your minimum fee, and kind of leave it at that for now . . . and leave it, figuring out the rest for another day." First Schlappig Declaration ¶ 11.  This further solidified PJT's belief that it would receive *at least* its minimum Transaction Fee.

3

If the Court prefers, PJT is willing to tender the First Schlappig Declaration and the Second Schlappig Declaration as direct testimony on points (a)-(h), and to make the Witness available for cross-examination on the same.

II.     **Issue**: The factual grounds supporting the bases in equity and/or acquiescence or implied consent for PJT's claim that either (a) the Receiver should not be allowed to waive the requirement in the Bidding Procedures to declare the LTS credit bid a Qualified Bid without providing for payment of the minimum Transaction Fee and/or FCS's collateral should be surcharged the amount of such fee.

2.      **Testimony**: Communications (or lack thereof) with the Receiver's counsel regarding the minimum Transaction Fee, particularly as it relates to any credit bid, following entry of the order approving the Bidding Procedures [Dkt. No. 363] (the "<u>Bidding Procedures Order</u>"). Specifically, Mr. Schlappig will testify that:

(a)     On June 19, 2023, the first weekday after he received the Voicemail and the Bidding Procedures were filed, Mr. Schlappig sent an email to Receiver's counsel stating that he had received the Voicemail and the resolution suggested in the Voicemail was acceptable. The Receiver's counsel responded with a copy of the Bidding Procedures and form asset purchase agreement redlined to reflect the Reservation of Rights, but did not suggest in that or any other communication with PJT that, in the time between the Voicemail and the filing of the Bidding Procedures (which was a matter of hours at most), FCS had decided that they would not agree to include cash in any credit bid it submitted. Second Schlappig Declaration ¶ 7.

(b)     In a phone conversation between Mr. Schlappig and the Receiver's counsel on June 19, 2023, Receiver's counsel *re-confirmed* PJT's understanding that the minimum Transaction Fee would be paid in a credit bid situation. Second Schlappig Declaration ¶ 7.

(c)     Following entry of the Bidding Procedures Order, Mr. Schlappig received an email from Receiver's counsel on July 20, 2023, which attached a spreadsheet setting forth the minimum cash portion required for any bids. Both the Receiver and counsel to FCS were included on this communication. The spreadsheet attached to the email, titled "Minimum Cash Bid Requirements | Auction of Theia Assets," included a line item for a "Minimum PJT Transaction Fee" of $1.5 million, and a comment that the "[m]inimum fee payable to PJT is $2 million; $500,000 previously paid to PJT." The spreadsheet then included another line item for an "Additional PJT Transaction Fee," with the outstanding amount "TBD" and a note that this additional fee would be equal to "3% on the first $500MM; 2% on second $250MM; 1% on amounts > $750MM." The spreadsheet

4

included a footnote that "[a]ll parties rights are reserved with respect to any PJT Transaction Fee *in excess of* $1.5 million" (emphasis added). Mr. Schlappig understood the Reservation of Rights to mean that parties were only reserving their rights with respect to the amount of a PJT Transaction Fee *in excess* of the minimum Transaction Fee, consistent with the Bidding Procedures. First Schlappig Declaration ¶ 12.

(d) It was not until after PJT completed its work on the second sale process that FCS's refusal to pay PJT's minimum Transaction Fee as part of a cashless credit bid was communicated to PJT for the first time. Second Schlappig Declaration ¶ 9.

If the Court prefers, PJT is willing to tender the First Schlappig Declaration and the Second Schlappig Declaration as direct testimony on points (a)-(d), and to make the Witness available for cross-examination on the same.

III. **Issue**: The validity of the Receiver's contention that the basis for PJT's agreement to conduct the second sale process was the prospect of earning a fee from a Rising Sky, LLC ("Rising Sky") renewed bid.

