UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
FCS ADVISORS, LLC,

                      Plaintiff,                        21-cv-6995 (PKC)

      -against-                      OPINION AND ORDER

 THEIA GROUP, INC, et al,

                     Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.


          The Court reluctantly has decided to approve the motion of the Receiver to approve the sale of substantially all assets of Theia Group, Inc. and affiliates ("Theia") to LTS Systems, LLC ("LTS"), an affiliate of FCS Advisors, LLC ("FCS") and Brevet Holdings, LLC ("Brevet").  The Court writes to explain its reluctance and why it has been overcome.  The Court holds itself accountable for not requiring the Court's approval of the retention of counsel by the Receiver together with full disclosure of actual or potential conflicts and for not placing precise limitations on the scope of counsel's retention.

          FCS Advisors, LLC, a secured creditor of Theia and an affiliate of Brevet Holdings, LLC, commenced this action and moved for the appointment of a "Temporary Receiver."  (ECF 12, 13.)  In response to questioning why bankruptcy was not a preferable option, FCS informed the Court that it could not place Theia in an involuntary bankruptcy proceeding because it was a secured creditor and added, "we'd be happy to be doing this in front of a bankruptcy court, but to date they've resisted."  (ECF 115 at 26.)  Counsel for Theia argued that "it's fair to say that within 60 days, we will be down in some type of bankruptcy proceeding,

either because we found a buyer or found a funder or because we didn't find that all of that, and we just need to move forward." (Id. at 28-29.)  FCS countered that a receiver was needed, among other reasons, to secure the collateral and urged that a receiver be installed quickly "to get a handle on this catastrophe. . . ." (Id. at 34.)

In a written Opinion and Order of October 29, 2021, the Court concluded that the appointment of a receiver was appropriate.  (ECF 105.)  It found the two candidates proposed by FCS to be acceptable and directed that negotiations be opened with Michael Fuqua, who was ultimately appointed as Receiver.  The Court's Order adopted language proposed by FCS that the receiver be empowered to "[c]hoose, engage and employ attorneys . . . as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order." (Id. at 8 ¶10; ECF 12 at 4 ¶10.)[1]

Granting this unqualified power to the Receiver was in hindsight a mistake.  In a bankruptcy proceeding, an attorney retained by the debtor would have had an affirmative duty to "disclose fully and fairly all existing and potential conflicts of interest or lack of disinterestedness . . . ."  In re Mercury, 280 B.R. 35, 55 (Bankr. S.D.N.Y. 2002), subsequently aff'd, 122 F. App'x 528 (2d Cir. 2004) (citing Fed. R. Bankr. P. 2014(a)).[2]  This affirmative disclosure duty does not exist in the receivership context.

On November 23, 2021, a member of the firm of Reed Smith LLP ("Reed Smith") entered an appearance on behalf of the Receiver.  (ECF 121.)  Thereafter, the Court received a submission from non-party creditor TG Capital Services LLC ("TG Capital") asserting that the Receiver had breached his fiduciary duty in failing to disclose that Reed Smith currently

---

[1] This power to engage attorneys without Court approval was carried over to the formal Order appointing Mr. Fuqua.  (ECF 117 at 4-5 ¶11.)
[2] The Court also notes that in a bankruptcy proceeding the United States Trustee would have had an active role in reviewing disclosure statements and the retention of professionals.

represents Brevet in at least three pending matters in this District and several state court actions. (ECF 167.)  TG Capital noted that there were counterclaims by Theia against Brevet Capital Management LLC and Mark Callahan and that the Receiver, advised by Reed Smith, would have to decide whether to pursue those claims and also to decide on the terms of any FCS or Brevet financing.  Callahan, a managing director of both FCS and Brevet, was directly involved in the loan from FCS to Theia.[3]  He was also aware of Reed Smith's role in the other matters pending in this Court.  (10/18/23  Tr. 24.)

