UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>    Defendants. | Case No. 21 Civ. 6995 (PKC) |

### MOTION OF CREDITOR BASLER TURBO CONVERSIONS, L.L.C. TO COMPEL PAYMENT OF CURE AMOUNTS, OR IN THE ALTERNATIVE, FOR RELIEF FROM THE SALE ORDER AND THE RECEIVERSHIP STAY

Creditor Basler Turbo Conversions, L.L.C. ("Basler"), by its counsel Reinhart Boerner Van Deuren s.c. and Foley & Lardner LLP, respectfully moves the Court for entry of an order either: (1) compelling payment of the cure amounts required by the Court's October 26, 2023 *Order (I) Approving the Sale of the Receivership Entities' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, and (II) Granting Related Relief* [Docket No. 411] (the "Sale Order"), attached as Exhibit A; or (2) in the alternative, granting relief pursuant to Fed. R. Civ. P. 60(b)(5) and (6) from both the Sale Order and the receivership stay, to allow Basler to cancel its contract with Theia Group, Inc. ("Theia" and together with the remaining defendants, the "Receivership Entities") and mitigate its damages in accordance with Wisconsin law.[1]

---

[1] By contract modification dated December 23, 2020, Theia Aviation, LLC purported to transfer "contractual authority" from Theia Group, Inc. to Theia Aviation, LLC.

51408530

## INTRODUCTION AND BACKGROUND

Nearly five months after the Court entered the Sale Order, LTS Systems, LLC ("Buyer") and Michael Fuqua, receiver for the Receivership Entities ("Receiver"), have yet to close their much-anticipated sale transaction. Hanging in the balance is Basler, a small Wisconsin company with its principal place of business in Oshkosh, Wisconsin.

Basler designs and configures DC-3 airplanes to support a global fleet serving the specialized cargo, scientific research, geophysical survey, aerial survey, ISR, flight testing, and Maritime Patrol markets. *See* Declaration of Joseph Varkoly, Exhibit B, at ¶ 3 (hereinafter, Varkoly Dec. ¶ __). Basler and Theia were parties to a pre-receivership *Contract for Sale of Three Basler Turbo-67 Aircraft and Modification of One Basler Turbo-67 Aircraft*, dated September 16, 2020 (the "Contract"). Varkoly Dec. ¶ 4. In the Contract, Basler promised to retrofit three Douglas Model DC-3 / C-47 planes (the "Aircraft") for Theia's use, and Theia promised to pay for them. Varkoly Dec. ¶ 4. Theia made significant down payments on the Aircraft prior to the filing of this receivership case, but it is undisputed that Basler, not Theia or the Receiver, owns the converted Aircraft.[2] Varkoly Dec. ¶ 4. Payments still owed to complete the purchase have not been made, and Basler continues to possess the Aircraft and incur expenses to keep them in deliverable condition in accordance with the Contract. Varkoly Dec. ¶ 4.

Since the filing of this receivership case, Basler has, in consultation with the Receiver, continued work on the Aircraft, and provided periodic updates to the Receiver on the amounts necessary to cure defaults under the Contract and the status of work. Varkoly Dec. ¶ 5. On

---

[2] As the name of the Contract reveals, Basler also agreed to modify a fourth plane for Theia. Basler completed and delivered that plane in February, 2021, and has been paid in full. Varkoly Dec. ¶ 4, n.1.

August 12, 2023, Buyer and Receiver entered into their *Asset Purchase Agreement* (the "APA"), by which the Receiver transferred to Buyer the Receiver's interest in, and obligations under, the Contract. In other words, Buyer acquired Theia's rights to complete its acquisition of the Aircraft. Varkoly Dec. ¶ 5. In theory, then, Basler still has a counterparty (Buyer) that is ready, willing and able to perform. In reality, such performance has never been fulfilled.

