
MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

July 1, 2024

**BY ECF**

Honorable Hon. P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *FCS Advisors, LLC v. Theia Group, Inc., et al.*, Case No. 21 Civ. 6995 (PKC)

Dear Judge Castel:

      We represent CogniSphere, a wholly owned subsidiary of LTS Systems, LLC[1] ("LTS"), and write to bring certain information to the Court's attention regarding its June 11, 2024, Order, which endorses the May 17, 2024, Letter Agreement among LTS, Basler Turbo Conversions, LLC, and the Receivership Entities. [ECF No. 449 ("Order")].[2]

      As the Court is aware, the Order and Letter Agreement gave LTS various options to acquire certain Aircraft, along with certain rights and contractual undertakings associated with them, from Basler in exchange for payment under the contract between Basler and Theia plus certain "cure" payments, a Cancellation Fee, and potentially other expenses. [*Id.* at 10 ¶ 4]. Under the Letter Agreement (and thus the Order), the longer LTS waits, the larger the overall payment. [*Id.*] As the Court may also recall, the underlying agreements—of which LTS is the beneficiary upon exercise of the so-called Cancellation Option—specifically provide that as a "Condition on Delivery," each Aircraft "shall have received a valid FAA airworthiness certificate" and will be "airworthy." [*See* Exhibit A, Section VIII.] Ensuring that the Aircraft are "airworthy" is a material term and critical to the Aircraft's allowable usefulness and thus their value.

---

[1]     In the interest of transparency, we remind the Court that this Firm previously appeared in this case on behalf of Robert Leeds and his entities Leeds Holdings, LLC and Strongbow Holdings, LLC, which were named as counterclaim defendants in the original pleading filed by the Theia defendants, prior to the appointment of the Receiver. [ECF No. 79 (Answer with Counterclaims)]. Upon his appointment, the Receiver investigated those counterclaims and determined to voluntarily dismiss them for no consideration. [ECF No. 244]. The Court may also recall that Mr. Leeds appeared in Court to assist in resolving the dispute between the Receivership and PJT Partners LP, including by personally advancing $1.25 million to satisfy PJT's claim for fees. [ECF No. 415 (counsel for PJT reporting that "on October 30, 2023, PJT received a wire payment from Strongbow Holdings, LLC in the amount of $1,250,000," and so withdrawing PJT's then-pending motions)]. Through CogniSphere, Mr. Leeds is trying to once again work with others to resolve a dispute between parties before the Court.

[2]     Capitalized terms not otherwise defined have the same meaning as in the Order.



Basler's argument for a $2.5 million "cure" amount, and LTS's agreement to potentially pay that amount, were based in large part on Basler's representation to the Receiver and to LTS (during negotiation of the Letter Agreement) and sworn representation to the Court (in seeking approval) that it had "fully performed" its contractual obligations and was prepared to deliver the Aircraft (each with a specific date from which the interest was calculated), with the exception of painting one of the planes. [*See* ECF No. 429-2 ("With the exception of painting one plane (as the Receiver is aware), I believe that Basler has fully performed all of its obligations to date.")]. LTS recently learned, however, that Basler's representations were materially inaccurate. Specifically, Basler has failed to obtain from the Federal Aviation Administration a valid FAA Airworthiness Certificate for the modified Aircraft. Given the modifications, an FAA Supplemental Type Certificate is required, without which the Aircraft are not airworthy and cannot be flown.[3] Complicating matters further is the fact that the need for the Supplemental Type Certificate arose from a modification to the autopilot system that, so far as Basler has disclosed and the Receiver's records confirm, was never properly approved by LTS or its predecessors in a signed amendment, as the Basler contract requires.

LTS, unfortunately, had to discover these facts for itself. It was only after LTS requested to perform industry-standard due diligence (which Basler refused to permit) that Basler finally revealed that it had only obtained what is known as an Experimental Airworthiness Certificate. Under the relevant regulations, however, this is not an "FAA Airworthiness Certification." Rather, an Experimental Airworthiness Certificate severely limits the use and value of the Aircraft. Under Federal Aviation Regulations, experimental aircraft can only be used for limited and very specific purposes, such as for research and development, test flights and crew training, or air racing. *See* 14 CFR § 21.191. No other operations are permitted. *Id.* This prevents the operator from conducting any meaningful commercial operations, and significantly reduces the value of the Aircraft.

