UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FCS ADVISORS, LLC,

    Plaintiff,

  v.

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN"; THEIA
AVIATION, LLC; and THEIA HOLDINGS
A, INC., d/b/a "THORIAN HOLDINGS,"

    Defendants.

Case No. 21 Civ. 6995 (PKC)

---

**BASLER TURBO CONVERSIONS, L.L.C.'S OPPOSITION
TO COGNISPHERE LLC'S MOTION TO COMPEL**

# TABLE OF CONTENTS

FACTUAL BACKGROUND ........................................................................................3

ARGUMENT .............................................................................................................7

I.    Basler made no misrepresentations in applying for the order compelling the
      payment of cure costs..........................................................................................7

II.   CogniSphere's breach of contract claims are not properly before this Court...................15

III.  Even if CogniSphere could assert its breach of contract theories here, it has not
      shown that Basler breached the Contract............................................................15

      a.    Basler did not breach by not delivering the aircraft immediately upon
            CogniSphere's payment of the cure costs. ............................................16

      b.    Basler has not breached any obligation to sell CogniSphere a fourth
            aircraft. ....................................................................................................18

      c.    Basler did not make unauthorized changes to the aircraft. ...................21

IV.   The Court should not unwind the Letter Agreement. ........................................22

V.    Basler has not waived its right to address these issues. ....................................23

CONCLUSION..........................................................................................................25

CogniSphere LLC's motion to compel (ECF No. 457 ["Motion"]) relies on factual assertions that are not true. CogniSphere claims that the three aircraft Basler Turbo Conversions, L.L.C ("Basler") built for CogniSphere's predecessor in interest, Theia Group, Inc. ("Theia"), are not airworthy; they are. It claims the aircraft do not have FAA Airworthiness Certificates; they do. And it claims that Basler misrepresented its fulfillment of its contractual obligations to the Court; it did not. Accordingly, its Motion must fail in its entirety.

In previously seeking relief from the Court, Basler's President, Joseph Varkoly, stated: "With the exception of painting one plane (as the Receiver is aware), I believe that Basler has fully performed all of its obligations to date." (Basler's Mot. to Compel Ex. B, Mar. 14, 2024 Decl. of Joseph Varkoly ¶ 8, ECF No. 429-2.) And it *had*. The original contract with Theia (the "Contract," ECF No. 458-1) provided that, *upon delivery*, the aircraft needed to: (1) be airworthy; and (2) have received FAA Airworthiness Certificates. Although delivery had not yet occurred, Basler, at that time, had completed the three aircraft such that they were airworthy as a factual matter *and* had received or were entitled to valid FAA Airworthiness Certificates, in the experimental category.

In fact, although the other party to the Contract—first Theia, and later LTS Systems, LLC—had been in breach of contract for years, and although the Contract explicitly permitted Basler to suspend its performance during that breach, Basler continued to perform throughout. Basler had completed the aircraft to the furthest extent possible at the time Mr. Varkoly submitted his declaration and had performed every one of its obligations under the Contract as of that date. The only items remaining to be completed were items outside of Basler's control, and with respect to which it could do nothing more than it already had until others—the FAA and LTS itself, respectively—took action.

Specifically, Basler had long since initiated the process to obtain a supplemental type certificate (STC) modification from the FAA, which, once granted, would allow the aircraft to obtain standard category FAA Airworthiness Certificates to replace the experimental category certificates under which they were covered at the time. Basler was awaiting FAA action and could do no more than it had done on this point.[1] And while other minor configuration details remained to be completed on at least one of the aircraft as well—essentially, the positioning/configuration of junction boxes and hard points for the ultimate buyer's particular planned use, as well as the painting of one of the aircraft referenced in Mr. Varkoly's declaration—those items required direction from the Buyer before Basler could take any additional action. Basler had asked for the direction it needed, but without a response, it was under no obligation to (indeed, it could not) take further action—and it did not receive that response until August 30, 2024, half a year after Mr. Varkoly stated that he believed Basler had complied with its contractual obligations *to date*.

Mr. Varkoly's statement was therefore true and correct when made.  That should end the inquiry. Other disputes, such as whether Basler has breached the Contract since LTS (and then CogniSphere) stepped into Theia's shoes, are not properly before this Court for adjudication. But even if they were, there has been no breach of contract on Basler's part. CogniSphere complains that Basler has "completely ignored" its desire to purchase a fourth plane, but the option no longer exists under the Letter Agreement (*see* ECF No. 458-3), and even if it did, CogniSphere has failed to exercise it. Nor has Basler made autopilot modifications "that were not ever properly approved" (Motion 6 n.4); to the contrary, Theia expressly directed and approved those modifications in a signed writing that was fully sufficient to amend the Contract under Wisconsin law. Basler has not

---

[1] CogniSphere's assertion that Basler did not even apply to the FAA until "about two weeks *after* the parties submitted the Letter Agreement to the Court for approval" (Motion 10) is false. Basler applied to the FAA for the STC modification on July 16, 2021. (Declaration of Joseph Varkoly ¶ 6 ["Varkoly Decl."].)

failed to timely deliver the aircraft, either: the parties have never settled on a delivery date, and in fact, when Basler offered to deliver one of the aircraft to CogniSphere in July, CogniSphere declined to take delivery, indicating that it prefers to wait.

Finally, Basler has not waived its right to oppose CogniSphere's Motion. It has consistently disputed CogniSphere's characterization of these issues, and on July 3, 2024, just two days after CogniSphere's initial correspondence to the Court, it filed a letter with the Court stating as much.

CogniSphere provides no basis for the Court to hold Basler in contempt or otherwise "order compliance" with the Court's prior orders. Nor is there a basis to unwind the Letter Agreement. Basler therefore respectfully requests that the Court deny CogniSphere's motion in its entirety.

