OBJRFASc

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    FCS Advisors, LLC,
4                  Plaintiff,
5          v.                              21 Civ. 6995 (PKC)
6    THEIA GROUP, ET AL.,
                                           Conference
7
                 Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           November 19, 2024
10                                         10:45 a.m.
11   Before:
12                     HON. P. KEVIN CASTEL,
13                                         District Judge
14                        APPEARANCES
15   STEPTOE, LLP
          Attorneys for Plaintiff
16   BY:  CHARLES ANTHONY MICHAEL
17   FOLEY & LARDNER, LLP
          Attorneys for Basler Turbo Conversions, L.L.C.
18   BY:  ANNE BERKOWITZ SEKEL
          -AND-
19   REINHART BOENER VAN DEUREN S.C.
          Attorneys for Basler Turbo Conversions, L.L.C.
20        PAUL J. STOCKHAUSEN(via telephone)
21   BOIES SCHILLER FLEXNER LLP
          Attorneys for CogniSphere, LLC
22   BY:  MATTHEW LANE SCHWARTZ
          LINDSEY RUFF
23
     Also Present:
24   Robert Leeds
25
```

OBJRFASc

```
 1              THE COURT:  Please be seated.

 2              (Case called)

 3              THE COURT:  There's no plaintiff.  That's part of the

 4    problem here.  There is no plaintiff.  There is no defendant.

 5    There's a Mr. Schwartz however.

 6              MR. SCHWARTZ:  Good morning, your Honor.  Matthew

 7    Schwartz and Lindsey Ruff for CogniSphere, and we're joined by

 8    our client.

 9              MS. SEKEL:  Good afternoon, your Honor.  Anne Sekel on

10    behalf of interested party Basler, and on the telephone, my

11    colleague Paul Stockhausen, for the Reinhart firm, also on the

12    side of Basler.

13              THE COURT:  I take it the receiver did not bother to

14    appear today?  They are not interested in any of this?

15              MR. SCHWARTZ:  They are not interested in the sense

16    that they are not parties to this dispute.  We did reach out to

17    them.  Mr. Fuqua was not able to be here on short notice.  We

18    did receive a declaration from the receiver in support of the

19    motion, so he certainly has a position.

20              THE COURT:  Let me find out.

21              MR. SCHWARTZ:  We're joined by counsel for FCS as

22    well.

23              THE COURT:  Okay.  So FCS is appearing.  So that's the

24    Carlisle group, correct?

25              MR. MICHAEL:  No, your Honor, brevet.
```

OBJRFASc

```
 1              THE COURT:  What?

 2              MR. SCHWARTZ:  FCS is affiliated with Brevet.

 3              THE COURT:  Reve?

 4              MR. MICHAEL:  No.  Brevet.

 5              THE COURT:  I'm sorry.  Brevet.  And let me ask you:

 6   Is Brevet associated with LTS?

 7              MR. MICHAEL:  Yes.

 8              THE COURT:  Because we've traveled down this road

 9   before.  This is bringing up some recollections.

10              MR. MICHAEL:  Understood.

11              THE COURT:  And what is the relationship, if any,

12   between Brevet and CogniSphere?

13              MR. MICHAEL:  There is none.

14              THE COURT:  All right.  Thank you.  So let me see

15   whether I understand this.  CogniSphere received an assignment

16   of a contract from LTS; is that correct?

17              MR. SCHWARTZ:  Succeeded to its rights under the

18   contract, correct.  It was originally a subsidiary of LTS where

19   the contractual rights were placed, and then it was spun off

20   out of LTS to an entity owned by Mr. Leeds.

21              THE COURT:  And Mr. Leeds was previously associated

22   with Brevet; is that the situation?  Or a Brevet company?

23              MR. SCHWARTZ:  So Mr. Leeds has been, at various

24   times, an outside adviser to Brevet, as well as an outside

25   adviser to Theia.  This has all been disclosed and discussed,
```

OBJRFASc

```
 1   and I think we've been careful to note this in our papers.
 2              THE COURT:  All right.  Okay.  So what happens here is
 3   at some point in time before the receivership, Theia enters
 4   into a contract with Basler.
 5              MR. SCHWARTZ:  Correct.
 6              THE COURT:  Then we have a receivership, which is
 7   secured by an affiliate of Brevet, or Brevet——however you want
 8   to pronounce it——and the receiver, who is paid and funded by
 9   Brevet, then recommends to the Court that the assets be sold to
10   an affiliate of Brevet and that sale is approved.  That's to
11   LTS.  And your client, CogniSphere, has succeeded to the rights
12   of LTS in this will contract with Basler.
13              MR. SCHWARTZ:  Correct.  And only with respect to this
14   contract.  Not with respect to the other --
15              THE COURT:  Not with respect to the other?
16              MR. SCHWARTZ:  Theia assets.
17              THE COURT:  What is the word?
18              MR. SCHWARTZ:  Theia, the company put into
19   receivership.
20              THE COURT:  Oh, Theia's assets, not other assets.
21   This is just one asset.
22              MR. SCHWARTZ:  Correct.
23              THE COURT:  Okay.  So how are you in a position any
24   different than someone who acquires the rights to a Ricoh
25   copier owned by Theia and comes into my court seeking to
```

OBJRFASc

```
 1   enforce the warranty against Ricoh?  How are you any different?

 2              MR. SCHWARTZ:  The difference is we're not seeking to

 3   enforce the warranty on the copiers.  I think we were very

 4   careful in our papers to say that.  We're not asserting a

 5   breach of contract.  That's not before your Honor.  We

 6   understand that's not before your Honor.  We raised this

 7   originally because Basler obtained an order from the Court to

 8   approve a new agreement with the receiver; a new agreement that

 9   paid them potentially additional consideration that they were

10   not otherwise entitled to, and they obtained that order based

11   on representations, representations made to the receiver and to

12   the district court in a sworn declaration.

13              THE COURT:  When was this order entered?

14              MR. SCHWARTZ:  June 11.

15              THE COURT:  If you're referring to the June 11 order,

16   how do you get off asserting that Basler obtained this order?

17   That order was presented to me on behalf of LTS, the receiver,

18   and Basler.  And now you characterize it as an order obtained

19   by Basler.  How do you get to that?

