UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FCS ADVISORS, LLC,<br><br>         Plaintiff,<br><br>   —against—<br><br>THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"<br><br>         Defendants. | 21 Civ. 6995 (PKC) |

**REPLY OF RECEIVER TO RESPONSES TO MOTION OF RECEIVER FOR ENTRY AN ORDER (I) ENFORCING THE SALE ORDER AND ASSET PURCHASE AGREEMENT AND (II) COMPELLING PERFORMANCE BY LTS SYSTEMS, LLC**

Kevin J. O'Brien
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
E-mail: kobrien@kslaw.com

- and -

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (312) 572-5100
E-mail: thadwilson@kslaw.com

*Counsel for Michael Fuqua, in his capacity as Receiver of*
*Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc*

Michael Fuqua, Court-appointed receiver (the "Receiver") for Theia Group, Inc. ("TGI"), Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities"), respectfully submits this reply (the "Reply") to (i) opposition (Doc. 505) (the "Brevet Response") filed by Brevet Capital Management, LLC ("Brevet"), which owns FCS Advisors, LLC ("FCS" or "Lender") and LTS Systems, LLC ("LTS" or "Buyer"); and (ii) the response letter (Doc. 504) (the "CogniSphere Response"; together with the LTS Response, the "Responses") filed by CogniSphere, LLC ("CogniSphere") and in further support of the *Notice of Motion of Receiver for Entry of an Order (I) Enforcing the Sale Order and Asset Purchase Agreement and (II) Compelling Performance by LTS Systems, LLC* (Doc. 500) (the "Motion to Enforce").[1]

## ARGUMENT

**A.      Reply to the Brevet Response**

1.      The Brevet Response is disingenuous, to say the least. In 2021, Brevet and FCS petitioned this Court to appoint a receiver to try to maximize their recovery as the first priority secured lender to the Receivership Entities.[2] After a sales and marketing process run by the Receiver and his advisors, Brevet elected to credit bid its debt and acquire the assets of the Receivership Entities through its newly created affiliate, LTS, which was formed for the sole purpose of owning the Theia assets. The Court approved the sale on October 26, 2023.

2.      To consummate the sale, the Receiver and his professionals were going to be required to spend time drafting the requisite transfer documents, including the FCC License. To ensure that there were adequate funds available to the Receiver and his professionals to close the

---

[1] Capitalized terms not defined herein will have the meanings ascribed to such terms in the Motion to Enforce or the accompanying *Memorandum of Law* (Doc. 502) (the "Memorandum"), as the context requires.

[2] The Response feigns ignorance over the identity of Brevet and refers to it only as "Brevet Capital" in scare quotes. The Lender's own Complaint initiating this action disclosed that FCS is part of "SEC-registered investment advisory firm Brevet Capital Management, LLC." Dkt. 1 ¶ 14.

sale to LTS/Brevet and complete the Receivership, the Receiver negotiated to have LTS assume the Assumed Liabilities. Breve/LTS and its counsel made clear to the Receiver at that time that the Assumed Liabilities would be paid—otherwise, the Receiver would have asked to the Court to close the Receivership immediately.

3. When the APA and the list of Assumed Liabilities was negotiated, Reed Smith was lead counsel in the Receivership, King & Spalding was special counsel, and Akin Gump was regulatory counsel for purposes of the FCC License transfer. Subsequently, Reed Smith withdrew as counsel to the Receiver, leaving King & Spalding to take over as lead counsel and Akin Gump as regulatory counsel.

4. At the time the Court approved the sale, Brevet/LTS led the Receiver to believe that it would close the sale within months. The Receiver's counsel prepared closing documentation, including paperwork to transfer the contracts related to several aircrafts.

5. Prior to the closing with respect to the aircraft contracts, Brevet/LTS became embroiled in a dispute with the contract counterparty, Basler, over back-owed payments, and the Receiver was pulled into that dispute, necessitating the Receiver and his counsel to spend unanticipated hours to ensure that the closing would occur.

6. Eventually, Brevet/LTS and Basler resolved their disputes (with the aid of the Court), and the Receiver transferred the aircraft contracts to LTS. In connection with the closing, LTS did not pay the Assumed Liabilities and informed the Receiver that it would pay the Assumed Liabilities once the closing occurred with respect to the sale of the remaining assets, specifically the FCC License.

7. LTS never intended to hold the FCC License and began looking for a buyer to designate as the transferee. After months of looking and negotiation, LTS identified Athena-5

Systems Corp. ("Athena") as its designee. It took months after the Court entered the Sale Order in October 2023 for LTS and Athena to negotiate their purchase agreement—an agreement to which the Receiver is not a party. The Receiver patiently waited for LTS and Athena to reach agreement because the Receiver was led to believe by Brevet/LTS and Athena that the consummation of such a transaction would maximize value for LTS/Brevet and other constituents of the Receivership (including unsecured creditors), who the Receiver was told would receive payments from Athena upon consummation of the transfer of the FCC License. Based on those representations, the Receiver wanted to provide a pathway—if he could—to ensure that some creditors would receive some distribution.

8. To that end, the Receiver has done everything in his power to consummate the transactions for the benefit of Brevet/LTS. In fact, the Receiver has transferred all assets of the Receivership Entities to LTS (with the exception of a few pieces of equipment that are in transit)—other than the FCC License. The Receiver and his counsel have spent significant time working directly for the benefit of LTS to ensure that the FCC License transfer paperwork was properly and appropriately submitted to the FCC. There have been countless calls with Brevet/LTS and their counsel regarding the sale and FCC License transfer.

