**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FCS ADVISORS, LLC,

Plaintiff,

—*against*—

THEIA GROUP, INC., d/b/a "THORIAN
GROUP" and/or "CYPHERIAN";

THEIA AVIATION, LLC; and

THEIA HOLDINGS A, INC., d/b/a "THORIAN
HOLDINGS,"

Defendants.

21 Civ. 6995 (KPC)

---

**LTS SYSTEMS, LLC'S OPPOSITION TO THE**
**RECEIVER'S CONTEMPT MOTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................3

      A.    FCS's Loans, Complaint and Motion to Appoint a Receiver ................... 3

      B.    The Receivership And Its Funding ................................................ 4

      C.    Compensation to the Receiver and His Professionals................................ 5

      D.    Auction for Theia's Assets............................................................. 5

      E.    Assumed Liabilities ...................................................................... 6

      F.    Aircraft Sale ................................................................................. 7

      G.    December 2023 Fee Requests ...................................................... 7

      H.    The Basler Cure and CogniSphere Note ..................................... 8

      I.    Regulatory Delays and The Court's Determination to Terminate the Receivership........................................................................................ 8

      J.    The Receiver's Motion to Collect on Assumed Liabilities........................ 9

      K.    The FCC License Is Lost .............................................................. 10

      L.    The Receiver's Final Report ....................................................... 10

      M.    The Receiver's Contempt Motion.............................................. 11

ARGUMENT............................................................................................................11

    I.    The Court Should Not Hold LTS In Contempt.................................... 11

      A.    The July 29 Order Cannot Be the Subject of Contempt Because the Assumed Liabilities Have Not Been Adjudicated As a Specific Amount Owing ...................................................... 12

      B.    LTS Lacks Funds to Pay Any Assumed Liabilities, Which Is a Complete Defense................................................. 14

    II.    There Is No Basis To Force LTS, or Any Affiliate, to Disgorge the Aircraft Sale Proceeds As a Contempt Sanction ......................... 15

CONCLUSION.........................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Banker v. Bath Iron Works Corp.*,
    507 A.2d 602 (Me. 1986)...................................................................................... 13

*Baumrin v. Cournoyer*,
    448 F. Supp. 225 (D. Mass. 1978) ...................................................................... 13

*Ecopetrol S.A. v. Offshore Exploration & Production LLC*,
    172 F. Supp. 3d 691 (S.D.N.Y.  2016).................................................................. 14

*Gucci America, Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)................................................................................ 12

*In re Flagstaff Foodservice Corp.*,
    739 F.2d 73 (2d Cir. 1984)................................................................................... 16

*In re Gravel*,
    6 F.4th 503 (2d Cir. 2021) .................................................................................. 14

*In re Old DDUS, Inc.*,
    659 B.R. 810 (Bankr. S.D.N.Y. 2024).................................................................. 14

*Jou v. Adalian*,
    No. CIV. 09–00226 (JMS), 2015 WL 477268 (D. Haw. Feb. 5, 2015) .......................... 14

*Levin v. Tiber Holding Corp.*,
    277 F.3d 243 (2d Cir. 2002)................................................................................ 11

*Lichtenstein v. Lichtenstein*,
    425 F.2d 1111 (3d Cir. 1970)............................................................................... 13

*N.Y. State National Organization for Women v. Terry*,
    886 F.2d 1339 (2d Cir. 1989)............................................................................... 11

*NLRB v. Deena Artware, Inc*,
    261 F.2d 503 (6th Cir. 1958) ............................................................................... 13

*SEC v. Musella*,
    818 F. Supp. 600 (S.D.N.Y. 1993) ...................................................................... 12

*UFI Razor Blades, Inc. v. Dist. 65, Wholesale, Retail, Office & Processing Union*,
    610 F.2d 1018 (2d Cir. 1979)........................................................................ 12, 13

*United States v. Bestfoods*,
    524 U.S. 51 (1998).............................................................................................. 16

*United States v. Rylander*,
    460 U.S. 752 (1983) .................................................................................................... 15

## TREATISES

17 Am. Jur. 2d Contempt § 128 ....................................................................................... 14

## INTRODUCTION

The motion of Michael Fuqua (the "Receiver") to hold LTS Systems, LLC ("LTS") in contempt should be denied. Contempt is a extreme remedy that should be used sparingly. It is appropriate only when clear and unambiguous commands are issued to a party that can, but chooses not to, follow those commands. The underlying Order here calls for LTS to pay certain "Assumed Liabilities" under a contract with the receivership entities, but the Receiver has not provided any calculation of the amounts due, and the Order does not specify any. That alone is grounds to deny the motion. In all events, LTS has not chosen to disregard this Court's Order. It does not have any funds with which to comply—a fact that has been explained to the Receiver many times. This is a separate and complete defense.

