UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FCS ADVISORS, LLC,

Plaintiff,

—against—

THEIA GROUP, INC., d/b/a "THORIAN GROUP" and/or "CYPHERIAN"; THEIA AVIATION, LLC; and THEIA HOLDINGS A, INC., d/b/a "THORIAN HOLDINGS,"

Defendants.

21 Civ. 6995 (PKC)

**REPLY IN FURTHER SUPPORT OF THE RECEIVER'S CONTEMPT MOTION**

Kevin J. O'Brien
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
E-mail: kobrien@kslaw.com

- and -

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (312) 572-5100
E-mail: thadwilson@kslaw.com

*Counsel for Michael Fuqua, in his capacity as Receiver of Theia Group, Inc., Theia Aviation LLC, and Theia Holdings A, Inc*

Michael Fuqua, the Court-appointed receiver (the "Receiver") for Theia Group, Inc. ("TGI"), Theia Aviation LLC, and Theia Holdings A, Inc. (collectively, the "Receivership Entities"), respectfully submits this reply in further support of his Order to Show Cause and Motion of Receiver for Contempt and Sanctions against LTS Systems, LLC [Dkt. 519] (the "Contempt Motion").[1]

## ARGUMENT

### A. The specific amount owing for the Assumed Liabilities is clear, unambiguous, and known to LTS.

1. For the first time, LTS is now claiming in its Opposition [Dkt. 524] that it does not know what specific amount is required to be paid for the Assumed Liabilities. This is plainly untrue. "Assumed Liabilities" is a defined term in the APA and includes a specific amount for the professional expenses listed in Items 1–6 of Schedule 1.01(i) of the APA (i.e., totaling $1,550,000). *See* Dkt. 365-1, at Ex. 1, Sch. 1.01(i); Opp. at 6–7.

2. The Receiver entered into the APA with the expectation (and assurances from LTS, FCS, and Brevet) that these Assumed Liabilities for the professional expenses—at a minimum—would be paid in full by LTS, FCS, and/or Brevet. *See Declaration of Michael Fuqua* filed contemporaneously herewith (the "Fuqua Decl.") ¶ 3.

3. In December 2023, the Aircraft Transfer closed in connection with the APA. LTS is the seller party listed in the agreement for the Aircraft Transfer and, pursuant to the agreement, received the $9.5 million purchase price (i.e., the Aircraft Proceeds) for the sale of the aircraft belonging to the Receivership Entities. *See* Fuqua Decl. ¶ 4 & Exh. A.

[1] Capitalized terms not defined herein will have the meanings ascribed to such terms in the Contempt Motion.

4. At the time of the Aircraft Transfer, the Receiver agreed to accept partial payment of the Assumed Liabilities for the professional expenses in the amount of $1,300,000 and allowed LTS, FCS, and Brevet to retain the Aircraft Proceeds with the expectation and promise from LTS, FCS, and Brevet that future funds—whether from the sale of other assets including, but not limited to, an FCC license or otherwise—would cover the Receiver's fees and expenses (including the remaining $250,000 owed for the Assumed Liabilities for the professional expenses). *See* Fuqua Decl. ¶ 5.

5. It has been clear that LTS did not intend to/want to directly own the FCC license. Consequently, the Receiver worked diligently with LTS, FCS, and Brevet throughout the remainder of the Receivership to assist them and their proposed buyer with the efforts to obtain the approvals needed to transfer the FCC license. The Receiver did this at the request of LTS, FCS, and Brevet and in hopes that he could provide a pathway that would be beneficial to all creditors. The Receiver and his counsel spent significant hours assisting LTS, FCS, Brevet and the third-party buyer to prepare and submit the necessary applications and other paperwork with the FCC. This, of course, resulted in additional fees and expenses in excess of the Assumed Liabilities being incurred by the Receiver, which LTS, FCS, and Brevet were fully aware of. *See* Fuqua Decl. ¶ 6.

6. Throughout the Receivership, and particularly following entry of the Termination Order, the Receiver, LTS, FCS, and Brevet continuously discussed payment of the remaining $250,000 owed for the Assumed Liabilities for the professional expenses (in addition to the Receiver's additional fees and expenses required to consummate the sale transactions and close the Receivership). *See* Fuqua Decl. ¶ 7.

