## Exhibit B

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| | ) |
| Theia Holdings A, Inc. | ) ICFS File Nos. SAT-LOA-20161115-00121 |
| | ) and SAT-AMD-20170301-00029 |
| Request for Retroactive Waiver of Surety | ) Call Sign:  S2986 |
| Bond Requirement for a Non-Geostationary | ) |
| Satellite Orbit System License | ) |
| | ) |

**PETITION FOR RECONSIDERATION OF**
**LTS SYSTEMS, LLC AND LTS SYSTEMS II, LLC**

Charles A. Zdebski
Molly Shaffer
COZEN O'CONNOR
2001 M Street, N.W.
Suite 500
Washington, D.C. 20036
(Tel) 202.280.6528
(Fax) 202.861.1905
czdebski@cozen.com
mshaffer@cozen.com

Russell M. Blau
Thomas J. Garrity, III
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: 202-739-3000
russell.blau@morganlewis.com
thomas.garrity@morganlewis.com

*Counsel to LTS Systems, LLC*
*and LTS Systems II, LLC*

August 25, 2025

## <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY ................................................................................................................. 1

BACKGROUND ........................................................................................................ 5

    I.      The License, Receivership and LTS ...................................................... 5

    II.     The Bond Nonrenewal ........................................................................... 6

    III.    The Waiver Request, Modification Application and Order ..................... 8

    IV.   Events Related to Termination of Receivership ..................................... 8

DISCUSSION ............................................................................................................ 9

    I.      LTS and LTS II are Entitled to File a Petition for Reconsideration ...... 9

    II.     Good Cause Exists to Grant the Requested Waiver ............................... 12

           A.     Good Cause Exists as to LTS and LTS II ................................ 12

           B.     Good Cause Exists as to the Receiver ...................................... 14

    III.    The Modification Application Should Be Granted ............................... 18

CONCLUSION ........................................................................................................ 19

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Theia Holdings A, Inc. | ) ICFS File Nos. SAT-LOA-20161115-00121 |
| | ) and SAT-AMD-20170301-00029 |
| Request for Retroactive Waiver of Surety | ) Call Sign: S2986 |
| Bond Requirement for a Non-Geostationary | ) |
| Satellite Orbit System License | ) |
| | ) |

## PETITION FOR RECONSIDERATION

LTS Systems, LLC ("LTS") and LTS Systems II, LLC ("LTS II"), by and through their attorneys, respectfully submit this petition for reconsideration of the order by the Federal Communications Commission (the "FCC" or "Commission") in this matter dated July 25, 2025 denying the request of Theia Holdings A, Inc. ("Theia") for retroactive waiver of the surety bond requirement associated with Theia's license to construct, launch, and operate a non-geostationary-satellite orbit ("NGSO") satellite system.[1] In further support hereof, LTS and LTS II states as follows.

## SUMMARY

1.    In a unique case, the Federal Communication Commission's ("FCC" or "Commission") Order inflexibly applies the bond requirements of Theia's license to Theia's Receiver[2] and concludes that the license is null and void. In so doing, despite the extraordinary circumstances, it visits grievous and inequitable financial harm on LTS, LTS II and their affiliate, FCS Advisors, LLC, ("FCS"), which Theia owed over 450 million dollars. The Order

---

[1] *Theia Holdings A, Inc.,* ICFS File Nos. SAT-LOA-20161115-00121 and SAT-AMD-20170301-00029, DA 25-660 (released July 25, 2025) (the "Order").
[2] Receiver refers to Michael Fuqua, as described in Paragraph 11 below.

misapprehends the facts of Theia's bond cancellation, does not account for the balance of hardship and equities that merit relief for LTS and LTS II, disserves Commission policy and overlooks the good cause for waiver of the bond requirement established by the Receiver's waiver request.

2.    The background set forth below establishes the special circumstances of this matter. The Commission awarded Theia an NGSO satellite license in 2019.  Theia subsequently entered receivership in 2021, which terminated on July 31, 2025.  During the course of that receivership, the Receiver acted diligently to comply with the Commission's license requirements and to find a suitable purchaser for Theia's assets, including any interests in the license.  Those efforts led to an asset purchase agreement between Theia and LTS and a subsequent agreement to transfer such assets to a third-party purchaser, which unfortunately was not consummated.  Ultimately, before the receivership terminated on July 31, 2025, the Receiver deposited all of Theia's assets, including any interest in the license and the right to petition for reconsideration, with LTS II pursuant to an escrow agreement.  The Order purports to erase any of LTS's and LTS II's rights in the license, along with their affiliate FCS's ability to recoup any of Theia's more than $450 million indebtedness and the opportunity to deploy the license spectrum in the most useful and efficient way, through either LTS, LTS II or a qualified buyer.

3.    Application of the law to these facts is clear.  First, LTS and LTS II are both entitled to file a petition for reconsideration under the Commission's rules.[3]  Both have rights in all of Theia's assets, including any interest in Theia's license, and their interests have been materially and directly adversely affected by the Order.  The escrow agreement between LTS II and the Receiver also provides LTS II the Receiver's right to seek reconsideration.