3. **Testimony**: Conversations PJT was involved in with and/or regarding Rising Sky, and their participation (or lack thereof) in the second sale process, and PJT's understanding with respect to the possibility of a Rising Sky transaction coming to fruition. Specifically, Mr. Schlappig will testify to the following:

(a) PJT was not involved in or kept in the loop in respect of the Receiver's negotiations with Rising Sky and received information thereon only sporadically, even though PJT was running the first sale process at the same time. PJT understood that the Receiver eventually entered into an asset purchase agreement with the Receiver but that Rising Sky thereafter defaulted under the agreement by failing to pay a $40 million deposit;

(b) PJT was never informed by the Receiver that Rising Sky intended to participate in the auction;

(c) In a virtual meeting on July 7, 2023, PJT was informed by the Receiver and Receiver's counsel that Rising Sky had not shown any serious interest in bidding;

(d) The email that the Receiver sent to PJT on July 12, 2023 to connect PJT with Rising Sky, attached to the *Declaration of Michael Fuqua, as Receiver, in Support of Receiver's Sur-Reply in Opposition to PJT Partner LP's (A) Response to Sale Motion and (B) Motion to Surcharge*

*Collateral* [Dkt. 396-1] (the "Second Fuqua Declaration") at Exhibit A, was actually prompted by PJT.

(e) PJT reminded the Receiver two times via email to connect PJT with Rising Sky before the Receiver attempted to make an initial introduction via email. PJT believed that, since it was running the second sale process, it was important for PJT to connect with Rising Sky to, among other things, gauge Rising Sky's interest in participating in the process.

(f) PJT then informed the Receiver that the email address for Rising Sky that the Receiver used to make the initial introduction was not a valid email address. That communication led to the introductory email that the Receiver sent to Mitchell Adams and PJT on July 12, 2023.

(g) Mr. Schlappig then contacted Mr. Adams via email but Mr. Adam's never responded to such email.

(h) Counsel for the Receiver contacted Mr. Schlappig to inquire about the quantum of PJT's fee in the event of either (a) a hypothetical bid by Rising Sky or (b) a credit bid by FCS, and, specifically, how much *in excess* of PJT's minimum Transaction Fee PJT would seek in either case. This inquiry and subsequent conversation with the Receiver's counsel thereon further underscored PJT's understanding the PJT would be paid its minimum Transaction Fee in connection with any credit bid. Despite this conversation, at no point did PJT believe that Rising Sky would bid again.

IV. **Issue**: The extent and benefit provided by PJT's work, and the validity of the Receiver's contention that PJT conducted minimal work in connection with the second sale process.

4. **Testimony**: The type and extent of work performed by PJT in the second sale process. Specifically, Mr. Schlappig will testify to the following:

(a) PJT expended well over 100 hours of work preparing for the launch of and then conducting the second sale process;

(b) While PJT did not create a new virtual data room in connection with the second sale process, PJT was given by the Receiver administrative status with respect to the second virtual data room and managed the site, including by uploading additional materials;

(c) PJT revised the "teaser" in connection with the second sale process with information on the process and the inclusion of the aircraft assets;

(d) PJT identified two new parties for the second sale process, exchanged over one hundred emails with potential third parties about the process, assets and opportunity, and participated in numerous calls with interested parties as well as with the Receiver and its counsel regarding the sale process;

(e) PJT spent considerable time drafting a declaration in support of the sale, which the Receiver copied substantial portions of for the Receiver's own declaration in support of the sale; and

(f) The knowledge that PJT brought with it to the second sale process from the first sale process, and how this allowed PJT to streamline the second sale process in a way that would have been difficult for a new investment banker that had not been involved in the first sale process.

Dated: October 3, 2023

New York, New York

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

        */s/ Robert D. Drain*
        Robert D. Drain
        One Manhattan West
        New York, New York 10001
        Telephone: (212) 735-3000
        Fax: (212) 735-2000
        Email: Robert.Drain@skadden.com

        -and-

        Jacqueline M. Dakin (admitted *pro hac vice*)
        920 N. King Street
        Wilmington, Delaware 19801
        Telephone: (302) 651-3000
        Fax: (302) 651-3001
        Email: Jacqueline.Dakin@skadden.com

*Counsel for PJT Partners LP*