Within two weeks of the TG Capital submission, the Court issued an Order to Show Cause "why the receivership ought not be terminated by March 9, 2022, if no bankruptcy proceeding is instituted on or before that date."  (ECF 178.)  The Court expressed concern with the circumstance that Reed Smith simultaneously represented Callahan and Brevet entities in other litigation.  As the Court observed, "At the time the receiver retained the law firm, Callahan had already been named as a counterclaim defendant by Theia in this action (Doc 79 at 20 & 49 of 50) and the law firm had appeared for Callahan in 18-cv-08048 (MKV) (Doc 144)."  (Id. at 2.) At present count, six Reed Smith lawyers have entered notices of appearance in one of the two cases pending in this District arising from the termination of a managing director or member of several Brevet entities and his alleged unfair competition premised on misappropriation of confidential information: in Brevet Holdings, LLC et al v. Enascor, LLC et al., 21-cv-1540

---

[3] In the course of the proceedings before this Court, FCS submitted correspondence to Theia from FCS regarding the negotiation of a Third Amendment to a loan agreement between FCS and Theia.  The letter was signed by "FCS Advisors, LLC d/b/a Brevet Capital Advisors By: Mark Callahan, Managing Director."  (ECF 14-7 at 7.)  Callahan has more recently submitted a declaration on behalf of FCS as its managing director.  (ECF 340.)

(MKV) and <u>Iacovacci v. Brevet Holdings, LLC et al,</u> 18-cv-8048 (MKV) (collectively, the Iacovacci Litigation.")[4]

At the time of the January 26 Order to Show Cause, the only two live issues involving Brevet were the counterclaims and the negotiation of financing from Brevet. The Court wrote as follows: "The Receiver ought to be able to rely on conflict-free lawyers for advice on these subjects."

The Court considered the matter resolved when the Receiver filed the following document with the Court on February 4, 2022: "NOTICE OF RECEIVER'S RETENTION OF KING & SPALDING LLP, AS COUNSEL TO DEAL WITH ISSUES RELATING TO FCS ADVISORS, LLC, BREVET CAPITAL MANAGEMENT, LLC AND ITS AFFILIATES." (ECF 186.)[5] <u>See</u> Order of February 16, 2022 (ECF 209). The body of the submission referenced the two matters specifically addressed in the Court's January 26 Order to Show Cause.

The Court has since learned that Reed Smith has advised the Receiver with regard to the credit bid by LTS, an affiliate of Brevet, and, indeed, represents the Receiver on the application to approve the sale of substantially all assets to LTS.

Because of the importance of a lawyer's duty of undivided loyalty, Rule 1.7 of the N.Y. Rules of Professional Conduct prohibits a lawyer from simultaneously representing a client and acting adverse to that client, even in an unrelated matter, unless "each affected client gives

---

[4] Brevet Holdings, LLC, Brevet Short Duration Partners, LLC, Brevet Short Duration Holdings, LLC, Brevet Capital Management, LLC, Callahan, and Douglas Monticciolo are parties to one or both actions. To give a sense of the magnitude of the litigation, the consolidated Rule 56.1 statements of the parties in 21-cv-1540 is over 100 pages in length.

[5] Perhaps the Court should not have taken the submission at face value. The body of the document makes no claim that King & Spalding LLP had been retained "as counsel to deal with issues relating to" Brevet Capital; it states that it had been retained "to represent the Receiver with respect to (i) the investigation of claims by and against the Defendants and (ii) the proposed receivership financing from FCS." (<u>Id.</u> at ¶ 4.)

informed consent, confirmed in writing."[6]  The Receiver is an affected client because any diminishment in the loyalty or ardor of the lawyer negotiating the sale of Receivership assets affects the Receivership estate.[7]  There is no dispute that the Receiver did not give informed written consent to Reed Smith's concurrent representation.  (10/5/23 Tr. 24.)

Reed Smith answers these assertions by noting that it did not initially discover the conflict because Reed Smith ran the conflict check before the counterclaims were filed.  (10/5/23 Tr. 9.)  This raises a whole set of unanswered questions because the counterclaims were filed on October 12, 2021 (ECF 79) before the Court granted the motion to appoint a receiver on October 29, 2023 (ECF 105) and, indeed, Mr. Fuqua was not appointed until November 8, 2021.  (ECF 117.)  Who or what, the Court wonders, caused Reed Smith to run a conflicts check before the Court decided whether to appoint a receiver?  The Court recently learned that it was counsel for FCS, a Brevet affiliate, who recommended Reed Smith to the Receiver.  (10/18/23 Tr. 36.)  When Reed Smith was first contacted is not known.  In any event, a valid conflicts check run any time after October 12 and before the entry of a notice of appearance on November 23, 2021 (ECF 121) would have picked up that Callahan, a natural person, and Brevet Capital Management, LLC were clients of Reed Smith in the Iacovacci Litigation  and were named in the counterclaims that had been inherited by the Receiver.