In the APA, Theia's rights to complete its purchase under the Contract are identified as both "Aircraft" and "Assigned Contracts," subsets of the "Acquired Assets" being purchased by the Buyer. Varkoly Dec. ¶ 6; APA at 10, Schedules 1.01(e) and (h), Docket No. 365-1. The "Cure Amount" for each Aircraft (that is to say, the remaining purchase price, plus amounts necessary to cure defaults) is listed as: "Aircraft #68" - $3,973,297; "Aircraft #69" - $3,550,581; and "Aircraft #70" - $3,238,700. Varkoly Dec. ¶ 6; APA at Schedule 1.01(h), Docket No. 365-1. These three cure amounts were accurate in August 2023, but the total amount due has since increased by more than $800,000 to $11,576,714 in the aggregate, as of February 29, 2024 (collectively, the "Cure Costs"). Varkoly Dec. ¶ 6. Basler has periodically updated the Receiver on these Cure Costs and the basis for their accrual. Varkoly Dec. ¶ 6.

The Court entered the Sale Order on October 26, 2023. Since then, Basler has spoken to the Receiver about the deal many times, and both the Receiver and the Buyer have repeatedly assured Basler, sometimes in succeeding weeks, that a closing is imminent. Varkoly Dec. ¶ 7. Most recently, however, the Buyer stopped communicating entirely with Basler, and the Receiver informed Basler that the Buyer is trying to broker a deal with a new, unrelated additional or replacement party in an apparent attempt to swap buyers. Varkoly Dec. ¶ 7. None of Basler's Cure Costs has been paid, and Basler continues to incur costs for storage and maintenance. Varkoly Dec. ¶ 7.

## DISCUSSION

Basler has been placed on ice: it remains subject to the Sale Order and the Receivership Stay, yet is compelled to wait for a closing that never occurs. In the meantime, Basler's Cure Costs continue to rise (including interest, aircraft storage charges, insurance, and other expenses), and, due to the receivership stay, it cannot sell the Aircraft to a third party. Varkoly Dec. ¶ 8. The Cure Costs of more than $11.5 million (and counting) are hugely significant for a company of Basler's size. Varkoly Dec. ¶ 8. So are the drain on capacity and the costs of storing and maintaining three planes that occupy space which would otherwise be used in Basler's manufacturing process. Varkoly Dec. ¶ 8. Basler's annual charges for Aircraft storage alone are more than $50,000 per plane (likely 2-3 times less than the relevant market price to rent a hangar), and Basler must pay approximately $37,000 *per month* for insurance. Varkoly Dec. ¶ 8. Neither the Receiver nor the Buyer has offered to pay any of Basler's costs while they intentionally delay their closing. Varkoly Dec. ¶ 8. In other words, the Receiver and the Buyer are both benefitting in a manner that directly places cost on Basler. With the exception of painting one plane (as the Receiver is aware), Basler has fully performed all of its obligations to date. Varkoly Dec. ¶ 8.

This must end. Either the Buyer or the Receiver must pay Basler's Cure Costs and take possession of and title to the Aircraft, or Basler should be granted relief from the Sale Order and the receivership stay (extended by the Sale Order "until fourteen (14) days after the later of the Closing Date or governmental approval of the transfers of the FCC License and the NOAA

License to Buyer" (the "Receivership Stay")) so that Basler may terminate the Contract and mitigate its damages.[3]  Varkoly Dec. ¶ 9.

The Sale Order both authorizes *and "directs"* the Receiver (on behalf of the Receivership Entities) and the Buyer to "perform under this Approval Order [and] the Sale Documents" and to "fully perform under, consummate, and implement the terms of the Sale Documents."  Sale Order at 18, 19.  Consistent with the Court's direction to the Receiver and the Buyer, the Sale Documents require the Buyer to pay Basler its Cure Costs to complete the Contract.  APA at Schedule 1.01(h), Docket No. 365-1.  This Court has the inherent power to enforce its own Sale Order, including by contempt should that be necessary.  *See, e.g., Powell v. Ward*, 643 F.2d 924, 931 (2d Cir. 1981) (holding that a court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court or to compensate for losses or damages).

Both the Receiver and the Buyer should be required to show cause why the Sale Order should not be enforced: the Sale Order is unambiguous, proof of noncompliance is clear, and neither the Receiver nor the Buyer appears to have been reasonably diligent in attempting to accomplish what was ordered.  To reiterate, it now appears that the Buyer is attempting to steer the assets to another purchaser altogether, presumably in the hope that it will never have to take title to the assets.  This opportunistic behavior hurts creditors like Basler, who have been waiting for resolution since the receivership case was filed in 2021.