These issues have potentially serious implications. One is that the Letter Agreement was premised on Basler having the Aircraft ready for delivery—save for the painting of one plane—which caused LTS to (among other things) forego the highly valuable option to purchase a fourth plane that was exercisable up until the delivery date. Because the delivery date by definition could only occur after Basler secured the FAA air worthiness certification, the option should remain open by virtue of Basler's failure to get that certification. But Basler did not disclose its failure, LTS had no idea that the option by contract remains open, and—it appears—Basler may have sold the fourth place to someone else.[4]

We understand that Basler has acknowledged (to the Receiver and to LTS) its obligation to secure full regulatory approval for an Airworthiness Certificate, and it represented to the Receiver

---

[3]   14 C.F.R. § 3.5(a) states that "Airworthy means the aircraft conforms to its type design and is in a condition for safe operation." Given the modifications to the Aircraft and the lack of a Supplemental Type Certificate covering those modifications, the aircraft does not conform to its type design and is not airworthy under FAA definitions.

[4]   https://www.dsca.mil/sites/default/files/mas/Press%20Release%20-%20Argentina%2024-28%20CN.pdf ("The State Department has made a determination approving a possible Foreign Military Sale to the Government of Argentina of Basler BT-67 Aircraft and related elements of logistics and program support for an estimated cost of $143 million. The Defense Security Cooperation Agency delivered the required certification notifying Congress of this possible sale today.")  Basler failed to inform LTS or the Court about this sale.



that it will do so promptly. We are further aware, through our own independent research, that about two weeks after the parties signed the May 17 Letter Agreement and submitted it to the Court for approval [ECF No. 446], Basler submitted a petition to the FAA seeking relief, which was published in the Federal Register on June 5.[5] The public comment period on the petition did not close until June 25, 2024, so we do not expect any immediate action by the FAA.

       LTS believed it important to inform the Court of this information. LTS could, we believe, ask the Court to reconsider its approval of the Letter Agreement considering the materially incorrect representations made by Basler about the state of its performance. However, at the same time, LTS has no interest in burdening the Court with additional litigation, especially given that Basler has apparently initiated the approval process.

       Still, LTS was in a tricky position. Under the Letter Agreement, if LTS waited any longer to exercise the so-called Cancellation Option, it would have had to pay more and was imminently at risk of the Aircraft being sold at auction, which was scheduled to occur in just two weeks. Under the terms of the Letter Agreement (and thus the Court's Order), the auction would have been on an as-is, where-is basis, which would have substantially impaired their value. On the other hand, the Letter Agreement and the Court's approval of it were premised on the representation that Basler has already performed all obligations under the original contract, including securing the necessary regulatory approvals, which has not occurred—although Basler says that such approvals will be forthcoming.

       In this situation, and in reliance on Basler's representations concerning the approval process, LTS exercised its Cancellation Option and made full payment on June 13, 2024. To the extent Basler fails to timely obtain FAA approval or otherwise fulfill its contractual obligations,[6] LTS reserves all rights, including but not limited to the right to unwind the Letter Agreement and seek other appropriate relief.

       If any party has a different understanding, LTS believes it is incumbent upon them to speak now.

       Thank you for your consideration.

                                         Respectfully,

                                         */s/ Matthew L. Schwartz*
                                         Matthew L. Schwartz

---

[5] *See* https://www.federalregister.gov/documents/2024/06/05/2024-12246/petition-for-exemption-summary-of-petition-received-basler-turbo-conversions-llc

[6] Basler, we presume, will acknowledge that the Delivery Date under the Letter Agreement and underlying contract (which is the date that the contractual warranties begin running) is the date that Basler receives the FAA Airworthiness Certification and is thus in a position to deliver the Aircraft in conformity with the contract.