## FACTUAL BACKGROUND

As this Court is aware, Basler and Theia were once parties to the Contract, under which Basler promised to retrofit three Douglas Model DC-3 / C-47 planes for Theia's use, and Theia promised to pay for them according to a fixed schedule. (Decl. of Joseph Varkoly ¶ 3 ["Varkoly Decl."].) During this time period, Theia requested, and the parties agreed on, modifications to the autopilot display systems of the aircraft: specifically, Theia requested that Basler install Genesys Aerosystems Integrated Display Units (IDU-680) in the three planes. (*Id.* ¶ 4.) This change to the original specifications ultimately necessitated that Basler obtain from the FAA a modification to its supplemental type certificate, or STC. Basler initiated the process to obtain that STC modification on July 16, 2021. (Varkoly Decl. ¶ 6.) But its request to the FAA remains pending.[2]

Eventually, Theia entered into receivership. After the Court appointed the Receiver on November 8, 2021, Basler, in consultation with the Receiver, continued work on the aircraft while

---

[2] The FAA granted Basler's exemption request on August 28, 2024, and Basler completed the mandatory differences training on October 17, 2024, but the final step of approval is still pending with the FAA.  (Varkoly Decl. ¶ 7.)

providing periodic updates to the Receiver on the amounts necessary to cure defaults under the Contract, as well as the status of the work. (Varkoly Decl. ¶ 9.) LTS entered into its agreement with the Receiver to purchase Theia's rights under the Contract on August 12, 2023, and the Court confirmed the sale order on October 26, 2023. (ECF Nos. 410, 411.) The closing, however, was significantly delayed while LTS attempted to locate a replacement buyer to whom it could assign its interest in the Contract. (Varkoly Decl. ¶ 10.) Basler was informed that closing was "imminent" on December 15, 2023, then again on January 26, 2024. (*Id.* ¶ 11.) After Basler's counsel twice sought information on the status of the closing in February 2024 and received no response, Basler ultimately filed its prior motion (ECF No. 429).

In that motion, Basler explained to the Court that it had been waiting for months for the Receiver and LTS to complete the closing so that it could receive direction from the new buyer and deliver the aircraft. All the while, Basler explained, it was incurring expenses to store, insure, and maintain the aircraft it had retrofitted on Theia's, and then LTS's, behalf. To compensate it for its damages, Basler asked the Court to compel the payment of cure amounts under the Contract or, in the alternative, to allow Basler to cancel the Contract with Theia and attempt to mitigate its damages by auctioning off the aircraft. (ECF No. 429.) In connection with that motion, Basler's President, Mr. Varkoly, made the statement of which CogniSphere currently complains: "With the exception of painting one plane (as the Receiver is aware), I believe that Basler has fully performed all of its obligations to date." (Mot. to Compel Ex. B, ¶ 8, ECF No. 429-2; Varkoly Decl. ¶ 12.) At the time Mr. Varkoly made this statement, the three aircraft were airworthy; had or were entitled to receive valid FAA Airworthiness Certificates in the experimental category (as explained further below); and could have been delivered to a buyer as operable, serviceable aircraft. (Varkoly Decl. ¶ 13.) In fact, Mr. Varkoly had previously confirmed to the Receiver that the first of three aircraft

was completed and ready to deliver on December 31, 2021, and the second of three was completed and ready to deliver on January 27, 2023. (Varkoly Decl. ¶ 18.) At the time of Mr. Varkoly's declaration, the third of three needed only to be painted according to the customer's requirements to be similarly ready to deliver. (*Id.* ¶ 19.)

LTS and Basler ultimately resolved Basler's motion via Letter Agreement, which provided LTS with several possible courses of action it could take. It could pay all amounts outstanding under the Contract on or before May 31, 2024 and then be committed to take delivery of the aircraft in due course under the Contract (the "Payment Option"); it could, on or before May 31, 2024, rescind the Contract and receive a one-time payment of $6 million from Basler; it could do neither and allow Basler to sell the aircraft at auction (the "Auction Option"); or, between June 1 and June 25, 2024, it could cancel the auction by paying Basler the cure costs plus an additional cancellation fee (the "Cancellation Option"). (*See* ECF No. 458-3, at 10-11.) The Court approved the Letter Agreement on June 11, 2024. (ECF No. 458-3, at 8; ECF No. 449.)

But LTS failed to meet its obligations under the Letter Agreement by May 31, 2024. Instead, counsel for LTS sent an email at 7:04 PM on May 31, purporting to exercise the Payment Option, but refusing to actually send payment. (Decl. of Frank W. DiCastri ¶ 3, Ex. A.) In that same email, counsel for LTS asked for "due diligence" on the aircraft before it would make payment. (*Id.*) This request for unspecified "due diligence" was the first attempt at any "due diligence" from LTS regarding the aircraft in spite of it having taken over as the contracting party on October 26, 2023, and in spite of having entered into the Letter Agreement on May 17, 2024. (Varkoly Decl. ¶ 20.) The Letter Agreement established a firm obligation of payment by May 31, 2024, which was not contingent on any "due diligence." (*See* ECF No. 458-3, at 10.) Nevertheless, Basler remained at all times willing to allow LTS to inspect the aircraft, ask questions about status,

5

or perform any due diligence it desired; Basler was not, however, willing to renegotiate the Letter Agreement to make LTS's payment obligation contingent, and declined to do so. (Varkoly Decl. ¶ 21.)

Between May 31, 2024, and June 13, 2024, the parties had several communications regarding the aircraft, during which Mr. Varkoly provided detailed information regarding the status of each aircraft, including the ongoing approval process that was underway before the FAA, the details about the aircraft being then under experimental category, but fully valid, FAA airworthiness certificates, and the need for final FAA approval before the aircraft could receive standard category airworthiness certificates. (Varkoly Decl. ¶ 22.)

Eventually, notwithstanding that Basler had already proceeded with the Auction Option under the Letter Agreement in light of LTS's failure to make the required payments for either the Payment Option or the Recission Option, and had executed an auction contract, Basler acceded to LTS's request that it be allowed to exercise the Cancellation Option by making a compromise cancellation payment to Basler along with payment of the previously-agreed cure costs on June 13, 2024. (Varkoly Decl. ¶ 23.) Thereafter, LTS appears to have assigned its rights under the contract to CogniSphere such that CogniSphere has now succeeded to LTS's rights under the Contract. (*See* Motion 4; ECF No. 458-4.)