20              MR. SCHWARTZ:  Because the impetus for the order was

21   that it resolved a motion filed by Basler.  So they had filed a

22   motion against --

23              THE COURT:  I am aware of that.  That preceded it.

24              MR. SCHWARTZ:  It did.

25              THE COURT:  But you all presented it.
```

OBJRFASc

```
1              MR. SCHWARTZ:  Well, not us.  We were not involved at
2     that time.
3              THE COURT:  LTS did.  Your predecessor in interest in
4     whose shoes you claim to stand, correct?
5              MR. SCHWARTZ:  Yes.  But what we did not understand at
6     the time was that the representation that had been made by
7     Basler was false.
8              THE COURT:  Well, you didn't have any understanding
9     because you were a stranger at that point.
10             MR. SCHWARTZ:  Correct.  And that's why --
11             THE COURT:  Your client was a stranger.
12             MR. SCHWARTZ:  That's why we put in evidence from the
13    receiver.  We put in evidence from others.  Everyone understood
14    the representation to mean -- because this is exactly what it
15    said, these planes are ready for delivery, which means they are
16    airworthy.
17             THE COURT:  But let's get this straight.  It's not
18    your client who is misled, correct?
19             MR. SCHWARTZ:  My client was not a proponent of that
20    motion, but he certainly was involved in the discussions at the
21    time.
22             THE COURT:  CogniSphere?
23             MR. SCHWARTZ:  CogniSphere.
24             THE COURT:  Not disclosed to the Court, of course.
25             MR. SCHWARTZ:  That there was someone else talking to
```

OBJRFASc

1      the parties, that's right.

2              THE COURT:  Right?

3              MR. SCHWARTZ:  Yes, true.

4              THE COURT:  Okay.  So your client is not in a position

5      to say it was lied to?

6              MR. SCHWARTZ:  Which is why the way we have styled

7      this application -- again, we tried to raise this in the most

8      benign way possible.  We wrote a letter as soon as we found out

9      on July 1.  We said, Hey, we found this out.  Maybe it won't be

10     an issue because they tell us the certifications are coming

11     right away, but we just want to put a marker down.  And we got

12     no response even though your Honor ordered them to respond.

13             THE COURT:  Well, they had responded before my order,

14     hadn't they?

15             MR. SCHWARTZ:  Yes, only to say they gave

16     the-my-cousin-Vinny response; everything this guy said was

17     nonsense.  They didn't explain why it was wrong in their view.

18     It was not until we got an opposition to a full-blown motion

19     that we get for the very first time a different theory of what

20     that representation meant and that this experimental-type

21     certification qualified under the contract when no one

22     thought --

23             THE COURT:  Let me ask you:  The contract which you're

24     referring to, the contract with Theia --

25             MR. SCHWARTZ:  Yes.

OBJRFASc

1          THE COURT:  -- is that an exhibit to the June 11

2     order?

3          MR. SCHWARTZ:  I don't believe so.  I believe you

4     have -- the letter agreement was an exhibit to the order, and

5     the letter agreement incorporated the APA, which in turn

6     incorporated that agreement, but it was not itself attached to

7     the order.  I agree.

8          THE COURT:  So you are not going to ask me to construe

9     that agreement?

10          MR. SCHWARTZ:  I'm simply asking you to --

11          THE COURT:  No.  Am I right about that?  You are not

12     here asking the Court to construe or enforce the original

13     agreement between Theia and Basler?

14          MR. SCHWARTZ:  Not in that posture.  I'm asking to

15     look at the representation that was made to the Court.

16          THE COURT:  All right.  And which representation?

17          MR. SCHWARTZ:  It was the representation that Basler

18     had fully performed its contractual obligations and was

19     prepared to deliver.

20          THE COURT:  And if that's not true, why isn't your

21     remedy to go to the designated forum in the contract between

22     Theia and Basler?

23          MR. SCHWARTZ:  Because we're not only aggrieved by a

24     violation of the original contract.  Again, the letter

25     agreement that was approved in the June 11 order provided for

OBJRFASc

1    additional and different consideration.  And so, what we, you

2    know, the nub of what we're asking for here is our client paid

3    several million dollars more than they otherwise should have.

4              THE COURT:  Why shouldn't I just vacate, if you were

5    misled -- first of all, you didn't enter into the stipulation

6    and order.  But if you persuade me that someone was misled into

7    entering into it, maybe the receiver was misled even though the

8    receiver is not here to claim that.

9              MR. SCHWARTZ:  But, again, we have a declaration from

10   the receiver.

11             THE COURT:  That's great, but my recollection is there

12   were a lot of lawyers who were working on the receivership

13   estate.

14             MR. SCHWARTZ:  True.

15             THE COURT:  And they certainly know how to come into

16   this courtroom when they feel like it, particularly to make a

17   fee application.

18             MR. SCHWARTZ:  I understand that.

19             THE COURT:  They apparently didn't feel like it.

20             MR. SCHWARTZ:  All I can tell you is that we

21   communicated with the receiver directly in his capacity as a

22   witness essentially, and he was not available on such short

23   notice to be here.

24             THE COURT:  The receiver himself.

25             MR. SCHWARTZ:  The receiver.  I did not speak to his

OBJRFASc

1    lawyers.

2            THE COURT:  What about his phalanx of lawyers?

3            MR. SCHWARTZ:  By --

4            THE COURT:  You don't know.  All right.  If you were

5    lied to, then my feeling is I should vacate this June 11, 2024,

6    stipulation and order, and send you off and pursue your

7    remedies under the contract.

8            MR. SCHWARTZ:  Right, and one of -- I mean, the

9    alternative relief we asked for is to unwind the contract and