9. Unfortunately, the FCC has yet to permit the FCC License to be transferred to LTS. Since October 2023, the Receiver has also incurred carry costs, including lease payments and storage costs, and additional expenses for tax returns that have been necessary to keep the Receivership open to enable Brevet/LTS to consummate their transaction with Athena. In other words, but for Brevet/LTS requesting that the Receivership remain open to ensure the FCC License is transferred, these costs would not have been incurred.

10. Throughout the process, the Receiver has been transparent with Brevet/LTS about the costs being incurred—again, costs being incurred for the benefit of Brevet/LTS. The Receiver provided Brevet/LTS estimates of the cost to consummate the transactions and close the Receivership, the latest of which is attached as Exhibit B (the "Receivership Fee Estimate") to the accompanying *Declaration of Kevin J. O'Brien* (the "O'Brien Decl.") filed contemporaneously herewith.

11. Since the Court entered its Termination Order, the Receiver has been preparing to close the Receivership—even though the transfer of the FCC Licenses has not been approved or resolved by the FCC. In so doing, the Receiver has been in regular contact with Brevet/LTS regarding payment of the Assumed Liabilities and the closing of the Receivership.

12. Until the Brevet Response was filed last night, the Receiver and Brevet/LTS had been discussing potential alternative solutions for Brevet/LTS to satisfy their obligations. Never once in those discussions did Brevet/LTS suggest that the fees incurred by the Receiver or his professionals were "unreasonable." Of course they were not because they were incurred for the benefit of Brevet/LTS, and to the extent they have not already been approved by the Court, they are reasonable as the Receiver has tried to wind down the Receivership Estates.

13. Now, though, it is transparent that Brevet/LTS are trying to avoid paying the Assumed Liabilities, even though they received tens of millions of dollars in value when the Receiver sold the aircraft contracts to LTS. They should have paid then—they didn't. The Receiver could have come to the Court and demanded payment then, but he did not because Brevet/LTS told the Receiver that he would be paid before the Receivership would be closed.

14. Brevet/LTS appear to have never had an intention of honoring their obligations to pay the Assumed Liabilities. In fact, counsel for Brevet/LTS sent an email to the Receiver stating, "If the license is lost, no one gets paid unless you find someone else liable that has assets."

15. What's more is that, even after Brevet/LTS's counsel emailed the Receiver and after they filed the Brevet Response with the Court, regulatory counsel for Brevet/LTS has requested phone calls with the Receiver's counsel to discuss issues related to the DOJ's indictments of former officers/directors of the Receivership Entities. In essence, Brevet/LTS are requesting that the Receiver and his counsel do what they say and do it for free.

16. Since the Court's Termination Order, the Receiver has been preparing to close the Receivership on July 31, 2025 as the Court directed. Now, for the first time in the Brevet Response, Brevet/LTS are requesting the Court hold the Receivership open for another 90 days. The Receiver does not oppose that request but believes any such extension should only be granted for the limited purpose of ensuring the FCC has time to make its determination regarding the FCC License transfer. But, if the Court grants Brevet/LTS's request to hold open the Receivership for that limited purpose, the Court should condition its approval on Brevet/LTS paying to the Receiver the full amount requested in the Receivership Fee Estimate – $529,873. *See* O'Brien Decl. Exh. B. To the extent any funds are not used by the Receiver, he would agree to return such funds to Brevet/LTS upon the FCC's decision regarding transfer of the FCC License.

17. Ultimately, the Receiver has no more funds to maintain the Receivership and cannot continue to ask his professionals to work for free, particularly when the lender who requested the Receivership in the first instance and whose affiliate (who bought the assets with a credit bid) agreed to pay those fees/expenses refuses to honor its obligations. It would be fundamentally unfair and inequitable to allow Brevet/LTS to take all the benefits of the Receivership without

having to pay the corresponding costs. The Court should order them to immediately pay the amounts requested in the Receivership Fee Estimate. *See* O'Brien Decl. Exh. B.

  **B.**  **Reply to the CogniSphere Response**

  18.  CogniSphere asserts that it has no responsibility for the Assumed Liabilities and requests clarifying language in an order that it has no obligations with respect to the Assumed Labilities. *See* CogniSphere Response. The Receiver is not a party to the assignment between LTS and CogniSphere and is unaware of its terms. Thus, the Receiver takes no position as to whether CogniSphere should also be liable for the Assumed Liabilities because, as the Receiver understands it, CogniSphere received substantial economic benefit in connection with the Receiver's transfer of the aircraft contracts to LTS.

## **CONCLUSION**

  19.  In light of the foregoing and based on the arguments set forth more fully in the Memorandum, the Receiver respectfully submits that the Court should enter an order, substantially in the form of the Proposed Order (Doc. 503), requiring Brevet/LTS/FCS and anyone else who may be liable for the Assumed Liabilities to be jointly and severally liable for the amounts of the Assumed Liabilities listed in the Receivership Fee Estimate. *See* O'Brien Decl. Exh. B.

[*Remainder of page intentionally left blank.*]

Dated: July 25, 2025
    New York, New York

Respectfully submitted,

<u>*/s/ Kevin J. O'Brien*</u>
Kevin J. O'Brien (SBN 5983713)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
E-mail: kobrien@kslaw.com

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (312) 572-5100
Email: thadwilson@kslaw.com

*Counsel for Michael Fuqua, in his capacity as Receiver of Theia Group, Inc., Theia Aviation, LLC, and Theia Holdings A, Inc.*

## CERTIFICATE OF COMPLIANCE

The foregoing memorandum of law, excluding the caption, tables of contents and authorities, and signature block, contains 1,778 words and complies with Rule 7.1(c) of the Court's Local Rules.

Dated: July 25 2025  /s/ Kevin J. O'Brien
       New York, New York        Kevin J. O'Brien