As the Court will recall, FCS Advisors, LLC ("FCS") filed this case against Theia Group Inc., Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, "Theia") for unpaid, secured debts approaching $300 million, leading the Court to place Theia into a receivership in 2021. FCS loaned Theia (*i.e.*, the receivership estate) nearly $7 million more with the hope of the Receiver generating hundreds of millions of dollars from Theia's primary asset, a satellite license, to pay back FCS and other creditors.

In 2023, it was apparent that a buyer for the license was not readily available, and so LTS, an affiliate of FCS, was created to credit bid, purchase and then hold the highly illiquid Theia assets. The transaction was set forth in an Asset Purchase Agreement (the "APA") whose terms were adopted by the Court in its "Sale Order."

By this point, the Receiver had spent nearly all of the funds FCS had loaned the receivership and so the Receiver negotiated, as part of the LTS transaction, that LTS would be responsible for certain defined "Assumed Liabilities," including certain of the receivership's professional fees that were capped at particular amounts for particular firms. The Assumed

Liabilities were to be paid at a "Closing," when, the hope was, LTS (or the Receiver) would have found a buyer for the license rights, generating cash sufficient to repay not only the Receiver's expenses, but potentially all the stakeholders. Two years later, the license has been declared "null and void" by the FCC, and there are no marketable or liquid assets in LTS whatsoever.

The Court Ordered the receivership to close by July 31, 2025, and, with that date looming, the Receiver moved for LTS to pay the Assumed Liabilities. The Court granted the motion, and signed the Receiver's proposed Order on July 29, 2025, directing LTS to pay the Assumed Liabilities within three business days. LTS had then (and has now) no funds to do so.

The Receiver thus moved for contempt sanctions against LTS. His cursory motion does not bother to set forth the standards for contempt, or, indeed cite a single case, statute or rule relating to contempt. Under basic contempt principles, the motion has at least two glaring flaws. *First*, courts widely recognize that an order to pay money cannot be the subject of contempt unless it specifies the amount to be paid. Here, the Assumed Liabilities are not calculated, either in the Order or by the Receiver. The APA includes firm-by-firm expense caps and provides that the Assumed Liabilities are to be paid at a "Closing," to the extent approved by the Court. The Receiver has not specified when he believes a Closing occurred, what funds were due to whom as of then, or whether those amounts are within the caps. The Receiver has only provided a schedule of amounts due as of July 2025, which makes it impossible to untangle what amounts—if any—qualify as Assumed Liabilities. *Second,* LTS has no funds to pay the Assumed Liabilities, which is a complete defense.

The Receiver is obviously well aware that LTS has no funds, and so he has sought a particular contempt remedy—having LTS "disgorge" the proceeds from sale of a Theia airplane in 2023—that is especially inappropriate and that merits brief further discussion. LTS never held

these proceeds, and so there is nothing to disgorge. The funds were used to pay FCS's first-priority secured debt—debt with a priority ahead of the Receiver. The Receiver has suggested in his "Final Report" to the Court that FCS (or, an affiliate, Brevet Capital Management, LLC ("Brevet")) should pay the Assumed Liabilities. But neither FCS nor Brevet *ever* agreed to bear any expenses of the receivership or to subordinate FCS's first-priority position. Any suggestion that FCS or Brevet should be responsible, or should be treated as interchangeable with LTS, is baseless. The Receiver does not even try to justify how such extreme relief could be appropriate.

The contempt motion should be denied in full.

## **BACKGROUND**

### A.     **FCS's Loans, Complaint and Motion to Appoint a Receiver**

In August 2021, FCS filed this case against Theia because Theia failed to repay debts to FCS that at the time were $289 million—and growing. ECF 1 ¶¶ 38-48; ECF 14 ¶ 31. FCS's debt was secured by substantially all of Theia's assets. *Id*. ¶¶ 15-16; ECF 17-1 § 8(a).

Theia's most valuable asset was believed to be an FCC license to build a network of satellites that Theia intended to use to create real-time images of the entire surface of the Earth. ECF 14 ¶¶ 5, 16.