7. On July 16, 2025—several days prior to filing the Receiver's motion to enforce the provision of the Sale Order requiring LTS to pay the Assumed liabilities [Dkt. 500-503] (the

"Motion to Enforce")—the Receiver provided LTS, FCS, and Brevet with the spreadsheet clearly listing the remaining $250,000 owed for the Assumed Liabilities.[2] *See* Fuqua Decl. ¶ 8. This is the *same* spreadsheet the Receiver attached to his reply papers for the Motion to Enforce. *See* Fuqua Decl. ¶ 8; 507-1; Opp. at 9. Additionally, the Receiver attached an updated version of the spreadsheet—again, clearly listing the remaining $250,000 owed for the Assumed Liabilities—to his Final Report. *See* Dkt. 511-2.[3]

8.   Thus, it is disingenuous for LTS to now claim that it is not aware of the specific amount owed for the Assumed Liabilities or that the Assumed Liabilities Order, which uses the defined term "Assumed Liabilities," is not clear and unambiguous.

9.   Accordingly, a finding of contempt is appropriate here because (i) the Assumed Liabilities Order utilizing the defined term "Assumed Liabilities" is clear and unambiguous, (ii) LTS's failure to pay is clear and convincing evidence of noncompliance with the Assumed Liabilities Order, and (iii) LTS has not clearly established an inability to comply with the Assumed Liabilities Order. *See Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) ("[I]n order to hold the alleged contemnor in contempt, the court need only (1) have entered a clear and unambiguous order, (2) find it established by clear and convincing evidence that that order was not complied with, and (3) find that the alleged contemnor has not clearly established his inability to comply with the terms of the order.").

10.   Importantly, district courts have "broad powers and wide discretion to determine relief in an equity receivership." *SEC v. Vescor Cap. Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010)

---

[2] The Receiver previously sent similar versions of the spreadsheet that also included the remaining $250,000 owed for the Assumed Liabilities to LTS, FCS, and Brevet on April 15, 2025 and May 29, 2025. Fuqua Decl. ¶ 8 n.2.

[3] Of course, there are additional fees and expenses—which continue to accrue based on LTS's attempts to fight payment of the Assumed Liabilities—that are owed by the Receiver to his professionals that are above the amount of the Assumed Liabilities.

(citation modified) (citing *SEC v. Safety Fin. Serv., Inc.*, 674 F.2d 368, 372-73 (5th Cir. 1982); *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 609 (9th Cir. 1978)). "Indeed, a court needs a wide range of powers to be able to effectively manage the amorphous goal of a receivership: 'to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets'—is broad enough to call for a flexible approach." *KeyBank Nat'l Ass'n v. Monolith Solar Assocs. LLC*, No. 1:19-CV-1562, 2021 WL 5769568, at *2 (N.D.N.Y. Dec. 6, 2021) (quoting *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006)).

11.     Because of this broad equitable power, the Court has significant discretion to fashion contempt sanctions. In other federal receivership cases, courts have held parties in contempt for violating court orders. *See KeyBank Nat'l Assoc. v. Monolith Solar Assocs. LLC*, No. 1:19-CV-1562, 2020 WL 4201489, at *4 (N.D.N.Y. July 22, 2020) (imposing contempt sanctions against party defying receivership court's orders and requiring payment of receiver's attorneys' fees and expenses), *vacated upon compliance*, 2021 WL 810105 (N.D.N.Y. Mar. 3, 2021); *United States v. Rapower-3, LLC*, 470 F. Supp. 3d 1232 (D. Utah 2020) (holding parties in contempt for defying receivership court's orders and holding parties liable for resulting costs and attorneys' fees incurred by the receiver to enforce the court's orders). The Court should similarly sanction LTS here for its deliberate violations of the Court's orders.