---

[3] *See* 47 C.F.R. § 1.106(b)(1).

4.       In addition, there is good reason why it was not possible for either entity to participate in the Receiver's waiver request proceeding.  LTS II did not exist as a legal entity until after the waiver request proceeding, so it could not have participated.  And LTS was not the license holder during the proceeding.  Not only could it therefore not have participated, but participation could have been viewed as an unauthorized transfer of control.

5.       The participation of LTS and LTS II in this reconsideration proceeding establishes that there is good cause to grant the requested waiver as to them.  A waiver is appropriate in this unique case where special circumstances apply.  LTS and LTS II are two good faith, arms' length actors which have neither done any wrong nor failed to comply with any law.  The Order erases their interests in Theia's license and causes vast financial harm to them, as well as eliminating their interest in recovering Theia's more than $450 million debt to their affiliate, FCS.  And it does so without regard to the Commission's policies of weighing the hardships and equities related to a waiver and supporting the federal bankruptcy laws, especially to protect innocent creditors.  The Order should be reconsidered for their benefit alone.

6.       Even if the Commission decides to look past the interests of LTS and LTS II, which it should not, the Order should be reconsidered for the good cause shown by the Receiver's waiver request:

- The bond was cancelled unilaterally and without notice to or fault of the Receiver by the surety company, Liberty Mutual, despite previous direct and regular communication through a course of dealing between the Receiver and Liberty Mutual.  Not only was this simply wrong, but it also left the Receiver with no opportunity to secure an alternative bond.
- The federal bankruptcy court issued a sale order approving the sale of Theia's assets, including any interest in the license, to LTS.  Unlike the Order, a waiver would properly account for the bankruptcy court's order, the significance of the receivership proceeding and the Commission's policy favoring support of federal bankruptcy laws.
- A waiver would not disserve the Commission's policy of deterring speculative satellite licenses and warehousing.  The Commission rightly recognized Theia as a

3

qualified licensee and properly awarded it the license.  And the Receiver acted diligently to fulfill the license requirements and to find a purchaser for Theia's assets.  The Order fails to recognize these facts and the unique circumstances of this matter.  Rather than providing a deterrent effect, the Order inappropriately punishes the Receiver and Theia.

- Grant of the waiver would best serve the most efficient use and commercialization of the spectrum at issue by allowing the license either to be built out by LTS and LTS II or promptly transferred to another qualified purchaser.  This is a much better option than the alternative, which would require another lengthy round of processing and a new licensee before the spectrum could ever be utilized.  As Chairman Carr has said: "While America is standing still, our global competitors and adversaries are passing us by.  They are executing on actual spectrum plans that are putting actual spectrum to use in their countries."[4]

7.     Finally, the Commission should reconsider its decision to deny as moot the Receiver's application to modify the two milestones associated with the license.  If the Commission had considered the modification application on its merits, it then would have had to take the result of that decision into consideration in deciding whether a waiver of the surety bond requirement was justified.  Instead, it took a shortcut that denied the Receiver any opportunity to make its case for a modified deployment schedule.

---

[4] Statement, Commissioner Brendan Carr, "Carr Statement on the Biden Administration's Spectrum Miss" (Nov. 13, 2013), https://docs.fcc.gov/public/attachments/DOC-398400A1.pdf.

# BACKGROUND[5]

## I.    THE LICENSE, RECEIVERSHIP AND LTS

8.    The Commission granted Theia's application for authority to construct, launch, and operate an NGSO satellite system of 112 active satellites and 8 on-orbit spare satellites on May 9, 2019 (the "License").[6]

9.    Paragraphs 59.a and 59.c of the License Order, consistent with Section 25.165(a) of the Commission's rules, set forth conditions requiring Theia to "post . . . and thereafter maintain on file a surety bond" in the amounts required under the rules and providing that "[f]ailure to post and maintain a surety bond will render this grant null and void automatically, without further Commission action."[7]

10.    Theia posted the required bond on May 20, 2019, in the Commission's International Communications Filing System, and annually thereafter submitted bond riders increasing the maximum penal sum owed upon an event of default in accordance with the Commission's rules.[8]

11.    Theia entered receivership on November 8, 2021, when the United States District Court for the Southern District of New York (the "Court") issued an order appointing Michael Fuqua as the Receiver ("Receiver") for the assets of Theia and certain related entities.[9]

12.    After Theia entered receivership, LTS entered an Asset Purchase Agreement with Theia as of August 12, 2023, for substantially all of Theia's assets (the "APA"), including the