Next, Reed Smith argues that it had an advance waiver from FCS and that FCS agreed that Reed Smith could be adverse to FCS "in any way we needed to be."  (10/5/23 Tr. 8.)  It also notes that its engagement letters with Brevet-related clients in the Iacovacci Litigation

---

[6] The terms "confirmed in writing" and "informed consent" are defined in Rule 1.0 (e) & (j).  Reed Smith has asserted that it obtained some form of a written waiver from Brevet Capital and/or its affiliates but makes no claim that it obtained informed consent confirmed in writing from the Receiver.

[7] The concurrent representation issue in this matter implicates the duty of loyalty, not the risk of disclosure of protected information.  Thus, Reed Smith's reliance on the unrelatedness of the representations and the implementation of an ethical screen (ECF 172) is entirely misplaced.

stated that "'Affiliates' of Client that are excluded from the meaning of Client include . . .parent, sister, brother and subsidiary companies." (Ltr. of 10/12/23.) But Reed Smith fails to explain how or why the Receiver and this Court should derive any comfort from a waiver signed by FCS or the limitation of the definition of client by the Brevet entities. The precise concern here is that the firm's concurrent representation of Brevet entities in the Iacovacci Litigation undermines the duty of undivided loyalty that it owes to the Receiver who the law firm represents on the sale of assets to a Brevet affiliate, LTS. It is a dubious proposition that FCS is a separate entity from other Brevet entities for purposes of a conflict analysis because Callahan testified that all managing directors of FCS are employed by or managing directors of Brevet Holdings, employees of Brevet Holdings perform the functions of a chief financial officer for FCS, an employee of a Brevet entity provides IT services to FCS, and FCS does not have its own employees. (10/18/23 Tr. 20-22.)[8]

Reed Smith also argues that it thought that because the Court's Order to Show Cause of January 26, 2022 focused upon the financing of the Receivership estate and the counterclaims but on no other matter, it was free to represent the Receiver on the sale transaction, especially because the counterclaims had been resolved and the Brevet financing was delegated to another law firm. It is true that the Court did not mention any other Brevet-related matter in the January 26 Order to Show Cause because there were none disclosed to the Court at the time, but the responsibility to avoid a conflict remains with the lawyer. The Court did not envision that the Receiver, nominated by Brevet, represented by a law firm that represents Brevet and was recommended to the Receiver by Brevet's counsel, would, at the end of the day, recommend

---

[8] See GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 212 (2d Cir. 2010) (setting forth standard for determining whether client affiliate is a client for the purpose of conflict analysis).

acceptance of a credit bid by a Brevet affiliate.  Finally, Reed Smith should derive no comfort from the fact that King & Spalding had some input in matters relating to the sale.  A lawyer from King & Spalding represented that the firm's role was limited to "two narrow areas" and that they were not advising the Receiver generally on the wisdom or propriety of the sale to the Brevet affiliate. (10/18/23 Tr. at 26-30.)

   The Court does not find bad faith on the part of Reed Smith or any of its lawyers. But they should have been mindful that the firm was not representing an ordinary litigant.  The Order of appointment granting the Receiver sweeping powers provides that "[t]he Receiver shall be the agent of this Court in acting as Receiver under this Order. . . ."  (ECF 117.)  The Court, the principal, was entitled to greater candor in this instance.  As Judge Jerome Frank wrote, "[a] receiver, as 'an officer or arm of the court,' is a trustee with the highest kind of fiduciary obligations." Phelan v. Middle States Oil Corp., 154 F.2d 978, 991 (2d Cir. 1946).  The same may be said of the Receiver's lawyer.

   The Court nevertheless has decided to approve the sale for several reasons.  First, upon its own review, the sale and its terms appear fair, reasonable and adequate.  The Court has been kept apprised throughout the progress of negotiations with other buyers and the ultimate failure of those buyers to proceed.  Ample time has elapsed for new buyers to emerge but they have not.  The Court also relies on the independent judgment of PJT Partners LP ("PJT"), who acted as investment banker to the Receiver.  PJT provides advisory services for, among other things, disposition and acquisition of assets, has ten offices in the U.S., Europe, and Asia and over 800 employees and has relevant industry experience, including advising on "12 of the 13 announced fixed satellite services mergers and acquisitions since 2001 that were in excess of $1

billion." (ECF 156 at ¶ 4.) Finally, there has been no opposition to the sale from any creditor or other interested person.[9]

CONCLUSION

The motion for an Order authorizing and approving the sale and other relief is GRANTED. A separate Order will issue addressing the terms and conditions of the sale. The Clerk shall terminate the motions filed at ECF 365, 378 and 396.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       October 26, 2023

---

[9] The limited objection of Liberty Mutual and the motion of PJT to surcharge collateral have been resolved.