---

[3] Basler believes there is a market for the Aircraft, and would attempt to sell the planes to a third party.  Varkoly Dec. ¶ 9.

In the alternative, Basler is entitled to relief from the Sale Order and the Receivership Stay pursuant to F.R.C.P. 60(b)(5) and (6), because the Buyer and the Receiver have failed to close the sale transaction contemplated, and required, by the Sale Order.  These rules permit relief from an order when "applying it prospectively is no longer equitable" or "for any other reason that justifies relief."  Rule 60(b)(5) codified a power that courts had long exercised: to modify their judgments in light of changed circumstances.  *See, e.g., Tapper v. Hearn*, 833 F.3d 166, 170 (2d Cir. 2016).  The Rule applies when an order has prospective application, which is to say, the order is "executory" or contemplates "the supervision of changing conduct or conditions."  *Id.* at 170-71 (citations omitted).  The Sale Order here has prospective effect because it requires the implementation of a series of actions by both parties, affecting and involving many other parties in interest (from contract counterparties, to creditors and regulatory entities), and the Court retained jurisdiction over all phases of the transaction.  Sale Order at ¶ 18, Docket No. 411.  Continued enforcement of the Sale Order to Basler's direct detriment, which detriment grows daily, would be inequitable for all of the reasons mentioned above.

While Rule 60(b)(6) is reserved for "extraordinary" circumstances, it provides courts with authority "adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988) (citation omitted).  A court-approved sale without a closing, and without protecting affected parties-in-interest, is certainly extraordinary, and none of the parties affected by the Sale Order could have contemplated that the Buyer and the Receiver would fail to close their transaction for months on end.  To be sure, some closing delays are common in large deals, perhaps even expected, but when some *five months* have passed, no one can ascertain with any certainty when the deal will close, and the Buyer appears to be taking steps to extricate itself from the deal, it

would be inequitable to leave the Sale Order in place, as it is currently drafted. Basler should be granted relief from the Sale Order so that it may find another buyer.

Relief from the Sale Order would be ineffective without simultaneous relief from the Receivership Stay. Initially entered by this Court on November 8, 2021, the Receivership Stay provides, in pertinent part, that "no person or entity, including any creditor or claimant against any of the Receivership Entities . . . shall take any action to interfere with the taking control, possession, or management of the assets." *Order Appointing Michael Fuqua as Receiver*, Docket No. 117, at ¶ 5. The stay has been extended repeatedly over the last three years, but the most recent extension—again, to a date that is 14 days "after the later of the Closing Date or governmental approval of the transfers of the FCC License and the NOAA License to Buyer"—is premised upon a closing that actually occurs. By failing to carry out the terms and provisions of the Sale Order, the Receiver is no longer entitled to the benefit of the stay, at least with respect to Basler's interests in the Aircraft. The prejudice to Basler if the Sale Order and the Receivership Stay continue to apply to Basler far outweighs any prejudice to the Receiver or the Buyer if they do not, particularly if Basler returns any surplus funds to the proper party after Basler is made whole. This it would certainly do. Varkoly Dec. ¶ 10.

WHEREFORE, Basler respectfully requests that the Court compel the Buyer or the Receiver to pay Basler's Cure Costs, on or before April 15, 2024, or in the alternative, grant

Basler relief from the Sale Order and the Receivership Stay so that Basler may cancel its Contract with Theia and mitigate its damages.

DATE: March 15, 2024

                                               Respectfully Submitted,

                                               BASLER TURBO CONVERSIONS, L.L.C.

                                               By: *s/ Anne Sekel*

                                               Anne Sekel
                                               FOLEY & LARDNER LLP
                                               90 Park Avenue
                                               New York, New York 10016
                                               (212) 682-7474
                                               asekel@foley.com

                                               and

                                               Frank W. DiCastri
                                               REINHART BOERNER VAN DEUREN s.c.
                                               1000 N. Water St. # 1700
                                               Milwaukee, Wisconsin 53202
                                               (414) 298-1000
                                               fdicastri@reinhartlaw.com
                                               *Pro hac vice application forthcoming*