On June 18, 2024, Mitch Dockens and Dan Franco visited Basler and saw all three aircraft. (Varkoly Decl. ¶ 24.) This was the first time anyone associated with LTS or CogniSphere (or the Receiver) ever made any attempt to see the aircraft, despite repeated invitations to do so. (*Id.*) On July 24-26, Rodney Allison of XP Services visited Basler and saw the aircraft. (Varkoly Decl. ¶ 25.) XP Services is apparently the company that is to outfit the aircraft for CogniSphere with the necessary equipment (already purchased and on site with XP Services in Tullahoma, TN) to

6

perform buyer's desired function. (*Id.*) The necessary first step after delivery to putting the aircraft into service would be to fly the aircraft to XP Services for outfitting. (*Id.*) On July 25, after speaking with Mr. Allison about the process, Mr. Varkoly specifically offered to Mr. Leeds that he could proceed to deliver at least Aircraft #69 immediately and fly it to XP Services to begin outfitting.[3] (Varkoly Decl. ¶ 26.) Mr. Varkoly explained that by the time outfitting was complete, the FAA approval should be in hand, so it didn't make sense to allow the aircraft to sit.  (*Id.*) Mr. Leeds declined to take delivery, indicating that he preferred to wait on final approval from the FAA before taking delivery. (*Id.*)

On August 30, 2024, after repeated requests by Mr. Varkoly for the input and direction necessary to finalize the aircraft for delivery, subject only to final approval of the STC modification by the FAA, CogniSphere confirmed directions for painting the third aircraft and for configuring the hard points and junction boxes (functional elements that are configured based on the buyer's desired usage of the aircraft). (Varkoly Decl. ¶ 28.) Basler has now completed those items and will be prepared to deliver all three aircraft as soon as #70 is back from the paint facility and final approval is received from the FAA on the STC modification (or, alternately, as soon as CogniSphere is willing to take delivery of the aircraft ahead of such approval). (*Id.*)

## ARGUMENT

**I.      Basler made no misrepresentations in applying for the order compelling the payment of cure costs.**

The sole question properly before this Court is whether Basler made a misrepresentation in applying for the order compelling the payment of its cure costs in March 2024. In seeking that order, Basler, through Mr. Varkoly, explained that, "[w]ith the exception of painting one plane (as

---

[3] Mr. Varkoly also explained that while Aircraft #68 was also ready to deliver, it had to be kept in Oshkosh for the mandatory testing by the FAA in connection with the approval process described above, which Mr. Leeds wanted Basler to complete as quickly as possible.  (Varkoly Decl. ¶ 27.)

the Receiver is aware), I believe that Basler has fully performed all of its obligations to date." (Basler Mot. to Compel Ex. B ¶ 8, ECF No. 429-2.) That statement was—and remains—true.

CogniSphere claims incorrectly that Basler breached two contractual requirements, and that those alleged breaches render Mr. Varkoly's statement in March 2024 false. Specifically, CogniSphere argues that Basler failed to comply with the requirements that: (1) the aircraft be "airworthy"; and (2) the aircraft have FAA Airworthiness Certificates. But CogniSphere's argument rests on both a misinterpretation of the Contract and a misapprehension of the facts.

First, CogniSphere misstates what the Contract actually requires. CogniSphere writes that "Basler's obligations *prior to delivery* include (1) that each Aircraft 'shall have received a valid FAA airworthiness certificate' and will be 'airworthy[]' . . . ." (Motion 9 (emphasis added).) That is not what the Contract says. To the contrary, the Contract provides in relevant part:

> Each Converted Aircraft,[4] *upon Delivery*, . . . shall have received a valid FAA airworthiness certificate; and will be in fully operative, airworthy, and serviceable condition.

(Contract § VIII (emphasis added).) In other words, though CogniSphere has tried to impose an arbitrary pre-delivery deadline on the obligation that the aircraft be airworthy and have their FAA Airworthiness Certificates, that is not what the Contract states. Those requirements must be satisfied *upon delivery*, and the aircraft here have not yet been delivered (due specifically to CogniSphere's direction). Thus, Basler cannot have breached these obligations even now; certainly, it had not done so in March of 2024, when LTS Systems, LLC, which had succeeded to Theia's interest in the Contract, was ignoring its *own* obligations under the Contract (as well as

---

[4] "Converted Aircraft" means the "three (3) Douglas Aircraft, Model DC-3 / C-47, Serial Numbers 33032, 12907, and 4654 currently FAA registered N1350A, N941AT and N856RB respectively . . . ." (Contract § II.) These are the "at least three Basler Turbo-67 Aircraft" that Theia agreed to buy from Basler and that CogniSphere references in its Motion. (*See* Motion 2.)

the fact that Basler continued to wait in vain for required direction in order to finalize the aircraft) in favor of attempting to locate a different buyer.

Moreover, even if CogniSphere were right that the requirements of Section VIII attached before delivery, Basler had satisfied those requirements at the time Mr. Varkoly submitted his declaration. The aircraft were, and are, airworthy, and each of the three aircraft *has* received an FAA Airworthiness Certificate. CogniSphere's representations to the contrary are false.

First, CogniSphere is flatly wrong when it states that as of the date of its motion, "Basler has still not obtained valid FAA Airworthiness Certificates for the Aircraft, despite promising that they were imminent." (Motion 5.) Each of the three planes had or was entitled to receive a valid FAA Airworthiness Certificate in March of 2024.[5] (Varkoly Decl. ¶ 13.) Two of the three planes still have valid FAA Airworthiness Certificates today; one of the planes has had its certificate expire due to the sheer amount of time that has passed, but renewal is automatic upon application. (Varkoly Decl. ¶ 14.)