10   letter agreement.

11           THE COURT:  No, I didn't say unwind the contracts and

12   letters.  I said vacate the stipulation and order, which was

13   the document that you claim you were misled into entering into.

14           MR. SCHWARTZ:  Right, which, I think, has the effect

15   of unwinding at least the letter agreement because the letter

16   agreement has no legal force without your Honor's approval of

17   it.

18           THE COURT:  Is that correct?

19           MR. SCHWARTZ:  I believe that's right.

20           THE COURT:  Well, take a look at the letter agreement.

21   Is there a provision in the letter agreement that it's of no

22   force and effect if the stipulation and order is not entered

23   into?

24           MR. SCHWARTZ:  I will double check that.

25           THE COURT:  Why don't you do that?

OBJRFASc

1          MR. SCHWARTZ:  The whole reason why it was presented

2     to you was because it was necessary.

3          THE COURT:  Why don't you double check?

4          MR. STOCKHAUSEN:  Your Honor, this is Paul Stockhausen

5     on behalf of Basler.  Could I comment on this issue briefly?

6          THE COURT:  Go ahead, sir.

7          MR. STOCKHAUSEN:  First, thank you for your

8     flexibility in allowing me to appear by phone this morning.  I

9     understand that it's unusual, and I very much appreciate the

10    flexibility in allowing me to do so.

11          First of all, the --

12          THE COURT:  Let me ask you a question.  Ultimately do

13    you agree that this case will turn on a construction of the

14    original agreement with Theia and its reference to an

15    airworthiness certificate?  Do you agree that that is what this

16    is going to turn on?

17          MR. STOCKHAUSEN:  Your Honor --

18          THE COURT:  It provides that the condition is that

19    they shall have received a valid FAA airworthiness certificate,

20    and you claim, what, that that term is ambiguous or

21    unambiguous?

22          MR. STOCKHAUSEN:  Your Honor, I don't think it's

23    ambiguous, but I don't think we even get there.

24          THE COURT:  Well, I just want to get that clear.  So

25    your position is, in paragraph 8, condition on delivery, a

OBJRFASc

1    valid FAA airworthiness certificate is not an ambiguous term,

2    right?

3            MR. STOCKHAUSEN:  Right.

4            THE COURT:  Okay.  Mr. Schwartz, what's your position?

5            MR. SCHWARTZ:  A valid FAA airworthiness

6    certificate --

7            THE COURT:  This is paragraph 8 of the underlying

8    agreement.  What's your position on that term as used in the

9    agreement?

10           MR. SCHWARTZ:  I believe, first, that an FAA

11   airworthiness certificate means a standard FAA airworthiness

12   certificate.  Second, I believe that it is undisputed that

13   Basler did not obtain standard-type FAA certificates, even

14   today, and at the time it made its representation to you, it

15   had not obtained even experimental-type certificates for all of

16   the planes.

17           THE COURT:  All right.  Mr. Schwartz, that doesn't

18   answer the question.  We can agree that your position is that a

19   valid FAA airworthiness certificate means the certificate for

20   normal operations provided for in 21-175(a) of the CFR, Title

21   14, and we can agree that that hasn't been provided.

22           MR. SCHWARTZ:  Correct.

23           THE COURT:  Neither of those were my questions.

24           MR. SCHWARTZ:  Your question, I thought, was how to

25   understand the contractual term.

OBJRFASc

1          THE COURT:  No.

2          MR. SCHWARTZ:  Tell me again the question.

3          THE COURT:  All right.  The question I asked was:  Do

4    you contend that the language in VIII "shall have received a

5    valid FAA airworthiness certificate" is ambiguous?

6          MR. SCHWARTZ:  I think the plain meaning of that

7    language is a standard FAA airworthiness certificate, and if

8    there's any ambiguity, all of the either evidence and canons of

9    construction point to it meaning that.

10          THE COURT:  All right.  That's nice.  Do you contend

11    it's ambiguous?

12          MR. SCHWARTZ:  I believe it's not ambiguous.

13          THE COURT:  Okay.  So you and Basler are on the same

14    page, right?  Correct?

15          MR. SCHWARTZ:  We believe it is ambiguous in different

16    directions.

17          THE COURT:  Of course.  That's not a very uncommon

18    situation; is it, Mr. Schwartz?

19          MR. SCHWARTZ:  Right.  It's not uncommon at all.

20          THE COURT:  All right.  So you both believe it's

21    unambiguous.  The significance of that being that it will

22    likely be for a judicial authority to construe that language,

23    correct?

24          MR. SCHWARTZ:  Yes.

25          THE COURT:  And does counsel for Basler agree with

1    that?

2              MR. STOCKHAUSEN:  If that becomes an issue between the

3    parties, yes.

4              THE COURT:  All right.  And is Mr. Schwartz correct

5    that as we appear today, there have been no FAA standard

6    airworthiness certificates issued for the aircraft?

7              MR. STOCKHAUSEN:  Yes, your Honor.  That's the subject

8    of the declaration we filed in our --

9              THE COURT:  I cut you off.  Let me hear what you

10   wanted to say, sir.

11             MR. STOCKHAUSEN:  Thank you, your Honor.  I was going

12   to point out two things.  One is that the representation we're

13   talking about doesn't actually say what they keep saying it

14   says.  I'll read the entire representation in quotes.  This is

15   the final sentence of paragraph 8 of Mr. Varkoly's declaration

16   of March 14, 2024.

17             This is the quote:  "With the exception of painting

18   one plane, as the receiver is aware, I believe that Basler has

19   fully performed all of its obligations to date."  It doesn't

20   say anything about ready for delivery.  It doesn't say anything

21   about full contractual performance.  It says "the obligations

22   to date."

23             And if the Court remembers, the whole point, the whole

24   reason for the motion to compel is that Basler was sitting

25   there having taken things as far as they could take them, and

OBJRFASc