FCS simultaneously moved, by order to show cause, to appoint a receiver empowered to take control of Theia and (among other things) sell the FCC license. ECF 12, 15-17. The motion detailed Theia's history of misconduct and dishonest behavior. ECF 16, at 10; ECF 37; ECF 57-59. Theia's principals were later indicted for the conduct set forth in FCS's motion. *See* Indictment, *United States v. Olson*, 1:25-cr-00069-RCL, ECF 1 (D.D.C. Mar. 13, 2025). The charges are pending.

B.    <u>The Receivership And Its Funding</u>

On November 8, 2021, The Court appointed Michael Fuqua, as Theia's "Receiver," and authorized him to "retain professionals . . . to assist him in carrying out the duties and responsibilities in the Court's Order." ECF 117. The appointment Order was clear as to how the Receiver and retained professionals were to be compensated:

- **Payments "Solely" From Estate**. The Order provides that the "Receiver and all personnel hired by the Receiver shall be compensated *solely out of funds now held by or in the possession or control of or which may in the future be received by the Receivership Entities*." *Id*. ¶ 12 (emphasis added).

- **$5 Million FCS Loan**. Recognizing that Theia had little to no liquid assets at the time, the Order provided that the Receiver, on Theia's behalf, could borrow up to $5 million from FCS (or, with prior approval, another source), to fund the receivership. *Id*. ¶ 13.

- **Prior Court Approval Required to Spend More**. The Order also provides: "To the extent the Receiver believes that additional funds are necessary for the carrying out of his duties he shall make an application for approval by the Court." *Id*.

- **Prior Approval Required For Receiver Compensation or Major Disbursements**. The Order provides that disbursements to the Receiver or his firm, B. Riley, or disbursements to anyone exceeding $300,000, required "prior approval" from the Court. *Id*. ¶ 7.

- **No Priority to Receiver**. The Order did not grant the Receiver or his professionals a lien on Theia's assets or otherwise indicate that debts to the Receiver would have priority over FCS's senior secured debt. To the contrary, the FCS receiver loans were to be "on a first priority secured basis." *Id*. ¶ 13.

In February 2022, the Court authorized the $5 million FCS loan contemplated by the Order appointing the Receiver. ECF 206. The Court's Order made clear that the FCS had an "enforceable first priority security interest, ahead of all other liens, encumbrances, security interest or similar encumbrance . . . in *all of the Receivership Property*," *id*. ¶ 6, meaning FCS's right to repayment was ahead of claims by the Receiver or his personnel. The loan amount was later increased, with the Court's approval, to $6.8 million. ECF 329.

All loan proceeds were required to be used by the Receiver "strictly in accordance" with an "Approved Budget." ECF 150-1, at 2.

**C.**    **Compensation to the Receiver and His Professionals**

In the fifteen months following the initial FCS loan, the Receiver, and the law firms he retained, filed multiple applications with the Court to approve their compensation, all of which were granted, as follows:

*Receiver and B. Riley*

| Date | Amount | ECF |
|------|--------|-----|
| March 15, 2022 | $559,529.21 | 222, 224 |
| June 17, 2022 | $506,287.49 | 246, 271, 281 |
| November 10, 2022 | $147,986.80 | 299, 313 |
| April 13, 2023 | $290,288.55 | 335, 353 |

*Total    $1,504,092.05*

*Receiver's Counsel*

| Date | Amount | ECF |
|------|--------|-----|
| April 15, 2022 (Reed Smith) | $1,323,971.49 | 226, 242 |
| July 1, 2022 (Reed Smith) | $272,298.31 | 256, 272, 282 |
| November 25, 2022 (Reed Smith) | $595,690.49 | 302, 314 |
| April 13, 2023 (Reed Smith) | $357,309.21 | 332, 354 |
| April 13, 2023 (King & Spalding) | $446,285.91 | 355, 412 |

*Total    $2,995,555.41*

These fees—and ultimately over $6 million in professional fees for lawyers and others—were paid through FCS's loans. ECF 511-1. In every fee application, the Receiver or his counsel noted expressly that payments were available *solely* out of funds in the receivership estate. ECF 222 ¶ 3; 226-1 ¶ 3; 246-1 ¶ 3; 256-1 ¶ 3; 299-1 ¶ 3; 302-1 ¶ 3; 332-1 ¶ 3; 335-1 ¶ 3; 355-1 ¶ 3.