      **B.     Funds are and/or should be available to LTS to pay the Assumed Liabilities.**

12.     LTS is playing a dangerous shell game here by suddenly claiming that it has no funds available to pay the Assumed Liabilities. *See* Opp. at 15. The reality is that LTS has acted as

a vehicle for FCS and Brevet, which is a fund with substantial resources—approaching $2.5 billion under management.[4]

13. In 2021, Brevet and FCS petitioned this Court to appoint a receiver to try to maximize their recovery as the first priority secured lender to the Receivership Entities.[5] After a sales and marketing process run by the Receiver and his advisors, FCS elected to credit bid its debt and acquire the assets of the Receivership Entities through its newly created affiliate, LTS, which was formed for the sole purpose of owning the Receivership Entities' assets. *See* Opp. at 6.

14. Throughout the course of the Receivership, all of the Receiver's communications with LTS have been with representatives of Brevet and FCS. *See* Fuqua Decl. ¶ 9. LTS, FCS, and Brevet even share the same counsel. *See* Fuqua Decl. ¶ 9. As such, LTS, FCS, and Brevet are, and should be considered as, functionally one and the same.

15. As mentioned above, LTS is the seller party listed in the agreement for the Aircraft Transfer to receive the Aircraft Proceeds. *See* Fuqua Decl. ¶ 4 & Exh. A. Accordingly, LTS had—or at least, should have had—sufficient funds at the time of the Aircraft Transfer to pay the full amount of the Assumed Liabilities. The fact that LTS claims that FCS—instead of LTS, the contracting seller—actually received the Aircraft Proceeds further supports the argument that LTS is merely an arm of FCS and Brevet. *See* Opp. at 7.

16. Additionally, LTS has been able to come up with the funds—presumably from FCS and/or Brevet—to file its Opposition and prior papers seeking to avoid paying the Assumed Liabilities despite its claims that it has no cash or other hard assets. *See* Opp. at 15. Apparently, LTS also has sufficient funds to retain two additional law firms to file a petition for reconsideration

---

[4] *See* Brevet, Form ADV, item 5, at 8 (filed with SEC Apr. 1, 2025), https://reports.adviserinfo.sec.gov/reports/ADV/151672/PDF/151672.pdf.

[5] FCS's own Complaint initiating this action disclosed that FCS is part of "SEC-registered investment advisory firm Brevet Capital Management, LLC." Dkt. 1 ¶ 14.

before the FCC on August 25, 2025 with respect to the denial of the waiver of the surety bond requirement for the FCC license. *See* Fuqua Decl. ¶ 12 & Exh. B. There is little doubt that LTS similarly is able to come up with the funds to pay the Assumed Liabilities.

17. Moreover, LTS "bears the burden of producing evidence of [its] inability to comply" with the Assumed Liabilities Order that establishes its inability "clearly, plainly, and unmistakably." *See SEC v. Universal Exp., Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008) (citation modified). "The court will presume a present ability to comply with an order where at some point in the past a [party] could have complied with that order." *Id.* at 135. Given the above, LTS has failed to meet its burden here to establish a complete defense for inability to pay.

**C. Disgorgement of the Aircraft Sale Proceeds is an appropriate contempt sanction.**

18. "District courts enjoy wide latitude in imposing a sanction that is compensatory, incentivizing, or both. When a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order." *CFPB v. Klopp*, 957 F.3d 454, 466 (4th Cir. 2020) (citation modified). "Disgorgement—the payment of profits arising from improper conduct—is one such sanction." *Id.*; *see also, e.g.*, *Cernelle v. Graminex, LLC*, 539 F. Supp. 3d 728, 734 (E.D. Mich. 2021) (holding that no error was committed when a lower court included disgorgement in a contempt order: "Disgorgement is an equitable remedy to force a [party] to give up the amount equal to the [party]'s unjust enrichment.")

19. LTS—as the designated assignee of FCS—entered into the APA to purchase the assets of the Receivership Entities and pay the Assumed Liabilities. LTS was the contracting party to receive the Aircraft Proceeds from the Aircraft Transfer, which were sufficient to pay the Assumed Liabilities. But LTS, FCS, and Brevet retained the Aircraft Proceeds and led the Receiver

to believe that the remaining $250,000 of the Assumed Liabilities would be paid at a later date. *See* Fuqua Decl. ¶ 10. It is irrelevant that LTS claims that FCS actually received the Aircraft Proceeds since LTS, FCS, and Brevet have been acting as one in the same entity throughout the entirety of this Receivership case. *See id.*[6]

20. Following the Aircraft Transfer, the Receiver transferred all other assets of the Receivership Entities to LTS in accordance with the APA, with the effective date of those transfers occurring on July 29, 2025 (together with the Aircraft Transfer, the "Closings"). *See* Fuqua Decl. ¶ 11.