---

[5] This background is largely restated from the waiver request filed by Theia on June 10, 2024. *See* Letter from Michael Fuqua, Receiver, Theia Group, Inc., to Marlene H. Dortch, Secretary, FCC, ICFS File Nos. SAT-LOA-20161115-00121 and SAT-AMD-20170301-00029 (filed June 10, 2024) ("Waiver Request"). For additional detail, please refer to the Waiver Request, which is incorporated here by reference.
[6] *Theia Holdings A, Inc.*, 34 FCC Rcd 3526, 3548 ¶¶ 59.a, c (2019) ("License Order").
[7] *Id.* at 3548, ¶¶ 59.a, c; *see also* 47 C.F.R. § 25.165(a).
[8] *See* ICFS File Nos. SAT-LOA-20161115-00121 and SAT-AMD-20170301-00029. The bond riders were filed with the Commission on May 5, 2020, May 5, 2021, April 29, 2022, and May 8, 2023.
[9] *See FCS Advisors, LLC v. Theia Group, Inc., d/b/a "Thorian Group" et al.*, 21 Civ. 6995 (PKC), Case 1:21-cv-06995-PKC (S.D.N.Y. Nov. 08, 2021) ("Receivership Order").

License.  LTS was an affiliate of a lender to Theia, FCS, to which Theia was indebted in excess of $450 million.[10]  The Court issued an order approving Theia's sale of its assets to LTS on October 26, 2023, including the License subject to Commission approval.[11]  The order found, among other things, that that asset sale to LTS was a fair and reasonable, arms' length transaction and that LTS was a good faith buyer for valid business purposes and uses.[12]

13.    LTS and Emtech Global International, LLC ("Emtech") reached an agreement pursuant to which Emtech would purchase the majority of Theia's assets, which would result in the assignment of the Theia License as directed by Emtech to Emtech's wholly owned subsidiary Athena-5 Systems Corp., subject to the receipt of required regulatory approvals. On March 25, 2024, the parties submitted an application for Commission consent to the assignment of Theia's authorization to Athena-5 Systems Corp.[13] The Commission consented to the application on May 9, 2024.[14]

## II.    THE BOND NONRENEWAL

14.    Theia continued in the ordinary course of business to maintain the required bond. Through no fault of Theia's however, and no fault of LTS or LTS II, the surety provider, Liberty Mutual, unilaterally and without notice did not renew the bond.  Specifically:

> In January 4, 2024 correspondence, Receiver's counsel communicated to Liberty Mutual's counsel an agreement that a Liberty Mutual cancellation of the bond in accordance with its terms would not require relief from the stay imposed in the Receivership Order, *on the express condition* that Liberty Mutual provide Receiver

---

[10] *See Order (I) Approving Bidding Procedures in Connection with the Sale of All or Substantially All of the Receivership Entities' Assets, (II) Scheduling an Auction for, and Hearing to Approve, the Sale, (III) Approving Notice of Auction and Sale Hearing, (IV) Further Extending the Receivership Stay through July 31, 2023 and (V) Granting Related Relief,* at Exhibit 1, page 10 (Dkt. 363)*, FCS Advisors, LLC v. Theia Group, Inc., d/b/a "Thorian Group" et al.,* Case No. 1:21-cv-06995-PKC (S.D.N.Y. June 30, 2023) ("Notwithstanding anything to the contrary herein, FCS has valid, perfected first-priority lien on all of the Assets of the Receivership Estates in an amount no less than $454.8 million and shall be entitled to Credit Bid up to the full amount of its debt.").

[11] *FCS Advisors, LLC v. Theia Group, Inc., d/b/a "Thorian Group" et al.,* 21 Civ. 6995 (PKC), Case 1:21-cv-06995-PKC, Dkt. No. 411 (S.D.N.Y. Oct. 26, 2023) ("Sale Order").

[12] *Id.*

[13] *See* ICFS File No. SAT-ASG-20240325-00064 ("Assignment Application").

[14] *See* Report No. SAT-01821, DA 24-445 (May 10, 2024) ("Transfer Approval").

notice of any intent of such cancellation. Notwithstanding that agreement, and unbeknownst to Receiver, on January 29, 2024, Liberty Mutual purported to non-renew the bond, effective May 9, 2024. In doing so, Liberty Mutual did not provide Receiver or Receiver's counsel actual notice, in spite of the express agreement to do so just a few weeks earlier, instead sending a paper notice to an address not used by Theia or Receiver for a number of years, which fact was known to Liberty Mutual and its counsel. Additionally, in a stark departure from standard industry practice, Liberty Mutual also provided no notice of the purported non-renewal to the Receiver's insurance broker. The claimed notice was further defective insofar as Liberty Mutual appears to have sent a copy to the Commission—which is not a party to the bond—rather than to the U.S. Treasury in its capacity as Obligee under the bond, as required by the terms of the bond.[15]

15.     Liberty Mutual's unilateral and undisclosed conduct left the Receiver with no actual or constructive knowledge of the bond nonrenewal.  Indeed, the Receiver acted to continue to fulfill Theia's bond requirements:

In keeping with the longstanding course of conduct between Liberty Mutual as surety and Theia, in April 2024, Receiver engaged the insurance broker to facilitate the execution of a bond rider extending the term of the bond and increasing the maximum penal sum, as well as remittance of a renewal premium. On May 6, 2024, Liberty Mutual and its counsel articulated for the first time Liberty Mutual's refusal to renew the bond. Since then, Receiver and Receiver's counsel have diligently and repeatedly sought to facilitate a consensual resolution with Liberty Mutual and have advised Liberty Mutual as to its obligations under the terms of the bond and the agreements between the parties, as well as the impact of its conduct on the court-approved sale process, but Liberty Mutual has refused to engage. As a result of Liberty Mutual's abandonment of the longstanding course of conduct between the parties, failure to provide actual or sufficient notice to Receiver of the purported non-renewal of the bond, and belated communication of its position regarding renewal, Receiver was deprived of any meaningful opportunity to engage its insurance broker to identify an alternative surety provider and complete the underwriting process necessary to obtain a replacement bond by the May 9, 2024 expiration of the current term of the Liberty Mutual bond.[16]

---

[15] Waiver Request at 3.

[16] *Id.*

## III. THE WAIVER REQUEST, MODIFICATION APPLICATION AND ORDER

16.    The Receiver promptly sought to remedy the bond nonrenewal.  On June 10, 2024, the Receiver filed the Waiver Request, asking the Commission to retroactively waive the surety bond requirement attendant to the License.[17]

17.    Subsequently, the Receiver filed a supplement to the Waiver Request on May 8, 2025.[18]  Also on May 8, 2025, Theia filed a modification application to extend or waive two milestone dates attendant to the License.[19]

18.    The Commission denied the Waiver Request in its Order issued July 25, 2025.  In the Order, the Commission held that Theia's License automatically terminated on May 16, 2024, when "Theia's potential liability under the Commission's escalating bond liability formula exceeded the value of its bond on file . . . ."[20]  In addition, the Order dismissed as moot Theia's May 8, 2025 Modification Application seeking to extend the milestone dates for deployment of Theia's authorized satellites.[21]  The Commission stated:  "As discussed above, we do not reach the merits of the application because of our finding that the license was null and void when the bond lapsed in May 2024."[22]

## IV. EVENTS RELATED TO TERMINATION OF RECEIVERSHIP

19.    On May 5, 2025, the Court entered an order terminating the receivership on July 31, 2025, unless otherwise ordered by the Court.[23]

---

[17] *See generally* Waiver Request.
[18] *See* Letter from Michael Fuqua, Receiver, Theia Group, Inc., to Marlene H. Dortch, Secretary, FCC, ICFS File Nos. SAT-LOA-20161115-00121 and SAT-AMD-20170301-00029 (May 8, 2025) ("Supplement").  The Supplement is incorporated here by reference.
[19] Theia Modification Application, ICFS File No. SAT-MOD-20250508-00118 (May 8, 2025) ("Modification Application").
[20] *Order*, ¶ 5 (internal citations omitted).
[21] *Id.*, ¶ 14 & n.35 (internal citations omitted).
[22] *Id.*, ¶ 11 n.35.
[23] *FCS Advisors, LLC v. Theia Group, Inc., d/b/a "Thorian Group" et al.*, 21 Civ. 6995 (PKC), Case 1:21-cv-06995-PKC, Dkt. No. 496 (S.D.N.Y. May 5, 2025) ("Termination Order").

20.     LTS deposited Theia's assets, including any rights related to the License, into LTS II, a special purpose entity formed to hold the assets, pursuant to an Escrow Agreement dated July 30, 2025 (the "Escrow Agreement").  By letter dated that same day, LTS provided a notice of designation to the Receiver, which the Receiver acknowledged, of LTS II "as the purchaser of all of Theia's right, title and interest in (a) the Licenses (as such term is defined in the APA) and (b) all rights, intellectual property, and other assets related to the Licenses."[24]

21.     The receivership terminated on July 31, 2025 pursuant to the Court's order.[25]  On August 25, 2025, LTS and LTS II explained these facts in a letter to the Commission.[26]

## DISCUSSION

## I.    LTS AND LTS II ARE ENTITLED TO FILE A PETITION FOR RECONSIDERATION

22.     Neither Theia nor the Receiver can file a petition for reconsideration of the Order.  The receivership has terminated and Theia (if it still exists), with no assets, is in no position to seek reconsideration.[27]  The Commission's rules, however, provide for an interested party to file a petition for reconsideration: "any other person whose interests are adversely affected by any action taken by the Commission or by the designated authority, may file a petition requesting reconsideration of the action taken."[28]  The interested party's petition for reconsideration "shall state with particularity the manner in which the person's interests are adversely affected by the action taken, and shall show good reason why it was not possible for him to participate in the earlier stages of the proceeding."[29]

---

[24] *See* Letter from Mark Dunsheath to Michael Fuqua, Receiver, dated July 30, 2025.
[25] *See* Termination Order.
[26] *See* Letter from Christopher Bjornson to Marlene H. Dortch, Secretary, FCC, ICFS File Nos. SAT-LOA-20161115-00121 and SAT-AMD-20170301-00029 (August 25, 2025).  .
[27] *See* Termination Order.
[28] 47 C.F.R. § 1.106(b)(1).
[29] *Id.*

23.    The APA provided LTS with an interest in all of Theia's assets, including any interest in the License.  In addition, LTS sought, through the course of its business dealings with Theia during the receivership, to protect and recoup the financial interests of its affiliate, FCS, which had loaned Theia funds totaling over 450 million dollars.  The Escrow Agreement placed any interest in Theia's assets, including in the License, into LTS II.