Reading between the lines, CogniSphere's *actual* objection is simply that the certificates Basler obtained for the aircraft are experimental certificates, rather than standard category. Indeed, the Motion suggests that CogniSphere believes an experimental airworthiness certificate is not an FAA Airworthiness Certificate at all. (*See* Motion 1, 5, 10 (repeatedly suggesting that Basler has not obtained valid FAA Airworthiness Certificates).) If this is CogniSphere's argument, it is grounded in a misunderstanding of the FAA regulations governing such certificates. Airworthiness certificates issued by the FAA fall into one of two categories: standard airworthiness certificates, and special airworthiness certificates. *See* 14 C.F.R. § 21.175; *see also* "Airworthiness

---

[5] Because the obligation for providing the Airworthiness Certificate did not attach until delivery, Basler had held off actually making the application for the Airworthiness Certificate on the final aircraft until it had some better idea of when the buyer would want that aircraft delivered. (Varkoly Decl. ¶ 13.)

Certification of Aircraft," https://www.faa.gov/aircraft/air_cert/aw_cert ("An airworthiness certificate is an FAA document which grants authorization to operate an aircraft in flight. . . . There are two different classifications of FAA airworthiness certificates: Standard Airworthiness Certificate; Special Airworthiness Certificate.") (last updated Sept. 12, 2024). A standard airworthiness certificate allows for the operation of type certificated aircraft in categories including normal, utility, commuter, and transport, 14 C.F.R. § 21.175(a); special airworthiness certificates include "primary, restricted, limited, light-sport, and provisional airworthiness certificates, special flight permits, and *experimental certificates*." 14 C.F.R. § 21.175(b) (emphasis added). Thus, an experimental airworthiness certificate is one category of "valid FAA airworthiness certificate." (Contract § VIII.) Each of the three planes had or was entitled to receive an experimental airworthiness certificate when Mr. Varkoly declared that he believed that it had fulfilled all its contractual obligations to date; that should end the inquiry.[6]

CogniSphere is apparently dissatisfied with the experimental airworthiness certificates that the aircraft have obtained because under those certificates, the aircraft "can be used for only limited purposes." (Motion 5.) But CogniSphere's dissatisfaction does not equate to a contractual breach. Nothing in the Contract provides that Basler must have obtained *standard* category airworthiness certificates at the time of delivery. It states only that each aircraft, upon delivery, "shall have received a valid FAA airworthiness certificate." (Contract § VIII.) CogniSphere thus reads a requirement into the contract that simply does not exist.

---

[6] It is also critical to note in this regard that Basler understands that the original contracting party, Theia, intended to use the aircraft for mapping and survey purposes in the Philippines, for which a standard category Airworthiness Certificate would not have been required. (Varkoly Decl. ¶ 8.) The fact that CogniSphere now desires standard category Airworthiness Certificates for whatever use it may anticipate does not change the contractual requirements, for which an experimental category Airworthiness Certificate is fully sufficient.

That CogniSphere *wants* Basler to obtain standard category airworthiness certificates is not a problem, even though it is not a requirement under the Contract. Basler has taken every step within its power to acquire those standard category certificates, and, in fact, Basler's understanding is that receipt of the standard category certificates is imminent. (*See* Varkoly Decl. ¶ 7.) Basler has been working diligently with the FAA to finalize the process of obtaining the modification to its STC and it is only awaiting final approval of its pilot training plan, which is the last step before authorization of the STC modification. (Varkoly Decl. ¶¶ 6-7.) Once the STC modification is finally approved by the FAA, nothing else stands in the way of receipt of the standard category Airworthiness Certificates. (Varkoly Decl. ¶ 7.) But the Contract explicitly recognizes that Basler is not responsible for FAA inaction or delay, providing that Basler "may extend the Delivery Dates for a reasonable time upon . . . a delay by the FAA with respect to obtaining an airworthiness certificate . . . ." (Contract § VII.) CogniSphere has not, and cannot, point to any contractual obligation related to airworthiness or Airworthiness Certificates that Basler has not fulfilled.

CogniSphere's suggestion that the aircraft are not *factually* airworthy (Motion 1, 5) is unsupported by any facts at all. The craft are airworthy—that is, fit for operation in the air—and nothing in CogniSphere's Motion or supporting materials is to the contrary. (*See* Varkoly Decl. ¶¶ 13, 15.)  If the aircraft were not airworthy, they could not have been flown to be painted, as all three were, so the very fact that each aircraft was certified for the flight to the paint shop (#70 just weeks ago) demonstrates that CogniSphere is incorrect. CogniSphere suggests that "experimental" is the opposite of "airworthy" (*see* Motion 5 ("[A]ircraft that is experimental—rather than airworthy—can be used for only limited purposes . . . .")), but this is incorrect. Experimental craft have the same requirements for airworthiness as aircraft operating under other categories of airworthiness certificates, and as discussed above, the FAA regulations *expressly provide* for the

issuance of certificates of airworthiness for experimental aircraft. *See* 14 C.F.R. § 21.175(b). This false dichotomy between "experimental" and "airworthy" is all CogniSphere has to offer on the question of factual airworthiness, and, like its certificate argument, it is grounded in an incorrect understanding of aviation.

CogniSphere also argues that Basler's entitlement to the cure payments is premised on the representation that Basler was "prepared to deliver the Aircraft," and that if LTS exercised the Cancellation Option, LTS would be "required to take delivery." (Motion 9.) While CogniSphere does not actually cite any sworn representation from Basler that it was "prepared to deliver the aircraft," Basler acknowledges that it informed the Receiver that the aircraft were ready to deliver subject only to getting the third aircraft painted. And Basler *was* prepared to deliver the aircraft in March of 2024. Had the parties settled on a delivery date, Basler could have delivered the aircraft and satisfied its contractual obligations. The three aircraft had or were entitled to receive valid FAA Airworthiness Certificates, as described above, and they were in fully operative, airworthy, and serviceable condition.[7] (Varkoly Decl. ¶ 13.) While one of the aircraft had not yet been painted, that is solely because Basler was waiting for direction on the desired paint specification. (Varkoly Decl. ¶¶ 13, 19; *see* Contract § VIII ("Each Aircraft on Delivery shall be painted at Seller's cost *in accordance with the detailed paint specification agreed to in writing between Buyer and Seller*." (emphasis added)).) And in any event, Mr. Varkoly expressly noted in his Declaration that the final plane still needed to be painted, as the Receiver was aware (Basler Mot. to Compel Ex. B, ¶ 8 ECF No. 429-2); that fact cannot support CogniSphere's accusations of misrepresentation.