```
 1    it was waiting on the others.  It was waiting on the FAA to
 2    give approval to the STC modifications, and it was waiting on
 3    Theia and then FCS and then later on CogniSphere to give them
 4    the directions to finalize the aircraft.  So it had done
 5    everything it could to that point.
 6            There's no representation in there about immediate
 7    delivery of the aircraft, much less immediate delivery of the
 8    aircraft to a standard-category airworthiness certificate.  The
 9    fact that there wasn't standard category, there was
10    experimental category, still an airworthiness certificate,
11    wasn't a secret.  The fact that we were waiting on the STC
12    modifications wasn't a secret.  These were things that are well
13    known.
14            Here is the second critical point.  What CogniSphere
15    here claims it was aggrieved by is having to pay these monies
16    under the letter agreement supposedly believing that they would
17    take immediate delivery of aircraft with standard-category
18    airworthiness certificates.  But Mitch Docken, the individual
19    on behalf of CogniSphere who has filed several declarations in
20    support of this motion, spoke to Mr. Varkoly on the 10th of
21    June before they made any payments under the letter agreement,
22    before the Court's order that is being talked about was
23    entered, and Mr. Varkoly specifically confirmed——and this is in
24    Mr. Varkoly's declaration filed with our response
25    brief——confirmed to Mitch Dockens at that time that there were
```

OBJRFASc

1    no standard-category airworthiness certificates, that they were

2    under experimental category, that the FAA still needed to act

3    to complete the modifications to the STC before they could be

4    delivered with standard-category airworthiness certificates,

5    which Dockens had indicated they want.

6            So they were in full knowledge of these facts.  They

7    didn't rely on any representations.  We believe those

8    representations, limited as it was, were completely true

9    anyway.  But they cannot claim that they relied on it in making

10   their payment, making the choice to exercise that option, and

11   make payments under the letter agreement.  They could have

12   chosen, knowing full well those facts on June 13, three days

13   later when they chose to make that payment, knowing of the

14   facts, they could have instead chosen to allow the aircraft to

15   go to auction, which was already underway, but knowing all the

16   facts, they made their choice.

17           We don't have to get to a discussion of what the

18   contract means --

19           THE COURT:  Now, tell me again, your witness is who?

20   The one who says that he communicated to a representative of—I

21   don't know—LTS?  Who did he communicate it to?

22           MR. STOCKHAUSEN:  Mitch --

23           THE COURT:  Start again, sir.

24           Excuse me, sir.  The court reporter cannot take you

25   down.  Start again.  And my question, just to be abundantly

1    clear on this:  Who is it who did the talking on behalf of

2    Basler, and to whom did they communicate that no airworthiness

3    certificates, standard ones, had been obtained?  And when was

4    this communication?

5              MR. STOCKHAUSEN:  Sure.  That is in the -- just so

6    that the court reporter knows where to find this in the factual

7    record, this is in paragraph 22 of Mr. Varkoly's declaration,

8    which is ECF document 463.  The specific answer to the question

9    is:  The person speaking on behalf of Basler was Joel Varkoly,

10   the president, and the person hearing the information was Mitch

11   Dockens on behalf of CogniSphere.

12             THE COURT:  And when was the communication?

13             MR. STOCKHAUSEN:  June 10, 2024.

14             THE COURT:  Okay.  Thank you.

15             Mr. Schwartz, do you want to respond to that?  You

16   presumably have seen this in the cited paragraph of ECF 463.

17             MR. SCHWARTZ:  Sure.  So let me respond to a few

18   things including that.  Number one, there's no question we knew

19   before we paid the money that they did not have standard-type

20   certification.  We disclosed that to you in our very first

21   letter on July 1.  We said we just found this out, but we had

22   really -- we were put in between a rock and a hard place,

23   because if we didn't pay the money, they were permitted to go

24   to auction and sell it --

25             THE COURT:  Well, let's just back this up.  You are

OBJRFASc

1    making a claim that you were lied to, or your predecessor in

2    interest was lied to as an inducement to enter into that which

3    became the order of June 11, 2024, correct?

4            MR. SCHWARTZ:  Correct.

5            THE COURT:  So now I want to find out whether you

6    dispute that this conversation took place on June 10.

7            MR. SCHWARTZ:  I don't know about that specific

8    conversation, but I agree before the money was paid --

9            THE COURT:  I'm asking you before the order was

10   entered.  That's what has been claimed here, that it took place

11   on June 10.

12           MR. SCHWARTZ:  It doesn't matter.  The important thing

13   is what representations were made before the parties entered

14   into the letter agreement and presented it to your Honor for

15   approval.  All of it happened before June 10.  So the

16   misrepresentations that were done in connection with contract

17   formation and then to the Court in connection with getting the

18   order, they were already made.

19           THE COURT:  Oh, no, no, no, sir.  No, sir.  No, sir.

20   No, sir.  Because if it was the case that the stipulation that

21   was on the Court's desk was premised upon a misrepresentation

22   which you learned before it was entered as an order of the

23   Court, it's not too late.  It's not even slightly too late.

24           MR. SCHWARTZ:  Well --

25           THE COURT:  And if you got in touch with me and I

1    entered the order, my goodness, I would vacate it if you had a

2    valid basis to claim a misrepresentation.

3        MR. SCHWARTZ:  That's what we did.  So we did that on

4    July 1.  I appreciate that was not June 10 or June 11.

5        THE COURT:  No, but the argument is before you paid

6    the money, you knew.  Before the stipulation was entered as an

7    order of the Court, you knew, and your comeback is a very

8    surprising one.  Your comeback is, well, we had signed the

9    letter agreements.  And I asked you before whether those letter

10   agreements remain enforceable, and if I understood you

11   correctly, no, they were dependent on there being an order.

12   And if there was no order, those agreements are not valid.  Is

13   that your position?

14       MR. SCHWARTZ:  That's true.  And I've looked at it,

15   and that's certainly true.

16       THE COURT:  And there's a provision in there to that

17   effect?

18       MR. SCHWARTZ:  There's -- there are things that the

19   letter agreement does that can only be done with Court

20   approval, which was the reason why Court approval for the

21   letter agreement was sought.  So the letter agreement cannot be

22   effectuated without Court approval.  It required, for example,

23   a lift of the receivership stay for Basler to go forward with

24   an auction under the auction option under the letter agreement.

25       THE COURT:  Well, that was only if there was a failure

OBJRFASc

1    to pay.

2           MR. SCHWARTZ:  Yes, but that was the structure of the

3    agreement.  I'm saying the structure of the agreement, it was

4    obviously a holistically negotiated agreement, and it could not

5    have been implemented without the Court's approval.

6           THE COURT:  What was the language in the agreement

7    regarding lifting the stay?

8           MR. SCHWARTZ:  I'm not sure that there's language in

9    the agreement other than specifically language about the

10   resolution of Basler's then pending motion, which was also

11   resolved through the letter agreement, but the stipulation and

12   order --

13          THE COURT:  I know what the stipulation and order

14   says.  It says if there's a breach, they can go ahead.

15          MR. SCHWARTZ:  Not a breach.  It's not a breach.

16          THE COURT:  A nonpayment.

17          MR. SCHWARTZ:  The structure of the letter agreement

18   was there were several different options, one of which was if

19   there's nonpayment under option one or two, Basler could go to

20   auction.  But there was still then option three, where LTS

21   could take it out of the auction process by paying an extra

22   fee, and that's the one that actually happened.

23          THE COURT:  And now what I'm asking you is whether

24   this was in the letter agreement.

25          MR. SCHWARTZ:  I don't think -- without reading every

OBJRFASc

1    single word, there's something in the letter agreement that

2    says this agreement requires approval of the Court.  It is

3    crystal clear that that's what the parties believed.  Maybe

4    Mr. Michael could speak to that because he was involved in it.

5    But it was crystal clear that just like the sale -- just like

6    the sale of assets was originally an agreement between Brevet

7    and the receiver, the APA, but it was of no legal moment until

8    the Court approved it because of the receivership.  This, too,

9    was of no moment until the Court approved it.  And everyone --

10            THE COURT:  And therefore, it becomes critically

11   important to know whether the representation that has been made

12   that is based on, I think I heard paragraph 22 of ECF 463, is

13   accurate and claimed to have taken place on June 10?

14            MR. SCHWARTZ:  Well, so --

15            THE COURT:  I think your client has a note to send

16   you, so why don't you talk to your client?

17            MR. SCHWARTZ:  I'm sure he does.

18            (Counsel and client conferred)

19            MR. SCHWARTZ:  It is true that money was paid in

20   tranches, and some of the money was paid before June 10 and

21   some of the money was paid after June 10.  So to the extent --

22            THE COURT:  When was the money before June 10 paid?

23            MR. SCHWARTZ:  Late May.