**D.**    **Auction for Theia's Assets**

In June 2023, after more than a year of the Receiver trying and failing to find buyers interested in Theia's assets, the Receiver moved the Court to approve certain "Bidding Procedures" to auction substantially all of Theia's assets. ECF 357-59. The Bidding Procedures

provide that "FCS has a valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount no less than $454.8 million." ECF 363 Ex. 1, at pg. 6.

The investment bank hired for the auction "contacted 53 potentially interested parties," ECF 380 ¶ 13, but, ultimately, only two bids came in. One was a $20.5 million bid for Theia's aircraft assets only (*i.e.*, *not* the satellite license) and, due to multiple problems, the Receiver deemed it not a "qualifying" bid. ECF 367 ¶ 8. The only other bid was a $40 million credit bid from a newly-formed FCS affiliate, LTS. *Id.* ¶ 31. LTS was formed specifically to hold the APA assets. *See* Declaration of Mark Dunsheath ("Dunsheath Decl.") ¶ 2.  LTS otherwise has no operations, employees or assets of any kind. *Id.* ¶¶ 3-6.

On August 12, 2023, the Receiver moved to approve the LTS sale. ECF 367. In October 2023, the Court entered the "Sale Order," approving the APA memorializing the LTS sale transaction. ECF 411 (approving APA, ECF 365-1, at Ex. 1).

### E.    Assumed Liabilities

As relevant here, the APA provides that "[a]t the Closing, Buyer"—LTS— "will assume and agree to pay, perform, be responsible for and discharge when due the Assumed Liabilities." APA § 2.02. The Assumed Liabilities include "those items set forth on Schedule 1.01(i)," *id*. Art. I(i), which are the eight items below—most relevant here, the six categories of "reasonable" professional expenses, each subject to cap beyond which the liabilities are "not to exceed," *id*. Sch. 1.01(i):

| | |
|---|---|
| 1. | Reasonable fees and expenses of Reed Smith LLP not to exceed $750,000. |
| 2. | Reasonable fees and expenses of GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services not to exceed $100,000. |
| 3. | Reasonable fees and expenses of Akin Gump Strauss Hauer & Feld not to exceed $100,000. |
| 4. | Reasonable fees and expenses of Frank Bonini, Esquire not to exceed $200,000. |
| 5. | Reasonable fees and expenses of Michael Fuqua in his capacity as Receiver with respect to administration of the Receivership Estate not to exceed $200,000. |
| 6. | Reasonable fees and expenses of King & Spalding LLP not to exceed $200,000. |
| 7. | $40 million of secured debt pursuant to the FCS Loan, *less* the total amount of other Assumed Liabilities. |
| 8. | $150,000, as secured by a mechanic's or possessory lien on any of the Aircraft; and any additional amounts accrued prior to Closing. |

Further, for Items 1-6 (the ones relevant here), the liabilities were subject to "allowance by the District Court." *Id*. Sch. 101.(i) n.2.

## F.    <u>Aircraft Sale</u>

Following the APA, the Receiver "assisted the Buyer with the sale of a DC 3 aircraft" for $9.5 million. ECF 434, at 3. The transaction closed in December 2023. Dunsheath Decl. ¶ 4. A portion of the proceeds ($1.5 million) went to the cover investment banking fees associated with the auction. *Id.* The rest ($8 million) were applied to FCS's first-priority debt. *Id*. None were ever paid to, or held by, LTS. *Id*.

## G.    <u>December 2023 Fee Requests</u>

In December 2023, the Receiver and his counsel made their final fee requests, as follows:

### *December 18, 2023 Fee Requests*

| Date | Amount | ECF |
|---|---|---|
| Receiver | $138,828.79 | 416, 424 |
| B. Riley | $83,024.30 | 416, 424 |
| Reed Smith | $705,843.97 | 418, 425 |
| King & Spalding | $150,348.20 | 420, 426 |
| **Total** | ***$1,078,045.26*** | |

Each application was clear that the "proceeds of receivership financing are insufficient to pay in full" the expenses, and so compensation would be in form of the "assumed liabilities" under the APA, which each application characterized as "deferred payments . . . *up to certain amounts*." ECF 417 ¶ 10; ECF 419 ¶ 8 n.2; ECF 421 ¶ 12 n.2 (emphasis added).

### H.    The Basler Cure and CogniSphere Note

Among the assets LTS agreed to purchase in the APA was an agreement between Theia and Basler Turbo Conversions, L.L.C. ("Basler") for the sale of three airplanes to Theia. APA Sch. 1.01(e), 1.01(h); ECF 458-1 (Basler contract). The APA called for LTS to "cure" the amounts still due to Basler to complete the sale. APA Sch. 1.01(h).