21. Even in the absence of the approvals required for the FCC license, LTS, FCS, and Brevet have retained value through the Closings in connection with the APA. The Receiver has spent considerable time, effort and expense incurred by his professionals for LTS's, FCS's and Brevet's benefit in an attempt to obtain approval of the FCC license transfer to a third party that LTS/FCS/Brevet chose. Yet, LTS has repeatedly refused to comply with its obligations under the APA, the Sale Order, and the Assumed Liabilities Order to pay the remaining $250,000 for the Assumed Liabilities. As such, LTS, FCS and Brevet have been unjustly enriched at the expense of the Receiver and the Receivership Estate.

22. If LTS is unwilling to make the Assumed Liabilities payment, the Receiver will be forced to initiate fraudulent transfer proceedings to return the Receivership Entities' assets that were transferred in connection with the APA back to the Receivership Estate.

[6] There is no question that, even if LTS and FCS were treated as truly independent entities, FCS would have legal liability to pay back at least the amount of the Assumed Liabilities: New York's Uniform Voidable Transactions Act requires a transferee of funds (FCS) to return the funds, for the benefit of creditors (the Receiver), where the transferor (LTS) was insolvent and received no value for the payment, as indisputably is the case here. *See generally* N.Y. Debt. & Cred. Law § 273.

23. For the reasons listed above, it is more than appropriate for the Court to order disgorgement of the Aircraft Proceeds as a sanction for LTS's contempt and to avoid subsequent litigation between the Receiver, LTS, FCS, and Brevet.[7]

**CONCLUSION**

24. In light of the foregoing and based on the arguments set forth more fully in the Contempt Motion, the Receiver respectfully submits that the Court should enter an order, substantially in the form of the Proposed Order [Dkt. 521], (i) finding the LTS in contempt for failure to comply with the Assumed Liabilities Order, (ii) requiring LTS to immediately comply with the with the Assumed Liabilities Order by paying the remaining Assumed Liabilities (i.e., $250,000) to the Receiver, and (iii) imposing appropriate sanctions to compel compliance and address the prejudice caused by LTS's noncompliance with the Assumed Liabilities Order, including: (a) ordering LTS to pay all the Receiver's fees, costs and expenses in connection with seeking enforcement of the Assumed Liabilities Order, (b) imposing a penalty on LTS for disregarding the Court's order, and (c) requiring LTS, FCS and/or Brevet to disgorge to the Receiver the cash received from the Aircraft Proceeds.

[7] As noted in the Receiver's Final Report, the Receiver is also requesting that the Court order Brevet, FCS, and LTS to return sufficient assets to the estate to pay the Receiver's and his professionals' fees above and beyond the Assumed Liabilities. Because Brevet, FCS, and LTS have continued to flout the Court's orders, the Receiver has had to incur significant additional expense on motion practice to seek to recover fees and expenses—and the Court should compel Brevet, FCS, and LTS to pay such amounts (which are well below the amount of estate assets those entities already have obtained).

Dated: August 27, 2025
New York, New York

Respectfully submitted,

*/s/ Kevin J. O'Brien*
Kevin J. O'Brien (SBN 5983713)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
E-mail: kobrien@kslaw.com

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (312) 572-5100
Email: thadwilson@kslaw.com

*Counsel for Michael Fuqua, in his capacity as Receiver of Theia Group, Inc., Theia Aviation, LLC, and Theia Holdings A, Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing reply memorandum complies with this Court's Individual Practices in Civil Cases Rule 3.D regarding page limits and formatting.

Dated: August 27, 2025
New York, New York

*/s/ Kevin J. O'Brien*
Kevin J. O'Brien