24.    The plain meaning of the express language of Section 1.106(b)(1) establishes that LTS and LTS II are persons "whose interests are adversely affected . . . ." The Commission's Order directly and materially adversely affects LTS's interest in Theia's assets, including any rights to the License under the APA, LTS II's rights under the Escrow Agreement, and LTS' ability to protect and recoup the extensive financial interests of its affiliate FCS.  The Commission's nullification of Theia's License erases an asset with highly material value to mitigate LTS's, LTS II's and FCS's financial harm.  Combined with the termination of Thea's receivership, which left no other assets, nothing is left for LTS, LTS II or FCS.  The value of the License would ultimately have inured to the benefit of LTS, LTS II and/or FCS, whether LTS acquired the License itself or received payment by virtue of a sale of the License.  Simply put, termination of the License leaves LTS, LTS II and FCS with nothing.

25.    The Commission's decision in *Susquehanna Radio Corp. and Whitley Media, LLC* is instructive.  In *Susquehanna*, the Commission stated:

> We disagree. Petitioners cite no precedent to support the theory that a third party with **no contractual right to acquire a station's license** could have standing to seek reinstatement of the license after the licensee had surrendered the license for cancellation.  Here, the October 7, 2013 termination of the Whitley Agreement reported by Susquehanna, **the licensee here, extinguished Whitley's contractual rights** to acquire the Station license and, consequently, any right of North Texas to then acquire the license from Whitley. Petitioners' vague, unsupported and unexplained assertions to the contrary fail to demonstrate that they held such rights when the Commission cancelled the Station license and dismissed the assignment application.  The relief that Petitioners seek could not have been accomplished

without Susquehanna actively entering into a new agreement with Petitioners. Accordingly, Susquehanna's inaction is fatal to Petitioners' standing claim. We affirm our holding that Petitioners have not suffered an injury directly traceable to an action by this agency and have no standing in this proceeding.[30]

26.    Here, of course, LTS and LTS II are in the exact position the Commission indicated **would** confer standing.  They have existing interests in the License that have not been cancelled and were directly adversely affected when the Commission held the License was null and void.[31]

27.    In addition, there is good reason why it was not possible for LTS II or LTS to participate in the Waiver Request proceeding.  As to LTS II, it simply did not exist during the proceeding.  It was created recently as a special purpose entity to hold assets under the July 30, 2025 Escrow Agreement.  Because LTS II was not formed until after the proceeding, it was not possible for it to engage in the proceeding.[32]

28.    There is also good reason why it was not possible for LTS to participate in the Waiver Request proceeding.  By virtue of Theia's receivership, the Receiver held the License. LTS simply was not the License holder at the time of the Waiver Request.  In addition, had LTS sought to file in the Waiver Request proceeding, either in place of or even with the Receiver, such an action could have been viewed as a transfer of control without prior Commission approval. LTS therefore had good reason for being unable to participate in the Waiver Request proceeding.

---

[30] *Susquehanna Radio Corp. and Whitley Media, LLC*, 30 FCC Rcd. 13978, 30 F.C.C.R. 13978, ¶4 (November 19, 2015) (emphases added).

[31] *See Fibertower Spectrum Holdings LLC*, 33 FCC Rcd. 6642 (2018 F.C.C.) (suggesting that a party would have standing by demonstrating that any of its members would have been in a position to acquire the spectrum or benefit from the retention of a license).

[32] *See Gregory L. Masters, Esq. Anthony T. Lepore, Esq.,* 28 F.C.C. Rcd. 15881, 15882 (2013) (finding good cause for not participating in the early proceedings because the was no circumstance in which filing the requisite earlier petition was possible).

## II.    GOOD CAUSE EXISTS TO GRANT THE REQUESTED WAIVER

### A.    Good Cause Exists as to LTS and LTS II

29.    LTS and LTS II both meet the Commission's good cause standard for a waiver of the bond requirement.  The Commission's rules provide that any rule may be waived for good cause shown, taking "into account considerations of hardship, equity, or more effective implementation of overall policy."[33]

30.    Waiver is appropriate if special circumstances warrant deviation from the general rule and such waiver would better serve the public interest.[34]  The FCC can consider factors such as hardship, equity, or more effective implementation of overall policy on an individual basis because the Commission has discretion to waive any rule if good cause is shown.[35]

31.    This is a unique case, in which considerations of hardship and equity support granting the waiver to prevent grave financial harm to LTS and LTS II, two good faith arms' length actors who will be left without recourse absent relief from the Commission.  LTS and LTS II have done no wrong here nor failed to comply with any regulation or law.  Both simply acquired interests in the License through Theia's receivership.  The FCC has a policy to support the bankruptcy laws, and where possible, to accommodate them in a manner that is consistent with the Communications Act because it advances the public interest through economic and social benefits, "especially the compensation of innocent creditors."[36]  LTS and LTS II are innocent third parties

---

[33] 47 C.F.R. § 1.3; *see also WAIT Radio v. FCC,* 418 F.2d 1153, 1159 (D.C. Cir. 1969); *Northeast Cellular Telephone Co. v. FCC,* 897 F.2d 1164, 1166 (D.C. Cir. 1990).