---

[7] Basler acknowledges that it was also, at this time, awaiting direction from the buyer on the positioning of junction boxes and hardpoints. But those minor tasks did not undermine the planes' airworthiness; had delivery been requested at that time, Basler could have delivered the aircraft as-is and would have been in compliance with Section VIII of the Contract.

CogniSphere also argues that Basler has made no reasonably diligent efforts to comply with its contractual obligations. Because Basler *has* complied, the argument fails. But, in addition, Basler has been diligent in seeking to carry out its various obligations. Aircraft 68 (N1350A) was ready for final inspection and customer acceptance by December 31, 2021. (Varkoly Decl. ¶ 16.) Aircraft 69 (N941AT) was ready for final inspection and customer acceptance by January 27, 2023. (Varkoly Decl. ¶ 17.) Aircraft 70 was awaiting painting, which, per the Contract, required the parties to agree on a "detailed paint specification." (Contract § VIII.) Basler finally received direction on the paint specification from CogniSphere on August 30, 2024, and Aircraft 70 is at the paint shop as of this writing. (Varkoly Decl. ¶ 19.) And Basler has had the required FAA Airworthiness Certificates since before CogniSphere even acquired any rights under the Contract. Basler also long ago applied for the STC modification from the FAA that is a precursor to the aircraft receiving the standard category certificates that CogniSphere wants (and which are not contractually required), and Basler has done everything in its power to move that process along. (*See* Varkoly Decl. ¶¶ 5-7.) Basler cannot be held responsible for the FAA's continued delays. Since CogniSphere does not wish to take delivery until FAA approval is received and standard category certificates can be obtained, delivery, as per the Contract, will be delayed until final approval from the FAA is received.

CogniSphere also complains that Basler failed to "cooperate in routine due diligence" but does not explain what it means by this. (Motion 10.) Of course, "failing to cooperate with due diligence," even if it could credibly be suggested that Basler did such a thing, is not a breach of the Contract and certainly was not an obligation that Basler had failed to perform as of the time of Mr. Varkoly's representation to the Court in March of 2024. But even if it could be a breach, there is no credible argument that Basler has not cooperated with due diligence. First, the very first

mention of any such "due diligence" was LTS's transparent attempt to unilaterally alter the Letter Agreement and delay its payment obligation when it raised that concept after business hours on the final day for payment in connection with the Payment Option under the Letter Agreement. Notably, prior to that moment LTS made no attempt to learn about the aircraft or the Contract, even though it had been the counterparty replacing Theia for many months. (Varkoly Decl. ¶ 20.) It was not until *after* LTS agreed to buy Theia's rights under the Contract, *after* the Court approved that sale, *after* LTS agreed to the Letter Agreement, and *after* LTS failed to make timely payment under the Letter Agreement that LTS finally made its first attempt at "due diligence." If LTS truly viewed its "due diligence" as important, it should have acted before buying Theia's interest; at the very least, it should have negotiated for the right to perform whatever due diligence it desired *before* making payment to Basler under the terms of the Letter Agreement's Payment or Cancellation Options. It did not.

Because Basler did not misrepresent any fact in connection with its motion for payment of its cure costs, there is nothing for the Court to compel here. Basler, through Mr. Varkoly, informed the Court that it had complied with its contractual obligations as of that date. It had: the aircraft were, and are, airworthy as a factual matter, and they had or were entitled to receive valid FAA Airworthiness Certificates. (Varkoly Decl. ¶¶ 13-15.) They could have been delivered then in full compliance with the Contract, had the parties agreed to a delivery date. (Varkoly Decl. ¶ 13.) It is simply not true that Basler "misrepresented the state of its performance" (Motion 10), as CogniSphere claims. Basler has complied in full with the Court's June 11, 2024 Order, and CogniSphere is not entitled to the relief it seeks. Its request for a "refund" and "damages," and for an order requiring Basler to obtain "all necessary regulatory approvals," should be denied.

II.    **CogniSphere's breach of contract claims are not properly before this Court.**

While CogniSphere attempts to frame its motion in terms of purported "misrepresentations" to the Court, its arguments in fact go further: it accuses Basler of other breaches of contract that formed no part of Mr. Varkoly's Declaration to the Court. (*See, e.g.*, Motion 10 (arguing that Basler has not "made the option to purchase the fourth plane available to CogniSphere").) But to the extent that CogniSphere wishes to raise any such disputes, they must be raised in Wisconsin state court, not here.

Basler agrees that this Court has the inherent power to enforce its own orders and that it therefore has the power to address whether Basler complied with the June 11, 2024 Order. But other disputes, including allegations of breach of the Contract, are not properly before this Court. Section XXIII of the Contract provides:

> Buyer agrees that for the purposes of resolving or adjudicating any dispute arising out of this Agreement or the modification of the Aircraft, *the Circuit Court of Winnebago County shall have sole jurisdiction*. No action, suit or proceeding may be brought in any other place.

(Contract § XXIII (emphasis added).) In other words, if CogniSphere wants to argue that Basler breached the Contract, it must file suit in Winnebago County Court to litigate that dispute.

III.    **Even if CogniSphere could assert its breach of contract theories here, it has not shown that Basler breached the Contract.**

Even if the Court determines it may address CogniSphere's additional breach of contract theories despite Section XXIII of the Contract, CogniSphere has not shown that Basler committed any such breach. Though CogniSphere is not entirely clear in its briefing, it appears to make three distinct arguments, none of which has merit.[8]

---

[8] Basler has already addressed CogniSphere's contention that it breached the requirements in Section VIII of the Contract that the aircraft be airworthy and have valid FAA Airworthiness Certificates. *See supra* Section I.

a. **Basler did not breach by not delivering the aircraft immediately upon CogniSphere's payment of the cure costs.**

First, CogniSphere implies, though it does not state, that it was entitled to take possession of the aircraft *immediately* upon payment of the cure costs, and that Basler's failure to deliver those aircraft at that time constitutes a breach. That is not the case, as the procedural history—and the Contract itself—show.