24            THE COURT:  Late May.  And what did you rely on that

25   was false to make that payment?

OBJRFASc

1          MR. SCHWARTZ:  Everyone understood, including based on

2     the representations that they admit in their opposition papers

3     were made directly to the receiver; they say separate from the

4     declaration to the Court, they represented to the receiver that

5     the planes were in deliverable condition.  Everyone understood

6     it.  And the entire premise of their original motion for cure

7     costs was these things are ready for delivery but for the fact

8     that Theia, and then the receiver, hasn't paid us.  And that --

9          THE COURT:  And so you thought there were FAA

10     certificates of airworthiness?

11          MR. SCHWARTZ:  Correct.

12          THE COURT:  And then I'm told that certainly on

13     June 10, you knew that wasn't true.

14          MR. SCHWARTZ:  I don't know exactly.  That's what --

15          THE COURT:  Why don't you talk to your client again?

16     Maybe you can find out.

17          MR. SCHWARTZ:  He wasn't party to that conversation.

18          THE COURT:  Okay.

19          MR. SCHWARTZ:  We found out --

20          THE COURT:  I'm sure he did his due diligence before

21     acquiring CogniSphere, no?

22          MR. SCHWARTZ:  Before acquiring CogniSphere?

23          THE COURT:  Didn't you tell me he was the owner of

24     CogniSphere?

25          MR. SCHWARTZ:  Yes.

OBJRFASc

| 1 | THE COURT:  Yes, before he acquired CogniSphere. |

1        THE COURT:  Yes, before he acquired CogniSphere.

2        MR. SCHWARTZ:  The diligence was understanding the

3   contractual relationships and the value of the assets.  We

4   tried to --

5        THE COURT:  This would relate to the value of assets,

6   right?

7        MR. SCHWARTZ:  But we tried to do diligence on the

8   planes themselves, but until the money started flowing, Basler

9   wouldn't permit any of that diligence.  That's why we don't

10  find out anything until after the money starts flowing in late

11  May.

12       THE COURT:  Well, apparently and --

13       MR. STOCKHAUSEN:  Can I comment on that topic?

14       THE COURT:  -- unless you have something to contradict

15  it with, because you had this before you walked in the

16  courtroom today.

17       MR. SCHWARTZ:  I agree.  I'm okay assuming for

18  purposes of this conversation that on or about June 10, we

19  found out that there was no airworthiness.

20       THE COURT:  Okay.

21       MR. SCHWARTZ:  And I understand the position that we

22  should have run into court then, and say this was --

23       THE COURT:  Yeah, I know you understand it, but what's

24  the legal effect of it?

25       MR. SCHWARTZ:  I don't think anything.  Because we

OBJRFASc

1    come in here complaining about the representations that were

2    made prior to the signing of the letter agreement and to obtain

3    approval of the letter agreement.  It is true, assuming this

4    conversation happened on the 10th and it came back to the

5    principals, that we could have run into court, you know, within

6    a day before you signed the order and said, Hold on, that

7    representation is not correct.  But we were also being told by

8    Basler that these things were imminent.

9            That's what we wrote to you on July 1.  We said, Look,

10   we're not trying to make a big deal of this, but we were told

11   that these certifications were imminent.  They haven't come

12   yet.  We want to just let it be known that if they don't come

13   through soon, it's a problem.  And your Honor --

14           THE COURT:  Mr. Schwartz, you are trying to say it's

15   not a big deal, it's imminent, et cetera, but the reality is

16   you are premising your fraud claim before me on not knowing

17   that there were no FAA standard airworthiness certificates.

18   That's what you're premising it on.  So when you tell me it's

19   not a big deal, it kind of undermines your fraud claim.

20           MR. SCHWARTZ:  No, no.  I --

21           THE COURT:  And, yeah, we might have known on June 10.

22   It doesn't sound like you're a victim of a fraud.

23           MR. SCHWARTZ:  I'm not saying it's not a big deal.

24   I'm saying our application is premised upon representations

25   that were made to you and that were made to the receiver that

OBJRFASc

1    were false, right, and those --

2            THE COURT:  So stop with this business like it's no

3    biggie that we knew on June 10.

4            MR. SCHWARTZ:  Okay.  But at that point, we were

5    already mid-transaction.  Money had flowed, and all of the

6    parties were behaving as if this letter agreement, although it

7    hadn't yet been approved, was going to be approved.  So there

8    are deadlines, date deadlines not keyed off of the entry of the

9    order, but objective date deadlines in the letter agreement

10   that had to be dealt with.

11           So there were on-the-ground realities which is why my

12   client had to make a decision even though it knew prior to

13   making the last payment for sure that these standard-type

14   certifications were in place.  Because if it hadn't done that,

15   the planes would have been sold at auction, and they would have

16   been sold on an as-is basis and --

17           THE COURT:  Under paragraph 3 of the order, right?

18           MR. SCHWARTZ:  Under the auction provision of the

19   letter.

20           THE COURT:  That's where your argument falls apart,

21   Mr. Schwartz.

22           MR. SCHWARTZ:  I understand --

23           THE COURT:  That's where your argument falls apart.

24   Stop.  Have a seat.

25           MR. SCHWARTZ:  I --

1              THE COURT:  You're a very bright man.  You've appeared

2      before me many times.  I've been very complimentary about your

3      work before me, but this is now talking nonsense.  If you knew,

4      there would have been no paragraph 3.  If you had alerted the

5      Court, I certainly would have stopped on a dime before I signed

6      it.  I don't know what I would have done, whether I would have

7      ultimately signed it or not, but rest assured that I would have

8      stopped on a dime if you made the assertion, There's a fraud

9      going on here.  I just found out.  My client just found out.

10     Mitch Dockens just found out that there are no FAA standard

11     certificates of airworthiness.  There wouldn't be a paragraph 3

12     of an order because you have told me today on the record that

13     that language doesn't appear in the letter agreements.  So the

14     argument sounds to me like it is full of holes.

15             MR. SCHWARTZ:  Well, I'm not sure what you mean when

16     you say the language doesn't appear in the letter agreement.

17             THE COURT:  Well, I asked you.  I asked you the

18     question.  I'll ask it again.  Maybe you'll give me a different

19     answer.  But did the letter agreement contain language about

20     lifting the automatic stay or the stay of any actions?  I don't

21     believe so.  I believe you told me, No, no, no, the letter

22     agreements didn't say that.  That was paragraph 3 of the order.

23             MR. SCHWARTZ:  Well --

24             THE COURT:  And you told me the letter agreement

25     absolutely contemplated the order.  If there was no order,

OBJRFAScc

1    there's no letter agreement.

2              MR. SCHWARTZ:  The letter --

3              THE COURT:  Well, then stop the presses on June 10.

4              MR. SCHWARTZ:  Let me say two things.  Number one,

5    Ms. Ruff helpfully points out that in paragraph 2 of the letter

6    agreement, it does expressly refer to lifting a receivership

7    stay.  For what it's worth, that is in the letter agreement.

8              THE COURT:  Which the letter could not do without the

9    order --

10             MR. SCHWARTZ:  Agreed.

11             THE COURT:  -- and you told me, and I think I'm

12   agreeing with you, the letter was premised on their being an

13   order.

14             MR. SCHWARTZ:  I agree 100 percent.

15             THE COURT:  If that's the case, you could have stopped

16   the train.

17             MR. SCHWARTZ:  So accepting all of that, I think the

18   question is:  Does the fact that we tried to be constructive

19   and not run into court and upset all of those negotiations in a

20   contract that was already going through, does that erase the

21   fact that misrepresentations were made?  I think the answer is

22   no, and I think your Honor ought to be at least as upset at

23   Basler as you are at me that misrepresentations were made to

24   receiver and to the Court in connection with obtaining that

25   order.  And there ought to be consequences for that, and that's

OBJRFASc

1    really what we're here for.

2              THE COURT:  Okay.  Let me ask Basler's attorney:  Have

3    you been paid what the June 11 order required you to be paid?

4              MR. STOCKHAUSEN:  Mostly, not completely, your Honor.

5              THE COURT:  What not completely?

6              MR. STOCKHAUSEN:  The letter agreement specifically

7    says that after the exercise of whichever option, the payment

8    option or the cancellation option, the cancellation option is

9    what occurred, that the parties acknowledge and agree that to

10   get from there to actual delivery is going to require

11   additional services from Basler in the ordinary course, storage

12   costs, and other costs incidental to the delivery.  Those costs

13   have been accruing.  They total -- I think Mr. Varkoly put in

14   his declaration that as of November it was right around a

15   little shy of $400,000, but they continue to accrue every day.

16   So those costs are outstanding and need to be paid, but other

17   than that, your Honor, I think we've been paid everything.

18             THE COURT:  All right.  Now, do I understand you that

19   you have some expectation that you will receive standard

20   airworthiness certificates in or about the first week of

21   December?

22             MR. STOCKHAUSEN:  Your Honor, for two of the aircraft,

23   yes.  The aircraft that is currently at the paint shop can't be

24   looked at by FAA DAR until it comes back from the paint shop,

25   which right now, based on the paint shop's schedule, looks to

OBJRFASc