LTS lacked the funds necessary to make the cure payment, and so, in June 2024, a third party, CogniSphere, LLC ("CogniSphere"), agreed to advance the cure costs of approximately $12.4 million and take ownership of the planes. Dunsheath Decl. ¶ 5. In exchange, CogniSphere issued a note to LTS whereby up to $2.75 million, with interest, is payable to LTS if and when CogniSphere is able to realize proceeds from selling the planes sufficient to cover (among other things) CogniSphere's earlier cash outlay. *Id*. None have yet been sold, and LTS cannot predict when or if that will occur. *Id*.

### I.    Regulatory Delays and The Court's Determination to Terminate the Receivership

Since the Sale Order, the primary function of the Receivership has been to await regulatory approval for transfer of the FCC license and related rights to a third party, Athena-5 Systems Corp., contemplated to buy the license rights from LTS. ECF 434, at 3 (Receiver's Seventh Status Report); ECF 511, at 6 (Receiver's Eighth Status Report).

On May 5, 2025, the Court issued an Order noting that the asset sales should not be conditioned on regulatory approval, and, thus, the Court stated: "Unless otherwise ordered, the Receivership terminates on July 31, 2025." ECF 496, at 2.

**J.**     **The Receiver's Motion to Collect on Assumed Liabilities**

With the receivership termination looming, the Receiver moved to enforce the provision of the Sale Order requiring LTS to cover the Assumed Liabilities at Closing. ECF 500-503. The motion included a perfunctory request that FCS and Brevet be held liable, "to the extent that [LTS] does not have assets to pay the Assumed Liabilities." ECF 502 ¶ 16. Nowhere did the motion calculate or explain the precise amounts qualifying as Assumed Liabilities.

When LTS pointed out this shortcoming in opposition, ECF 505, at 3-4, the Receiver, in his reply papers, provided the spreadsheet below, *see* ECF 507-1:

**Theia Receivership**

**Accounts Payable and Professional Fees Estimate (Updated through 07/15/2025)**

| Vendor | Accounts Payable | Accounts Payable includes Fees through | Estimated Unbilled Expense through July 15, 2025 | Estimated Additional Expense to be Incurred through Closing | Gross Cash Required to Pay Vendor | Application of Retainers | Net Cash Required |
|---|---|---|---|---|---|---|---|
| King & Spalding [1] | $ 167,922 | 5/31/2025 | $ 15,000 | $ 50,000 | $ 232,922 | $ (100,000) | $ 132,922 |
| Akin Gump [2] | 195,568 | 5/31/2025 | - | 35,000 | 230,568 | - | 230,568 |
| Receiver | 53,335 | 4/30/2025 | 6,000 | 23,000 | 82,335 | - | 82,335 |
| B. Riley | 16,199 | 4/30/2025 | 2,000 | 25,000 | 43,199 | - | 43,199 |
| Nelson Mullins | 2,851 | 12/31/2024 | - | - | 2,851 | - | 2,851 |
| CRI | 4,000 | 4/30/2025 | - | 15,000 | 19,000 | - | 19,000 |
| Dissolution costs | - | N/A | - | 10,000 | 10,000 | - | 10,000 |
| 2025 taxes | - | N/A | - | 5,000 | 5,000 | - | 5,000 |
| 2024 taxes | - | N/A | 3,500 | - | 3,500 | - | 3,500 |
| Bank fees | - | N/A | 200 | 300 | 500 | - | 500 |
| **TOTAL** | $ 439,873 | | $ 26,700 | $ 163,300 | $ 629,873 | $ (100,000) | $ 529,873 |

| | |
|---|---|
| Assumed Liabilities to be Paid per Sale Order | 250,000 |
| **Excess Amount Due to Maintain Receivership to Close** | $ 279,873 |

*Notes*
[1] K&S will draft the Receiver's final report as well as respond to any DOJ inquiries as long as Receivership is open.
[2] Akin Gump is critical to maintaining and transferring the FCC licenses.

The spreadsheet asserts that the "Assumed Liabilities" are a collective $250,000, but does not explain the source of that calculation. To properly calculate the Assumed Liabilities, one would need to know when the Receiver considered a "Closing" to have occurred (perhaps in December 2023, when an aircraft was sold), what amounts were due and approved by the Court

as of then, what portion of those amounts were within the APA's specified caps for each firm, and, finally, what portion remains outstanding, taking into account payments since the Closing. But nothing like that detail is provided. The Receiver merely sets forth a fee estimate "Updated through 07/15/2025" and a bottom-line Assumed Liability number of $250,000.