[34] *Space Exploration Holdings LLC*, 2024 WL 4921382 (F.C.C.).

[35] *Id.*; *see also Space Innovation Facilitating Capabilities for In-Space Servicing, Assembly, and Manufacturing*, 39 FCC Rcd. 1864 (2024 F.C.C.) (stating waiver is appropriate where the facts make strict compliance inconsistent with the public interest. Waiver is appropriate "if special circumstances warrant a deviation from the general rule, such deviation will serve the public interest, and the waiver does not undermine the validity of the general rule.").

[36] *Stanford Springel as Chapter 11 Trustee for the Bankruptcy Estate of Innovative Communication Corporation, and National Rural Utilities Cooperative Finance Corporation and its Subsidiaries, Applications for Consent to Assign and Transfer Control*, Order, 24 FCC Rcd 14360 ¶ 19 (2009).  Although Theia's liquidation in this case was accomplished through a receivership rather than a Bankruptcy Code proceeding, the policy considerations guiding the

with a direct interest in the receivership proceedings.  LTS acquired an interest in the License during bankruptcy proceeding through the APA.  LTS then deposited its interest in the License to LTS II via the Escrow Agreement. Both LTS and LTS II are therefore the types of entities that the FCC typically protects when creditors or other interested parties acquire valuable assets, such as spectrum, through bankruptcy proceedings.[37]

32.     Here, granting the requested limited waiver would be consistent with: (1) the Court's order authorizing the Receiver's sale of Theia's assets to LTS, finding the sale to LTS was a fair and reasonable arms' length transaction and that LTS was a good faith buyer for valid business purposes and uses,[38] and (2) the deposit of LTS's interest in the License into LTS II under the Escrow Agreement.  It would also allow for the maximum mitigation of financial harm to LTS and its affiliate FCS visited upon them by Theia's receivership, in keeping with Commission policy.[39]

33.     Conversely, strict application of the bond requirements and termination of the License would be inconsistent with the Court's Sale Order and cause grave and inequitable financial harm to LTS, LTS II and FCS.  It would also make LTS, LTS II and FCS pay dearly for Liberty Mutual's failure to renew the bond, an action undertaken unilaterally by Liberty Mutual and without Theia's or the Receiver's knowledge or culpability.  Indeed, even if the Commission believes that Theia bears responsibility for not renewing the bond, which is shown below not to be

---

Commission should be the same, since the economic and social interests at stake are the same regardless of the form of the proceeding.

[37] *See Mar. Communications Land Mobile, LLC, Debtor-in-Possession*, 32 FCC Rcd. 3907, 3909 (2017) (determining that discharging the bankruptcy "protects innocent creditors" and "removes a cloud on valuable spectrum so it can be quickly put to use in the public interest"); *Alpha Media Licensee LLC, Debtor-in-Possession (Assignor) & Alpha Media Licensee LLC (Assignee) Alpha 3e Licensee LLC, Debtor-in-Possession (Assignor) & Alpha 3e Licensee LLC (Assignee) Applications for Consent to Assignment of Licenses*, 36 FCC Rcd. 10891 (2021) (same) (emphasizing the urgency for "prompt emergence" of the license from bankruptcy).

[38] *See* Sale Order.

[39] *See* n.36, *supra*.

the case, that responsibility and resulting economic impact should not be laid at the feet of LTS, LTS II and FCS.

### B.    Good Cause Exists as to the Receiver

34.    LTS and LTS II request that the Commission grant the waiver based on good cause shown that denial of the waiver visits extreme financial harm and nullification of rights on innocent good faith purchasers and a creditor.  To the extent there is a need to show that good case exists to grant the waiver based upon good cause shown by the Receiver, such good cause also exists.

35.    The Receiver showed good cause in its Waiver Request, but the Order disagreed for reasons that must be reconsidered.  The Order states that "Theia offers no reason for its failure to maintain an adequate bond . . . ."[40]  The Receiver, however, explained that Liberty Mutual's nonrenewal of the bond was in no way the Receiver's fault.  Liberty Mutual unilaterally and without any notice to the Receiver acted to not renew the bond, sending notice to an invalid address.  The Order assumes that the use of the address was the fault of the Receiver, indicating the problem was "exacerbated by Theia's listing of a formal mailing address not in use . . . ."[41] There is no record support for the conclusion that Theia or the Receiver listed an improper formal mailing address.[42]  Indeed, as explained in the Waiver Request, Liberty Mutual and the Receiver were in regular and direct contact over the bond issue prior to the cancellation.[43]  And they expressly agreed that Liberty Mutual would provide the Receiver with notice of any intent to cancel the bond.[44]  Despite this agreement and despite a direct and known line of communication, Liberty Mutual failed to provide notice.  In addition, Liberty Mutual also failed to send notice of

---

[40] *Order*, ¶ 11.
[41] *Id.*
[42] *See Waiver Request* at 3.
[43] *Id.*
[44] *Id.*

cancellation to the Receiver's insurance broker as is standard industry practice. Because Liberty Mutual provided no notice of cancellation, the Receiver had no opportunity to secure "a bond with an alternative surety company" as the Order suggests.[45] Neither Theia nor the Receiver should be held responsible for Liberty Mutual's failures.