Theia was in breach of the Contract with Basler at least as of late 2021. Importantly, Theia's failure to make payments due under the Contract explicitly excused Basler from adhering to the estimated delivery dates in Section VII. (*See* Contract § VII ("Seller may extend the Delivery Dates for a reasonable time upon Buyer's failure to make any Payment when due . . . .").) Following Theia's breach, as the Court is aware, Basler's costs began to rise as it shouldered the burden of storing, insuring, and maintaining the aircraft. By March 2024, Basler was owed nearly $12 million, and it sought relief from the Court, asking that it compel either the Receiver or LTS, which had stepped into Theia's shoes by purchasing its interest in the Contract, to either pay its costs or allow it to cancel the Contract. (*See generally* ECF No. 429.)

To resolve that motion, Basler, the Receiver, and LTS entered into the Letter Agreement. Under the Letter Agreement, while the parties would be committed to proceeding under the Contract—Basler to deliver the aircraft and LTS to take delivery—the process under the Contract leading to delivery was unchanged. Moreover, in the Letter Agreement the parties *expressly contemplated* that additional work remained before delivery would occur. Section 6 of the Letter Agreement provides:

> The Parties acknowledge and agree that if LTS exercises the Payment Option or the Cancellation Option, it will be required to take delivery of the three Aircraft. In such case, the Parties will work together in good faith to cause the Aircraft to be transferred to LTS or its assignee and Basler will be reimbursed for work required for an airworthiness certificate as outlined in Section 3. The Parties further acknowledge that the transfer may require additional services from Basler in the

> ordinary course and storage costs and other costs incidental to the delivery of the Aircraft, which shall be commercially reasonable. Notwithstanding anything to the contrary herein, LTS shall pay or shall cause its transferee to pay such amounts as a condition to final delivery of the Aircraft.

(Letter Agreement § (6).) In other words, LTS recognized, and the Letter Agreement memorializes, that "work required for an airworthiness certificate," and other "additional services from Basler," might well be required before "final delivery of the Aircraft." (*Id.*) Neither Section (6) of the Letter Agreement nor any contractual provision created an obligation for Basler to *immediately deliver the aircraft* upon LTS's exercise of the Cancellation Option.

Apparently, LTS ultimately assigned its rights to CogniSphere, so CogniSphere has now succeeded to the rights that LTS had. Those rights were the same rights that *Theia* had—the rights under the original Contract. That is: CogniSphere now has the right, as did Theia, to agree with Basler on a date for delivery of the aircraft. (*See* Contract § VII (noting that delivery dates were "estimates only" and could be extended for "Buyer's failure to make any Payment when due" or "a delay by the FAA with respect to obtaining an airworthiness certificate" among other reasons).) It has never had the right to demand immediate delivery upon payment of the $12 million in cure costs—not under the Letter Agreement, and not under the Contract. And tellingly, when Basler requested that CogniSphere take delivery of at least one of the aircraft in July, CogniSphere *refused*. (Varkoly Decl. ¶ 26.) This belies any suggestion by CogniSphere that it is genuinely aggrieved by the fact that the aircraft have not yet been delivered. To the contrary, CogniSphere clearly prefers to wait. That is acceptable (although Basler continues to incur increasing costs that, under the Letter Agreement, CogniSphere is obligated to pay)[9]—but CogniSphere cannot then *complain* that it is waiting.

---

[9] As of the date of this writing, Basler estimates that the unpaid costs CogniSphere will owe Basler through the end of November, 2024, are approximately $389,000.  (Varkoly Decl. ¶ 29.)

**b.      Basler has not breached any obligation to sell CogniSphere a fourth aircraft.**

Second, CogniSphere argues that Basler has breached its contractual obligation to build and sell to CogniSphere a fourth aircraft. Like many of CogniSphere's arguments, this contention ignores the language of the Contract, and it should be rejected.

Section V of the Contract states: "Buyer elects to purchase AC #71 as an OPTION under this contract. This Option may be exercised on or before the delivery of AC #70." (Contract § V.) It goes on to explain the pricing, and the payment terms, for the exercise of that option, which include the requirement that, in addition to the $150,000 deposit to hold the option open, in order to exercise the option, the buyer must wire a payment of $4 million to Basler.  (*Id.*)

At this point, *neither* of those requirements has been met. While Theia did originally make the $150,000 deposit to preserve the option, the Letter Agreement refunded that deposit to Basler. (*See* Letter Agreement, ECF No. 458-3, at 17, "Basler Turbo Conversions – Cure Cost Calculation for the Three Aircraft on Contract 20-068-V1 (as of June 1, 2024)," ¶ 4 (subtracting the $150,000 "[d]ownpayment" from Basler's cure costs).) Thus, the option to purchase the fourth aircraft simply does not exist under the terms of the Contract anymore, because the down payment required by Section V of the Contract to hold open the option has been returned. The rest of the Letter Agreement is wholly consistent with the elimination of the Contract's option to purchase: it explicitly discusses just three aircraft and makes no mention of a fourth. (*See, e.g.*, Letter Agreement § (6) (noting that, if LTS exercises the Payment or Cancellation Options, "it will be required to take delivery of *the three Aircraft*").) Accordingly, contrary to CogniSphere's arguments, it has no contractual right to purchase a fourth aircraft from Basler at all.

However, even assuming the option to purchase still existed, Basler has not breached the Contract because CogniSphere has *not yet exercised that option*. Critically, Section V does not merely require a $150,000 down payment to hold the option to purchase open; it also requires that

CogniSphere pay Basler $4 million, via wire transfer, "on execution of Option One." (Contract § V.) CogniSphere has made no such payment. Indeed, it has not even returned to Basler the $150,000 down payment that previously held the option open. (Varkoly Decl. ¶ 30.) Basler cannot have breached an obligation to build and sell a fourth aircraft to CogniSphere when CogniSphere has not taken the action necessary to trigger Basler's obligation to do so. *Cf. Locke v. Bort*, 10 Wis. 2d 585, 103 N.W.2d 555, 558 (1960) ("Restatement, 1 Contracts, p. 359, sec. 250(a) recognizes conditions precedent in contract law, and states that, when such a condition is provided, the fact upon which the condition is based must occur 'before a duty of immediate performance of a promise arises,' unless the same has been excused.").