```
 1    be mid-January.  For two of the aircraft, first week of

 2    December, and for one of the aircraft, mid-January whenever

 3    it's back from the paint shop, and we can schedule the DAR.

 4              THE COURT:  Right.

 5              MR. STOCKHAUSEN:  I'd like to point something out if I

 6    may, your Honor, about this question of notice.  You know,

 7    we've talked about fraud and misrepresentation, and we still

 8    haven't gotten back to any representation to the Court about

 9    standard-category airworthiness certificates.  If the parties

10    truly talked past each other and had a different understanding

11    of what the term meant in the contract, as your Honor noted in

12    the beginning, that's a different question.  That's a contract

13    interpretation question that would have to go before a court in

14    Winnebago County, Wisconsin, to talk about the interpretation

15    of --

16              THE COURT:  Well, it's either going to be there or

17    here, I assume.

18              MR. STOCKHAUSEN:  What?

19              THE COURT:  It's either going to be there or here.

20              MR. STOCKHAUSEN:  Yes, your Honor.

21              And one thing that's really critical is the status of

22    these aircraft; the fact that they were under experimental

23    airworthiness certificates, the fact that the STC modification

24    was applied for but pending FAA action, the fact that in all

25    other ways, they were ready to go, ready for delivery, work on
```

OBJRFASc

them had been completed as far as it could be without the final
input from Theia or LTS or CogniSphere.  That status was the
same from 2021 forward.  It had been the same all along, and it
was not a secret.

LTS before CogniSphere or CogniSphere after that at
any time could have found out that information by calling Joe
Varkoly at Basler, by emailing, by asking the questions, by
coming and visiting, any means.  And when they were
investigating -- LTS was investigating whether they wanted to
step into Theia's shoes and buy the Theia receivership assets;
could have asked.  It was a widely known fact.  There was even
available public records that would have reflected part of it
because it's an ongoing FAA proceeding.  Could have asked.
Could have known.  Didn't brother.

Between then and the pending motion to compel, could
have asked.  Could have known.  Didn't bother all the way up
until the moment they were going to make that final payment on
the 13th of June.  They finally asked, and when they finally
asked, they were immediately told and there was no more
uncertainty.  This isn't reliance on a fraud or a lie.  They,
for whatever reason, never looked.

THE COURT:  Well, this is asked out of total ignorance
on the subject.  Are FAA standard certificates of airworthiness
matters that are knowable by somebody who has the appropriate
identification numbers of the aircraft?

OBJRFASc

1          MR. STOCKHAUSEN:  Yeah.  You can go to the FAA's

2     website and look up any aircraft by tail number, and you can

3     obtain its entire registration status, which includes its

4     airworthiness status.

5          THE COURT:  And as of May 1, what would you have found

6     if you looked on May 1?  Make that April 15.  What would you

7     have found out on April 15 if you had looked up the tail

8     number?

9          MR. STOCKHAUSEN:  My understanding, your Honor, is you

10    would have found out the aircraft are registered to Basler

11    Turbo Conversions, and that aircraft 68 -- you know, I can't

12    remember which of the numbers it is.  Two of the three aircraft

13    were under currently active experimental category airworthiness

14    certificates.  The third wasn't at that time under any

15    airworthiness certificate because that was the one that was

16    waiting to be completed, which now that I say this out loud was

17    aircraft 70.

18         THE COURT:  So if there's discovery in this and

19    depositions are taken, one supposes that we'll find out whether

20    LTS or CogniSphere or its owner did that --

21         MR. STOCKHAUSEN:  Yes, your Honor.

22         THE COURT:  -- before plunking down 12 million bucks.

23         MR. STOCKHAUSEN:  It's not a secret.  We would have

24    told them this information if they were confused about it at

25    any time.

OBJRFASc
```


```
 1            THE COURT:  I understand.  I understand.

 2            Mr. Schwartz, can you say that your client——let's take

 3   April——did not know as of April what could have been learned by

 4   a check of the FAA website?

 5            MR. SCHWARTZ:  I don't know.  I can ask him.  I can

 6   put him on the stand to see when we found out what we found

 7   out.  And in that connection --

 8            THE COURT:  No, no.  I had a specific question.

 9            MR. SCHWARTZ:  I know --

10            THE COURT:  I had a specific question.

11            MR. SCHWARTZ:  I know.  I'm answering it.  I'm

12   answering it.

13            THE COURT:  So finding out what a particular

14   individual learned and when he learned it doesn't answer the

15   question of whether in the course of due diligence someone on

16   behalf of LTS or CogniSphere, whether it was a lawyer, a

17   retained aircraft broker or otherwise, had secured this

18   information.  I mean, I would find it astounding that you would

19   buy an aircraft not knowing anything about the condition of the

20   aircraft, the maintenance, the hours on the engine, any of

21   these things, or whether it had a normal certificate of

22   airworthiness.

23            Now, it will be great.  If I keep this case, we'll

24   have a hearing.  We'll have the testimony of the witnesses and

25   we'll have the witnesses——your witnesses——come up and take the

1    stand and say it never occurred to me to check the FAA website

2    to see whether there was a certificate of airworthiness before

3    plunking down $12 million.  I'd be very curious to hear that

4    testimony.

5         MR. SCHWARTZ:  I don't know the answer to that.  I

6    don't even know if we knew the tail numbers at the time.  As

7    they note in the papers, these numbers, 68, 69, 70, these are

8    arbitrary designates not tail numbers.  I don't know the answer

9    to that.  I also -- I may have been reading quickly, but since

10   my friend made the observation, your Honor, that there was some

11   conversation between their president and a representative of

12   CogniSphere on June 10, an important date, I looked carefully

13   at his declaration to find that and I don't see that.  I may be

14   overlooking it, but what I see is a representation that between

15   late May and June 13, there were a number of conversations

16   including where that was discussed.  That would be important,

17   too.

18        MR. STOCKHAUSEN:  That's accurate, your Honor.  The

19   specific date of June 10 is, in fact, the date that Mr. Varkoly

20   had the conversation with Mitch Dockens.  Getting to the level

21   of talking about which of each of the conversations Mr. Varkoly

22   had during that period wasn't critical at the time we filed

23   that declaration a couple weeks ago.  So what seemed critical

24   was that they knew the facts before the date of June 13, which

25   is when they chose to exercise the option and make the payment.

OBJRFASc

1   We could certainly have Mr. Varkoly get on the stand or submit

2   a supplemental declaration describing that specific

3   conversation that occurred on the 10th.

4           I think what the declaration says is that he had

5   multiple conversations with multiple people for LTS between

6   May 31 and June 13 and provided all of the information that I

7   described.  He, in fact, did do so.  One of those conversations

8   was the conversation on the 10th of June with Mr. Dockens.

9           THE COURT:  All right.  Let me get to something of

10  more practical significance.  I want to hear from Basler's

11  viewpoint what happens with regard to the two planes in the

12  first week of December.  I don't know how this works.  Is it

13  like a driver's test where you complete the driver's test and

14  they tell you passed or you failed?  Does it take a week?  A

15  month?  Three months?  When do you find out whether you get

16  standard certificates of airworthiness on the two planes?

17          MR. STOCKHAUSEN:  Your Honor, my understanding, and I

18  don't have a full detailed understanding of Mr. Varkoly to lay

19  all this out for you, but my understanding of it is what the

20  DAR——it stands for designated airworthiness

21  representative——from the FAA does is -- this is in relation

22  from the application for the modification of the STC.  So they

23  are coming out essentially to inspect the aircraft and confirm

24  that the condition of the aircraft is as it was represented to

25  be in the application for the modification of the STC, and they

1    are confirming that it is so as their confirmation.

2            They look at it.  It's essentially a checked box.

3    Yep, yep.  It is.  That's what you said.  That's the system

4    that is installed.  That's the one listed on the modifications

5    from the STC and described in the training materials.  And that

6    upon the DAR's making inspection and confirming that it is as

7    it was said to be, at that point, they sign off.  And then, the

8    standard-category airworthiness certificate issues from the

9    type certificate holder, which is standard Arrow in this case,

10   and that that's simply inputting it on the form on the internet

11   and it's done.  It's not so much a piece of paper as a change