On July 29, 2025, the Court granted the motion by signing the Receiver's proposed order. ECF 509. The operative terms of the Order are below, *id*.:

> 1.    The Motion is GRANTED.
>
> 2.    The Buyer is hereby ordered to pay the Receiver, within three (3) business days of the date hereof, the Assumed Liabilities for the costs and expenses of the Receivership Estate.

The term "Assumed Liabilities" is not further defined in the Order, nor is a dollar amount specified.

### K.    The FCC License Is Lost

On July 25, 2025, the FCC declared Theia's license "null and void." ECF 508-1. The upshot is that LTS has lost its primary asset. Although Theia transferred certain intangible rights to LTS (such as potential claims that could be brought against third parties), LTS does not have any cash, or other assets with a ready market value. Dunsheath Decl. ¶¶ 3-6.

### L.    The Receiver's Final Report

On July 30, 2025, the day following the Court's Order, the Receiver issued a Final Report, stating that the receivership had approximately $600,000 in unpaid and estimated expenses. ECF 511, 511-1.

The Report, although not styled as a motion, requested that the Court order that FCS and its affiliate Brevet be "joint and severally liable" for the unpaid and estimated expenses, and that they be forced to disgorge proceeds from the airplane sale 18 months earlier to pay those

expenses. ECF 511, at 8-9. The Report cites no legal authority for these demands, which FCS opposed in a letter the following day. ECF 513.

The Court later issued a memo endorsement on FCS's letter stating that the issues raised would be addressed at the hearing on this contempt motion. ECF 517.

### M.    The Receiver's Contempt Motion

On August 8, 2025, the Receiver brought this motion for contempt sanctions against LTS for not having paid the Assumed Liabilities under the July 29 Order. ECF 519. The Receiver seeks to force LTS, in addition to paying the (still uncalculated and unspecified) Assumed Liabilities: (i) to pay all the Receiver's fees for bringing its contempt motion, (ii) to pay penalties to be determined by the Court, and (iii) to "disgorge to the Receiver the cash the Buyer received from the Aircraft Proceeds that is needed to pay the Receiver and his professionals." ECF 521.

The motion does not explain how LTS is to "disgorge" the Aircraft Proceeds that, as the Receiver well knows, did not go to LTS but were paid to FCS to satisfy (a tiny portion of) its first-priority secured debt. Dunsheath Decl. ¶ 4; *see also* ECF 514 (letter from Receiver's counsel stating that the aircraft sale "generated $9.5 million in cash proceeds for FCS" and that "FCS . . . retain[ed] those proceeds").

## ARGUMENT

### I.    THE COURT SHOULD NOT HOLD LTS IN CONTEMPT

"A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989). The "party seeking to hold another in civil contempt bears the burden of proof" as to these elements. *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation

omitted). Further, as relevant here, "[w]hen an order requires a party to pay a sum certain," that party's "inability to comply is a complete defense" to contempt. *SEC v. Musella*, 818 F. Supp. 600, 602 (S.D.N.Y. 1993).

The Court should deny the Receiver's contempt motion for two reasons. *First*, the July 29 Order is not sufficiently "clear and unambiguous" insofar as it does not specify the dollar amount to be paid as Assumed Liabilities. Courts consistently hold that orders directing payment, without the specifics, cannot be the subject of contempt. *Second*, LTS is a holding company with no cash, liquid assets or ability to pay the Assumed Liabilities, whatever they are.

A.    **The July 29 Order Cannot Be the Subject of Contempt Because the Assumed Liabilities Have Not Been Adjudicated As a Specific Amount Owing**

Contempt is available only for "clear and unambiguous" orders, meaning that "ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142-143 (2d Cir. 2014) (citation omitted). In the context of order involving the payment of money, contempt is consistently rejected where, as here, the order does not specify a dollar amount that must be paid.

For example, in *UFI Razor Blades, Inc. v. Dist. 65, Wholesale, Retail, Office & Processing Union*, 610 F.2d 1018, 1021 (2d Cir. 1979), the District Court ordered a razor blade manufacturer that violated its union contract to reinstate certain employees and "to reimburse each of them for the wages lost by them because of the wrongful layoffs under the contract." *Id*. The order did not calculate the backpay due. When the company did not comply, the District Court held it in contempt. *Id*.