36.     The Order thus appears not to consider the balance of hardships and equities in the events surrounding nonrenewal of the bond. Instead, it imposes a maximum penalty on Theia and the Receiver for the unilateral and improper actions of Liberty Mutual. The Commission should reconsider this basis for the Order.[46]

37.     The Order also concludes that the Receiver's asset sale to a new buyer is "no justification for bond waiver."[47] In doing so, the Order fails to account for the receivership proceeding. As noted above, the FCC has a policy to support the bankruptcy laws, and where possible, to accommodate them in a manner that is consistent with the Communications Act because it advances the public interest through economic and social benefits.[48] Here, the Court's Sale Order expressly approved the sale of Theia's assets, including any interest in the License, to LTS, which then entered an agreement to sell those assets to a third-party. Denial of the Waiver Request directly contravenes the Sale Order.[49]

---

[45] *See Order*, ¶ 11.

[46] The *Order* also suggests Theia and the Receiver are to blame for "making a business decision to lower is bond maintenance costs and seek periodic increases in its bond value through riders, instead of filing a single bond in the maximum value . . . ." *Id*. It is inequitable to hold that these parties were at fault when they simply followed a process that the Commission expressly made available to provide flexibility. *See International Bureau Clarifies Procedures for Maintaining Satellite Space Station Surety Bonds pursuant to Escalating Bond Requirements,* Public Notice, 32 FCC Rcd 743 (2017).

[47] *Order*, ¶ 11.

[48] *See Stanford Springel as Chapter 11 Trustee for the Bankruptcy Estate of Innovative Communication Corporation, and National Rural Utilities Cooperative Finance Corporation and its Subsidiaries, Applications for Consent to Assign and Transfer Control*, Order, 24 FCC Rcd 14360 ¶ 19 (2009).

[49] The *Order* points out that there is no explanation as to how Theia could have met its first milestone date under the License of May 9, 2025. That very issue was, of course, the reason for the Modification Application filed on May 8, 2025, which the Commission refused to rule on and is addressed below.

38.     Finally, the Order does not accomplish the Commission's purpose, and the Order's stated purpose for the bond requirement, to "deter speculative satellite licenses."[50]   The Commission has previously waived the bond requirement where it has determined that grant of such relief "does not implicate the warehousing concerns that the Commission's milestone and bond requirements are designed to address."[51]   First, there was nothing speculative here about Theia's License.   The Commission found Theia fully qualified to receive the License and determined that awarding Theia the License was in the public interest.[52]

39.     And there was no "warehousing" by the Receiver.   The Receiver acted diligently to find a purchaser for Theia's assets, including the License, which resulted in the Asset Purchase Agreement with LTS and then LTS's sale agreement with Emtech.   The Order here does not have any deterrence value or serve the Commission's stated purposes, but rather punishes the Receiver and the creditors whose interests the Receiver was appointed to protect.   As stated in the Waiver Request, the Receiver was:

> neither a licensee that failed to "consider [its] business risks before applying for a license" nor one whose actions raise "concerns with speculation," but rather a duly appointed Receiver seeking to complete a yearslong process of preserving, marketing, and ultimately disposing of Theia's assets—including the diligent and timely renewal of the surety bond in 2022 and 2023—to a qualified buyer . . . .[53]

40.     This is a unique case with unique circumstances, in light of which grant of the Waiver Request will not either "tend to undermine the bond requirement" or promote license

---

[50] *Order*, ¶ 11.   The *Order* invites Athena to submit a new satellite license application.   That invitation ignores the harm to the Receiver, LTS, LTS II and FCS.

[51] *Space Logistics, LLC, Application for Space Station Authorization*, ICFS File Nos. SAT-LOA-20170224-00021 and SAT-AMD-20190207-00008 (stamp grant June 20, 2019); *see also Space Logistics, LLC, Application for Space Station Authorization*, ICFS File No. SAT-LOA-20191210-00144 (stamp grant Mar. 25, 2020); *Spire Global, Inc., Satellite Bond Waiver Request*, ICFS File No. SAT-LOA-20151123-00078 (granted in part Apr. 14, 2016) (granting waiver and extension of bond filing requirement).

[52] *See License Order*.