Thus, CogniSphere's complaint that it "notified Basler in writing that it was exercising its option to acquire the fourth plane" but that "Basler has not acknowledged that notice or otherwise responded" (Motion 8) is of no moment. CogniSphere's email to Basler (ECF No. 458-5) is neither necessary nor sufficient under the Contract to trigger Option One and purchase the fourth plane; CogniSphere needed to make the $4 million payment (plus the $150,000 down payment) via wire transfer to exercise that option. Indeed, given that the email itself indicates that CogniSphere "will send [an] additional letter as well" (*id.*), it is unclear what response CogniSphere believes it *should* have received from Basler. In any event, Basler's decision not to respond to this email does not constitute a breach of any contractual obligation.

CogniSphere also makes much of its belief that Basler has sold an aircraft to the Government of Argentina and claims that the sale "includes a plane with the same tail number as the fourth plane under the Basler Contract." (Motion 6.) It does not identify any of the "numerous online sources" that purportedly have reported this "fact" (*see id.*), but more to the point, CogniSphere once again misinterprets both the factual circumstances and the Contract. First, it is

19

important to note that under the Contract, a *specific* fourth aircraft did not exist. That is, there never

has been a specific "Plane 71" to which the buyer was entitled: there was no tail number identified

in the Contract, just an arbitrary identifier to differentiate from the other aircraft. (Varkoly Decl.

¶ 31.) In other words, the Contract did not extend to Theia in the first instance the right to purchase

a *specific plane*; it offered Theia the option to elect to purchase an aircraft from Basler at some

point in the future, so long as the deposit was maintained and Theia properly exercised that option

before Aircraft #70 is delivered.

In addition, the press release that CogniSphere cites memorializes the mere authorization

of, and potential for, the sale of aircraft and related support to the government of Argentina; the

Argentinian government has not yet taken any action. (Varkoly Decl. ¶ 32.) That Basler has agreed

to *potentially* sell a plane or planes to the government of Argentina at some undetermined point in

the future does not infringe on any right CogniSphere may have had under the Contract to purchase

a future plane from Basler. Crediting CogniSphere's argument would essentially hold that, until

CogniSphere either exercises Option One or it expires, Basler is not permitted to sell *any* planes

to *anyone* else. That would be an absurd interpretation of the Contract, and this Court should not

credit it. *See Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶ 2, 351 Wis. 2d 123, 839 N.W.2d

425 ("[W]e must interpret contracts to avoid absurd results.").

Finally, Basler notes that even if the option to purchase the fourth aircraft still existed under

the Contract (it does not), it is simply no longer practicable to extend that option to CogniSphere

under the terms set forth in the Contract. The $12.15 million price was set many years ago, well

before Basler suffered through long breaches of the Contract and changes in the broader economic

and business circumstances. It is not workable to begin a new aircraft now and sell it to

CogniSphere for the Option One price. Basler is, however, willing to sell CogniSphere a fourth

20

aircraft at a reasonable, mutually acceptable price reflecting current market conditions—not because the option to purchase still exists under the Contract, but because Basler remains willing to act reasonably and work toward a mutually agreeable solution. (Varkoly Decl. ¶ 33.)

> **c.    Basler did not make unauthorized changes to the aircraft.**

Third, CogniSphere argues, in a cursory and conclusory fashion, that Basler made changes to the aircraft's autopilot system that were not "properly approved." (*See* Motion 6 n.4.) To the extent that Basler can understand CogniSphere's argument given the lack of detail in its assertion, CogniSphere is incorrect here, as well. Theia explicitly approved the modifications Basler ultimately made to the planes' autopilot systems by directing Basler in a signed writing to proceed with the Genesys autopilot system on April 27, 2021 and signed off on the modified panel on May 6, 2021. (Varkoly Decl. ¶¶ 34-35, Exs. A & B.)

These changes fully complied with the Contract's requirement that any amendments be "written" and "executed by an authorized agent or officer of Seller and an authorized agent or officer of Buyer." (*See* Contract § XXVII.) The April 27, 2021 email included a typewritten signature from Armando Carrion, Theia's Director, Airborne Mission Solutions and Operations (Varkoly Decl. Ex. A); the May 6, 2021 email included an image of the modified panel with the handwritten signature of Theia's Vice President, Ben Charny. (Varkoly Decl. Ex. B.) Under Wisconsin law, which governs the Contract (*see* Contract § XXIV), an email can constitute a writing for purposes of such a requirement, and a signature in an email can satisfy a signature requirement. *See* Wis. Stat. § 137.15(1); *accord Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289 (7th Cir. 2002) (holding that, under Illinois law, emails between parties satisfied UCC requirement that modifications to contracts for the sale of goods exceeding $500 be "memorialized in a writing signed by the party sought to be held to that term"). In other words, the typewritten signature of Mr. Carrion and the wet-ink signature of Mr. Charny cannot be discounted simply because they

were transmitted electronically.[10] Those signatures served to authorize the amendments to the specifications of the aircraft *years* before CogniSphere ever got involved with this matter. Basler therefore did not breach the Contract by modifying the aircrafts' specifications as it was expressly instructed to do by Theia in 2021.