12   in status of the aircraft.  So it's effectively immediate after

13   the inspection is complete.  It should be the same day.

14           THE COURT:  All right.

15           MR. STOCKHAUSEN:  That's my understanding of it.

16           THE COURT:  All right.  Okay.  So let me ask your view

17   of the world, and then I'm going to ask CogniSphere its view of

18   the world.  Two of the planes now have standard certificates of

19   airworthiness.  What happens with regard to those two planes?

20   And then, we'll talk about what happens with regard to the

21   third plane.  Start with the two planes.  In your view of the

22   world, what should happen?

23           MR. STOCKHAUSEN:  What should happen, your Honor, we

24   believe——and this is what we've sort of been following all

25   along——is we're just following the normal course toward and

OBJRFASc

1    through delivery under the contract.  And there's a specific

2    procedure to follow for delivery that -- and there will be --

3    as soon as the parties schedule the moment of delivery, which

4    we've been waiting for to get schedule, then they come out and

5    they do, first, a ground inspection, which is essentially them

6    going through the aircraft in every detail and confirming that

7    it conforms to the agreed specifications for the aircraft.  And

8    then, they do a flight, and then sign-off on that.  And then,

9    they'll do a flight inspection where they will go up with the

10   instructor and take the aircraft through its paces and

11   demonstrate that in flight, in operation, it conforms to its

12   specifications.  And then, there's the pilot transition

13   training that will occur as part of that.

14         That process will complete with acceptance of the

15   aircraft against the contract specifications, and assuming they

16   accept it, that it is what they understood it was supposed to

17   be, that we would then sign -- they would sign the acceptance

18   of the aircraft.  We would sign the bill of sale transferring

19   ownership of, you know, title of the aircraft, and then they

20   file with the FAA and get their registration transfer.  That's

21   the process under the contract.  That's what we see occurring.

22         We can do it with the aircraft sequentially, you know,

23   the first two and the third one when it's available.  We can do

24   them all when they are all available.  We can do it in any

25   order that CogniSphere prefers.  And I believe that

OBJRFASc

representatives, in fact the same Mitch Dockens of CogniSphere,
have been in touch with Mr. Varkoly to start scheduling all of
that already.

THE COURT:  All right.  So it's not crystal clear to
me, but first order of business would be the FAA inspection of
the two aircraft.  Then there would be some inspection process
by the buyer, right?

MR. STOCKHAUSEN:  Yes, your Honor.

THE COURT:  Okay.  And then the two aircraft would be
eligible to be delivered to the buyer, right?

MR. STOCKHAUSEN:  Yes.

THE COURT:  And what's the story on the third
aircraft?

MR. STOCKHAUSEN:  The story on the third aircraft,
your Honor, is exactly the same.

THE COURT:  I know it's being painted.  But when the
paint dries, what happens?

MR. STOCKHAUSEN:  When the paint dries, it gets flown
back to Basler's hangar at Oshkosh, Wisconsin, and Basler will
do the final, you know, checks and minor assembly post-pointing
that is normally done.  And then, the same process will occur.

THE COURT:  And when will the paint be dry?

MR. STOCKHAUSEN:  I don't believe we've got a firm
date on that, your Honor, but our understanding is mid-January.

THE COURT:  All right.  Okay.  Thank you.  Let me hear

OBJRFASc

1    from Mr. Schwartz, your version of the world.  What should

2    happen when, as, and if, there is an issuance of a standard

3    airworthiness certificate in or about the first or second week

4    of December?

5            MR. SCHWARTZ:  So assuming all the contracts in order

6    stay in place and the standard airworthiness certificates are

7    issued, then, as my friend said, as soon as the planes

8    otherwise meet the specifications, they will be ready for

9    delivery.  When they go through that sort of delivery process,

10   that will become the delivery date.  I appreciate Basler

11   clarified both in their papers, in our meet-and-confer

12   yesterday, and in my friend's remarks just now, that the

13   delivery date hasn't occurred yet and will occur at some point

14   in the future when all those points happen, and then we'll take

15   delivery.  The one part of it that was left out was they also

16   have charged us and intend to charge us large sums of money for

17   storing, maintaining and insuring the planes.

18           THE COURT:  And you think I should adjudicate that?

19           MR. SCHWARTZ:  Well, those are the cure costs.

20           THE COURT:  Do you think I should adjudicate that?

21           MR. SCHWARTZ:  Yes, in the following sense.  The

22   incremental monies that were paid in the letter agreement, the

23   cure costs, are those costs.  Those are costs that Basler --

24   this is why the misrepresentation is so important.

25           THE COURT:  You are so far remote from the reason for

OBJRFASc

1    this receivership.  You're a total downstream party.  My

2    analogy to the Ricoh copier warranty is not far off base.

3           MR. SCHWARTZ:  Again, we're not here complaining about

4    contract terms.  We're not here complaining about the diligence

5    that was done.  The reason why we're before you is because an

6    order was obtained from your Honor and an agreement was

7    obtained from the receiver and LTS based on the representation

8    that the planes were deliverable then.  And you just heard an

9    admission that the planes won't be deliverable until sometime

10   next month or the month after that.  And that was the basis --

11          THE COURT:  No, no, no, no.  That's not what I heard.

12   No, no.  Their position is that——I hear it.  I'm not adopting

13   it.  But their position is that they have satisfied the

14   requirement in the contract of a valid FAA airworthiness

15   certificate, and they assert that the experimental certificate

16   under 21-191 is an FAA airworthiness certificate.  A point with

17   which you vigorously disagree.  I understand.

18          MR. SCHWARTZ:  And, of course, they agree that one of

19   the planes doesn't have that.

20          THE COURT:  I didn't hear that.

21          MR. SCHWARTZ:  It's in the papers.

22          THE COURT:  Okay.  All right.

23          MR. STOCKHAUSEN:  Your Honor, I could explain that

24   point.

25          THE COURT:  Yes.

OBJRFASc

1          MR. STOCKHAUSEN:  It's true that one of them doesn't

2     have that because that's something we're supposed to provide

3     upon delivery.  The experimental-category airworthiness

4     certificate could have been obtained in a moment's notice at

5     any time because the third aircraft is airworthy, but there was

6     no point in applying for it until we had a scheduled delivery

7     date because they expire and we'd just have to do it again.

8     And Basler had already earlier applied for those as to the

9     first two aircraft, and they had them and they expired and they

10    reapplied and it expired.  And they just didn't want to start

11    that process unnecessarily with the third aircraft because

12    Theia was in receivership by the time the third aircraft was

13    complete.  There was no point in applying for it.

14          They were planning to apply to comply with the

15    obligations upon delivery as soon as the parties agreed on the

16    delivery date.  CogniSphere declined to take delivery of the

17    aircraft with experimental-category airworthiness certificate,

18    and so we're waiting to schedule a delivery date after getting

19    the standard-category ones that they desire.  That's why the

20    scheduling is the case, and that's why there's not

21    airworthiness certificate on the third aircraft yet because it

22    hasn't been delivered yet.  It was --

23          THE COURT:  Okay.  I've heard enough.  I've heard

24    enough of that.  The fact of the matter though is you say, and

25    I hear you.  You are here because your client was defrauded in

OBJRFASc

1   connection with entering into an agreement that was premised on

2   an order to be entered by the Court.  You say that.  That's why

3   you're here.  That's why you're not Ricoh copier.  That's why

4   you are different.

5           Yet, you do not dispute in this proceeding today that

6   a representative of your client or its predecessor in interest

7   knew on June 10 that there were no standard certificates of

8   airworthiness.  And I've learned that that circumstance was

9   knowable.

10          MR. SCHWARTZ:  So --

11          THE COURT:  Before that even.

12          MR. SCHWARTZ:  The June 10 --

13          THE COURT:  And therefore, I get back to my question

14  to you:  You're fine with taking delivery of these planes in

15  December if they pass your inspection, if the contract is

16  complied with?  If there's an FAA standard certificate of

17  airworthiness as to the two and the conditions are otherwise

18  met, you're fine?

19          MR. SCHWARTZ:  If the contracts remain in place,

20  that's what will happen.  Yes.

21          THE COURT:  All right.  And my strong advice to you

22  today is retain good local counsel in Wisconsin.  In which

23  county is it?

24          MR. STOCKHAUSEN:  Winnebago County, your Honor.

25          THE COURT:  Winnebago.  You'll love it there.  It's

OBJRFASc

```
 1   terrific.  All right.