But the Second Circuit reversed. The Court held that "judicial contempt power is a potent weapon" that cannot be deployed "unless the order claimed to be violated is specific and definite," and the Court cited with approval cases holding that contempt is inappropriate "unless

12

the underlying decree requires the alleged contemnor to pay *a specific sum*." *Id*. at 1024 (emphasis added). Under these standards, the order on which the District Court premised its contempt finding did not quality—it did not "specifically identif[y] the employees to be reinstated or the *amount of money due them*." *Id*. (emphasis added).

Courts across the country likewise hold that an order must set forth a "specific sum" before nonpayment can trigger contempt. *Lichtenstein v. Lichtenstein*, 425 F.2d 1111, 1113 (3d Cir. 1970); *see also*, *e.g.*, *NLRB v. Deena Artware, Inc*, 261 F.2d 503, 509 (6th Cir. 1958), *rev'd sub nom. on other grounds*, 361 U.S. 398 (1960) (order that "left undecided and undisposed of the amounts of back pay which any individual employee would be entitled to receive, was not sufficiently definite and mandatory to serve as the basis for contempt proceedings"); *Baumrin v. Cournoyer*, 448 F. Supp. 225, 227 (D. Mass. 1978) ("[T]he court order embodied in this judgment does not specify either the amount of money that plaintiff should pay to reimburse the prevailing party or the amount that DeWitt could properly charge for his title examination. I rule, therefore, that the court order on which this motion is based lacks the requisite specificity to sustain an adjudication of contempt for failure to perform the act of payment."); *Banker v. Bath Iron Works Corp.*, 507 A.2d 602, 605 (Me. 1986) (vacating lower court's contempt order for failing to make workers comp payments to former employee because, in part, "the commission's order does not specify the amount of the voluntary payments for which [the employer] is entitled to credit" and hence the "order is simply not ready for judicial enforcement").

Here, consistent with *UFI* case and case law elsewhere, contempt is inappropriate because Court's July 29 Order does not set forth an amount LTS must pay. Nor is the amount

discernible because, as discussed above, the Receiver never provided enough information to calculate what Assumed Liabilities—if any—are actually due.[1]

The Receiver's moving papers do not address this shortcoming. In fact, the Receiver makes *no effort* to satisfy his burden to show that a "clear and unambiguous" order was issued. His motion does not even set forth the contempt standards or cite any case on the issue—in fact the motion cites *no case law at all*. ECF 519. Having not carried his burden on the first element of contempt—a "clear an unambiguous" order—the Receiver's motion must be denied.

### B.    LTS Lacks Funds to Pay Any Assumed Liabilities, Which Is a Complete Defense

As mentioned above, the inability to pay is a "complete defense" to contempt. *Musella*, 818 F. Supp. 602. The logic of this rule is obvious. The "purpose of the civil contempt power"— "to induce compliance," *In re Gravel*, 6 F.4th 503, 513 (2d Cir. 2021)—is not advanced in the slightest by punishing a party for not paying amounts the party does not have the ability to pay. In other words, "[w]here compliance is impossible, neither the moving party nor the court has

---

[1] If and when the Court fixes the amount of Assumed Liabilities, the appropriate remedy is to issue a judgment enforceable by execution, not an Order enforceable by contempt. There are only limited circumstances where "contempt is appropriately imposed for the violation of courts' orders to render payment"—such as cases involving child support payments, back wages or other relief "traditionally available in equity"—but *not* including, as here, "damages for a breach of contract claim between private parties." *See Ecopetrol S.A. v. Offshore Exploration & Prod. LLC,* 172 F. Supp. 3d 691, 697 (S.D.N.Y.  2016); *see also In re Old DDUS, Inc*., 659 B.R. 810, 838 (Bankr. S.D.N.Y. 2024) (holding that court-ordered bankruptcy plan that directed an individual to pay $750,000 could not be enforced by contempt but instead would only be enforceable by a judgment followed by execution); *Jou v. Adalian*, No. CIV. 09–00226 (JMS), 2015 WL 477268, at *5 (D. Haw. Feb. 5, 2015) (contempt proceeding were inappropriate to enforce order requiring payment of a sum certain within seven days); *see generally* 17 Am. Jur. 2d Contempt § 128 (explaining that "[c]ontempt cannot be used as a mere debt-collecting device" and is generally inappropriate for the "enforcement of an obligation to pay money").

any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757 (1983).