[53] *Waiver Request* at 5, *quoting Hiber, Inc. Request for Waiver or Reduction of Surety Bond Default Payment,* 37 FCC Rcd 6553, 6557 ¶ 9 (2022) *(quoting Satellite Licensing Reconsideration Order*, 19 FCC Rcd at 12652, ¶ 37) and *ATCONTACT Communications, LLC Petition for Reconsideration, Motion for Stay,* 25 FCC Rcd 7567, 7583 ¶ 45 (2010).

speculation and warehousing.[54]  On the other hand, denial of the Waiver Request and cancellation of the License based on a strict application of the bond requirement would disserve the public interest and work undue and inequitable harm upon the Receiver, LTS, LTS II and FCS.

41.    Most importantly, reconsideration provides the fastest means for commercializing spectrum. The Commission has made it clear that efficient use and commercialization of spectrum is of the utmost importance to not only the Commission's mission, but also the national security of the United States. As noted by Chairman Carr in testimony delivered to the House Subcommittee on Financial Services and General Government, "America's spectrum leadership is part and parcel of our geopolitical leadership."[55]  "While America is standing still, our global competitors and adversaries are passing us by.  They are executing on actual spectrum plans that are putting actual spectrum to use in their countries."[56]  Indeed, Commissioner Gomez has stated that "overseeing the efficient use of spectrum is of paramount importance to our Agency."[57]  Under the Order, the License and its associated spectrum would continue to lie fallow, not being commercialized and subject to significant additional lead times for any efficient commercial use subject to new applications and lengthy reviews.  Failure to grant the Waiver results in a longer period wherein the valuable and important spectrum of the License will not be commercialized, thereby harming the public interest.  For example, there would be the lag times to draft and file a

---

[54] *ATCONTACT Communications*, ¶ 53.

[55] Testimony of Brendan Carr, Commissioner, Federal Communications Commission, "Budget Hearing – Fiscal Year 2025 Request for the Federal Communications Commission," Before The Subcommittee on Financial Services and General Government of The United States House of Representatives Committee on Appropriations, at 2 (May 16, 2024), available at https://www.congress.gov/118/meeting/house/117255/witnesses/HHRG-118-AP23-TTF-CarrB-20240516.pdf.

[56] Statement, Commissioner Brendan Carr, "Carr Statement on the Biden Administration's Spectrum Miss" (Nov. 13, 2013), https://docs.fcc.gov/public/attachments/DOC-398400A1.pdf.

[57] *Enhancing National Security Through the Auction of AWS-3 Spectrum Licenses; Applying New Average Annual Gross Revenue Benchmarks for Small Business Bidding Credits; Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695- 1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands*; GN Docket Nos. 25-70, 25-71, 13-185, Report and Order and Second Report and Order, FCC 25-39, Statement of Commissioner Gomez at 2 (rel. July 25, 2025).

new application, start a processing round, and review applications.  None of these would exist with a Waiver, and a new license would have a full buildout period rather than the accelerated schedule proposed by the Receiver.  Therefore, good cause exists to grant the Waiver Request in order to "put[] actual spectrum to use."

### III.    THE MODIFICATION APPLICATION SHOULD BE GRANTED

42.    Finally, the Commission did not rule on the Modification Application.  Instead, it dismissed the application as Moot.  For all of the reasons stated in the Modification Application, incorporated here by reference, and those discussed above, the Commission should grant the Modification Application as to the License milestones.  In addition, granting the Modification Application would allow LTS and LTS II either to meet the milestones or transfer the License, with the Commission's approval, to a purchaser which can do so.  This will put the license and the spectrum to use for its highest value and in the fastest possible manner.

43.    The Commission's refusal to consider the Modification Application based on the denial of the waiver request, coupled with its denial of the waiver request based at least in part on failure to demonstrate an ability to meet the milestone date in the original license, is irrational and a classic example of circular reasoning.  If the Commission had considered the Modification Application on its merits, it then would have had to take the result of that decision into consideration in deciding the Waiver Request.  Instead, it took a shortcut that denied the Receiver any opportunity to make its case for a modified deployment schedule.

## CONCLUSION

Wherefore, LTS and LTS II respectfully request that, for the above reasons, as well as those stated in the Waiver Request and Milestone Request, the Commission grant this petition for reconsideration.

Respectfully submitted,

*/s/ Charles A. Zdebski*
Charles A. Zdebski
Molly Shaffer
COZEN O'CONNOR
2001 M Street, N.W.
Suite 500
Washington, D.C. 20036
(Tel) 202.280.6528
(Fax) 202.861.1905
czdebski@cozen.com
mshaffer@cozen.com

*/s/ Russell M. Blau*
Russell M. Blau
Thomas J. Garrity, III
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel: 202-739-3000
russell.blau@morganlewis.com
thomas.garrity@morganlewis.com

*Counsel to LTS Systems, LLC
and LTS Systems II, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2025, I caused a copy of the foregoing Petition for Reconsideration to be served on the following by electronic filing, hand delivery, U.S. mail or electronic mail (as indicated):

Marlene H. Dortch, Secretary
Federal Communications Commission
9050 Junction Drive
Annapolis Junction, MD 20701
(Via ICFS)

*/s/ Charles A. Zdebski*
Charles A. Zdebski