## IV.    The Court should not unwind the Letter Agreement.

CogniSphere also asks, in the alternative, that the Court unwind the Letter Agreement entirely. (Motion 12.) But CogniSphere has not shown that continued enforcement of the July 11, 2024 Order adopting the Letter Agreement is inequitable. As discussed above, Basler made no misrepresentations in filing the motion that ultimately resulted in the entry of the Letter Agreement: when it moved to compel payment of the amounts owed under the Contract, it had, in fact, complied with all of its contractual obligations to date. The aircraft were airworthy; they had or were entitled to receive valid FAA Airworthiness Certificates; and, though Basler continued to await direction from the buyer on the painting of one craft and the placement of certain minor components, they could have been delivered that day as airworthy, operable, and serviceable aircraft. (Varkoly Decl. ¶ 13.) Even today, Basler has not failed to take any action that it is contractually obligated to take. While it continues to wait on the FAA for final approval of the STC modification that will allow the aircraft to have the standard category Airworthiness Certificates that CogniSphere desires, Basler's request for exemption has been granted, it has completed its mandatory differences training, and its training module has been tentatively approved; Basler is simply waiting on final paperwork from the FAA at this point. (Varkoly Decl. ¶ 7.) Until the FAA grants final approval, there is nothing more that Basler can do—and,

---

[10] Similarly, to the extent that CogniSphere intends to argue that *Basler* did not sign off on the modification, the typewritten signature of Shannon Voss in the email transmitting the image of the modified panel satisfies that requirement. (*See* Varkoly Decl. Ex. B.)

particularly since the aircraft already have or are entitled to valid FAA Airworthiness Certificates in the experimental category, there is nothing more that the Contract requires.

Basler has incurred substantial costs over the past few years waiting for direction from the Receiver, then from LTS, and it continues to incur costs even now. In short, everything in Basler's original motion to compel the payment of the cure amounts was true when submitted and remains true today. It would be inequitable for the Court to unwind the Letter Agreement and order Basler to repay the cure amounts intended to compensate it for its expenses during the years of delay and breach by Theia and LTS. This is particularly true given that LTS elected, and made payment under, the Letter Agreement's Cancellation Option *after* it was informed that Basler was still awaiting FAA approval, and that the aircraft, while fully airworthy, were operating under experimental category airworthiness certificates until such approval was obtained. It would be inequitable to refund that payment now on the basis of a fact that LTS already knew when it chose voluntarily to make that payment. Accordingly, Basler respectfully requests that the Court reject CogniSphere's alternative claim for relief, as well.

## V.    Basler has not waived its right to address these issues.

Finally, CogniSphere argues that Basler has waived its right to argue that it has complied with the Contract or the Court's order by failing to make an "application" in response to the letter CogniSphere filed with the Court on July 1. (Motion 10.) But again, CogniSphere is wrong, and its recitation of the procedural history of this matter is misleading at best.

On July 1, 2024, CogniSphere filed a letter with the Court purporting to bring to the Court's attention what it termed "materially incorrect representations made by Basler about the state of its performance." (ECF No. 451, at 3.) The letter sought no relief and was supposedly filed to reserve LTS's rights "[t]o the extent Basler fails to timely obtain FAA approval or otherwise fulfill its

contractual obligations."[11] (*Id.*) Basler disputed then, and disputes now, CogniSphere's characterization of the Contract, Basler's performance, and the parties' communications. Thus, although CogniSphere sought no relief through the filing of its letter, Basler responded with its own filing (ECF No. 452) on July 3, 2024, "disagree[ing] with and disput[ing] the allegations made therein." (*Id.* at 3.) In other words, Basler did precisely what CogniSphere argues it should have done: it responded to, and disputed, CogniSphere's arguments.

That the Court thereafter entered an order indicating that anyone who disagreed with CogniSphere's letter should file a response (ECF No. 453) does not change that fact. Basler had already exercised its right to dispute CogniSphere's filing by filing its July 3, 2024 letter. CogniSphere cites no authority suggesting that a party can waive its right to respond to an argument by disputing it *too quickly*.

Finally, CogniSphere argues, without further explanation, that Basler's letter was insufficient because it "contained no application." (Motion 7 n.5.) It is unclear what else CogniSphere believes that Basler should have included. The Court's memorandum indicated that "[a]ny party with an understanding different than that expressed by LTS shall make an appropriate application to the Court . . . ." (ECF No. 453.) Basler had already written to the Court to say that its understanding differed from that of LTS. (*See* ECF No. 452.) And while it did not engage in a point-by-point refutation of LTS's allegations, it was clear about the reason for that: "considering that LTS is, by its own admission only 'reserv[ing] all rights' 'to the extent Basler fails to timely obtain FAA approval or otherwise fulfill its contractual obligations,' a more detailed response would be premature and inappropriate." (*Id.* at 3.) In other words, given that LTS had not sought

---

[11] Of course, as discussed *supra* herein, Basler has neither failed to obtain FAA approval nor fulfill any other contractual obligation.

24

relief and that no live dispute was pending, there was nothing more for Basler to do other than memorialize its disagreement, as the Court instructed. That is exactly what Basler did.

## CONCLUSION

Basler made no misrepresentations in connection with its motion to compel payment of its cure costs, and it breached no provision of the Contract. The three aircraft it contracted to deliver to Theia are airworthy, with the FAA Airworthiness Certificates to prove it, and Basler has done everything it can to secure the standard-category certificates that CogniSphere wants instead even though there is no contractual obligation to do so. There is, therefore, nothing for the Court to compel Basler to do: Basler is in compliance with the Letter Agreement and the Contract alike.

The best and proper way to proceed is simply for the parties to wait for final action by the FAA, schedule and complete delivery, and go on with their separate businesses. As best Basler can determine, that FAA final action should be forthcoming soon. But in any event, if CogniSphere truly believes it has been harmed by some contractual breach by Basler, this is the wrong forum to litigate that dispute and it should be required to make that claim properly in a Wisconsin court as the Contract requires.

Accordingly, because there is nothing for the Court to compel, and no jurisdiction over CogniSphere's other breach-of-contract arguments, Basler respectfully requests that the Court deny CogniSphere's motion in its entirety.

DATE: November 8, 2024

Respectfully Submitted,

BASLER TURBO CONVERSIONS, L.L.C.

By: *s/ Anne B. Sekel* _____

Anne B. Sekel
Sabrina M. Bryan
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
(212) 682-7474
asekel@foley.com
sbryan@foley.com

and

Of Counsel:

Frank W. DiCastri
Paul J. Stockhausen
Monica A. Mark
REINHART BOERNER VAN DEUREN s.c.
1000 N. Water St. # 1700
Milwaukee, Wisconsin 53202
(414) 298-1000
fdicastri@reinhartlaw.com
pstockhausen@reinhartlaw.com
mmark@reinhartlaw.com
*Pro hac vice applications forthcoming*