 2               MR. SCHWARTZ:  I --

 3               THE COURT:  That's where your future lies.

 4               MR. SCHWARTZ:  I understand that there are disputes

 5   between the parties that are contractual and that probably

 6   belong in that forum.  Again, the reason we came here:  June 10

 7   was new as of this hearing.  And when he said it before, he

 8   said it was in the papers, you know, I pride myself on being

 9   prepared so I was surprised by that.

10               THE COURT:  I understand.  I know.

11               MR. SCHWARTZ:  So I'm not in a position to contest

12   that because I hadn't heard it before.  As I said, we've been

13   forthright from day one, however, that before the final payment

14   was made, we knew.  But because of the realities, because the

15   transaction was halfway through --

16               THE COURT:  I'm not standing here faulting you for

17   that, for doing what you felt were the economic realities.  I

18   don't fault you for that, but you are coming in here claiming

19   fraud.

20               MR. SCHWARTZ:  We're coming in here saying that

21   misrepresentations were made to the receiver, to LTS, and to

22   the Court.  And, you know, you've presided over enough fraud

23   cases to know that it's not a defense to say you could have

24   done due diligence and discovered the fraud.

25               THE COURT:  No.  But I do know from enough fraud cases
```

OBJRFASc

1    that it's a fruitful area of intense discovery to find out

2    whether or not there was due diligence done.

3              MR. SCHWARTZ:  Sure.  But I'm focused on and our

4    application is focused on --

5              THE COURT:  And whether a rational business person

6    parted with $12 million without bothering to check the FAA

7    website.

8              MR. SCHWARTZ:  I am focused on and the application is

9    focused on the representations that were made to the Court in

10   connection with Basler's original motion and the stipulation

11   order that resolved that motion.  Whatever else happened

12   between the parties, that representation was inaccurate.  I

13   understand you are frustrated at this posture, and we're

14   definitely downstream for the reasons that this case was filed

15   in the first instance.  But someone came into court and made an

16   application or obtained an order based on a misrepresentation,

17   and I think that matters and I think that belongs here.

18             THE COURT:  And do you ask me to vacate the June 11

19   order?  Would you like me to vacate it right now?

20             MR. SCHWARTZ:  That's the alternative relief we asked

21   for.  You have the ability to vacate the order, which will

22   vacate the agreement, which will result, we believe, in Basler

23   having to refund the monies paid by Theia and --

24             THE COURT:  And if they don't?

25             MR. SCHWARTZ:  Well, I would dispute, I guess.

OBJRFASc

1          THE COURT:  Where?

2          MR. SCHWARTZ:  That's a good question.

3          THE COURT:  Well, I asked it.  That's why.

4          MR. SCHWARTZ:  Yeah.  I don't know the answer to that.

5          MR. STOCKHAUSEN:  Your Honor, if I could comment on

6     this misrepresentation issue?

7          THE COURT:  Sure.

8          MR. STOCKHAUSEN:  This is a really critical point.

9     We're being very fast and loose or CogniSphere's counsel is

10    being fast and loose with this, you were defrauded, that a

11    misrepresentation was made to the Court.  They conveniently

12    never go back to what that actual misrepresentation was.

13    There's nothing in it about the standard-category airworthiness

14    certificates.  There's nothing in about its readiness for

15    immediate delivery.  It always, as part of it, was the

16    obligation to date.  The delivery date was always in the

17    future, and that was understood by all the parties at the time,

18    that the aircraft -- the delivery had to have happened pursuant

19    to the contract.

20          There's just no representation they can point to the

21    Court that talks about any of the things that they are now

22    claiming are false.  They have to pack their understanding of

23    what that would have meant and would have implied in order to

24    get to anything that they can even pretend is a

25    misrepresentation.  If we're going to have a fraud case, we've

OBJRFASc

1    got to look at the actual representation we're talking about,

2    and it just doesn't say what they keep saying it says.

3         THE COURT:  Mr. Schwartz, you want to -- I'm going to

4    give you an opportunity to say anything you want to say on any

5    of the issues pending.

6         MR. SCHWARTZ:  There are two representations.  There's

7    a representation that was made in the declaration filed with

8    the Court that said that Basler had performed all of its

9    obligations under the agreement.  The agreement, the contract.

10        The contract required the planes to be delivered

11   airworthy and with valid FAA airworthiness certificates.  The

12   premise of their original motion and of the letter agreement

13   was these planes are ready for delivery but for nonpayment, and

14   so, the letter agreement was a way to remedy the nonpayment.

15   That representation was false because they were not ready for

16   delivery without those airworthiness certificates.

17   Separately——separately——they admit in their papers that Basler

18   made a representation directly to the receiver that the planes

19   were in deliverable condition, which meant that they had

20   airworthiness certificates.  It's undisputed that two of them

21   had only experimental certificates.  One had none at all.  None

22   of them had standard-type certificates, which is what everyone

23   in the universe understood they meant.

24        If you look at their declaration, they admit that at

25   the time of contract formation, they only could have been

OBJRFASc

1    talking about standard-type certifications because they hadn't

2    yet even started talking about the modifications that led to

3    them ultimately getting experimental-type certificates.  No one

4    was thinking of that at the time of contract formation.  The

5    representation that was made to the Court and to the receiver

6    were inaccurate.

7              They obtained court orders that resulted in millions

8    of extra dollars being paid as a result.  That ought to be a

9    problem.  That ought to be a problem for the Court.  That ought

10   to be a problem for the receiver, which is why he put in the

11   declaration, and now it's ultimately my client who was put in a

12   very difficult business situation who bears the brunt of them.

13   So, you know, we're here on that narrow issue, narrow but

14   important issue, seeking relief.  And that issue, I think, is

15   properly before this Court.  Other issues may be for another

16   court.

17             THE COURT:  Thank you.  Anything further from Basler's

18   counsel?

19             MR. STOCKHAUSEN:  Your Honor, I think we said it all

20   already, and I won't bore you by just repeating things I've

21   already indicated.

22             THE COURT:  All right.  I'm going to set a conference

23   for January 10, 2025, at 10 a.m.  It will be a telephonic

24   conference, and the access number will be as put up in the

25   order of yesterday.  I think I put the AT&T access number up

OBJRFASc

1    yesterday.  It will be the same number unless you hear

2    otherwise.

3            MR. STOCKHAUSEN:  Thank you, your Honor.

4            MR. SCHWARTZ:  Thank you.

5            THE COURT:  Thank you, all, very much.

6            (Adjourned)

7                            o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25