That is the situation here. As the Receiver well knows, LTS is a nonoperating entity that was formed to hold the assets of Theia—primarily the FCC license that has now unfortunately been declared "null and void," ECF 508-1—and so has no cash or other hard assets from which to pay any Assumed Liabilities. Dunsheath Decl. ¶¶ 3-6. The only *potential* source of cash at any point soon is the CogniSphere Note, but proceeds will arise from that Note only if and when CogniSphere both (i) sells the aircraft, and (ii) generates enough proceeds to trigger LTS's right to payment. *Id*. ¶ 5. At present, LTS cannot say if or when that will occur. *Id*.

Holding LTS in contempt for not doing what it has no ability to do would serve no purpose and should be denied on this independent basis.

## II.    THERE IS NO BASIS TO FORCE LTS, OR ANY AFFILIATE, TO DISGORGE THE AIRCRAFT SALE PROCEEDS AS A CONTEMPT SANCTION

The Receiver's request that, as a contempt sanction, LTS "disgorge to the Receiver the cash the Buyer [*i.e.*, LTS] received from the Aircraft Proceeds that is needed to pay the Receiver and his professionals," ECF 521, should be rejected. To start, the Court should not hold LTS in contempt, for the reasons discussed above.

Further, LTS did not receive the proceeds, as the Receiver well knows. Dunsheath Decl. ¶ 4; ECF 514 (letter from Receiver's counsel stating that the aircraft sale "generated $9.5 million in cash proceeds for FCS" and that "FCS . . . retain[ed] those proceeds"). To state the obvious, LTS cannot disgorge fund it does not have and never had.

To the extent that the Receiver seeks to hold FCS (or its affiliate Brevet) responsible to pay the Receiver's expenses, there is no basis for that relief, either. The Court's July 29 Order pertained *only* to the "Buyer," *i.e.*, LTS. ECF 509. Further, "respect for corporate distinctions"

among affiliated companies is a "bedrock principle" of corporate law that is "deeply ingrained in our economic and legal systems," *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation and quotation omitted), and the Receiver makes *no effort* to justify the extraordinary relief of treating LTS's liabilities as belonging to any other entity. Any suggestion that FCS disgorge the aircraft proceeds is especially groundless because, as discussed, those proceeds constitute first-priority collateral for FCS's debt—ahead in priority status of any claim of the Receiver.

The fact that the Receiver and his professionals may end up bearing some losses here is an unfortunate reality but part of the risk associated with providing services to an entity (the Theia receivership) that ends up generating insufficient funds to pay its expenses or provide any return to its secured lenders. An example of this dynamic is *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir. 1984). There, a food service company financed by GECC filed for bankruptcy, during which GECC advanced $9 million on a priority basis to try to turn the company around. *Id*. at 74. When that effort failed, the bankruptcy court authorized payment—ahead of GECC—of approximately $250,000 in fees for the company's lawyers and accounts. *Id*. at 75. The Second Circuit reversed, holding that the professional fees were owed by the estate—not the secured creditor, GECC—and could only be paid ahead of GECC with its consent, which was not "to be lightly inferred." *Id*. at 77 (citation omitted). The Second Circuit noted that the professionals should have been aware that the rules of priority could ultimately mean that their right to payment would "prove illusive." *Id*.

The facts here are highly analogous: Neither FCS nor Brevet agreed to be responsible for the expenses of the Receiver, who knew from the start—and repeatedly acknowledged in fee applications—that he would have to be paid from the fixed amount of the FCS loans or other funds earmarked for expense payments. The receivership has been a colossal failure, leaving pre-

receivership secured creditor FCS with the biggest losses—$485 million plus—by far. There is no basis to force FCS to bear more.

## **CONCLUSION**

For the stated reasons, the Court should deny the Receiver's motion for contempt.

Dated:  New York, NY
        August 19, 2025

Respectfully Submitted,

STEPTOE LLP

*/s/ Charles Michael*
Charles Michael
Jeffrey M. Reisner
1114 Avenue of the Americas
New York, NY
(212) 506-3900
jreisner@steptoe.com
cmichael@steptoe.com

*Counsel for nonparty LTS Systems, LLC*

17

## <u>LOCAL RULE 7.1(c) CERTIFICATION</u>

I am the attorney who is filing this document. I hereby certify that this document, exclusive of the caption and signature block, contains 4,871 words as counted by the word-processing system used to prepare the document.

_/s/ Charles Michael_
Charles Michael
